# 2025-1371

In The
# United States Court of Appeals
## For The Federal Circuit

**THE NIELSEN COMPANY (US), LLC,**

*Appellant*,

v.

**TVISION INSIGHTS, INC.,**

*Appellee.*

APPEAL FROM UNITED STATES PATENT AND TRADEMARK OFFICE

## JOINT APPENDIX


**Clifford T. Brazen**
**Jennifer C. Bailey**
**ERISE IP, P.A.**
**7015 College Boulevard**
**Suite 700**
**Overland Park, KS 66211**
**(913) 777-5600**

*Counsel for Appellant*

**Harper Batts**
**Jeffrey Liang**
**Christopher Scott Ponder**
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
**1540 El Camino Real**
**Suite 120**
**Menlo Park, CA 94025**
**(650) 815-2600**

*Counsel for Appellee*

**JOINT APPENDIX - 2025-1371**


| # | PTAB # | Document | Date | Appendix No. |
|---|---|---|---|---|
| 01 | 34 | Final Written Decision IPR2023-01014 | 1/6/2025 | Appx 0001 |
| 02 | | EX1001- U.S. Patent No. 11,470,243 (“the ’243 Patent”) | N/A | Appx 0095 |
| 03 | | Certified List-IPR2023-01014 | 2/26/2025 | Appx 0112 |
| 04 | 2 | Petition for Inter Partes Review | 6/16/2023 | Appx 0215 |
| 06 | | EX1003 - Declaration of Dr. David Scott Doermann | 6/16/2023 | Appx 0667 |
| 07 | | EX1004 - U.S. Patent Application Publication No. 2002/0059577 (“Lu-577”) | 6/16/2023 | Appx 0934 |
| 08 | | EX1005 - Ying-li Tian, Evaluation of Face Resolution for Expression Analysis, 2004 | 6/16/2023 | Appx 0955 |
| 09 | | EX1006 - U.S. Patent Application Publication No. 2010/0274372 (“Nielsen-372”) | 6/16/2023 | Appx 0962 |
| 10 | | EX1007 - U.S. Patent Application Publication No. 2010/0066822 (“Steinberg”) | 6/16/2023 | Appx 1009 |
| 11 | | EX1008 - U.S. Patent No. 4,858,000(“Lu-000”) | 6/16/2023 | Appx 1066 |
| 16 | | EX1013 - Robust Face Detection At Video Frame Rate Base on Edge Orientation Features | 6/16/2023 | Appx 1131 |
| 17 | | EX1014 - U.S. Patent No. 7,315,631 | 6/16/2023 | Appx 1137 |
| 18 | | EX1015 - European Patent Application No. 0932114 | 6/16/2023 | Appx 1151 |
| 19 | | EX1016 - Erik Larson, Watching Americans Watch TV | 6/16/2023 | Appx 1172 |
| 27 | | EX1024 - Facial Recognition Vendor Test 2000, Evaluation Report | 6/16/2023 | Appx 1378 |
| 30 | | EX1027 - Face Image Resolution versus Face Recognition Performance | 6/16/2023 | Appx 1413 |
| 32 | 6 | Patent Owner’s Preliminary Response | 10/11/2023 | Appx 1436 |
| 33 | | EX2001 - Declaration of Dr. Eli Saber | 10/11/2023 | Appx 1515 |
| 51 | 10 | Decision – Institution of Inter Partes Review | 1/8/2024 | Appx 1921 |
| 55 | 17 | Patent Owner’s Response | 5/1/2024 | Appx 2000 |
| 61 | | EX2020 - Supplemental Declaration of Dr. Eli Saber | 5/1/2024 | Appx 2365 |
| 80 | 22 | Petitioner’s Reply to Patent Owner’s Response | 7/24/2024 | Appx 2758 |
| 81 | | EX1031 - Comprehensive Database for Facial Expression Analysis | 7/24/2024 | Appx 2790 |
| 83 | | EX1033 - Deposition Transcript of Dr. Saber | 7/24/2024 | Appx 2880 |
| 84 | | EX1034 - Reply Declaration of Dr. Doermann | 7/24/2024 | Appx 3105 |

| # | PTAB # | Document | Date | Appendix No. |
|---|---|---|---|---|
| 91 | 28 | Patent Owner’s Sur-Reply to Petitioner’s Reply | 9/4/2024 | Appx 3165 |
| 95 | 33 | Oral Hearing Transcript | 11/15/2024 | Appx 3304 |

Trials@uspto.gov
571-272-7822

Paper 34
Date: January 6, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

TVISION INSIGHTS, INC.,
Petitioner,

v.

THE NIELSEN COMPANY (US), LLC,
Patent Owner.

---

IPR2023-01014
Patent 11,470,243 B2

---

Before TERRENCE W. McMILLIN, JOHN A. HUDALLA, and GARTH D. BAER, *Administrative Patent Judges*.

McMILLIN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

# I. INTRODUCTION

## *A. Background and Summary*

TVision Insights, Inc. ("Petitioner")[1] filed a Petition for *inter partes* review of claims 1, 4–6, 8, 9, 11–14, 16, and 18–20 of U.S. Patent No. 11,470,243 B2 (Ex. 1001, "the '243 patent"). Paper 2 ("Pet."), 3. The Nielsen Company (US), LLC ("Patent Owner")[2] filed a Preliminary Response. Paper 6 ("Preliminary Response" or "Prelim. Resp."). In the Preliminary Response, Patent Owner provided notice that it has filed a statutory disclaimer for independent claims 1, 9, and 16 of the '243 patent and thus claims 4–6, 8, 11–14, and 18–20 (the "challenged claims") are the only claims at issue. Prelim. Resp. 1–2 (citing Ex. 2002 (Request for Statutory Disclaimer)). With our authorization, Petitioner filed a Reply to Patent Owner's Preliminary Response (Paper 7) and Patent Owner filed a preliminary Sur-reply (Paper 9) to address the issue of discretionary denial. Taking into account the arguments and evidence presented in these papers, we determined that Petitioner's challenges to the claims were compelling because it was highly likely that Petitioner would prevail with respect to challenging at least one of claims 4–6, 8, 11–14, and 18–20 of the '243 patent as unpatentable. Paper 10 ("Institution Decision" or "Inst. Dec."), 52. Pursuant to 35 U.S.C. § 314, we instituted this *inter partes* review. *Id.* at 53.

---

[1] Petitioner identifies "TVision Insights, Inc." as the real party-in-interest to this proceeding. Pet. 89.

[2] Patent Owner identifies "The Nielsen Company (US), LLC" as the real party-in-interest to this proceeding. Paper 3, 2. Patent Owner states that "it is a subsidiary, either directly or indirectly, of numerous parent entities, and that Brookfield Corporation (NYSE: BN; TSX: BN.TO), through its subsidiaries and investment funds and vehicles, indirectly owns 10% or more of Patent Owner The Nielsen Company (US), LLC." *Id.*

During trial, Patent Owner filed a Response (Paper 17, "PO Resp."), Petitioner filed a Reply to the Response (Paper 22, "Pet. Reply"), and Patent Owner filed a Sur-reply to the Reply (Paper 28, "PO Sur-reply"). An oral argument was held and a transcript of the oral argument is included in the record. Paper 33 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6. This decision is a Final Written Decision under 35 U.S.C. § 318(a) as to the patentability of claims 4–6, 8, 11–14, and 18–20 of the '243 patent. For the reasons we identify below, we hold that Petitioner has demonstrated by a preponderance of the evidence that claims 4–6, 8, 11–14, and 18–20 of the '243 patent are unpatentable.

### *B. Patent Owner's Disclaimer of Claims 1, 9, and 16*

As indicated above, Patent Owner filed a statutory disclaimer of claims 1, 9, and 16 of the '243 patent. *See* Ex. 2002. In view of Patent Owner's statutory disclaimer, we treat claims 1, 9, and 16 as having never been part of the '243 patent. *See Vectra Fitness, Inc. v. TNWK Corp.*, 162 F.3d 1379, 1383 (Fed. Cir. 1998) ("This court has interpreted the term 'considered as part of the original patent' in [35 U.S.C. §] 253 to mean that the patent is treated as though the disclaimed claims never existed.") (citing *Guinn v. Kopf*, 96 F.3d 1419, 1422 (Fed. Cir. 1996)). And, because no *inter partes* review can be instituted based on disclaimed claims, we do not consider claims 1, 9, and 16 to be within the scope of this proceeding. *See* 37 C.F.R. § 42.107(e) ("No *inter partes* review will be instituted based on disclaimed claims"); *see also General Elec. Co. v. United Techs. Corp.*, IPR2017-00491, Paper 9 (PTAB July 6, 2017) (precedential) (denying institution of *inter partes* review in view of a statutory disclaimer of all

challenged claims). Thus, this Final Written Decision relates to claims 4–6, 8, 11–14, and 18–20 (the challenged claims of the '243 patent that have not been disclaimed).

### *C. Related Proceeding*

The parties identify the following district court matter related to the '243 patent: *The Nielsen Company (US), LLC v. TVision Insights, Inc.*, 1:22-cv-01345 (D. Del.). Pet. 89; Paper 3, 2.

### *D. The '243 Patent (Ex. 1001)*

The '243 patent is titled "Method and Apparatus to Capture Images." Ex. 1001, code (54). The '243 patent relates to audience measurement that includes methods and apparatus "to obtain exposure data for media exposure environment(s)" using "processor circuitry to determine audience information and content identifying data," in which the audience information includes captured images. *Id.* at code (57), 1:37–39. The '243 patent explains that audience measurement of media content such as broadcast television often involves collection of content identifying data and people data which can be combined to generate media exposure data. *Id.* at 1:43–55. The number of people exposed to media content can be calculated by measurement systems that capture a series of images and such information is used to provide "ratings data." *Id.* at 1:56–67. Techniques for identification by audience measurement systems include facial recognition. *Id.* at 1:67–2:3. Although facial recognition increases the accuracy of identification, the high resolution from such techniques require illumination sources that in turn require "a significant power drain" while the illumination sources can

also be annoying to the audience.[3] *Id.* at 2:42–56, 3:4–21. The '243 patent asserts there is a need to reduce or eliminate such "annoying aspects of the system." *Id.* at 3:24–30. The '243 patent purports to do this by providing methods and apparatus that require lower resolution for "the frames captured without the use of the illumination sources" such that "those frames will not be subjected to processing that requires high-resolution data." *Id.* at 3:57–62.

Figure 1, reproduced below, illustrates an exposure environment that is used by an audience measurement system in accordance with the '243 patent. *Id.* at 2:7–9.




FIG. 1

Figure 1 depicts media exposure environment 100 that includes media presentation device 102, audience measurement device 104, and audience 106. *Id.* at 4:52–56. Media exposure environment 100 "is a room of a

[3] The challenged claims make no reference to illumination sources or any similar subject matter. Non-challenged claims 24 and 25, which indirectly depend from non-challenged independent claim 22, relate to selective use of an illumination source. Ex. 1001, 18:43–50.

household that has been statistically selected to develop television ratings data," media presentation device 102 is a television that is coupled to a set-top box (STB) 108, and audience measurement device 104 utilizes camera 110 to capture time stamped frames of image data of environment 100. *Id.* 4:56–5:11.

Figure 2, reproduced below, is a block diagram that shows implementation of the audience measurement device in accordance with the '243 patent. *Id.* at 2:10–11.




**FIG. 2**

Figure 2 depicts audience measurement device 104 which includes audience detector 200 and content identifier 202. *Id.* at 5:29–33. Audience detector 200 includes image sensor 204, people counter 206, person identifier 207, time stamper 208, and memory 210. *Id.* at 5:33–35. Image sensor 204 captures frames of image data of media exposure environment 100 from Figure 1 that are then conveyed to people counter 206, which can recognize

a general shape of a human body. *Id.* at 5:35–6:2. Some frames are conveyed to person identifier 207 for a facial recognition procedure. *Id.* at 6:3–44. People counter 206 and person identifier 207 output calculated tallies or frames to time stamper 208, and together with clock and calendar data, are stored in memory 210. *Id.* at 6:45–67. Content identifier 202 includes program detector 212 and output device 214. *Id.* at 7:1–2. Program detector 212 detects and collects the presentation of media content from STB 108 of Figure 1 and output device 214 exports recorded data received from memory 210 to a data collection facility, via a network, for further data analysis. *Id.* at 7:2–8:6. Program detector 212 "can collect a signature representative of a portion of the media content" such as "a frequency spectrum of an audio signal" that "can be compared against a collection of signatures of known media content to identify the corresponding media content." *Id.* at 7:29–34. Identification information of the media content is time stamped by time stamper 208 and is then stored in memory 210. *Id.* at 7:38–41.

The '243 patent discloses that in a second mode or a minority mode, image sensor 204 obtains high-resolution image data of frames that are used for a facial recognition process. *Id.* at 8:55–60. However, in a first mode or a majority mode, frames are designated by resolution determiner 300 from image sensor 204 which are captured while illuminator 306 of image sensor 204 is inactive in which "the contrast level is likely to be too low for proper analysis" by people counter 206. *Id.* at 10:58–67, Fig. 3. Consequently, resolution determiner 300 routes low-contrast frames to pixel binner 312. *Id.* at 10:67–11:4, Fig. 3. Pixel binner 312 thereafter "enhances the dark, low-contrast images generated in the majority mode for processing that does

not require high-resolution image data" for the people counting process by people counter 206." *Id.* at 11:19–29, Fig. 3. The '243 patent also discloses that image sensor 204 includes image capturer 308 that conveys frames captured in the minority mode for storage in frame cache 303 that "are used by the example hi-res trigger 302 to identify heads and/or faces in the environment that, due to their orientation, may be identifiable by the person identifier 207." *Id.* at 10:31–38, Fig. 3; *see also id.* at 9:18–22.

### *E. Challenged Claims*

Petitioner challenges claims 4–6, 8, 11–14, and 18–20 of the '243 patent.[4] Pet. 3. Disclaimed claim 1 from which challenged claims 4–6 and 8, directly or indirectly, depend, and disclaimed claim 9 from which challenged claims 11–14, directly or indirectly, depend, are independent system claims. Ex. 1001, 15:13–42, 16:21–43. Disclaimed claim 16 from which challenged claims 18–20, directly or indirectly, depend is an independent method claim. *Id.* at 17:15–36. Claims 1 and 4 recite:

> 1. An audience measurement system to obtain exposure data for a media exposure environment,
> the audience measurement system comprising:
> memory;
> machine readable instructions; and
> processor circuitry to execute the machine readable instructions to:
> generate an audio signature of media content presented by a television within the media exposure environment;

[4] The '234 patent as issued had 29 claims. Ex. 1001, 15:13–19:7. Petitioner does not challenge claims 2, 3, 7, 10, 15, 17, and 21–29 of the '234 patent. *See, e.g.*, Pet. 3. As indicated above, Patent Owner filed a statutory disclaimer for independent claims 1, 9, and 16 of the '243 patent. *See* Ex. 2002.

obtain content identifying data corresponding to the presented media content, the content identifying data based on the audio signature of the media content presented by the television within the media exposure environment;
analyze a sequence of images of the media exposure environment to detect a head appearing in one or more of the images, the sequence of images obtained by a camera while the media content corresponding to the content identifying data is presented by the television;
determine an orientation of the head with respect to the camera; and
determine audience identification information based on a match of the head to a known person associated with the media exposure environment; and
network interface circuitry to output a signal indicative of the content identifying data and the audience identification information to a data collection facility.

4. The audience measurement system of claim 1, wherein the processor circuitry is to:
**reduce a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image**, and
determine the orientation of the head with respect to the camera based on the reduced-resolution image.

*Id.* at 15:13–42, 15:54–60 (emphasis added). Given the dependencies of the challenged claims, we construe all the challenged claims as containing the limitation reciting "reduce a resolution," which is the focus of many of the Patent Owner's arguments.

### *E. The Instituted Grounds*

In the Petition, Petitioner challenges claims 1, 4–6, 8, 9, 11–14, 16, and 18–20 of the '243 patent based on the grounds set forth in the table below.

| Claims Challenged | 35 U.S.C. § | Reference(s)/Basis[5] |
|---|---|---|
| 1, 4–6, 8, 9, 11, 14, 16, 18–20 | 103[6] | Lu-577,[7] Tian[8] |
| 1, 4–6, 8, 9, 11, 14, 16, 18–20 | 103 | Nielsen-372,[9] Steinberg,[10] Tian |

Pet. 3.

Petitioner supports its showing of unpatentability of the challenged claims of the '243 patent with the Declaration of David Scott Doermann, Ph.D. (Ex. 1003). Patent Owner relies on the Declaration of Eli Saber, Ph.D. (Ex. 2001).

---

[5] Petitioner contends that the cited art qualifies as prior art under applicable law. *See* Pet. 4–6. Patent Owner does not dispute the prior art status of the cited art. *See generally* PO Resp. Pursuant to our independent analysis as set forth in this decision, we determine that the cited art qualifies as prior art.

[6] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011) ("AIA"), amended 35 U.S.C. § 103, was effective on March 16, 2013. The application for the '243 patent was filed on May 23, 2022, and claims priority via a series of continuation applications to the filing date of a nonprovisional application filed on Dec. 15, 2011. Ex. 1001, codes (22), (63), 1:6–32. Because the date of the priority claim is before the effective date of the applicable AIA amendment, the pre-AIA version of § 103 applies for purposes of institution.

[7] US 2002/0059577 A1, published May 16, 2002; filed July 19, 2001 (Ex. 1004).

[8] Ying-li Tian, *Evaluation of Face Resolution for Expression Analysis*, 2004 IEEE Computer Society Conference on Computer Vision and Pattern Recognition Workshops, Washington, DC, USA, 2004 (Ex. 1005).

[9] US 2010/0274372 A1, published Oct. 28, 2010; filed July 7, 2010; continuation of application No. 11/576,328, filed Mar. 29, 2007, filed as application No. PCT/US2006/031960, filed Aug. 16, 2006 (Ex. 1006).

[10] US 2010/0066822 A1, published Mar. 18, 2010; filed Sept. 4, 2009 (Ex. 1007).

## II. OBVIOUSNESS ANALYSIS

### *A. Principles of Law*

Under 35 U.S.C. § 103(a), "[a] patent claim is unpatentable if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007) (similar language). "[W]hen a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result." *KSR*, 550 U.S. at 416 (citing *United States v. Adams*, 383 U.S. 39, 50–51 (1966)). The question of obviousness involves resolving underlying factual determinations including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and when presented (4) objective evidence of non-obviousness (not presented here). *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). Further, "there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *See KSR*, 550 U.S. at 418.

### *B. Level of Ordinary Skill in the Art*

Petitioner contends that

> [a] POSITA [(Person of Ordinary Skill in The Art)] would have been a person with a bachelor's degree in computer science, electrical engineering, or a similar field with at least two years of experience in media analysis or a person with a master's degree in computer science, electrical engineering, or a similar field with a specialization in media analysis. . . . . A

> person with less education but more relevant practical experience may also meet this standard. . . . . A POSITA in 2011 would have known or been able to implement systems that collect and analyze audio and image data, techniques for audio feature extraction and identification, techniques for image processing (e.g., resolution adjustment), and face or head analysis techniques.

Pet. 7 (citing Ex. 1003 ¶¶ 46–49). Patent Owner does not dispute Petitioner's assessment of the level of ordinary skill. *See generally* PO Resp.

Determining the level of ordinary skill in the art involves various factors, including the "type of problems encountered in the art; prior art solutions to those problems; rapidity with which innovations are made; sophistication of the technology; and educational level of active workers in the field." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citation omitted). The prior art of record also reflects the level of ordinary skill in the art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). We adopt the assessment offered by Petitioner as it is not disputed by the Patent Owner and is consistent with the '243 patent and the asserted prior art.

### *C. Claim Construction*

In *inter partes* reviews, the Board construes claims using the same claim construction standard employed in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b) (2023). The "words of a claim 'are generally given their ordinary and customary meaning,'" as would have been understood by a person of ordinary skill in the art at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582

(Fed. Cir. 1996)). "In determining the meaning of the disputed claim limitation, we look principally to the intrinsic evidence of record, examining the claim language itself, the written description, and the prosecution history, if in evidence." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1014 (Fed. Cir. 2006) (citing *Phillips*, 415 F.3d at 1312–17).

Petitioner puts forth a construction of "media exposure environment." Pet. 8. Patent Owner does not put forth any express claim constructions. *See generally* PO Resp.

No need exists to expressly construe any claim terms to resolve the parties' disputes.[11] *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) ("[W]e need only construe terms 'that are in controversy, and only to the extent necessary to resolve the controversy.'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

*D. Cited Art*

Petitioner relies on the combinations of (1) Lu-577 and Tian and (2) Nielsn-372, Steinberg, and Tian in its challenges to the patentability of claims 4–6, 8, 11–14, and 18–20 of the '243 patent. Pet. 3. Summaries of

---

[11] In the Institution Decision, the Board instructed the parties that "If either party contends that explicit claim construction is necessary in order to make a final determination whether or not any challenged claim is unpatentable based on the arguments and evidence presented, it should clearly explain why during trial and provide a clear and unambiguous construction with supporting evidence including specifically identifying the challenges, claims, and limitations to which the construction is necessary." Inst. Dec. 13–14 n.12. Neither party addressed claim construction after institution of this proceeding.

the disclosures of the cited references and analysis of Patent Owner's argument that Tian and Steinberg are not analogous art are provided below.

*1. Lu-577 (Ex. 1004)*

Lu-577 is titled, "Audience Measurement System for Digital Television." Ex. 1004, code (54). The audience measurement system

> measures viewing of a television program viewed on digital television located in a statistically selected site by (i) retrieving an audience measurement data packet from a television set in order to identify the television program, (ii) detecting an audio code embedded in the television program in order to identify the television program, (iii) extracting an audio signature from the television program in order to identify the television program, (iv) identifying the television program through use of a software agent, and (v) selecting at least one of the retrieving means, the detecting means, the extracting means, and the software agent in order to identify the television program.

*Id.* at code (57). Figure 2 of Lu-577 is reproduced below.

Figure 2



Figure 2 is a schematic block diagram depicting an audio-based tuning measurement system usable with digital or analog broadcasting in accordance to Lu-577. *Id.* ¶ 23. Lu-577 discloses that

> a person identifier 98 may be provided in order to identify the persons watching television programming on the digital television set 66. The person identifier 98 may be [a] video camera, an IR camera, or the like. When such equipment is available in the statistically selected monitoring site 62, the site unit 86 may employ known head location and face recognition software (e.g., as taught by Lu in **U.S. Pat. No. 4,858,000**) for the identification of the viewing persons and for the collection of other demographic data. Similarly, person identifiers may be provided in order to identify the persons watching television programming on the analog television set 70 and on the personal computer 80.

*Id.* ¶ 39 (emphasis added). Lu-000 (U.S. Patent No. 4,858,000 (Ex. 1008)) is incorporated by reference into Lu-557 (Ex. 1004) in paragraph 13 ("[I]t is well known in the audience measurement arts to use computer-based image recognition in order to identify members of a viewing audience. Notable among teachings in this area is that by Lu in U.S. Pat. No. 4,858,000. The teaching of this patent is herein incorporated by reference.").

Lu-577 was filed on July 19, 2001, and was published on May 16, 2002. Ex. 1004, codes (22), (43). The earliest priority date claimed for the '243 patent is December 15, 2011. Ex. 1001, code (63), 1:6–32. Lu-577 is prior art to the '243 patent.

*2. Tian (Ex. 1005)*

Tian is titled, "Evaluation of Face Resolution for Expression Analysis." Ex. 1005, 1. Tian is an article from a journal published by The Institute of Electrical and Electronics Engineers ("IEEE"). *Id.* Tian discloses:

> Most automatic facial expression analysis (AFEA) systems attempt to recognize facial expressions from data collected in a highly controlled environment with very high resolution frontal faces (face regions greater than 200 x 200 pixels). However, in real environments, the face image is often in lower resolution and with head motion. It is unclear [as to] the performance of AFEA systems for low resolution face images. The general approach to AFEA consists of 3 steps: face acquisition, facial feature extraction, and facial expression recognition. This paper explores the effects of different image resolutions for each step of facial expression analysis. The different approaches are compared for face detection, face data extraction and expression recognition. A total of five different resolutions of the head region are studied (288x384, 144x192, 72x96, 36x48, and 18Xx24 [sic]) based on a widely used public database. The lower resolution images are down-sampled from the originals.

*Id.* at 1 (Abstract) (italics and citation omitted). According to Tian, "[i]n order to handle large head motion, head finding, head tracking and pose estimation can be applied to a facial expression analysis system." *Id.* ("1. Introduction"); *see also id.* at 2 ("2.1 Face Acquisition"), 3 ("Geometric Feature Extraction (1) Feature Tracking"). Tian discloses that "[o]ur empirical studies illustrated [the] following conclusions: (1) Head detection and head pose estimation can detect faces in lower resolution than face detectors[;] (2) Appearance feature extraction needs face alignment[;] and (3) There is no difference in the recognition of expression analysis when the head region resolution is 72x96 or higher." *Id.* at 6 ("Conclusion and Discussion").

Petitioner presents a declaration from an IEEE Director that states that Tian was published and made available no later than July 2, 2004. Ex. 1028; *see also* Pet. 5 ("Tian was published by IEEE and publicly available no later than July 2004."). On its face, Tian states, "Proceedings of the 2004 IEEE

Computer Society Conference on Computer Vision and Pattern Recognition (CVPRW'04)." Ex. 1005 (footer on every page). Patent Owner does not dispute this evidence. *See generally* PO Resp. The earliest priority date claimed for the '243 patent is December 15, 2011. Ex. 1001, code (63), 1:6–32. Tian is prior art to the '243 patent.

### 3. *Nielsen-372 (Ex. 1006)*

Nielsen-372 "relates generally to audience measurement." Ex. 1006 ¶ 2. Figure 1 of Nielsen-372 is reproduced below.




FIG. 1

Figure 1 is a block diagram depicting a local metering system coupled to a home entertainment system. *Id.* ¶ 7. Local metering system 100 provides viewing and metering information for program content presented via home entertainment system 102. *Id.* ¶ 36. Home entertainment system 102 includes broadcast source 104, set-top box (STB) 108, signal splitter 116, and display device 120. *Id.* Local metering system 100 includes metering unit 124 and display device ON/OFF detector 128. *Id.* This configuration "may perform the functions of storing data and forwarding the stored data to a central facility for subsequent processing." *Id.* The configuration also

"performs the functions of collecting viewing/metering data, processing such data (possibly in real-time) and sending the processed data to the single home unit for that home." *Id.* Program identifying information is determined and viewing records are generated for the program content that is received and output by STB 108. *Id.* ¶ 44. Metering unit 124 and display device ON/OFF detector 128 include one or more sensors 144 such as a microphone to receive audio signals corresponding to the program that is being displayed. *Id.* Local metering system 100 also includes people meter 162 for capturing information about the audience by receiving information from people meter control device 164. *Id.* ¶ 48. People meter 162 "may prompt the audience members to indicate that they are present in the viewing audience by pressing the appropriate input key on the people meter control device 164." *Id.* STB 108 can "determine whether program content being received and output is also being presented by the monitored display device 120." *Id.* ¶ 49. Device ON/OFF detector is configured to process signals received from sensors 144 which can be an audio sensor, a video sensor, or an emission sensor. *Id.* ¶ 50. The video sensor can be a camera "positioned to detect the display area of the display device 120 or corresponding information presenting device." *Id.*

Nielsen-372 was filed on July 7, 2010, and was published on October 28, 2010. Ex. 1006, codes (22), (43). Nielsen-372 is a continuation of an application filed on March 29, 2007. *Id.* at code (63). The earliest priority date claimed for the '243 patent is December 15, 2011. Ex. 1001, code (63), 1:6–32. Nielsen-372 is prior art to the '243 patent.

*4. Steinberg (Ex. 1007)*

Steinberg is titled, "Classification and Organization of Consumer

Digital Images Using Workflow, and Face Detection and Recognition." Ex. 1007, code (54). Steinberg discloses that

> [a] processor-based system operating according to digitally embedded programming instructions performs a method including identifying a group of pixels corresponding to a face region within digital image data acquired by an image acquisition device. A set of face analysis parameter values is ext[r]acted from said face region, including a faceprint associated with the face region. First and second reference face prints are determined for a person using reference images captured respectively in predetermined face-portrait conditions and using ambient conditions. The faceprints are analyzed to determine a baseline faceprint and a range of variability from the baseline associated with the person. Results of the analyzing are stored and used in subsequent recognition of the person in a subsequent image acquired under ambient conditions.

*Id.* at code (57) (Abstract).

Steinberg was filed on September 4, 2009, and was published on March 18, 2010. Ex. 1007, codes (22), (43). The earliest priority date claimed for the '243 patent is December 15, 2011. Ex. 1001, code (63), 1:6–32. Steinberg is prior art to the '243 patent.

#### 5. *Analysis of Patent Owner's Argument That Tian and Steinberg Are Not Analogous Art*

Patent Owner argues that Tian and Steinberg are not analogous art. PO Resp. 59–63. Patent Owner's Response states, "All of Petitioner's modifications of the primary references across all grounds share a common, fatal flaw: none of Petitioner's secondary references are analogous art." *Id.* at 59. The two criteria for evaluating whether a reference is sufficiently analogous to the invention are: "(1) whether the art is from the same field of endeavor, regardless of the problem addressed, and (2) if the reference is not

within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved." *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992); *see also* PO Resp. 59 (citing *Netflix v. DivX*, 80 F.4th 1352, 1358 (Fed. Cir. 2023)).

We find that Tian and Steinberg are, at the very least, reasonably pertinent to the particular problem with which the inventor of the '243 patent is involved.[12] In the '243 patent, the "Field of the Disclosure," states that it "relates generally to audience measurement" but, "more particularly, to methods and apparatus to capture images." Ex. 1001, 1:36–38. The problem purported to be addressed by the '243 patent is discussed in the Specification at column 3, line 4, through column 4, line 51. The '243 patent describes problems related to "[f]requent activation of the illumination sources when capturing image data." *Id.* at 3:4–5. Among the identified problems are: "significant power drain for the audience measurement system" (*id.* at 3:5–6), "shorten[ed] lifetime of the illumination source" (*id.* at 3:8), "significant amounts of heat generated by the illumination sources" (*id.* at 3:9–10), and "light emissions of the illumination source ha[ving] the potential to annoy people" (*id.* at 3:12–13). The '243 patent purports to address these problems by "reserv[ing] use of an illumination source of a high-resolution image sensor for frames of image data designated for processing that requires high resolution image data . . . e.g., when the corresponding frame will not be subjected to facial recognition." *Id.* at 3:31–47. In order to "enhance resulting images to compensate for low light levels and loss of contrast due to lack of

[12] We need not and do not decide whether Tian and Steinberg are within the same field of endeavor as the '243 patent.

illumination," in an example, the '243 patent discloses "employ[ing] a pixel binning procedure on the image data captured without use of the illumination source." *Id.* at 3:49–53. "Binning is the process of summing pixel values in a neighborhood of pixels (e.g., a 2x2, 3x3, 4x4, etc. area) thereby capturing more light per pixel at the cost of lower resolution."[13] *Id.* at 3:54–56.

Patent Owner describes challenged claims 4, 11, and 18[14] as "teach[ing] a specific process of reducing the resolution of images as part of the overall system or method. The specification describes how the image sensor of the device reducing the resolution enhances the contrast and allows a low-light frame to trigger illumination for a succeeding frame—thus enabling the advantage of the invention." PO Resp. 4 (citing Ex. 1001,

---

[13] Pixel binning is the only procedure described in the '243 patent for reducing the resolution of an image. *See* Ex. 1001, 10:58–11:36. The description of pixel binning states:

> The example pixel binner 312 of FIG. 3 receives high-resolution frames of image data from the frame router 310 that are likely to be of low contrast levels due to the illuminator 306 being inactive during capture of the frames. The example pixel binner 312 of FIG. 3 performs a binning procedure on the received frames. . . . After the pixel procedure performed by the example pixel binner 312 of FIG. 3, the frames are of lower resolution (e.g.., in comparison with the original format of the frame as captured by the high-resolution camera of the image capturer 308) but may also have higher contrast levels.

*Id.* at 11:5–24.

[14] The remaining challenged claims (claims 5, 6, 8, 12–14, 19, 20) directly or indirectly depend from claims 4, 11, and 18 and by virtue of their dependency are construed to incorporate the limitations of claims 4, 11, and 18. *See* 35 U.S.C. § 112 ¶ 4 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers.").

11:5–36). The Patent Owner's expert declarant, Dr. Saber,[15] offers this explanation of the invention recited in claims 4, 11, and 18:

> The '243 Patent thus discloses and claims (in claims 4, 11, and 18) determining the orientation of the heads in the captured images based on a reduced resolution image. The step of determining the head orientation based on the reduced-resolution image then allows for analyzing images captured in low light to determine when to activate the illumination source for images that will undergo facial recognition. All of the challenged dependent claims include a limitation reciting "determin[ing] the orientation of the head with respect to the camera." *'243 Patent*, claims 4, 11, 18. . . . the determination of the head orientations provides an improvement to the audience measurement system, i.e., improving the analysis of images captured in low light by performing head orientation determination on reduced-resolution images and determining the head orientation in order to perform the selective illumination of images designated to undergo facial recognition.

Ex. 2001 ¶ 33 (footnote noting that the remaining challenged claims incorporate the limitations of claims 4, 11, and 18 omitted) (first alteration in original). And, Dr. Saber testified that "the '243 patent is obviously doing . . . face recognition." Ex. 1033, 16:21–22.

---

[15] Patent Owner's reliance on the testimony of an expert witness who specializes in media analysis also belies its argument that the analogous art does not include media analysis. It seems reasonable to assume that Patent Owner's expert was chosen for his experience in the field of the '243 patent and because his expertise relates to analogous art. Dr. Saber, Patent Owner's expert, agreed with Dr. Doermann, Petitioner's expert, that a person of ordinary skill in the art (POSITA) would have at least two years of experience in media analysis and a specialization in media analysis. Ex. 2001 ¶¶ 26–27; *see also* Pet. 7 (citing Ex. 1003 ¶¶ 46–48). Dr. Saber, Patent Owner's declarant, testified that he had no experience in audience measurement. Ex. 1033, 23:2–9.

Petitioner relies on Tian for its "teachings about improving facial analysis." Tr. 6:1–2. Patent Owner states that the goal of Tian is "'to help understand [the] question: how do we recognize facial expressions in real life" (PO Resp. 61 (quoting Ex. 1005, 6) (alteration in original)) and that "[t]o achieve this goal, Tian examines images at different resolutions to determine the effects of resolution on the ability to identify facial expressions" (*id.*). Patent Owner also quotes the Abstract of Tian which states: "[t]his paper explores the effects of different image resolutions for each step of facial expression analysis." *Id.* (quoting Ex. 1005, 1).

Steinberg states that "[t]he invention relates to digital image processing." Ex. 1007 ¶ 3. Petitioner relies on Steinberg for its "face detection and face recognition teachings." Tr. 6:4–5. With regard to Steinberg, Patent Owner's Preliminary Response states that, "Steinberg (Ex. 1007) describes a system for performing facial recognition to organize an image collection" and "[t]he system includes face detection module that determines if a face is in an image." Prelim. Resp. 48 (citing Ex. 1007 ¶¶ 90, 118).

We find that Tian and Steinberg are reasonably pertinent to the problem to which the '243 patent is directed. The '243 patent, Tian, and Steinberg are each directed to problems in image processing and, particularly, to problems in facial detection and analysis. Thus, we determine that Tian and Steinberg qualify as analogous art to the '243 patent.

### *E. Asserted Obviousness of Claims 4–6, 8, 11–14, and 18–20 Based on Lu-577 and Tian*

Petitioner challenges claims 4–6, 8, 11–14, and 18–20 as being obvious over Lu-577 and Tian. *See* Pet. 8–43. The Petition provides an

element-by-element analysis to show that the limitations recited in dependent claims 4, 11, and 18, including the limitations recited in disclaimed independent claims 1, 9, and 16 that are incorporated by dependency, are taught by the cited art. *See id.* at 12–27 (claims 1 and 4), 32–37 (claims 9 and 11), 38–42 (claims 16 and 18). With regard to all the challenged claims, Patent Owner argues that Tian does not teach "*reduc[ing] a resolution of a first image*" (PO Resp. 3–13) and Patent Owner also disputes the showing as to motivation to combine the cited references. *Id.* at 17–44. With regard to claims 5, 6, 12, and 19, Patent Owner argues that these claims require a two-frame process for facial recognition and Tian is a single-frame process. *Id.* at 13–17.

*1. Claims 4, 11, and 18*

Claims 4, 11, and 18 are similar in that each of these claims includes limitations directed to reducing the resolution of an image and determining the orientation of a head with respect to a camera based on the reduced-resolution image. *See* Ex. 1001, 15:54–60, 16:47–53, 17:40–47. But there are differences in these dependent claims (*see id.*)[16] and in the independent

[16] Challenged claim 4 depends from disclaimed claim 1 and challenged claim 11 depends from disclaimed claim 9. Ex. 1001, 15:53–60 (claim 4), 16:47–53 (claim 11). Method claims 4 and 11 differ in their preambles and in that claim 4 recites "reduce a resolution of a first image of the one or more of the images . . ." whereas claim 11 recites "reduce a resolution of the first image . . ." *Id.* Challenged claim 18 depends from disclaimed claim 16. *Id.* at 17:40–47. Method claim 18 is similar to claims 4 and 11. In place of "reduce a resolution" as recited in claims 4 and 11, claim 18 recites "reducing a resolution of the first image." In place of "determine the orientation of the head with respect to the camera based on the reduced-resolution image" as recited in claims 4 and 11, claim 18 recites, "wherein the determining the orientation of the head includes determining the

claims (1, 9, and 16) that recite limitations that claims 4, 11, and 18 incorporate based on the dependency (*see id.* at 15:13–42, 16:21–43, 17:15–36). 35 U.S.C. § 112 ¶ 4 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."). The parties largely ignore these differences and we shall only discuss them as necessary to our analysis of the contentions, arguments, and evidence presented by the parties. We focus our analysis on claim 4 of the '243 patent (as do the parties), but our analysis is equally applicable to similar claims 11 and 18.

Each of dependent claims 4, 11, and 18 of the '243 patent contains two additional limitations beyond the limitations recited in disclaimed independent claims 1, 9, and 16 from which they directly depend. Ex. 1001, 15:53–60, 16:47–53, 17:40–47. The first additional limitation in claim 4 is "*reduce a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image*." *Id.* at 15:56–58 (referred to herein as "the 'reduce the resolution' limitation"). The second additional limitation in claim 4 is "*determine the orientation of the head with respect to the camera based on the reduced-resolution image*." *Id.* at 15:59–60 (referred to herein as "the 'determine the orientation of the head' limitation"). These limitations relate to the recitation in claim 1 from which claim 4 depends of "*[a]n audience measurement system . . . comprising . . . processor circuitry to execute . . . machine readable instructions to . . . analyze a sequence of images of the media exposure environment to detect a head appearing in one or more of the images . . .*

---

orientation of the head with respect to the camera using the reduced-resolution image."

*[and] determine an orientation of the head with respect to the camera.*" *Id.* at 15:13–42.

#### a. *The "Reduce the Resolution" Limitation*

With regard to the "reduce the resolution" limitation, the Petition states:

> The combination teaches [this] limitation . . . Ex-1003, ¶¶117-120. Tian describes "the effects of different image resolutions" for facial analysis. Ex-1005, Abstract; 000002; Ex-1003, ¶118. Tian creates lower-resolution images by down-sampling from original images. Ex-1005, 000002 ("The lower resolution images are down-sampled from the originals."), Abstract; Ex-1003, ¶119.

Pet. 26.[17] Patent Owner argues that "*Tian* does not teach actually reducing the resolution of the images." PO Resp. 3. In the Response, Patent Owner argues that "*Tian* discloses a pre-existing 'public database' of images that 'are down-sampled' versions of the original images." *Id.* at 3–4. In the Sur-reply, Patent Owner argues that "Tian's teachings are ambiguous and "Petitioner has not met its burden by a preponderance of the evidence" on the issue of whether Tian teaches resolution reduction. PO Sur-reply 1. After reviewing Patent Owner's arguments and the evidence of record, we find Tian teaches reducing the resolution of the images and reject Patent Owner's contrary argument.

In the Abstract, Tian states that "A total of five different resolutions of the head region are studied (288x384, 144x192, 72x96, 36x48, and 18Xx24

---

[17] With regard to the similar "reduce the resolution" limitations in claims 11 and 18, Petitioner relies on its showing for claim 4. *See* Pet. 36, 42. Patent Owner acknowledges that "Challenged Claims 4, 11, and 18 recite similar limitations for processing circuitry, a device, or a method step to '*reduce a resolution of a first image.*'" PO Resp. 3.

[sic]) based on a widely used public database [16][18]. The lower resolution images are down-sampled from the originals." Ex. 1005, 1 (footnote omitted). Tian includes Table 1 with descriptive text, reproduced below.

Table 1: An example in five different resolutions from Cohn-Kanade database. The head region is cropped for display purpose only. The lower resolution images are down-sampled from the originals.



| | | | | |
|---|---|---|---|---|
| 288x384 (Original) | 144x192 | 72x96 | 36x48 | 18x24 |

*Id.* at 2. With regard to this table, Tian states "As shown in Table 1, total five different resolutions of the head region are studied (288x384, 144x192, 72x96, 36x48, and l8x24) based on Cohn-Kanade AU-Coded Face Expression Image Database. The lower resolution images are down-sampled from the originals." *Id.* (footnote omitted). Tian also states:

> The DFAT subset of Cohn-Kanade expression database is used for our experiments. The database contains 704 image sequences from 97 subjects. Subjects sat directly in front of the camera and performed a series of facial behaviors which were recorded in an observation room. Image sequences with in-plane and limited out-of-plane motion were included. The image sequences began with a neutral face and were digitized into 640x480 pixel arrays with either 8-bit gray-scale values. The length of the image sequences are varying from 9 to 47

[18] The bracketed number 16 is in the original here and elsewhere in Tian as a cite to "T. Kanade, J. Cohn, and Y. Tian. Comprehensive database for facial expression analysis. In *Proceedings of International Conference on Face and Gesture Recognition,* pages 46–53, March, 2000." *See* Ex. 1005, 7. This paper is cited 5 times in Tian. *Id.* at 1, 2, 5 (cited twice), 6. This paper has been entered into the record as Exhibit 1031.

> frames. The size of head region is about 280 x 380 pixels. More details about the database can be found at paper [16].

*Id.* at 5 (footnotes omitted).

The stated purpose of Tian as stated in the title is "Evaluation of Face Resolution . . ." and in the abstract is "explor[ing] the effects of different image resolutions . . . ." Ex. 1005, 1; *see also id.* at 2 ("In this paper, we investigate the effects of different image resolutions . . ." and at 5 ("In this paper we have presented an experimental evaluation of different face resolutions . . ."). Importantly, Patent Owner does not dispute that Tian teaches that lower resolution images are down-sampled from the originals and that down-sampling is a method of reducing image resolution. Thus, we find that Tian addresses the use of different image resolutions and does disclose a method of reducing the resolution of an image, i.e., down-sampling.[19]

Patent Owner's argument relating to Tian is contradicted by Tian itself. In the section of Tian describing the database,[20] all the images in the

[19] The Petition also states that "[b]y [the priority date claimed for the '243 patent], techniques (e.g., subsampling, interpolation) for obtaining reduced-resolution images were widely known." Pet. 2 (citing Ex. 1003 (Doermann Decl.) ¶ 15). Patent Owner does not challenge this statement. *See generally* PO Resp. The only technique for reducing resolution of an image discussed in the '243 patent is binning pixels. *See* Ex. 1001, 11:5–36 ("Binning is a process in which a neighborhood of pixels (e.g., a first pixel and a number of adjacent pixels) is summed together . . . to assign more light per orthogonal block of pixels at the cost of lower resolution."). In paragraph 15 of the Declaration of Dr. Doermann cited in the Petition, it states that "binning pixels" is among the techniques for obtaining reduced-resolution images that were widely known.

[20] We consider this section of Tian to be the most pertinent passage in Tian and the most relevant evidence in the record related to this argument.

Cohn-Kanade database are described as having a single, uniform resolution ("640x480 pixel arrays") and the resolution of the head or face region in all of the images is described as being of a single, uniform resolution ("about 280x380 pixels"). Ex. 1005, 5. Tian calls the single, uniform face resolution ("288x384") the "Original" resolution. (*id.* at 2 (Table 1), 5 (Table 3)). Considering Tian as a whole and particularly its description of the database from which its images were obtained, we find Tian teaches obtaining images from a database and reducing the resolution of such images by down-sampling.

This finding is supported by additional evidence. Petitioner presents evidence that the cited Cohn-Kanade database contains images at a single, uniform resolution, but not the reduced resolution images. Pet. Reply 7–8 (citing Ex. 1031, 6; Ex. 1034 ¶¶ 2–4). As noted in footnote 18 *supra*, Exhibit 1031 is a paper cited five times in Tian[21] that is titled "Comprehensive Database for Facial Expression Analysis." This paper states that "[i]mage sequences for frontal views were digitized into either 640x490 or 640x480 pixel arrays" and makes no reference to reduced-resolution images.[22] Ex. 1031, 6; *see also* Pet. Reply 7. Dr. Doermann, Petitioner's declarant, testified that he obtained a copy of the database cited in Tian and confirmed that the database contains only images at a single, uniform resolution and not reduced resolution images. Ex. 1034 ¶ 4.

---

[21] It appears that Exhibit 1031 and Tian (Exhibit 1005) share a common author. One of the authors of Exhibit 1031 is Yingli Tian (Ex. 1031, 1) and the author of Tian is Ying-li Tian (Ex. 1005, 1).

[22] Exhibit 1031 even suggests down-sampling the database images to obtain reduced resolution images. Ex. 1031, 6 ("The image data may be transformed or down-sampled to examine the effects of reduced resolution . . .").

Dr. Doermann testified:

> I obtained a copy of the Cohn-Kanade database. I was previously familiar with the dataset while at the University of Maryland but no longer had access. Dr. Jeffrey Cohn lists the database on his personal website (https://www.jeffcohn.net/Resources/) under Databases, and provides an agreement form for its use. As instructed, I provided the form as a faculty member at the University at Buffalo, and received instructions to download it. The source and website from which I obtained the Cohn-Kanade database indicate that any reference to the database should include the citation "Kanade, T., Cohn, J. F., & Tian, Y. (2000). Comprehensive database for facial expression analysis. Proceedings of the Fourth IEEE International Conference on Automatic Face and Gesture Recognition (FG'00), Grenoble, France, 46-53." Tian cites this paper as a reference [16] and states that "[m]ore details about the [Cohn-Kanade] database can be found at paper [16]." Ex-1005, 000005, 07. I reviewed the Cohn-Kanade database and determined that images in the database have resolutions of 640x480 or 640x490. I did not find reduced-resolution images in the database. This is consistent with my reading of Tian and my recollection about the Cohn-Kanade database, which I encountered in earlier research. My review of the Cohn-Kanade database confirms my understanding that Tian obtains original images from this database and creates reduced-resolution images by down-sampling.

*Id.* (alterations in original). Petitioner's evidence about the single resolution images in the Cohn-Kanade database tends to support that an ordinarily skilled artisan would have known that Tian teaches reducing the resolution of original images to obtain the "down-sampled" images.

Patent Owner argues:

> Intentionally reducing the resolution of images prior to facial analysis is novel. This is why the *Tian* mapping fails. Tian suggests that conventional approaches rely on performing "facial analysis" on "very high resolution faces[.]" *Tian's*

> investigation shows the highest accuracy for both face detection and head-pose estimation with full resolution images.

PO Resp. 18 (citing Ex. 1005, Table 3) (alteration in original). We reject this argument. Tian indisputably teaches reducing the resolution of images prior to facial analysis. *See* Pet. Reply 15 ("The challenged claims merely require reducing image resolution before performing facial analysis, and there is nothing novel about this because it is exactly what Tian does."). The Abstract of Tian states:

> This paper explores the effects of different image resolutions for each step of facial expression analysis. The different approaches are compared for face detection, face data extraction and expression recognition. A total of five different resolutions of the head region are studied (288x384, 144x192, 72x96, 36x48, and 18Xx24 [sic]) based on a widely used public database. . . . The lower resolution images are down-sampled from the originals.

Ex. 1005, 1. In addition, Tian states that, "[t]he results show that both face detectors . . . can detect all faces for head region in resolution of 288x384, 144x192, 72x96, and 36x48, but failed for resolution of 18x24." *Id.* at 5. In the results provided in Table 3, the face detector (FD) results were reported as 100% and equivalent for the "Original" resolution of 288x384 and for each of the following reduced resolutions: 144x192, 72x96, and 36x48. *Id.* And, Tian states that "head pose estimation can detect 98% faces for all the resolutions." *Id.* For head pose estimation (HPE), Table 3 provides the following results: 98.5 % for 288x384 (Original); 98% for 144x192; 98.2% for 72x96; 97.8% for 36x48; and 98% for 18x24. Thus, Tian reports the same or approximately the same accuracy for both face detection and head pose estimation for both "Original" and reduced resolution images. Patent

Owner's argument is contrary to what Tian teaches.

Aside from the arguments discussed above, Patent Owner also cites Dr. Saber's testimony in support of its argument that Tian does not teach reducing the resolution of images. *See* PO Resp. 4, 6, 7 (citing Ex. 2001 ¶¶ 46–50; Ex. 2020 ¶¶ 4–7); *see also* PO Sur-reply 4. For example, Petitioner cites Dr. Saber's declaration for the proposition that "*Tian* discloses a pre-existing 'public database' of images that 'are down-sampled' versions of the original images." PO Resp. 3–4 (citing Ex. 2001 ¶¶ 46, 48). Yet Dr. Saber did not do anything to confirm his understanding of the alleged public database. Ex. 1033, 119:20–120:11. We give little or no weight to Dr. Saber's testimony in this regard. Based upon the plain language of Tian, we find Dr. Saber's testimony to be inaccurate.

Based on the entire trial record, we find that Tian teaches the "reduce the resolution" limitation.

*b. The "Determine the Orientation of the Head" Limitation*

As noted above, claim 4 recites, "*determine the orientation of the head with respect to the camera based on the reduced-resolution image.*"[23] Ex. 1001, 15:59–60. In Petitioner's proposed combination of the teachings of Lu-577 and Tian, Petitioner relies on Tian's teaching of "obtaining and analyzing reduced-resolution images and that the accuracy of face detection and head pose estimation can be maintained for reduced-resolution images." Pet. 10 (citing Ex. 1005 (Tian), Abstract, 2, 5). Petitioner contends that "[a] POSITA would have found it obvious to apply Tian's teachings to Lu-577's

[23] Disclaimed, independent claim 1 from which claim 4 depends recites, "*determine an orientation of the head with respect to the camera.*" Ex. 1001, 15:35–36.

system to perform facial analysis on reduced-resolution images" because "[d]oing so can reduce the time and resources consumption of tasks such as face detection and pose estimation, without substantially reducing the accuracy of these tasks." *Id.* (citing Ex. 1003 ¶¶ 68–69.

Patent Owner does not dispute showing for this limitation. *See generally* PO Resp. Based on Tian's teachings related to face detection and head pose estimation and Petitioner's showing for this limitation and the "determine an orientation of the head with respect to the camera" limitation in claim 1 (*see* Pet. 22), we find that Tian teaches the "determine the orientation of the head" limitation.

*c. Limitations of Claims 1, 9, and 16*

Claims 4, 11, and 18 by virtue of their dependency on claims 1, 9, and 16, respectively, incorporate all the limitations of claims 1, 9, and 16. 35 U.S.C. § 112 ¶ 4. The Petition includes an element-by-element analysis showing that Lu-577 and Tian teach all the limitations of claims 1, 9, and 16. Pet. 12–26 (claim 1), 32–36 (claim 9), 38–41 (claim 16). After the Petition was filed, Patent Owner filed a statutory disclaimer of independent claims 1, 9, and 16 of the '243 patent. Ex. 2002 (Request for Statutory Disclaimer); *see also* Prelim. Resp. 1–2. Accordingly, Patent Owner did not dispute the showing in the Petition as to claims 1, 9, and 16. *See generally* PO Resp.

Independent claims 1, 9, and 16 are similar. *See* Ex. 1001, 15:12–42, 16:21–43, 17:14–36. For claim 9, Petitioner relies substantially on its showing for claim 1. *See* Pet. 32–36. For claim 16, Petitioner relies substantially on its showing for claims 1 and 9. *See id.* at 38–41.

The preamble of claim 1 recites, "*[a]n audience measurement system to obtain exposure data for a media exposure environment.*" Ex. 1001,

15:12–14. The Petition includes a showing that all the elements of the preamble are taught by the cited art.[24] Pet. 12–13 (citing Ex. 1003 ¶¶ 73–80; Ex. 1004, code (57), ¶¶ 14–17, 35, 39, 40, 50, 89, Fig. 2; Ex. 1008, code (57), 1:15–19). The Petition states that "Lu-577's system is **to obtain exposure data** (e.g., data identifying a television program, data identifying the audience) **for a media exposure environment** (e.g., a statistically selected site). *Id.* at 12 (citing Ex. 1004, code (57), ¶¶ 17, 35, 39, 40, Fig. 2). Cited paragraph 17 of Lu-577 (Ex. 1004) provides, "a television audience measurement system measures viewing of a television program viewed on digital television located in a statistically selected site."

We find that the cited art teaches the preamble of claim 1.

Claim 1 recites that "*the audience measurement system compris[es]: memory; machine readable instructions; and processor circuitry to execute the machine readable instructions*." Ex. 1001, 15:15–19. The Petition includes a showing that these limitations are taught by the cited art. Pet. 13–16 (citing Ex. 1003 ¶¶ 81–85; Ex. 1004 ¶¶ 3, 35–40, claim 14, Fig. 2; Ex. 1008, 2:20–38, 3:27–60, 5:61–6:4, 7:25–8:6, Fig. 5; Ex. 1009, 3:57–4:42, 4:61–5:19, Figs. 1, 2). Lu-577 provides multiple teachings that the disclosed audience measurement system includes memory (*see, e.g.*, Ex. 1004 ¶ 3); software (machine readable instructions) (*see, e.g., id.* ¶ 39 ("the site unit 86 may employ known head location and face recognition software"); and a computer (processor circuitry to execute the machine readable instructions) (*see, e.g. id.* ¶¶ 35–40, Fig. 2). Claim 14 of Lu-577

[24] Petitioner does not take a position on whether the preamble of claim 1 is limiting. *See* Pet. 12–13. We need not determine whether the preamble is limiting as Petitioner establishes the cited art teaches the preamble. *Id.*

recites, "The television audience measurement system . . . comprises . . . a microprocessor, memory, [and] an operating system . . . ."

For these limitations, Petitioner also relies on the incorporation by reference of U.S. Patent No. 4,677,466 ("Lert")[25] and U.S. Patent No. 4,858,000 ("Lu-000" (*see* Ex. 1004 ¶¶13, 39) into Lu-577. Pet. 13–16. The Petition states that, "Lu-577's audience measurement system includes detectors (64, 68, 78) that detect audio data and site units (86, 94, 96) or a home unit (88) that analyze the data to identify a television program, for which it incorporates Lert by reference" and "Lu-577 further teaches a person identifier (98) that feeds image data to the site unit (86), which employs 'known head location and face recognition software' (e.g., as taught by Lu-000) to identify viewing persons in the audience." *Id.* at 13–14. The Petition provides:

> Lert teaches using **processor circuitry** (e.g., audio processing circuitry, signature recognition computer) for extracting and comparing audio signatures and **memory** for storing audio signatures. Ex-1009, 3:57-4:42, 4:61-5:19, FIGs. 1-2; Ex-1003, ¶83.
>
> Lu-000 teaches using **processor circuitry** (e.g., audience locating circuitry, control command processor subsystem, audience recognition subsystem) for locating and recognizing audience members and **memory** for storing pattern image signatures. Ex-1008, 2:20-38, 3:27-60, 7:25-8:6; Ex-1003, ¶84. For example, Lu-000's control command processor subsystem includes a central processing unit 78 and a memory device 80. Ex-1008, 5:61-6:4, FIG. 5 . . . .
>
> By incorporating Lert and Lu-000 by reference, Lu-577 teaches identifying a television program and audience members (*infra* §VI.A.2[1b-1g]) using memory and processor circuitry. The processor circuitry performs these operations by **executing**

---

[25] Lu-577 states, "[t]he teaching of U.S. Pat. No. 4,677,466 [Lert] is herein incorporated by reference." Ex. 1004 ¶ 3)

> **machine readable instructions** (e.g., head location and face recognition software, software program for identifying television program based on audio data). Ex-1004, ¶¶0039-0040. By 2011, basic computer components such as memories, processor circuitries, and machine readable instructions executable by the processor circuitries were well developed and commonly used. Ex-1003, ¶85; *see e.g.*, Ex-1004, cl. 14. A POSITA would have found it obvious to implement Lu-577's television audience measurement system using this ordinary architecture. Ex-1003, ¶85.

*Id.* at 14–16.

We find that the cited art teaches these limitations.

Claim 1 recites, "*generate an audio signature of media content presented by a television within the media exposure environment*." Ex. 1001, 15:20–22. Petitioner relies on Lu-577 for teaching this limitation. Pet. 16 (citing Ex. 1003 ¶¶ 86–89; Ex. 1004, code (57), ¶¶ 17, 35, 40, 41). The Abstract of Lu-577 provides, "A television audience measurement system measures viewing of a television program viewed on digital television located in a statistically selected site by . . . extracting an audio signature from the television program in order to identify the television program." Ex. 1004, code (57).

We find that the cited art teaches this limitation.

Claim 1 recites, "*obtain content identifying data corresponding to the presented media content, the content identifying data based on the audio signature of the media content presented by the television within the media exposure environment*." Ex. 1001, 15:23–27. Petitioner relies on Lu-577 for this limitation. Pet. 17 (citing Ex. 1003 ¶¶ 90–93; Ex. 1004 ¶¶ 17, 35, 40, 41, 44, 45, 50). Cited paragraph 17 of Lu-577 provides:

> [A] television audience measurement system measures viewing of a television program viewed on digital television located in a statistically selected site and comprises detecting means, extracting means, a software agent, and selecting means. The detecting means detects an audio code embedded in the television program in order to identify the television program. The extracting means extracts an audio signature from the television program in order to identify the television program. The software agent is arranged to identify the television program. The selecting means selects at least one of the detecting means, the extracting means, and the software agent in order to identify the television program.

Ex. 1004 ¶ 17.

We find that the cited art teaches this limitation.

Claim 1 recites, "*analyze a sequence of images of the media exposure environment to detect a head appearing in one or more of the images, the sequence of images obtained by a camera while the media content corresponding to the content identifying data is presented by the television*." Ex. 1001, 15:28–33. The Petition identifies passages in the cited art that include teachings of all the elements of this limitation. Pet. 18–22 (citing Ex. 1003 ¶¶ 94–102; Ex. 1004 ¶¶ 13, 39; Ex. 1005, 5; Ex. 1008, (code (57), 1:15–19, 2:20–38, 3:27–4:8, 7:39–47, 9:47–10:12, Figs. 8I, 8J). Petitioner primarily relies on the teachings of Lu-577 and the incorporated teachings of Lu-000. *See id.* The Petition states, "Lu-577's system includes a person identifier and incorporates Lu-000's teachings on head location and face recognition software for identifying members of a viewing audience." *Id.* at 18. The Petition further states:

> The combination teaches **obtaining a sequence of images by a camera while the media content** (e.g., television program) **corresponding to the content identifying data** (e.g., data identifying the television program) **is presented by the**

> **television**. Lu-577's person identifier identifies "persons watching television programing" based on image recognition. Ex-1004, ¶0039. Since the identified persons are "watching television programing" on the television set, the images of the persons are captured while the media content (e.g., television program) is presented by the television. *Id.* The images are captured by a camera. Ex-1004, ¶0039 ("The person identifier 98 may be video camera, an IR camera, or the like."). The presented media content corresponds to content identifying data. . . .
>
> Lu-000 teaches obtaining (e.g., capturing) images for audience members in the monitored area using a video camera. Ex-1008, Abstract ("A video image is captured for each of the located individual audience members in the monitored area."), 2:20-38, 3:27-4:8. Lu-teaches capturing multiple "images of the audience members[.]" Ex-1008, 3:27-60. In light of Lu-000's teachings of obtaining the images using a video camera, which a POSITA would have known to be capable of taking sequences of images over time, Lu-000 teaches or renders obvious obtaining **a sequence of images**. Because Lu-000 teaches a television audience (Ex-1008, 1:15-19), the images are obtained when media content is presented by a television. Ex-1003, ¶96. . . .
>
> The combination further teaches **analyzing a sequence of images of the media exposure environment to detect a head appearing in one or more of the images**. Lu-577 teaches using "head location" software that detects a head appearing in an image. Ex-1004, ¶0039. Lu-000 teaches analyzing images to detect a head appearing in an image and to determine the location of the head based on a "search raw picture for heads subroutine" and a "search head(s) subroutine." Ex-1008, 9:47-52 ("The sequential steps begin with a search raw picture for heads subroutine illustrated in FIG. 8I. Next a locate and search head(s) subroutine illustrated in FIG. 8J is performed."), 7:39-47; Ex-1003, ¶98.

*Id.* at 18–20 (second alteration in original). The cited passages support Petitioner's contentions.

We find that the cited art teaches this limitation.

Claim 1 recites, "*determine an orientation of the head with respect to the camera*." Ex. 1001, 15:35–36. For this limitation, Petitioner primarily relies teachings in Tian. Pet. 22 (citing Ex. 1003 ¶¶ 103–105; Ex. 1005, 1–3). The Petition states:

> Tian teaches **determining an orientation of the head** (e.g., pose estimation) **with respect to the camera**. Ex-1005, 000001 ("[P]ose estimation can be applied[.]"), 000002 ("[T]he head pose was estimated based on the detected head."); Ex-1003, ¶¶103-105. Pose estimation outputs a head pose that describes the view of the head (e.g., frontal or near frontal view, side view), which describes the orientation of the head with respect to the camera. Ex-1005, 000002; Ex-1003, ¶103.

*Id.* (alterations in original). With regard to combining this teaching from Tian with the teachings of Lu-577, the Petition states that "[i]t would have been obvious to apply Tian's teaching to Lu-577 such that the audience measurement system determines an orientation of the head with respect to the camera."[26] *Id.* at 23 (citing Ex. 1003 ¶ 105).

We find that the cited art teaches this limitation.

Claim 1 recites, "*determine audience identification information based on a match of the head to a known person associated with the media exposure environment*." Ex. 1001, 15:37–39. The Petition identifies passages in the cited art that include teachings of all the elements of this limitation. Pet. 23–24 (citing Ex. 1003 ¶¶ 106–111; Ex. 1004 ¶ 39; Ex. 1008, code (57), 2:10–14, 2:20–47, 7:39–8:6, 9:3–10, 9:18–46, 10:4–32,

---

[26] We discuss the rationale for combining the teachings of Lu-577 and Tian in greater detail below. *See infra* Section II.E.1.d.

Figs. 6, 7, 8B–8J). Petitioner primarily relies on the teachings of Lu-577 and the incorporated teachings of Lu-000. *See id.* The Petition states:

> Lu-577 teaches "a person identifier 98 [that] identif[ies] the persons watching television programming[.]" Ex-1004, ¶0039; Ex-1003, ¶106. Lu-000 teaches **determining audience identification information based on a match of the head to a known person** (e.g., predetermined individual) **associated with the media exposure environment** (e.g., monitored area). Lu-000 teaches "identifying predetermined individual members of a viewing audience in a monitored area," which is a media exposure environment . . . . Ex-1008, Abstract, 2:10-14, 2:20-38. Lu-000 teaches storing a pattern image signature "corresponding to each predetermined individual member." Ex-1008, Abstract, 2:20-47. Because Lu-000's monitored area is a media exposure environment . . . and the predetermined individuals are in the monitored area, Lu-000 teaches storing pattern image signatures of known person associated with the media exposure environment. Ex-1003 ¶107.
>
> Lu-000 next teaches identifying an audience member by comparing a newly extracted pattern image signature with the stored pattern image signatures. Ex 1008, Abstract, 2:20-38 ("The extracted pattern image signature is compared with each of the stored pattern image signatures to identify a particular one of the predetermined audience members."), 7:39-8:6; Ex-1003, ¶¶108-109. A newly extracted pattern image signature is generated based on a "B-Sub image" that corresponds to the "head location" of a person. Ex-1008, 7:39-8:6, FIGs. 6-7. . . . Lu-000 thus teaches that the identification is based on a match of the head to a known person. Ex-1003, ¶109.
>
> Lu-000 teaches searching through stored image feature signatures and identifying one having the greatest similarity with an extracted signature. Ex-1008, 8:46-9:2, 9:18-31, FIGs. 8B, 8E. Next, "results" are displayed and is verifiable by a person. Ex-1008, 9:3-10, 9:32-46, 10:4-32, FIG. 8C, 8F-8G, 8J. A POSITA would have understood or found it obvious that the displayed result includes audience identification information by indicating the most similar image feature signature or the corresponding individual. Ex-1003, ¶110.

*Id.* (first three alterations in original). The cited passages support Petitioner's contention that the cited art teaches this limitation.

We find that the cited art teaches this limitation.

In its last limitation, claim 1 recites, "*network interface circuitry to output a signal indicative of the content identifying data and the audience identification information to a data collection facility*." Ex. 1001, 15:40–42. Petitioner relies on Lu-577 for teaching all the elements of this limitation. Pet. 25–26 (citing Ex. 1003 ¶¶ 112–114; Ex. 1004 ¶¶ 15, 37, 39, 40, 50, claims 13, 29–33). The Petition states:

> The combination teaches **network interface circuitry** (e.g., interface and communication apparatus) **to output a signal indicative of the content identifying data and the audience identification information to a data collection facility** (e.g., intermediate data collector, data collection central office). . . . Ex-1003, ¶¶112-114. . . . Lu-577 further teaches that "television audience data ... can be communicated, via the Internet ... to a locally located or remotely located intermediate data collector 128 and then to a remotely located central office 130 through a communication channel 170." Ex-1004, ¶0050, ¶0037. A POSITA would have understood that the television audience data in Lu-577 includes television content identifying data and audience identification information and that data commonly transmit over networks in the form of electromagnetic signals. Therefore Lu-577 teaches outputting a signal to a data collection facility. Ex-1003 ¶113.
>
> The intermediate data collector and the data collection central office in Lu-577 are data collection facilities because they collect and store data. Ex-1003, ¶114. Lu-577's audience measurement system includes "an interface and communication apparatus" that includes network communication features such as "a serial port" and functionalities such as sending data "to an internet service provider via the internet." Ex-1004, cls. 13, 29-33, ¶0015. It would have been understood or obvious that this apparatus comprises a network interface circuitry and is suitable

> to be used for outputting the content identifying data and audience identification information to the data collection facilities. Ex-1003, ¶114.

*Id.* The cited passages in Lu-577 support Petitioner's contentions.

We find that the cited art teaches this limitation.

As noted above, for disclaimed, independent claims 9 and 16, Petitioner principally relies on its showing for claim 1. *See* Pet. 32–36, 38–41. To the extent claims 9 and 16 differ from claim 1, Petitioner addresses the differences and provides further explanations and reasoning. *Id.*

We find that Petitioner establishes that the combination of Lu-577 and Tian teaches all the limitations of claims 1, 9, and 16.

*d. Motivation to Combine*

Petitioner contends that a skilled artisan would have been motivated to combine the relevant teachings of Lu-577 and Tian with a reasonable expectation of success, and the Petition includes the following passages to support this contention:

> A POSITA would have found it obvious to combine Lu-000 and Tian because they are similarly directed to image processing and facial analysis, and to use Tian's techniques to improve Lu-000. (*Id.* at 8 (citing Ex. 1003 ¶ 58).)
>
> Employing the solutions of Tian in Lu-577's system would have been obvious because Lu-577 explicitly invites employing "known head location and face recognition software." (*Id.* (citing Ex. 1003 ¶ 59; Ex. 1004 ¶ 39).)
>
> A POSITA would have been motivated to apply Tian's teaching [of using a video camera, which is capable of taking a sequence of images] because performing facial analysis on a sequence of images can improve the confidence level of person identification and allow the selective performance of face

recognition on suitable images (e.g., where a person opens her eyes and faces the camera). (*Id.* at 9 (citing Ex. 1003 ¶ 61; Ex. 1010 ¶ 3; Ex. 1022, 7).)

As suggested by contemporary writings, it would have been obvious to apply Tian's teaching to Lu-577's system, such that it determines a face or head location in a first image and use the determined location for subsequent images. . . A POSITA would have been motivated to apply this approach because it saves processing resources and time by reducing the times face detection needs to be applied. (*Id.* (citing Ex. 1003 ¶¶ 63–64; Ex. 1010 ¶ 3).)

Tian teaches performing head pose estimation on a subject based on an image. A POSITA would have found it obvious to apply this teaching to Lu-577's system. A POSITA would have found it obvious to determine a person's head pose to determine whether an image is suitable for face recognition and understood that this improves the performance of face recognition. A POSITA would have been further motivated to perform pose estimation to determine whether a person is watching the television, which was known in the art. (*Id.* at 10 (citing Ex. 1003 ¶¶ 65–66; Ex. 1005, 2–3; Ex. 1010 ¶ 3; Ex. 1012 ¶ 39; Ex. 1021, 42).)

Tian teaches obtaining and analyzing reduced-resolution images and that the accuracy of face detection and head pose estimation can be maintained for reduced-resolution images. A POSITA would have found it obvious to apply Tian's teaching to Lu-577's system to perform facial analysis on reduced-resolution images. Doing so can reduce the time and resource consumption of tasks such as face detection and pose estimation, without substantially reducing the accuracy of these tasks. However, it was known that the performance of face recognition may be adversely affected by the reduction of image resolution. A POSITA would have been motivated to perform certain facial analysis techniques (e.g., face detection, head pose estimation) on reduced-resolutions images, while other techniques (e.g., face recognition) on full-quality images.

> (*Id.* at 10–11 (citing Ex. 1003 ¶¶ 68–70; Ex. 1005, Abstract, 2, 5; Ex. 1013, 1; Ex. 1014, 2:43–53; Ex. 1015 ¶ 22; Ex. 1027, 4–5).)
>
> A POSITA would have found it obvious and been motivated to apply the teachings of Tian to Lu-577 because this is an application of known techniques (e.g., facial analysis techniques) to a known system (e.g., audience measurement system) and method ready for improvement. Doing so would have improved accuracy of face recognition and saved processing resources, and would have yielded predictable results at least because Tian provides experimental assessments of its techniques. (*Id.* at 11 (citing Ex. 1003 ¶ 71).)
>
> The combination simply uses Tian's teachings about image processing and facial analysis, in the manner taught by Tian, to implement functionalities in Lu-577, which a POSITA would have been more than capable of doing. A POSITA would have had a reasonable expectation of success in combining the references given the overlap between Lu-000 and Tian and because the combination uses well-known techniques that would not have changed the principle of operation for any of the references. (*Id.* (citing Ex. 1003 ¶ 72).)
>
> A POSITA would have found it obvious that head orientation is determined based on an [sic] reduced-resolution image at least because doing so would have saved processing resources without substantially reducing the accuracy of determination. (*Id.* at 27 (citing Ex. 1003 ¶ 122).)

Patent Owner disputes Petitioner's showing as to the motivation to combine the relevant teachings of Lu-577 and Tian. *See* PO Resp. 17–44. However, as related to claims 4, 11, and 18, Patent Owner challenges only a subset of Petitioner's articulated motivations to combine. *Id.* at 19. Patent Owner only challenges Petitioner's arguments on page 10 of the Petition that a skilled artisan would have been motivated to combine the teachings,

because "[p]erforming head detection and head orientation determination on reduced-resolution images requires fewer processing resources" and "[d]etermining whether an image is suitable for face recognition would improve the 'performance' of face recognition." *See id.* As pointed out by Petitioner, Patent Owner does not address several of the articulated reasons provided in the Petition that support the showing on motivation to combine. *See* PO Sur-reply 14–15. We agree with Petitioner that "[t]hese [unchallenged] showings provide independent and unrebutted reasons for combining Lu-577 and Tian" and that "P[atent ]O[wner] fails to rebut concrete motivations for modifying Lu-577 based on Tian's teachings.") *Id.* at 15.

Moreover, we find that Patent Owner's arguments relating to motivation to combine are not persuasive or well-supported. Patent Owner argues:

> Petitioner proposes performing head orientation determination on a reduced-resolution image in order to allegedly "reduce the time and resource consumption of tasks such as face detection and pose estimation, without substantially reducing the accuracy of these tasks." *Petition*, 10 (citing Ex. 1003, ¶¶69-70). However, Petitioner's modification *would not* save time and processing resources and *would* reduce the accuracy of face detection and pose estimation. Petitioner's failure to consider the drawbacks of the proposed modification is fatal to their proposed combination.

PO Resp. 20. We reject this argument. The claims do not recite any particular level of resolution in the starting images or the reduced resolution images. Tian clearly teaches that face detection and head pose estimation can be accurately preformed using images with reduced resolution. *See* Pet. Reply 9 ("Tian proves P[atent ]O[wner] wrong by reporting face detection

and pose estimation being performed on down-sampled images with high accuracy.") (citing Ex. 1005, 5).

With regard to reducing processing resources, Patent Owner more specifically argues:

> Petitioner claims a reduction in processing resources required to analyze reduced-resolution images but fails to weigh (or even consider) the *additional* processing resources that would be required to produce the reduced-resolution images in the first place. Neither Petitioner nor Petitioner's declarant addresses whether the increase in resources needed to reduce the resolution of the images would outweigh any decrease in resources needed to process the lower-resolution images. *See Petition* at 10-11 (claiming the benefit of "reduce[d] the time and resource consumption" for reducing image resolution but failing to address any time and resource consumption associated with the resolution reduction process).

PO Resp. 21. Yet Petitioner and Dr. Doermann directly address in the Petition how performing facial analysis on reduced-resolution images reduces time and resource consumption "without substantially reducing the accuracy" of head detection. Pet. 10–11. And, Patent Owner acknowledges that Petitioner further addresses this issue in the Reply. *See* PO Sur-reply 11 ("Petitioner argues that the computational cost of performing facial analysis for a reduced-resolution image is less than for a non-reduced-resolution image. (Paper 22 [Pet. Reply], 18). Petitioner also argues that the cost to reduce the resolution is less than the cost to perform the facial analysis on the nonreduced-resolution image. *Id.*"). Petitioner's Reply states, "P[atent ]O[wner]'s argument about 'increase in processing resources' (POR, 36-37) misses the point because replacing face detection with face tracking reduces the number of pixels analyzed and the processing resources needed to do so. Dr. Doermann explains that face tracking allows a face to be 'accurately

tracked from frame to frame without a need to run a face detector across the entire image.' Ex-1003, ¶64 (citing Ex-1010, ¶0003)." Pet. Reply 23.

Moreover, there is additional evidence tending to show that a skilled artisan would have been motivated to combine the relevant teachings of Lu-577 and Tian in order to reduce processing resources and time Tian clearly teaches obtaining reduced resolution images by down-sampling. Ex. 1005, 1, 2 (Tian repeats three times that "The lower resolution images are down-sampled from the originals."). The expert declarants of both parties agree that down-sampling is a simple process that would involve minimal resources. Ex. 1034 ¶ 9 (Dr. Doermann testifying that "This can be accomplished by subsampling the images to pick one pixel out of every four."); Ex. 1033, 99:11–17 (Dr. Saber describing down-sampling: "Generally speaking, it's fairly simple for you to skip every other pixel in the horizontal and vertical direction and just select one."). Doing face detection and head pose estimation on reduced resolution images as taught by Tian would prevent wasteful facial recognition processing of unsuitable images. Dr. Doermann's Declaration states:

> Tian teaches performing facial expression analysis only for frontal or near frontal view faces. Ex-1005, 000002 ("The expression analysis process is applied only to the frontal and near frontal view faces."). A POSITA would have found it obvious to apply this approach to Lu-577 such that a person's head pose is first determined in an image and a decision is made as to whether the image will be used for face recognition. In this manner, it can be ascertained that face recognition is only performed on images in which a person's head pose is suitable for such analysis. This improves the accuracy of identification of audience members and addresses the problem that pose variations adversely affect recognition performance. Ex-1021, 000042. A POSITA would have been motivated to apply Tian's teachings to Lu-577 in order to achieve this

> benefit. . . .
>
> A POSITA would have found it obvious to apply Tian's teaching to Lu-577 such that the television audience measurement system reduces the resolution of an image and performs face detection or head pose estimation on the reduced-resolution image. Tasks such as face detection can be resource-consuming. Ex-1013, 000001 ("[V]iew-based [face detection] methods … are reported to have a good detection performance but the drawback to be computationally rather expensive and at present are not the appropriate choice for real-time applications."). Some approaches of face detection may require analyzing all pixels of an image to search for a face. The processing resources and time can be reduced if the resolution of the image is reduced. Ex-1014, 2:43-53 (teaching that "calculations are avoided of a complete highest resolution integral image for every acquired image in an image stream" in face tracking, thereby "reduces processing overhead for face detection[.]"); Ex-1015, ¶0022 ("By reducing the resolution of the saturation of the image, computational requirements are substantially reduced and a relatively simple method may be used.").

Ex. 1003 ¶¶ 66, 69 (second to fourth alterations in original). Thus, Dr. Doermann testifies that a skilled artisan would have been motivated to combining the relevant teachings of Lu-577 and Tian in order to reduce processing resources and time.

Patent Owner also argues that down-sampling introduces artifacts into an image and Petitioner has failed to consider the additional processing resources necessary to avoid these artifacts. *See* PO Resp. 22–24 (arguing antialiasing filtering would be necessary). In its Reply, Petitioner argues that "'[t]o the extent P[atent ]O[wner] is contending antialiasing is an implied necessary step, Tian's experimental results (Ex-1033, 123:1-10) show otherwise by achieving high accuracy (Ex-1005, 000005; Ex. 1003,

¶68) while not performing antialiasing (Ex-2020, ¶20).” Pet. Reply. 10. We agree with Petitioner that Tian shows that accurate face detection and head pose estimation may be performed on down-sampled, reduced resolution images without antialiasing, and we credit the testimony of Dr. Doermann in this regard.

We have considered all the arguments and evidence of the parties on this issue and find that the clear weight of the evidence supports the position of Petitioner.[27] Petitioner’s showing as to motivation to combine the relevant teachings of Lu-577 and Tian is well-supported, reasonable, and persuasive. We have considered the contrary testimony of the expert declarants on this issue and find that Dr. Doermann’s testimony is based on a more accurate and reliable description of the prior art (particularly, Tian). *Compare* Ex. 1003 ¶¶ 6–194, *and* Ex. 1034 ¶¶ 2–14, *with* Ex. 2001 ¶¶ 35–129, *and* Ex. 2020 ¶¶ 2–69. We accord Dr. Doermann’s testimony more weight than Dr. Saber’s contrary testimony.

Based on the entire trial record (particularly, Tian’s teachings), we find that a skilled artisan would have recognized that by using down-sampling, the resolution of images could be reduced by a simple process without decreasing accuracy. *See, e.g.*, Ex. 1034 ¶¶ 5–9. We further find that a skilled artisan would have recognized that processing resources and time would be advantageously reduced by performing face detection and head pose estimation on images with fewer pixels. *See, e.g.*, Ex. 1003

[27] We also note that it is not necessary for Petitioner to show that the proposed modification is “the *best* option, only that it be a *suitable* option.” *Par Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014).

¶¶ 66–70. Thus, we are persuaded by Petitioner's rationale for combining Tian with Lu-577 in the manner suggested by Petitioner.

*e. Summary as to Claims 4, 11, and 18*

We have considered all the arguments and evidence presented by the parties with regard to claims 4, 11, and 18. Petitioner has shown that the cited combination of Lu-577 and Tian teaches all the limitations of claims 4, 11, and 18, and has articulated well-supported reasoning as to why a skilled artisan would have been motivated to combine these teachings as set forth in claims 4, 11, and 18. In contrast, Patent Owner's arguments to the contrary are not supported or convincing. We conclude that Petitioner has shown by a preponderance of the evidence that claims 4, 11, and 18 would have been obvious in view of Lu-577 and Tian.

*2. Analysis of Claims 5, 6, 8, 12–14, 19, and 20*

Petitioner challenges claims 5, 6, 8, 12–14, 19, and 20 based upon a combination of the teaching of Lu-577 and Tian. Pet. 3, 27–31, 37–38, 42–43. Petitioner provides a detailed analysis showing that the additional limitations recited in these dependent claims are taught by the cited art. *See id.* Patent Owner disputes whether the cited art (particularly, Tian) teaches limitations of these claims. *See* PO Resp. 13–17.

*a. Patent Owner's Argument*

Patent Owner argues that these claims require a two-frame process for facial recognition. PO Resp. 13. Patent Owner contends that "[b]roadly, the[se] claims require (1) identifying the location of a head in a first frame; and (2) using the identified head location from the first frame to perform facial recognition in a second frame." PO Sur-reply 20; *see also* PO Resp. 13.

Patent Owner further argues that Tian discloses a single-frame process. PO Resp. 14; *see also* PO Sur-reply 21. Patent Owner contends that this is different from Tian "which identifies the face location and performs facial analysis in the same frame. For every subsequent frame, Tian updates the face location and does not use the face location from the first frame." Pet. Resp. 14. In contrast, Petitioner contends that Tian "teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected." Pet. 28 (citing Ex. 1005, 1, 3, 5).

Tian provides:

> Face acquisition is a processing stage to automatically find the face region for the input images or sequences. It can be a face detector to detect a face in each frame ***or*** just detect face in the first frame and then track the face in the remainder of the video sequence.

Ex. 1005, 1 (emphasis added). In this passage, Tian describes two alternatives for its face acquisition process. In the first alternative, the face detector "detect[s] a face in each frame." In the second alternative the face detector "just detect[s the] face in the first frame and then track[s] the face in the remainder of the video sequence." Thus, Tian contrasts and distinguishes face tracking from detecting the face in each frame.

In a later passage, Tian provides, "Given an image sequence, the region of the face and approximate location of individual face features are detected automatically in the initial frame. . . . Then, all face feature changes are automatically tracked in the image sequence." Ex. 1005, 3. Here again, the explicit language of Tian contrasts and distinguishes detecting the region of the face in a single, initial frame with tracking in the subsequent frames.

Dr. Doermann testifies that under the face tracking approach described in Tian on pages 1 and 3 (quoted above) that "Tian teaches determining a face/head location in a first image and only tracking changes to face features in subsequent images" and "[u]nder this approach, if no change is detected, the face is determined to be at the same location in subsequent images." Ex. 1003 ¶ 62. Dr. Doermann further testifies:

> A POSITA would have found it obvious to apply Tian's teaching to Lu-577 such that when the television audience measurement system processes a sequence of images, it determines a face or head location in a first image and use[s] the determined location for subsequent images. For example, the television audience measure system analyzes a portion in a subsequent image corresponding to the location for face recognition.
>
> A POSITA would have understood that this approach is applicable when a sequence of images is taken for a person by a video camera. Video cameras were able to take multiple images in a relatively short period of time, in which a person's head or face is unlikely to move significantly. Therefore, the region corresponding to the person's head or face likely remains the same across the sequence of images. A POSITA would have found it obvious to apply this approach since this approach is taught in contemporaneous writings. Ex-1010, ¶0003 ("Once a face is detected, its location is recorded and a localized region around that face is scanned by a face detector in the next frame. Thus, once a face is initially detected, it can be accurately tracked from frame to frame without a need to run a face detector across the entire image."). A POSITA would have been motivated to apply the teachings of Tian because this approach has the benefit of saving processing resources and time by reducing the number of times face detection needs to be applied.

*Id.* ¶¶ 63, 64. We credit Dr. Doermann's testimony because it is consistent with the passages of Tian cited above.

Accordingly, we reject Patent Owner's argument based on the contention that Tian's disclosure is limited to detecting the head region in every image and does not disclose doing facial analysis on a region of an image corresponding to the location of the head as detected in an earlier image.[28]

*b. Claim 5*

Claim 5 recites:

> *The audience measurement system of claim 4, wherein the processor circuitry is to determine the audience identification information by: (i) generating a facial signature from a region of a second image of the one or more of the images corresponding to a location of the head in the reduced-resolution image, and (ii) comparing the generated facial signature to a database of facial signatures.*

Ex. 1001, 15:61–67. Petitioner cites Lu-577 for teaching "*determin[ing] the audience identification information*." Pet. 29 (citing Ex. 1004 ¶ 39). In paragraph 39, Lu-577 describes a person identifier. Ex. 1004 ¶ 39 ("[A] person identifier 98 may be provided in order to identify persons watching televisions programming on the digital television set 66. The person identifier 98 may be video camera [sic], an IR camera, or the like."). Paragraph 39 of Lu-577 further teaches, "employ[ing] known head location and face recognition software (e.g., as taught by Lu in U.S. Pat. No. 4,858,000 [Lu-000]) for the identification of the viewing persons." Lu-000 states that, "The extracted pattern image signature is compared with each of

---

[28] In addition, all the claims of the '243 patent are "comprising" claims which do not exclude additional limitations such as updating the location of the face and using the location of the face detected in an earlier frame unless a change in location is detected.

the stored pattern image signatures to identify a particular one of the predetermined audience members. These steps are repeated to identify all of the located individual audience members in the monitored area." Ex. 1008, code (57) (Abstract); *see also id.* at 2:33–38.

With regard to "*generating a facial signature from a region . . . corresponding to a location of the head*," Petitioner cites Lu-000. Pet. 28 (citing Ex. 1008, code (57), 2:20–38, 6:49–51, 7:25–27, 7:39–8:6). Figure 7 of Lu-000 depicts audience recognition subsystem 26 which includes zooming and head location block 104. Ex. 1008, 7:39–45, Fig. 7. The detailed description of Figure 7 states:

> The digital representation of the infrared image signal from the image acquisition block 88 corresponding to an identified direction of an audience member by the processor subsystem 14 is applied to a zooming and **head location** block 104. A gray-level subimage output G-Sub of the zooming and **head location** block 104 is applied to a normalization block 106. The normalized output of block 106 is applied to a thresholding block 108 to provide a thresholding, binary level image output B-Sub. **A feature signature is extracted** from the B-Sub image at a feature signature extraction block 110.

*Id.* at 7:41–51 (emphasis added).

With regard to generating the facial signature from a region of "*a second image of the one or more of the images*" corresponding to a location of the head "*in the reduced-resolution image*," Petitioner relies on Tian. Pet. 28 (citing Ex. 1005, 1, 3, 5). Petitioner contends that "Tian teaches generating a reduced resolution image" and that "Tian also teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected." *Id.* Tian provides, "just

detect face in the first frame and then track the face in the remainder of the video sequence." Ex. 1005, 1.

With regard to "*comparing the generated facial signature to a database of facial signatures*," Petitioner relies on Lu-000 (citing Ex. 1008, 7:25–8:6, 8:46–9:31, Figs. 7, 8B, 8E, 8G). Lu-000 states:

> The extracted B-Sub image feature signature is compared with each of the pattern image signatures stored in the individual face library as illustrated at a block 112 to identify a match. A particular audience member is identified when the compared signatures exceed a predetermined correlation threshold value corresponding to the best matching rate or highest correlation with an individual face pattern image signature in the individual face library is identified at a conclusion block 114.

Ex. 1008, 7:52–60.

We find that Petitioner has established that the cited art teaches the limitations of claim 5.

*c. Claim 6*

Claim 6 recites:

> *The audience measurement system of claim 4, wherein the processor circuitry is to:*
> *identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained;*
> *analyze a portion corresponding to the identified region of a second image; and*
> *based on the analysis of the region of the second image, determine that the head matches the known person.*

Ex. 1001, 6:1–9. With regard to "*identify[ing] a region corresponding to the head within the first image from which the reduced-resolution image was obtained,*" Petitioner cites Lu-000 and Tian. Pet. 30 (citing Ex. 1005, 1, 3; Ex. 1008, 7:39–47, 9:47–10:12, Figs. 8I, 8J). Based on its previous showing

with regard Lu-000 and Tian in the context of claims 1 and 4 and the testimony of Dr. Doermann (Ex. 1003 ¶¶ 135–136), the Petition states "Lu-000 teaches analyzing images to detect a region corresponding to the head"; "Tian teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected"; and "Tian further teaches obtaining a reduced-resolution image from the first image." *Id.*

With regard to "*analyze a portion corresponding to the identified region of a second image; and based on the analysis of the region of the second image, determine that the head matches the known person*," based on its previous showing as to claim 4 and Dr. Doermann's testimony (Ex. 1003 ¶¶ 137–138), Petitioner contends that "[i]t would have been obvious to apply Tian's teaching to Lu-577 such that the television audience measurement system determines a face or head location in a first image and use the determined location for subsequent images." Pet. 30. The Petition also states that "Lu-000 teaches analyzing a portion corresponding to the identified region of the head or face to determine that the head matches the known person based on the analysis." *Id.* at 30–31 (citing Ex. 1003 ¶¶ 139–140; Ex. 1008, 7:39–8:6, 8:46–9:31, Figs. 7, 8B, 8E, 8G).

We find that the cited art teaches the limitations of claim 6.

*d. Claim 8*

Claim 8 recites:

> *The audience measurement system of claim 6, wherein the audience identification information includes an identifier associated with the known person and the processor circuitry is to, responsive to a determination that the head matches the known person, cause the identifier associated with the person to be stored in the memory.*

Ex. 1001, 16:15–20. Based on its showing with regard to claims 1, 4 and 6 and the testimony of Dr. Doermann (Ex. 1003 ¶¶ 141–144), Petitioner contends that "Lu-577 teaches determining audience identification information based on a match of the head to a known person, outputting the identification information as an output signal, and storing 'identified individual viewing member data'" and "Lu-577 teaches that the audience measurement system includes a memory." Pet. 31. Petitioner also cites Lu-000. *Id.* (citing Ex. 1008, 2:39–47, 5:61–6:4, 7:25–38, 7:67–8:6). Lu-000 states that "each of the plurality of feature image signatures are stored in a distinct memory space of a predetermined capacity." Ex. 1008, 2:39–41. Based on the testimony of Dr. Doermann (Ex. 1003 ¶¶ 143–144), the Petition states that, "[a] POSITA would have understood or found it obvious that the stored individual viewing member data includes an identifier associated with the known person" and that "[i]t would have been obvious to cause the identifier associated with the person to be stored in memory."

We find that the cited art teaches the limitations of claim 8.

*e. Claim 12*

Claim 12 is similar to claim 6. *Compare* Ex. 1001, 16:1–9, *with id.* at 16:54–61. Claim 12 recites:

> *The audience measurement system of claim 11, wherein the audience measurement device is to:*
> *identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained; and*
> *analyze a portion of a second image corresponding to the identified region to determine whether the head matches the known person.*

Ex. 1001, 16:54–61. Based on its showing for claim 6, 9, and 11, and the testimony of Dr. Doermann (Ex. 1003 ¶¶ 165–167), Petitioner contends that the cited art teaches the limitations of claim 12. Pet. 37. The Petition also states that "Lu-000 teaches comparing a signature with stored signatures of different individuals to determine whether there is a match with any of the individuals." *Id.* (citing Ex. 1008, code (57), 2:20–38, 7:39–8:6).

We find that the cited art teaches the limitations of claim 12.

*f. Claim 13*

Claim 13 is similar to claim 8. *Compare* Ex. 1001, 16:15–19, *with id.* at 16:62–67. Claim 13 recites:

> *The audience measurement system of claim 12, wherein the audience identification information includes an identifier associated with the known person and the audience measurement device is to, responsive to the indication that the head matches the known person, cause recordation of the identifier associated with the known person in a memory.*

Ex. 1001, 16:62–67. Based on its showing for claims 8, 9, and 12, and the testimony of Dr. Doermann (Ex. 1003 ¶ 169), Petitioner contends that the cited art teaches the limitations of claim 13. Pet. 38. The Petition states that "the combination teaches that the audience identification information includes an identifier associated with the known person and that the audience measurement device causes the identifier associated with the person to be stored (i.e., recorded) in the memory responsive to a determination that the head matches the known person" and "Lu-577 further teaches representing the match with an indication that the head matches the known person." *Id.*

We find that the cited art teaches the limitations of claim 13.

*g. Claim 14*

Claim 14 is similar to claim 5. *Compare* Ex. 1001, 15:61–67, *with id.* at 17:1–7. Claim 14 recites:

> *The audience measurement system of claim 11, wherein the audience measurement device is to determine the audience identification information by: (i) generating a facial signature from a region of a second image corresponding to a location of the head in the reduced-resolution image, and (ii) comparing the generated facial signature to a database of facial signatures.*

Ex. 1001, 17:1–7. Based on its showing for claims 5, 9, and 11 and the testimony of Dr. Doermann (Ex. 1003 ¶ 171), Petitioner contends that the cited art teaches the limitations of claim 14. Pet. 38.

We find that the cited art teaches the limitations of claim 14.

*h. Claim 19*

Claim 19 is similar to claims 6 and 12. *Compare* Ex. 1001, 16:1–9 (claim 6), *and id.* at 16:54–61 (claim 12), *with id.* at 17:48–56 (claim 19). Claim 19 recites:

> *The method of claim 18, further comprising:*
> *identifying a region corresponding to the head within the first image from which the reduced-resolution image was obtained;*
> *analyzing a portion of the second image corresponding to the identified region; and*
> *based on the analyzing of the region of the second image, determining whether the head matches the known person.*

Ex. 1001, 17:48–56. Based on its showing for claims, 6, 12, and 18 and the testimony of Dr. Doermann (Ex. 1003 ¶¶ 190–192), Petitioner contends that the cited art teaches the limitations of claim 19. Pet. 42–43.

We find that the cited art teaches the limitations of claim 19.

*i. Claim 20*

Claim 20 is similar to claims 8 and 13. *Compare* Ex. 1001, 16:15–19 (claim 8), *and id.* at 16:62–67 (claim 13), *with id.* at 17:58–61 (claim 20). Claim 20 recites:

> *The method of claim 19, wherein the audience identification information includes an identifier associated with the known person, and further including recording the identifier associated with the known person in a memory.*

Ex. 1001, 17:58–61. Based on its showing for claims, 8, 13, and 19 and the testimony of Dr. Doermann (Ex. 1003 ¶ 194), Petitioner contends that the cited art teaches the limitations of claim 20. Pet. 43.

We find that the cited art teaches the limitations of claim 20.

*j. Summary as to Claims 5, 6, 8, 12, 13, 14, 19, and 20*

We find that Petitioner has shown that the cited art teaches all the limitations of challenged claims 5, 6, 8, 12, 13, 14, 19, and 20. Petitioner has also articulated a rationale for combining the relevant teachings of Lu-577 and Tian. Based on the entire trial record, we conclude that Petitioner has shown by a preponderance of the evidence that claims 5, 6, 8, 12, 13, 14, 19, and 20 would have been obvious in view of Lu-577 and Tian.

*F. Asserted Obviousness of Claims 4–6, 8, 11–14, and 18–20 Based on Nielsen-372, Steinberg, and Tian*

Petitioner also challenges claims 4–6, 8, 11–14, and 18–20 as being obvious over Nielsen-372, Steinberg, and Tian. *See* Pet. 3, 71–88; Pet. Reply 26–29. Patent Owner disputes this contention. PO Resp. 44–59; PO Sur-reply 22–25.

Petitioner provides an element-by-element showing that the combination of Nielsen-372, Steinberg, and Tang teaches all the limitations

of disclaimed, independent claims 1, 9, and 16. Pet. 45–71, 73–75, 80–82, 84–86. Petitioner also provides an element-by-element showing for challenged, dependent claims 4–6, 8, 11–14, and 18–20. *Id.* at 75–80, 82–84, 86–88.

Petitioner provides this summary of the teachings of Nielsen-372 that it relies on:

> Nielsen-372 teaches a local metering system that includes a metering unit or display device ON/OFF detector that identifies a presented television program and a people meter that identifies the persons viewing the program. Ex-1006, ¶0003, ¶¶0036-0037, ¶0040, ¶0044, ¶0048, ¶0057. The people meter takes an approach of "prompt[ing] the audience members to indicate that they are present in the viewing audience[.]" Ex-1006, ¶0048; Ex-1003, ¶196.

Pet. 43 (alterations in original). Petitioner also points out that Nielsen-372 discloses hardware recited in the challenged claims. *Id.* at 44 ("Nielsen-372's system includes needed hardware (e.g., a computer and a camera).").

Petitioner provides this summary of the teachings of Steinberg that it relies on:

> Steinberg is directed to "using face detection and face recognition techniques to identify the persons contained within a digital image[.]" Ex-1007, ¶0090. Steinberg teaches detecting a face and its location in an image, determining a pose or orientation of a face, and identifying a person using face recognition. Ex-1007, ¶0005, ¶0057, ¶0092, ¶0096, ¶0118, ¶0120, ¶¶0126-0128, ¶0130, ¶¶0157-0158, ¶0166, ¶0168, ¶0176; Ex-1003, ¶197.

Pet. 43–44 (alteration in original).

As with the previously-discussed combination of Lu-577 and Tian,

Petitioner relies on Tian for its teachings related to reduced-resolution images and head orientation determination as recited in claims 4, 11, and 18. *See* Pet. 3, 71–73 (combining Nielsen-372, Steinberg, and Tian), 75–76 (claim 4), 82–83 (claim 11), 86–87 (claim 18). We determine that the challenged claims are unpatentable in view of Nielsen-372, Steinberg, and Tian.

### *1. Motivation to Combine the Relevant Teachings of Nielsen-372 and Steinberg*

With regard to motivation to combine the relevant teachings of Nielsen-372 and Steinberg with a reasonable expectation of success, the Petition states:

> Nielsen-372's approach of prompting and soliciting manual inputs from the individuals may create a negative audience experience and compromise the accuracy of data. Ex-1006, ¶0048. Applying Steinberg's method to Nielsen-372 would have allowed identification of the audience members without interruptions to the entertainment experience and with improved accuracy. A POSITA would have been motivated to do so because these benefits are consistent with Nielsen-372's goal of collecting viewing information. Ex-1003, ¶201.
>
> A POSITA would have found it obvious and been motivated to apply the teachings of Steinberg to Nielsen-372 because this is a simple substitution of one known element (e.g., audience identification based on facial analysis) for another (e.g., audience identification based on user input) to obtain predictable results. Doing so would have yielded predictable results because the techniques of facial analysis were well known in the 2011 timeframe and applied to television audience measurement. *Supra* §I; Ex-1003, ¶202.
>
> A POSITA would have had a reasonable expectation of success given that Nielsen-372 provide the hardware architecture for performing Steinberg's method and that Steinberg's techniques were admittedly known. Ex-1001, 1:67-2:3. The combination simply implements Steinberg's teachings

> about facial analysis, in the manner taught by Steinberg, in Nielsen-372's system. *See supra* §I. The combination would have been nothing more than the use of a known technique to improve similar devices in the same way and would not have changed the principle of operation for any of the references. Ex-1003, ¶203.

Pet. 44–45.

Patent Owner challenges Petitioner's showing of motivation to combine Nielsen-372 and Steinberg. PO Resp. 51–57. Patent Owner contends that "Petitioner's combination relies upon the camera of *Nielsen-372* to teach the claim limitations of the '243 Patent related to capturing images of the 'media exposure environment' to collect the audience identification information." *Id.* at 51. Petitioner argues that this contention is based on a mischaracterization of Petitioner's combination of Nielsen-372 and Steinberg and should be rejected. Pet. Reply 26–29. For the reasons discussed below, we agree with Petitioner and determine that the premise of Patent Owner's argument is incorrect.

Patent Owner's contention is contradicted by a quotation from the Petition that appears in the Patent Owner's Response. As quoted in the Response (PO Resp. 46), the Petition states, "Steinberg teaches obtaining a sequence of images by a camera (*e.g.*, digital camera, image capture device)." Pet. 53 (citing Ex. 1007 ¶ 10) (emphasis omitted). This sentence from the Petition appears in the opening paragraph of the section related to showing how the cited art teaches the following limitation in claim 1[29] (Ex.

---

[29] Independent claim 9 recites, "*while the media content corresponding to the content identifying data is presented by the television, collect a first image of the media exposure environment by a* ***camera***" (*id.* at 16:30–33) (emphasis added); and independent claim 16 recites, "*while the media*

1001, 15:28–34) (emphasis added)): "*analyze a sequence of images of the media exposure environment to detect a head appearing on one or more of the images, the sequence of images obtained by a* ***camera*** *while the media content corresponding to the content identifying data is presented by the television.*" *Id.* For each of the limitations in the independent claims that contains the first recitation of "a camera" in the claims and that serves as the antecedent basis for the later references to "the camera" in the claims, Petitioner cites teachings in Steinberg. *See* Pet. 53, 65, 69. In this regard, the Petition states:

> Steinberg teaches **obtaining a sequence of images by a camera** (e.g., digital camera, image capture device). Ex-1007, ¶0010. Steinberg's image capture device (e.g., a digital camera) captures images and handles certain image processing operations. Ex-1007, ¶¶0128-0129, FIGs. 1(b)-1(c); Ex-1003, ¶227.
>
> Steinberg teaches adding sets of new images that a POSITA would have understood to encompasses consecutive images obtained by the camera, which form a sequence of images. Ex-1007, ¶0010. Steinberg thus teaches the camera obtaining a sequence of images. Ex-1003, ¶228.

*Id.* at 53.

As noted by Patent Owner, Petitioner does cite to Nielsen-372's teachings related to a camera. PO Resp. 44–45, 48. Patent Owner quotes the following passage in the Petition:

> Nielsen-372's system includes needed hardware (*e.g.*, a computer and a camera) for implementing Steinberg's approach. . . . A POSITA would have had a reasonable expectation of success given that Nielsen-372 provide the

---

*content corresponding to the content identifying data is presented by the television, capturing first and second images of the media exposure environment with a* ***camera***" (*id.* at 17:22–25) (emphasis added).

> hardware architecture for performing Steinberg's method and that Steinberg's techniques were admittedly known.

*Id.* at 48 (quoting Pet. 44–45). Notably, this passage is from the section of the Petition related to motivation to combine the teachings of Nielsen-372 and Steinberg (*see* Pet. 43–45) and not the section of the Petition related to the camera limitation of the claims (*id.* at 53, 65, 69). This passage in the Petition supports the showing that, "[a] POSITA would have found it obvious to apply Steinberg's teachings to Nielsen-372, such that audience members are identified by face detection and recognition." *Id.* at 44. Read in the context of the Petition in which it appears, this passage contradicts, rather than supports, Patent Owner's contention that "Petitioner's combination relies upon the camera of *Nielsen-372* to teach the claim limitations of the '243 Patent related to capturing images of the 'media exposure environment' to collect the audience identification information." PO Resp. 51. And, we agree with Petitioner that the teachings in Nielsen-372 of hardware including a camera support, rather than undermine, the motivation to combine Nielsen-372 and Steinberg.[30] With regard to this passage and Patent Owner's contention, Petitioner responds:

> In both sentences [in this passage], Steinberg's approach/method refers to identifying individuals in the audience using face detection, normalization, and recognition, as opposed to Nielsen-372's manual-input-based approach. *See, e.g.*, Ex-1003, ¶202 ("Steinberg teaches a different *approach* of

[30] "[A] determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012); *see also In re Applied Materials, Inc.*, 692 F.3d 1289, 1298 (Fed. Cir. 2012) ("A reference must be considered for everything that it teaches, not simply the described invention or a preferred embodiment.").

> identifying individuals by performing face detection, normalization, and recognition …"); Pet., 44.
>
> Dr. Doermann explains that "modules for performing face detection, normalization, and recognition may be implemented on a computer …, an image acquisition device …, or both" (Ex-1003, ¶199) and that it would have been obvious to implement these functions "on either the computer or the camera of Nielsen-372…" (Ex-1003, ¶200) because "Nielsen-372 provide the hardware architecture for performing Steinberg's face recognition method …" (Ex-1003, ¶203). Nowhere do the Petition or Dr. Doermann propose physically implementing Steinberg's camera using Nielsen-372's camera. PO's mischaracterization should be rejected.

Pet. Reply 27 (second to fourth alterations in original). We agree with Petitioner and, accordingly, we reject this misdirected argument.[31] Stated simply, Nielsen-372's teaching of a system including a camera supports combining Nielsen-372's teachings with a Steinberg's method which uses a camera.

Patent Owner argues that in Nielsen-372 the camera is pointed towards the television and Petitioner's proposed modification of Nielsen-372 to point the camera towards the audience would frustrate the purpose of Nielsen-372 and change the principle of operation. PO Resp. 51–52. Patent

---

[31] Petitioner argues that, "P[atent ]O[wner]'s attack on the combination of Nielsen-372 and Steinberg essentially asks the Board to find the challenged claims non-obvious for claiming a camera pointing at individuals rather than a television." Pet. Reply 27. As pointed out by Petitioner (*id.*), in the "Background," the '243 patent acknowledges that it is known that "some audience measurement systems . . . capture a series of images of a media exposure environment . . . and analyze the images." Ex. 1001, 1:56–66 (cited, e.g., at Pet. 56 (discussing limitation reciting "a camera")). Dr. Saber, Patent Owner's declarant, testified that "[it was] common to use cameras to take photos of the audience." Ex. 1033, 23:10–12.

Owner contends that "Petitioner's proposed modification of *Nielsen-372's* camera to perform facial recognition of people watching TV would frustrate the purpose of *Nielsen-372's* metering system by rendering it unable to determine media content information and would change the principle of operation." *Id.* To begin with, Patent Owner's argument is premised on the incorrect contention that Petitioner relies on Nielsen-372 for teaching the camera recited in the claims. As shown above, Petitioner relies on Steinberg for teaching a camera used for audience identification.

With regard to Patent Owner's contention that Petitioner's combination frustrates the purpose of Nielsen-372, Patent Owner's Response states:

> Modifying *Nielsen-372* so that the camera faces the audience (to meet the claim limitation of the '243 Patent) instead of the display (the actual functionality disclosed in *Nielsen-372*) significantly and fundamentally changes how *Nielsen-372's* system operates and renders it unsatisfactory for its intended purpose, (*i.e.*, generating accurate viewing records by detecting whether the display is on or off).

PO Resp. 53. In its Reply, Petitioner counters:

> Nielsen-372 explicitly teaches that the video sensor (e.g., camera) is optional. For example, claim 1 recites "[a] method to determine whether a presentation device is ON or OFF" based on "an audio signal," without requiring video signal. Ex-1006, 17-18 (cl. 1). Thus, not using Nielsen-372's camera to capture images of the television, even if required by the combination, is not inconsistent with the purpose and intended operation of Nielsen-372's system.

Pet. Reply 28 (alteration in original). We are persuaded by Petitioner's position because it is well-supported by Nielsen-372 and Patent Owner's contention is not.

The camera pointed at the television is not fundamental to the purpose and operation of Nielsen-372. The display device ON/OFF detector 200 is depicted in Figure 2 on Nielsen-372, reproduced below.




FIG. 2

Figure 2 depicts "a block diagram of the example display device ON/OFF detector." Ex. 1006 ¶ 8. In Figure 2, Nielsen-372 discloses three different types of sensors included in its display device ON/OFF detector: audio sensor 204 in the form of a microphone; video sensor 208 in the form of "a camera, a single output analog or digital light sensor, etc."; and emission sensor 212 in the form of an EM (electromagnetic) field pickup, a current detector, a temperature sensor, a receiver to detect signals from the remote control and/or people meter, etc. *Id.* ¶ 50. However, Nielsen-372 provides that the video sensor and the emission sensor are used in addition to, or as an alternative to, the audio sensor. *See id.* ¶¶ 44 (describing use of audio sensor), 45 (describing "[a]dditionally or alternatively" use of video sensor), 46 (describing "[a]dditionally or alternatively" use of emission sensor).

Patent Owner's argument that the optional video sensor or camera of Nielsen-372 is fundamental to the purpose and operation of Nielsen-372 lacks merit.

And, as Petitioner points out, another camera could be added to Nielsen-372's system. Petitioner's Reply states:

> This argument also lacks merit because applying Steinberg's teachings to Nielsen-372 does not necessitate turning the Nielsen-372's camera away from the television. Dr. Saber [Patent Owner's declarant] confirmed a POSITA's ability to connect two cameras to a computer to simultaneously capture a television and an audience (Ex-1033, 23:17-24, 24:17-25:9) as well as the availability of cameras with multiple image sensors for different directions or a wide field of view by 2011 (Ex-1033, 24:5-16, 27:8-21). Available technologies would have obviated the need to stop capturing images of the television.

Pet. Reply 28. Dr. Doermann, Petitioner's declarant, testified:

> [A] POSITA would have been motivated and would have had a reasonable expectation of success in combining the references . . . , because the combination would not have changed the principle of operation for any of the teachings of the references relied upon in the combination. Applying the teachings of Steinberg to Nielsen-372 would have been nothing more than the use of a known technique to improve similar devices in the same way.

Ex. 1003 ¶ 203.

Patent Owner also argues that modifying Nieslen-372 in light of the teachings of Steinberg would alter the principle of operation of Nielsen-372. PO Resp. 55–56. Nielsen-372 discloses a people meter allowing viewers to register their presence in the media exposure environment. Ex. 1006 ¶ 48; *see also* PO Resp. 53. Patent Owner contends that "Petitioner's proposed system would change *Nielsen-372* from a voluntary system into one in

which the audience is tracked without their input (and potentially without their knowledge)" and that "[s]uch a change is fundamental and could significantly impact the willingness of an audience to have *Nielsen-372*'s measurement system in their living room." PO Resp. 55. However, Patent Owner cites to nothing in Nielsen-372 that supports its contention. *See id.* at 55–56. The only evidence that Patent Owner cites is the opinion of Dr. Saber, its technical expert, and he has no experience in audience measurement. Ex. 1033, 23:2–9. Petitioner argues that "P[atent ]O[wner]'s claim that 'voluntary audience measurement' is a principle of operation of Nielsen-372 . . . lacks support because Nielsen-372 does not mention the concept of 'voluntary audience measurement' or discuss any benefit of such an approach." Pet. Reply 28–29. Dr. Doermann, Petitioner's expert, testifies that obtaining audience information with a camera as taught by Steinberg would improve Nielsen-372's system and "would have furthered Nielsen-372's goal of collecting viewing information by facilitating a less intrusive manner that collects more accurate information." Ex. 1003 ¶ 201. Patent Owner's criticism of the combination on this basis in not well-founded and has little or no merit.

In summary, we find that a skilled artisan would have been motivated to combine the relevant teachings of Nielsen-372 and Steinberg.

### 2. *Motivation to Combine the Relevant Teachings of Nielsen-372, Steinberg, and Tian*

With regard to motivation to combine the relevant teachings of Nielsen-372, Steinberg, and Tian with a reasonable expectation of success, the Petition provides:

> A POSITA would have found it obvious to add Tian to the combination of Nielsen-372 and Steinberg because

> Steinberg and Tian are directed to similar functionalities (e.g., images process and facial analysis) and address similar software-based tasks (e.g., identifying a head in an image). (Pet. 71)
>
> A POSITA would have been motivated to apply Tian's teaching because performing facial analysis on a sequence of images can improve the confidence level of identification and allow the selective performance of face recognition on suitable images. (*Id.* at 72 (citing Ex. 1003, ¶ 283; Ex. 1010 ¶ 3; Ex. 1022, 7).)
>
> Tian teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected. . . . Contemporary writings demonstrates that it was obvious to apply Tian's approach to Nielsen-372 and Steinberg. . . . A POSITA would have been motivated to apply this approach because it saves processing resources and time by not repeating face detection for entire images. (*Id.* (citing Ex. 1003 ¶¶ 284–285; Ex. 1005, 1, 3; Ex. 1010 ¶ 3).)
>
> A POSITA would have been motivated to perform certain facial analysis techniques (e.g., face detection, head pose estimation) on reduced-resolutions images, while other techniques (e.g., face recognition) on full-quality images. (*Id.* at 72–73 (citing Ex. 1003 ¶¶ 287–288).)
>
> A POSITA would have found it obvious and been motivated to apply the teachings of Tian to the combination of Nielsen-372 and Steinberg because this is an application of known techniques (e.g., Tian's facial analysis techniques) to a known system (e.g., Nielsen-372's people meter) and method (e.g., Steinberg's facial analysis methods) ready for improvement. . . . Doing so would have improved accuracy of face recognition and provided savings in processing resources and time, and would have yielded predictable results at least because Tian provides experimental assessments of its techniques.
>
> The combination simply uses Tian's teachings about image processing and facial analysis, in the manner taught by

> Tian, to implement functionality in Nielsen-372. . . . A POSITA would have been motivated and would have had a reasonable expectation of success in combining the references given the overlap between Steinberg and Tian and because the combination uses well-known techniques that would not have changed the principle of operation for any of the references. (*Id.* at 73 (citing Ex. 1003 ¶¶ 289–290).)
>
> Tian teaches reducing the resolution of an image to obtain a reduced-resolution image. . . . A POSITA would have found it obvious to apply this teaching to a first image of the media exposure environment. . . . Steinberg's teachings of processing images of different resolutions would have further motivated a POSITA to apply Tian's teachings. (*Id.* at 75–76 (citing Ex. 1003 ¶ 311; Ex. 1005, Abstract, 2; Ex. 1007 ¶¶ 141, 142, 196).)

Patent Owner disputes Petitioner's showing as to motivation to combine the relevant teachings of Nielsen-372, Steinberg, and Tian for reasons that we have already discussed and found unavailing. *See* PO Resp. 50–59.

We find that a skilled artisan would have been motivated to combine the relevant teachings of Nielsen-372, Steinberg, and Tian.

*3. Claims 1, 9, and 16*

The Petition includes a showing that disclaimed, independent claims 1, 9, and 16 are unpatentable over the combination of Nielsen-372, Steinberg, and Tian.[32] *See* Pet. 43–75, 80–82, 84–86. As the challenged

---

[32] Petitioner's analysis for this ground incorporates its analysis from the Nielsen-372–Steinberg ground in the Petition. *See* Pet. 43–71. We did not institute *inter partes* review based on the Nielsen-372–Steinberg ground in light of Petitioner's disclaimer of claims 1, 9, and 16. *See supra* § I.B; Inst. Dec. 3, 9–10.

claims are dependent, directly or indirectly, on claims 1, 9, and 16, we analyze Petitioner's showing on these disclaimed, independent claims.

The preamble of Claim 1 is, "*[a]n audience measurement system to obtain exposure data for a media exposure environment.*" Ex. 1001, 15:12–14. Petitioner shows that Nielsen-372 teaches all the elements of the preamble. Pet. 45–47, 74 (citing Ex. 1003 ¶¶ 204–210, 292–293; Ex. 1006 ¶¶ 3, 36, 37, 40, 44, 48, 49, 57, Fig. 1).[33] Nielsen-372 discloses a "local metering system 100 capable of providing viewing and metering information for program content presented via an example home entertainment system 102." Ex. 1006 ¶ 36; *see also id.* at Fig. 1. The Petition states:

> Nielsen-372's local metering system **obtains exposure data** (e.g., data identifying a displayed program, data identifying the audience) **for a media exposure environment** (e.g., environment in which a home entertainment system is placed). The local metering system includes a sensor "to receive audio signals corresponding to the program being displayed." and "a metering unit 124 and a display device ON/OFF detector 128" that may be "integrated into a single unit" and identify the displayed program based on the audio signals[.] Ex-1006, ¶0036, ¶0044, ¶0049, ¶0057; Ex-1003, ¶207.
>
> The local metering system also "includes a people meter 162 to capture information about the audience" viewing a television program. Ex-1006, ¶0003, ¶0048. It would have been obvious to apply Steinberg to Nielsen-372 such that the people meter identifies audience members using facial analysis. . . . Ex-1003, ¶208.

Pet. 46–47. The cited art teaches the preamble of claim 1.

---

[33] We note that Nielsen-372 states, "[t]his disclosure relates generally to audience measurement." Ex. 1006 ¶ 2.

Claim 1 recites: "*the audience measurement system comprising: memory; machine readable instructions; and processor circuitry to execute the machine readable instructions*." Ex. 1001, 15:15–18. Petitioner establishes that Nielsen-372 teaches these limitations. Pet. 47–49, 74 (citing Ex. 1003 ¶¶ 211–216, 294–295; Ex. 2006 ¶¶ 35, 36, 41, 51, 56, 75, 78, 95, 97, 135, 136, 141, Figs. 6, 7, 14, 15, 29). The Petition states that, "Nielsen-372 teaches "implementing [its] apparatus and methods" using a computer that comprises **memory** (e.g., local memory, memory device, main memory, mass storage devices)**; machine readable instructions** (e.g., coded instructions, software)**; and processor circuitry** (e.g., processor) **to execute the machine readable instructions**." *Id.* at 47. Cited paragraph 135 of Nielsen-372 provides:

> The system 2900 of the instant example includes a processor 2912 such as a general purpose programmable processor. The processor 2912 includes a local memory 2914, and executes coded instructions 2916 present in the local memory 2914 and/or in another memory device. The processor 2912 may execute, among other things, the machine readable instructions represented in FIGS. 13 through 28 and/or implement any or all of the processors 612, 712, 812, 912, 1012, 1112, 1212, 1262 and/or 1292.

Ex. 1006 ¶ 135. These teachings are repeated in other passages of Nielsen-372. We find Nielsen-372 teaches these limitations.

Claim 1 recites, "*generate an audio signature of media content presented by a television within the media exposure environment*." Ex. 1001, 15:20–22. Petitioner relies on Nielsen-372 as teaching this limitation. Pet. 49–50, 74 (citing Ex. 1003 ¶¶ 217–222, 296–297; Ex. 1006, code (57), ¶¶ 36, 37, 40, 44, 50, 51, 55–57, 95–100, Figs. 1–3, 14, 15). The Petition states, "Nielsen-372 teaches that the audience measurement system

(e.g., including the local metering system) **generates an audio signature of media content presented by a television** (e.g., a program displayed by the home entertainment system) **within the media exposure environment** (e.g., environment in which the home entertainment system is placed)." *Id.* at 49. The Abstract of Nielsen-372 provides;

> An example method disclosed herein to determine whether a presentation device is ON or OFF comprises determining an audio signature based on an audio signal corresponding to an output of the presentation device, comparing the audio signature to a set of reference signatures corresponding to a set of known media content, and determining a result indicating whether the presentation device is ON or OFF based on whether the audio signature matches any of the set of reference signatures.

Ex. 1006, code (57). The Petition also states, "Nielsen-372's displayed program is media content presented by a television. Ex-1006, ¶0037 ("The broadcast source 104 may be … a cable television service provider …."), ¶0036, ¶0040; Ex-1003, ¶220. The media content is presented in a media exposure environment. . . . Ex-1003, ¶221." Pet. 50 (first and second alterations in original). We find that Nielsen-372 teaches this limitation.

Claim 1 recites, "*obtain content identifying data corresponding to the presented media content, the content identifying data based on the audio signature of the media content presented by the television within the media exposure environment*." Ex. 1001, 15:23–27. Petitioner relies on Nielsen-372 as teaching this limitation. Pet. 51–52, 74 (citing Ex. 1003 ¶¶ 223–226, 298–299; Ex. 1006, code (57), ¶¶ 36, 41, 43, 44, 51, 56, 57, 95, 96, Fig. 14). The Petition states:

> Nielsen-372 teaches that the audience measurement system (e.g., including the local metering system) **obtains content identifying data** (e.g., program identifying information) **corresponding to the presented media content** (e.g., television program). Nielsen teaches that the local metering system determines "program identifying information." Ex-1006, ¶0044. The program identifying information is part of viewing data that is collected and transmitted, and is content identifying data because it identifies the presented program. Ex-1006, ¶0036, ¶0041, ¶¶0043-0044; Ex-1003, ¶223.
>
> Nielsen-327's local metering system generates an **audio signature of media content presented by a television within the media exposure environment**. . . . Nielsen-372 teaches that **the content identifying data is based on the audio signature** as it teaches identifying the presented media content by comparing the audio signature to "a set of reference signatures" and finding "a match." Ex-1006, ¶0057, ¶0096, FIG. 14.

*Id.* at 51. The cited passages in Nielsen-372 support Petitioner's contentions related to this limitation. We find that Nielsen-372 teaches this limitation.

Claim 1 recites, "*analyze a sequence of images of the media exposure environment to detect a head appearing in one or more of the images, the sequence of images obtained by a camera while the media content corresponding to the content identifying data is presented by the television.*" Ex. 1001: 15:28–33. Petitioner establishes that the cited art teaches all the elements of this limitation. Pet. 53–56, 74 (citing Ex. 1003 ¶¶ 227–235, 300–302; Ex. 1005, 2, 5; Ex. 1006 ¶¶ 3, 48; Ex. 1007, code (57), ¶¶ 5, 10, 57, 92, 117, 118, 128, 129, 130, 151, Figs. 1(b), 1(c), 3). The cited Abstract of Steinberg provides:

> A processor-based system operating according to digitally-embedded programming instructions performs a method including identifying a group of pixels corresponding to a face region within digital image data acquired by an image

> acquisition device. A set of face analysis parameter values is extacted from said face region, including a faceprint associated with the face region.

Ex. 1007, code (57). The Petition states, "Steinberg's face detection teaches **analyzing a sequence of images to detect a head appearing in one or more of the images** since 'face detection' is often used interchangeably with 'head detection.'" Pet. 55 (citing Ex. 1003, ¶ 233). The Petition further states:

> Steinberg teaches **obtaining a sequence of images by a camera** (e.g., digital camera, image capture device). Ex-1007, ¶0010. Steinberg's image capture device (e.g., a digital camera) captures images and handles certain image processing operations. Ex-1007, ¶¶0128-0129, FIGs. 1(b)-1(c); Ex-1003, ¶227.
>
> Steinberg teaches adding sets of new images that a POSITA would have understood to encompasses consecutive images obtained by the camera, which form a sequence of images. Ex-1007, ¶0010. Steinberg thus teaches the camera obtaining a sequence of images. Ex-1003, ¶228.
>
> Nielsen-372 teaches that the people meter "detect[s] the identities and/or number of the persons currently viewing programs displayed on the television." Ex-1006, ¶0003, ¶0048. Applying Steinberg's teachings to the people meter . . . , a POSITA would have found it obvious to capture images **while the media content is presented by the television** to detect current viewing activities. As explained above, the media content **corresponds to the content identifying data**. . . . Ex-1003, ¶229.
>
> In light of Nielsen-372's teachings, a POSITA would have found it obvious to identify the persons in the audience based on **images of the media exposure environment**. Ex-1003, ¶230. Steinberg teaches that, when new image(s) are acquired, a Face Detection module is alerted to further process the image(s). Ex-1007, ¶0092, ¶0117, ¶0128, ¶0130, ¶0151. Steinberg teaches or renders obvious analyzing a sequence of

> images by disclosing analyzing multiple images. *See, e.g.,* Ex-1007, ¶0092 ("new images"), ¶0117, ¶0130; Ex-1003, ¶231.

*Id.* at 53–54. Petitioner contends that "Tian further teaches obtaining a sequence of images of human subjects using a camera and analyzing the sequence of images to detect a head appearing in one or more of the images." *Id.* at 74 (citing Ex. 1003, ¶¶ 300–302; Ex-1005, 2, 5).

The cited evidence supports Petitioner's contentions. We find that the cited art teaches this limitation.

Claim 1 recites, "*determine an orientation of the head with respect to the camera*." Ex. 1001, 15:35–36. Petitioner establishes that the cited art teaches this limitation. Pet. 56–58, 75 (citing Ex. 1003 ¶¶ 236–239, 303–304; Ex. 1005, 1–3; Ex. 1007 ¶¶ 92, 120, 121, 130, 136, 166–168, 173, 176, Figs. 1(a)–1(c), 5(a), 6(a)–6(e)). The Petition states:

> Steinberg normalizes detected faces. Ex-1007, ¶0092("If faces are found, then they are preferably normalized and face prints are generated."), ¶0120, ¶0130, ¶0136, FIGs. 1(a)-(c). Normalizing includes determining a pose or orientation of the detected face. Ex-1007, ¶0120 ("[T]he Face Normalization module … analyzes the …pose, … orientation of each face candidate region."), ¶0166, ¶0168, FIG. 5(a) . . . ¶0176, FIG. 5(b); Ex-1003, ¶¶236-237.
>
> The determined facial pose or orientation is **an orientation of the head with respect to the camera** as it reflects different rotation angles of the head in an image with respect to the camera that captured the image (e.g., a frontal pose indicates that the face is directly facing the camera). Ex-1007, ¶0121, ¶0167, FIG. 6(a)-(e) . . . ¶0173; Ex-1003, ¶238.

*Id.* at 56–57 (first three alterations in original). Petitioner also relies on "Tian . . . teach[ing] determining an orientation of the head with respect to the camera." *Id.* at 75 (citing Ex. 1005, 1–3).

The cited evidence supports Petitioner's contentions. We find that the cited art teaches this limitation.

Claim 1 recites, "*determine audience identification information based on a match of the head to a known person associated with the media exposure environment*." Ex. 1001, 15:37–39. Petitioner shows that the cited art teaches this limitation. Pet. 58–61, 75 (citing Ex. 1003 ¶¶ 240–247, 305–306; Ex. 1006 ¶¶ 3, 48; Ex. 1007 ¶¶ 5, 57, 92, 96, 99, 126, 127, 130, 135, 156, 157, 178, Figs. 1(a)–1(c), 4(a), 4(b), 9(a)). The Petition states:

> Steinberg teaches **determining identification information** (e.g., identity region, identity grouping, face class, identity of person) **based on a match of the head to a known person**. Steinberg teaches face recognition based a match between a "face region" in an image and a "known face." Ex-1007, ¶0005, ¶0057; Ex-1003, ¶240. Face recognition is performed by generating a faceprint and comparing it with faceprints stored in a database. Ex-1007, ¶0092 ("[T]he face recognition module… compares their faceprints with a database of 'known faceprints'."), ¶0096, ¶¶0126-0127, ¶0130, FIGs. 1(a)-(c); Ex-1003, ¶241. . . .
>
> A matched faceprint allows the determination of the identity information (e.g., a face class, association with a person). Ex-1007, ¶¶0156-0157, FIGs. 4(a)-(b) . . . Ex-1003, ¶243. Steinberg's teachings regarding faceprints teaches a match of a "head" (e.g., used interchangeably with face) to a known person. *See, e.g.,* Ex-1001, 10:20-38 ("… to identify heads and/or faces"); Ex-1003, ¶244.
>
> Nielsen-372 teaches that its people meter is located in a media exposure environment for identifying members of the **audience**. . . . Ex- 1006, ¶0003, ¶0048. Combining Nielsen-372 and Steinberg (supra §VI.B.1), it would have been obvious to compare a face or head in an image to those for persons **associated with the media exposure environment**.

*Id*. at 58–61 (first two and fourth alterations in original).

The cited evidence supports Petitioner's contentions. We find that the cited art teaches this limitation.

The last limitation of claim 1 recites, "*network interface circuitry to output a signal indicative of the content identifying data and the audience identification information to a data collection facility*." Ex. 1001, 15:40–42. Petitioner shows that the cited art teaches this limitation. Pet. 61–64, 75 (citing Ex. 1003 ¶¶ 248–252, 307–308; Ex. 1006 ¶¶ 35, 41, Fig. 29; Ex. 1007 ¶ 131). The Petition states:

> Nielsen-372 teaches "implementing the apparatus and methods" using a computer that includes a[n] "interface circuit." Ex-1006, ¶0135, FIG. 29 . . . . Nielsen-372's interface circuit can be implemented as an "Ethernet interface," which is a network interface circuitry. Ex-1006, ¶0135; Ex-1003, ¶248.
>
> The combination teaches that the network interface circuitry outputs a signal indicative of the content identifying data and the audience identification information to a data collection facility (e.g., central facility, central office, data processing facility, image collection database). Nielsen-372 teaches that the local metering system outputs viewing records to a central office or data processing facility over a network connection. Ex-1006, ¶0041 ("The metering unit 124 … transmits the collected viewing records over a connection 140 to a central office or data processing facility[.]"), ¶0036, FIG. 1 . . . Ex-1003, ¶249.
>
> A POSITA would have understood that the central office or data processing facility in Nielsen-372 and the image classification database in Steinberg are data collection facilities because they collect and store data. Because data commonly transmit over networks in the form of electromagnetic signals, Nielsen-372 and Steinberg teach outputting a signal to a data collection facility. Ex-1003, ¶251. A POSITA would have found it obvious that the signal is indicative of the content identifying data and the audience identification information. . . . Ex-1003, ¶252.

*Id.* at 61–64 (emphasis omitted, third alteration in original). The cited evidence supports Petitioner's contentions. We find that the cited art teaches this limitation.

Summing up our analysis of the showing by Petitioner, we find that the cited art teaches all the limitations of disclaimed, independent claims 1, 9, and 16 of the '243 patent.

*4. Claims 4, 11, and 18*

Claims 4, 11, and 18 are similar. *See* Ex. 1001, 15:53–60, 16:47–53, 17:40–47. Claim 4 depends from claim 1 and recites that the processor circuitry is to:

> *reduce a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image, and*
> *determine the orientation of the head with respect to the camera based on the reduced-resolution image.*

*Id.* at 15:56–60. Petitioner cites Tian and the testimony of Dr. Doermann (Ex. 1003 ¶¶ 310–313 (claim 1), 355–357 (claim 11), 384–386 (claim 18)) in support of its challenge to claims 4, 11, and 18. For the "reduce a resolution" limitation, Petitioner again relies on Tian. Pet. 75 (citing Ex. 1005, 1 (Abstract), 2). The Petition also provides that, "Steinberg's teachings of processing images of different resolutions would have further motivated a POSITA to apply Tian's teachings." *Id.* at 76 (citing Ex. 1007 ¶¶ 141, 142, 196). Steinberg states:

> Selective compression, or alternatively selective resolution, or both, of images may be suggested or automatically provided where one or more faces receive higher grade compression and/or alternatively higher local resolution than other portions of the image. A fill flash may be automatically digitally simulated or suggested, or actually applied to an object, upon analysis of a luminance map of the image. A

> camera may also be automatically focused prior to acquiring an image based on knowledge regarding the faces in an image.

Ex. 1007 ¶ 196.

With regard to the "determine the orientation of the head" limitation, Petitioner again relies on Tian. Pet. 76 (citing Ex. 1003 ¶ 105). As discussed above with regard to claim 4 and the combination of Lu-577 and Tian, we find Petitioner has shown that Tian teaches the limitations of claim 4.

For claims 11 and 18 (Pet. 82–83, 86–87), Petitioner relies on the showing for claim 4 (*id.* at 75–76).

With regard to claims 4, 11, and 18, Patent Owner relies on its arguments discussed above with regard to the combination of Lu-577 and Tian for disputing Petitioner's showing based on the combination of Nielsen-372, Steinberg, and Tian. PO Resp. 49. Patent Owner's Response states, "Tian does not teach or suggest instructions, a device, or a step for 'reducing a resolution,' and Petitioner's mappings for claims 4, 11, and 18 in Ground 3 fail for the same reason as that in Ground 1." *Id.* Accordingly, we have already considered Patent Owner's arguments and found them to be unavailing.

Based on the entire trial record, we find that the limitations of claims 4, 11, and 18 are taught by the cited art and a skilled artisan would have been motivated to apply the relevant teachings of the cited art in the manner recited in claims 4, 11, and 18. We conclude that Petitioner has shown by a preponderance of the evidence that claims 4, 11, and 18 would have been obvious in view of Nielsen-372, Steinberg, and Tian.

*5. Claim 5*

Claim 5 recites:

> *The audience measurement system of claim 4, wherein the processor circuitry is to determine the audience identification information by: (i) generating a facial signature from a region of a second image of the one or more of the images corresponding to a location of the head in the reduced-resolution image, and (ii) comparing the generated facial signature to a database of facial signatures.*

Ex. 1001, 15:61–67. Petitioner relies on the testimony of Dr. Doermann to support its challenge to claim 5. Pet. 76–78 (citing Ex. 1003 ¶¶ 315–321).

Petitioner cites Steinberg for teaching "*determin[ing] the audience identification information.*" Pet. 77–78 (citing Ex. 1007 ¶¶ 99, 135, 156, 157, 178, Figs. 4(a)–(b), 9(a)). The Petition states, "Steinberg . . . teaches **determining the audience identification information** by generating the facial signature and comparing the generated facial signature to a database of facial signatures." Cited paragraph 178 of Steinberg is the first paragraph in a section titled, "Image Recognition Process" and provides:

> A highly advantageous feature of the system of the preferred embodiment is its approach to the problem of implementing an adaptive, self-learning means of performing face recognition. FIG. 9(*a*) shows a graphical representation of how multiple, distinct, face classes formed from collections of closely collocated faceprints can be used to define a unique region in Face Space which is associated with a particular Identity Region for a "known person".

Ex. 1007 ¶ 178.

With regard to "*generating a facial signature from a region . . . corresponding to a location of the head*," Petitioner cites Steinberg. Pet. 76 (citing Ex. 1007 ¶¶ 92, 96, 126, 127, 130, Figs. 1(a)-(c)). The Petition states

that "Steinberg's faceprint is a 'facial signature' because it is a feature vector corresponding to parameters associated with a face region" (*id.* at 76–77 (citing Ex. 1003 ¶ 316; Ex. 1007 ¶¶ 77, 124, 126) and "Steinberg's face candidate region corresponds to a location of the face, which is also the location of the head" (*id.* at 77 (citing Ex. 1003 ¶ 317; Ex. 1007 ¶¶ 118, 120).

With regard to generating the facial signature from a region of "*a second image of the one or more of the images*" corresponding to a location of the head "*in the reduced-resolution image*," Petitioner relies on Tian. Pet. 77 (citing Ex. 1005, 1, 3, 5). Petitioner states:

> In light of Tian's teachings of generating a reduced-resolution image and tracking face in a sequence of images, a POSITA would have found it obvious to determine the location of a person's face in a reduced-resolution image and use this location to perform facial recognition based on higher-resolution images. . . . In this manner, after a location of the head is determined in a reduced-resolution image generated from a first image, facial recognition is performed on a region corresponding to the location in one or more images of the sequence, including a second image.

*Id.*

With regard to "*comparing the generated facial signature to a database of facial signatures*," Petitioner relies on Steinberg (citing Ex. 1007 ¶¶ 92, 96, 126, 127, 130, Figs. 1(a)–(c)). Steinberg states: "[O]ne or more faces are detected within the acquired images, and face recognition module 1640 which compares face classifier parameter values of the normalized face regions, or face prints, with archived face prints to discern whether there are matches with known identities." Ex. 1007 ¶ 130.

For claim 5, Patent Owner relies on its previously discussed arguments that we have found to be unavailing. *See* PO Resp. 49–50.

The cited evidence supports Petitioner's contention that all the limitations of claim 5 are taught by the cited art. We find that Petitioner has established that the cited art teaches the limitations of claim 5.

*6. Claim 6*

Claim 6 recites:

> *The audience measurement system of claim 4, wherein the processor circuitry is to:*
> *identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained;*
> *analyze a portion corresponding to the identified region of a second image; and*
> *based on the analysis of the region of the second image, determine that the head matches the known person.*

Ex.1001, 16:1–9. Petitioner relies on the testimony of Dr. Doermann to support its challenge to claim 6. Pet. 78–79 (citing Ex. 1003 ¶¶ 323–328).

With regard to "*identify[ing] a region corresponding to the head within the first image from which the reduced-resolution image was obtained,*" Petitioner cites Steinberg and Tian. Pet. 78 (citing Ex. 1005, 1, 3; Ex. 1007, code (57) (Abstract), ¶¶ 5, 57, 118, 128, 130, 151, Fig. 3). The Petition states: "Steinberg teaches analyzing images to detect a 'face region,' which is a region corresponding to the face and head"; "Tian teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected"; and "Tian . . . teaches **obtaining a reduced-resolution image from the first image**." *Id.*

With regard to "*analyze a portion corresponding to the identified region of a second image; and based on the analysis of the region of the second image, determine that the head matches the known person*," Petitioner cites Steinberg. Pet. 79 (citing Ex. 1007 ¶¶ 92, 96, 99, 126, 127, 130, 135, 156, 157, 178, Figs. 1(a)–(c), 4(a)–(b)). The Petition states that "Steinberg teaches analyzing a portion corresponding to the identified region of the head or face to determine that the head matches the known person based on the analysis" and "[i]t would have been obvious to apply Tian's teaching to Nielsen-372 and Steinberg such that the television audience measurement system determines a face or head location in a first image and use[s] the determined location for subsequent images." *Id.*

For claim 6, Patent Owner relies on its previously discussed arguments that we have found to be unavailing. *See* PO Resp. 49–50.

The cited evidence supports Petitioner's contention that all the limitations of claim 6 are taught by the cited art. We find that Petitioner has established that the cited art teaches the limitations of claim 6.

*7. Claim 8*

Claim 8 recites:

> *The audience measurement system of claim 6, wherein the audience identification information includes an identifier associated with the known person and the processor circuitry is to, responsive to a determination that the head matches the known person, cause the identifier associated with the person to be stored in the memory.*

Ex. 1001, 16:15–20. Petitioner relies on the testimony of Dr. Doermann to support its challenge to claim 8. Pet. 79–80 (citing Ex. 1003 ¶¶ 331–334).

The Petition states:

> The combination teaches determining audience identification information based on a match of the head to a known person and outputting such information. . . . Steinberg teaches the local metering unit storing viewing records, which includes information regarding the audience, before sending the records to a central facility. . . . Steinberg also stores identification information in association with faceprints. . . .
>
> The audience identification information includes, for example, identity region, identity grouping, face class, and identity of person. . . . The identification information are linked to database profiles of known persons. . . . Because the identification information identifies known persons, a POSITA would have understood or found it obvious for it to include identifiers, which the '243 patent also admits to be known in the prior art. . . .
>
> The combination teaches that the audience measurement system includes a memory. . . . A POSITA would have found it obvious to cause the identifier associated with the person to be stored in memory.

Pet. 79–80 (citing Ex. 1006 ¶¶ 36, 41, 48; Ex. 1007 ¶¶ 99, 135, 150, 156, 157, 159, 178).

Patent Owner does not present any arguments specific to the combination of Neilsen-372, Steinberg, and Tian, and claim 8. *See generally* PO Resp.

The cited evidence supports Petitioner's contention that all the limitations of claim 8 are taught by the cited art. We find that Petitioner has established that the cited art teaches the limitations of claim 8.

*8. Claim 12*

Claim 12 is similar to claim 6. *Compare* Ex. 1001, 16:1–9, *with id.* at 16:54–61. Claim 12 recites:

> *The audience measurement system of claim 11, wherein the audience measurement device is to:*

> *identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained; and*
> *analyze a portion of a second image corresponding to the identified region to determine whether the head matches the known person.*

Ex. 1001, 16:54–61. Based on its showing for claim 6, 9, and 11, and the testimony of Dr. Doermann (Ex. 1003 ¶¶ 359–361), Petitioner contends that the cited art teaches the limitations of claim 12. Pet. 83. The Petition also states that "the combination teaches analyzing a portion of a second image corresponding to the identified region to determine that the head matches the known person" and "Steinberg teaches determining whether the head matches the known person." *Id.* (citing Ex. 1007 ¶ 126).

For claim 12, Patent Owner relies on its previously discussed arguments that we have found to be unavailing. *See* PO Resp. 49–50.

The cited evidence supports Petitioner's contention that all the limitations of claim 12 are taught by the cited art. We find that Petitioner has established that the cited art teaches the limitations of claim 12.

*9. Claim 13*

Claim 13 is similar to claim 8. *Compare* Ex. 1001, 16:15–19, *with id.* at 16:62–67. Claim 13 recites:

> *The audience measurement system of claim 12, wherein the audience identification information includes an identifier associated with the known person and the audience measurement device is to, responsive to the indication that the head matches the known person, cause recordation of the identifier associated with the known person in a memory.*

Ex. 1001, 16:62–67. Based on its showing for claims 8, 9, and 12, and the testimony of Dr. Doermann (Ex. 1003 ¶ 363), Petitioner contends that the

cited art teaches the limitations of claim 13. Pet. 83–84. The Petition states that "the combination teaches that the audience identification information includes an identifier associated with the known person and that the audience measurement device causes the identifier associated with the person to be stored (i.e., recorded) in the memory responsive to a determination that the head matches the known person" and "[t]he combination further teaches representing the match with an indication that the head matches the known person." *Id.*

Patent Owner does not present any arguments specific to the combination of Neilsen-372, Steinberg, and Tian, and claim 13. *See generally* PO Resp.

The cited evidence supports Petitioner's contention that all the limitations of claim 13 are taught by the cited art. We find that Petitioner has established that the cited art teaches the limitations of claim 13.

*10. Claim 14*

Claim 14 is similar to claim 5. *Compare* Ex. 1001, 15:61–67, *with id.* at 17:1–7. Claim 14 recites:

> *The audience measurement system of claim 11, wherein the audience measurement device is to determine the audience identification information by: (i) generating a facial signature from a region of a second image corresponding to a location of the head in the reduced-resolution image, and (ii) comparing the generated facial signature to a database of facial signatures.*

Ex. 1001, 17:1–7. Based on its showing for claims 5, 9, and 11 and the testimony of Dr. Doermann (Ex. 1003 ¶ 365), Petitioner contends that the cited art teaches the limitations of claim 14. Pet. 84.

For claim 14, Patent Owner relies on its previously discussed arguments that we have found to be unavailing. *See* PO Resp. 49–50.

The cited evidence supports Petitioner's contention that all the limitations of claim 14 are taught by the cited art. We find that Petitioner has established that the cited art teaches the limitations of claim 14.

*11. Claim 19*

Claim 19 is similar to claims 6 and 12. *Compare* Ex. 1001, 16:1–9 (claim 6), *and id.* at 16:54–61 (claim 12), *with id.* at 17:48–56 (claim 19). Claim 19 recites:

> *The method of claim 18, further comprising:*
> *identifying a region corresponding to the head within the first image from which the reduced-resolution image was obtained;*
> *analyzing a portion of the second image corresponding to the identified region; and*
> *based on the analyzing of the region of the second image, determining whether the head matches the known person.*

Ex. 1001, 17:48–56. Based on its showing for claims, 6, 12, and 18 and the testimony of Dr. Doermann (Ex. 1003 ¶¶ 388–390), Petitioner contends that the cited art teaches the limitations of claim 19. Pet. 87.

For claim 19, Patent Owner relies on its previously discussed arguments that we have found to be unavailing. *See* PO Resp. 49–50.

The cited evidence supports Petitioner's contention that all the limitations of claim 19 are taught by the cited art. We find that Petitioner has established that the cited art teaches the limitations of claim 19.

*12. Claim 20*

Claim 20 is similar to claims 8 and 13. *Compare* Ex. 1001, 16:15–19 (claim 8), *and id.* at 16:62–67 (claim 13), *with id.* at 17:58–61 (claim 20). Claim 20 recites:

> *The method of claim 19, wherein the audience identification information includes an identifier associated with the known person, and further including recording the identifier associated with the known person in a memory.*

Ex. 1001, 17:58–61. Based on its showing for claims, 8, 13, and 19 and the testimony of Dr. Doermann (Ex. 1003 ¶ 392), Petitioner contends that the cited art teaches the limitations of claim 20. Pet. 87–88.

Patent Owner does not present any arguments specific to the combination of Neilsen-372, Steinberg, and Tian, and claim 20. *See generally* PO Resp.

The cited evidence supports Petitioner's contention that all the limitations of claim 20 are taught by the cited art. We find that Petitioner has established that the cited art teaches the limitations of claim 20.

*13. Summary as to Claims 4–6, 8, 11–14, and 18–20*

We have considered all the arguments and evidence presented by the parties with regard to claims 4–6, 8, 11–14, and 18–20. Petitioner has shown that the combination of Nielsen-372, Steinberg, and Tian teaches all the limitations of claims 4–6, 8, 11–14, and 18–20, and has articulated well-supported reasoning as to why a skilled artisan would have been motivated to combine these teachings as set forth in claims 4–6, 8, 11–14, and 18–20. In contrast, Patent Owner's arguments to the contrary are relatively weak. Based on the entire trial record, we conclude that Petitioner has shown by a preponderance of the evidence that claims 4–6, 8, 11–14, and 18–20 would

have been obvious in view of Nielsen-372, Steinberg, and Tian.

## III. CONCLUSION[34]

Based on the entire trial record, Petitioner has demonstrated by a preponderance of the evidence that claims 4–6, 8, 11–14, and 18–20 of the '243 patent are unpatentable. For the reasons stated above, we conclude that (1) the combination of Lu-577 and Tian and (2) the combination of Nielsen-372, Steinberg, and Tian both render obvious the subject matter of claims 4–6, 8, 11–14, and 18–20 of the '243 patent. A summary of our conclusions is set forth in the table below.

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 4–6, 8, 11–14, 18–20 | 103 | Lu-577, Tian | 4–6, 8, 11–14, 18–20 | |
| 4–6, 8, 11–14, 18–20 | 103 | Nielsen-372, Steinberg, Tian | 4–6, 8, 11–14, 18–20 | |
| **Overall Outcome** | | | 4–6, 8, 11–14, 18–20 | |

[34] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that claims 4–6, 8, 11–14, and 18–20 of U.S. Patent No. 11,470,243 B2 are held to be unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, parties to this proceeding seeking judicial review of our decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

FOR PETITIONER:

Harper Batts
Chris Ponder
Jeffrey Liang
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
hbatts@sheppardmullin.com
cponder@sheppardmullin.com
jliang@sheppardmullin.com

FOR PATENT OWNER:

Jennifer Bailey
Robin Snader
ERISE IP, P.A.
jennifer.bailey@eriseip.com
robin.snader@eriseip.com

US011470243B2

(12) **United States Patent**
**Nielsen**

(10) **Patent No.: US 11,470,243 B2**
(45) **Date of Patent: Oct. 11, 2022**

(54) **METHODS AND APPARATUS TO CAPTURE IMAGES**


(71) Applicant: **The Nielsen Company (US), LLC**, New York, NY (US)

(72) Inventor: **Christen V. Nielsen**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, New York, NY (US)


(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.


(21) Appl. No.: **17/751,283**

(22) Filed: **May 23, 2022**

(65) **Prior Publication Data**

US 2022/0286601 A1 Sep. 8, 2022

**Related U.S. Application Data**

(63) Continuation of application No. 17/666,322, filed on Feb. 7, 2022, which is a continuation of application (Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***H04N 5/232*** | (2006.01) |
| ***G06V 40/16*** | (2022.01) |
| ***H04N 21/4223*** | (2011.01) |
| ***H04N 21/442*** | (2011.01) |
| ***G06V 40/10*** | (2022.01) |
| ***G06V 20/52*** | (2022.01) |
| ***H04N 21/4415*** | (2011.01) |
| ***H04H 60/45*** | (2008.01) |
| ***G06V 10/141*** | (2022.01) |
| ***H04N 5/347*** | (2011.01) |

(Continued)

(52) **U.S. Cl.**
CPC ....... ***H04N 5/23219*** (2013.01); ***G06V 10/141*** (2022.01); ***G06V 20/53*** (2022.01); ***G06V 40/103*** (2022.01); ***G06V 40/161*** (2022.01); ***G06V 40/172*** (2022.01); ***H04H 60/45*** (2013.01); ***H04N 5/2256*** (2013.01); ***H04N 5/33*** (2013.01); ***H04N 5/347*** (2013.01); ***H04N 21/4223*** (2013.01); ***H04N 21/4415*** (2013.01); ***H04N 21/44218*** (2013.01)

(58) **Field of Classification Search**
CPC .... H04N 5/23219; H04N 5/2256; H04N 5/33; H04N 5/347; H04N 21/4223; H04N 21/4415; H04N 21/44218; G06V 10/141; G06V 20/53; G06V 40/103; G06V 40/161; G06V 40/172; H04H 60/45
See application file for complete search history.


(56) **References Cited**


U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,987,154 | A | 11/1999 | Gibbon et al. |
| 6,014,461 | A | 1/2000 | Hennessey et al. |

(Continued)

OTHER PUBLICATIONS

Wikipedia. (Dec. 2010) "Kinect." http://en.wikipedia.org/wiki/Kinect, 15 pages.

(Continued)


*Primary Examiner* — Amandeep Saini
(74) *Attorney, Agent, or Firm* — Hanley, Flight & Zimmerman, LLC

(57) **ABSTRACT**


Methods and apparatus to obtain exposure data for media exposure environment(s) are disclosed. An example apparatus disclosed herein includes processor circuitry to determine audience identification information and content identifying data.


**29 Claims, 5 Drawing Sheets**



**Related U.S. Application Data**

No. 16/878,935, filed on May 20, 2020, now Pat. No. 11,245,839, which is a continuation of application No. 16/196,810, filed on Nov. 20, 2018, now abandoned, which is a continuation of application No. 15/793,108, filed on Oct. 25, 2017, now Pat. No. 10,165,177, which is a continuation of application No. 15/419,120, filed on Jan. 30, 2017, now Pat. No. 9,843,717, which is a continuation of application No. 14/732,175, filed on Jun. 5, 2015, now Pat. No. 9,560,267, which is a continuation of application No. 13/327,227, filed on Dec. 15, 2011, now Pat. No. 9,082,004.

(51) **Int. Cl.**
***H04N 5/33*** (2006.01)
***H04N 5/225*** (2006.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 7,043,056 | B2 | 5/2006 | Edwards et al. |
| 7,440,593 | B1 | 10/2008 | Steinberg et al. |
| 7,602,524 | B2 | 10/2009 | Eichhorn et al. |
| 7,636,456 | B2 | 12/2009 | Collins et al. |
| 7,676,065 | B2 | 3/2010 | Wiedemann et al. |
| 7,697,735 | B2 | 4/2010 | Adam et al. |
| 7,796,154 | B2 | 9/2010 | Senior et al. |
| 7,899,209 | B2 | 3/2011 | Greiffenhagen et al. |
| 8,620,088 | B2 | 12/2013 | Lee |
| 9,082,004 | B2 | 7/2015 | Nielsen |
| 9,560,267 | B2 | 1/2017 | Nielsen |
| 9,843,717 | B2 | 12/2017 | Nielsen |
| 10,165,177 | B2 | 12/2018 | Nielsen |
| 11,245,839 | B2 | 2/2022 | Nielsen |
| 2003/0081834 | A1 | 5/2003 | Philomin et al. |
| 2003/0093784 | A1 | 5/2003 | Dimitrova et al. |
| 2004/0122679 | A1 | 6/2004 | Neuhauser et al. |
| 2005/0117783 | A1 | 6/2005 | Sung et al. |
| 2006/0062429 | A1 | 3/2006 | Ramaswamy et al. |
| 2006/0133699 | A1 | 6/2006 | Widrow et al. |
| 2007/0150916 | A1 | 6/2007 | Begole et al. |
| 2007/0154063 | A1 | 7/2007 | Breed |
| 2007/0263934 | A1 | 11/2007 | Ojima et al. |
| 2007/0294126 | A1 | 12/2007 | Maggio |
| 2008/0232650 | A1 | 9/2008 | Suzuki et al. |
| 2008/0243590 | A1 | 10/2008 | Rich |
| 2008/0271065 | A1 | 10/2008 | Buonasera et al. |
| 2009/0091650 | A1 | 4/2009 | Kodama |
| 2009/0177528 | A1 | 7/2009 | Wu et al. |
| 2009/0307084 | A1 | 12/2009 | Monighetti et al. |
| 2009/0310829 | A1 | 12/2009 | Baba et al. |
| 2010/0245567 | A1 | 9/2010 | Kralmstoever et al. |
| 2011/0019924 | A1 | 1/2011 | Elgersma et al. |
| 2011/0137721 | A1 | 6/2011 | Bansal |
| 2011/0164188 | A1* | 7/2011 | Karaoguz .......... H04N 21/4122 348/734 |
| 2011/0169953 | A1 | 7/2011 | Sandler et al. |
| 2011/0265110 | A1 | 10/2011 | Weinblatt |
| 2011/0285845 | A1 | 11/2011 | Bedros et al. |
| 2012/0081392 | A1 | 4/2012 | Arthur |
| 2012/0151079 | A1 | 6/2012 | Besehanic et al. |
| 2013/0013396 | A1 | 1/2013 | Vinson et al. |
| 2013/0129159 | A1 | 5/2013 | Huijgens et al. |
| 2013/0152113 | A1* | 6/2013 | Conrad ............ H04N 21/42201 725/12 |
| 2013/0156273 | A1 | 6/2013 | Nielsen |
| 2015/0271390 | A1 | 9/2015 | Nielsen |
| 2017/0142330 | A1 | 5/2017 | Nielsen |
| 2018/0048807 | A1 | 2/2018 | Nielsen |
| 2019/0089894 | A1 | 3/2019 | Nielsen |
| 2020/0351436 | A1 | 11/2020 | Nielsen |

OTHER PUBLICATIONS

Fellers et al. (Aug. 2004) "Nikon MicroscopyU: Interactive Java Tutorials—CCD Signal-to-Noise Ratio." http://www.microscopyu.com/tutorials/java/digitalimaging/signaltonoise/index.html as archived by The Internet Archive, www.archive.org., 4 pages.

United States Patent and Trademark Office, "Non-Final Office Action," issued in connection with U.S. Appl. No. 13/327,227, dated May 20, 2014, 15 pages.

United States Patent and Trademark Office, "Final Office Action," issued in connection with U.S. Appl. No. 13/327,227, dated Sep. 18, 2014, 20 pages.

United States Patent and Trademark Office, "Notice of Allowance and Fee(s) Due," issued in connection with U.S. Appl. No. 13/327,227, dated Mar. 6, 2015, 9 pages.

United States Patent and Trademark Office, "Requirement for Restriction/Election," issued in connection with U.S. Appl. No. 14/732,175, dated Jul. 8, 2016, 6 pages.

United States Patent and Trademark Office, "Notice of Allowance and Fee(s) Due," issued in connection with U.S. Appl. No. 14/732,175, dated Sep. 23, 2016, 10 pages.

United States Patent and Trademark Office, "Notice of Allowance and Fee(s) Due," issued in connection with U.S. Appl. No. 15/419,120, dated Aug. 2, 2017, 10 pages.

United States Patent and Trademark Office, "Notice of Allowance and Fee(s) Due," issued in connection with U.S. Appl. No. 15/793,108, dated Aug. 23, 2018, 10 pages.

United States Patent and Trademark Office, "Non-Final Office action," issued in connection with U.S. Appl. No. 15/793,108, dated Mar. 2, 2018, 11 pages.

United States Patent and Trademark Office, "Advisory action," issued in connection with U.S. Appl. No. 16/196,810, dated May 13, 2020, 2 pages.

United States Patent and Trademark Office, "Final Office action," issued in connection with U.S. Appl. No. 16/196,810, dated Feb. 26, 2020, 23 pages.

United States Patent and Trademark Office, "Non-Final Office action," issued in connection with U.S. Appl. No. 16/196,810, dated Nov. 7, 2019, 15 pages.

United States Patent and Trademark Office, "Advisory action," issued in connection with U.S. Appl. No. 16/196,810, dated Aug. 22, 2019, 2 pages.

United States Patent and Trademark Office, "Final Office action," issued in connection with U.S. Appl. No. 16/196,810, dated Jun. 13, 2019, 16 pages.

United States Patent and Trademark Office, "Non-Final Office action," issued in connection with U.S. Appl. No. 16/196.810, dated Mar. 1, 2019, 14 pages.

United States Patent and Trademark Office, "Non-Final Office action," issued in connection with U.S. Appl. No. 16/878.935, dated Jun. 10, 2021, 9 pages.

United States Patent and Trademark Office, "Notice of Allowance and Fee(s) Due," issued in connection with U.S. Appl. No. 16/878,935, dated Sep. 27, 2021, 7 pages.


* cited by examiner




FIG. 1


104
200
AUDIENCE MEASUREMENT DEVICE
AUDIENCE DETECTOR
PEOPLE COUNTER 206
PERSON IDENTIFIER 207
IMAGE SENSOR 204
TIME STAMPER 208
MEMORY 210
202
PROGRAM DETECTOR 212
OUTPUT DEVICE 214
CONTENT IDENTIFIER

FIG. 2


204
IMAGE SENSOR
RESOLUTION DETERMINER 300
HI-RES TRIGGER 302
FRAME CACHE 303
IMAGE CAPTURER 308
FRAME ROUTER 310
PERSON IDENTIFIER 207
ILLUMINATION CONTROLLER 304
PIXEL BINNER 312
PEOPLE COUNTER 206
ILLUMINATOR 306

FIG. 3


400
INITIATION OF IMAGE SENSOR
402
IS NEXT FRAME(S) TO BE CAPTURED DESIGNATED FOR HIGH-RESOLUTION PROCESSING?
YES
NO
404
DISABLE ILLUMINATOR
406
CAPTURE FRAME(S) WITH ILLUMINATOR DEACTIVATED
408
ROUTE FRAME(S) TO PIXEL BINNER
410
PERFORM BINNING PROCEDURE ON IMAGE DATA OF FRAME(S) CAPTURED WITH ILLUMINATOR DEACTIVATED
412
CONVEY FRAME(S) TO PEOPLE COUNTER AND FRAME CACHE
414
ENABLE ILLUMINATOR
416
CAPTURE FRAME(S) WITH ILLUMINATOR ACTIVATED
418
CONVEY FRAME(S) TO PERSON IDENTIFIER AND FRAME CACHE

FIG. 4


510
512
PROCESSOR
514
526
I/O
DEVICE
522
518
I/O
CONTROLLER
532
MEMORY
CONTROLLER
I/O
DEVICE
530
NETWORK
INTERFACE
520
528
534
524
SYSTEM
MEMORY
MASS STORAGE
MEMORY
NETWORK
525
DIGITAL VERSATILE
DISK (DVD)
540

FIG. 5

# METHODS AND APPARATUS TO CAPTURE IMAGES

## RELATED APPLICATIONS

This patent arises from a continuation of U.S. patent application Ser. No. 17/666,322, filed Feb. 7, 2022, which is a continuation of U.S. patent application Ser. No. 16/878,935, filed May 20, 2020, now U.S. Pat. No. 11,245,839, which is a continuation of U.S. patent application Ser. No. 16/196,810, filed Nov. 20, 2018, which is a continuation of U.S. patent application Ser. No. 15/793,108, filed Oct. 25, 2017, now U.S. Pat. No. 10,165,177, which is a continuation of U.S. patent application Ser. No. 15/419,120, filed Jan. 30, 2017, now U.S. Pat. No. 9,843,717, which is a continuation of U.S. patent application Ser. No. 14/732,175, filed Jun. 5, 2015, now U.S. Pat. No. 9,560,267, which is a continuation of U.S. patent application Ser. No. 13/327,227, filed Dec. 15, 2011, now U.S. Pat. No. 9,082.004. U.S. patent application Ser. No. 17/666,322, U.S. patent application Ser. No. 16/878,935, U.S. patent application Ser. No. 16/196,810, U.S. patent application Ser. No. 15/793,108, U.S. patent application Ser. No. 15/419,120, U.S. patent application Ser. No. 14/732,175, and U.S. patent application Ser. No. 13/327,227 are hereby incorporated herein by reference in their entirety. Priority to U.S. patent application Ser. No. 17/666,322, U.S. patent application Ser. No. 16/878,935, U.S. patent application Ser. No. 16/196,810, U.S. patent application Ser. No. 15/793,108, U.S. patent application Ser. No. 15/419,120, U.S. patent application Ser. No. 14/732,175 and U.S. patent application Ser. No. 13/327,227 is claimed.

## FIELD OF THE DISCLOSURE

This disclosure relates generally to audience measurement and, more particularly, to methods and apparatus to capture images.

## BACKGROUND

Audience measurement of media content (e.g., broadcast television and/or radio, stored audio and/or video content played back from a memory such as a digital video recorder or a digital video disc, audio and/or video content played via the Internet, video games, etc.) often involves collection of content identifying data (e.g., signature(s), fingerprint(s), embedded code(s), channel information, time of consumption information, etc.) and people data (e.g., identifiers, demographic data associated with audience members, etc.). The content identifying data and the people data can be combined to generate, for example, media exposure data indicative of amount(s) and/or type(s) of people that were exposed to specific piece(s) of media content.

In some audience measurement systems, the collected people data includes an amount of people being exposed to media content. To calculate the amount of people being exposed to the media content, some measurement systems capture a series of images of a media exposure environment (e.g., a television room, a family room, a living room, a bar, a restaurant, etc.) and analyze the images to determine how many people appear in the images at a particular date and time. The calculated amount of people in the media exposure environment can be correlated with media content being presented at the particular date and time to provide exposure data (e.g., ratings data) for that media content. Additionally,



some audience measurement systems identify people in the images via one or more identification techniques such as, for example, facial recognition.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an illustration of an example exposure environment including an example audience measurement device disclosed herein.

FIG. **2** is a block diagram of an example implementation of the example audience measurement device of FIG. **1**.

FIG. **3** is a block diagram of an example implementation of the example image sensor of FIG. **2**.

FIG. **4** is a flowchart illustrating example machine readable instructions that may be executed to implement the example image sensor of FIGS. **1**, **2** and/or **3**.

FIG. **5** is a block diagram of an example processing system capable of executing the example machine readable instructions of FIG. **4** to implement the example image sensor of FIGS. **1**, **2** and/or **3**.

## DETAILED DESCRIPTION

To count people in a media exposure environment, such as a room of a house in which a television is located, some audience measurement systems attempt to recognize objects as humans in a series of captured images of the room. A tally is maintained for each frame of image data to reflect an amount of people in the room at a time corresponding to a respective frame. That is, each recognition of an object as a human in a frame increases the tally associated with that frame. The audience measurement system counting the people in the room may also collect content identifying information to identify media content being presented (e.g., aurally and/or visually) in the room. With the identification of the media content and the amount of people in the room at a given date and time, the audience measurement system is aware of how many people were exposed to the specific media content.

Additionally, some systems recognize an identity of one or more of the detected humans by, for example, performing a facial recognition process on image data of one or more of the frames, receiving identifier(s) from the detected humans, detecting identifying signal(s) generated by devices carried by the humans, etc. Personal identification information can be used in conjunction with the content identifying information and/or the tally information to generate exposure information related to the content. When an audience measurement system uses a facial recognition process to identify people, an accuracy of the identification increases with an increase in resolution of the image data on which the facial recognition process is performed. In other words, the higher the resolution of a frame of image data, the more likely identification made via facial recognition will be accurate.

To provide high-resolution image data, audience measurement systems that include facial recognition capabilities typically employ high-resolution image sensors equipped with an illumination source, such as an infrared (IR) light emitting diode (LED). In previous systems, each time the high-resolution image sensor captures a frame of image data, the illumination source illuminates a surrounding area. The resulting illumination provides lighting conditions favorable to capturing high-resolution image data. When the illumination source is an IR LED, the illumination source emits IR light to enable the image sensor to capture illuminated

objects. In addition to the IR light, IR emitters also emit light from the visible spectrum that appears as a red glow from the emitter.

Frequent activation of the illumination sources when capturing image data represents a significant power drain for the audience measurement system. Moreover, frequent interval activation (e.g., every two seconds) of the illumination source shortens a lifetime of the illumination source. Additionally, due to significant amounts of heat generated by the illumination sources, heat sinking devices and techniques are typically needed in systems that activate the illumination sources frequently. Further, light emissions of the illumination source has the potential to annoy people such as, for example, members of a panel that are exposed to the illumination source while in the presence of the audience measurement system. In an audience measurement system utilizing an IR LED, the red glow emitted from the illumination source is a blinking red light that faces the panel members while the panel members are, for example, watching a television. This blinking red light may annoy some panel members. Annoyance of panel members is undesirable and may prove detrimental to an ability of the audience measurement system to maintain persons in the panel and/or to collect as much data as possible. That is, some audience measurement systems rely on the willing participation of panel members and, thus, reduction or elimination of annoying aspects of the system is beneficial to avoid impairing willingness to volunteer. An annoying feature of the audience measurement system may decrease panelist compliance with and/or participation in the system.

Example methods, apparatus, and articles of manufacture disclosed herein reserve use of an illumination source of a high-resolution image sensor for frames of image data designated for processing that requires high-resolution image data. Example frames designated for such processing include frames on which a facial recognition process is to be executed. For frames not designated for processing that requires high-resolution image data, example methods, apparatus, and articles of manufacture disclosed herein capture image data without the use of the illumination source. Example frames not designated for processing that requires high-resolution image data include frames on which a person count (e.g., a body count) is to be executed without recognizing an identity of the detected persons. Additionally, when image data is captured without activation of the illumination source (e.g., when the corresponding frame will not be subjected to facial recognition), example methods, apparatus, and articles of manufacture disclosed herein enhance resulting images to compensate for low light levels and loss of contrast due to lack of illumination. In particular, example methods, apparatus, and articles of manufacture disclosed herein employ a pixel binning procedure on the image data captured without use of the illumination source. Binning is the process of summing pixel values in a neighborhood of pixels (e.g., a 2×2, 3×3, 4×4, etc. area), thereby capturing more light per pixel at the cost of lower resolution. However, for example methods, apparatus, and articles of manufacture disclosed herein, the lower resolution is acceptable for the frames captured without the use of the illumination source because, as described above, those frames will not be subjected to processing that requires high-resolution data.

Accordingly, example methods, apparatus, and articles of manufacture disclosed herein selectively activate an illumination source associated with an image sensor for certain frames. In contrast, previous systems activate the illumination source for each frame captured by a corresponding image sensor. In many instances, frames not designated for high-resolution processing (e.g., frames used solely to count people) greatly outnumber the frames designated for high-resolution frame (e.g., frame used for facial recognition). In fact, as described below, a mode of an image sensor during which image data is captured without the use of the illumination source (e.g., because high-resolution image data is not necessary for the corresponding frame(s)) is referred to herein as a 'majority capture' mode. Conversely, because the number of frames requiring high-resolution image data is far less than the number of frames for which lower resolution image data is acceptable, a mode of the image sensor during which image data is captured with the use of the illumination source is referred to herein as a 'minority capture' mode.

Because the illumination source is a significant power consumer, selective activation of the illumination source provided by example methods, apparatus, and articles of manufacture disclosed herein greatly reduce power consumption levels of the image sensors of audience measurement systems. Moreover, the selective activation provided by example methods, apparatus, and articles of manufacture disclosed herein extends the operational lifetime of the image sensors of audience measurement systems by less frequently operating the corresponding illumination sources. Further, the selective activation provided by example methods, apparatus, and articles of manufacture disclosed herein reduces or even eliminates the need for heat sinking devices and/or techniques otherwise required to dissipate heat generated by the illumination sources. In addition to the reduced resource consumption provided by example methods, apparatus, and articles of manufacture disclosed herein, audience measurement methods, systems, and articles of manufacture employing the selective activation disclosed herein reduce the likelihood that panel members become irritated by light and/or glow emitted from illumination sources. As described above, illumination sources of image sensors typically face panel members in a media exposure environment (e.g., a television room) and, thus, the panel members are subjected to a blinking and/or glowing light whenever the illumination source is activated. In previous systems utilizing a high-resolution image sensor, each frame is captured with the use of the illumination source, resulting in a blinking light (e.g., red light in the case of an IR LED flash unit being used as the illumination source) or a light that is seemingly persistently on throughout operation of the system. Selectively activating the illumination source for frames requiring high-resolution image data and not activating the illumination source for other frames, as disclosed herein, considerably reduces the instances of illumination of the media exposure environment and, thus, the potential for irritating the panel members.

FIG. **1** is an illustration of an example media exposure environment **100** including a media presentation device **102** and an example audience measurement device **104** for measuring and/or identifying an audience **106** of the media presentation device **102**. In the illustrated example of FIG. **1**, the media exposure environment **100** is a room of a household that has been statistically selected to develop television ratings data for a population/demographic of interest. Assumingly, one or more persons of the household have registered with the system and provided this demographic information. The example audience measurement device **104** can be implemented in additional and/or alternative types of environments such as, for example, a room in a non-statistically selected household, a theater, a restaurant, a tavern, a retail location, an arena, etc. In the illustrated example of FIG. **1**, the media presentation device is a

television **102** coupled to a set-top box (STB) **108** that implements a digital video recorder (DVR) and a digital versatile disc (DVD) player. The example audience measurement device **104** can be implemented in connection with additional and/or alternative types of media presentation devices such as, for example, a radio, a computer monitor, a video game console and/or any other communication device able to present content to one or more individuals.

The example audience measurement device **104** of FIG. **1** utilizes a camera **110** to capture a plurality of time stamped frames of image data of the environment **100**. The example camera **110** captures images within a field of view defined by the dotted lines of FIG. **1**. In the example shown in FIG. **1**, an image captured by the camera **110** includes each member of a three-person audience **106**. The images captured by the camera **110** are used to generate people tallies representative of how many people are in the audience **106** and/or personal identifications of the people in the audience. As described in detail below, the example audience measurement device **104** of FIG. **1** also monitors the environment **100** to identify media content being presented (e.g., displayed, played, etc.) by the television **102** and/or other media presentation devices to which the audience **106** is exposed. Identification(s) of media content to which the audience **106** is exposed are correlated with the people tallies and/or the personal identifications to generate exposure data for the media content.

FIG. **2** is a block diagram of an example implementation of the example audience measurement device **104** of FIG. **1**. The example audience measurement device **104** of FIG. **2** includes an audience detector **200** and a content identifier **202**. The example audience detector **200** includes an image sensor **204**, a people counter **206**, a person identifier **207**, a time stamper **208**, and a memory **210**. The example image sensor **204** of FIG. **2** captures frames of image data of the environment **100**, which includes the audience **106** being exposed to a presentation output by the media presentation device **102** of FIG. **1**. In the illustrated example, the image sensor **204** is implemented by a high-resolution camera capable of capturing high-resolution image data, such as an image sensor configured to capture images at a resolution of, for example, 1920×1080 or 1280×960. In some examples, the image sensor **204** and/or the camera **110** of FIG. **1** is implemented by a gaming system, such as XBOX® Kinect®.

In the illustrated example, the frames obtained by the image sensor **204** of FIG. **2** are conveyed to the people counter **206**. The example people counter **206** determines how many people appear in each of the received frames and records each of the amounts of people as a tally for each frame. The example people counter **206** can determine how many people appear in a frame in any suitable manner using any suitable technique. For example, the people counter **206** of FIG. **2** recognizes a general shape of a human body and/or a human body part, such as a head and/or torso. Additionally or alternatively, the example people counter **206** of FIG. **2** may count a number of "blobs" that appear in the frame and count each distinct blob as a person. Recognizing human shapes and counting "blobs" are illustrative examples and the people counter **206** of FIG. **2** can count people using any number of additional and/or alternative techniques. An example manner of counting people is described by Blumenthal in U.S. patent application No. 10/538,483, filed on Jun. 8, 2005, now U.S. Pat. No. 7,203,338, which is hereby incorporated herein by reference in its entirety. To track the number of detected people in a room, the example people counter **206** of FIG. **2** also tracks a position (e.g., an X-Y coordinate) of each detected person.

In the illustrated example, some frames obtained by the image sensor **204** of FIG. **2** are conveyed to the person identifier **207** in addition to or in lieu of the people counter **206**. As described in greater detail below in connection with FIG. **3**, the frames conveyed to the example person identifier **207** of FIG. **2** are frames designated (e.g., by the image sensor **204** and/or any other component of the audience measurement system **100**) for a facial recognition procedure such that people captured in those frames can be individually identified. In some examples, the audience detector **200** may have additional or alternative methods and/or components to identify people in the frames captured by the image sensor **204**, such as a feedback system to which the members of the audience **106** provide (e.g., actively and/or passively) identification to the audience measurement device **104**). To identify people in the frames captured by the image sensor **204**, the example person identifier **207** includes or has access to a collection (e.g., stored in a database) of facial signatures (e.g., vectors). Each facial signature corresponds to a person having a known identity to the person identifier **207**. The collection includes an identifier (ID) for each known facial signature that corresponds to a known person. For example, in reference to FIG. **1**, the collection of facial signatures may correspond to frequent visitors and/or members of the household associated with the room **100**. The example person identifier **207** analyzes one or more regions of a frame thought to correspond to a human face and develops a pattern or map for the region(s). The pattern or map of the region represents a facial signature of the detected human face. The example person identifier **207** compares the detected facial signature to entries of the facial signature collection. When a match is found, the person identifier **207** has successfully identified at least one person in the frame. In such instances, the person identifier **207** records (e.g., in a memory address dedicated to the person identifier **207**) the ID associated with the matching facial signature of the collection. When a match is not found, the person identifier **207** of the illustrated example retries the comparison or prompts the audience **106** for information that can be added to the collection of known facial signatures for the unmatched face. More than one signature may correspond to the same face (i.e., the face of the same person).

The example people counter **206** of FIG. **2** outputs the calculated tallies and/or corresponding image frames (or identifications thereof) to the time stamper **208**. Also, the person identifier **207** outputs the records ID(s) for any identified persons and/or the corresponding image frames (or identifications thereof) to the time stamper **208**. The time stamper **208** of the illustrated example includes a clock and a calendar. The example time stamper **208** associates a time and date with each calculated tally and/or ID and the corresponding frame by, for example, appending the time/date data to the end of the tally data, the ID(s), and/or the frame. A data package (e.g., the tally, the ID(s), the date and time, and/or the frame) is stored in the memory **210**. The memory **210** may include a volatile memory (e.g., Synchronous Dynamic Random Access Memory (SDRAM), Dynamic Random Access Memory (DRAM), RAMBUS Dynamic Random Access Memory (RDRAM, etc.) and/or a non-volatile memory (e.g., flash memory). The memory **210** may include one or more double data rate (DDR) memories, such as DDR, DDR2, DDR3, mobile DDR (mDDR), etc. The memory **210** may also include one or more mass storage devices such as, for example, hard drive disk(s), compact disk drive(s), digital versatile disk drive(s), etc.

The example content identifier **202** of FIG. **2** includes a program detector **212** and an output device **214**. The example program detector **212** of FIG. **2** detects presentation(s) of media content in the media exposure environment **100** and collects identification information associated with the detected presentation(s). For example, the program detector **212**, which may be in wired and/or wireless communication with the presentation device **102** and/or the STB **108** of FIG. **1**, can identify a presentation time and a source of a presentation. The presentation time and the source identification data may be utilized to identify the program by, for example, cross-referencing a program guide configured, for example, as a look up table. The source identification data may, for example, be the identity of a channel obtained, for example, by monitoring a tuner of the STB **108** or a digital selection (e.g., a remote control signal) of a channel to be presented on the television **102**. Additionally or alternatively, codes embedded with or otherwise broadcast with media content being presented via the STB **108** and/or the television **102** may be utilized by the program detector **212** to identify the presentation. As used herein, a code is an identifier that is transmitted with the media content for the purpose of identifying and/or tuning the corresponding media content. Codes may be carried in the audio, in the video, in metadata, in a vertical blanking interval, in a program guide, in content data, or in any other portion of the media content or the signal carrying the content. Additionally or alternatively, the program detector **212** can collect a signature representative of a portion of the media content. As used herein, a signature is a representation of some characteristic of the media content (e.g., a frequency spectrum of an audio signal). Collected signature(s) can be compared against a collection of signatures of known media content to identify the corresponding media content. The signature(s) can be collected by the program detector **212** and/or the program detector **212** can collect samples of the media content and export them to a remote site for generation of the signature(s). Irrespective of the manner in which the media content of the presentation is identified, the identification information is time stamped by the time stamper **208** and maybe stored in the memory **210**.

In the illustrated example of FIG. **2**, the output device **214** periodically and/or aperiodically exports the recorded data from the memory **214** to a data collection facility via a network (e.g., a local-area network, a wide-area network, a metropolitan-area network, the Internet, a digital subscriber line (DSL) network, a cable network, a power line network, a wireless communication network, a wireless mobile phone network, a Wi-Fi network, etc.). The data collection facility of the illustrated example utilizes the people tallies generated by the people counter **206** and/or the personal IDs generated by the person identifier **207** in conjunction with the content identifying data collected by the program detector **212** to generate exposure information and/or compliance information (e.g., indications of whether or not members of a panel have behaved in accordance with term(s) of membership). Alternatively, the data analysis could be performed locally and exported via a network or the like to a data collection facility for further processing. For example, the amount of people (as counted by the people counter **206**) in the exposure environment **100** at a time (as indicated by the time stamp appended to the people tally by the time stamper **208**) in which a sporting event (as identified by the program detector **212**) was presented by the television **102** can be used in a rating calculation for the sporting event. In some examples, additional information (e.g., demographic data associated with one or more people personally identified by the person identifier **207**, geographic data, etc.) is correlated with the exposure information at the data collection facility to expand the usefulness of the data collected by the example audience measurement device **104** of FIGS. **1** and/or **2**. The data collection facility of the illustrated example compiles data from many monitored exposure environments.

While an example manner of implementing the audience measurement device **104** of FIG. **1** has been illustrated in FIG. **2**, one or more of the elements, processes and/or devices illustrated in FIG. **2** may be combined, divided, re-arranged, omitted, eliminated and/or implemented in any other way. Further, the example audience detector **200**, the example content identifier **202**, the example image sensor **204**, the example people counter **206**, the person identifier **207**. the example time stamper **208** and/or, more generally, the example audience measurement device **104** of FIG. **2** may be implemented by hardware, software, firmware and/or any combination of hardware, software and/or firmware. Thus, for example, any of the example audience detector **200**, the example content identifier **202**, the example image sensor **204**, the example people counter **206**, the person identifier **207**, the example time stamper **208** and/or, more generally, the example audience measurement device **104** of FIG. **2** could be implemented by one or more circuit(s), programmable processor(s), application specific integrated circuit(s) (ASIC(s)), programmable logic device(s) (PLD(s)) and/or field programmable logic device(s) (FPLD(s)), field programmable gate array (FPGA), etc. When any of the apparatus or system claims of this patent are read to cover a purely software and/or firmware implementation, at least one of the example audience detector **200**, the example content identifier **202**, the example image sensor **204**, the example people counter **206**, the person identifier **207**, the example time stamper **208**, and/or the example audience measurement device **104** of FIG. **2** are hereby expressly defined to include a tangible computer readable medium such as a memory, DVD, CD, BluRay, etc. storing the software and/or firmware. Further still, the example audience measurement device **104** of FIG. **2** may include one or more elements, processes and/or devices in addition to, or instead of, those illustrated in FIG. **2**, and/or may include more than one of any or all of the illustrated elements, processes and devices.

FIG. **3** is a block diagram of an example implementation of the example image sensor **204** of FIG. **2**. The example image sensor **204** of FIG. **3** includes a resolution determiner **300**, a high-resolution (hi-res) trigger **302**, a frame cache **303**, an illumination controller **304**, an illuminator **306**, an image capturer **308**, a frame router **310**, and a pixel binner **312**. In the illustrated example, the image sensor **204** operates in a first mode for frames not designated for processing that requires high-resolution image data. The first mode is referred to herein as a majority mode. In some examples, a default mode of the image sensor **204** is the majority mode. The example image sensor **204** also operates in a second mode for frames designated for processing that requires high-resolution image data, such as frames designated for a facial recognition process to be executed by the example person identifier **207** of FIG. **2**. The second mode is referred to herein as a minority mode. The first mode is referred to as the majority mode and the second mode is referred to as a minority mode because the image sensor **204** is expected (but not necessarily) to be in the majority mode more often than the minority mode.

The resolution determiner **300** of the illustrated example determines in which mode the image sensor **204** is to operate for a given time period, an image frame and/or set of image

frames. In the illustrated example of FIG. **3**, the resolution determiner **300** causes the image sensor to operate in the majority mode unless the minority mode has been triggered. As described above, the minority mode is to be entered when a frame to be captured by the image capturer **308** is designated to undergo, for example, a facial recognition process. To determine when an upcoming frame or set of frames is to undergo such resolution-demanding process, the example hi-res trigger **302** references the frame cache **303**. The example frame cache **303** of FIG. **3** is a memory that stores frames recently captured by the image capturer **308**. The example frame cache **303** of FIG. **3** receives frames directly from the image capturer **308** and/or the pixel binner **312**, which is described in detail below. The hi-res trigger **302** retrieves one or more of the recently captured frames from the frame cache **303** and analyzes the frame(s) to determine whether a shape corresponding to a human head and/or face appears in the previous frame(s). In some examples, the hi-res trigger **302** also determines whether the detected head and/or face of the previous frames is oriented such that a facial recognition process can be successfully performed on the corresponding image data. In some examples, the hi-res trigger **302** also determines a period of time during which the detected head and/or face has been in a general location (e.g., if the corresponding person is not moving from a general position in the frame). Given the results of the one or more analyses performed by the hi-res trigger **302** on the previous frame(s), the example hi-res trigger **302** of FIG. **3** determines whether succeeding frame(s) are to undergo a facial recognition process to attempt to identify the detected head(s) and/or face(s). In some examples, the hi-res trigger **302** is a clock that drives the system into the minority mode at fixed intervals. For each frame that the hi-res trigger **302** designates as a frame that will be subject to a facial recognition process (either via analysis or based on a clock), the example hi-res trigger **302** of FIG. **3** places the image sensor **204** in the minority mode. Otherwise, the example image sensor **204** of FIG. **3** operates according to the majority mode.

When the example image sensor **204** of FIG. **3** is operating in the majority mode (e.g., the hi-res trigger **302** determines that facial recognition is not to be performed on the corresponding frame(s)), the resolution determiner **300** of the illustrated example conveys an instruction or indication to the illumination controller **304** that causes the illumination controller **304** to disable the illuminator for the corresponding frame(s). In the illustrated example, the illuminator **306** is an IR LED that emits IR light to illuminate the environment **100** with IR light detectable by the image capturer **308**, which includes IR capabilities. When in the majority mode, the example illumination controller **304** coordinates with the image capturer **308** to synchronize inaction of the illuminator **306** with the capture of the corresponding frame(s). Thus, the resolution determiner **300** causes the illuminator **306** to be inactive during capture of frames not designated for facial recognition processes (and/or only causes the illuminator **306** to be active during capture of frames that are designated for facial recognition processing. As described above, disabling the illuminator **306** reduces power consumption and extends the lifetime of the image sensor **204**. Further, disabling the illuminator **306** reduces the heat generated by the illuminator and, thus, reduces or even eliminates the need for heat sinking devices and/or techniques. Further, when the illuminator **306** is not blinking and/or glowing (e.g., when active), members of the audience **106** are less likely to become annoyed by the image sensor **204**.

When the example image sensor **204** of FIG. **3** is operating in the minority mode (e.g., the hi-res trigger **302** determines that facial recognition is to be performed on the corresponding frame(s)), the resolution determiner **300** conveys an instruction to the illumination controller **304** that causes the illumination controller **304** to enable the illuminator **306** during capture of the corresponding frame(s). The example illumination controller **304** coordinates with the image capturer **308** to synchronize operation of the illuminator **306** with the capture of the corresponding frame(s). Thus, the hi-res trigger **302** causes the illuminator **306** to be active for frames designated for facial recognition processes (e.g., by the person identifier **207**). Frames may be specifically designated or may be generally designated as "frames which occur at a certain time." Accordingly, when operating in the majority mode, the illuminator **306** does not illuminate the environment **100**. In contrast, when operating the minority mode, the illuminator **306** does illuminate the environment **100**.

The example image capturer **308** of FIG. **3** is a high-resolution camera that captures image data representative of the environment **100** of FIG. **1**. In the illustrated example, the image capturer **308** operates similarly in the majority mode as in the minority mode. That is, the example image capturer **308** of FIG. **3** captures high-resolution image data for each captured frame. Given the selective operation of the illuminator **306** described above, the high-resolution frames captured when operating in the majority mode are likely to be poorly lit. On the other hand, the high-resolution frames captured when operating in the minority mode are well lit. The example image capturer **308** of FIG. **3** conveys all or some (e.g., only the frames captured in the minority mode) of the captured frames to the resolution determiner **300** for storage in the frame cache **303**. As described above, the frames stored in the frame cache **303** are used by the example hi-res trigger **302** to identify heads and/or faces in the environment **100** that, due to their orientation, may be identifiable by the person identifier **207**.

Further, the example image capturer **308** of FIG. **3** conveys the captured high-resolution frames to the frame router **310**. The example frame router **310** of FIG. **3** also receives an instruction from the resolution determiner **300** indicative of the mode (e.g., majority or minority) in which the image sensor **204** is operating for the received frames. For frames designated by the resolution determiner **300** as frames captured in the minority mode, the illuminator **306** was active and, thus, the image data is of high-resolution and well lit. Accordingly, the image data captured in the minority mode is in condition for the facial recognition process. Therefore, in response to the indicator from the resolution determiner **300** that the received frame(s) were captured in the minority mode, the example frame router **310** of FIG. **3** routes the illuminated, high-resolution frames to the person identifier **207** for facial recognition process(es). In some examples, the frame router **310** also routes the high-resolution frames to the people counter **206** for counting process(es).

For frames designated by the resolution determiner **300** as frames captured in the majority mode, the illuminator **306** was inactive and, thus, the image data is of high-resolution but likely to be dark and of low contrast. For many of these frames, the contrast level is likely to be too low for proper analysis (e.g., people counting) to be accurately performed. Accordingly, the image data captured in the majority mode may not be in condition (e.g., may not have high enough contrast levels) for an accurate execution of the people counting process of the people counter **206**. Therefore, in

response to the instruction from the resolution determiner **300** that the received frame(s) were captured in the majority mode, the example frame router **310** of FIG. **3** routes the low-contrast frames to the pixel binner **312**.

The example pixel binner **312** of FIG. **3** receives high-resolution frames of image data from the frame router **310** that are likely to be of low contrast levels due to the illuminator **306** being inactive during capture of the frames. The example pixel binner **312** of FIG. **3** performs a binning procedure on the received frames. Binning is a process in which a neighborhood of pixels (e.g., a first pixel and a number of adjacent pixels) is summed together. Example binning procedures sum pixels according to a 2×2 neighborhood of pixels, a 3×3 neighborhood of pixels, a 4×4 neighborhood of pixels, or another arrangement of pixels. In effect, the binning procedure performed by the pixel binner **312** may assign more light per orthogonal block of pixels at the cost of lower resolution. The additional light per block pixel increases the contrast levels of the image data. After the pixel procedure performed by the example pixel binner **312** of FIG. **3**, the frames are of lower resolution (e.g., in comparison with the original format of the frame as captured by the high-resolution camera of the image capturer **308**) but may also have higher contrast levels. Thus, the example pixel binner **312** enhances the dark, low-contrast images generated in the majority mode for processing that does not require high-resolution image data (e.g., the facial recognition process of the person identifier **207**), such as the people counting process of the people counter **206**. The example pixel binner **312** conveys the resulting frames of image data to the people counter **206**. The higher contrast levels provided by the example pixel binner **312** may enable the people counter **206** to distinguish between shapes in the frames of image data. The example pixel binner **312** of FIG. **3** also conveys the frames of image data to the resolution determiner **300** for storage in the frame cache **303**.

While an example manner of implementing the image sensor **204** of FIG. **2** has been illustrated in FIG. **3**, one or more of the elements, processes and/or devices illustrated in FIG. **3** may be combined, divided, re-arranged, omitted, eliminated and/or implemented in any other way. Further, the example resolution determiner **300**, the example hi-res trigger **302**, the example illumination controller **304**, the example frame router **310**, the example pixel binner **310**, and/or, more generally, the example image sensor **204** of FIG. **3** may be implemented by hardware, software, firmware and/or any combination of hardware, software and/or firmware. Thus, for example, any of the example resolution determiner **300**, the example hi-res trigger **302**, the example illumination controller **304**, the example frame router **310**, the example pixel binner **310**, and/or, more generally, the example image sensor **204** of FIG. **3** could be implemented by one or more circuit(s), programmable processor(s), application specific integrated circuit(s) (ASIC(s)), programmable logic device(s) (PLD(s)) and/or field programmable logic device(s) (FPLD(s)), field programmable gate array (FPGA), etc. When any of the apparatus or system claims of this patent are read to cover a purely software and/or firmware implementation, at least one of, the example resolution determiner **300**, the example hi-res trigger **302**, the example illumination controller **304**, the example frame router **310**, the example pixel binner **310**, and/or the example image sensor **204** of FIG. **3** are hereby expressly defined to include a tangible computer readable medium such as a memory, DVD, CD, Bluray, etc. storing the software and/or firmware. Further still, the example image sensor **204** of FIG. **3** may include one or more elements, processes and/or devices in addition to, or instead of, those illustrated in FIG. **3**, and/or may include more than one of any or all of the illustrated elements, processes and devices.

FIG. **4** is a flowchart representative of example machine readable instructions for implementing the example image sensor **204** of FIGS. **1**, **2** and/or **3**. In this example, the machine readable instructions comprise a program for execution by a processor such as the processor **512** shown in the example processing system **500** discussed below in connection with FIG. **5**. The program may be embodied in software stored on a tangible computer readable medium such as a CD-ROM, a floppy disk, a hard drive, a digital versatile disk (DVD), a BluRay disk, or a memory associated with the processor **512**, but the entire program and/or parts thereof could alternatively be executed by a device other than the processor **512** and/or embodied in firmware or dedicated hardware. Further, although the example program is described with reference to the flowchart illustrated in FIG. **4**, many other methods of implementing the example image sensor **204** may alternatively be used. For example, the order of execution of the blocks may be changed, and/or some of the blocks described may be changed, eliminated, or combined.

As mentioned above, the example processes of FIG. **4** may be implemented using coded instructions (e.g., computer readable instructions) stored on a tangible computer readable medium such as a hard disk drive, a flash memory, a read-only memory (ROM), a compact disk (CD), a digital versatile disk (DVD), a cache, a random-access memory (RAM) and/or any other storage media in which information is stored for any duration (e.g., for extended time periods, permanently, brief instances, for temporarily buffering, and/or for caching of the information). As used herein, the term tangible computer readable medium is expressly defined to include any type of computer readable storage and to exclude propagating signals. Additionally or alternatively, the example processes of FIG. **4** may be implemented using coded instructions (e.g., computer readable instructions) stored on a non-transitory computer readable medium such as a hard disk drive, a flash memory, a read-only memory, a compact disk, a digital versatile disk, a cache, a random-access memory and/or any other storage media in which information is stored for any duration (e.g., for extended time periods, permanently, brief instances, for temporarily buffering, and/or for caching of the information). As used herein, the term non-transitory computer readable medium is expressly defined to include any type of computer readable medium and to exclude propagating signals. As used herein, when the phrase "at least" is used as the transition term in a preamble of a claim, it is open-ended in the same manner as the term "comprising" is open ended. Thus, a claim using "at least" as the transition term in its preamble may include elements in addition to those expressly recited in the claim.

FIG. **4** begins with an initiation of the example image sensor **204** of FIG. **3** (block **400**). In the illustrated example, the initiation of the image sensor **204** corresponds to an initiation of a monitoring session of the example exposure environment **100** of FIG. **1**. The example resolution determiner **300** determines whether the next frame(s) to be captured are to be subjected to processing that demands high-resolution image data (block **402**). In the illustrated example, the amount of frames for which the determination is to be made varies depending on, for example, an adjustable setting and/or a finding of the hi-res trigger **302** regarding previous frame(s). As described above, the determination of the resolution determiner **300** indicates which mode (e.g., majority (e.g., low resolution) mode or minority

(e.g., high resolution) mode) in which the image sensor **204** is to operate for the next frame(s). In the illustrated example, the resolution determiner **300** bases the determination on whether the next frame(s) to be captured will undergo a facial recognition process implemented by the example person identifier **207** of FIG. **2**. For example, the hi-res trigger **302** of FIG. **3** determines whether a head or face is included in previous frame(s) (e.g., frames(s) obtained from the frame cache **303**) capable of providing an identification of a corresponding person.

In the example of FIG. **4**. when the resolution determiner **300** determines that the next frame(s) to be captured are not going to be subjected to the facial recognition process (block **402**), the example resolution determiner **300** provides an instruction to the illumination controller **304** to disable the illuminator **306** during capture of the next frame(s) (block **404**). In such instances, the illumination controller **304** cooperates with the image capturer **308** to capture the next frame(s) with the illuminator **306** deactivated (block **406**). While the resulting frames are captured with the high-resolution camera of the image capturer **308**, the frames are not lit by the illuminator **306** and, thus, likely to be dark and to have low contrast levels. To increase the contrast levels of the frame(s) captured without use of the illuminator **306**, the frame router **310** routes the frame(s) to the pixel binner **312** (block **408**). The example frame router **310** of FIG. **3** is aware of which frames were captured without use of the illuminator **306** via the instruction provided thereto by the resolution determiner **300** regarding in which mode (e.g., majority mode or minority mode) the image sensor **204** is operating.

The example pixel binner **312** of FIG. **3** performs a binning procedure (e.g., a 2×2 binning) on the received frame(s) (block **410**). As described above, the binning procedure increases the contrast levels of the image data at the expense of the resolution of the image data. The lower resolution is acceptable for the frame(s) captured while in the majority mode because the people counting process(es) for which the majority mode frames are designated does not require high-resolution data, but operates more accurately with higher contrast levels. Having performed the binning procedure on the majority mode frames, the example pixel binner **312** conveys the binned frame(s) to the people counter **206** and the frame cache **303** (block **412**). Control returns to block **402**.

Referring back to block **402**, when the resolution determiner **300** determines that the next frame(s) to be captured are going to be subjected to the facial recognition process, the example resolution determiner **300** provides an instruction to the illumination controller **304** to enable the illuminator **306** during capture of the next frame(s) (block **414**). In such instances, the illumination controller **304** cooperates with the image capturer **308** to capture the next frame(s) with the illuminator **306** activated (e.g., emitting light, such as IR light into the exposure environment **100** of FIG. **1**) (block **416**). The resulting frames are captured with the high-resolution camera of the image capturer **308** and the frames are lit by the illuminator **306**. Thus, the minority mode frames are ready for processing by the person identifier **207**. Accordingly, the route framer **310** conveys the minority mode frames to the person identifier **207** and the frame cache **303** (block **418**). Control returns to block **402**.

While the example image sensor of FIGS. **1**, **2** and/or **3** is described in the context of an audience measurement device **104** and the generation of exposure data for media content, the example methods, apparatus, and articles of manufacture disclosed herein can be applied to additional or alternative contexts, systems, measurements, applications, programs, etc. That is, the example methods, apparatus, and articles of manufacture disclosed herein can be used in any application to selectively operate an illumination source of an image sensor based on a resolution demand for the resulting frames of image data.

FIG. **5** is a block diagram of an example processor system **510** capable of executing the instructions of FIG. **4** to implement the example image sensor **204** of FIGS. **2** and/or **3**. The processor system **510** can be, for example, a server, a personal computer, a mobile phone, a personal digital assistant (PDA), an Internet appliance, a DVD player, a CD player, a digital video recorder, a BluRay player, a gaming console, a personal video recorder, a set-top box, an audience measurement device, or any other type of computing device.

The example processor system **510** of FIG. **5** includes a processor **512** that is coupled to an interconnection bus **514**. The processor **512** may be any suitable processor, processing unit, or microprocessor (e.g., one or more Intel® microprocessors from the Pentium® family, the Itanium® family or the XScale® family and/or other processors from other families). The system **510** may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor **512** and that are communicatively coupled to the interconnection bus **514**.

The processor **512** of FIG. **5** is coupled to a chipset **518**, which includes a memory controller **520** and an input/output (I/O) controller **522**. A chipset provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset **518**. The memory controller **520** performs functions that enable the processor **512** to access a system memory **524**, a mass storage memory **525**, and/or a digital versatile disk (DVD) **540**.

In general, the system memory **524** may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), double data rate memory (DDR), etc. The mass storage memory **525** may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc. The machine readable instructions of FIGS. **5A-5C** may be stored in the system memory **524**, the mass storage memory **525**, and/or the DVD **540**.

The I/O controller **522** performs functions that enable the processor **512** to communicate with peripheral input/output (I/O) devices **526** and **528** and a network interface **530** via an I/O bus **532**. The I/O devices **526** and **528** may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor, a mouse, etc. The network interface **530** may be, for example, an Ethernet device, an asynchronous transfer mode (ATM) device, an 802.11 device, a digital subscriber line (DSL) modem, a cable modem, a cellular modem, etc. that enables the processor system **510** to communicate with another processor system. The example network interface **530** of FIG. **5** is also communicatively coupled to a network **534**, such as an intranet, a Local Area Network, a Wide Area Network, the Internet, etc.

While the memory controller **520** and the I/O controller **522** are depicted in FIG. **5** as separate functional blocks within the chipset **518**, the functions performed by these

blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

Although certain example apparatus, methods, and articles of manufacture have been disclosed herein, the scope of coverage of this patent is not limited thereto. On the contrary, this patent covers all apparatus, methods, and articles of manufacture fairly falling within the scope of the claims of this patent.

What is claimed is:

1. An audience measurement system to obtain exposure data for a media exposure environment, the audience measurement system comprising:

memory;

machine readable instructions; and

processor circuitry to execute the machine readable instructions to:

generate an audio signature of media content presented by a television within the media exposure environment;

obtain content identifying data corresponding to the presented media content, the content identifying data based on the audio signature of the media content presented by the television within the media exposure environment;

analyze a sequence of images of the media exposure environment to detect a head appearing in one or more of the images, the sequence of images obtained by a camera while the media content corresponding to the content identifying data is presented by the television;

determine an orientation of the head with respect to the camera; and

determine audience identification information based on a match of the head to a known person associated with the media exposure environment; and

network interface circuitry to output a signal indicative of the content identifying data and the audience identification information to a data collection facility.

2. The audience measurement system of claim 1, wherein the audio signature is a representation of a frequency spectrum of an audio signal of the media content.

3. The audience measurement system of claim 1, wherein the signal is a first signal; the processor circuitry is to determine a people tally indicative of a count of people appearing within the one or more of the images based at least in part on the detected head; and the network interface circuitry is to output a second signal indicative of the people tally.

4. The audience measurement system of claim 1, wherein the processor circuitry is to:

reduce a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image, and

determine the orientation of the head with respect to the camera based on the reduced-resolution image.

5. The audience measurement system of claim 4, wherein the processor circuitry is to determine the audience identification information by: (i) generating a facial signature from a region of a second image of the one or more of the images corresponding to a location of the head in the reduced-resolution image, and (ii) comparing the generated facial signature to a database of facial signatures.

6. The audience measurement system of claim 4, wherein the processor circuitry is to:

identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained;

analyze a portion corresponding to the identified region of a second image; and

based on the analysis of the region of the second image, determine that the head matches the known person.

7. The audience measurement system of claim 6, wherein the processor circuitry is to identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained by determining that a face is potentially identifiable based on the orientation of the head.

8. The audience measurement system of claim 6, wherein the audience identification information includes an identifier associated with the known person and the processor circuitry is to, responsive to a determination that the head matches the known person, cause the identifier associated with the person to be stored in the memory.

9. An audience measurement system, comprising:

an audience measurement device at a media exposure environment, the audience measurement device to:

generate an audio signature of media content presented by a television within the media exposure environment;

obtain content identifying data corresponding to the presented media content, the content identifying data based on the audio signature;

while the media content corresponding to the content identifying data is presented by the television, collect a first image of the media exposure environment with a camera;

attempt to detect a head in the first image;

determine an orientation of the head with respect to the camera;

determine audience identification information based on an indication that the head matches a known person associated with the audience measurement system; and

a data collection facility to obtain the content identifying data and the audience identification information from the audience measurement device.

10. The audience measurement system of claim 9, wherein the audio signature is a representation of a frequency spectrum of an audio signal of the media content.

11. The audience measurement system of claim 9, wherein the audience measurement device is to:

reduce a resolution of the first image of the media exposure environment to obtain a reduced-resolution image, and

determine the orientation of the head with respect to the camera based on the reduced-resolution image.

12. The audience measurement system of claim 11, wherein the audience measurement device is to:

identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained; and

analyze a portion of a second image corresponding to the identified region to determine whether the head matches the known person.

13. The audience measurement system of claim 12, wherein the audience identification information includes an identifier associated with the known person and the audience measurement device is to, responsive to the indication that the head matches the known person, cause recordation of the identifier associated with the known person in a memory.

14. The audience measurement system of claim 11, wherein the audience measurement device is to determine the audience identification information by: (i) generating a facial signature from a region of a second image corresponding to a location of the head in the reduced-resolution image, and (ii) comparing the generated facial signature to a database of facial signatures.

15. The audience measurement system of claim 9, wherein the audience measurement device is to:

determine a people tally indicative of a count of people appearing in the first image based at least in part on the detected head; and

provide the people tally to the data collection facility.

16. A method for obtaining exposure data for a media exposure environment, the method comprising:

generating, using a program detector, an audio signature of media content presented by a television within the media exposure environment;

obtaining, based on the audio signature, content identifying data corresponding to the presented media content;

while the media content corresponding to the content identifying data is presented by the television, capturing first and second images of the media exposure environment with a camera;

analyzing, using an audience detector, the first image to attempt to detect a head in the first image;

determining, using the audience detector, an orientation of the head with respect to the camera;

determining, using the audience detector, audience identification information based on an indication that the head matches a known person associated with the audience detector; and

providing the content identifying data and the audience identification information to a data collection facility.

17. The method of claim 16, wherein the audio signature is a representation of a frequency spectrum of an audio signal of the media content.

18. The method of claim 16, further comprising:

reducing a resolution of the first image of the media exposure environment to obtain a reduced-resolution image, and

wherein the determining of the orientation of the head includes determining the orientation of the head with respect to the camera using the reduced-resolution image.

19. The method of claim 18, further comprising:

identifying a region corresponding to the head within the first image from which the reduced-resolution image was obtained;

analyzing a portion of the second image corresponding to the identified region; and

based on the analyzing of the region of the second image, determining whether the head matches the known person.

20. The method of claim 19, wherein the audience identification information includes an identifier associated with the known person, and further including recording the identifier associated with the known person in a memory.

21. The method of claim 16, further comprising:

determining a people tally indicative of a count of people appearing within the first image based at least in part on the detected head and one or more additional heads; and

providing the people tally to the data collection facility.

22. An audience measurement system to obtain exposure data for a media exposure environment, the audience measurement system comprising:

memory;

processor circuitry: and

program detector software to cause the processor circuitry to:

generate an audio signature of media content presented by a television within the media exposure environment, and

obtain, based on the audio signature, content identifying data corresponding to the presented media content;

audience detector software to cause the processor circuitry to:

while the media content corresponding to the content identifying data is presented by the television, obtain first and second images of the media exposure environment captured with a camera;

analyze one or more of the first or second images to: (i) detect one or more heads in the media exposure environment; (ii) determine corresponding orientations with respect to the camera for respective ones of the one or more heads, and (iii) determine audience identification information indicative that one or more of the heads matches respective ones of one or more persons known to be associated with the media exposure environment; and

network interface circuitry to output the content identifying data and the audience identification information to a data collection facility.

23. The audience measurement system of claim 22, wherein the audience detector software is to cause the processor circuitry to analyze the one or more of the first or second images to detect the one or more heads in the media exposure environment by:

analyzing the first image to detect the one or more heads in the media exposure environment, and

analyzing the second image to determine the audience identification information.

24. The audience measurement system of claim 23, wherein the audience detector software is to cause activation of an illumination source while the camera captures the second image.

25. The audience measurement system of claim 24, wherein the audience detector software is to cause the camera to capture the first image without use of the illumination source.

26. The audience measurement system of claim 23, wherein:

the audience detector software is to cause the processor circuitry to reduce a resolution of the first image using pixel binning to obtain a reduced-resolution image, and

to detect the one or more heads in the media exposure environment based on the reduced-resolution image.

27. The audience measurement system of claim 22, wherein the audio signature is a representation of a frequency spectrum of an audio signal of the media content.

28. The audience measurement system of claim 22, wherein the audience detector software is to cause the processor circuitry to determine the audience identification information by: (i) generating a facial signature from a region of the second image corresponding to a location of one of the one or more heads, and (ii) comparing the generated facial signature to a database of facial signatures.

**29**. The audience measurement system of claim **22**, wherein the audience detector software is to determine a people tally indicative of a count of people appearing within the first image based at least in part on the detected one or more heads, and

the network interface circuitry is to provide the people tally to the data collection facility.

* * * * *

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**THE NIELSEN COMPANY (US), LLC,**
**Patent Owner/Appellant**

**Appeal No. 2025-1371**

**v.**

**TVISION INSIGHTS, INC.,**
**Petitioner/Appellee**

**Proceeding No.: IPR2023-01014**

---

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely filed January 15, 2025, in the United States Patent and Trademark Office in connection with the above identified *Inter Partes Review* proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being forwarded to the Federal Circuit.

Respectfully submitted,

Date: February 26, 2025

By: Macia L. Fletcher
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant and Appellee this 26th day of February, 2025, as follows:

| PATENT OWNER: | PETITIONER: |
|---|---|
| Clifford T. Brazen<br>Jennifer C. Bailey<br>ERISE IP, P.A.<br>cliff.brazen@eriseip.com<br>jennifer.bailey@eriseip.com | Harper Batts<br>Jeffrey Liang<br>Christopher Scott Ponder<br>SHEPPARD MULLIN RICHTER & HAMPTON LLP<br>hbatts@sheppardmullin.com<br>jliang@sheppardmullin.com<br>cponder@sheppardmullin.com |

By: Macia L. Fletcher

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, Virginia 22313-1450
(571) 272-9035

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

**February 26, 2025**
(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**TVISION INSIGHTS, INC.,**
**Petitioner,**

**v.**

**THE NIELSEN COMPANY (US), LLC,**
**Patent Owner.**

**Case: IPR2023-01014**
**Patent No. 11,470,243 B2**
By authority of the

**DIRECTOR OF THE UNITED STATES**
**PATENT AND TRADEMARK OFFICE**

*Certifying Officer*

| Date | Document |
|---|---|
| 6/16/2023 | Petition or Inter Partes Review |
| 6/16/2023 | Petitioner's Power of Attorney |
| 7/7/2023 | Patent Owner's Mandatory Notice |
| 7/7/2023 | Patent Owner's Power of Attorney |
| 7/11/2023 | Notice of filing Date Accorded to Petition and Time for Filing Patent Owner's Preliminary Response |
| 10/11/2023 | Patent Owner's Preliminary Response to Petition for Inter Partes Review |
| 10/31/2023 | Petitioner's Reply to Patent Owner's Preliminary Response |
| 10/31/2023 | Petitioner's Updated Exhibit List |
| 11/8/2023 | Patent Owner's Sur-Reply to Petitioner's Reply to Preliminary Response |
| 1/8/2024 | Decision - Institution of Inter Partes Review |
| 1/8/2024 | Scheduling Order |
| 1/31/2024 | Notice of Deposition - Doermann |
| 3/13/2024 | Joint Stipulation to Modify Due Dates 1, 2, and 3 |
| 3/15/2024 | Updated Notice of Deposition - Doermann |
| 3/18/2024 | Updated Notice of Deposition - Doermann |
| 4/29/2024 | Motion for Pro Hac Vice Admission - Redmond |
| 5/1/2024 | Patent Owner's Response to Petition for Inter Partes Review |
| 5/7/2024 | Order - Pro Hac Vice Admission - Redmond |
| 5/16/2024 | Notice of Deposition - Saber |
| 6/20/2024 | Petitioner's Updated Power of Attorney |
| 7/24/2024 | Petitioner's Updated Exhibit List |
| 7/24/2024 | Petitioner's Reply to Patent Owner's Response |
| 7/31/2024 | Patent Owner's Objections to Evidence |
| 8/6/2024 | Petitioner's Updated Exhibit List |
| 8/28/2024 | Patent Owner's Request for Oral Argument |
| 8/28/2024 | Petitioner's Request for Oral Hearing |
| 8/28/2024 | Order - Setting Oral Argument |
| 9/4/2024 | Patent Owner's Sur-Reply to Petitioner's Reply to Preliminary Response |
| 10/4/2024 | Petitioner's Updated Mandatory Notices |
| 10/7/2024 | LEAP Practitioner Request and Verification Form (Petitioner) |
| 10/11/2024 | Patent Owner's Updated Exhibit List |
| 10/11/2024 | Petitioner's Demonstratives Exhibit |
| 11/15/2024 | Oral Hearing Transcript |
| 1/6/2025 | Final Written Decision |

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

TVISION INSIGHTS, INC.,

Petitioner,

v.

THE NIELSEN COMPANY (US), LLC,

Patent Owner.

---

IPR2023-01014
U.S. Patent No. 11,470,243

---

**PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 11,470,243**

# TABLE OF CONTENTS

**Page**


EXHIBIT LIST ..... IV

I. BACKGROUND ..... 1

A. Television Audience Measurement ..... 1

B. Audio Content Recognition ..... 1

C. Image Processing and Facial Analysis ..... 1

II. THE ’243 PATENT ..... 2

A. Overview ..... 2

B. Prosecution History ..... 3

C. Priority Date ..... 3

III. IDENTIFICATION OF CHALLENGE ..... 3

A. Statutory Grounds ..... 3

B. Relied-Upon Prior Art ..... 4

1. Lu-577 (Exhibit 1004) ..... 4

2. Tian (Exhibit 1005) ..... 5

3. Nielsen-372 (Exhibit 1006) ..... 5

4. Steinberg (Exhibit 1007) ..... 6

C. Standing ..... 6

D. Discretionary Analysis for Review ..... 6

IV. LEVEL OF ORDINARY SKILL IN THE ART ..... 7

V. CLAIM CONSTRUCTION ..... 7

A. Media Exposure Environment ..... 7

VI. CHALLENGED CLAIMS ..... 8

A. Ground 1 ..... 8

1. Combination of Lu-577 and Tian ..... 8

2. Claim 1 ..... 12

3. Claim 4 ..... 26

4. Claim 5 ..... 27

5. Claim 6 ....................29
6. Claim 8 ....................31
7. Claim 9 ....................32
8. Claim 11 ....................36
9. Claim 12 ....................37
10. Claim 13 ....................38
11. Claim 14 ....................38
12. Claim 16 ....................38
13. Claim 18 ....................42
14. Claim 19 ....................42
1. Claim 20 ....................43

B. Ground 2 ....................43
1. Combination of Nielsen-372 and Steinberg ....................43
2. Claim 1 ....................45
3. Claim 9 ....................64
4. Claim 16 ....................67

C. Ground 3 ....................71
1. Combination of Nielsen-372, Steinberg, and Tian ....................71
2. Claim 1 ....................73
3. Claim 4 ....................75
4. Claim 5 ....................76
5. Claim 6 ....................78
6. Claim 8 ....................79
7. Claim 9 ....................80
8. Claim 11 ....................82
9. Claim 12 ....................83
10. Claim 13 ....................83
11. Claim 14 ....................84
12. Claim 16 ....................84

13. Claim 18 .... 86

14. Claim 19 .... 87

15. Claim 20 .... 87

VII. MANDATORY NOTICES AND FEES .... 89

## EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 1001 | U.S. Patent No. 11,470,243("the '243 Patent") |
| 1002 | Prosecution History for the '243 Patent |
| 1003 | Declaration of Dr. David Scott Doermann |
| 1004 | U.S. Patent Application Publication No. 2002/0059577 ("Lu-577") |
| 1005 | Ying-li Tian, *Evaluation of Face Resolution for Expression Analysis*, 2004 Conference on Computer Vision and Pattern Recognition Workshop, Washington, DC, USA, 2004, pp. 82-82, doi: 10.1109/CVPR.2004.334 ("Tian") |
| 1006 | U.S. Patent Application Publication No. 2010/0274372 ("Nielsen-372") |
| 1007 | U.S. Patent Application Publication No. 2010/0066822 ("Steinberg") |
| 1008 | U.S. Patent No. 4,858,000("Lu-000") |
| 1009 | U.S. Patent No. 4,677,466 ("Lert") |
| 1010 | U.S. Patent Application Publication No. 2011/0081052 |
| 1011 | Brent Merritt, *A Brief History of Media Measurement*, Media, available at https://medium.com/@brentmerritt/a-brief-history-of-media-measurement-f1f28aa807ce |
| 1012 | U.S. Patent Application Publication No. 2011/0265110 |
| 1013 | Bernhard Fröba and Christian Küblbeck, *Robust Face Detection At Video Frame Rate Base on Edge Orientation Features*, International Conference on Audio- and Video-Based Biometric Person Authentication (2001) |
| 1014 | U.S. Patent No. 7,315,631 |
| 1015 | European Patent Application No. 0932114 |
| 1016 | Erik Larson, *Watching American Watch TV*, The Atlantic Monthly (1992) |
| 1017 | U.S. Patent No. 6,173,074 |
| 1018 | U.S. Patent No. 7,359,889 |
| 1019 | Cha Zhang and Zhengyou Zhang, *A Survey of Recent Advances in Face Detection*, MSR-TR-2010-66, available at https://www.microsoft.com/en-us/research/publication/a-survey-of-recent-advances-in-face-detection/ |
| 1020 | E. Murphy-Chutorian and M. M. Trivedi, *Head Pose Estimation in Computer Vision: A Survey*, in IEEE Transactions on Pattern |

| Exhibit No. | Description |
|---|---|
| | Analysis and Machine Intelligence, vol. 31, no. 4, pp. 607-626, April 2009, doi: 10.1109/TPAMI.2008.106 |
| 1021 | W. Zhao, R. Chellappa, P. J. Phillips, and A. Rosenfeld, *Face recognition: A literature survey*, ACM Comput. Surv. 35, 4 (December 2003), 399–458 |
| 1022 | G. Shakhnarovich, L. Lee and T. Darrell, *Integrated face and gait recognition from multiple views*, Proceedings of the 2001 IEEE Computer Society Conference on Computer Vision and Pattern Recognition. CVPR 2001, Kauai, HI, USA, 2001, pp. I-I, doi: 10.1109/CVPR.2001.990508 |
| 1023 | Qaim Rizvi, *A Review on Face Detection Methods*, Journal of Management Development and Information Technology (2011) |
| 1024 | Duane M. Blackburn, Mike Bone, P. Jonathon Phillips, *Facial Recognition Vendor Test 2000*, Evaluation Report |
| 1025 | Vidit Jain and Erik Learned-Miller, *FDDB: A Benchmark for Face Detection in Unconstrained Settings* (2010) |
| 1026 | Avery Wang, *The Shazam Music Recognition Service*, Commun. ACM 49 (2006) |
| 1027 | J. Wang, C. Zhang, and H. Shum, *Face Image Resolution versus Face Recognition Performance Based on Two Global Methods* (2004) |
| 1028 | Declaration of Gordon MacPherson for Tian |

## I. BACKGROUND

### A. Television Audience Measurement

Automated systems to provide television audience measurement services were well-known before 2011 and typically included obtaining information about a presented television program (e.g., identity of the program) and its audience (e.g., identities of individuals in the audience). Ex-1003, ¶6; Ex-1011; Ex-1016; Ex-1004; Ex-1006. In fact, PO or its affiliate has developed automated systems for television audience identification at least by 1992 and obtained patent rights for systems that monitor television programs and the audience based audio and video data well before the '243 patent. Ex-1016, 000003, 000009-10; Ex-1004, Abstract; Ex-1006, ¶0036, FIG. 1; Ex-1003, ¶¶7-8. All of the technology enablers for automated television audience measurement were all widely available before 2011. Ex-1003, ¶9.

### B. Audio Content Recognition

Audio content recognition based on acoustic features and fingerprinting technology were available since at least the early 2000s. *See, e.g.*, Ex-1017, Abstract; Ex-1018, Abstract; Ex-1026, 000003-04; Ex-1003, ¶10. Audio content recognition was applied in audience measurement systems. Ex-1004, Abstract; Ex-1006, Abstract; Ex-1003, ¶11.

### C. Image Processing and Facial Analysis

By 2011, facial analysis techniques (e.g., face detection, face or head pose estimation, and face recognition) were widely available and applied to real-world problems. Ex-1019, 000002; Ex-1020, 000003; Ex-1021, 000002-03; Ex-1023; Ex-1024; Ex-1025; Ex-1003, ¶¶12-13. One well-known method to save computation resources in facial analysis was to process lower-resolution images. Certain facial analysis methods (e.g., face detection) tolerate low-resolution images better than others (e.g., face recognition). Ex-1005, 000005; Ex-1027, 000005, FIG. 7; Ex-1003, ¶14. By 2011, techniques (e.g., subsampling, interpolation) for obtaining reduced-resolution images were widely known. Ex-1003, ¶15.

## II. THE '243 PATENT

### A. Overview

The '243 patent relates to "[m]ethods and apparatus to obtain exposure data for media exposure environment(s)[,]" which "determine[s] audience identification information and content identifying data." Ex-1001, Abstract, 2:25-56; Ex-1003, ¶16. The '243 patent does not purport to invent media content identification or audience recognition (e.g., based on facial recognition), explaining in its "Background" section that these functionalities were known in the prior art. Ex-1001, 1:43-2:3; Ex-1003, ¶17.

The '243 patent purports to address disadvantages of frequently using illumination by selectively activating an illumination source and processing images

taken without illumination to enhance the lighting while reducing the resolution and analyzing them for certain purposes. Ex-1001, 2:42-4:4; Ex-1003, ¶¶18-19. None of the challenged claims include any limitation directed to the purported new approach of illumination. Ex-1001, 15:13-17:61; Ex-1003, ¶20.

### B. Prosecution History

The '243 patent was allowed as originally filed. In the Notice of Allowance, the Examiner referred to U.S. Patent Application Publication No. 2011/0164188 ("Karaoguz") as relevant art and distinguished the claims from its teachings. Ex-1002, 000293-94; Ex-1003, ¶21.

### C. Priority Date

The '243 patent cites a continuation chain to December 15, 2011. All relied-upon art predates December, 2011. Ex-1003, ¶22.

## III. IDENTIFICATION OF CHALLENGE

### A. Statutory Grounds

Petitioner requests *inter partes* review and cancelation of the challenged claims on the following grounds:

| Grounds | Claims | Statutory Basis | Prior Art |
|---|---|---|---|
| 1 | 1, 4-6, 8, 9, 11-14, 16, 18-20 | § 103 | Lu-577 and Tian |
| 2 | 1, 9, 16 | § 103 | Nielsen-372 and Steinberg |
| 3 | 1, 4-6, 8, 9, 11-14, 16, 18-20 | § 103 | Nielsen-372, Steinberg, and Tian |

The Grounds render the challenged claims obvious because any differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a POSITA to which the subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).

## B. Relied-Upon Prior Art[1]

### 1. Lu-577 (Exhibit 1004)

Lu-577 was published May 16, 2002; it is pre-AIA §102(b) prior art. Ex-1003, ¶27. Lu-577 teaches "[a] television audience measurement system[.]" Ex-1004, Abstract. Lu-577's system analyzes audio data to identify a television program (e.g., based on an audio signature), for which Lu-577 incorporates Lert (Ex-1009) by reference. Ex-1004, Abstract, ¶0003, ¶0017, ¶¶0035-0038, ¶¶0040-0041, FIG. 2; Ex-1003, ¶28. Lu-577 further identifies persons watching television using head detection and face recognition, for which Lu-577 incorporates Lu-000 (Ex-1008) by reference Ex-1004, ¶0039; Ex-1008, Abstract, 2:10-47, 3:27-60, 3:61-4:8, 7:39-8:6, 9:47-52, FIGs. 6-7; Ex-1003, ¶¶29-30. Lu-577 is in the same field of endeavor as the '243 patent, which is media analysis. *Infra* §IV; Ex-1003, ¶32.

---

[1] Pre-AIA 35 U.S.C. §102 applies. MPEP §2159.02.

**2. Tian (Exhibit 1005)**

Tian was published by IEEE and publicly available no later than July 2004; it is pre-AIA §102(b) prior art. Ex-1028; Ex-1003, ¶33. Tian teaches analyzing a sequence of images of human subjects at different resolutions to detect heads and estimate poses. Ex-1005, Abstract, 000001-03, 000005; Ex-1003, ¶34. According to Tian, the accuracy of face detection and pose estimation can be maintained at relatively low resolutions. Ex-1005, 000005. Tian further teaches tracking the location of head/face in a sequence of images. Ex-1005, 000001, 000003; Ex-1003, ¶35. Tian is in the same field of endeavor as the '243 patent, which is media analysis. *Infra* §IV; Ex-1003, ¶36.

**3. Nielsen-372 (Exhibit 1006)**

Nielsen-372 was published October 28, 2010; it is pre-AIA §102(b) prior art. Ex-1003, ¶37. Nielsen-372 teaches a local metering system that identifies a displayed television program based on the audio signals (e.g., by generating and comparing audio signatures). Ex-1006, ¶0036, ¶0044, ¶¶0049-0051, ¶¶0055-0057, ¶¶0095-0100, FIGs. 1-3, 14-15; Ex-1003, ¶¶38-39.. The system also detects the identities of persons viewing programs on a television. Ex-1006, ¶0003, ¶0048; Ex-1003, ¶39. The system outputs viewing records to a central office or data processing facility over a network connection. Ex-1006, ¶0036, ¶0041, FIG. 1; Ex-

1003, ¶40. Nielsen-372 is in the same field of endeavor as the ’243 patent, which is media analysis. *Infra* §IV; Ex-1003, ¶41.

### 4. Steinberg (Exhibit 1007)

Steinberg was published March 18, 2010; it is pre-AIA §102(b) prior art. Ex-1003, ¶42. Steinberg teaches detecting faces in the captured images, detecting the orientations of the faces, and identifying known persons based on a faceprint. Ex-1007, Abstract, ¶0003, ¶0005, ¶0057, ¶0092, ¶0096, ¶0099, ¶¶0117-0118, ¶0120, ¶¶0126-0130, ¶¶0135-0136, ¶0151, ¶¶0156-0157, ¶0166, ¶0168, ¶0176, ¶0178, FIGs. 1(a)-(c), FIGs. 4(a)-(b), FIGs. 5(a)-(b), FIG. 9(a); Ex-1003, ¶¶43-44. Steinberg is in the same field of endeavor as the ’243 patent, which is media analysis. *Infra* §IV; Ex-1003, ¶45.

## C. Standing

Petitioner certifies it is not barred or estopped from requesting this *inter partes* review and the ’243 patent is eligible for such review.

## D. Discretionary Analysis for Review

This Petition’s merits are compelling, which “alone demonstrates that the PTAB should not discretionarily deny institution under *Fintiv*.” *See* June 21, 2022 Memorandum at 3-5 (“Director’s Memo”). Even if the Board addresses *Fintiv*, denial of institution under §314 is not warranted. Judge Noreika has stayed cases pending IPR institution decisions and after institution of IPRs. *See, e.g.*, *Valyant AI, Inc. v. Kea Cloud, Inc.*, No. 21-cv-1698-MN (D. Del. Mar. 23, 2023), Dkt. 31.

A jury trial is set for November 3, 2025, almost one year after the expected statutory deadline for a final written decision. The *Fintiv* factors favor institution. If facts change, Petitioner will seek a Reply to the POPR to address any new facts.

Denial of institution under §325(d) is likewise unwarranted because none of the relied-upon art was cited or considered during the '243 patent's prosecution. Ex-1003, ¶¶25-26. And this is the only IPR filed against the challenged claims to date.

## IV. LEVEL OF ORDINARY SKILL IN THE ART

A POSITA would have been a person with a bachelor's degree in computer science, electrical engineering, or a similar field with at least two years of experience in media analysis or a person with a master's degree in computer science, electrical engineering, or a similar field with a specialization in media analysis. Ex-1003, ¶¶46-48. A person with less education but more relevant practical experience may also meet this standard. *Id.* A POSITA in 2011 would have known or been able to implement systems that collect and analyze audio and image data, techniques for audio feature extraction and identification, techniques for image processing (e.g., resolution adjustment), and face or head analysis techniques. Ex-1003, ¶49.

## V. CLAIM CONSTRUCTION

### A. Media Exposure Environment

A POSITA would have understood the meaning of "media exposure environment" to at least encompass a space in which a television is located. Ex-1001, 1:56-2:3, 2:25-41, 4:15-5:8, 15:13-17:61, FIG. 1; Ex-1003, ¶¶51-52.

# VI. CHALLENGED CLAIMS

## A. Ground 1

### 1. Combination of Lu-577 and Tian

Lu-577 teaches a television audience measurement system that identifies a television program based on an audio signature. Ex-1004, Abstract, ¶0017, ¶0035, ¶0040, FIG. 2; Ex-1003, ¶55. Lu-000, which Lu-577 incorporates by reference, captures and analyzes images to locate the heads or faces of audience members and extracts and compares pattern image signatures with stored signatures to identify the audience members. Ex-1008, Abstract, 7:39-9:52; Ex-1004, ¶0013, ¶0039; Ex-1003, ¶¶55-56.

Tian similarly teaches techniques for image processing and facial analysis. Ex-1005, Abstract, 000002, 000005; Ex-1003, ¶57. A POSITA would have found it obvious to combine Lu-000 and Tian because they are similarly directed to image processing and facial analysis, and to use Tian's techniques to improve Lu-000. Ex-1003, ¶58. Employing the solutions of Tian in Lu-577's system would have been obvious because Lu-577 explicitly invites employing "known head location and face recognition software." Ex-1004, ¶0039; Ex-1003, ¶59.

Tian teaches performing facial analysis on sequences of images of subjects. Ex-1005, 000005. This is compatible with Lu-577 and Lu-000's teaching of using a video camera, which is capable of taking a sequence of images. Ex-1004, ¶0039; Ex-1008, 3:27-4:8; Ex-1003, ¶60. A POSITA would have been motivated to apply Tian's teaching because performing facial analysis on a sequence of images can improve the confidence level of person identification and allow the selective performance of face recognition on suitable images (e.g., where a person opens her eyes and faces the camera). *See, e.g.*, Ex-1022, 000007; Ex-1010, ¶0003; Ex-1003, ¶61.

Tian teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected. *See, e.g.*, Ex-1005, 000001, 000003; Ex-1003, ¶62. As suggested by contemporary writings, it would have been obvious to apply Tian's teaching to Lu-577's system, such that it determines a face or head location in a first image and use the determined location for subsequent images. Ex-1010, ¶0003; Ex-1003, ¶¶63-64. This approach is applicable when a video camera is used to take multiple images in a short period of time. A POSITA would have been motivated to apply this approach because it saves processing resources and time by reducing the times face detection needs to be applied. Ex-1003, ¶64.

Tian teaches performing head pose estimation on a subject based on an image. *See, e.g.*, Ex-1005, 000002-03. A POSITA would have found it obvious to apply this teaching to Lu-577's system. Ex-1003, ¶65 A POSITA would have found it obvious to determine a person's head pose to determine whether an image is suitable for face recognition and understood that this improves the performance of face recognition. Ex-1005, 000002; Ex-1010, ¶0003; Ex-1021, 000042; Ex-1003, ¶¶65-66. A POSITA would have been further motivated to perform pose estimation to determine whether a person is watching the television, which was known in the art. Ex-1012, ¶0039. This is beneficial in light of Lu-577's function of measuring viewing of a television program. Ex-1003, ¶67.

Tian teaches obtaining and analyzing reduced-resolution images and that the accuracy of face detection and head pose estimation can be maintained for reduced-resolution images. *See, e.g.*, Ex-1005, Abstract, 000002, 000005; Ex-1003, ¶68. A POSITA would have found it obvious to apply Tian's teaching to Lu-577's system to perform facial analysis on reduced-resolution images. Ex-1003, ¶69. Doing so can reduce the time and resource consumption of tasks such as face detection and pose estimation, without substantially reducing the accuracy of these tasks. Ex-1013, 000001; Ex-1014, 2:43-53; Ex-1015, ¶0022; Ex-1005, 000005. However, it was known that the performance of face recognition may be adversely affected by the reduction of image resolution. Ex-1027, 000004-05. A

POSITA would have been motivated to perform certain facial analysis techniques (e.g., face detection, head pose estimation) on reduced-resolutions images, while other techniques (e.g., face recognition) on full-quality images. Ex-1003, ¶¶69-70.

A POSITA would have found it obvious and been motivated to apply the teachings of Tian to Lu-577 because this is an application of known techniques (e.g., facial analysis techniques) to a known system (e.g., audience measurement system) and method ready for improvement. Doing so would have improved accuracy of face recognition and saved processing resources, and would have yielded predictable results at least because Tian provides experimental assessments of its techniques. Ex-1003, ¶71.

The combination simply uses Tian's teachings about image processing and facial analysis, in the manner taught by Tian, to implement functionalities in Lu-577, which a POSITA would have been more than capable of doing. *See supra* §I. A POSITA would have had a reasonable expectation of success in combining the references given the overlap between Lu-000 and Tian and because the combination uses well-known techniques that would not have changed the principle of operation for any of the references. Ex-1003, ¶72.

### 2. Claim 1

| **1[p].**[2] |
| --- |

Lu-577 teaches the preamble. Ex-1003, ¶¶73-80. Lu-577 teaches **an audience measurement system**. Ex-1004, Abstract ("A television audience measurement system …."); ¶¶0014-0017; Ex-1003, ¶75. Lu-577's system is **to obtain exposure data** (e.g., data identifying a television program, data identifying the audience) **for a media exposure environment** (e.g., a statistically selected site). Ex-1004, Abstract, ¶0017, ¶0035, ¶¶0039-0040, FIG. 2. Lu-577's system "measures viewing of a television program viewed on digital television located in a statistically selected site[.]" Ex-1004, Abstract, ¶0017, ¶0035. The system identifies the television program and identifies the persons watching television. Ex-1004, Abstract, ¶0017, ¶0035, ¶¶0039-0040, FIG. 2; Ex-1003, ¶76.

Lu-000 teaches "identifying predetermined individual members of a viewing audience in a monitored area." Ex-1008, Abstract. Lu-577 teaches obtaining information regarding the television program and the persons as "television audience data." Ex-1004, ¶0050[3]; Ex-1003, ¶77. The television audience data in Lu-577 constitute "exposure data," which, according to the '243 patent, include

[2] The numbering of claim elements are set forth in the Claim Appendix.

[3] The embodiments of Lu-577's Figures 2 and 3 are compatible with each other and intended to be applied together. Ex-1003, ¶77.

media content identification(s) and personal identification(s). Ex-1001, 5:9-28, 1:43-2:3; Ex-1003, ¶78.

The statistically selected site in Lu-577 and the monitored area in Lu-000 both refer to a "media exposure environment" as they are spaces in which a television is located. *Supra* §V.A; Ex-1004, ¶0017, ¶0089; Ex-1008, Abstract, 1:15-19; *see also* Ex-1001, 4:56-5:8; Ex-1003, ¶79.

The '243 patent admits that the preamble was known. Ex-1001, 1:56-2:3; Ex-1003, ¶80.

| **[1a]** |
|---|

Lu-577 teaches limitation [1a]. Ex-1003, ¶¶81-85. Lu-577's audience measurement system includes detectors (64, 68, 78) that detect audio data and site units (86, 94, 96) or a home unit (88) that analyze the data to identify a television program, for which it incorporates Lert by reference. Ex-1004, ¶0003, ¶¶0035-0040, FIG. 2:

Figure 2




Ex-1003, ¶¶81-82. Lu-577 further teaches a person identifier (98) that feeds image data to the site unit (86), which employs "known head location and face recognition software" (e.g., as taught by Lu-000) to identify viewing persons in the audience. Ex-1004, ¶0039; Ex-1003, ¶82.

Lert teaches using **processor circuitry** (e.g., audio processing circuitry, signature recognition computer) for extracting and comparing audio signatures and **memory** for storing audio signatures. Ex-1009, 3:57-4:42, 4:61-5:19, FIGs. 1-2; Ex-1003, ¶83.

Lu-000 teaches using **processor circuitry** (e.g., audience locating circuitry, control command processor subsystem, audience recognition subsystem) for locating and recognizing audience members and **memory** for storing pattern image

signatures. Ex-1008, 2:20-38, 3:27-60, 7:25-8:6; Ex-1003, ¶84. For example, Lu-000's control command processor subsystem includes a central processing unit 78 and a memory device 80. Ex-1008, 5:61-6:4, FIG. 5[4]:




By incorporating Lert and Lu-000 by reference, Lu-577 teaches identifying a television program and audience members (*infra* §VI.A.2[1b-1g]) using memory and processor circuitry. The processor circuitry performs these operations by **executing machine readable instructions** (e.g., head location and face recognition software, software program for identifying television program based on audio data). Ex-1004, ¶¶0039-0040. By 2011, basic computer components such as memories, processor circuitries, and machine readable instructions executable by the processor circuitries were well developed and commonly used. Ex-1003, ¶85; *see e.g.*, Ex-1004, cl. 14. A POSITA would have found it obvious

[4] All emphasis added unless otherwise noted.

to implement Lu-577's television audience measurement system using this ordinary architecture. Ex-1003, ¶85.

| **[1b]** |
|---|

Lu-577 teaches that the audience measurement system **generates an audio signature of media content presented by a television** (e.g., a television program viewed on digital television) **within the media exposure environment** (e.g., statistically selected site). Ex-1004, Abstract ("A television audience measurement system measures viewing of a television program … in a statistically selected site by … (iii) extracting an audio signature from the television program in order to identify the television program….); ¶0017; Ex-1003, ¶¶86-89. A television program is media content presented by a television; Lu-577's statistically selected site is a media exposure environment. Ex-1003, ¶86; *supra* §VI.A.2[1p].

Lu-577 sets forth the extraction of an audio signature as one of the techniques for identifying a television program. Ex-1004, ¶0041 ("… determine the programs being viewed ... by extracting characteristic signatures from these programs…."), ¶0035, ¶0040; Ex-1003, ¶87. Lu-577's extraction of a characteristic signature is at least one way to generate an audio signature. Ex-1003, ¶88.

The '243 patent admits that this limitation was known. Ex-1001, 1:43-55; Ex-1003, ¶89.

**[1c]**

Lu-577 teaches that its television audience measurement system **obtains content identifying data** (e.g., data identifying a television program) **corresponding to the presented media content** (e.g., television program), **the content identifying data based on the audio signature of the media content presented by the television within the media exposure environment** (e.g., statistically selected site). Ex-1004, ¶0017 ("The extracting means extracts an audio signature from the television program in order to identify the television program."), Abstract; Ex-1003, ¶¶90-93.

Lu-577 teaches identifying the media content (e.g., television programs) "by extracting characteristic signatures from these programs and by matching the extracted signatures to reference signatures stored in a reference signature database based on the audio signature." Ex-1004, ¶0041, *see also* ¶0035, ¶0040; Ex-1003, ¶91.

Lu-577 teaches representing information identifying a television program as "tuning data." Ex-1004, ¶¶0044-0045, ¶0050. The tuning data is "content identifying data" because the tuning data identifies the media content that is presented by a television. Lu-577 teaches obtaining such content identifying data. Ex-1003, ¶92.

The '243 patent admits that this limitation was known. Ex-1001, 1:43-55; Ex-1003, ¶93.

| |
|---|
| **[1d]** |

The combination teaches limitation [1d]. Ex-1003, ¶¶94-102. Lu-577's system includes a person identifier and incorporates Lu-000's teachings on head location and face recognition software for identifying members of a viewing audience. Ex-1004, ¶0013, ¶0039; Ex-1003, ¶94.

The combination teaches **obtaining a sequence of images by a camera while the media content** (e.g., television program) **corresponding to the content identifying data** (e.g., data identifying the television program) **is presented by the television**. Lu-577's person identifier identifies "persons watching television programing" based on image recognition. Ex-1004, ¶0039. Since the identified persons are "watching television programing" on the television set, the images of the persons are captured while the media content (e.g., television program) is presented by the television. *Id.* The images are captured by a camera. Ex-1004, ¶0039 ("The person identifier 98 may be video camera, an IR camera, or the like."). The presented media content corresponds to content identifying data. *Supra* §VI.A.2[1c]; Ex-1003, ¶95.

Lu-000 teaches obtaining (e.g., capturing) images for audience members in the monitored area using a video camera. Ex-1008, Abstract ("A video image is

captured for each of the located individual audience members in the monitored area."), 2:20-38, 3:27-4:8. Lu-teaches capturing multiple "images of the audience members[.]" Ex-1008, 3:27-60. In light of Lu-000's teachings of obtaining the images using a video camera, which a POSITA would have known to be capable of taking sequences of images over time, Lu-000 teaches or renders obvious obtaining **a sequence of images**. Because Lu-000 teaches a television audience (Ex-1008, 1:15-19), the images are obtained when media content is presented by a television. Ex-1003, ¶96.

To the extent it is argued that Lu-577 does not teach "a ***sequence*** of images," Tian teaches obtaining a sequence of images of human subjects using a camera. Ex-1005, 000005 ("The database contains 704 image sequences from 97 subjects."). *Supra* §VI.A.1; Ex-1003, ¶97.

The combination further teaches **analyzing a sequence of images of the media exposure environment to detect a head appearing in one or more of the images**. Lu-577 teaches using "head location" software that detects a head appearing in an image. Ex-1004, ¶0039. Lu-000 teaches analyzing images to detect a head appearing in an image and to determine the location of the head based on a "search raw picture for heads subroutine" and a "search head(s) subroutine." Ex-1008, 9:47-52 ("The sequential steps begin with a search raw

picture for heads subroutine illustrated in FIG. 8I. Next a locate and search head(s) subroutine illustrated in FIG. 8J is performed."), 7:39-47; Ex-1003, ¶98.

The search raw picture for head(s) subroutine searches for heads and saves search area pointers that identify areas corresponding to heads. Ex-1008, 9:53-10:3, FIG. 8I:

FIG. 8I




Ex-1003, ¶99.

The locate and search head(s) subroutine sets a search area window based on the saved pointer. Ex-1008, 10:4-12, FIG. 8J:

FIG. 8J




Ex-1003, ¶100.

Tian also teaches analyzing a sequence of images to detect a head appearing in one or more of the images. Ex-1005, 000005 ("All images in 704 sequences from 97 subjects are used for face detection and head pose estimation."), 000002; Ex-1003, ¶101.

The ’243 patent admits the prior art included approaches for identifying a number of people in a media exposure environment, which commonly involved identifying heads. Ex-1001, 1:56-2:3; Ex-1003, ¶102.

| [1e] |
|---|

Tian teaches **determining an orientation of the head** (e.g., pose estimation) **with respect to the camera**. Ex-1005, 000001 (“[P]ose estimation can be applied[.]”), 000002 (“[T]he head pose was estimated based on the detected head.”); Ex-1003, ¶¶103-105. Pose estimation outputs a head pose that describes the view of the head (e.g., frontal or near frontal view, side view), which describes the orientation of the head with respect to the camera. Ex-1005, 000002; Ex-1003, ¶103. Tian provides examples of head poses:



| Poses | Frontal or near frontal | Side view or profile | Others |
|---|---|---|---|
| Definitions | Both eyes and lip corners are visible | One eye or one lip corner is occluded | Not enough facial features |
| Examples | | | |

Ex-1005, 000003; Ex-1003, ¶104.

It would have been obvious to apply Tian's teaching to Lu-577 such that the audience measurement system determines an orientation of the head with respect to the camera. *Supra* §VI.A.1; Ex-1003, ¶105.

| **[1f]** |
| --- |

Lu-577 teaches limitation [1f]. Ex-1003, ¶¶106-111. Lu-577 teaches "a person identifier 98 [that] identif[ies] the persons watching television programming[.]" Ex-1004, ¶0039; Ex-1003, ¶106. Lu-000 teaches **determining audience identification information based on a match of the head to a known person** (e.g., predetermined individual) **associated with the media exposure environment** (e.g., monitored area). Lu-000 teaches "identifying predetermined individual members of a viewing audience in a monitored area," which is a media exposure environment (*supra* §VI.A.2.1[p]). Ex-1008, Abstract, 2:10-14, 2:20-38. Lu-000 teaches storing a pattern image signature "corresponding to each predetermined individual member." Ex-1008, Abstract, 2:20-47. Because Lu-000's monitored area is a media exposure environment (*supra* §VI.A.2.1[p]) and the predetermined individuals are in the monitored area, Lu-000 teaches storing pattern image signatures of known person associated with the media exposure environment. Ex-1003 ¶107.

Lu-000 next teaches identifying an audience member by comparing a newly extracted pattern image signature with the stored pattern image signatures. Ex-

1008, Abstract, 2:20-38 ("The extracted pattern image signature is compared with each of the stored pattern image signatures to identify a particular one of the predetermined audience members."), 7:39-8:6; Ex-1003, ¶¶108-109. A newly extracted pattern image signature is generated based on a "B-Sub image" that corresponds to the "head location" of a person. Ex-1008, 7:39-8:6, FIGs. 6-7:




Lu-000 thus teaches that the identification is based on a match of the head to a known person. Ex-1003, ¶109.

Lu-000 teaches searching through stored image feature signatures and identifying one having the greatest similarity with an extracted signature. Ex-1008, 8:46-9:2, 9:18-31, FIGs. 8B, 8E. Next, "results" are displayed and is verifiable by a person. Ex-1008, 9:3-10, 9:32-46, 10:4-32, FIG. 8C, 8F-8G, 8J. A POSITA would have understood or found it obvious that the displayed result includes audience identification information by indicating the most similar image feature signature or the corresponding individual. Ex-1003, ¶110.

The ’243 patent admits that audience identification based on facial recognition was known. Ex-1001, 1:56-2:3; Ex-1003, ¶111.

| **[1g]** |
| --- |

The combination teaches **network interface circuitry** (e.g., interface and communication apparatus) **to output a signal indicative of the content identifying data and the audience identification information to a data collection facility** (e.g., intermediate data collector, data collection central office). The combination teaches obtaining content identifying data and determining audience identification information. *Supra* §VI.A.2[1b-1f]; Ex-1003, ¶¶112-114. Lu-577 teaches the audience measurement system determining these information locally in the statistically selected site. Ex-1004, ¶¶0039-0040; Ex-1003, ¶112. Lu-577 further teaches that "television audience data … can be communicated, via the Internet … to a locally located or remotely located intermediate data collector 128 and then to a remotely located central office 130 through a communication channel 170." Ex-1004, ¶0050, ¶0037. A POSITA would have understood that the television audience data in Lu-577 includes television content identifying data and audience identification information and that data commonly transmit over networks in the form of electromagnetic signals. Therefore Lu-577 teaches outputting a signal to a data collection facility. Ex-1003 ¶113.

The intermediate data collector and the data collection central office in Lu-577 are data collection facilities because they collect and store data. Ex-1003, ¶114. Lu-577's audience measurement system includes "an interface and communication apparatus" that includes network communication features such as "a serial port" and functionalities such as sending data "to an internet service provider via the internet." Ex-1004, cls. 13, 29-33, ¶0015. It would have been understood or obvious that this apparatus comprises a network interface circuitry and is suitable to be used for outputting the content identifying data and audience identification information to the data collection facilities. Ex-1003, ¶114.

### 3. Claim 4

| **4[p].** |
|---|

The combination teaches claim 1. *Supra* §VI.A.2. It would have been obvious to use the processor circuitry to perform the operations of limitations [4a] and [4b]. *Supra* §VI.A.2[1a]; Ex-1003, ¶¶115-116.

| **[4a]** |
|---|

The combination teaches limitation [4a]. Ex-1003, ¶¶117-120. Tian describes "the effects of different image resolutions" for facial analysis. Ex-1005, Abstract; 000002; Ex-1003, ¶118. Tian creates lower-resolution images by down-sampling from original images. Ex-1005, 000002 ("The lower resolution images are down-sampled from the originals."), Abstract; Ex-1003, ¶119.

The combination teaches determining an orientation of the head in one or more images. *Supra* §VI.A.2[1d-1e]. A POSITA would have found it obvious to apply Tian's teaching such that Lu-577's system reduces the resolution of a first image of the one or more of the images and performs face detection or head pose estimation on the reduced-resolution image. *Supra* §VI.A.1; Ex-1003, ¶120.

| **[4b]** |
|---|

The combination teaches limitation [4b]. Ex-1003, ¶¶121-122. Tian's head pose estimation teaches determining an orientation of the head with respect to the camera. *Supra* §VI.A.2[1e]. Tian teaches performing pose estimation based on a reduced-resolution image. Ex-1005, 000005 ("[H]ead pose estimation can detect 98% faces for all the resolutions."); Ex-1003, ¶121. A POSITA would have found it obvious that head orientation is determined based on an reduced-resolution image at least because doing so would have saved processing resources without substantially reducing the accuracy of determination. *Supra* §VI.A.1; Ex-1003, ¶122.

### 4. Claim 5

| **5.** |
|---|

The combination teaches claim 4. *Supra* §VI.A.3. It would have been obvious to use the processor circuitry to perform the operations of claim 5. *Supra* §VI.A.2[1a]; Ex-1003, ¶¶124-132.

Lu-000 teaches **generating a facial signature** (e.g., pattern image signature) **from a region of an image corresponding to a location of the head**. *Supra* §VI.A.2[1f]. Lu-000 teaches that "[a] pattern image signature is extracted from [a] captured image." Ex-1008, Abstract, 2:20-38; Ex-1003, ¶125. The pattern image signature is a facial signature because it is extracted from a "head location" and is alternatively called a "face pattern image signature." Ex-1008, 6:49-51, 7:25-27, 7:39-8:6; Ex-1003, ¶126. Lu-000's extraction of a pattern image signature teaches generating a facial signature because "extracting" and "generating" are used interchangeably. Ex-1003, ¶127.

The combination teaches generating the facial signature from a region of **a second image of the one or more of the images** corresponding to a location of the head **in the reduced-resolution image**. Tian teaches generating a reduced-resolution image. *Supra* ¶VI.A.3[4a]. Tian also teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected. Ex-1005, 000001 ("… just detect face in the first frame and then track the face in the remainder of the video sequence."), 000003. A POSITA would have found it obvious to determine a person's face/head location in a reduced-resolution image and perform face recognition on regions of this location in one or more subsequent images of the sequence, including a second image. Ex-1005, 000001, 000005; *supra* §VI.A.1; Ex-1003, ¶¶128-130.

Lu-000 further teaches **comparing the generated facial signature** (e.g., pattern image signature) **to a database of facial signatures** (e.g., individual face storage library (IFL)). *Supra* §VI.A.2[1f]. Lu-000 teaches that "[t]he extracted … image feature signature is compared with each of the pattern image signatures stored in the individual face library." Ex-1008, 7:39-8:6, FIG. 7; *see also* Ex-1008, 8:46-9:31, FIGs. 8B, 8E, 8G; *supra* §VI.A.2[1f]. Lu-000's individual face storage library is a database because it includes a structured collection of data (e.g., pattern image signatures) stored in memory. Ex-1008, 7:25-38; Ex-1003, ¶131.

Lu-577 further teaches **determining the audience identification information** by generating the facial signature and comparing the generated facial signature to a database of facial signatures. *Supra* §VI.A.2[1f]; Ex-1004, ¶0039; Ex-1008, Abstract ("The extracted pattern image signature is compared with each of the stored pattern image signatures to identify a particular one of the predetermined audience members."), 2:20-38; Ex-1003, ¶132.

**5. Claim 6**

| |
|---|
| **6[p].** |

The combination teaches claim 4. *Supra* §VI.A.3. It would have been obvious to use the processor circuitry to perform the operations of limitations [6a]-[6c]. *Supra* §VI.A.2[1a]; Ex-1003, ¶¶133-140.

**[6a]**

The combination teaches **identifying a region corresponding to the head within an image**. *Supra* §VI.A.2[1d]. Lu-000 teaches analyzing images to detect a region corresponding to the head. *Supra* §VI.A.2[1d]; Ex-1008, 7:39-47, 9:47-52, 9:53-10:3, 10:4-12, FIGs. 8I-8J. Tian teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected. *Supra* §VI.A.4; Ex-1005, 000001, 000003; Ex-1003, ¶135.

Tian further teaches **obtaining a reduced-resolution image from the first image**. *Supra* ¶VI.A.3[4a]. Therefore, the combination teaches identifying a region corresponding to the head within the first image from which the reduced-resolution image was obtained. Ex-1003, ¶136.

**[6b]**

It would have been obvious to apply Tian's teaching to Lu-577 such that the television audience measurement system determines a face or head location in a first image and use the determined location for subsequent images. *Supra* §VI.A.4; Ex-1003, ¶¶137-138.

Lu-000 teaches analyzing a portion corresponding to the identified region of the head or face to determine that the head matches the known person based on the analysis. *Supra* §VI.A.2[1f], §VI.A.4; Ex-1008, 7:39-8:6, FIG. 7; *see also* Ex-

1008, 8:46-9:31, FIGs. 8B, 8E, 8G. Ex-1003, ¶139. Therefore, the combination teaches limitation [6b]. Ex-1003, ¶140.

### 6. Claim 8

| |
|---|
| **8.** |

The combination teaches claim 6. *Supra* §VI.A.5. It would have been obvious to use the processor circuitry to perform the operations of claim 8. Ex-1003, ¶¶141-144.

Lu-577 teaches determining audience identification information based on a match of the head to a known person, outputting the identification information as an output signal, and storing "identified individual viewing member data." *Supra* §VI.A.2[1f].; Ex-1008, 7:67-8:6. A POSITA would have understood or found it obvious that the stored individual viewing member data includes an identifier associated with the known person. Ex-1003, ¶143. In fact, the '243 patent admits that the concept of an identifier was known in the prior art. Ex-1001, 1:43-55.

Lu-577 teaches that the audience measurement system includes a memory. *Supra* §VI.A.2[1a]. Lu-000 teaches storing data related to facial recognition using a memory. Ex-1008, 2:39-47 ("[E]ach of the plurality of feature image signatures are stored in a distinct memory space…."), 5:61-6:4, 7:25-38. It would have been obvious to cause the identifier associated with the person to be stored in memory. Ex-1003, ¶144.

| [19b] |
| --- |

As explained for claim 12 and the preamble 16[p], the combination teaches limitation [19b]. *Supra* §VI.A.9[12b], §VI.A.12.16[p]; Ex-1003, ¶192.

#### 1. Claim 20

| 20. |
| --- |

The combination teaches claim 19. *Supra* §VI.A.14. As explained for claim 13 and the preamble 16[p], the combination teaches claim 20. *Supra* §VI.A.10, §VI.A.12.16[p]; Ex-1003, ¶194.

### B. Ground 2

#### 1. Combination of Nielsen-372 and Steinberg

Nielsen-372 teaches a local metering system that includes a metering unit or display device ON/OFF detector that identifies a presented television program and a people meter that identifies the persons viewing the program. Ex-1006, ¶0003, ¶¶0036-0037, ¶0040, ¶0044, ¶0048, ¶0057. The people meter takes an approach of "prompt[ing] the audience members to indicate that they are present in the viewing audience[.]" Ex-1006, ¶0048; Ex-1003, ¶196.

Steinberg is directed to "using face detection and face recognition techniques to identify the persons contained within a digital image[.]" Ex-1007, ¶0090. Steinberg teaches detecting a face and its location in an image, determining a pose or orientation of a face, and identifying a person using face recognition. Ex-

1007, ¶0005, ¶0057, ¶0092, ¶0096, ¶0118, ¶0120, ¶¶0126-0128, ¶0130, ¶¶0157-0158, ¶0166, ¶0168, ¶0176; Ex-1003, ¶197.

A POSITA would have found it obvious to apply Steinberg's teachings to Nielsen-372, such that audience members are identified by face detection and recognition. Ex-1003, ¶198. Nielsen-372's system includes needed hardware (e.g., a computer and a camera) for implementing Steinberg's approach. *Infra* §VI.B.2[1a]; Ex-1006, FIG. 29, ¶0050, ¶¶0135-0136, ¶0141; Ex-1007, Abstract, ¶0092, ¶0112, ¶0129; Ex-1003, ¶¶199-200.

Nielsen-372's approach of prompting and soliciting manual inputs from the individuals may create a negative audience experience and compromise the accuracy of data. Ex-1006, ¶0048. Applying Steinberg's method to Nielsen-372 would have allowed identification of the audience members without interruptions to the entertainment experience and with improved accuracy. A POSITA would have been motivated to do so because these benefits are consistent with Nielsen-372's goal of collecting viewing information. Ex-1003, ¶201.

A POSITA would have found it obvious and been motivated to apply the teachings of Steinberg to Nielsen-372 because this is a simple substitution of one known element (e.g., audience identification based on facial analysis) for another (e.g., audience identification based on user input) to obtain predictable results. Doing so would have yielded predictable results because the techniques of facial

analysis were well known in the 2011 timeframe and applied to television audience measurement. *Supra* §I; Ex-1003, ¶202.

A POSITA would have had a reasonable expectation of success given that Nielsen-372 provide the hardware architecture for performing Steinberg's method and that Steinberg's techniques were admittedly known. Ex-1001, 1:67-2:3. The combination simply implements Steinberg's teachings about facial analysis, in the manner taught by Steinberg, in Nielsen-372's system. *See supra* §I. The combination would have been nothing more than the use of a known technique to improve similar devices in the same way and would not have changed the principle of operation for any of the references. Ex-1003, ¶203.

### 2. Claim 1

| **1[p].** |
|---|

The combination teaches the preamble. Ex-1003, ¶204-210. Nielsen-372 teaches **an audience measurement system** (e.g., including a local metering system "capable of providing viewing and metering information").[6] Ex-1006, ¶0036, FIG. 1:

[6] Nielsen-372 teaches other systems or devices, such as a central (data processing) facility, that may be included as part of the audience measurement system. Ex-1006, ¶0036, ¶0041.

**[16g]**

As explained for claim 1 and the preamble 16[p], the combination teaches limitation [16g]. *Supra* §VI.B.2[1g], §VI.B.4.16[p]; Ex-1003, ¶278.

## C. Ground 3

### 1. Combination of Nielsen-372, Steinberg, and Tian

The combination of Nielsen-372 and Steinberg teaches an audience measurement system that determines media content presented by a television and identifies individuals in the audience based on facial analysis. *Supra* §§VI.B.1-2. Similar to Steinberg, Tian teaches techniques for image processing and facial analysis. Ex-1005, Abstract, 000002, 000005; Ex-1003, ¶280.

A POSITA would have found it obvious to add Tian to the combination of Nielsen-372 and Steinberg because Steinberg and Tian are directed to similar functionalities (e.g., images process and facial analysis) and address similar software-based tasks (e.g., identifying a head in an image). A POSITA would have found it obvious and been motivated to use Tian's techniques to improve Steinberg and to apply these techniques to the people meter of Nielsen-372. Ex-1003, ¶281.

Tian teaches performing facial analysis on sequences of images of subjects. *See, e.g.*, Ex-1005, 000005. Tian's teaching are compatible with Steinberg, which teaches identifying analyzing one or multiple images (*see supra* §VI.B.2[1d-1f]); it was obvious for the people meter to analyze sequences of images to identify

audience members. Ex-1003, ¶282. A POSITA would have been motivated to apply Tian's teaching because performing facial analysis on a sequence of images can improve the confidence level of identification and allow the selective performance of face recognition on suitable images. *Supra* §VI.A.1; Ex-1022, 000007; Ex-1010, ¶0003; Ex-1003, ¶283.

Tian teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected. *See, e.g.*, Ex-1005, 000001, 000003; Ex-1003, ¶284. Contemporary writings demonstrates that it was obvious to apply Tian's approach to Nielsen-372 and Steinberg. Ex-1010, ¶0003; Ex-1003, ¶¶284-285; *supra* §VI.A.1. A POSITA would have been motivated to apply this approach because it saves processing resources and time by not repeating face detection for entire images. Ex-1003, ¶285; *supra* §VI.A.1.

Tian teaches obtaining and analyzing reduced-resolution images and that the accuracy of face detection and head pose estimation can be maintained for reduced-resolution images. *See, e.g.*, Ex-1005, Abstract, 000002, 000005; Ex-1003, ¶286. Analyzing reduced-resolution images can reduce the time and resource consumption of tasks such as face detection and pose estimation. Ex-1013, 000001; Ex-1014, 2:43-53; Ex-1015, ¶0022; Ex-1005, 000005; Ex-1003, ¶287. However, it was known that the performance of face recognition may be adversely affected by the reduction of image resolution. Ex-1027, 000004-05. A

POSITA would have been motivated to perform certain facial analysis techniques (e.g., face detection, head pose estimation) on reduced-resolutions images, while other techniques (e.g., face recognition) on full-quality images. Ex-1003, ¶¶287-288; *supra* §VI.A.1.

A POSITA would have found it obvious and been motivated to apply the teachings of Tian to the combination of Nielsen-372 and Steinberg because this is an application of known techniques (e.g., Tian's facial analysis techniques) to a known system (e.g., Nielsen-372's people meter) and method (e.g., Steinberg's facial analysis methods) ready for improvement. *Supra* §VI.B.1. Doing so would have improved accuracy of face recognition and provided savings in processing resources and time, and would have yielded predictable results at least because Tian provides experimental assessments of its techniques. Ex-1003, ¶289.

The combination simply uses Tian's teachings about image processing and facial analysis, in the manner taught by Tian, to implement functionality in Nielsen-372. *See supra* §I. A POSITA would have been motivated and would have had a reasonable expectation of success in combining the references given the overlap between Steinberg and Tian and because the combination uses well-known techniques that would not have changed the principle of operation for any of the references. Ex-1003, ¶290.

**2. Claim 1**

**1[p].**

Nielsen-372 and Steinberg teach the preamble. *Supra* §VI.B.2.1[p]; Ex-1003, ¶¶292-293.

**[1a]**

Nielsen-372 and Steinberg teach limitation [1a]. *Supra* §VI.B.2[1a]; Ex-1003, ¶¶294-295.

**[1b]**

Nielsen-372 teaches limitation [1b]. *Supra* §VI.B.2[1b]; Ex-1003, ¶¶296-297.

**[1c]**

Nielsen-372 teaches limitation [1c]. *Supra* §VI.B.2[1c]; Ex-1003, ¶¶298-299.

**[1d]**

Nielsen-372 and Steinberg teach limitation [1d]. *Supra* §VI.B.2[1d]; Ex-1003, ¶300. Tian further teaches obtaining a sequence of images of human subjects using a camera and analyzing the sequence of images to detect a head appearing in one or more of the images. Ex-1005, 000002, 000005; *supra* §VI.A.2[1d]. Ex-1003, ¶¶300-302.

**[1e]**

Nielsen-372 and Steinberg teach limitation [1e]. *Supra* §VI.B.2[1e]; Ex-1003, ¶303. Tian further teaches determining an orientation of the head with respect to the camera. *Supra* §VI.A.2[1a]; Ex-1005, 000001-03; Ex-1003, ¶¶303-304.

**[1f]**

Nielsen-372 and Steinberg teach limitation [1f]. *Supra* §VI.B.2[1f]; Ex-1003, ¶¶305-306.

**[1g]**

Nielsen-372 and Steinberg teach limitation [1g]. *Supra* §VI.B.2[1g]; Ex-1003, ¶¶307-308.

### 3. Claim 4

**4[p].**

The combination teaches claim 1. *Supra* §VI.C.2. It would have been obvious to use the processor circuitry to perform the operations of limitations [4a] and [4b]. *Supra* §VI.B.2[1a], §VI.C.2[1a]; Ex-1003, ¶310.

**[4a]**

Tian teaches reducing the resolution of an image to obtain a reduced-resolution image. *Supra* §VI.A.3[4a]; Ex-1005, Abstract, 000002. A POSITA

would have found it obvious to apply this teaching to a first image of the media exposure environment. *Supra* §VI.C.1, §VI.A.3[4a]; Ex-1003, ¶311. Steinberg's teachings of processing images of different resolutions would have further motivated a POSITA to apply Tian's teachings. Ex-1007, ¶0141, ¶0142, ¶0196. Therefore, the combination teaches limitation [4a]. Ex-1003, ¶312.

| **[4b]** |
|---|

Tian teaches determining a pose estimate (i.e., determining orientation of head, *see* §VI.C.2[1e]) based on a reduced-resolution image. Ex-1005, 000005; *supra* §VI.A.3[4b]. A POSITA would have found it obvious to apply Tian's teachings to the audience measurement system. *Supra* §VI.C.1, §VI.A.3[4b]. Therefore, the combination teaches limitation [4b]. Ex-1003, ¶313.

### 4. Claim 5

| **5.** |
|---|

The combination teaches claim 4. *Supra* §VI.C.3. It would have been obvious to use the processor circuitry to perform the operations of claim 5. *Supra* §VI.B.2[1a], §VI.C.2[1a]; Ex-1003, ¶315.

Steinberg teaches **generating a facial signature** (e.g., faceprint) **from a region of an image corresponding to a location of the head** (e.g., face candidate region). *Supra* §VI.B.2[1f]; Ex-1007, ¶0092, ¶0096, ¶¶0126-0127, ¶0130, FIGs. 1(a)-(c). Steinberg's faceprint is a "facial signature" because it is a feature vector

corresponding to parameters associated with a face region. Ex-1007, ¶0077, ¶0124, ¶0126; Ex-1001, 6:3-44; Ex-1003, ¶316. Steinberg's face candidate region corresponds to a location of the face, which is also the location of the head. Ex-1007, ¶0118, ¶0120. Ex-1003, ¶317.

The combination teaches generating the facial signature from a region of **a second image of the one or more of the images** corresponding to a location of the head **in the reduced-resolution image**. In light of Tian's teachings of generating a reduced-resolution image and tracking face in a sequence of images, a POSITA would have found it obvious to determine the location of a person's face in a reduced-resolution image and use this location to perform facial recognition based on higher-resolution images. *Supra* §VI.A.4, §VI.C.1; Ex-1005, 000001, 000003, 000005; Ex-1003 ¶¶318-319. In this manner, after a location of the head is determined in a reduced-resolution image generated from a first image, facial recognition is performed on a region corresponding to the location in one or more images of the sequence, including a second image. Ex-1003 ¶320.

Steinberg teaches **comparing the generated facial signature** (e.g., faceprint) **to a database of facial signatures**. *Supra* §VI.C.2[1f]; Ex-1007, ¶0092, ¶0096, ¶¶0126-0127, ¶0130, FIGs. 1(a)-(c). Steinberg further teaches **determining the audience identification information** by generating the facial signature and comparing the generated facial signature to a database of facial signatures. *Supra*

§VI.C.2[1f]; Ex-1007, ¶0099, 0135, 0156-0157, 0178, FIGs. 4(a)-(b), FIG. 9(a). Therefore, the combination teaches claim 5. Ex-1003, ¶321.

### 5. Claim 6

| **6[p].** |
| --- |

The combination teaches claim 4. *Supra* §VI.C.3. It would have been obvious to use the processor circuitry to perform the operations of limitations [6a]-[6c]. *Supra* §VI.C.2[1a]; Ex-1003, ¶323.

| **[6a]** |
| --- |

The combination teaches **identifying a region corresponding to the head within an image**. *Supra* §VI.B.2[1d], §VI.C.2[1d]. Steinberg teaches analyzing images to detect a "face region," which is a region corresponding to the face and head. *Supra* §VI.B.2[1d]; Ex-1007, Abstract, ¶0005, ¶0057, ¶0118, ¶0128, ¶0130, ¶0151, FIG. 3. Furthermore, Tian teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected. *Supra* §VI.A.4, §VI.C.4; Ex-1005, 000001, 000003; Ex-1003, ¶324.

Tian further teaches **obtaining a reduced-resolution image from the first image**. *Supra* ¶VI.A.3[4a], ¶VI.C.3[4a]. Therefore, the combination teaches identifying a region corresponding to the head within the first image from which the reduced-resolution image was obtained. Ex-1003, ¶325.

| [6b] |
|---|

It would have been obvious to apply Tian's teaching to Nielsen-372 and Steinberg such that the television audience measurement system determines a face or head location in a first image and use the determined location for subsequent images. *Supra* §VI.C.4; Ex-1003, ¶¶326-327.

Steinberg teaches analyzing a portion corresponding to the identified region of the head or face to determine that the head matches the known person based on the analysis. *Supra* §VI.B.2[1f], §VI.C.2[1f], §VI.C.4; Ex-1007, ¶0092, ¶0096, 0099, ¶¶0126-0127, ¶0130, ¶0135, ¶¶0156-0157, ¶0178, FIGs. 1(a)-(c), FIGs. 4(a)-(b); Ex-1003, ¶328. Therefore, the combination teaches limitation [6b]; Ex-1003, ¶329.

### 6. Claim 8

| 8. |
|---|

The combination teaches claim 6. *Supra* §VI.C.5. It would have been obvious to use the processor circuitry to perform the operations of claim 8. *Supra* §VI.B.2[1a], §VI.C.2[1a]; Ex-1003, ¶331.

The combination teaches determining audience identification information based on a match of the head to a known person and outputting such information. *Supra* §VI.B.2[1f-1g], §VI.C.2[1f-1g]. Steinberg teaches the local metering unit storing viewing records, which includes information regarding the audience, before

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

---

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

TVISION INSIGHTS, INC.,

Petitioner,

v.

THE NIELSEN COMPANY (US), LLC,

Patent Owner.

---

Case No. IPR2023-01014

U.S. Patent 11,470,243

---

**Declaration of Dr. David Scott Doermann**

## TABLE OF CONTENTS

**Page**

I. OVERVIEW OF THE TECHNOLOGY ........ 6
- A. Television Audience Measurement ........ 6
- B. Audio Content Recognition ........ 8
- C. Image Processing and Facial Analysis ........ 9

II. THE '243 PATENT ........ 12
- A. Overview ........ 12
- B. Prosecution History ........ 15
- C. Priority Date ........ 16
- D. Challenged Claims ........ 16

III. SUMMARY OF THE PRIOR ART ........ 17
- A. Invalidity Grounds ........ 17
- B. U.S. Patent Application Publication No. 2002/0059577 ("Lu-577") (Exhibit 1004) ........ 18
- C. *Evaluation of Face Resolution for Expression Analysis* ("Tian") (Exhibit 1005) ........ 21
- D. U.S. Patent Application Publication No. 2010/0274372 ("Nielsen-372") (Exhibit 1006) ........ 22
- E. U.S. Patent Application Publication No. 2010/0066822 ("Steinberg") (Exhibit 1007) ........ 24

IV. LEVEL OF ORDINARY SKILL IN THE ART ........ 25

V. CLAIM CONSTRUCTION ........ 27
- A. Media Exposure Environment ........ 27

VI. INVALIDITY ........ 29
- A. Ground 1: Claims 1, 4-6, 8, 9, 11-14, 16, and 18-20 are Rendered Obvious in View of Lu-577 and Tian ........ 29
  - 1. Combination of Lu-577 and Tian ........ 29
  - 2. Claim 1 ........ 41
  - 3. Claim 4 ........ 73

4. Claim 5 .......... 78

5. Claim 6 .......... 84

6. Claim 8 .......... 86

7. Claim 9 .......... 89

8. Claim 11 .......... 99

9. Claim 12 .......... 101

10. Claim 13 .......... 103

11. Claim 14 .......... 104

12. Claim 16 .......... 105

13. Claim 18 .......... 112

14. Claim 19 .......... 113

15. Claim 20 .......... 114

B. Ground 2: Claims 1, 9, and 16 are Rendered Obvious in View of Nielsen-372 and Steinberg .......... 115

1. Combination of Nielsen-372 and Steinberg .......... 115

2. Claim 1 .......... 121

3. Claim 9 .......... 157

4. Claim 16 .......... 165

C. Ground 3: Claims 1, 4-6, 8, 9, 11-14, 16, and 18-20 are Rendered Obvious in View of Nielsen-372, Steinberg, and Tian .......... 172

1. Combination of Nielsen-372, Steinberg, and Tian .......... 172

2. Claim 1 .......... 179

3. Claim 4 .......... 183

4. Claim 5 .......... 186

5. Claim 6 .......... 191

6. Claim 8 .......... 194

7. Claim 9 .......... 197

8. Claim 11 .......... 201

9. Claim 12 .......... 202

10. Claim 13 .......... 204

11. Claim 14 .......... 205
12. Claim 16 .......... 206
13. Claim 18 .......... 210
14. Claim 19 .......... 211
15. Claim 20 .......... 212
VII. BACKGROUND AND QUALIFICATIONS .......... 213
A. Compensation .......... 217
B. Materials and Other Information Considered .......... 217
VIII. UNDERSTANDING OF THE LAW .......... 217
IX. RESERVATION OF RIGHTS .......... 217
APPENDIX 1: CURRICULUM VITAE
APPENDIX 2: MATERIALS CONSIDERED
APPENDIX 3: CHALLENGED CLAIMS
APPENDIX 4: UNDERSTANDING OF THE LAW

I, David Scott Doermann, declare as follows:

1. My name is David Scott Doermann. I am currently a Professor of Empire Innovation in the Department of Computer Science and Engineering at the University at Buffalo. I am also the inaugural director of the University at Buffalo Institute for Artificial Intelligence and Data Science. I received my B.Sc. degree in Computer Science and Mathematics from the Bloomsburg University of Pennsylvania in 1987, and I received my M.Sc. degree in computer science from the University of Maryland College Park, Maryland, in 1989. I continued my studies in the Computer Vision Laboratory at the University of Maryland, where I earned a Ph.D. degree in Computer Science in 1993. My Ph.D. thesis focused on applying image processing and computer vision techniques.

2. Over the past decade, my research has expanded to include the general field of artificial intelligence, applied primarily to computer vision. I have published extensively on image quality estimation, text detection in the wild, machine learning applications for front-end and edge computing, and cutting-edge applications in evolutionary computing.

3. I have over 65 refereed journal publications and over 225 refereed conference papers. In 2002, I received an honorary Doctor of Technology Sciences from the University of Oulu in Finland for my contributions to digital media processing and document image analysis research. I am a Fellow of the

Institute of Electrical and Electronics Engineers (IEEE) and the International Association of Pattern Recognition (IAPR).

4. I have prepared this report as an expert witness retained by TVision Insights, Inc. In this report I give my opinions as to whether certain claims of U.S. Patent No. 11,470,243 ("the '243 patent") are invalid. I provide technical bases for these opinions as appropriate.

5. This report contains statements of my opinions formed to date and the bases and reasons for those opinions. I may offer additional opinions based on further review of materials in this case, including opinions and/or testimony of other expert witnesses. I make this declaration based upon my own personal knowledge and, if called upon to testify, would testify competently to the matters contained herein.

# I. OVERVIEW OF THE TECHNOLOGY

## A. Television Audience Measurement

6. Television audience measurement services have been widely used since the 1950s for gathering quantitative information to support, for example, advertising, programming, and financial forecasting. Ex-1011. Furthermore, automated systems to provide such services were well-known before 2011. Ex-1016; Ex-1004; Ex-1006. Typical components of such a service included obtaining information about the audience, such as the number of members, their

locations, the directions they are facing, and their identities, and identifying a television program broadcasted at the time by analyzing media data (e.g., audio data) associated with the program.

7. In fact, Patent Owner or its affiliate has developed automated systems for television audience measurement at least by 1992, almost 20 years before the earliest possible priority date of the '243 patent. In 1992, the A.C. Nielsen Company demonstrated to a reporter its "passive meter" that "can identify viewers and even gives a rough indication of whether their heads are turned toward the TV." Ex-1016, 000003. The passive meter "scans a room every two seconds, looking for signs of life" by "compar[ing] each fresh image in a given location with its predecessor to produce a digital representation of movement, the hall mark of humanness." Ex-1016, 000009. To identify individuals in the audience, the passive meter obtains multiple images of a known person and matches a new image to the obtained images. Ex-1016, 000009 ("The machine and I had already been introduced - that is, it had scanned me and then stored four images of my face: three head-on portraits and one quarter-profile. It was now ready to try matching the real me to these digital mug shots."). If the identification is successful, the passive meter "display[s] on a nearby video screen [the identified person's] name and a number indicating how confident it was about the identification." Ex-1016, 000009. The passive meter also distinguishes those who

are watching the television from those involved in other activities. Ex-1016, 000009-10 ("Its reliance on head-on or nearly head-on views, moreover, means that it will not count people who are present but involved in other activities[.]").

8. The PO or its affiliates continued to develop television audience measurement systems that use audio and video monitoring equipment to identify television programs and the audience and disclosed such systems in patent applications well before the '243 patent. *See, e.g.*, Ex-1004, Abstract ("A television audience measurement system measures viewing of a television program viewed on digital television located in a Statistically Selected Site"); Ex-1006, ¶0036 ("A block diagram of an example local metering system 100 capable of providing viewing and metering information for program content presented via an example home entertainment system 102 is illustrated in FIG. 1."), FIG. 1.

9. As explained below, all of the technology enablers for automated television audience measurement, including audio content recognition and face detection analysis and recognition, were all widely available before 2011 and used in this domain.

### B. Audio Content Recognition

10. Audio content recognition is an approach to identifying live or recorded media, typically through the use of acoustic features. Early technology from the late 1990s provided solutions that extracted features from acoustic signals

and used temporal templates to match the resulting signatures. *See, e.g.*, Ex-1017, Abstract. Solutions were available since at least the early 2000s that use audio "fingerprinting" technology based on audio spectrograms to identify the source media from a set of predefined targets. Ex-1018, Abstract. This technology was robust and was able to identify music, and audio in general in noisy environments and in a speaker independent manner. Ex-1026, 000003-04.

11. Audio content recognition was applied in a variety of applications, and in particular was applied in audience measurement systems. Ex-1004, Abstract ("A television audience measurement system measures viewing of a television program viewed on digital television located in a statistically selected site by … (iii) extracting an audio signature from the television program in order to identify the television program[.]"); Ex-1006, Abstract ("Display device ON/OFF detection methods and apparatus are disclosed. An example method disclosed herein to determine whether a presentation device is ON or OFF comprises determining an audio signature based on an audio signal corresponding to an output of the presentation device, comparing the audio signature to a set of reference signatures corresponding to a set of known media content….").

**C. Image Processing and Facial Analysis**

12. By 2011, techniques and commercial products were widely available for facial analysis, including face detection, face or head pose estimation, and face

recognition. Ex-1019, 000002; Ex-1020, 000003; Ex-1021, 000002-03. All three problems were well-defined, benchmarks existed, and vendor tests were commonplace. The solutions that emerged were advanced enough to be applied to real-world problems such as entertainment, where face recognition can be used to control video games or play an important role in human robot interaction. Facial analysis techniques were also applied to information security, providing access controls to sensitive data or computer systems, or law enforcements for video surveillance, suspect tracking or criminal investigation. Ex-1021, 000002-03.

13. By 2011, there were numerous conferences that focused on the systematic evaluation of various face detection techniques and survey papers that summarized the status of face detection. *See, e.g.*, Ex-1019; Ex-1023. Databases also emerged along with benchmarks for face detection to quantitatively evaluate problems which were focused on face recognition in general unconstrained environments. *See, e.g.*, Ex-1025. Head pose estimation techniques were also advanced as described in a state-of-the-art survey in 2009. Ex-1020. The paper was based on an analysis of over 90 papers published in the field and demonstrated that the state-of-the-art was advanced enough to actively apply to various real-world applications. Starting in 2000, the National Institute of Standards and Technology ("NIST") began running vendor tests for face recognition systems.

Ex-1024. At the time the technology was widely available and had matured into commercial products that could address large-scale and real-world applications.

14. One of the challenges leading up to this time was the ability to perform analysis efficiently to save computation resources while maintaining the quality of the analysis. It was well-known that savings of computation resources can be achieved by performing facial analysis on lower-resolution images. Certain facial analysis methods tolerate low-resolution images better than others. For example, Tian showed that face detection was somewhat agnostic to resolution and able to operate equally as well on faces of resolution 288x384 as on faces of resolution 36x48. Ex-1005, 000005. This enabled acquisition systems to have fewer constraints on the size of the face in an image but also suggested that processing could be done on lower-resolution images to conserve precious computational resources. On the other hand, it was known that facial recognition suffered from degraded performances at lower resolution. Ex-1027, 000005, Fig. 7:




**Fig. 7**. Performance curve with the resolution changing from 16 × 12 to 136 × 102 based on PCA (the left figure) and LDA (the right figure)

15. By 2011, techniques for obtaining reduced-resolution images were widely known. Such techniques ranged from simply subsampling the image and dropping pixels to various forms of interpolation. These techniques were applied for a variety of reasons, including, for example, the ability to save computation by working on less data, providing representations that could be used to find objects and different scales, and binning pixels that compensate for low-light environments.

## II. THE '243 PATENT

### A. Overview

16. The '243 patent relates to "[m]ethods and apparatus to obtain exposure data for media exposure environment(s)[,]" which "determine[s] audience identification information and content identifying data." Ex-1001,

claims, I have considered all claims 1-29 of the '243 patent, as well as portions of the '243 patent prosecution history in forming my opinions.

## III. SUMMARY OF THE PRIOR ART

24. There are a number of patents and publications that constitute prior art to the '243 patent. I have reviewed and considered the prior art discussed in this section, along with the materials listed in Appendix 2.

### A. Invalidity Grounds

25. Based on my review and analysis of the materials cited herein, my opinions regarding the understanding of a POSITA in the 2011 timeframe, and my training and experience, it is my opinion that the challenged claims of the '243 patent are invalid based on the following grounds:

| Grounds | Claims | Statutory Basis | Prior Art |
|---|---|---|---|
| 1 | 1, 4-6, 8, 9, 11-14, 16, and 18-20 | § 103 | Lu-577 in view of Tian |
| 2 | 1, 9, and 16 | § 103 | Nielsen-372 in view of Steinberg |
| 3 | 1, 4-6, 8, 9, 11-14, 16, and 18-20 | § 103 | Nielsen-372 in view of Steinberg and Tian |

26. I understand that none of the above-referenced art was cited or considered during prosecution of the '243 patent. First, none of these references or any related patents are listed on the face of the '243 patent. In addition, I reviewed

the file history for the '243 patent and am not aware of any of the above references being discussed in the prosecution history.

### B. U.S. Patent Application Publication No. 2002/0059577 ("Lu-577") (Exhibit 1004)

27. Lu-577 was filed July 19, 2001 and published May 16, 2002. Therefore, Lu-577 is prior art under pre-AIA §102(b) because it was published over one year before December 15, 2011.

28. Lu-577 teaches "[a] television audience measurement system [that] measures viewing of a television program viewed on digital television located in a statistically selected site." Ex-1004, Abstract. Lu-577 teaches that the television audience measurement system includes detectors (64, 68, 78) that detect audio portions of a presented television program and feed data to site units (86, 94, 96) or a home unit (88), which analyze the data to identify a television program. Ex-1004, ¶¶0035-0038, FIG. 2:

Figure 2




One approach to identify the television program is by extracting an audio signature, for which Lu-577 incorporates U.S. Patent No. 4,677,466 ("Lert") by reference. Ex-1004, Abstract, ¶0003, ¶0017, ¶0035, ¶0040. Lu-577 teaches identifying the television program by comparing the audio signature with reference signatures. Ex-1004, ¶0035, ¶0040, ¶0041.

29. Lu-577 further teaches that its television audience measurement system includes a person identifier "to identify the persons watching television programming" "in the statistically selected monitoring site." Ex-1004, ¶0039. Lu-577 teaches using "known head location and face recognition software" as taught by U.S. Patent No. 4,858,000 ("Lu-000") "for the identification of the viewing persons and for the collection of other demographic data." Ex-1004, ¶0039.

30. Lu-000 teaches "[a]n image recognition method and system … for identifying predetermined individual members of a viewing audience in a monitored area." Ex-1008, Abstract. A video camera is used to capture images for audience members in the monitored area. Ex-1008, Abstract, 2:20-38, 3:27-60, 3:61-4:8. Lu-000 teaches analyzing images to detect a head appearing in an image and to determine the location of the head. Ex-1008, 7:39-47, 9:47-52. Lu-000 further teaches storing a pattern image signature corresponding to each predetermined individual member of the viewing audience, extracting a pattern image signature from a captured image, and identifying an audience member by comparing a newly extracted pattern image signature with the stored pattern image signatures. Ex-1008, Abstract, 2:10-47, 7:39-8:6, FIGs. 6-7.

31. Lu-577 further teaches communicating television audience data to an intermediate data collector or a data collection central office. Ex-1004, ¶0050, ¶0037.

32. Lu-577 is in the same field of endeavor as the '243 patent, which is media analysis. *See infra* §IV. Lu-577 "relates to the measurement of audiences of digitally broadcast television programming and to the measurement of usage of other information services provided to the audiences." Ex-1004, ¶0001. Lu-577 teaches analyzing audio data to identify a television program and analyzing images to identify members of the audience. *See, e.g.*, *infra* §VI.A.2.

### C. *Evaluation of Face Resolution for Expression Analysis* ("Tian") (Exhibit 1005)

33. Exhibit 1005 is a copy of Ying-li Tian, *Evaluation of Face Resolution for Expression Analysis*, 2004 Conference on Computer Vision and Pattern Recognition Workshop, Washington, DC, USA, 2004, pp. 82-82, doi: 10.1109/CVPR.2004.334. I understand that Tian is prior art under pre-AIA §102(b) because it was published no later than July 2, 2004, over one year before December 15, 2011. Ex. 1028.

34. Tian teaches obtaining a sequence of images of human subjects using a camera and analyzing the images to detect heads appearing in the images using face detection techniques.. Ex-1005, 000002, 000005. Tian further teaches performing pose estimation to determine orientations of the heads in the images. Ex-1005, 000001-03.

35. Tian creates lower-resolution images by down-sampling from original images and analyzes multiple different resolutions and performs face detection and pose estimation based on reduced-resolution images. Ex-1005, Abstract, 000005. According to Tian, the accuracy of face detection and pose estimation can be maintained at relatively low resolutions. Ex-1005, 000005. Tian further teaches determining a face/head location in a first image and only tracking changes to face features in subsequent images. Ex-1005, 000001, 000003.

36. Tian is in the same field of endeavor as the '243 patent, which is media analysis. *See infra* §IV. Tian "explores the effects of different image resolutions for each step of facial expression analysis." Ex-1005, Abstract. Tian teaches analyzing images for head detection and pose estimation. *See, e.g.*, *infra* §VI.A.2.

### D. U.S. Patent Application Publication No. 2010/0274372 ("Nielsen-372") (Exhibit 1006)

37. Nielsen-372 was filed July 7, 2010 and published October 28, 2010. Therefore, Nielsen-372 is prior art under pre-AIA §102(b) because it was published over one year before December 15, 2011.

38. Nielsen-372 is directed to "audience measurement." Ex-1006, ¶0002. Nielsen-372 teaches a local metering system that is placed in the same environment as a home entertainment system, which presents media content and includes a display device such as a television. Ex-1006, ¶¶0036-0037, ¶0040.

39. The local metering system includes a sensor to receive audio signals corresponding to a displayed program and a metering unit and/or display device ON/OFF detector that identify the displayed program based on the audio signals. Ex-1006, ¶0036, ¶0044, ¶¶0049-0050, ¶0057, FIG. 1:



FIG. 1

The metering unit and/or display device ON/OFF detector generates an audio signature corresponding to a program being presented Ex-1006, ¶0044, ¶0051, ¶¶0055-0057, ¶¶0095-0100, FIGs. 2-3, FIGs. 14-15. Then, identifying information of the presented program is obtained by comparing the audio signature with a set of reference signatures. Ex-1006, ¶0044, ¶0057, ¶0096, FIG. 14. The local metering system also includes a people meter 162 that detects the identities of persons viewing programs on a television. Ex-1006, ¶0003, ¶0048.

40. The local metering system outputs viewing records to a central office or data processing facility over a network connection. Ex-1006, ¶0036, ¶0041, FIG. 1.

41. Nielsen-372 is in the same field of endeavor as the '243 patent, which is media analysis. *See infra* §IV. Nielsen-372 teaches analyzing audio data,

including "determining an audio signature based on an audio signal corresponding to an output of the presentation device [and] comparing the audio signature to a set of reference signatures corresponding to a set of known media content[.]" Ex-1006, Abstract; *see, e.g.*, *infra* §VI.B.2.

### E. U.S. Patent Application Publication No. 2010/0066822 ("Steinberg") (Exhibit 1007)

42. Steinberg was filed September 4, 2009 and published March 18, 2010. Therefore, Steinberg is prior art under pre-AIA §102(b) because it was published over one year before December 15, 2011.

43. Steinberg is directed to grouping and classification of images based on the occurrence of faces in the images and the identification and classification of such faces. Ex-1007, ¶0003. Steinberg teaches an image capture device (e.g., a digital camera) that captures images and handles certain image processing operations. Ex-1007, ¶¶0128-0129, FIG. 1(a)-(c).

44. Steinberg teaches performing facial detection on acquired images to detect faces in the images and their corresponding locations. Ex-1007, Abstract, ¶0005, ¶0057, ¶0092, ¶¶0117-0118, ¶0128, ¶0130, ¶0151. Next, Steinberg detects the orientations of the faces to normalize them for further processing. Ex-1007, ¶0092, ¶0120, ¶0130, ¶0136, ¶0166, ¶0168, ¶0176, FIGs. 1(a)-(c), FIG. 5(a)-(b). Steinberg further teaches performing face recognition on the detected faces by generating a faceprint and comparing it with faceprints stored in a database. Ex-

1007, ¶0092, ¶0096, ¶¶0126-0127, ¶0130, FIGs. 1(a)-(c). As the database stores faceprints in association with identity information of known persons, identity information is determined based a match of faceprints. Ex-1007, ¶0099, ¶0135, ¶¶0156-0157, ¶0178, FIGs. 4(a)-(b), FIG. 9(a).

45. Steinberg is in the same field of endeavor as the '243 patent, which is media analysis. *See infra* §IV. Steinberg "relates to digital image processing, particularly to the field of automatic or semiautomatic grouping and classification of images in a database or image collection and based on the occurrence of faces in the images and the identification and classification of such faces." Ex-1007, ¶0003. Steinberg teaches analyzing images to identify known persons. *See, e.g.*, *infra* §VI.B.2.

## IV. LEVEL OF ORDINARY SKILL IN THE ART

46. I have analyzed the '243 patent and determined that the field of the patent is media analysis, including analysis of audio signals (e.g., audio signals of a television program) and image signals (e.g., images of individuals in a room).

47. In determining the characteristics of a hypothetical person of ordinary skill in the art ("POSITA") of the '243 patent at the time of the claimed invention, I considered several things, including various prior art techniques relating to media analysis, the type of problems that such techniques gave rise to, and the rapidity with which innovations were made. I also considered the sophistication of the

technologies involved, and the educational background and experience of those actively working in the field at the time. I also considered the level of education that would be necessary to understand the '243 patent. Finally, I placed myself back in the relevant period of time and considered the engineers and programmers that I have worked with and managed in the field of media analysis.

48. I came to the conclusion that a person of ordinary skill in the field of art of the '243 patent would have been a person with a bachelor's degree in computer science, electrical engineering, or a similar field with at least two years of experience in media analysis or a person with a master's degree in computer science, electrical engineering, or a similar field with a specialization in media analysis. A person with less education but more relevant practical experience may also meet this standard.

49. In the year 2011 timeframe, a POSITA would have known and had the skills necessary to:

- Design or implement systems that collect audio and image data from an environment for analysis;
- Understand and implement known techniques for extracting characteristic features from audio content and identifying the audio content based on the extracted features;

- Understand and implement known techniques of image processing, including adjusting parameters of images, such as resolution, illumination, and orientation;
- Understand and implement known face or head analysis techniques on images, such as face or head detection, face or head pose estimation, and identity determination based on face or head in images.

## V. CLAIM CONSTRUCTION

50. For purposes of this *inter partes* review, I have considered the claim language, specification, and portions of the prosecution history, to determine the meaning of the claim language as it would have been understood by a person of ordinary skill in the art at the time of the invention. I have applied the *Phillips* standard in my analysis. Unless otherwise stated, I have applied the plain and ordinary meaning to claim terms.

### A. Media Exposure Environment

51. Challenged claims 1, 4, 9, 11, 16, and 18 recite "media exposure environment." Ex-1001, 15:13-17:61. The claims recite "a television within the media exposure environment," "images of the media exposure environment," and "a known person associated with the media exposure environment." *Id*. The specification of the '243 patent provides examples of a "media exposure environment," including "a television room, a family room, a living room, a bar, a

52. In light of the claim language and the specification, it is my opinion that a POSITA would have understood the meaning of "media exposure environment" in the context of the '243 patent to at least encompass a space in which a television is located.

## VI. INVALIDITY

53. Based on my review and analysis of the materials cited herein, my opinions regarding the understanding of a POSITA in the 2011 timeframe, and my training and experience, it is my opinion that:

- Claims 1, 4-6, 8, 9, 11-14, 16, and 18-20 of the '243 patent are obvious in view of Lu-577 and Tian.
- Claims 1, 9, and 16 of the '243 patent are obvious in view of Nielsen-372 and Steinberg.
- Claims 1, 4-6, 8, 9, 11-14, 16, and 18-20 of the '243 patent are obvious in view of Nielsen-372, Steinberg, and Tian.

The reasons for my conclusions are explained more fully below.

### A. Ground 1: Claims 1, 4-6, 8, 9, 11-14, 16, and 18-20 are Rendered Obvious in View of Lu-577 and Tian

54. It is my opinion that a POSITA would have found Claims 1, 4-6, 8, 9, 11-14, 16, and 18-20 obvious based on the teachings of Lu-577 and Tian.

#### 1. Combination of Lu-577 and Tian

55. Lu-577 teaches a television audience measurement system that measures viewing of a television program on television. Ex-1004, Abstract. The television audience measurement system "extract[s] an audio signature from the television program in order to identify the television program[.]" Ex-1004, Abstract, ¶0017, ¶0035, ¶0040, FIG. 2. The television audience measurement system further uses "known head location and face recognition software … for the identification of the viewing persons[.]" Ex-1004, ¶0039.

56. Lu-577 incorporates Lu-000 by reference as teaching already-known exemplary location and face recognition software. Ex-1004, ¶0013 ("Notable among teachings in this area is that by Lu in U.S. Pat. No. 4,858,000. The teaching of this patent is herein incorporated by reference."), ¶0039 ("known head location and face recognition software (e.g., as taught by Lu in U.S. Pat. No. 4,858,000)"). Lu-000 teaches "[a]n image recognition method and system … for identifying predetermined individual members of a viewing audience in a monitored area." Ex-1008, Abstract. Lu-000 captures video images for individual audience members, analyzes the images to locate the heads or faces of the audience members, extracts pattern image signatures from the images, and compares the extracted pattern images signatures with stored signatures to determine the identities of the audience members. Ex-1008, Abstract, 7:39-9:52.

57. Similar to Lu-000, Tian teaches techniques for image processing and facial analysis. Tian teaches processing image sequences of human subjects to perform facial analysis that includes, for example, face detection, head pose estimation, and expression recognition. Ex-1005, 000002, 000005. Tian teaches processing reduced-resolution images and studies the effects of the reduction of resolution on the performance of different facial analysis techniques, including face detection and head pose estimation. Ex-1005, Abstract, 000005.

58. A POSITA would have found it obvious to combine the teachings of Lu-000 and Tian because they are directed to similar functionalities (e.g., image processing and facial analysis) and address similar software-based tasks (e.g., identifying a head in an image). As explained below, Tian provides multiple techniques that provide performance improvements for facial analysis methods, such as those taught by Lu-000. A POSITA would have understood that Tian's techniques are applicable to Lu-000's teachings and would have been motivated to use these techniques to improve Lu-000.

59. Lu-577 teaches employing known head location and face recognition software to identify audience members. Ex-1004, ¶0039. Lu-577 refers to Lu-000 as one example of such software solutions, clearly indicating that it contemplates using other software solutions with relevant functions in the context of television audience measurement. Ex-1004, ¶0039. A POSITA would have realized that

Tian's solutions of facial analysis are applicable to the television audience measurement solution of Lu-577 because Lu-577 provides the capability of capturing images of audience members (Ex-1004, ¶0039) and the captured images provide the basis of Tian's analysis. A POSITA would have found it obvious to employ the known head location and face analysis software solutions of Tian in Lu-577's system for audience measurement based on Lu-577's explicit invitation of employing such known solutions.

60. Tian teaches performing facial analysis on sequences of images of subjects. *See, e.g.*, Ex-1005, 000005 ("The database contains 704 image sequences from 97 subjects. … The length of the image sequences are varying from 9 to 47 frames."). A POSITA would have found it obvious to apply Tian's teaching to Lu-577's teachings (including Lu-000) such that the television audience measurement system analyzes sequences of images to identify audience members. Lu-577 and Lu-000 teaches identifying members of an audience by analyzing images of the audience. *See, e.g.*, Ex-1004, ¶0039; Ex-1008, 3:27-60. Neither Lu-577 nor Lu-000 limits the number of images for an audience member that can be analyzed. Furthermore, Lu-577 and Lu-000 teach using a video camera to obtain audience images. *See, e.g.*, Ex-1004, ¶0039 ("The person identifier 98 may be video camera, an IR camera, or the like."); Ex-1008, 3:61-4:8 ("[T]he audience scanner 12 includes a video camera 28 for capturing a video image[.]") A POSITA would

have understood that a video camera is capable of taking a sequence of images over time. It would have been obvious to implement Tian's teachings of analyzing a sequence of images as obtained by a video camera.

61. A POSITA would have been motivated to apply Tian's teaching of performing facial analysis on a sequence of images because of the benefits provided by such an approach. First, a POSITA would have known that facial analysis usages always strive for higher accuracy levels, and that operations such as head detection and face recognition generally correspond to certain levels of accuracy. As contemporaneous writings recognized, the accuracy of identifying a person can be improved by analyzing multiple images including the same person and aggregating the analysis results from the multiple images. *See, e.g.*, Ex-1022, 000007. This would have motivated a POSITA to analyze multiple images in order to achieve a higher confidence level for the identification than a single image. Second, a POSITA would have understood that a single image captures a person's facial features at a particular point in time. The person's facial expression and orientation, as captured by that image, may or may not be suitable for face recognition. For example, the person may close their eyes or face a direction other than the camera, and in those cases, face recognition with high accuracy may not be feasible. Ex-1010, ¶0003 ("[A] typical face detector can only accurately detect faces in a semi-frontal pose."). Obtaining and analyzing a sequence of images

allows the selection of images in which the facial features are suitable for face recognition and selective performance of face recognition on suitable images. A POSITA would have understood that this would have improved the accuracy of the audience identification.

62. Tian teaches determining a face/head location in a first image and only tracking changes to face features in subsequent images. *See, e.g.*, Ex-1005, 000001 ("Face acquisition is a processing stage to automatically find the face region for the input images or sequences. It can be a face detector to … just detect face in the first frame and then track the face in the remainder of the video sequence."), 000003 ("Given an image sequence, the region of the face and approximate location of individual face features are detected automatically in the initial frame. … Then, all face feature changes are automatically tracked in the image sequence."). Under this approach, if no change is detected, the face is determined to be at the same location in subsequent images.

63. A POSITA would have found it obvious to apply Tian's teaching to Lu-577 such that when the television audience measurement system processes a sequence of images, it determines a face or head location in a first image and use the determined location for subsequent images. For example, the television audience measure system analyzes a portion in a subsequent image corresponding to the location for face recognition.

64. A POSITA would have understood that this approach is applicable when a sequence of images is taken for a person by a video camera. Video cameras were able to take multiple images in a relatively short period of time, in which a person's head or face is unlikely to move significantly. Therefore, the region corresponding to the person's head or face likely remains the same across the sequence of images. A POSITA would have found it obvious to apply this approach since this approach is taught in contemporaneous writings. Ex-1010, ¶0003 ("Once a face is detected, its location is recorded and a localized region around that face is scanned by a face detector in the next frame. Thus, once a face is initially detected, it can be accurately tracked from frame to frame without a need to run a face detector across the entire image."). A POSITA would have been motivated to apply the teachings of Tian because this approach has the benefit of saving processing resources and time by reducing the number of times face detection needs to be applied.

65. Tian teaches performing head pose estimation on a subject based on an image. *See, e.g.*, Ex-1005, 000002 ("[T]he head pose was estimated based on the detected head."). Tian teaches categorizing the subject into one of several possible poses such as frontal or new frontal view, side view or profile, and others. *See, e.g.*, Ex-1005, 000003. A POSITA would have found it obvious to apply Tian's teaching of determining head poses to Lu-577 such that the television

audience measurement system determines an orientation of the head with respect to the camera before performing further steps to identify the corresponding person. A POSITA would have understood that a person's head pose refers to an orientation of the person's head with respect to the camera. The visibility of the person's facial features differ for different poses. Ex-1005, 000002 ("In the frontal or near frontal view, both eyes and lip corners are visible. In side view or profile, at least one eye or one corner of the mouth becomes self-occluded because of the head.").

66. A POSITA would have understood that certain poses are not suitable for face recognition. For example, in a side view, one or more facial features of a person may not be visible, which may make face recognition with a high accuracy unfeasible. Ex-1010, ¶0003 ("[A] typical face detector can only accurately detect faces in a semi-frontal pose."). In fact, Tian teaches performing facial expression analysis only for frontal or near frontal view faces. Ex-1005, 000002 ("The expression analysis process is applied only to the frontal and near frontal view faces."). A POSITA would have found it obvious to apply this approach to Lu-577 such that a person's head pose is first determined in an image and a decision is made as to whether the image will be used for face recognition. In this manner, it can be ascertained that face recognition is only performed on images in which a person's head pose is suitable for such analysis. This improves the accuracy of identification of audience members and addresses the problem that pose variations

adversely affect recognition performance. Ex-1021, 000042. A POSITA would have been motivated to apply Tian's teachings to Lu-577 in order to achieve this benefit.

67. Furthermore, a POSITA would have been motivated to apply Tian's teachings of head pose estimation to that of Lu-577 such that the television audience measurement system can determine whether a member of the audience is watching the television. Using an individual's head pose to determine the individual's watching activity was known in the 2011 timeframe. Ex-1012, ¶0039 ("For example, the facial recognition unit 11 may use the measurements of the angle of a face, if the eyes of the face are open or closed, and/or if the face of the person is 'looking at' the camera or at the broadcast program to determine if the person is watching the broadcast program."). In light of Lu-577's function of measuring viewing of a television program, a POSITA would have found it beneficial to apply the teachings of Tian such that the television audience measurement system better determines whether the detected individuals are watching the television program.

68. Tian teaches reducing the resolution of an image to obtain reduced-resolution images and performing analysis on the reduced-resolution images such as face detection and head pose estimation. *See, e.g.*, Ex-1005, Abstract, 000002, 000005. Tian teaches that the accuracy of face detection and head pose estimation

can be maintained for reduced-resolution images. *See, e.g.*, Ex-1005, 000005 ("The results show that both face detectors [23, 29] can detect all faces for head region in resolution of 288x384, 144x192, 72x96, and 36x48, but failed for resolution of 18x24. Compared to face detection, head pose estimation can detect 98% faces for all the resolutions.").

69. A POSITA would have found it obvious to apply Tian's teaching to Lu-577 such that the television audience measurement system reduces the resolution of an image and performs face detection or head pose estimation on the reduced-resolution image. Tasks such as face detection can be resource-consuming. Ex-1013, 000001 ("[V]iew-based [face detection] methods … are reported to have a good detection performance but the drawback to be computationally rather expensive and at present are not the appropriate choice for real-time applications."). Some approaches of face detection may require analyzing all pixels of an image to search for a face. The processing resources and time can be reduced if the resolution of the image is reduced. Ex-1014, 2:43-53 (teaching that "calculations are avoided of a complete highest resolution integral image for every acquired image in an image stream" in face tracking, thereby "reduces processing overhead for face detection[.]"); Ex-1015, ¶0022 ("By reducing the resolution of the saturation of the image, computational requirements are substantially reduced and a relatively simple method may be used.").

Performing face detection or head pose estimation on a reduced-resolution image provides savings in processing resources or time, but does not substantially reduce the accuracy of these analysis tasks according to Tian's teachings. Ex-1005, 000005. A POSITA would have been motivated to apply Tian's teachings of analyzing reduced-resolution images to achieve the benefit of savings in processing resources and time.

70. It was known that the performance of face recognition may be adversely affected by the reduction of image resolution. Ex-1027, 000004-05. Therefore, a POSITA would have been motivated to perform certain facial analysis techniques (e.g., face detection, head pose estimation) on reduced-resolutions images, while other techniques (e.g., face recognition) on full-quality images.

71. A POSITA would have found it obvious and been motivated to apply the teachings of Tian to Lu-577 because this is an application of known techniques to a known system and method ready for improvement. Lu-577 teaches a system and method for measuring viewing of a television program, in which Lu-577 explicitly describes the use of known head location and face recognition software. Tian provides known techniques for determining the location and orientation of faces or heads in images. Lu-577 contemplates the application of known techniques, such as those taught by Tian, to be applied to its system and method. Furthermore, as explained above, applying Tian's techniques to Lu-577 would

have provided improvements such as improved accuracy of face recognition (e.g., by processing a sequence of images and determining the orientation of the head) and savings in processing resources and time (e.g., by analyzing reduced-resolution images and tracking the location of the head in a sequence of images). Applying Tian's teachings to Lu-577 would have yielded predictable results at least because Tian provides experimental assessments of its techniques, such as the accuracy of face detection and head pose estimation for images of different resolutions.

72. A POSITA would have had a reasonable expectation of success when combining the teachings of Lu-577 and Tian, given the overlap between Lu-000 and Tian and that Tian's image processing techniques were well known. As explained above, the combination simply uses Tian's teachings about image processing and facial analysis, in the manner taught by Tian, to implement functionalities in Lu-577 where Lu-577 expressly refers to techniques that were known in the art. A POSITA would have been more than capable of implementing the image processing techniques taught by Tian, such as creating reduced-resolution images by down-sampling an original image, face detection, head pose estimation, and face tracking. *See supra* §I. Furthermore, a POSITA would have been motivated and would have had a reasonable expectation of success in combining the references, as explained above, because the combination would not have changed the principle of operation for any of the teachings of the references

relied upon in the combination. Here, Tian's techniques are used in a conventional manner and applied to Lu-577 in a manner contemplated by Lu-577.

### 2. Claim 1

73. It is my opinion that a POSITA would have found claim 1 obvious based on the combined teachings of Lu-577 and Tian.

| | |
|---|---|
| **1[p].** | **An audience measurement system to obtain exposure data for a media exposure environment,** |

74. I understand that a preamble may or may not state a limitation of a claim. However, to the extent the preamble limits claim 1, it is my opinion that Lu-577 teaches the preamble.

75. Lu-577 teaches **an audience measurement system** (e.g., a television audience measurement system). Ex-1004, Abstract ("A television audience measurement system measures viewing of a television program viewed on digital television located in a statistically selected site …."); ¶¶0014-0017.

76. Lu-577 teaches that its television audience measurement system **obtains exposure data** (e.g., data identifying a television program(s), data identifying the audience) **for a media exposure environment** (e.g., a statistically selected site). Ex-1004, Abstract, ¶0017, ¶0035, ¶¶0039-0040, FIG. 2. For example, Lu-577 teaches that its television audience measurement system "measures viewing of a television program viewed on digital television located in a statistically selected site[.]" Ex-1004, Abstract, ¶0017, ¶0035. The television

system comprising a network interface circuitry to output a signal indicative of the content identifying data and the audience identification information to a data collection facility.

### 3. Claim 4

115. It is my opinion that a POSITA would have found claim 4 obvious based on the combined teachings of Lu-577 and Tian.

| | |
|---|---|
| **4[p].** | **The audience measurement system of claim 1, wherein the processor circuitry is to:** |

116. The combination of Lu-577 and Tian teaches the audience measurement system of claim 1. *Supra* §VI.A.2. As explained below, the combination of Lu-577 and Tian further teaches that the audience measurement system performs the further operations recited in claim 4. *Infra* §VI.A.3[4a-4b]. Furthermore, a POSITA would have found it obvious to implement Lu-577's television audience measurement system such that the processor circuitry executes the machine readable instructions to perform operations directed to identifying a television program and audience members. *Supra* §VI.A.2[1a]. It would have been obvious to use the processor circuitry to perform the operations of limitations [4a] and [4b].

| | |
|---|---|
| **[4a]** | **reduce a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image, and** |

117. The combination of Lu-577 and Tian teaches that the processor circuitry of the audience measurement system **reduces a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image**.

118. Tian recognizes that "in real environments, the face image is often in lower resolution" and describes the effects of different image resolutions on face image analysis. Ex-1005, Abstract ("This paper explores the effects of different image resolutions for each step of facial expression analysis. The different approaches are compared for face detection, face data extraction and expression recognition."); 000002 ("However, in real applications, the face region is often in lower resolutions.").

119. Tian creates lower-resolution images by down-sampling from original images and analyzes multiple different resolutions. Ex-1005, Abstract ("A total of five different resolutions of the head region are studied (288x384, 144x192, 72x96, 36x48, and 18[]x24) based on a widely used public database [16]. The lower resolution images are down-sampled from the originals."). Tian illustrates example images in reduced resolutions:

Table 1: An example in five different resolutions from Cohn-Kanade database. The head region is cropped for display purpose only. The lower resolution images are down-sampled from the originals.



| | | | | |
|---|---|---|---|---|
| 288x384 (Original) | 144x192 | 72x96 | 36x48 | 18x24 |

Ex-1005, 000002 ("As shown in Table 1, total five different resolutions of the head region are studied (288x384, 144x192, 72x96, 36x48, and l8x24) based on Cohn-Kanade AU-Coded Face Expression Image Database [16]. The lower resolution images are down-sampled from the originals."). Therefore, Tian teaches reducing the resolution of an image to obtain a reduced-resolution image.

120. As explained above, the combination of Lu-577 and Tian teaches obtaining a sequence of images of the media exposure environment, detecting a head in one or more of the images, and determining an orientation of the head. *Supra* §VI.A.2[1d-1e]. A POSITA would have found it obvious to apply Tian's teaching to Lu-577 such that the television audience measurement system reduces the resolution of an image and performs face detection or head pose estimation on the reduced-resolution image. *Supra* §VI.A.1 (explaining why it would have been obvious to analyze reduced-resolution images; that analysis is incorporated here).

Therefore, the combination of Lu-577 and Tian teaches the television audience measurement system reducing a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image.

| | |
|---|---|
| **[4b]** | **determine the orientation of the head with respect to the camera based on the reduced-resolution image.** |

121. The combination of Lu-577 and Tian teaches that the processor circuitry of the audience measurement system **determines the orientation of the head with respect to the camera** (e.g., pose estimate) **based on the reduced-resolution image**. As explained above, Tian's disclosure about head pose estimation teaches determining an orientation of the head with respect to the camera. *Supra* §VI.A.2[1e]. Tian teaches determining a pose estimation based on a reduced-resolution image. Ex-1005, 000005 ("[H]ead pose estimation can detect 98% faces for all the resolutions. Our previous results of head pose estimation showed that the head pose estimation can achieve 96% accuracy for 5 poses when head region resolution is about 8x8 pixels[.]"). Tian provides a summary of the accuracy level of head pose estimation for reduced-resolution images at different resolutions:

Table 3: Summary of the effects of faces at different resolutions for expression analysis. For face acquisition, "FD" indicates face detector. "HPE" indicates head pose estimation. For feature extraction, "G1" indicates geometric features extracted by feature tracking. "G2" indicates geometric features extracted by feature detection. "AP" indicates appearance features extracted by Gabor wavelets.

| Face Process | |  288x384 (Original) |  144x192 |  72x96 |  36x48 |  18x24 |
|---|---|---|---|---|---|---|
| Face Acquisition | FD | 100% | 100% | 100% | 100% | 0% |
| | HPE | 98.5% | 98% | 98.2% | 97.8% | 98% |
| Feature Extraction | G1 | Yes | Yes | Yes | No | No |
| | G2 | Yes | Yes | Yes | Yes | No |
| | AP | Yes | Yes | Yes | Yes | Yes |
| FACS AUs | G1 | 90% | 90.2% | 89.8% | N/A | N/A |
| | G2 | 71% | 70.8% | 72% | 54.3% | N/A |
| | AP | 90.7% | 90.2% | 89.6% | 72.6% | 58.2% |
| | G1+AP | 92.8% | 93% | 92.2% | N/A | N/A |
| | G2+AP | 91.2% | 90.8% | 90% | 87.7% | N/A |
| Basic Expressions | G1 | 92.5% | 91.8% | 91.6% | N/A | N/A |
| | G2 | 74% | 73.8% | 72.9% | 61.3% | N/A |
| | AP | 91.7% | 92.2% | 91.6% | 77.6% | 68.2% |
| | G1+AP | 93.8% | 94% | 93.5% | N/A | N/A |
| | G2+AP | 93.2% | 93% | 92.8% | 89% | N/A |

Ex-1005, 000005 (emphasis added).

122. As shown in the above table, the accuracy of head pose estimation remains high at relatively low resolutions (e.g., 98% at 18x24 compared with 98.5% at 288x384). A POSITA would have found it obvious to apply Tian's teachings of determining the orientation of the head with respect to the camera

based on the reduced-resolution image to the television audience measurement system of Lu-577. *Supra* §VI.A.1 (explaining why it would have been obvious to analyze reduced-resolution images; that analysis is incorporated here). A POSITA would have been motivated to do so because performing the head pose estimation on the reduced-resolution image would have saved processing resources and time without substantially reducing the accuracy of the determination. Therefore, the combination of Lu-577 and Tian teaches the audience measurement system determining the orientation of the head with respect to the camera based on the reduced-resolution image.

**4. Claim 5**

123. It is my opinion that a POSITA would have found claim 5 obvious based on the combined teachings of Lu-577 and Tian.

| | |
|---|---|
| **5.** | **The audience measurement system of claim 4, wherein the processor circuitry is to determine the audience identification information by: (i) generating a facial signature from a region of a second image of the one or more of the images corresponding to a location of the head in the reduced-resolution image, and (ii) comparing the generated facial signature to a database of facial signatures.** |

124. The combination of Lu-577 and Tian teaches the audience measurement system of claim 4. *Supra* §VI.A.3. As explained below, the combination of Lu-577 and Tian further teaches that the audience measurement system performs the further operations recited in claim 5. Furthermore, a POSITA would have found it obvious to implement Lu-577's television audience

measurement system such that the processor circuitry executes the machine readable instructions to perform operations directed to identifying a television program and audience members. *Supra* §VI.A.2[1a]. It would have been obvious to use the processor circuitry to perform the operations of claim 5.

125. Lu-000 teaches **generating a facial signature** (e.g., pattern image signature) **from a region of an image corresponding to a location of the head**. *Supra* §VI.A.2[1f]. Lu-000 teaches extracting a pattern image signature from an image:

> A video image is captured for each of the located individual audience members in the monitored area. A pattern image signature is extracted from the captured image. The extracted pattern image signature is compared with each of the stored pattern image signatures to identify a particular one of the predetermined audience members. These steps are repeated to identify all of the located individual audience members in the monitored area.

Ex-1008, Abstract, 2:20-38.

126. Lu-000's pattern image signature is extracted from a region of an image corresponding to a location of the head:

> A gray-level subimage output G-Sub of the zooming and **head location** block 104 is applied to a normalization block 106. The normalized output of block 106 is applied to a thresholding block 108 to provide a thresholding, binary level image output B-Sub. A feature signature is

extracted from the B-Sub image at a feature signature extraction block 110.

Ex-1008, 7:39-8:6 (emphasis added). The pattern image signature is a facial signature because it represents the features of a person's face as it is extracted from the portion of the image corresponding to the person's head/face and is alternatively called a "face pattern image signature" in Lu-000. Ex-1008, 6:49-51 ("An extracted pattern image signature output of the feature signature extraction block 98 is stored in an individual face storage library (IFL) 100."), 7:25-27 ("A distinct memory space of a predetermined capacity is defined for each of the individual face pattern image signatures within the image face library IFL block 100."), 7:39-8:6 ("A particular audience member is identified when the compared signatures exceed a predetermined correlation threshold value corresponding to the best matching rate or highest correlation with an individual face pattern image signature in the individual face library is identified at a conclusion block 114.").

127. As the '243 patent does not limit the method used to generate the facial signature, a POSITA would have understood that the terms "extracting" and "generating" are often used interchangeably to refer to the creation of a facial signature based on an image. Extracting a pattern image signature based on a processed region of an image corresponding to the face of a person is at least one

way to generate a facial signature. Therefore, Lu-000 teaches generating a facial signature from a region of an image corresponding to a location of the head.

128. The combination of the teachings of Lu-000 and Tian teaches generating the facial signature from a region of **a second image of the one or more of the images** corresponding to a location of the head **in the reduced-resolution image**. Tian teaches generating a reduced-resolution image by reducing the resolution of a first image of the one or more of the images. *Supra* ¶VI.A.3[4a]. A POSITA would have been motivated to perform face detection (e.g., determining the location of the face or head) on a reduced-resolution image. *Supra* §VI.A.1 (explaining why it would have been obvious to analyze reduced-resolution images; that analysis is incorporated here). As Tian explains, face detection can be performed on a reduced-resolution image with high accuracy. Ex-1005, 000005 ("The results show that both face detectors [23, 29] can detect all faces for head region in resolution of 288x384, 144x192, 72x96, and 36x48….”). Therefore, a POSITA would have been motivated to detect a face/head location on a reduced-resolution image to save processing power before performing face recognition to identify a person. *Supra* §VI.A.1.

129. Furthermore, Tian teaches determining a face/head location in a first image and only tracking changes to face features in subsequent images. Ex-1005, 000001 ("Face acquisition is a processing stage to automatically find the face

region for the input images or sequences. It can be a face detector to detect a face in each frame or **just detect face in the first frame and then track the face in the remainder of the video sequence**." (emphasis added)), 000003 ("Given an image sequence, the region of the face and approximate location of individual face features are detected automatically in the initial frame. … Then, all face feature changes are automatically tracked in the image sequence."). Under this approach, if no change is detected, the face is determined to be at the same location in subsequent images.

130. A POSITA would have found it obvious to apply Tian's teaching to Lu-577 such that when the television audience measurement system processes a sequence of images, it determines a face or head location in a first image and use the determined location for subsequent images. *Supra* §VI.A.1 (explaining why it is obvious to determine a face or head location in a first image and use the location for subsequent images; that analysis is incorporated here). Further in light of Tian's teachings of analyzing reduced-resolution images, a POSITA would have found it obvious to determine the location of a person's face in a reduced-resolution version of a first image and use this location to perform facial recognition based on the sequence of higher-resolution images because doing so would have saved processing resources without sacrificing performance. *Supra* §VI.A.1 (explaining why it is obvious to perform face detection in a reduced-

resolution image; that analysis is incorporated here). In this manner, after a location of the head is determined in a reduced-resolution image generated from a first image, facial recognition is performed on a region corresponding to the location in one or more images of the sequence, including a second image.

131. Lu-000 further teaches **comparing the generated facial signature** (e.g., pattern image signature) **to a database of facial signatures** (e.g., individual face storage library (IFL)). *Supra* §VI.A.2[1f]. Lu-000 teaches comparing the extracted pattern image signature to the pattern image signatures stored in an individual face storage library (IFL). Ex-1008, 7:39-8:6 ("The extracted B-Sub image feature signature is compared with each of the pattern image signatures stored in the individual face library as illustrated at a block 112 to identify a match."), FIG. 7; *see also* Ex-1008, 8:46-9:31, FIGs. 8B, 8E, 8G; *supra* §VI.A.2[1f]. A POSITA would have understood that Lu-000's individual face storage library is a database because it includes a structured collection of data (e.g., pattern image signatures) stored in memory. Ex-1008, 7:25-38 ("A distinct memory space of a predetermined capacity is defined for each of the individual face pattern image signatures within the image face library IFL block 100.").

132. Lu-577 (including Lu-000) further teaches **determining the audience identification information** by generating the facial signature and comparing the generated facial signature to a database of facial signatures. *Supra* §VI.A.2[1f];

Ex-1004, ¶0039 ("[A] person identifier 98 may be provided in order to identify the persons watching television programming on the digital television set 66."); Ex-1008, Abstract ("A pattern image signature is extracted from the captured image. The extracted pattern image signature is compared with each of the stored pattern image signatures to identify a particular one of the predetermined audience members."), 2:20-38. Therefore, the combination of Lu-577 and Tian teaches the limitations of claim 5.

#### 5. Claim 6

133. It is my opinion that a POSITA would have found claim 6 obvious based on the combined teachings of Lu-577 and Tian.

| | |
|---|---|
| **6[p].** | **The audience measurement system of claim 4, wherein the processor circuitry is to:** |

134. The combination of Lu-577 and Tian teaches the audience measurement system of claim 4. *Supra* §VI.A.3. As explained below, the combination of Lu-577 and Tian further teaches that the audience measurement system performs the further operations recited in claim 6. Furthermore, a POSITA would have found it obvious to implement Lu-577's television audience measurement system such that the processor circuitry executes the machine readable instructions to perform operations directed to identifying a television program and audience members. *Supra* §VI.A.2[1a]. It would have been obvious to use the processor circuitry to perform the operations of limitations [6a]-[6c].

| | |
|---|---|
| **[6a]** | **identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained;** |

135. The combined disclosure of Lu-000 and Tian teaches **identifying a region corresponding to the head within an image**. *Supra* §VI.A.2[1d]. Lu-000 teaches analyzing images to detect a region corresponding to the head. *Supra* §VI.A.2[1d]; Ex-1008, 7:39-47, 9:47-52, 9:53-10:3, 10:4-12, FIGs. 8I-8J. Furthermore, Tian teaches determining a face/head location in a first image and use the location for subsequent images unless a change is detected. *Supra* §VI.A.4; Ex-1005, 000001, 000003.

136. Tian further teaches **obtaining a reduced-resolution image from the first image**. *Supra* ¶VI.A.3[4a]. Therefore, the combined disclosure of Lu-000 and Tian teaches identifying a region corresponding to the head within the first image from which the reduced-resolution image was obtained.

| | |
|---|---|
| **[6b]** | **analyze a portion corresponding to the identified region of a second image; and based on the analysis of the region of the second image, determine that the head matches the known person.** |

137. The combined disclosure of Lu-000 and Tian teaches **analyzing a portion corresponding to the identified region of a second image; and based on the analysis of the region of the second image, determine that the head matches the known person**.

138. As explained with respect to claim 5, a POSITA would have found it obvious to apply Tian's teaching to Lu-577 such that when the television audience measurement system processes a sequence of images, it determines a face or head location in a first image and use the determined location for subsequent images. *Supra* §VI.A.4.

139. Lu-000 teaches analyzing a portion corresponding to the identified region of the head or face to determine that the head matches the known person based on the analysis (e.g., by extracting a pattern image signature from the portion and determining that the extracted pattern image signature matches a stored pattern image signature of the known person). *Supra* §VI.A.2[1f], §VI.A.4; Ex-1008, 7:39-8:6, FIG. 7; *see also* Ex-1008, 8:46-9:31, FIGs. 8B, 8E, 8G.

140. Therefore, the combined disclosure of Lu-000 and Tian teaches analyzing a portion corresponding to the identified region of a second image and based on the analysis of the region of the second image, determine that the head matches the known person.

### 6. Claim 8

141. It is my opinion that a POSITA would have found claim 8 obvious based on the combined teachings of Lu-577 and Tian.

determining the match with **a known person associated with the audience detector**. Therefore, the combination of Nielsen-372 and Steinberg teaches determining, using the audience detector, audience identification information based on an indication that the head matches a known person associated with the audience detector.

| | |
|---|---|
| **[16g]** | **providing the content identifying data and the audience identification information to a data collection facility.** |

278. As explained for claim 1, the combination of Nielsen-372 and Steinberg teaches that the audience measurement system outputs a signal indicative of the content identifying data and the audience identification information to a data collection facility. *Supra* §VI.B.2[1g]. A POSITA would have understood that one well-known way to provide the content identifying data and the audience identification information is to output a signal thereof. Therefore, the combination of Nielsen-372 and Steinberg teaches providing the content identifying data and the audience identification information to a data collection facility.

### C. Ground 3: Claims 1, 4-6, 8, 9, 11-14, 16, and 18-20 are Rendered Obvious in View of Nielsen-372, Steinberg, and Tian

279. It is my opinion that a POSITA would have found Claims 1, 4-6, 8, 9, 11-14, 16, and 18-20 obvious based on the teachings of Nielsen-372, Steinberg, and Tian.

#### 1. Combination of Nielsen-372, Steinberg, and Tian

280. As explained above, a POSITA would have found it obvious and been motivated to combine Nielsen-372 and Steinberg. *Supra* §VI.B.1. The combination of Nielsen-372 and Steinberg teaches an audience measurement system that determines media content presented by a television and identifies individuals in the audience. *Supra* §VI.B.2. The combination applies Steinberg's technique of identifying individuals based on face detection, normalization, and recognition to Nielsen-372's people meter. *Supra* §VI.B.1. Similar to Steinberg, Tian teaches techniques for image processing and facial analysis. Ex-1005, 000002, 000005. Tian teaches processing reduced-resolution images and studies the effects of the reduction of resolution on the performance of different facial analysis techniques, including face detection and head pose estimation. Ex-1005, Abstract, 000005.

281. A POSITA would have found it obvious to add Tian to the combination of Nielsen-372 and Steinberg because Steinberg and Tian are directed to similar functionalities (e.g., images process and facial analysis) and address similar software-based tasks (e.g., identifying a head in an image). As explained below, Tian provides multiple techniques that provide performance improvements for facial analysis methods, such as those taught by Steinberg. A POSITA would have understood that Tian's techniques are applicable to Steinberg's teachings and would have been motivated to use these techniques to improve Steinberg. A

POSITA would have been motivated to apply known facial analysis techniques, including the techniques taught by Tian, to the people meter of Nielsen-372.

282. Tian teaches performing facial analysis on sequences of images of subjects. *See, e.g.*, Ex-1005, 000005 ("The database contains 704 image sequences from 97 subjects. … The length of the image sequences are varying from 9 to 47 frames."). A POSITA would have found it obvious to apply Tian's teaching to the teachings of Nielsen-372 and Steinberg such that the audience measurement system analyzes sequences of images to identify audience members. Steinberg teaches identifying members of an audience by analyzing one or multiple images. *See supra* §VI.B.2[1d-1f]. A POSITA would have understood that this is compatible with Tian's teaching of analyzing a sequence of images and it would have been obvious to implement such an approach in the people meter.

283. A POSITA would have been motivated to apply Tian's teaching of performing facial analysis on a sequence of images because of the benefits provided by such an approach. First, a POSITA would have known that facial analysis usages are always striving for higher levels of accuracy, and that operations such as head detection and face recognition generally correspond to certain levels of accuracy. As contemporaneous writings recognized, the accuracy of identifying a person can be improved by analyzing multiple images including the same person and aggregating the analysis results from the multiple images.

*See, e.g.*, Ex-1022, 000007. This would have motivated a POSITA to analyze multiple images in order to achieve a higher confidence level for the identification than a single image. Second, a POSITA would have understood that a single image captures a person's facial features at a particular point in time. The person's facial expression and orientation, as captured by that image, may or may not be suitable for face recognition. For example, the person may close eyes or face a direction other than the camera, and in those cases, face recognition with a high accuracy may not be feasible. Ex-1010, ¶0003 ("[A] typical face detector can only accurately detect faces in a semi-frontal pose."). Obtaining and analyzing a sequence of images allows the selection of images in which the facial features are suitable for face recognition and selective performance of face recognition on the suitable images. A POSITA would have understood that this would have improved the accuracy of the audience identification.

284. Tian teaches determining a face/head location in a first image and only tracking changes to face features in subsequent images. *See, e.g.*, Ex-1005, 000001 ("Face acquisition is a processing stage to automatically find the face region for the input images or sequences. It can be a face detector to … just detect face in the first frame and then track the face in the remainder of the video sequence."), 000003 ("Given an image sequence, the region of the face and approximate location of individual face features are detected automatically in the

initial frame. … Then, all face feature changes are automatically tracked in the image sequence.”). Under this approach, if no change is detected, the face is determined to be at the same location in subsequent images. A POSITA would have found it obvious to apply Tian’s teaching to the combination of Nielsen-372 and Steinberg such that when the audience measurement system processes a sequence of images, it determines a face or head location in a first image and use the determined location for subsequent images. For example, the audience measurement system analyzes a portion in a subsequent image corresponding to the location for face recognition.

285. A POSITA would have found it obvious to apply this approach since this approach is taught in contemporaneous writings. Ex-1010, ¶0003 (“Once a face is detected, its location is recorded and a localized region around that face is scanned by a face detector in the next frame. Thus, once a face is initially detected, it can be accurately tracked from frame to frame without a need to run a face detector across the entire image.”). A POSITA would have been motivated to apply the teachings of Tian because this approach has the benefit of saving processing resources and time as the process of face detection is performed once and not repeated.

286. Tian teaches reducing the resolution of an image to obtain reduced-resolution images and performing analysis on the reduced-resolution images such

as face detection and head pose estimation. *See, e.g.*, Ex-1005, Abstract, 000002, 000005. Tian teaches that the accuracy of face detection and head pose estimation can be maintained for reduced-resolution images. *See, e.g.*, Ex-1005, 000005 ("The results show that both face detectors [23, 29] can detect all faces for head region in resolution of 288x384, 144x192, 72x96, and 36x48, but failed for resolution of 18x24. Compared to face detection, head pose estimation can detect 98% faces for all the resolutions.").

287. A POSITA would have found it obvious to apply Tian's teaching to the combination of Nielsen-372 and Steinberg such that the audience measurement system reduces the resolution of an image and performs face detection or pose estimation on the reduced-resolution image. Tasks such as face detection can be resource-consuming. Some approaches of face detection may require analyzing all pixels of an image to search for a face. The processing resources and time can be reduced if the resolution of the image is reduced. Ex-1014, 2:43-53 (teaching that "calculations are avoided of a complete highest resolution integral image for every acquired image in an image stream" in face tracking, thereby "reduces processing overhead for face detection[.]"); Ex-1015, ¶0022 ("By reducing the resolution of the saturation of the image, computational requirements are substantially reduced and a relatively simple method may be used."). Performing face detection or head pose estimation on a reduced-resolution image provides savings in processing

resources or time, but does not substantially reduce the accuracy of these analysis tasks according to Tian's teachings. Ex-1005, 000005. A POSITA would have been motivated to apply Tian's teachings of analyzing reduced-resolution images to achieve the benefit of savings in processing resources and time.

288. It was known that the performance of face recognition may be adversely affected by the reduction of image resolution. Ex-1027, 000004-05. Therefore, a POSITA would have been motivated to perform certain facial analysis techniques (e.g., face detection, head pose estimation) on reduced-resolutions images, while other techniques (e.g., face recognition) on full-quality images.

289. A POSITA would have found it obvious and been motivated to apply the teachings of Tian to the combination of Nielsen-372 and Steinberg because this is an application of known techniques to a known system and method ready for improvement. As explained for Ground 2, it would have been obvious to apply Steinberg's method of identifying individuals using facial analysis to Nielsen-372's people meter. *Supra* §VI.B.1. Tian's techniques (e.g., analyzing a sequence of images, analyzing reduced-resolution images, tracking the location of head in a sequence of images) would have improved Steinberg's method (e.g., improving accuracy, saving processing resources). A POSITA would have found it obvious to further apply the known techniques of Tian to the known system according to the combination of Nielsen-372 and Steinberg to achieve these improvements.

Applying Tian's teachings to the combination of Nielsen-372 and Steinberg would have yielded predictable results because Tian provides experimental assessments of its techniques, such as the accuracy of face detection and head pose estimation for images of different resolutions.

290. A POSITA would have had a reasonable expectation of success when combining the teachings of Nielsen-372, Steinberg, and Tian, given the overlap between Steinberg and Tian and that Tian's image processing techniques were well known. As explained above, the combination simply uses Tian's teachings about image processing and facial analysis, in the manner taught by Tian, to implement functionality in Nielsen-372. A POSITA would have been more than capable of implementing the image processing techniques taught by Tian, such as creating reduced-resolution images by down-sampling an original image, face detection, head pose estimation, and face tracking. *See supra* §I. Furthermore, a POSITA would have been motivated and would have had a reasonable expectation of success in combining the references, as explained above, because the combination would not have changed the principle of operation for any of the teachings of the references relied upon in the combination. Here, Tian's techniques are used in a conventional manner and applied to Nielsen-372 and Steinberg in a known manner.

**2. Claim 1**

US 20020059577A1

(19) **United States**
(12) **Patent Application Publication** (10) **Pub. No.: US 2002/0059577 A1**
**Lu et al.** (43) **Pub. Date: May 16, 2002**

(54) **AUDIENCE MEASUREMENT SYSTEM FOR DIGITAL TELEVISION**

(75) Inventors: **Daozheng Lu**, Dunedin, FL (US); **Paul C. Kempter**, Palm Harbor, FL (US); **William A. Feininger**, Palm Harbor, FL (US)

Correspondence Address:
**MARSHALL, O'TOOLE, GERSTEIN, MURRAY & BORUN**
**6300 Sears Tower**
**233 South Wacker Drive**
**Chicago, IL 60606-6402 (US)**

(73) Assignee: **Nielsen Media Research, Inc.**, 150 North Martingale Road, Schaumburg, IL 60173-2076 (US)

(21) Appl. No.: **09/909,224**

(22) Filed: **Jul. 19, 2001**

**Related U.S. Application Data**

(62) Division of application No. 09/076,517, filed on May 12, 1998.

**Publication Classification**

(51) Int. Cl.[7] .......... **H04N 7/16**
(52) U.S. Cl. .......... **725/9**

(57) **ABSTRACT**

A television audience measurement system measures viewing of a television program viewed on digital television located in a statistically selected site by (i) retrieving an audience measurement data packet from a television set in order to identify the television program, (ii) detecting an audio code embedded in the television program in order to identify the television program, (iii) extracting an audio signature from the television program in order to identify the television program, (iv) identifying the television program through use of a software agent, and (v) selecting at least one of the retrieving means, the detecting means, the extracting means, and the software agent in order to identify the television program.




Analog TV
STB
DTV
STB
DTV
Monitor
STB
Personal Computer
Key Bd
RCVR
HD
SD
Anslog
Film
A/D

Figure 1


CO
90
92
88
HU
SU
94
62
68
74
SU
86
SU
96
70
Analog TV
78
64
76
STB
DTV
72
PC Monitor
Personal Computer
80
98
66
82
84
60

Figure 2

Figure 3


CO
130
170
IDC
128
166
Analog TV
108
STB
SA
I/O
106
112
114
116
DTV
SA
I/O
110
118
120
PC Monitor
126
PC
SA
I/O
104
122
124
100
102

Figure 4


CO
250
252
HU
248
222
202
246
220
214
216
234
Analog
TV
212
STB
210
204
218
254
DTV
224
228
226
232
230
206
238
240
PC
Monitor
Personal Computer
236
242
244
200
208


CO
348
350
HU
346
320
322
302
STB
310
304
Analog TV
312
316
314
SR
318
DTV
324
334
306
328
326
332
SR
330
PC Monitor
Personal Computer
336
308
340
338
344
SR
342
300
51

Figure 5

Figure 6


CO
430
470
IDC
466
428
STB
DP
SU
406
412
414
Analog TV
408
416
DTV
DP
SU
410
418
420
421
PC Monitor
PC
DP
SU
426
404
422
424
427
402
400


500
START
GET CURRENT OPERATING TASK
502
DOES TASK USE A TV PACKET?
504
Y
N
IS PACKET LABELED?
506
Y
N
IS LABEL SAME AS PREVIOUS ONE?
510
Y
N
LOG TV PROGRAM NAME & TIME
512
LOG TV ON IF IT IS A NEW STATUS
508
IS TASK A COMMAND TO OTHER MONITORED EQUIPMENT?
514
Y
N
LOG ISSUER & RECEIVER OF COMMAND
516
DOES TASK USE A CO-TRANSMITTED PACKET?
518
Y
N
SEARCH TASK FOR LABEL OR URL & LOG RESULTS
520
IS TASK AN INTERNET TASK?
522
Y
N
SEARCH TASK FOR URL & LOG RESULTS
524

Figure 7

# AUDIENCE MEASUREMENT SYSTEM FOR DIGITAL TELEVISION

## TECHNICAL FIELD OF THE INVENTION

[0001] The present invention relates to the measurement of audiences of digitally broadcast television programming and to the measurement of usage of other information services provided to the audiences.

## BACKGROUND OF THE INVENTION

[0002] Of the many approaches to measuring the usage of electronic entertainment equipment (commonly called "tuning" data), one approach involves the addition of an identifying code to a radio or television program, the distribution of the identifying code with the program throughout the relevant broadcasting system, and the detection and interpretation of the identifying code when the broadcast signal is viewed or heard in a statistically selected monitoring site. An example of-a system which implements this type of measurement approach may be found in the following patents: U.S. Pat. No. 5,481,294 to Thomas et al., who describe, inter alia, identifying codes added to the vertical blanking interval of an NTSC television broadcast; U.S. Pat. No. 5,629,739 to Dougherty, who is particularly concerned with the addition of an identifying code to a low energy portion of the audio spectrum of an NTSC signal; and U.S. Pat. No. 5,404,377 to Moses, who teaches an audio encoding arrangement using signal masking to decrease the perceptibility of the identifying code. The disclosures of U.S. Pat. Nos. 5,481,294, 5,629,739, and 5,404,377 are herein incorporated by reference.

[0003] Another approach to measuring usage of electronic entertainment equipment involves the extraction of a characteristic feature signature (or characteristic feature signature set) from the programming selected for viewing, and the storing of a time-stamped signature (or signature set) in a memory for subsequent transmission to a central data collection office where the signature (or signature set) is compared with corresponding reference signatures collected by the central office from known broadcasting sources. This approach is taught by Lert and Lu in U.S. Pat. No. 4,677,466. The teaching of U.S. Pat. No. 4,677,466 is herein incorporated by reference.

[0004] Yet another approach to the measurement of the usage of electronic entertainment equipment has been that of comparing the viewed signal (or some component or artifact thereof) with all the signals available to a sampled household at the time the measurement is made. A review of apparatus and methods useful for this measurement approach is found in the teachings of Thomas et al. in U.S. Pat. No. 5,629,739 and of Lu et al. in U.S. Pat. No. 5,594,934. The teachings in U.S. Pat. No. 5,594,934 and in U.S. Pat. No. 5,629,739 are herein incorporated by reference.

[0005] Wheeler, et al., in U.S. application Ser. No. 08/786,270, filed on Jan. 22, 1997, teach a video signal source detection arrangement which determines the source of a video and/or audio signal being displayed by a television receiver. The arrangement implements a variety of tuning measurement approaches. For example, it can be used to read an identifying ancillary code transmitted with television programming, to obtain characteristic feature signatures from television programming, or to obtain a signal that is matched with a contemporary reference signal obtained by a television-tuner controlled by measurement equipment. The disclosure of the aforementioned U.S. application Ser. No. 08/786,270 is herein incorporated by reference.

[0006] Chan, in U.S. application Ser. No. 08/654,309, filed on May 28, 1996, teaches a sensor arrangement for non-intrusively obtaining a representation of video and synchronization signals from a television receiver. The disclosure of the aforementioned U.S. application Ser. No. 08/654,309 is herein incorporated by reference.

[0007] Changes in the methods of measuring the reception of television or radio programming are required because of a planned change-over from analog to digital broadcasting. In the U.S., the change-over is scheduled to be phased in by the year 2006, as documented in the Federal Communication Commission's Mass Media Docket 87-268, with particular reference to the Fifth Report and Order, FCC 97-116, Apr. 3, 1997 and to the Sixth Report and Order, FCC 97-115, Apr. 3, 1997. Some of the changes, and their respective impacts on approaches used for measuring analog broadcasts, include the following: (1) digital broadcast techniques do not use a vertical blanking' interval and, therefore, the program tracking and identifying codes that are written in the vertical blanking interval of analog broadcast signals will not be transmitted; (2) multiple signal formats and associated multiple display formats having, among other features, differing height-to-width ratios and different resolutions are allowed, so that existing video signal correlation methods used with analog broadcasts may essentially be disabled because these methods depend on having the same pictorial feature appear at corresponding places on the measured and reference displays; (3) a broadcaster can transmit as many as six programs (arrayed as a sequence of data packets, where each data packet is labeled as to which of the programs' data is carried therein) within an assigned 6 MHZ frequency band by trading off pictorial resolution for an increase in the number of programs so that (i) digital signal compression methods used to decrease the spectrum space required by a program destroy program identifying codes embedded in an original, high-resolution, program master, and (ii) determining which channel has been tuned by a receiver does not uniquely identify a program being viewed if more than one program is being transmitted in that channel; and, (4) data other than television broadcasting may be co-transmitted in the same channel and, in some cases, it is expected that the other data will be related in some manner to the co-transmitted programming so that a viewer can interact with the TV programming (e.g., to obtain a program guide or detailed information on an advertised product, to automatically switch to a desired program, or to take part in an audience-participation program).

[0008] It may be noted that, although projected digital signal compression and transmission methods destroy the types of video codes used in, and suggested for, the prior-generation analog broadcasting approaches, it is expected that less change will be encountered with respect to audio codes. That is, because the audio component of a television broadcast comprises much less information than does the video, there is much less to be gained by applying signal compression methods to audio. Nonetheless, it is expected that various audio compression methods may be employed. These methods include those defined by the Dolby AC-3 or

the European MUSICAN standards, or those defined by some yet-to-be-defined standard operable within the relatively open and flexible MPEG arrangement. Although the coding approaches taught in the aforementioned U.S. Pat. No. 5,404,377 are known to survive the Dolby AC-3 and MUSICAN compression methods, compression methods other than Dolby AC-3 and MUSICAN may destroy these codes. Moreover, although the change in technology may obviate the use of some of the codes, such-as those described above, other codes (e.g., digital data packet codes telling a receiving site which of several interleaved programs is associated with a given data packet) are expected to be broadcast both with television programming and with any co-transmitted data that are related to, and intended to be used in conjunction with, one or more of the programs.

**[0009]** In addition to changes in transmission equipment and signals, considerable changes are expected in reception equipment. Notable among these are both the use of set top signal converters (generally referred to as set top boxes) allowing a digital broadcast to be viewed on an analog receiver, and a projected convergence of television receivers and computers. In the short term, for example, it is expected that digital receivers, configured as plug-in boards for personal computers, will be used to enable the display of digital television signals on the computers.

**[0010]** Another traditional measurement reflected in television audience reporting has been the determination of who actually viewed the program that was received by the equipment being monitored in a statistically selected monitoring site. A related measurement of interest is the identification of users of on-line services, such as on-line services provided over the Internet. Also, it is clear that measuring the members of an audience in a statistically selected monitoring site who are interactively using a television and/or accessing the Internet, and the information delivery apparatus used to deliver information to the members, will continue to be important.

**[0011]** By far the most commonly used approach in making these measurements is that of interrogation, wherein the viewer and/or Internet user is asked to identify himself or herself as a member of the television audience or as an Internet user. In connection with television viewing, this inquiry is usually done by means of an electronic prompting and data input device (commonly referred to as a Peoplemeter) associated with a monitored receiver in a statistically selected monitoring site. The member identification may also include age, sex, and other demographic data. It is common to store both the demographic data and the tuning data associated with each monitored receiver in the statistically selected monitoring site in store-and-forward equipment located within the monitoring site and to subsequently forward these data to a central office computer via a direct call over the public switched telephone network, or via the Internet, on a daily basis.

**[0012]** Of particular interest in this area is the teaching of an audience interrogation arrangement disclosed by McKenna et al., in U.S. Pat. No. 4,816,904. According to this arrangement, a prompting message is displayed on a television screen overlaid on viewer selected programming by mixing the prompting message with the video signal being sent to the display. However, McKenna et al. do not teach a "tiling" arrangement where the prompting message is displayed on a portion of a display separated from the portion of the display devoted to television picture.

**[0013]** Many arrangements have been proposed in the computer arts for reliably identifying a user so that only selected individuals can secure access to some of the data on a computer or computer system. The most common of such arrangements is that of requiring the user to enter both his or her claimed identity along with a password. Other arrangements have included the use of various biometric techniques, such as image or voice recognition devices. Additionally, it is well known in the audience measurement arts to use computer-based image recognition in order to identify members of a viewing audience. Notable among teachings in this area is that by Lu in U.S. Pat. No. 4,858,000. The teaching of this patent is herein incorporated by reference.

## SUMMARY OF THE INVENTION

**[0014]** According to one aspect of the present invention, a television audience measurement system identifies a viewer selected television program from among a plurality of television programs simultaneously broadcast in a broadcast channel. The television audience measurement system comprises a channel detector and a comparitor. The channel detector detects the broadcast channel in which the plurality of television programs is broadcast. The comparitor sequentially compares an audio component of the plurality of television programs broadcast in the detected broadcast channel with an audio signal of the viewer selected television program so as to identify the viewer selected television program.

**[0015]** According to another aspect of the present invention, a television audience measurement system is provided for digital television equipment that is disposed in a statistically selected location. The television audience measurement system comprises a software agent and an interface and communication apparatus. The software agent is adapted to read, from a data packet contained in digital television programming, a datum identifying a television program, and the software agent is stored in memory associated with the digital television equipment. The interface and communication apparatus is adapted to transmit the identification datum to a remotely located central office.

**[0016]** According to still another aspect of the present invention, a television audience measurement system identifies a viewer selected television program from among a plurality of television programs broadcast as a time division multiplexed sequence of data packets in a broadcast channel. The viewer selected television program is displayed on a television display in a statistically selected location. The television audience measurement system comprises receiving means, acquiring means, recovering means, and comparing means. The receiving means receives the time division multiplexed sequence of data packets in the broadcast channel. The acquiring means acquires an audio portion of the viewer selected television program. The recovering means recovers audio components respectively corresponding to the television programs contained in the sequence of data packets. The comparing means compares the audio components to the audio portion in order to determine the viewer selected television program.

**[0017]** According to yet another aspect of the present invention, a television audience measurement system mea-

sures viewing of a television program viewed on digital television located in a statistically selected site and comprises detecting means, extracting means, a software agent, and selecting means. The detecting means detects an audio code embedded in the television program in order to identify the television program. The extracting means extracts an audio signature from the television program in order to identify the television program. The software agent is arranged to identify the television program. The selecting means selects at least one of the detecting means, the extracting means, and the software agent in order to identify the television program.

[0018] According to a further aspect of the present invention, a method is provided to identify a television program selected by a viewer from a set of television programs broadcast as multiplexed data packets in a viewer selected broadcast channel. The viewer selected television program is displayed on a display portion of an apparatus tuned to the viewer selected broadcast channel. The method comprises the following steps: a) determining the viewer selected broadcast channel; b) acquiring an audio portion of the viewer selected television program; c) selecting an audio component associated with one of the set of television programs broadcast in the viewer selected broadcast channel; d) comparing the audio portion with the audio component in order to determine whether the audio portion and the audio component match; e) if the audio portion and the audio component match, storing a tuning record from at least one of the audio portion and the audio component; and, f) if the audio portion and the audio component do not match, selecting a different one of the television programs from the set of television programs and repeating steps (c) through (f) until either a match is found or the set of television programs is exhausted.

[0019] According to a still further aspect of the present invention, a method is provided to identify a viewer selected television program from among a plurality of time overlapped television programs broadcast in a viewer selected broadcast channel. The viewer selected television program is displayed in a first window of a multi-window television display. A data file, logically related to the viewer selected television program, is also broadcast in the viewer selected channel so as to be time overlapped with the viewer selected television program. The viewer selected television program and the data file contain respective labels indicative of the logical relation. Data from the data file is displayed in a second window of the multi-window display. The method comprises the following steps: a) reading, from the data file, the respective data file label and an identifying datum; b) finding, from the logical relation, the television program label associated with the respective data file label; and, c) storing a time-stamped record comprising the identifying datum.

[0020] According to yet a further aspect of the present invention, a software agent is stored in memory associated with digital television equipment. The software agent is arranged to acquire television audience measurement data relative to the digital television equipment. The software agent comprises first, second, and third logging means. The first logging means logs a television program identification datum identifying a television program selected for viewing on the digital television equipment. The second logging means logs a co-transmitted identification datum associated with data co-transmitted with the television program selected for viewing on the digital television equipment. The third logging means logs an Internet identification datum associated with an Internet task of the digital television equipment.

BRIEF DESCRIPTION OF THE DRAWING

[0021] These and other features and advantages of the present invention will become more apparent from a detailed consideration of the invention when taken in conjunction with the drawings in which:

[0022] **FIG. 1** is a schematic block diagram depicting typical digital television broadcasting and reception equipment;

[0023] **FIG. 2** is a schematic block diagram depicting an audio-based tuning measurement system which is usable with either digital or analog broadcasting and which is in accordance with a first embodiment of the present invention;

[0024] **FIG. 3** is a schematic block diagram depicting a tuning measurement system which employs a software agent resident in some of the monitored receiving equipment and which is in accordance with a second embodiment of the present invention;

[0025] **FIG. 4** is a schematic block diagram depicting the use of digital source detection in accordance with a third embodiment of the present invention;

[0026] **FIG. 5** is a schematic block diagram depicting the use of digital source detection in accordance with a fourth embodiment of the present invention;

[0027] **FIG. 6** is a schematic block diagram depicting the use of data ports on various television viewing equipment in order to measure television related data in accordance with a fifth embodiment of the present invention; and,

[0028] **FIG. 7** is a flow chart depicting the operation of a software agent of the present invention.

DETAILED DESCRIPTION OF THE INVENTION

[0029] A typical digital television broadcasting environment, which is planned during a transition period in which both digital and analog programs are transmitted, may comprise some combination of the elements depicted in **FIG. 1**. Network programming, and other non-local programming, is provided to a local television station **10** from a broadcast station over a communication medium **12**, such as a satellite, or terrestrial digital transmission lines, or the like. Local programming is also provided to the local television station **10** from some mixture of high definition television (HDTV) cameras **14** (which may employ a variety of formats), standard definition digital video cameras **16** (which may employ a variey of resolutions and aspect ratios), and analog sources comprising both analog video cameras **18** (e.g., those compatible with the prior generation NTSC broadcast standard), and cinema film sources **20** that have historically been converted to the NTSC standard by means of well known telecine **22**.

[0030] The signals from the analog video cameras **18** and from the cinema film sources **20** are input to an A/D converter **24** having an appropriate digital output. The

outputs from the A/D converter **24**, from the communication medium **12**, from the high definition television (HDTV) cameras **14**, and/or from the standard definition digital video cameras **16** are provided to a switching and routing apparatus **26**. The switching and routing apparatus **26** passes selected ones of the signals provided to it through digital compression equipment **28** prior to being broadcast from the station's transmitter **30**. The station's transmitter **30** may also include an antenna, a satellite dish, a cable modem, or the like.

**[0031]** In addition, a cable headend **31** (which is shown as a single cable provider but which may represent a plurality of cable providers) receives signals over the air, from satellite distribution, or the like, and distributes the signals (with or without reformatting) by way of regular cables, optical fibers, microwaves, or the like.

**[0032]** The digital transmission from the local television station **10** and/or from the cable headend **31** may be directly received and displayed in a statistically selected monitoring site **32** by a digital television set **34**. The digital transmission also may be directly received and converted by a digital converter **36** (commonly configured as a set top box or STB) into an analog output (e.g., in the NTSC format) for use by an analog television set **38** purchased by a viewer prior to the change-over to digital programming. The digital transmission further may be directly received and displayed by a personal computer **40** that has a digital receiver **42** providing a baseband video output signal that the personal computer **40** can show in one of the windows **44** defined on its display unit **46**. The digital receiver **42**, for example, could be a plug in board of the personal computer **40** or integrated on the motherboard. The personal computer also may have speakers **47**, a keyboard **48**, and a mouse **50** or other pointing device known in the art.

**[0033]** Moreover, the digital transmission may be directly received and converted by a digital converter **52** to a form useable by a digital television set **54**. For example, the digital converter **52** may be used for pay-per-view television programming, video-on-demand television programming, satellite programs, and/or other services provided to the statistically selected monitoring site **32**. The digital transmission also may be directly received and converted by a digital converter **56** to a form useable by a simple monitor **58**. In either of these two cases, the digital television viewing can be measured by means of metering technologies similar to the set top box and an analog television configuration described below.

**[0034]** In addition to the direct reception of the digital transmission by apparatus dedicated solely to that purpose (e.g., the digital television set **34** and/or the personal computer **40**), it is expected that a variety of yet-to-be-defined consumer electronic apparatuses will be configured Add that incorporate at least some of the features of both a digital or analog television receiver and a home computer.

**[0035]** A first embodiment **60** of the present invention, which measures tuning to digital television programming received in a statistically selected monitoring site **62**, is depicted schematically in **FIG. 2**. The first embodiment **60** measures such tuning by detecting program identification codes and/or extracting signatures from the audio portion of the television signal to which a receiver is tuned. This audio portion is detected by a detector **64** in the case of a digital television set **66**, and by a detector **68** in the case of an analog television set **70**. The detector **64** may detect the audio portion of a program to which the digital television set **66** is tuned by non-intrusively detecting the sound provided by a speaker **72** of the digital television set **66** (in which case the detector **64** may be a microphone) or by intrusively detecting the audio signal from a direct connection to the speaker, the audio output terminals, or the audio processing circuitry of the digital television set **66**. Similarly, the detector **68** may detect the audio portion of a program to which the analog television set **70** is tuned by non-intrusively detecting the sound provided by a speaker **74** of the digital television set **66** or by intrusively detecting the audio signal from a direct connection to the speaker, the audio output terminals, or the audio processing circuitry of the analog television set **70**. The analog television receiver **70** is provided with a digital converter **76**, which may be similar to the digital converter **36** of **FIG. 1**.

**[0036]** The audio portion of a television program may also be detected by a detector **78** when the television program is played by a personal computer **80** on a monitor **82** and speakers **84**. The detector **78** may detect the audio portion of a program to which the personal computer **80** is tuned by non-intrusively detecting the sound provided by the speakers **84** or by intrusively detecting the audio signal from a direct connection to the speaker, the audio output terminals, or the audio processing circuitry of the personal computer **80**.

**[0037]** As has been taught by Thomas et al., in U.S. Pat. No. 5,629,739, a representation of the audio portion picked up by the detector **64** can be analyzed by a site unit (SU) **86** and/or a home unit (HU) **88** (which may be provided with data storage and forwarding unit capability) within the statistically selected monitoring site **62** in order to determine if the audio portion from the digital television set **66** contains television program identification codes. Alternatively, the representation of the audio portion picked up by the detector **64** can be analyzed at a remotely located data collection central office **90** in order to determine if the audio portion from the digital television set **66** contains such television program identification codes. The remotely located data collection central office **90** is schematically depicted as a computer based data collection central office that interchanges data with the home unit **88** over a communication network **92**, such as a public switched telephone network, the Internet, or the like.

**[0038]** Similarly, a representation of the audio portion picked up by the detector **68** can be analyzed by a site unit **94** and/or the home unit **88** in order to determine if the audio portion from the analog television set **70** contains television program-identifying codes, and a representation of the audio portion picked up by the detector **78** can be analyzed by a site unit **96** and/or the home unit **88** in order to determine if the audio portion from the personal computer **80** contains television program-identifying codes. Alternatively, the representation of the audio portions picked up by the detectors **68** and **78** can be analyzed at the remotely located data collection central office **90** in order to determine if the audio portions from the analog television set **70** and the personal computer **80** contain television program identification codes.

**[0039]** Moreover, a person identifier **98** may be provided in order to identify the persons watching television programming on the digital television set **66**. The person identifier **98**

may be video camera, an IR camera, or the like. When such equipment is available in the statistically selected monitoring site **62**, the site unit **86** may employ known head location and face recognition software (e.g., as taught by Lu in U.S. Pat. No. 4,858,000) for the identification of the viewing persons and for the collection of other demographic data. Similarly, person identifiers may be provided in order to identify the persons watching television programming on the analog television set **70** and on the personal computer **80**.

**[0040]** Instead of analyzing the representations of the audio portions picked up by the detectors **64**, **68**, and **78** in order to determine if the audio portions from the corresponding digital television set **66**, analog television set **70**, and personal computer **80** contain television program-identifying codes, characteristic signatures can be extracted from these representations for subsequent comparison, either in the statistically selected monitoring site **62** or in the central office **90**, with previously collected reference signatures in order to identify the television programs to which the digital television set **66**, the analog television set **70**, and the personal computer **80** are tuned.

**[0041]** Programs played by VCRs on the digital television set **66**, on the analog television set **70**, and on the personal computer **80** can be identified using either the code or the signature technique. Thus, if the programs being played carry program identification codes that are preserved through the process of recording and replay in the case of time shifted viewing, or that are recorded in the programs stored on tapes to be rented or sold, the program identification codes can be detected at the time that the programs are played so that the audiences of the programs may be measured. However, if the programs being played are non-encoded programs, or if the program identification codes are lost (e.g., during the recording process), then the embodiments of the present invention described herein can determine the programs being viewed, when the tapes are played, by extracting characteristic signatures from these programs and by matching the extracted signatures to reference signatures stored in a reference signature database. In this case, searching can be optimized by the use of well known hashing techniques.

**[0042]** Although the present invention may use either the code technique or the signature technique in order to measure audiences of programs played on digital television equipment, the present invention may use both of these two techniques so that one of the techniques backs up the other in the event that the one technique is unable to identify a viewer selected television program. For example, signatures are extracted and matched in order to identify a viewer selected television program only if identifying codes cannot be detected. As a further alternative, the present invention may use both of these two techniques simultaneously. Demographic data may also be collected in connection with the present invention.

**[0043]** It may be noted that, although the first embodiment **60** measures the great majority of the overall audience, it is not arranged to measure interactive features (e.g., co-transmitted advertising detail) that are expected to be part of the digital broadcasting environment. Therefore, an important feature of the following embodiment is that it measures interactive features.

**[0044]** Accordingly, a second embodiment **100** of the present invention is provided as shown in **FIG. 3**. The second embodiment **100** measures tuning to digital television programming in connection with a statistically selected monitoring site **102**. As will be apparent from the discussion below, this second embodiment **100** may include some or all of the features of the first embodiment **60**, as well as the new features described below in connection with the second embodiment **100**.

**[0045]** According to this second embodiment **100**, tuning data, and possibly demographic data, are collected from digital television reception equipment that includes processing equipment preferably having adequate non-volatile or battery-backed memory available so that an algorithm, hereinafter referred to as a software agent, can be stored thereon. The digital television reception equipment of the second embodiment **100** may include (i) a personal computer **104** which may be similar to the personal computer **40** of **FIG. 1**, (ii) a digital converter **106** which may be similar to the digital converter **36** of **FIG. 1**, (iii) an analog television set **108** operating in response to the digital converter **106**, and (v) a digital television set **110**.

**[0046]** One or more software agents of the second embodiment **100**, as disclosed in greater detail hereinafter, monitor operating tasks in order to create time-stamped records containing tuning and/or other data regarding operation of the particular pieces of equipment in which the software agents are resident. Such monitored operating tasks may be, for example, messages passed from a remote or other control operated by a user to a tuner or other program selector in order to select a television program being broadcast in a channel, messages passed from a controller of processing equipment to a tuner in order to select a television program being broadcast in a channel, or the like. Although software agents are expected to be able to effectively eavesdrop on data traffic passing though their hosts' data ports, the use of software agents would not fully measure tuning at viewing sites unless each item of television equipment at those sites has a respective software agent within it so that a complete set of operating tasks can be captured.

**[0047]** Accordingly, a software agent **112** is included in the digital converter **106**. The software agent **112** monitors operating tasks in order to create time-stamped records containing tuning and/or other data regarding operation of the digital converter **106** in which the software agent **112** is resident. Thus, the software agent **112** detects, for example, a message relating to selection of a television program being broadcast in a selected channel. From this detected message, the identity of the selected television program may be determined. The software agent **112** is also arranged to eavesdrop on data traffic passing though its host's input/output data port **114**, and to communicate over the input/output data port **114**. Accordingly, programs to which the analog television set **108** is tuned may be detected through use of the software agent **112**. The software agent **112** may be downloaded over a communication medium **116** to the digital converter **106** by use of the input/output data port **114**. Alternatively, the software agent **112** may be a plug in, may be resident on a floppy disk, or the like.

**[0048]** Similarly, a software agent **118** is included in the digital television set **110**. The software agent **118** monitors operating tasks associated with the digital television set **110** in order to create time-stamped records containing tuning and/or other data regarding operation of the digital television

set **110** in which the software agent **118** is resident. The software agent **118** is also arranged to cooperate with its host's input/output data port **120**. A software agent **122** is included in the personal computer **104**. The software agent **122** monitors operating tasks associated with the personal computer **104** in order to create time-stamped records containing tuning and/or other data regarding operation of the personal computer **104** in which the software agent **122** is resident. The software agent **122** is also arranged to cooperate with its host's input/output data port **124**.

**[0049]** Moreover, a person identifier **126** may be provided in order to identify the persons watching television programming on the personal computer **104**. As in the case of the person identifier **98**, the person identifier **126** may be video camera, an IR camera, or the like, and may be provided with any or all of the viewing equipment shown in **FIG. 4**.

**[0050]** The software agents **112**, **118**, and **122** may be telecommunication enabled so that television audience data from all the viewing sites in the statistically selected monitoring site **102** can be communicated, via the Internet, a public telephone system, or the like, to a locally located or remotely located intermediate data collector **128** and then to a remotely located central office **130** through a communication channel **170**. The intermediate data collector **128** can be flexibly located either at the same statistically selected monitoring site **102**, or at a remotely located site **166**, or at the central office **130**. For this purpose, the input/output data ports **114**, **120**, and **124** may be serial ports, parallel ports, universal serial buses (USB), firewires (according to IEEE 1394), or the like. The data transfer may, for example, be structured as a background task and take the form of a sequence of data packets, each of which is e-mailed or otherwise communicated to the remotely located intermediate data collector **128** during pauses in a user's on line sessions or at any other time. The intermediate data collector **128**, for example, may be a computerized data collector or an Internet service provider. Alternatively, the intermediate data collector **128** may be a home unit, in which case, the intermediate data collector **128** may be located within the statistically selected monitoring site **102** and may itself be arranged to communicate tuning and demographic data via e-mail or other communication to the central office **130**.

**[0051]** The software agent **122** additionally may monitor the personal computer **104** for interactive uses such as Internet usage (e.g., through logging of Universal Resource Locators, URLs), application software usage, and television viewing supported by the personal computer **104**. Similarly, to the extent that the digital converter **106** and the digital television set **110** are web-enabled, the software agents **114** and **118** may monitor interactive uses such as Internet usage (e.g., through logging of URLs) and application software usage, as well as television viewing.

**[0052]** Because not all equipment that is encountered by a research firm doing television audience research, at least during the early part of the digital television broadcasting era, will be compatible with the software agent approach discussed above, the second embodiment **100** of the measurement system of the present invention may be arranged to include many or all of the features found in the first embodiment **60**.

**[0053]** As described above, the first embodiment **60** measures the great majority of the overall audience by detecting the programs to which receivers are tuned by detecting program identification codes embedded in the programs, and/or by extracting signatures of the programs being viewed and by comparing the extracted signatures to reference signatures. Moreover, the second embodiment **100** measures not only the overall audience, but also interactive features provided with the programming. The embodiments described below are specifically arranged to measure, in an efficient manner, the digital television viewing data where multiple television programs are present in a common digital transmission channel (e.g., of 6 MHZ), particularly where a digital television set does not have an accessible operating system with which a software agent can reside. The first embodiment **60** is also useful where there is no I/O interface on the television set so that there is no easy way to read data from the television set.

**[0054]** **FIG. 4** depicts a third embodiment **200** of the invention in which a statistically selected monitoring site **202**, during the transition period when both analog and digital broadcasting occur, includes, for example, a first viewing site **204**, a second viewing site **206**, and a third viewing site **208**. The first viewing site **204** includes a digital converter **210** connected to an analog television set **212**. The audio portion of a program to which the analog television set **212** is tuned is detected by a detector **214**. The detector **214** may detect this audio portion by non-intrusively detecting the sound provided by a speaker **216** of the analog television set **212** or by intrusively detecting the audio signal from a direct connection to the analog television set **212**.

**[0055]** A probe **218** is provided to detect the intermediate frequency signal of the digital converter **210**. A signal processor **220** demodulates the detected intermediate frequency signal to the baseband bit stream contained in the detected intermediate frequency signal, and then demultiplexes the baseband bit stream to recover the audio portion of the baseband bit stream.

**[0056]** A comparitor **222** may be arranged to first determine whether there is a program identification code in the audio detected by the detector **214**. If there is a program identification code in the audio detected by the detector **214**, this program identification code identifies the program to which the analog television set **212** is tuned and is, therefore, logged. If there is no program identification code in the audio detected by the detector **214**, the comparitor **222** then scans the audio portion of the baseband bit stream provided by the signal processor **220** in order to detect the audio in a first program contained in the intermediate frequency signal detected by the probe **218**. The comparitor **222** compares this audio to the audio data from the detector **214**. If there is a match, the program to which the digital converter **210** is tuned is known from the information provided by the signal processor **220**. If there is no match, the comparitor **222** then scans the audio portion of the baseband bit stream provided by the signal processor **220** in order to detect the audio in a second program contained in the intermediate frequency signal detected by the probe **218**, and so on until the comparitor **222** detects a match. Once a match is found, the major and minor channel numbers of the matched channel are known, and the corresponding program identifying ancillary code can be read from the corresponding data packet.

**[0057]** The second viewing site **206** includes a digital television set **224**. The audio portion of a program to which

the digital television set **224** is tuned is detected by a detector **226**. The detector **226** detects this audio portion by non-intrusively detecting the sound provided by a speaker **228** of the digital television set **224** or by intrusively detecting the audio signal from a direct connection to the digital television set **224**.

**[0058]** A probe **230** is provided to detect the intermediate frequency signal of the digital television set **224**. A signal processor **232** operates similarly to the signal processor **220** in order to provide the audio portion of the baseband bit stream in the intermediate frequency signal detected by the probe **230**. A comparitor **234** operates similarly to the comparitor **222** in order to first determine whether there is a program identification code in the audio detected by the detector **226** and, if there is not, to scan the audio portion of the baseband bit stream provided by the signal processor **232** until a match is found.

**[0059]** The third viewing site **208** includes a personal computer **236**. The audio portion of a program to which the personal computer **236** is tuned is detected by a detector **238**. The detector **238** detects this audio portion by non-intrusively detecting the sound provided by speakers **240** of the personal computer **236** or by intrusively detecting the audio signal from a direct connection to the personal computer **236**.

**[0060]** A probe **242** is provided to detect the intermediate frequency signal of the personal computer **236**. A signal processor **244** operates similarly to the signal processor **220** in order to provide the audio portion of the baseband bit stream in the intermediate frequency signal detected by the probe **242**. A comparitor **246** operates similarly to the comparitor **222** in order to first determine whether there is a program identification code in the audio detected by the detector **238** and, if there is not, to scan the audio portion of the baseband bit stream provided by the signal processor **244** until a match is found.

**[0061]** The comparitors **222**, **234**, and **246** provide their program identification codes from the audio or from the data packet, and/or match information to a home unit **248**, which may be provided with data storage and forwarding unit capability, within the statistically selected monitoring site **202**. A remotely located data collection central office **250** is schematically depicted as a computer based data collection central office that interchanges data with the home unit **248** over a communication network **252**, such as a public switched telephone network, the Internet, or the like. Moreover, a person identifier **254** may be provided in order to identify the persons watching television programming on the digital television set **224**. As in the case of the person identifier **98**, the person identifier **254** may be video camera, an IR camera, or the like, and may be provided for any or all of the viewing equipment shown in **FIG. 4**.

**[0062]** Alternatively, instead of using intermediate frequency probes for the probes **218**, **230**, and **242**, local oscillator probes may be used. A local oscillator probe may be employed to initially identify the channel tuned by its associated television receiver, which offers a significant speed advantage in the measurement. That is, because channel detection apparatus normally operates much faster than does audio signal comparison apparatus, the program determination process can be carried out in a hierarchical fashion in which the broadcast channel is first determined from the local oscillator signal by the signal processors **220**, **232**, and **244** (assuming that a program identification code is not first detected). Then, the comparitors **222**, **234**, and **246** sequentially tune to the programs co-transmitted in the detected broadcast channel and compare the audio portion of the tuned program to the audio data from detectors **214**, **226**, and **238** in order to identify the program in the broadcast channel. In this way, the comparitors **222**, **234**, and **246** are not required to sequentially tune through all of the programs in all of the available channels in order to determine the tuned program.

**[0063]** A still further alternative is provided by a fourth embodiment **300** of the invention shown in **FIG. 5**. The fourth embodiment **300** is used in a statistically selected monitoring site **302** having a first viewing site **304**, a second viewing site **306**, and a third viewing site **308**. The first viewing site **304** includes a digital converter **310** connected to an analog television set **312**. The audio portion of a program to which the analog television set **312** is tuned is detected by a detector **314**. The detector **314** may detect this audio portion by non-intrusively detecting the sound provided by a speaker **316** of the analog television set **312** or by intrusively detecting the audio signal from a direct connection to the audio processing circuitry of the analog television set **312**.

**[0064]** A scanning receiver **318** is arranged to sequentially tune to each of the programs carried in each broadcast channel to which the digital converter **310** may be tuned, and to provide an audio portion of each such program to a comparitor **320**. The comparitor **320** may be arranged to first determine whether there is a program identification code in the audio detected by the detector **314**. If there is a program identification code in the audio detected by the detector **314**, this program identification code is logged because it identifies the program to which the analog television set **312** is tuned. If there is no program identification code in the audio detected by the detector **314**, the comparitor **320** then compares the audio portion of a first program provided by the scanning receiver **318** to the audio data from the detector **314**. If there is a match, the program to which the digital converter **310** is tuned is known from the information provided by the scanning receiver **318**. Once a match is found, the major and minor channel numbers of the matched channel are known, and the corresponding program identifying ancillary code can be read from the corresponding data packet.

**[0065]** If there is no match, the comparitor **320** compares the audio portion of a second program provided by the scanning receiver **318** to the audio data from the detector **314**, and so on until the comparitor **320** detects a match. A demographic input **322** may be used to provide demographic data to the comparitor **320** which couples this demographic data, and time, with the program to which the digital converter **310** is tuned as a tuning record. The demographic input **322**, for example, may be the well know Peoplemeter with which people currently identify themselves manually when they are viewing a program displayed on a television set.

**[0066]** The second viewing site **306** includes a digital television set **324**. The audio portion of a program to which the digital television set **324** is tuned is detected by a detector **326**. The detector **326** detects this audio portion by

non-intrusively detecting the sound provided by a speaker **328** of the digital television set **324** or by intrusively detecting the audio signal from a direct connection to the digital television set **324**.

**[0067]** A scanning receiver **330** is arranged to sequentially tune to each of the programs carried in each broadcast channel to which the digital television set **324** may be tuned, and to provide an audio portion of each such program to a comparitor **332**. The comparitor **332** may be arranged to first determine whether there is a program identification code in the audio detected by the detector **326**. If there is a program identification code in the audio detected by the detector **326**, this program identification code is logged because it identifies the program to which the digital television set **324** is tuned. If there is no program identification code in the audio detected by the detector **326**, the comparitor **332** then compares the audio portion of a first program provided by the scanning receiver **330** to the audio data from the detector **326**. If there is a match, the program to which the digital television set **324** is tuned is known from the information provided by the scanning receiver **330**. If there is no match, the comparitor **332** compares the audio portion of a second program provided by the scanning receiver **330** to the audio data from the detector **326**, and so on until the comparitor **332** detects a match.

**[0068]** Moreover, a person identifier **334** may be provided in order to identify the persons watching television programming on the digital television set **224**. As in the case of the person identifier **98**, the person identifier **254** may be video camera, an IR camera, or the like, and may be provided for any or all of the viewing equipment shown in **FIG. 4**. The comparitor **332** couples the identities of the persons watching the digital television set **324**, and time, with the program to which the digital television set **324** is tuned as a tuning record.

**[0069]** The third viewing site **308** includes a personal computer **336**. The audio portion of a program to which the personal computer **336** is tuned is detected by a detector **338**. The detector **338** detects this audio portion by non-intrusively detecting the sound provided by speakers **340** of the personal computer **336** or by intrusively detecting the audio signal from a direct connection to the personal computer **336**.

**[0070]** A scanning receiver **342** is arranged to sequentially tune to each of the programs carried in each broadcast channel to which the personal computer **336** may be tuned, and to provide an audio portion of each such program to a comparitor **344**. The comparitor **344** may be arranged to first determine whether there is a program identification code in the audio detected by the detector **338**. If there is a program identification code in the audio detected by the detector **338**, this program identification code is logged because it identifies the program to which the personal computer **336** is tuned. If there is no program identification code in the audio detected by the detector **338**, the comparitor **344** then compares the audio portion of a first program provided by the scanning receiver **342** to the audio data from the detector **338**. If there is a match, the program to which the personal computer **336** is tuned is known from the major and minor channel numbers indicated by the match. If there is no match, the comparitor **344** compares the audio portion of a second program provided by the scanning receiver **342** to the audio data from the detector **338**, and so on until the comparitor **344** detects a match. The comparitor **344** couples time with the program to which the personal computer **336** is tuned as a tuning record.

**[0071]** The comparitors **222**, **234**, and **246** provide their tuning records to a home unit **346**, which may be provided with data storage and forwarding unit capability, within the statistically selected monitoring site **302**. A remotely located data collection central office **348** is schematically depicted as a computer based data collection central office that interchanges data with the home unit **346** over a communication network **350**, such as a public switched telephone network, the Internet, or the like.

**[0072]** It is likely that many, if not all, digital television sets, digital converters, and like digital equipment will have data ports that will provide output viewer-selected program information for use in consumer devices connected to the data ports. In connection with digital televisions, a data port is likely to provide, for example, the full major channel ATSC bitstream and information on virtual channels that may include analog or digital major channel selection, program (minor channel) selection, physical source (TV, VCR, DVD, etc.) identification, and the like. In connection with digital converters (i.e., set top boxes), a data port is likely to provide, for example, the full ATSC bitstream and information on virtual channels that may include analog or digital major channel selection, program (minor channel) selection, vertical blanking interval data reinserted on the correct line and field of analog signals, and the like.

**[0073]** Accordingly, a fifth embodiment **400** of the present invention is provided as shown in **FIG. 6**. The fifth embodiment **400** measures tuning to digital television programming in connection with a statistically selected monitoring site **402**. The fifth embodiment **400** may include some or all of the features of the previously described embodiments.

**[0074]** The fifth embodiment **400** permits tuning data, and possibly demographic data, to be collected from digital television reception equipment that includes (i) a personal computer **404**, (ii) a digital converter **406**, (iii) an analog television set **408** operating in response to the digital converter **406**, and (v) a digital television set **410**.

**[0075]** The digital converter **406** has a data port **412**. A site unit **414** reads and stores the full ATSC bitstream, the analog or digital major channel selection, the program selection, vertical blanking interval data, and/or the like data available at the data port **412** in order to determine the program selected for viewing on the analog television set **408** as well as any other desired and available information. Moreover, the site unit **414** may be arranged to collect demographic data related to the viewers in the audience of the program selected for viewing on the analog television set **408**. For example, the site unit **414** may collect demographic data from a person identifier, a Peoplemeter, or the like, as discussed above. All such data may be uploaded over a communication medium **416**, which may be a wire, a power line, and IR link, an RF modem, or the like.

**[0076]** Similarly, the digital television set **410** has a data port **418**. A site unit **420** reads and stores the full major channel ATSC bitstream, the major channel selection, the program selection, physical source identification, and the like data available at the data port **418** in order to determine

the program selected for viewing on the digital television set **410** as well as any other desired and available information. Moreover, the site unit **420** may be arranged to collect demographic data related to the viewers in the audience of the program selected for viewing on the digital television set **408**. For example, the site unit **420** may collect demographic data from a person identifier, a Peoplemeter, or the like, as discussed above. All such data may be uploaded over a communication medium **421**.

[0077] Also, the personal computer **404** has a data port **422**. A site unit **424** reads and stores the full major channel ATSC bitstream, the major channel selection, the program selection, and the like data available at the data port **422** in order to determine the program selected for viewing on the personal computer **404** as well as any other desired and available information. Moreover, a person identifier **426** may be provided in order to identify the persons watching television programming on the personal computer **404**. As in the case of the person identifier **98**, the person identifier **426** may be video camera, an IR camera, or the like, and may be provided with any or all of the viewing equipment shown in **FIG. 6**. All program and demographic data may be uploaded over a communication medium **427**.

[0078] The site units **414**, **420**, and **424** may be telecommunication enabled so that television audience data from all the viewing sites in the statistically selected monitoring site **402** can be communicated, via the Internet, a public telephone system, or the like, to a locally located or remotely located intermediate data collector **428** and then to a remotely located central office **430** through a communication channel **470**. The intermediate data collector **428** can be flexibly located either at the same statistically selected monitoring site **402**, or at a remotely located site **466**, or at the central office **430**. For this purpose, the site units **414**, **420**, and **424** may be provided with serial ports, parallel ports, universal serial buses (USE), firewires (according to IEEE 1394), or the like. The intermediate data collector **428**, for example, may be a computerized lo data collector or an Internet service provider. Alternatively, the intermediate data collector **428** may be a home unit, in which case, the intermediate data collector **428** may be located within the statistically selected monitoring site **402** and may itself be arranged to communicate tuning and demographic data via e-mail or other communication to the central office **430**.

[0079] A software agent **500** is shown in **FIG. 7**. The software agent **500** can be used for any of the software agents **112**, **118**, and **122**. As shown at a block **502** of the software agent **500**, the software agent **500** copies the current operating task. If the current operating task uses a packet of television programming as determined at a block **504**, the software agent **500** at a block **506** determines whether the data packet has a decodable packet label including a decodable program identification code, name, or other indicia. This program identification data packet is expected to be a feature of digital television programming, particularly if multiple programs are packed simultaneously as minor channels in a broadcast channel in a digital broadcasting environment, and is expected to identify the program tuned by the monitored television.

[0080] If the data packet does not have a decodable packet label, the software agent **500** at a block **508** causes the ON state of the monitored viewing equipment to be logged, provided that this ON state is a new status for the monitored viewing equipment and the monitored viewing equipment is ON. The balance of the measurement system (e.g., the audio signal methods employed by any of the other embodiments **60**, **200**, and **300** described above) is relied on in order to identify the tuning. Program flow then returns to the block **502** to await the next operating task.

[0081] On the other hand, if the data packet does have a decodable packet label, the software agent **500** determines at a block **510** whether the packet label from the data packet of the current operating task is the same as the packet label previously determined by the software agent **500**. If so, there is no need to store the packet label unless it is merely indicative of continued viewing to an already identified television program. Accordingly, program flow returns to the block **502** to await the next operating task. However, if the packet label from the data packet of the current operating system task is not the same as the packet label previously determined at the block **506**, the software agent **500** at a block **512** logs the identification of the television program as contained in the program label and also logs the time. Program flow then returns to the block **502** to await the next operating task.

[0082] If the current operating task does not use a packet of television programming as determined at a block **504**, the software agent **500** at a block **514** determines whether the current operating task is a command to other monitored equipment (e.g., a command to the digital television receiver **110** to tune a different channel and to select a particular one of the N programs being broadcast in that channel). If the current operating task is a command to other monitored equipment, the software agent **500** at a block **516** logs as much detail as is available (e.g., the command itself, the identity of the issuer of the command, and the identity of the recipient of the command) in memory, and program flow returns to the block **502**.

[0083] If the current operating task is not a command to other monitored equipment, the software agent **500** at a block **518** determines if co-transmitted data (i.e., data that is related to one of the television programs being broadcast in a channel and that is transmitted during the same time interval as the program) has been selected by a viewer. Co-transmitted data may comprise a guide to other available television programming, catalog-like details on products being advertised on the co-transmitted program, and the like. Some of these proposed uses of co-transmitted data will be configured so that one can infer what program is being viewed from a URL or other label that logically links the co-transmitted data to the television program. Accordingly, the software agent **500** at a block **520** searches the header portion of a task for such URL or other label, and logs such URL or other label that is found. Thereafter, program flow returns to the block **502**.

[0084] If co-transmitted data has not been selected by a viewer, the software agent **500** at a block **522** determines if the user of the equipment has directed his or her browser, or other communication software, to access an internet page (assuming that the monitored viewing equipment being monitored is configured so that it has access to the Internet or other on-line service). If the user of the equipment has directed his or her browser, or other communication software, to access an internet page, the software agent **500** at

a block **524** searches for a URL or other label, and logs such URL or other label that is found. Thereafter, program flow returns to the block **502**. If the user of the equipment has not directed his or her browser, or other communication software, to access an internet page, program flow returns to the block **502**.

**[0085]** As an example of the use of a software agent as describe above, consider the case of a person in a statistically selected monitoring site who is viewing a digital television program and who sees an interesting product being advertised. It is expected that the person will have the capability to request more data on that product by means of a simple mouse-click operation. This data, for example, will either be a subset of the data providing the displayed advertisement, or will be co-transmitted subsequently in the signal of the television program that the person has selected for viewing. This data would then be displayed in a separate window on the multi-windowed display being used for television viewing. An additional set of data could then be obtained by clicking on a hypertext link element of the initially displayed data. This action would result in downloading the desired additional data over the Internet. A software agent installed in this viewing equipment could thus log not only what program was being viewed, but could also supply additional marketing research data on the consumer's use of in-program advertising.

**[0086]** In addition to providing a device for monitoring tuning activity, the software agent of the present invention can be used to collect demographic data relative to the monitored viewing. In a manual approach to the collection of demographic data, the software agent could generate a status and prompting display in one window of the viewing equipment requiring a viewer or user to input the appropriate demographic data. This status and prompting display window could have an appearance similar to that provided by the peoplemeter hardware widely used in contemporary audience measurements and that displays a status reminder light for each occupant of a statistically selected monitoring site. However, in the comparable windowed display arrangement, the name of each occupant could be shown along with a status indicator.

**[0087]** If the software agent is used with a personal computer that can receive digital television programming, a variety of more nearly automatic and less intrusive approaches (from the television viewer's perspective) could be used to collect persons data and update a tiled status display. For example, it is well known to identify an individual user of a manual input device (such as a keyboard or a mouse) of a computer by the characteristic rates of data entry and pauses between data entries. In a television audience measurement, in which the occupant population to be monitored is very small, measurements of this sort should be expected to be highly accurate. Moreover, an increasing number of personal computers have video cameras associated with them, so that the user of the computer can engage in video conferences by telephone. When such equipment is available in a statistically selected monitoring site, a software agent comprising known head location and face recognition software (e.g., as taught by Lu in U.S. Pat. No. 4,858,000) can be employed for the identification persons and the collection of demographic data.

**[0088]** Certain modifications of the present invention have been discussed above. Other modifications will occur to those practicing in the art of the present invention. For example, the software agents **112, 118,** and **122**, as described above, monitor operating tasks. The operating tasks may be operating system events of the operating systems used by the equipment in which the software agent is resident. Indeed, the software agents **112, 118,** and **122** may monitor any function of the monitored equipment as long as the desired data is collected.

**[0089]** Also, a statistically selected monitoring site according to each of the embodiments of the invention, as described above, includes certain viewing equipment as well as certain monitoring equipment. However, it should be understood that a statistically selected monitoring site according to the present invention may include any combination of the equipment incorporated in the embodiments described above, as well as other and/or different equipment.

**[0090]** Moreover, the software agent **500** described above can be generic so that it can be used with any piece of equipment with which it is compatible, or it may be specialized for each particular apparatus in which it is used. Also, the software agent **500** may be arranged to detect the all window activities conducted by an audience.

**[0091]** Furthermore, although not shown in FIGS. **2-5**, the digital television reception equipment of the embodiments shown therein may further include auxiliary digital television equipment such as a VCR, a digital video disk player, a video game, or other entertainment systems.

**[0092]** Additionally, as described above, program identification codes are detected in order to identify television programs. However, television programs may be identified by any indicia such as program names. Moreover, an internet page may be identified by its address or by an identification code or name or label or, in the case of an advertisement on the Internet, by its banner. Therefore, any indicia from which a television program or content associated with a television program may be identified is referred to herein generically as an identification datum.

**[0093]** Moreover, the home units **248** and/or **346** may be referred to herein an intermediate data collectors.

**[0094]** Accordingly, the description of the present invention is to be construed as illustrative only and is for the purpose of teaching those skilled in the art the best mode of carrying out the invention. The details may be varied substantially without departing from the spirit of the invention, and the exclusive use of all modifications which are within the scope of the appended claims is reserved.

We claim:

1. A television audience measurement system for identifying a viewer selected television program from among a plurality of television programs simultaneously broadcast in a broadcast channel, the television audience measurement system comprising:

a channel detector that detects the broadcast channel in which the plurality of television programs is broadcast; and,

a comparitor that sequentially compares an audio component of the plurality of television programs broadcast in the detected broadcast channel with an audio signal of the viewer selected television program so as to identify the viewer selected television program.

2. The television audience measurement system of claim 1 wherein the audio signal is detected by a microphone disposed adjacent a television display.

3. The television audience measurement system of claim 1 wherein the audio signal is detected by an intrusive connection into equipment related to television viewing.

4. The television audience measurement system of claim 1 further comprising a program identification datum detector that detects, from the viewer selected television program, a program identification datum indicative of an identity of the viewer selected television program.

5. The television audience measurement system of claim 4 wherein the program identification datum detector comprises a software agent resident in equipment related to television viewing.

6. The television audience measurement system of claim 5 wherein the software agent is arranged to search for the program identification datum.

7. The television audience measurement system of claim 4 wherein the audio signal is detected by a microphone disposed adjacent a television display.

8. The television audience measurement system of claim 4 wherein the audio signal is detected by an intrusive connection into equipment related to television viewing.

9. The television audience measurement system of claim 4 wherein the comparitor is arranged to sequentially compare the audio component of the plurality of television programs broadcast in the detected broadcast channel with the audio signal of the viewer selected television program so as to identify the viewer selected television program if the program identification datum detector is unable to detect a program identification datum indicative of an identity of the viewer selected television program.

10. The television audience measurement system of claim 1 further comprising a software agent arranged to detect, from the viewer selected television program, a data element indicative of an identity of the viewer selected television program.

11. The television audience measurement system of claim 10 wherein the software agent is arranged to search for a program identification datum indicative of an identity of the viewer selected television program.

12. The television audience measurement system of claim 4 wherein the comparitor is arranged to sequentially compare the audio component of the plurality of television programs broadcast in the detected broadcast channel with the audio signal of the viewer selected television program so as to identify the viewer selected television program if the program identification datum detector is unable to detect a program identification datum indicative of an identity of the viewer selected television program.

13. A television audience measurement system for digital television equipment, wherein the digital television equipment is disposed in a statistically selected location, the television audience measurement system comprising:

a software agent adapted to read, from a data packet contained in digital television programming, a datum identifying a television program, wherein the software agent is stored in memory associated with the digital television equipment;

an interface and communication apparatus adapted to transmit the identification datum to a remotely located central office.

14. The television audience measurement system of claim 13 wherein the digital television equipment comprises a receiver having a tuner, a microprocessor, memory, an operating system, and a video display unit.

15. The television audience measurement system of claim 13 wherein the digital television equipment is a set top box providing an analog television signal to an analog receiver.

16. The television audience measurement system of claim 13 wherein the digital television equipment comprises a set top box providing a digital television signal to a digital receiver.

17. The television audience measurement system of claim 13 wherein the digital television equipment comprises a set top box and a monitor.

18. The television audience measurement system of claim 13 wherein the digital television equipment comprises a personal computer provided with a television receiver.

19. The television audience measurement system of claim 13 wherein the digital television equipment includes a VCR.

20. The television audience measurement system of claim 13 wherein the digital television equipment includes a digital versatile disk player.

21. The television audience measurement system of claim 13 further comprising a person identification apparatus.

22. The television audience measurement system of claim 13 wherein the identification datum is a program identification code of a television program.

23. The television audience measurement system of claim 13 wherein the identification datum comprises a program name.

24. The television audience measurement system of claim 13 wherein the identification datum comprises an address of an Internet page.

25. The television audience measurement system of claim 13 wherein the identification datum comprises an identification code of an Internet page.

26. The television audience measurement system of claim 13 wherein the identification datum comprises a banner of material viewed by an audience.

27. The television audience measurement system of claim 13 wherein the identification datum comprises a signature extracted from a television program viewed on the digital television equipment.

28. The television audience measurement system of claim 13 wherein the software agent is arranged to detect window activities conducted by an audience.

29. The television audience measurement system of claim 13 wherein the interface and communication apparatus includes a serial port.

30. The television audience measurement system of claim 13 wherein the interface and communication apparatus includes a parallel port.

31. The television audience measurement system of claim 13 wherein the interface and communication apparatus includes a universal serial bus.

32. The television audience measurement system of claim 13 wherein the interface and communication apparatus includes a firewire.

33. The television audience measurement system of claim 13 wherein the interface and communication apparatus is arranged to send the identification datum to an Internet service provider via the Internet.

34. The television audience measurement system of claim 13 wherein the interface and communication apparatus includes an intermediate data collector.

35. The television audience measurement system of claim 34 wherein the intermediate data collector includes a store and forward device, and wherein the store and forward device is arranged to send the identification datum to the central office via a telephone line.

36. The television audience measurement system of claim 34 wherein the intermediate data collector is an Internet service provider.

37. The television audience measurement system of claim 34 wherein the intermediate data collector is a data collection facility located in the central office.

38. The television audience measurement system of claim 13 wherein the software agent is a software agent downloaded to the memory associated with the digital television equipment.

39. The television audience measurement system of claim 13 wherein the software agent is a plug in software agent of the digital television equipment.

40. The television audience measurement system of claim 13 wherein the software agent is a floppy disk software agent of the digital television equipment.

41. A television audience measurement system for identifying a viewer selected television program from among a plurality of television programs broadcast as a time division multiplexed sequence of data packets in a broadcast channel, the viewer selected television program being displayed on a television display in a statistically selected location, the television audience measurement system comprising:

receiving means for receiving the time division multiplexed sequence of data packets in the broadcast channel;

acquiring means for acquiring an audio portion of the viewer selected television program;

recovering means for recovering audio components respectively corresponding to the television programs contained in the sequence of data packets; and,

comparing means for comparing the audio components to the audio portion in order to determine the viewer selected television program.

42. The television audience measurement system of claim 41 wherein the acquiring means comprises a sensor arranged to acquire a representation of a speaker signal from a speaker associated with the television display.

43. The television audience measurement system of claim 41 wherein the acquiring means comprises a connection to audio processing circuitry associated with the television display.

44. The television audience measurement system of claim 41 wherein the receiving means comprises;

an intermediate frequency probe arranged to acquire an intermediate frequency signal from a viewer controlled tuner associated with the television display; and,

demodulating means for demodulating the intermediate frequency signal in order to receive the data packets.

45. The television audience measurement system of claim 41 wherein the receiving means comprises:

a local oscillator frequency probe arranged to pick up a local oscillator frequency signal from the television display;

means for identifying the broadcast channel from the local oscillator signal;

wherein the recovering means recovers the audio components from television programs contained in the identified broadcast channel; and,

wherein the comparing means compares the audio components to the representation of the speaker signal in order to determine the viewer selected television program.

46. The television audience measurement system of claim 41 wherein the receiving means comprises a scanning receiver arranged to scan each of a plurality of broadcast channels and to receive a corresponding plurality of time division multiplexed television programs from each of the plurality of broadcast channels.

47. The television audience measurement system of claim 41 further comprising identifying means for identifying persons in an audience of the viewer selected television program.

48. A television audience measurement system for measuring viewing of a television program viewed on digital television located in a statistically selected site comprising:

detecting means for detecting an audio code embedded in the television program in order to identify the television program;

extracting means for extracting an audio signature from the television program in order to identify the televsion program;

a software agent arranged to identify the television program; and,

selecting means for selecting at least one of the detecting means, the extracting means, and the software agent in order to identify the television program.

49. The television audience measurement system of claim 48 further comprising retrieving means for retrieving an audience measurement data packet from a television set in order to identify the television program, wherein the selecting means selects at least one of the retrieving means, the detecting means, the extracting means, and the software agent in order to identify the television program.

50. A method of identifying a television program selected by a viewer from a set of television programs broadcast as multiplexed data packets in a viewer selected broadcast channel, the viewer selected television program being displayed on a display portion of an apparatus tuned to the viewer selected broadcast channel, the method comprising the steps of:

a) determining the viewer selected broadcast channel;

b) acquiring an audio portion of the viewer selected television program;

c) selecting an audio component associated with one of the set of television programs broadcast in the viewer selected broadcast channel;

d) comparing the audio portion with the audio component in order to determine whether the audio portion and the audio component match;

e) if the audio portion and the audio component match, storing a tuning record from at least one of the audio portion and the audio component; and,

f) if the audio portion and the audio component do not match, repeating steps (c) through (f) until either a match is found or the set of television programs is exhausted.

**51**. The method of claim 50 wherein step a) comprises the step of determining the viewer selected broadcast channel by use of a channel detector associated with the apparatus.

**52**. The method of claim 51 wherein step b) comprises the step of acquiring the audio portion of the viewer selected television program by use of an audio probe adjacent the apparatus.

**53**. The method of claim 52 wherein step c) comprises the step of selecting the audio component by use of a digital tuner that is not a portion of the apparatus.

**54**. The method of claim 50 wherein step b) comprises the step of acquiring the audio portion of the viewer selected television program by use of an audio probe adjacent the apparatus.

**55**. The method of claim 54 wherein step c) comprises the step of selecting the audio component by use of a digital tuner that is not a portion of the apparatus.

**56**. The method of claim 50 wherein step c) comprises the step of selecting the audio component by use of a digital tuner that is not a portion of the apparatus.

**57**. A method of identifying a viewer selected television program from among a plurality of time overlapped television programs broadcast in a viewer selected broadcast channel, wherein the viewer selected television program is displayed in a first window of a multi-window television display, wherein a file is also broadcast in the viewer selected channel so as to be time overlapped with the viewer selected television program, wherein the viewer selected television program and the data file contain respective labels, wherein material from the file is displayed in a second window of the multi-window display, and wherein the method comprises the steps of:

a) reading, from the file, the respective file label and an identifying datum;

b) finding the television program label associated with the respective file label; and,

c) storing a time-stamped record comprising the identifying datum.

**58**. The method of claim 57 wherein the file is a data file.

**59**. The method of claim 57 wherein the file is an image file.

**60**. The method of claim 57 wherein the file is logically related to the viewer selected television program, wherein the television program label and the file label are indicative of the logical relation, and wherein step comprises the step of finding, from the logical relation, the television program label associated with the respective data file label.

**61**. A software agent stored in memory associated with digital television equipment, wherein the software agent is arranged to acquire television audience measurement data relative to the digital television equipment, the software agent comprising:

first logging means for logging a television program identification datum identifying a television program selected for viewing on the digital television equipment;

second logging means for logging an identification datum associated with data corresponding to the television program selected for viewing on the digital television equipment; and,

third logging means for logging an Internet identification datum associated with an Internet task of the digital television equipment.

**62**. An apparatus for identifying a viewer selected television program from among a plurality of time overlapped television programs broadcast in a viewer selected broadcast channel and received by digital television program reception equipment, wherein the digital television program reception equipment has a data port, the apparatus comprising:

reading means connected to the data port for reading program identifying data from among data provided on the data port; and,

storing means for storing the program identifying data.

**63**. The apparatus of claim 62 wherein the digital television program reception equipment is a digital converter.

**64**. The apparatus of claim 62 wherein the digital television program reception equipment is a personal computer.

**65**. The apparatus of claim 62 wherein the digital television program reception equipment is a digital television set.

**66**. An apparatus for identifying a viewer selected television program from among a plurality of time overlapped television programs broadcast in a viewer selected broadcast channel and received by digital television program reception equipment, wherein the digital television program reception equipment has a data port, the apparatus comprising:

reading means connected to the data port for reading program identifying data from among data provided on the data port; and,

communicating means for communicating the program identifying data to a remote point.

**67**. The apparatus of claim 66 wherein the digital television program reception equipment is a digital converter.

**68**. The apparatus of claim 66 wherein the digital television program reception equipment is a personal computer.

**69**. The apparatus of claim 66 wherein the digital television program reception equipment is a digital television set.

* * * * *

# Evaluation of Face Resolution for Expression Analysis

Ying-li Tian

IBM T. J. Watson Research Center,
PO Box 704, Yorktown Heights, NY 10598
Email: yltian@us.ibm.com

## Abstract

*Most automatic facial expression analysis (AFEA) systems attempt to recognize facial expressions from data collected in a highly controlled environment with very high resolution frontal faces ( face regions greater than 200 x 200 pixels ). However, in real environments, the face image is often in lower resolution and with head motion. It is unclear that the performance of AFEA systems for low resolution face images. The general approach to AFEA consists of 3 steps: face acquisition, facial feature extraction, and facial expression recognition. This paper explores the effects of different image resolutions for each step of facial expression analysis. The different approaches are compared for face detection, face data extraction and expression recognition. A total of five different resolutions of the head region are studied (288x384, 144x192, 72x96, 36x48, and 18Xx24) based on a widely used public database [16]. The lower resolution images are down-sampled from the originals.*

## 1. Introduction

Facial expression analysis includes both measurement of facial motion and recognition of expression. The general approach to Automatic Facial Expression Analysis (AFEA) systems consists of 3 steps (see Figure 1): face acquisition, facial feature extraction and representation, and facial expression recognition.

Face acquisition is a processing stage to automatically find the face region for the input images or sequences. It can be a face detector to detect a face in each frame or just detect face in the first frame and then track the face in the remainder of the video sequence. In order to handle large head motion, head finding, head tracking and pose estimation can be applied to a facial expression analysis system.

After the face is located, the next step is to extract and represent the facial changes caused by facial expressions. In facial feature extraction for expression analysis, there are mainly two types of approaches: geometric feature-based methods and appearance-based methods. The geometric facial features present the shape and locations of facial components (including mouth, eyes, brows, nose etc.). The facial components or facial feature points are extracted to form a feature vector that represents the face geometry. In appearance-based methods, image filters, such as Gabor wavelets, are applied to either the whole face or specific regions in a face image to extract a feature vector. Depending on the different facial feature extraction methods, the effects of in-plane head rotation and different scales of the faces can be eliminated, either by face normalization before the feature extraction or by feature representation before the step of expression recognition.




Figure 1: Basic Structure of Facial Expression Analysis Systems.

Facial expression recognition is the last stage of AFEA systems to identify facial changes as facial action coding system (FACS) action units (AUs) [9] or prototypic emotional expressions.

Many recent advances and successes in AFEA have been achieved [2, 3, 5, 8, 10, 12, 19, 21, 27, 30, 32]. With a few exceptions [7, 8, 11, 18, 27], most systems only recognized the basic expressions. We [27, 28] reported some of the most extensive experimental results on AU recognition. Their system can cope with a large change of appearance and limited out-of-plane head motion. To increase the robustness and accuracy of the feature extraction, multi-state face-component models were devised. The system recognized 16 of the 30 AUs whether they occured alone or in combinations. Recently, Bartlett *et al.* [2] and Cohn *et al.* [6, 20] attempted a comparative study for FACS AU recognition (in the upper face) in spontaneously occurring behavior by using same database [13]. In that database, subjects

Proceedings of the 2004 IEEE Computer Society Conference on Computer Vision and Pattern Recognition Workshops (CVPRW'04)
1063-6919/04 $ 20.00 IEEE

TVision Insights, Inc. – Ex. 1005, Page 000001
IPR2023-01014 (TVision Insights, Inc. v. The Nielsen Company (US), LLC)
APPX955

were ethnically diverse, AUs occurred during speech, and out-of-plane motion and occlusion from head motion and glasses were common.

While many recent advances and successes in automatic facial expression analysis have been achieved as described above, many questions remain open. For example, how do we recognize facial expressions in real life? Real-life facial expression analysis is much more difficult than the posed actions studied predominantly to date. Head motion, low resolution input images, absence of a neutral face for comparison, and low intensity expressions are among the factors that complicate facial expression analysis. This paper focuses on evaluation of AFEA system for low resolution input images. Most (AFEA) systems attempt to recognize facial expressions from data collected in a highly controlled laboratory situation with very high resolution faces (face regions are greater than 200 x 200 pixels). However, in real applications, the face region is often in lower resolutions. We [26] were the first attempt to recognize facial expressions in compressed images with lower resolution (the face region is around 50x70 to 75x100 pixels). To handle the full range of head motion, we detected the head instead of the face. Then the head pose was estimated based on the detected head. For frontal and near frontal views of the face, the location and shape features were computed for expression recognition. Our system ran in real-time and successfully dealt with complex real world interactions.

Table 1: An example in five different resolutions from Cohn-Kanade database. The head region is cropped for display purpose only. The lower resolution images are down-sampled from the originals.

|  |  |  |  |  |
|---|---|---|---|---|
| 288x384 (Original) | 144x192 | 72x96 | 36x48 | 18x24 |

In this paper, we investigate the effects of different image resolutions for each step of facial expression analysis. As shown in Table 1, total five different resolutions of the head region are studied (288x384, 144x192, 72x96, 36x48, and 18x24) based on Cohn-Kanade AU-Coded Face Expression Image Database [16]. The lower resolution images are down-sampled from the originals. As shown in Figure 1, two face detectors [23, 29] and a head pose estimator [26] are studied for the step of face acquisition. The effects of resolutions on the extraction of both geometric features and appearance features are investigated in stage 2. For the step of expression recognition, both emotional-specific expressions and selected action units recognition are investigated for different face resolutions.

In Section 2 we describe the implementation details for the methods used in our evaluation in each step of facial expression analysis. Section 3 gives the experimental results. In the last section, we conclude and discuss the results.

# 2. Experimental Setup

## 2.1. Face Acquisition

Most research of AFEA attempts to recognize facial expressions only from frontal-view or near frontal-view faces. Since the frontal-view face is not always available in real environments, the face acquisition methods should detect both frontal and non-frontal view faces in an arbitrary scene. To handle out-of-plane head motion, the face can be obtained by face detection, 2D or 3D face tracking, or head pose detection. Non-frontal view faces can be warped or normalized to frontal view for expression analysis.

**Face Detection:** Many face detection methods have been developed to detect faces in an arbitrary scene [15, 22, 23, 17, 25, 29]. In this paper, we evaluate two face detectors for different image resolutions[23, 29]. One is a neural network based face detector which was developed by Rowley et *al.* [23]. Another was developed by Viola and Jones [29] based on a set of rectangle features. Both of them can only detect frontal and near-frontal views of faces. Details of the face detectors can be found in papers [23, 29].

**Head Pose Estimation:** In order to handle the full range of head motion for expression analysis in real environments, we also evaluate head pose detection for different image resolutions. We [26] detect the head instead of the face. Head detection uses the smoothed silhouette of the foreground object as segmented using background subtraction, and computes the *negative curvature minima* (NCM) points of the silhouette. Other head detection techniques that use silhouettes can be found in papers [14].

After the head is located, the head image is converted to gray scale, histogram equalized and resized to 32x32. Then a three-layer neural network (NN) is employed to estimate the head pose. The inputs to the network are the processed head image. The outputs are the 3 head poses: 1) frontal or near frontal view, 2) side view or profile, 3) others such as back of the head or occluded face (see Table 2). In the frontal or near frontal view, both eyes and lip corners are visible. In side view or profile, at least one eye or one corner of the mouth becomes self-occluded because of the head. The expression analysis process is applied only to the frontal and near frontal view faces. More details about head pose estimation can be found in our paper [4].



TVision Insights, Inc. – Ex. 1005, Page 000002
APPX956

Table 2: The definitions and examples of the 3 head pose classes: 1) frontal or near frontal view, 2) side view or profile, 3) others such as back of the head or occluded faces. The expression analysis process is applied to only the frontal and near frontal view faces.

| Poses | Frontal or near frontal | Side view or profile | Others |
|---|---|---|---|
| Definitions | Both eyes and lip corners are visible | One eye or one lip corner is occluded | Not enough facial features |
| Examples |  |  |  |

## 2.2. Facial Feature Extraction and Representation

In our study, we extract two types of features: geometric features and appearance features. Geometric features present the shape and locations of facial components (including mouth, eyes, brows, nose etc.). The facial components or facial feature points are extracted to form a feature vector that represents the face geometry. The appearance features present the appearance (skin texture) changes of the face such as wrinkles and furrows. The appearance features can be extracted on either the whole face or specific regions in a face image.

**Geometric Feature Extraction**

**(1) Feature Tracking:** For feature tracking, we use the same method as that was developed in paper [27]. To detect and track changes of facial components in near frontal face images, multi-state models are developed to extract the geometric facial features. A three-state lip model describes the lip state: open, closed, and tightly closed. A two-state model (open or closed) is used for each of the eyes. Each brow and cheek has a one-state model. Some appearance features, such as *nasolabial furrows* and *crows-feet wrinkles*, are represented explicitly by using two states: present and absent. Given an image sequence, the region of the face and approximate location of individual face features are detected automatically in the initial frame. The contours of the face features and components then are adjusted manually in the initial frame. Then, all face feature changes are automatically tracked in the image sequence. Details of geometric feature extraction and representation can be found in paper [27].

**(2) Feature Detection:**In order to deal with low resolution face images, we also evaluate a simple geometric feature detection method [26]. In our method, six location features are extracted for expression analysis. They are eye centers (2), eyebrow inner endpoints (2), and corners of the mouth (2). The feature extraction approach presented here is similar to that taken by Yang *et al.* [33] and is an attempt to make the extraction of the eye centers more accurate and robust.



(a) (b) (c) (d)

Figure 2: Iterative thresholding of the face to find eyes and brows. (a) grey-scale face image, (b) threshold = 30, (c) threshold = 42, (d) threshold = 54.

To find the eye centers and eyebrow inner endpoints inside the detected frontal or near frontal face, we have developed an algorithm that searches for two pairs of dark regions which correspond to the eyes and the brows by using certain geometric constraints such as position inside the face, size and symmetry to the facial symmetry axis. Similar to paper [33], the algorithm employs an iterative thresholding method to find these dark regions under different or changing lighting conditions.

Figure 2 shows the iterative thresholding method to find eyes and brows. Generally, after *five* iterations, all the eyes and brows are found. If satisfactory results are not found after 20 iterations, we think the eyes or the brows are occluded or the face is not in a near frontal view. Unlike the work of Yang *et al.* to find one pair of dark regions for the eyes only, we find two pairs of parallel dark regions for both the eyes and eyebrows. By doing this, not only are more features obtained, but also the accuracy of the extracted features is improved. As shown in Figure 2(b), the right brow and the left eye is wrongly extracted as the two eyes in Yang's approach. Figure 2(d) shows that the correct positions are extracted for all the eyes and eyebrows by our method. Then the eye centers and eyebrow inner endpoints can be easily determined. If the face image is continually in the frontal or near frontal view in an image sequence, the eyes and brows can be tracked by simply searching for the dark pixels around their positions in the last frame.

After finding the positions of the eyes, the location of the mouth is first predicted. Then, the vertical position of the line between the lips is found, using an integral projection of the mouth region proposed by Yang *et al.* [33]. Finally, the horizontal borders of the line between the lips are found, using an integral projection over an edge-image



IEEE COMPUTER SOCIETY

of the mouth. After Yang *et al.*, the following steps are used to track the corners of the mouth: 1) Find two points on the line between the lips near the previous positions of the corners in the image. 2) Search along the darkest path to the left and right, until the corners are found. Finding the points on the line between the lips can be done by searching for the darkest pixels in search windows near the previous mouth corner positions. Because there is a strong change from dark to bright at the location of the corners, the corners can be found by looking for the maximum contrast along the search path. The details of the tracking method of the mouth corners can be found in the original paper [33].

**(3) Geometric Feature Representation:** After extracting the location features, the geometric facial features can be represented by a set of parameters for expression recognition based on the line connecting the two eyes (*eye-line*) [27].

For the geometric features estimated by feature tracking, a total of 24 parameters were grouped for the whole face which describe shape, motion, and the state of face components and furrows. To remove the effects of variation in planar head motion and scale between image sequences in face size, all parameters are computed as ratios of their current values to that in the reference frame (neutral frame).

For the geometric features estimated by feature detection, we represent the face location features by 5 parameters. These parameters are the distances between the *eye-line* and the corners of the mouth, the distances between the *eye-line* and the inner eyebrows, and the width of the mouth (the distance between two corners of the mouth). Again, all the parameters are computed as ratios of their current values to that in the reference frame.

#### Appearance Feature Extraction

**(1) Gabor Wavelet Representation:** We use Gabor wavelets to extract the facial appearance changes as a set of multi-scale and multi-orientation coefficients. Unlike paper [8], which applies Gabor wavelets to the upper face and lower face separately, we apply the Gabor filters to the difference image for the whole face. The difference images are obtained by subtracting a neutral expression frame for each sequence, and were convolved with a bank of 40 Gabor filters with 8 orientations and 5 spatial frequencies.

**(2) Face Alignment:** To remove position noises for appearance feature extraction, the faces are normalized to a fixed distance between the center of two eyes for each face resolution. For example, the distance between the eyes is 104 pixels for resolution 288x384, 52 pixels for 144x192, 26 pixels for 72x96, 13 pixels for 36x48, and 7 pixels for 18x24 respectively. To remove the light changes, the brightness of the face images are linearly rescaled to [0, 255].




Figure 3: Neural network-based recognizer for expressions.

## 2.3. Expression Recognition

We investigate two type of expression recognition: FACS AUs and basic expressions. For each type of expression recognition, we compare the recognition accuracy for geometric features, appearance features, and both geometric and appearance features. Figure 3 shows an example of our network-based recognizer to recognize FACS AUs.

We use three-layer neural networks with one hidden layer to recognize expressions by a standard back-propagation method. The inputs can be either the normalized geometric features or the appearance feature or both. The outputs are the recognized action units or six basic expressions. Figure 3(a) is a sun-network for recognizing AUs by using the geometric features alone. The sub-network shown in Figure 3(b) is used for recognizing AUs by using Gabor wavelets. For using both geometric features and regional appearance patterns, these two sub-networks are applied in concert. The outputs either are the recognized AUs or the six basic expressions. If the outputs are AUs, each output unit gives an estimate of the probability of the input image consisting of the associated AUs. The networks are trained to respond to the designated AUs whether they occur singly or in combination. When AUs occur in combination, multiple output nodes are excited. When the outputs are the six basic expressions, only one output node with the highest probability is selected.

For AU recognition, we recognized 14 AUs. There are AU1, AU2, AU4, AU5, AU6, AU9, AU10, AU12, AU15, AU17, AU20, AU23, AU24, and AU25*, where AU25* includes AU25, AU26, and AU27. The six basic expressions which we recognized are happiness, surprise, fear, sadness, disgust, and anger.

# 3. Effects of Image Resolution for Facial Expression Analysis

## 3.1. Database

The DFAT subset of Cohn-Kanade expression database [16] is used for our experiments. The database contains 704 image sequences from 97 subjects. Subjects sat directly in front of the camera and performed a series of facial behaviors which were recorded in an observation room. Image sequences with in-plane and limited out-of-plane motion were included. The image sequences began with a neutral face and were digitized into 640x480 pixel arrays with either 8-bit gray-scale values. The length of the image sequences are varying from 9 to 47 frames. The size of head region is about 280×380 pixels. More details about the database can be found at paper [16].

Table 3: Summary of the effects of faces at different resolutions for expression analysis. For face acquisition, "FD" indicates face detector. "HPE" indicates head pose estimation. For feature extraction, "G1" indicates geometric features extracted by feature tracking. "G2" indicates geometric features extracted by feature detection. "AP" indicates appearance features extracted by Gabor wavelets.

| Face Process | |  288x384 (Original) |  144x192 |  72x96 |  36x48 |  18x24 |
|---|---|---|---|---|---|---|
| Face Acquisition | FD | 100% | 100% | 100% | 100% | 0% |
| | HPE | 98.5% | 98% | 98.2% | 97.8% | 98% |
| Feature Extraction | G1 | Yes | Yes | Yes | No | No |
| | G2 | Yes | Yes | Yes | Yes | No |
| | AP | Yes | Yes | Yes | Yes | Yes |
| FACS AUs | G1 | 90% | 90.2% | 89.8% | N/A | N/A |
| | G2 | 71% | 70.8% | 72% | 54.3% | N/A |
| | AP | 90.7% | 90.2% | 89.6% | 72.6% | 58.2% |
| | G1+AP | 92.8% | 93% | 92.2% | N/A | N/A |
| | G2+AP | 91.2% | 90.8% | 90% | 87.7% | N/A |
| Basic Expressions | G1 | 92.5% | 91.8% | 91.6% | N/A | N/A |
| | G2 | 74% | 73.8% | 72.9% | 61.3% | N/A |
| | AP | 91.7% | 92.2% | 91.6% | 77.6% | 68.2% |
| | G1+AP | 93.8% | 94% | 93.5% | N/A | N/A |
| | G2+AP | 93.2% | 93% | 92.8% | 89% | N/A |

## 3.2. Experimental Results

Table 3 summarizes the effects of faces at different resolutions for each step of expression analysis. For face acquisition, "FD" indicates face detector. "HPE" indicates head pose estimation. For feature extraction, "G1" indicates geometric features extracted by feature tracking. "G2" indicates geometric features extracted by feature detection. "AP" indicates appearance features extracted by Gabor wavelets. For expression analysis, "FACS AU" indicates the recognition of FACS AUs. "Basic Expression" indicates the recognition of six basic expressions.

**Effects of Image Resolution for Face Acquisition:**

In this investigation, we focus on effects of image resolution for face acquisition. All images in 704 sequences from 97 subjects are used for face detection and head pose estimation. The results show that both face detectors [23, 29] can detect all faces for head region in resolution of 288x384, 144x192, 72x96, and 36x48, but failed for resolution of 18x24. Compared to face detection, head pose estimation can detect 98% faces for all the resolutions. Our previous results of head pose estimation showed that the head pose estimation can achieve 96% accuracy for 5 poses when head region resolution is about 8x8 pixels [4].

**Effects of Image Resolution for Feature Extraction**

In this experiment, a total of 696 sequences from 97 subjects (the sequences with very low intensity expression changes are removed) are processed. For the feature tracking method on resolution of 288X384, the tracking results are visually observed. We found the main features such as lip corners, eye center, and brow positions can be well tracked for more than 99% of the sequences. Then we use the tracking results for the resolution of 288x384 as "ground truth". For other resolutions, we compare the six main features (lip corners, eye center, and brow positions) which obtained by feature tracking or feature detection with the "ground truth". We found that the feature tracking method [27] works well for head region in resolution of 72x96 and higher. The feature detection method can extract reasonable features for head region in resolution of 36Xx48 and higher. For the appearance feature extraction, it is difficult to judge the extracted features without going to the step of expression recognition. We process all of the 696 sequences.

**Effects of Image Resolution for Expression Recognition**

**(1) Recognition of FACS AUs:** A total of 690 sequences from 97 subjects are used for FACS AU recognition by removing the sequences either with very low intensity expression changes or which we cannot extract geometric features for the highest resolution. For each sequence, the neutral face and three peak frames are selected for recognition. Currently, we do not use sequential information. We randomly separate the sequences into a training set and a test set, based on the total number of each AUs. That means the same subjects may appear in both training and testing. As described above, we recognize 14 AUs. Almost all AUs are in combination with following exceptions: 9 sequences



IEEE COMPUTER SOCIETY

for single AU12, 2 sequences for single AU17, and 63 sequences for single AU25*.

The average accuracy of the AU recognition is shown in Table 3. For resolution of head region in 72x96 or larger, the same level of recognition rates are achieved by feature tracking and appearance features. The feature detection method achieves lower recognition rates since fewer features are used. Also, appearance features work better for lower resolution of face images. But the face images must be well aligned. Smith et *al.* [24] recognized 6 upper AUs by Gabor wavelets and obtained the comparable results .

**(2) Recognition of Basic Expressions:** Since the database is coded as FACS AUs, 375 sequences are selected for six basic expression recognition, based on the guide line from FACS to basic expressions, by removing those sequences do not clearly meet the guide line. For example, AU6+12 or AU12 alone with intensity C/D interpret happiness and AU1+2+5B interprets a surprise reaction. The average accuracy of the basic expression recognition is shown in Table 3. Same as AU recognition, for resolution of head region in 72x96 or higher, the same level of recognition rates are achieved by feature tracking and appearance feature. The feature detection method achieves lower recognition rates since fewer features are used. Also as reported by Cohen *et al.*[5], we observe that good recognition results are achieved for happiness and surprise, but most confusions comes from anger, disgust, fear, and sadness.

# 4. Conclusion and Discussion

In this paper we have presented an experimental evaluation of different face resolutions for each step of facial expression analysis: face acquisition, facial feature extraction, and facial expression recognition. A total of five different resolutions of the head region were studied (288x384, 144x192, 72x96, 36x48, and 18x24) based on Cohn-Kanade AU-Coded Face Expression Image Database [16].

Our empirical studies illustrated following conclusions: (1) Head detection and head pose estimation can detect faces in lower resolution than face detectors. (2) Appearance feature extraction needs face alignment. (3) There is no difference in the recognition of expression analysis when the head region resolution is 72x96 or higher. Geometric features and appearance features achieve same level of recognition rates for both FACS AU recognition and six basic expression recognition. (4) When the resolution of the head region is about 36x48 or lower, appearance features achieve better recognition results than geometric features, but the faces must be well aligned. (5) When the resolution of the head region is lower than 36x48, more reliable results can be obtained for recognizing emotional-specific expressions than for recognizing finer levels of expressions (e.g. FACS AUs.)

The goal was to help understand question: how do we recognize facial expressions in real life?

Real-life facial expression analysis is much more difficult than the posed actions studied predominantly to date. Head motion, low resolution input images, absence of a neutral face for comparison, and low intensity expressions are among the factors that complicate facial expression analysis. Recent work in 3-D modeling of spontaneous head motion and action unit recognition in spontaneous facial behavior are exciting developments. How elaborate a head model is required in such work remains a research question. A cylindrical model is relatively robust and has proven effective as part of a blink detection system [31], but higher parametric generic, or even custom-fitted head models, may prove necessary for more complete action unit recognition.

Most work to date has used a single, passive camera. While there are clear advantages to approaches that require only a single passive camera or video source, multiple cameras are feasible in a number of settings and can be expected to provide improved accuracy. Active cameras can be used to acquire high resolution face images. Also, the techniques of super-resolution can be used to get higher resolution images from multiple low resolution images [1]. At present, it is an open question how to recognize expressions in situations in which a neutral face is unavailable, expressions are of low intensity, or other facial or nonverbal behaviors, such as occlusion by the hands, are present.

## Acknowledgements

We would like to thank T. Sim, S. Baker, and M. Bsat at CMU for the creation and public access of the CMU Pose, Illumination, and Expression (PIE) Database of Human Faces which we used for head pose detection. We would also like to thank J. Cohn at University of Pittsburgh to provide Cohn-Kanade AU-Coded Face Expression Image Database.

# References

[1] S. Baker and T. Kanade. Limits on super-resolution and how to break them. *IEEE Transactions on Pattern Analysis and Machine Intelligence*, 24(9):1167 – 1183, September 2002.

[2] M. S. Bartlett, B. Braathen, G. Littlewort-Ford, J. Hershey, I. Fasel, T. Marks, E. Smith, T. Sejnowski, and J. R. Movellan. Automatic analysis of spontaneous facial behavior: A final project report. Technical Report INC-MPLab-TR-2001.08, Machine Perception Lab, Institute for Neural Computation, University of California, San Diego, San Diego, CA, October 2001.

[3] M. J. Black and Y. Yacoob. Recognizing facial expressions in image sequences using local parameterized models of image motion. *International Journal of Computer Vision*, 25(1):23–48, October 1997.



IEEE COMPUTER SOCIETY

[4] L. Brown and Y. li Tian. Comparative study of coarse head pose estimation. In *IEEE Workshop on Motion and Video Computing, Orlando FL, Dec. 5-6*, 2002.

[5] I. Cohen, N. Sebe, F. G. Cozman, M. C. Cirelo, and T. S. Huang. Coding, analysis, interpretation, and recognition of facial expressions. *Journal of Computer Vision and Image Understanding Special Issue on Face recognition*, 2003.

[6] J. Cohn, T. Kanade, T. Moriyama, Z. Ambadar, J. Xiao, J. Gao, and H. Imamura. A comparative study of alternative facs coding algorithms. Technical Report CMU-RI-TR-02-06, Robotics Institute, Carnegie Mellon University, Pittsburgh, PA, November 2001.

[7] J. F. Cohn, A. J. Zlochower, J. Lien, and T. Kanade. Automated face analysis by feature point tracking has high concurrent validity with manual facs coding. *Psychophysiology*, 36:35–43, 1999.

[8] G. Donato, M. S. Bartlett, J. C. Hager, P. Ekman, and T. J. Sejnowski. Classifying facial actions. *IEEE Transaction on Pattern Analysis and Machine Intelligence*, 21(10):974–989, Oct. 1999.

[9] P. Ekman and W. Friesen. *The Facial Action Coding System: A Technique For The Measurement of Facial Movement.* Consulting Psychologists Press, Inc., San Francisco, CA, 1978.

[10] I. Essa and A. Pentland. Coding, analysis, interpretation, and recognition of facial expressions. *IEEE Trans. on Pattern Analysis and Machine Intell.*, 19(7):757–763, July 1997.

[11] B. Fasel and J. Luttin. Recognition of asymmetric facial action unit activities and intensities. In *Proceedings of International Conference of Pattern Recognition*, 2000.

[12] G. L. Ford. Fully automatic coding of basic expressions from video. Technical Report INC-MPLab-TR-2002.03, Machine Perception Lab, Institute for Neural Computation, University of California, San Diego, San Diego, CA, September 2002.

[13] M. Frank and P. Ekman. The ability to detect deceit generalizes across different types of high-stake lies. *Personality and Social Psychology*, 72:1429–1439, 1997.

[14] H. Fujiyoshi and A. Lipton. Real-time human motion analysis by image skeletonization. In *proc. of the Workshop on Application of Computer Vision*, 1998.

[15] B. Heisele, T. Serre, M. Pontil, and T. Poggio. Component-based face detection. In *Proc. IEEE Conf. on Computer Vision and Pattern Recogn. (CVPR)*, 2001.

[16] T. Kanade, J. Cohn, and Y. Tian. Comprehensive database for facial expression analysis. In *Proceedings of International Conference on Face and Gesture Recognition*, pages 46–53, March, 2000.

[17] S. Z. Li and L. Gu. Real-time multi-view face detection, tracking, pose estimation, alignment, and recognition. In *IEEE Conf. on Computer Visioin and Pattern Recognition Demo Summary*, 2001.

[18] J.-J. J. Lien, T. Kanade, J. F. Cohn, and C. C. Li. Detection, tracking, and classification of action units in facial expression. *Journal of Robotics and Autonomous System*, 31:131–146, 2000.

[19] M. Lyons, S. Akamasku, M. Kamachi, and J. Gyoba. Coding facial expressions with gabor wavelets. In *Proceedings of International Conference on Face and Gesture Recognition*, 1998.

[20] T. Moriyama, T. Kanade, J. Cohn, J. Xiao, Z. Ambadar, J. Gao, and M. Imanura. Automatic recognition of eye blinking in spontaneously occurring behavior. In *Proceedings of the 16th International Conference on Pattern Recognition (ICPR '2002)*, volume 4, pages 78 – 81, August 2002.

[21] M. Pantic and L. J. M. Rothkrantz. Expert system for automatic analysis of facial expression. *Image and Vision Computing*, 18(11):881–905, 2000.

[22] A. Pentland, B. Moghaddam, and T. Starner. View-based and modular eigenspaces for face recognition. In *Proc. IEEE Conf. Computer Vision and Pattern Recognition*, pages 84–91, 1994.

[23] H. A. Rowley, S. Baluja, and T. Kanade. Neural network-based face detection. *IEEE Transactions On Pattern Analysis and Machine intelligence*, 20(1):23–38, January 1998.

[24] E. Smith, M. S. Bartlett, and J. Movellan. Computer recognition of facial action: A study of co-articulation effects. In *Proceedings of 8th Joint Symposium on Neural Computation*, May, 2001.

[25] K. K. Sung and T. Poggio. Example-based learning for view-based human face detection. *IEEE Transactions On Pattern Analysis and Machine intelligence*, 20(1):39–51, January 1998.

[26] Y. Tian, L. Brown, A. Hampapur, S. Pankanti, A. W. Senior, and R. M. Bolle. Real world real-time automatic recognition of facial expressions. In *Proceedings of IEEE workshop on performance evaluation of tracking and surveillance, Graz, Austria*, March, 2003.

[27] Y. Tian, T. Kanade, and J. Cohn. Recognizing action units for facial expression analysis. *IEEE Trans. on Pattern Analysis and Machine Intell.*, 23(2):1–19, Feb. 2001.

[28] Y. Tian, T. Kanade, and J. Cohn. Evaluation of gabor-wavelet-based facial action unit recognition in image sequences of increasing complexity. In *Proceedings of the 5th IEEE International Conference on Automatic Face and Gesture Recognition (FG'02), DC*, May, 2002.

[29] P. Viola and M. Jones. Robust real-time object detection. In *International Workshop on Statistical and Computational Theories of Vision - Modeling, Learning, Computing, and Sampling*, 2001.

[30] Z. Wen and T. S. Huang. Capturing subtle facial motions in 3d face tracking. In *Proc. Of Int. Conf. On Computer Vision*, 2003.

[31] J. Xiao, T. Kanade, and J. F. Cohn. Robust full motion recovery of head by dynamic templates and re-registration techniques. In *Proceedings of International Conference on Automatic Face and Gesture Recognition*, pages 163–169, 2002.

[32] Y. Yacoob and L. Davis. Recognizing human facial expression from long image sequences using optical flow. *IEEE Trans. on Pattern Analysis and Machine Intell.*, 18(6):636–642, June 1996.

[33] J. Yang, R. Stiefelhagen, U. Meier, and A. Waibel. Real-time face and facial feature tracking and applications. In *Proceedings of Auditory-Visual Speech Processing (AVSP 98), New South Wales, Australia*, 1998.

US 20100274372A1

(19) **United States**
(12) **Patent Application Publication**
(10) **Pub. No.: US 2010/0274372 A1**
(43) **Pub. Date: Oct. 28, 2010**

**Nielsen et al.**

(54) **DISPLAY DEVICE ON/OFF DETECTION METHODS AND APPARATUS**

(76) Inventors: **Christen V. Nielsen**, Palm Harbor, FL (US); **Dan Nelson**, Tampa, FL (US)

Correspondence Address:
**Hanley, Flight & Zimmerman, LLC**
**150 S. Wacker Dr. Suite 2100**
**Chicago, IL 60606 (US)**

(21) Appl. No.: **12/831,870**

(22) Filed: **Jul. 7, 2010**

**Related U.S. Application Data**

(63) Continuation of application No. 11/576,328, filed on Mar. 29, 2007, filed as application No. PCT/US2006/031960 on Aug. 16, 2006.

(60) Provisional application No. 60/708,557, filed on Aug. 16, 2005, provisional application No. 60/761,678, filed on Jan. 24, 2006.

**Publication Classification**

(51) **Int. Cl.**
***G06F 17/00*** (2006.01)
***G06N 5/02*** (2006.01)

(52) **U.S. Cl.** ............................................. **700/94**; 706/54

(57) **ABSTRACT**

Display device ON/OFF detection methods and apparatus are disclosed. An example method disclosed herein to determine whether a presentation device is ON or OFF comprises determining an audio signature based on an audio signal corresponding to an output of the presentation device, comparing the audio signature to a set of reference signatures corresponding to a set of known media content, and determining a result indicating whether the presentation device is ON or OFF based on whether the audio signature matches any of the set of reference signatures.




100
102
104
BROADCAST SOURCE
108
SET-TOP BOX
116
SPLITTER
120
DISPLAY DEVICE
160
REMOTE CONTROL DEVICE
168
136
124
METERING UNIT
140
162
PEOPLE METER
164
PEOPLE METER CONTROL DEVICE
144
SENSOR(S)
128
DEVICE ON/OFF DETECTOR

FIG. 1


200
EMISSION SENSOR(S)
212
238
EMISSION PROCESSOR(S)
236
250
254
VIDEO SENSOR(S)
208
234
VIDEO PROCESSOR(S)
232
248
DECISION PROCESSOR
244
AUDIO SENSOR(S)
204
230
AUDIO PROCESSOR(S)
228
246

FIG. 2


AUDIO
230
228
312
AUDIO CODE DETECTOR
340
WEIGHT
316
AUDIO SIGNATURE PROCESSOR
344
WEIGHT
320
AUDIO GAIN LEVEL PROCESSOR
348
WEIGHT
324
HORIZONTAL SYNC AUDIO PROCESSOR
352
WEIGHT
328
QUIET TIME DETECTOR
356
WEIGHT
332
FAN NOISE DETECTOR
360
WEIGHT
336
AUDIO SOURCE DETECTOR
364
WEIGHT
246
TO DECISION PROCESSOR

FIG. 3


VIDEO
234
232
412
VISIBLE LIGHT RHYTHM PROCESSOR
432
WEIGHT
416
DISPLAY ACTIVITY DETECTOR
436
WEIGHT
248
TO DECISION PROCESSOR

FIG. 4


EMISSIONS
548
544
540
536
532
238
236
512
ELECTROMAGNETIC FIELD DETECTOR
552
WEIGHT
516
CURRENT DETECTOR
556
WEIGHT
520
TEMPERATURE DETECTOR
560
WEIGHT
524
REMOTE CONTROL ACTIVITY DETECTOR
564
WEIGHT
528
PEOPLE METER ACTIVITY DETECTOR
568
WEIGHT
250
TO DECISION PROCESSOR

FIG. 5


120
TELEVISION
204
AUDIO SENSOR
230
600
616
604
A/D
612
PROCESSOR

FIG. 6


230A
700
120
TELEVISION
204A
AUDIO SENSOR
716A
704A
A/D
712
PROCESSOR
204B
AUDIO SENSOR
716B
A/D
704B
230B

FIG. 7




FIG. 8




FIG. 9A




FIG. 9B


120
TELEVISION
1000
1004
1012
CURRENT
SENSE
TRANSFORMER
A/D
PROCESSOR
1002
212
536

FIG. 10


212A
120
1100
TELEVISION
1104A
1112
TEMP
SENSOR
A/D
PROCESSOR
1104B
A/D
540A
540B
212B
TEMP
SENSOR

FIG. 11




FIG. 12A




FIG. 12B


120
TELEVISION
1280
1284
ULTRA-
SONIC
RECEIVER
1292
PROCESSOR
212
REMOTE
CONTROL
DEVICE
160
PEOPLE
METER
164

FIG. 12C


START AUDIO CODE PROCESSING
1300
1304
PERFORM AUTOMATIC GAIN CONTROL TO FILL A/D RANGE
1308
CHECK FOR VALID AUDIO CODES
1312
VALID AUDIO CODE DETECTED?
YES
NO
1316
DETECT DEVICE ON
1320
DETECT DEVICE PROBABLY OFF
END AUDIO CODE PROCESSING

FIG. 13


START AUDIO SIGNATURE PROCESSING
1400
1404
PERFORM AUTOMATIC GAIN CONTROL TO FILL A/D RANGE
1408
GENERATE AUDIO SIGNATURE
1412
SIGNATURE MATCH DETECTED?
YES
NO
1416
DETECT DEVICE ON
1420
DETECT DEVICE PROBABLY OFF
END AUDIO SIGNATURE PROCESSING

FIG. 14


START HISSY SIGNATURE PROCESSING
1500
1504
PERFORM AUTOMATIC GAIN CONTROL TO FILL A/D RANGE
1508
EXAMINE AUDIO SIGNATURE
1512
HISSY SIGNATURE DETECTED?
NO
YES
1520
DETECT DEVICE PROBABLY ON
1516
DETECT DEVICE OFF
END HISSY SIGNATURE PROCESSING

FIG. 15


START AUDIO GAIN LEVEL PROCESSING
1600
1604
PERFORM AUTOMATIC GAIN CONTROL TO FILL A/D RANGE
1608
EXAMINE AUDIO GAIN LEVEL
1612
AUDIO GAIN LEVEL > THRESHOLD?
NO
YES
1616
DETECT DEVICE PROBABLY ON
1620
DETECT DEVICE PROBABLY OFF
END AUDIO GAIN LEVEL PROCESSING

FIG. 16


START HORIZONTAL SYNC AUDIO PROCESSING
1700
1704
PERFORM AUTOMATIC GAIN CONTROL TO FILL A/D RANGE
1708
EXAMINE AUDIO FREQUENCY SPECTRUM
1712
FLY-BACK TRANSFORMER AUDIO DETECTED?
YES
NO
1716
DETECT DEVICE ON
1720
DETECT DEVICE PROBABLY OFF
END HORIZONTAL SYNC AUDIO PROCESSING

FIG. 17


START QUIET TIME PROCESSING
1800
1804
PERFORM AUTOMATIC GAIN CONTROL TO FILL A/D RANGE
1808
PERFORM QUIET TIME DETECTION
1812
QUIET TIME DETECTED?
YES
NO
1820
QUIET TIME DETECTED WITHIN LAST N MINUTES?
NO
YES
1828
DETECT DEVICE PROBABLY OFF
1816
DETECT DEVICE PROBABLY ON
END QUIET TIME PROCESSING

FIG. 18


START FAN NOISE PROCESSING
1900
1904
PERFORM AUTOMATIC GAIN CONTROL TO FILL A/D RANGE
1908
CHECK FOR DISPLAY FAN NOISE
1912
FAN NOISE DETECTED?
YES
NO
1916
DETECT DEVICE PROBABLY ON
1920
DETECT DEVICE PROBABLY OFF
END FAN NOISE PROCESSING

FIG. 19


START AUDIO SOURCE PROCESSING
2000
2004
PERFORM AUTOMATIC GAIN CONTROL TO FILL A/D RANGE
2008
PERFORM AUDIO SOURCE DETERMINATION ALGROITHM
2012
AUDIO SOURCE IS MONITORED DEVICE?
YES
NO
2016
DETECT DEVICE PROBABLY ON
2020
DETECT DEVICE PROBABLY OFF
END AUDIO SOURCE PROCESSING

FIG. 20


START VISIBLE LIGHT RHYTHM PROCESSING
2100
2104
DETERMINE LIGHT INTENSITIES
2108
EXAMINE LIGHT INTENSITIES
2112
INTENSITIES INDICATE DISPLAY IS ACTIVE?
YES
NO
2116
DETECT DEVICE PROBABLY ON
2120
DETECT DEVICE PROBABLY OFF
END VISIBLE LIGHT RHYTHM PROCESSING

FIG. 21


START DISPLAY ACTIVITY PROCESSING
2200
2204
CAPTURE VIDEO FRAME
2208
LOCATE MONITORED DISPLAY IN VIDEO FRAME
2212
EXTRACT REGION(S) CORRESPONDING TO MONITORED DISPLAY
2216
COMPARE EXTRACTED REGIONS WITH PREVIOUS REGIONS
2220
REGIONS DIFFER?
YES
NO
2224
DETECT DEVICE ON
2228
DETECT DEVICE PROBABLY OFF
END DISPLAY ACTIVITY PROCESSING

FIG. 22


START EM FIELD PROCESSING
2300
2304
SAMPLE EM FIELD PICKUP SENSOR
2308
SENSOR VALUE > THRESHOLD?
YES
NO
2312
DETECT DEVICE ON
2316
DETECT DEVICE OFF
END EM FIELD PROCESSING

FIG. 23


START A/C CURRENT PROCESSING
2400
2404
SAMPLE A/C CURRENT SENSOR
2408
SENSOR VALUE > THRESHOLD?
YES
NO
2412
DETECT DEVICE ON
2416
DETECT DEVICE OFF
END A/C CURRENT PROCESSING

FIG. 24


START TEMPERATURE PROCESSING
2500
2504
SAMPLE DEVICE TEMPERATURE SENSOR
2508
SAMPLE AMBIENT TEMPERATURE SENSOR
2512
DEVICE TEMP > AMBIENT TEMP + THRESHOLD?
YES
NO
2516
DETECT DEVICE ON
2520
DETECT DEVICE OFF
END TEMPERATURE PROCESSING

FIG. 25


START ACTIVITY PROCESSING
2600
2604
CONFIGURE USER INPUT DEVICE RECEIVER
2608
PROCESS RECEIVED SIGNAL FROM RECEIVER
2612
ACTIVITY DETECTED?
YES
NO
2616
DETECT DEVICE PROBABLY ON
2620
DETECT DEVICE PROBABLY OFF
END ACTIVITY PROCESSING

FIG. 26


BEGIN COMPREHENSIVE ON/ OFF DETECTION
2700
2704
SAMPLE AUDIO METRICS
2708
SAMPLE VIDEO METRICS
2712
SAMPLE EMISSION METRICS
2716
SCALE METRICS BY CONFIDENCE FACTORS
2720
COMPUTE MAJORITY VOTE
2724
MAJORITY INDICATES DEVICE IS ON?
YES
NO
2728
DETECT DEVICE ON
2732
DETECT DEVICE OFF
END COMPREHENSIVE ON/ OFF DETECTION

FIG. 27


BEGIN COMPREHENSIVE ON/ OFF DETECTION
2800
2704
SAMPLE AUDIO METRICS
2806
SCALE AUDIO METRICS BY CONFIDENCE FACTORS AND COMPUTE AUDIO METRIC MAJORITY VOTE
2708
SAMPLE VIDEO METRICS
2810
SCALE EMISSION METRICS BY CONFIDENCE FACTORS AND COMPUTE EMISSION METRIC MAJORITY VOTE
2712
SAMPLE EMISSION METRICS
2814
SCALE VIDEO METRICS BY CONFIDENCE FACTORS AND COMPUTE VIDEO METRIC MAJORITY VOTE
2818
SCALE AUDIO, VIDEO AND EMISSION METRIC MAJORITY VOTES BY CONFIDENCE FACTORS
2822
COMPUTE OVERALL MAJORITY VOTE
2724
MAJORITY INDICATES DEVICE IS ON?
NO
YES
2732
DETECT DEVICE OFF
2728
DETECT DEVICE ON
END COMPREHENSIVE ON/ OFF DETECTION

FIG. 28


2900
2930
MASS STORAGE
2926
INPUT DEVICE(S)
2924
INTERFACE
2928
OUTPUT DEVICE(S)
2918
RANDOM ACCESS MEMORY
CODED INSTRUCTIONS 2916
2920
READ ONLY MEMORY
2922
2912
PROCESSOR
LOCAL MEMORY 2914

FIG. 29

# DISPLAY DEVICE ON/OFF DETECTION METHODS AND APPARATUS

## RELATED APPLICATIONS

[0001] This patent arises from a continuation of U.S. application Ser. No. 11/576,328, entitled "Display Device ON/OFF Detection Methods and Apparatus," filed on Mar. 29, 2007, which is a U.S. national stage of International Patent Application Serial No. PCT/US2006/031960, entitled "Display Device ON/OFF Detection Methods and Apparatus," filed on Aug. 16, 2006, which claims the benefit of U.S. Provisional Application Ser. No. 60/708,557, entitled "Display Device ON/OFF Detection Methods and Apparatus" and filed on Aug. 16, 2005, and U.S. Provisional Application Ser. No. 60/761,678, entitled "Display Device ON/OFF Detection Methods and Apparatus" and filed on Jan. 24, 2006. U.S. Provisional Application Ser. No. 60/708,557, U.S. Provisional Application Ser. No. 60/761,678, International Application Serial No. PCT/US2006/031960 and U.S. application Ser. No. 11/576,328 are hereby incorporated by reference in their entireties.

## FIELD OF THE DISCLOSURE

[0002] This disclosure relates generally to audience measurement and, more particularly, to display device ON/OFF detection methods and apparatus.

## BACKGROUND

[0003] Media ratings and metering information is typically generated by collecting viewing records and/or other media consumption information from a group of statistically selected households. Each of the statistically selected households typically has a data logging and processing unit commonly referred to as a "home unit." In households having multiple viewing sites (e.g., multiple television systems or, more generally, multiple presentation devices), the data logging and processing functionality may be distributed among a single home unit and multiple "site units," one site unit for each viewing site. The home unit (or the combination of the home unit and the site unit) is often in communication with a variety of attachments that provide inputs to the home unit or receive outputs from the metering unit. For example, a frequency detector attachment coupled with the home unit may be in communication with a television to sense a local oscillator frequency of the television tuner. In this manner, the frequency detector attachment may be used by the home unit to determine the channel to which the television is currently tuned based on a detected frequency. As another example, a people meter may be located in the viewing space of the television and in communication with the home unit, thereby enabling the home unit to detect the identities and/or number of the persons currently viewing programs displayed on the television. Additional devices may be provided, for example, to determine if the television is operating (i.e., is turned ON) and/or the channel to which the television is tuned.

[0004] In addition, building security and building monitoring systems are becoming more and more prevalent in today's society. Such systems enable the building owner to determine the status of various electronic appliances disposed in the building even when the building owner is located remotely from the building premises. In many instances, the building owner may desire to know the operating status, e.g., ON/OFF, of a particular appliance, such as a television, or other media delivery/presentation device.

[0005] In another setting, parents often have an interest in monitoring their children's television viewing habits, electronic gaming habits and computer usage habits. A component of monitoring such habits involves determining the operating status of the appliance, electronic device, etc. of interest.

[0006] Media monitoring systems, building monitoring systems and parenting tools such as those described above, are only three (of many) applications in which an ON/OFF detection apparatus/device has use.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0007] FIG. **1** is a block diagram of an example local metering system including an example display device ON/OFF detector and shown coupled to an example home entertainment system.

[0008] FIG. **2** is a block diagram of the example display device ON/OFF detector of FIG. **1**.

[0009] FIG. **3** is a block diagram of an example set of audio processors that may be used to implement the example display device ON/OFF detector of FIG. **2**.

[0010] FIG. **4** is a block diagram of an example set of video processors that may be used to implement the example display device ON/OFF detector of FIG. **2**.

[0011] FIG. **5** is a block diagram of an example set of emissions processor that may be used to implement the example display device ON/OFF detector FIG. **2**.

[0012] FIG. **6** is a block diagram of a first example audio processor system that may be used to implement one or more of the example audio processors of FIG. **3**.

[0013] FIG. **7** is a block diagram of a second example audio processor system that may be used to implement one or more of the example audio processors of FIG. **3**.

[0014] FIG. **8** is a block diagram of an example video processor system that may be used to implement one or more of the example video processors of FIG. **4**.

[0015] FIGS. **9**A-B are block diagrams of two implementations of a first example emission processor system that may be used to implement the example electromagnetic field detector of FIG. **5**.

[0016] FIG. **10** is a block diagram of a second example emission processor system that may be used to implement the current detector of FIG. **5**.

[0017] FIG. **11** is a block diagram of a third example emission processor system that may be used to implement the temperature detector of FIG. **5**.

[0018] FIGS. **12**A-C are block diagrams of fourth, fifth and sixth example emission processor systems that may be used to implement the remote control activity detector and/or the people meter activity detector of FIG. **5**.

[0019] FIG. **13** is a flowchart representative of example machine readable instructions that may be executed to implement the example audio code detector of FIG. **3**.

[0020] FIG. **14** is a flowchart representative of first example machine readable instructions that may be executed to implement the example audio signature processor of FIG. **3**.

[0021] FIG. **15** is a flowchart representative of second example machine readable instructions that may be executed to implement the example audio signature processor of FIG. **3**.

**[0022]** FIG. **16** is a flowchart representative of example machine readable instructions that may be executed to implement the example audio gain level processor of FIG. **3**.

**[0023]** FIG. **17** is a flowchart representative of example machine readable instructions that may be executed to implement the example horizontal sync audio processor of FIG. **3**.

**[0024]** FIG. **18** is a flowchart representative of example machine readable instructions that may be executed to implement the example quiet time detector of FIG. **3**.

**[0025]** FIG. **19** is a flowchart representative of example machine readable instructions that may be executed to implement the example fan noise detector of FIG. **3**.

**[0026]** FIG. **20** is a flowchart representative of example machine readable instructions that may be executed to implement the example audio source detector of FIG. **3**.

**[0027]** FIG. **21** is a flowchart representative of example machine readable instructions that may be executed to implement the example visible light rhythm processor of FIG. **4**.

**[0028]** FIG. **22** is a flowchart representative of example machine readable instructions that may be executed to implement the example display activity detector of FIG. **4**.

**[0029]** FIG. **23** is a flowchart representative of example machine readable instructions that may be executed to implement the example electromagnetic field detector of FIG. **5**.

**[0030]** FIG. **24** is a flowchart representative of example machine readable instructions that may be executed to implement the example current detector of FIG. **5**.

**[0031]** FIG. **25** is a flowchart representative of example machine readable instructions that may be executed to implement the example temperature detector of FIG. **5**.

**[0032]** FIG. **26** is a flowchart representative of example machine readable instructions that may be executed to implement the example remote control activity detector and/or the people meter activity detector of FIG. **5**.

**[0033]** FIG. **27** is a flowchart representative of first example machine readable instructions that may be executed to implement the example decision processor of FIG. **2**.

**[0034]** FIG. **28** is a flowchart representative of second example machine readable instructions that may be executed to implement the example decision processor of FIG. **2**.

**[0035]** FIG. **29** is a block diagram of an example computer that may execute the example machine readable instructions of FIGS. **13-26** and/or **27** to implement the example display device ON/OFF detector of FIG. **2**.

## DETAILED DESCRIPTION

**[0036]** A block diagram of an example local metering system **100** capable of providing viewing and metering information for program content presented via an example home entertainment system **102** is illustrated in FIG. **1**. The example home entertainment system **102** includes a broadcast source **104**, a set-top box (STB) **108**, a signal splitter **116** and a display device **120**. The example local metering system **100** includes a metering unit **124** and a display device ON/OFF detector **128**. The components of the home entertainment system **102** and the local metering system **100** may be connected in any well-known manner including that shown in FIG. **1**. For example, in a statistically selected household having one or more home entertainment systems **102**, the metering unit **124** may be implemented as a single home unit and one or more site units. In such a configuration, the single home unit may perform the functions of storing data and forwarding the stored data to a central facility for subsequent processing. Each site unit is coupled to a corresponding home entertainment system **102** and performs the functions of collecting viewing/metering data, processing such data (possibly in real-time) and sending the processed data to the single home unit for that home. The home unit receives and stores the data collected by the site units and subsequently forwards that collected data to the central facility.

**[0037]** The broadcast source **104** may be any broadcast media source, such as a cable television service provider, a satellite television service provider, a radio frequency (RF) television service provider, an internet streaming video/audio provider, etc. The broadcast source **104** may provide analog and/or digital television signals to the home entertainment system **102**, for example, over a coaxial cable or via a wireless connection.

**[0038]** The STB **108** may be any set-top box, such as a cable television converter, a direct broadcast satellite (DBS) decoder, a video cassette recorder (VCR), etc. The set-top box **108** receives a plurality of broadcast channels from the broadcast source **104**. Typically, the STB **108** selects one of the plurality of broadcast channels based on a user input, and outputs one or more signals received via the selected broadcast channel. In the case of an analog signal, the STB **108** tunes to a particular channel to obtain programming delivered on that channel. For a digital signal, the STB **108** may tune to a channel and decode certain packets of data to obtain programming delivered on a selected channel. For example, the STB **108** may tune to a major channel and then extract a program carried on a minor channel within the major channel via the decoding process mentioned above. For some home entertainment systems **102**, for example, those in which the broadcast source **104** is a standard RF analog television service provider or a basic analog cable television service provider, the STB **108** may not be present as its function is performed by a tuner in the display device **120**.

**[0039]** In the illustrated example, an output from the STB **108** is fed to a signal splitter **116**, such as a single analog y-splitter (in the case of an RF coaxial connection between the STB **108** and the display device **120**) or an audio/video splitter (in the case of a direct audio/video connection between the STB **108** and the display device **120**). (For configurations in which the STB **108** is not present, the broadcast source **104** may be coupled directly to the signal splitter **116**). In the example home entertainment system **102**, the signal splitter produces two signals indicative of the output from the STB **108**. Of course, a person of ordinary skill in the art will readily appreciate that any number of signals may be produced by the signal splitter **116**.

**[0040]** In the illustrated example, one of the two signals from the signal splitter **116** is fed to the display device **120** and the other signal is delivered to the metering unit **124**. The display device **120** may be any type of video display device, such as a television. For example, the display device **120** may be a television and/or other display device (e.g., a computer monitor, a CRT, an LCD, etc.) that supports the National Television Standards Committee (NTSC) standard, the Phase Alternating Line (PAL) standard, the Système Électronique pour Couleur avec Mémoire (SECAM) standard, a standard developed by the Advanced Television Systems Committee (ATSC), such as high definition television (HDTV), a standard developed by the Digital Video Broadcasting (DVB) Project, or may be a multimedia computer system, etc.

**[0041]** In the example of FIG. **1**, the second of the two signals from the signal splitter **116** (i.e., the signal carried by

connection **136** in FIG. **1**) is coupled to an input of the metering unit **124**. The metering unit **124** is a data logging and processing unit that may be used to generate viewing records and other viewing information useful for determining viewing and other metering information. The metering unit **124** typically collects a set of viewing records and transmits the collected viewing records over a connection **140** to a central office or data processing facility (not shown) for further processing or analysis. The connection **140** may be a telephone line, a return cable television connection, an RF or satellite connection, an internet connection or the like.

**[0042]** The metering unit **124** may be configured to determine identifying information based on the signal corresponding to the program content being output by the STB **108**. For example, the metering unit **124** may be configured to decode an embedded code in the signal received via connection **136** that corresponds to the channel or program currently being delivered by the STB **108** for display on the display device **120**. The code may be embedded for purposes such as, for example, audience measurement, program delivery (e.g., PIDS in a digital television presentation, electronic program guide information, etc.) or delivery of other services (e.g., embedded hyperlinks to related programming, closed caption information, etc.). Alternatively or additionally, the metering unit **124** may be configured to generate a program signature (e.g., a proxy signal which is uniquely representative of the program, signal) based on the signal received via connection **136** that corresponds to the program currently being delivered by the STB **108** for display on the display device **120**. The metering unit **124** may then add this program identifying information (e.g., the code(s) and/or signature(s)) to the viewing records corresponding to the currently displayed program.

**[0043]** In the example local metering system **100**, the display device ON/OFF detector **128** is coupled to the metering unit **124**. The display device ON/OFF detector **128** is configured to determine whether the display device **120** or other monitored information presenting device (e.g., a computer monitor, etc.) is operating in an ON (active) state or an OFF (inactive) state. Such ON/OFF detection information concerning the operating state of the information presenting device **120** may be used to more accurately process the viewing information and viewing records determined by the metering unit **124**. For example, in the home entertainment system **102**, it is possible that even though the display device **120** is turned OFF, the STB **108** may be inadvertently or intentionally left in an ON (active) state such that the STB **108** continues to receive and output program content provided by the broadcast source **104**. Without the ON/OFF detection information provided by the display device ON/OFF detector **128**, the metering unit **124** (or subsequent processing at, for example, a central facility) might credit the program content provided by the STB **108** as being consumed even though the display device **120** is turned OFF. Thus, the display device ON/OFF detector **128** may be used to augment the viewing information and/or viewing records determined by the metering unit **124** to more accurately determine whether program content output by the STB **108** is actually presented by the display device **120**.

**[0044]** To facilitate the determination of program identifying information and the generation of viewing records for the program content received and output by the STB **108**, as well as the determination of the operating state of the display device **120** or corresponding information presenting device, the metering unit **124** and the display device ON/OFF detector **128** may be provided with one or more sensors **144**. For example, a sensor **144** may be implemented by a microphone placed in the proximity of the display device **120** to receive audio signals corresponding to the program being displayed. The metering unit **124** and/or display device ON/OFF detector **128** may then process the audio signals received from the microphone **144** to decode any embedded ancillary code(s) and/or generate one or more audio signatures corresponding to a program being displayed. The display device ON/OFF detector **128** may also process the audio signal to determine whether the display device **120** is turned ON and emitting audio signals consistent with operation in an active state.

**[0045]** Additionally or alternatively, a sensor **144** may be implemented by an on-screen display detector for capturing images displayed on the display device **120** and processing regions of interest in the displayed image. The regions of interest may correspond, for example, to a broadcast channel associated with the currently displayed program, a broadcast time associated with the currently displayed program, a viewing time associated with the currently displayed program, etc. Example on-screen display detectors are disclosed by Nelson, et al. in U.S. Provisional Patent Application Ser. No. 60/523,444 filed on Nov. 19, 2003, and Patent Cooperation Treaty Application Serial No. PCT/US04/12272 filed on Apr. 19, 2004, both of which are hereby incorporated by reference.

**[0046]** Additionally or alternatively, a sensor **144** could be implemented by a frequency detector to determine, for example, the channel to which the display device **120** is tuned. Additionally or alternatively, a sensor **144** could be implemented by an electromagnetic (EM) field pickup, a current sensor and/or a temperature sensor configured to detect emissions from the display device **120** indicative of the display device **120** being turned ON. Persons having ordinary skill in the art will recognize that there are a variety of sensors **144** that may be coupled with the metering unit **124** and/or the display device ON/OFF detector to facilitate generation of viewing records and display device operating state data containing sufficient information to determine a set of desired ratings and/or metering results. Persons of ordinary skill in the art will also appreciate that any or all of the sensors **144** may be located separate from and/or disposed in the metering unit **124**, the display device ON/OFF detector **128** and/or any combination thereof. Additionally or alternatively, any or all of the sensors **144** may be duplicated in the metering unit **124** and the display device ON/OFF detector **128** to, for example, facilitate flexible placement of the various components of the local metering system **100** to permit metering of a wide range of home entertainment systems **102**.

**[0047]** The example home entertainment system **102** of FIG. **1** also includes a remote control device **160** to transmit control information that may be received by any or all of the STB **108**, the display device **120**, the metering unit **124** and/or the display device ON/OFF detector **128**. Persons having ordinary skill in the art will recognize that the remote control device **160** may transmit this information using a variety of techniques, including, but not limited to, infrared (IR) transmission, ultrasonic transmission, radio frequency transmission, wired/cabled connection, and the like.

**[0048]** The example local metering system **100** of FIG. **1** also includes a people meter **162** to capture information about the audience. The example people meter **162** may be configured to receive information from a people meter control device **164** having a set of input keys, each assigned to rep-

resent a single viewer. The people meter **162** may prompt the audience members to indicate that they are present in the viewing audience by pressing the appropriate input key on the people meter control device **164**. The people meter **162** may also receive information from the metering unit **124** to determine a time at which to prompt the audience members. Moreover, the metering unit **124** may receive information from the people meter **162** and/or the people meter control device **164** to modify an operation of the metering unit **124** (e.g., such as causing the metering unit **124** to generate one or more viewing records based on a change in the viewing audience). The display device ON/OFF detector **128** may also receive information from the people meter **162** and/or people meter control device **164** to facilitate determination of whether the display device **120** is currently turned ON (e.g., such as receiving responses to prompts displayed by the display device **120**). As will be appreciated by persons having ordinary skill in the art, the people meter control device **164** may transmit and/or receive information using a variety of techniques, including, but not limited to, infrared (IR) transmission, radio frequency transmission, ultrasonic transmission, wired/cabled connection, and the like. As will also be appreciated by persons having ordinary skill in the art, the people meter control device **164** and people meter **162** may be implemented by a combination of the remote control device **160** and one or more of the STB **108** and/or the metering unit **124**. In such an implementation, the STB **108** and/or the metering unit **124** may be configured to display prompting information and/or other appropriate people meter content directly on the display device **120**. Correspondingly, the remote control device **160** may be configured to accept inputs from the viewing audience and transmit these user inputs to the appropriate device responsible for generating the people meter display on the display device **120**.

**[0049]** Persons of ordinary skill in the art will appreciate that the metering unit **124** and the display device ON/OFF detector **128** may be implemented as separate devices or integrated into a single unit. Additionally or alternatively, any or all or the metering unit **124**, the display device ON/OFF detector **128**, or portions thereof may be integrated into the STB **108** and/or the display device **120**. For example, the display device ON/OFF detector **128** could be integrated into the STB **108** such that STB **108** is able to determine whether program content being received and output is also being presented by the monitored display device **120** or corresponding information presenting device. Such display device operating state information, coupled with operating state information concerning the STB **108** itself, could be transmitted back to the broadcast provider responsible for the broadcast source **104** via a back-channel connection **168** to allow the broadcast provider to, for example, monitor consumption of program content output by the STB **108** and presented by the display device **120** in the absence of the metering unit **124**.

**[0050]** A block diagram of an example display device ON/OFF detector **200** that may be used to implement the display device ON/OFF detector **128** of FIG. **1** is illustrated in FIG. **2**. The example display device ON/OFF detector **200** is configured to process signals received from one or more sensors, such as the sensors **144** of FIG. **1**. In the example of FIG. **2**, the display device ON/OFF detector **200** includes an audio sensor **204**, a video sensor **208** and an emission sensor **212**. The audio sensor **204** may be one or more microphones positioned to detect audio signals emitted by the display device **120** or corresponding information presenting device. The video sensor **208** may be, for example, a camera, a single output analog or digital light sensor, etc., positioned to detect the display area of the display device **120** or corresponding information presenting device. The emission sensor **212** may include one or more sensors configured to detect emissions from the display device **120** or corresponding information presenting device, or emissions from other devices that may be indicative of the operating state of the display device **120** or corresponding information presenting device. For example, the emission sensor **212** may include an EM field pickup to detect EM emissions from the display device **120**, a current detector to detect current draw from a power source coupled to the display device **120**, a temperature sensor to detect heat radiated by the display device **120**, a receiver to detect control signals from, for example, the remote control device **160** and/or people meter control device **164** indicative of an active display device **120**, etc.

**[0051]** The display device ON/OFF detector **200** includes one or more audio processors **228** to process the audio signal **230** output by the audio sensor **224**. The audio processors **228** are configured to determine characteristics of the input audio signal **230** and/or information included in the input audio signal **230** that may be used to ascertain whether the monitored information presenting is turned ON and operating in an active state. Examples of audio processors **228** are discussed in greater detail below in connection with FIG. **3**.

**[0052]** The example display device ON/OFF detector **200** also includes one or more video processors **232** to process the video signal **234** output by the video sensor **208**. Similar to the audio processors **228**, the video processors **232** are configured to determine characteristics of the input video signal **234** and/or information included in the input video signal **234** that may be used to ascertain whether the information presenting device monitored by the display device ON/OFF detector **200** (e.g., the display device **120**) is turned ON and operating in an active state. Examples of video processors **232** are discussed in greater detail below in connection with FIG. **4**.

**[0053]** The example display device ON/OFF detector **200** also includes one or more emission processors **236** to process the emission signals **238** output by the emission sensor **212**. Similar to the audio processors **228** and the video processors **232**, the emission processors **236** are configured to determine characteristics of the input emission signals **238** and/or information included in the input emission signals **238** that may be used to ascertain whether the information presenting device monitored by the display device ON/OFF detector **200** (e.g., the display device **120**) is turned ON and operating in an active state. Examples of emission processors **236** are discussed in greater detail below in connection with FIG. **5**.

**[0054]** The example display device ON/OFF detector **200** of FIG. **2** includes a decision processor **244** to process the ON/OFF decision outputs **246**, **248** and **250** generated by the audio processor(s) **228**, the video processor(s) **232** and/or the emission processor(s) **236**, if present. The decision processor **244** processes the available input information to determine whether the information presenting device monitored by the display device ON/OFF detector **200** (e.g., the display device **120**) is turned ON and operating in an active state. The decision processor **244** outputs its ON/OFF decision via the device ON/OFF decision output **254**. An example set of machine readable instructions which may be executed to implement the decision processor **244** is discussed in greater detail below in connection with FIG. **27**.

**[0055]** An example set of audio processors **228** is shown in FIG. **3**. The audio processors **228** process the input audio signal(s) **230** provided, for example, by the audio sensor(s) **204** of FIG. **2**. The input audio signal(s) **230** are intended to correspond to an audio signal being output by a monitored information presenting device, such as the display device **120** of FIG. **1**. A particular audio processor in the set of audio processors **228** may be configured to sample and process the input audio signal **230** at a frequency that depends on the processing performed by that particular audio processor. Thus, the audio processors **228** may operate autonomously and read the input audio signal **230** and generate corresponding audio processor outputs **246** in an autonomous fashion.

**[0056]** The example set of audio engines **228** of FIG. **3** includes an audio code detector **312**, an audio signature processor **316**, an audio gain level processor **320**, a horizontal sync audio processor **324**, a quiet time detector **328**, a fan noise processor **332** and an audio source detector **336**. The example audio code detector **312** is configured to detect audio codes that may be embedded in the audio signal corresponding to the input audio signal **230**. As is known, audio codes may be used to encode and embed identifying information (e.g., a broadcast/network channel number, a program identification code, a broadcast time stamp, a source identifier to identify a network and/or station providing and/or broadcasting the content, etc.) in, for example, non-audible portions of the audio signal accompanying a broadcast program. Methods and apparatus for implementing the audio code detector **312** are known in the art. For example, in U.S. Pat. No. 6,272,176, incorporated herein by reference in its entirety, Srinivasan discloses a broadcast encoding system and method for encoding and decoding information transmitted within an audio signal. This and/or any other appropriate technique may be used to implement the audio code detector **312**. Additionally, example machine readable instructions **1300** that may be executed to implement the audio code detector **312** are discussed in the detailed description of FIG. **13** below.

**[0057]** The example audio signature processor **316** of FIG. **3** is configured to generate and process audio signatures corresponding to the input audio signal **230**. As is known, characteristics of the audio portion of presented program content may be used to generate a substantially unique proxy or signature (e.g., a series of digital values, a waveform, etc.) for that content. The signature information for the content being presented may be compared to a set of reference signatures corresponding to a known set of content. When a substantial match is found, the currently presented program content can be identified with a relatively high probability. Methods and apparatus for implementing the audio signature processor **316** are known in the art. For example, in U.S. patent application Ser. No. 09/427,970, incorporated herein by reference in its entirety, Srinivasan, et al. disclose audio signature extraction and correlation techniques. As another example, in Patent Cooperation Treaty Application Serial No. PCT/US03/22562, incorporated herein by reference in its entirety, Lee, et al. disclose signature based program identification apparatus and methods for use with a digital broadcast system. These and/or any other appropriate technique may be used to implement the audio signature processor **316**. Additionally, example machine readable instructions **1400** and **1500** that may be executed to implement the audio signature processor **316** are discussed in the detailed description of FIGS. **14-15** below.

**[0058]** The example audio gain level processor **320** of FIG. **3** is configured to determine the amount of amplifier gain applied to the input audio signal **230** to appropriately fill the dynamic range of an analog-to-digital converter used to sample the input audio signal **230** for processing by the various audio signal processors **228**. Knowledge of the amount of gain applied to the input audio signal **230** may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether a monitored information presenting device is ON and emitting an audio signal. Example machine readable instructions **1600** that may be executed to implement the audio gain level processor **320** are discussed in the detailed description of FIG. **16** below.

**[0059]** The example horizontal sync audio processor **324** of FIG. **3** is configured to determine whether the input audio signal **230** includes audio emissions generated by a horizontal scan fly-back transformer used to scan an electron beam across a picture tube of a monitored information presenting device, such as the display device **120** of FIG. **1**. For example, in a display device **120** operating in accordance with the NTSC standard, the laminations of the fly-back transformer emit a tonal audio signal at approximately 15.75 kHz. Knowledge of the whether the input audio signal **230** includes audio emission corresponding to the horizontal scan fly-back transformer may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether a monitored information presenting device is ON. Methods and apparatus which may be adapted to implement the horizontal sync audio processor **324** are known in the art. For example, Patent Cooperation Treaty Application Serial No. PCT/US02/12333, incorporated herein by reference in its entirety, discloses a television proximity sensor based on monitoring the audio signal emitted by a horizontal scan fly-back transformer. This and/or any other appropriate technique may be used to implement the horizontal sync audio processor **324**. Additionally, example machine readable instructions **1700** that may be executed to implement the horizontal sync audio processor **324** are discussed in the detailed description of FIG. **17** below.

**[0060]** The example quiet time detector **328** of FIG. **3** is configured to determine whether the input audio signal **230** includes quiet time characteristics typically associated with, for example, broadcast channel change events, etc. Knowledge of the whether the input audio signal **230** includes quiet time characteristics may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether a monitored information presenting device is ON based on the presence of audio indicative of the information presenting device being controlled by a user. Methods and apparatus which may be adapted to implement the quiet time detector **328** are known in the art. For example, Patent Cooperation Treaty Application Serial No. PCT/US03/27336, incorporated herein by reference in its entirety, discloses audio based methods and apparatus for detecting channel change events which employ detection of quiet-time intervals. This and/or any other appropriate technique may be used to implement the quiet time detector **328**. Additionally, example machine readable instructions **1800** that may be executed to implement the quiet time detector **328** are discussed in the detailed description of FIG. **18** below.

**[0061]** The example fan noise detector **332** of FIG. **3** is configured to determine whether the input audio signal **230** includes a component indicative of audio noise generated by a fan assembly operating in a monitored information present-

ing device. Knowledge of the whether the input audio signal **230** includes fan noise may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether a monitored information presenting device is ON based on the activation of an associated fan assembly. Example machine readable instructions **1900** that may be executed to implement the fan noise detector **332** are discussed in the detailed description of FIG. **19** below.

**[0062]** The example audio source detector **336** of FIG. **3** is configured to determine the location of the source of the input audio signal **230**. Knowledge of the location of the source of the input audio signal **230** may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether a monitored information presenting device is ON based on whether the determined source location coincides with the monitored information presenting device. Methods and apparatus which may be adapted to implement the audio source detector **336** are known in the art. For example, in "A Tentative Typology of Audio Source Separation Tasks," ICA2003, April 2003, incorporated herein by reference in its entirety, Vincent, et al. discuss techniques for audio source separation. Additionally, in "Using IIDs to Estimate Sound Source Direction," in *From Animals to Animats* 7, edited by Hallam, et al., MIT Press, 2002, incorporated herein by reference in its entirety, Smith discusses techniques for using inter-aural intensity differences to determine audio source direction information. These and/or any other appropriate technique may be used to implement the audio source detector **336**. Additionally, example machine readable instructions **2000** that may be executed to implement the audio source detector **336** are discussed in the detailed description of FIG. **20** below.

**[0063]** As shown in the example of FIG. **3**, the results of each audio processor **312-336** may be scaled/prioritized by a set of respective weights **340-364**. For example, the weights **340-364** may explicitly scale the processor results based on the amount of information, amount of confidence, etc. that a respective result may contribute to the processing performed by a decision processor, such as the decision processor **224** of FIG. **2**. Additionally or alternatively, the weights **340-364** may be implicit and based, for example, on a stage in which a particular audio processor result is used in a decision process performed by the decision processor, the priority given a particular audio processor result by the decision processor, etc. In any case, the scaling may be dynamic or static. Also, the weights **340-364** may be eliminated explicitly or implicitly be setting the values of the weights **340-364** all equal to one.

**[0064]** An example set of video processors **232** is shown in FIG. **4**. The video processors **232** process the input video signal **234** provided, for example, by the video sensor **208** of FIG. **2**. The input video signal **234** is intended to be representative of a display corresponding to a monitored presentation device, such as the display device **120** of FIG. **1**. A particular video processor in the set of video processors **232** may be configured to sample and process the input video signal **234** at a frequency that depends on the processing performed by that particular video processor. Thus, the video processors **232** may operate autonomously and sample the input video signal **234** and generate corresponding video processor outputs **248** in an autonomous fashion.

**[0065]** The example set of video engines **232** of FIG. **4** includes a visible light rhythm processor **412** and a display activity detector **416**. The example visible light rhythm processor **412** of FIG. **4** is configured to determine whether light patterns over time associated with the input video signal **234** corresponds to patterns indicative of an active display of a monitored information presenting device. Knowledge of whether the input video signal **234** includes such light patterns may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether a monitored information presenting device is ON based on whether the light patterns are indicative of an active display device. Methods and apparatus which may be adapted to implement the visible light rhythm processor **412** are known in the art. For example, Patent Cooperation Treaty Application Serial No. PCT/US03/30370, incorporated herein by reference in its entirety, discloses methods and apparatus to detect an operating state of a display based on visible light. This and/or any other appropriate technique may be used to implement the visible light rhythm processor **412**. Additionally, example machine readable instructions **2100** that may be executed to implement the visible light rhythm processor **412** are discussed in the detailed description of FIG. **21** below.

**[0066]** The example display activity detector **416** of FIG. **4** is configured to determine whether a particular region of a monitored scene corresponding to the input video signal **234** varies in accordance with an active display of a monitored information presenting device. Knowledge of whether the input video signal **234** includes such varied scene activity may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether a monitored information presenting device is ON based on whether the regions of the scene associated with the display of the information presenting device indicate that the display is active. Example machine readable instructions **2200** that may be executed to implement the display activity detector **416** are discussed in the detailed description of FIG. **22** below.

**[0067]** As shown in the example of FIG. **4**, the results of each video processor **412-416** may be scaled/prioritized by a set of respective weights **432-436**. For example, the weights **432-436** may explicitly scale the video processor results based on the amount of information, amount of confidence, etc. that a respective result may contribute to the processing performed by a decision processor, such as the decision processor **224** of FIG. **2**. Additionally or alternatively, the weights **432-436** may be implicit and based, for example, on a stage in which a particular video processor result is used in a decision process performed by the decision processor, the priority given a particular video processor result by the decision processor, etc. In any case, the scaling may be dynamic or static. Also, the weights **432-436** may be eliminated explicitly or implicitly be setting the values of the weights **432-436** all equal to one.

**[0068]** An example set of emissions processors **236** is shown in FIG. **5**. The emissions processors **236** of FIG. **5** process the input emission signals **238** provided, for example, by the emission sensors **212** of FIG. **2**. The input emissions signals **238** are intended to correspond to one or more emissions from a monitored presentation device, such as the display device **120** of FIG. **1**. A particular emission processor in the set of emission processors **236** may be configured to sample and process the appropriate input emission signal **238** at a frequency that depends on the processing performed by that particular emission processor. Thus, the emission processors **236** may operate autonomously and sample the appropriate input emission signal **238** and generate corresponding emission processor outputs **250** in an autonomous fashion.

[0069] The example set of emissions processors **236** of FIG. **5** includes an electromagnetic (EM) field detector **512**, a current detector **516**, a temperature detector **520**, a remote control activity detector **524** and a people meter activity detector **528**. The example EM field detector **512** of FIG. **5** is configured to process an EM field emission input **532** corresponding to an EM field measured by an appropriately configured emission sensor **212**. Knowledge of whether the EM field emission input **532** corresponds to EM field emissions from a monitored information presenting device may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether the monitored information presenting device is ON. Any known technique may be used to implement the EM field detector **512**. Additionally, example machine readable instructions **2300** that may be executed to implement the EM field detector **512** are discussed in the detailed description of FIG. **23** below.

[0070] The example current detector **516** of FIG. **5** is configured to process a current input **536** corresponding to a current measured by an appropriately configured emission sensor **212**. Knowledge of whether the current input **536** corresponds to an amount of current that would be drawn from a power source coupled to an actively-operating monitored information presenting device may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether the monitored information presenting device is ON. Any known technique may be used to implement the current detector **516**. Additionally, example machine readable instructions **2400** that may be executed to implement the current detector **516** are discussed in the detailed description of FIG. **24** below.

[0071] The example temperature detector **520** of FIG. **5** is configured to process one or more temperature inputs **540** corresponding to, for example, sensors **212** configured to measure the temperature of a monitored information presenting device and the ambient air temperature of a room in which the information presenting device is located. Knowledge of whether the temperature of the monitored information presenting device is substantially higher than the ambient air temperature may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether the monitored information presenting device is ON. Example machine readable instructions **2500** that may be executed to implement the temperature detector **520** are discussed in the detailed description of FIG. **25** below.

[0072] The example remote control activity detector **524** of FIG. **5** is configured to process a remote control signal input **544** corresponding to a received signal from an appropriately configured emission sensor **212**. Knowledge of whether the remote control signal input **544** corresponds to a valid remote control command may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether a monitored information presenting device is ON. Example machine readable instructions **2600** that may be executed to implement the remote control activity detector **524** are discussed in the detailed description of FIG. **26** below.

[0073] The example people meter activity detector **528** of FIG. **5** is configured to process a people meter signal input **548** corresponding to a received signal from an appropriately configured emission sensor **212**. Knowledge of whether the remote control signal input **544** corresponds to a valid people meter response and/or command may be used, for example, by a decision processor, such as the decision processor **244** of FIG. **2**, to determine whether a monitored information presenting device is ON. Example machine readable instructions **2600** that may be executed to implement the people meter activity detector **528** are discussed in the detailed description of FIG. **26** below.

[0074] As shown in the example of FIG. **5**, the results of each emission processor **512-528** may be scaled/prioritized by a set of respective weights **552-568**. For example, the weights **552-568** may explicitly scale the emission processor results based on the amount of information, amount of confidence, etc. that a respective result may contribute to the processing performed by a decision processor, such as the decision processor **224** of FIG. **2**. Additionally or alternatively, the weights **552-568** may be implicit and based, for example, on a stage in which a particular emission processor result is used in a decision process performed by the decision processor, the priority given a particular emission processor result by the decision processor, etc. In any case, the scaling may be dynamic or static. Also, the weights **552-568** may be eliminated explicitly or implicitly be setting the values of the weights **552-568** all equal to one.

[0075] A first example audio processor system **600** that may be used to implement any or all of the audio code detector **312**, the audio signature processor **316**, the audio gain level processor **320**, the horizontal sync audio processor **324**, the quiet time detector **328** and/or the fan noise processor **332** of FIG. **3** is shown in FIG. **6**. The example audio processor system **600** is configured to process audio signals emanating from the monitored display device **120** (or, more generally, a corresponding information presenting device) and detected by the audio sensor **204**. The audio processor system **600** includes an analog-to-digital (A/D) converter **604** to sample the audio signal **230** output by the audio sensor **204** and convert the audio signal **230** to a digital format for processing by the processor **612**. The audio processor system **600** also includes a variable gain amplifier (VGA) **616** which may amplify or attenuate, as needed, the audio signal **230** so that the audio signal **230** appropriately fills the dynamic range of the A/D converter **604** to yield a desired bit resolution at the output of the A/D converter **604**.

[0076] The processor **612** may be configured to control the gain/attenuation provided by the VGA **616** based on any known automatic gain control (AGC) algorithm. For example, an AGC algorithm implemented by the processor **612** may control the VGA **616** to yield an output of the A/D converter **604** having an amplitude, variance, standard deviation, energy, etc. within a predetermined range. The predetermined range is typically derived from the characteristics of the particular A/D converter **604** to result in a gain/attenuation of the VGA **616** that appropriately fills the dynamic range of the A/D converter **604**.

[0077] In addition to implementing the AGC algorithm, the processor **612** may also be configured to execute machine readable instructions to implement one or more of the audio code detector **312**, the audio signature processor **316**, the audio gain level processor **320**, the horizontal sync audio processor **324**, the quiet time detector **328** and/or the fan noise processor **332**. Such machine readable instructions are discussed in greater detail below in connection with FIGS. **13-19**.

[0078] A second example audio processor system **700** that may be used to implement any or all of the audio code detector **312**, the audio signature processor **316**, the audio gain level processor **320**, the horizontal sync audio processor **324**, the

quiet time detector **328**, the fan noise processor **332** and/or the audio source detector **336** of FIG. **3** is shown in FIG. **7**. The example audio processor system **700** is configured to process audio signals emanating from the monitored display device **120** (or, more generally, a corresponding information presenting device) and detected by two or more audio sensors **204**A-B. The audio processor system **700** includes a first A/D converter **704**A to sample the audio signal **230**A output by the audio sensor **204**A and convert the audio signal **230**A to a digital format for processing by the processor **712**. The audio processor system **700** also includes a first VGA **716**A which may amplify or attenuate, as needed, the audio signal **230**A so that the audio signal **230**A appropriately fills the dynamic range of the A/D converter **604**A to yield a desired bit resolution at the output of the A/D converter **604**A.

**[0079]** The audio processor system **700** also includes a second A/D converter **704**B to sample the audio signal **230**B output by the audio sensor **204**B and convert the audio signal **230**B to a digital format for processing by the processor **712**. Additionally, the audio processor system **700** includes a second VGA **716**B which may amplify or attenuate, as needed, the audio signal **230**B so that the audio signal **230**B appropriately fills the dynamic range of the A/D converter **704**B to yield a desired bit resolution at the output of the A/D converter **704**B.

**[0080]** The processor **712** may be configured to control the gain/attenuation provided by the VGAs **716**A-B based on any known AGC algorithm as discussed above in connection with FIG. **6**. In addition to implementing the AGC algorithm, the processor **712** may also be configured to execute machine readable instructions to implement one or more of the audio code detector **312**, the audio signature processor **316**, the audio gain level processor **320**, the horizontal sync audio processor **324**, the quiet time detector **328**, the fan noise processor **332** and/or the audio source detector **336**. Such machine readable instructions are discussed in greater detail below in connection with FIGS. **13**-**20**.

**[0081]** An example video processor system **800** that may be used to implement any or all of the visible light rhythm processor **412** and/or the display activity detector **416** of FIG. **4** is shown in FIG. **8**. The example video processor system **800** is configured to process video signals corresponding to the display of the monitored display device **120** (or, more generally, a corresponding information presenting device) as detected by the video sensor **208**. The video processor system **800** includes a frame grabber **804** to capture video frames corresponding to video signal **234** output by the video sensor **208** for processing by the processor **812**. Any known technique for capturing video frames and storing such video frames in a digital format may be used to implement the frame grabber **804**.

**[0082]** The processor **812** may be configured to execute machine readable instructions to implement one or more of the visible light rhythm processor **412** and/or the display activity detector **416**. Such machine readable instructions are discussed in greater detail below in connection with FIGS. **21**-**22**.

**[0083]** An example EM field processor system **900** that may be used to implement the EM field detector **512** of FIG. **5** is shown in FIGS. **9**A-B. The example EM field processor system **900** is configured to process EM field emissions corresponding to the monitored display device **120** (or, more generally, a corresponding information presenting device) as detected by an emission sensor **212** implemented alternatively as an inductive or capacitive pickup **212** in FIG. **9**A or as an antenna pickup **212** in FIG. **9**B. In the examples of FIGS. **9**A-**9**B, the emission sensor **212** provides the EM field signal **532** shown in FIG. **5** for processing by the EM field processor system **900**. Inductive, capacitive and antenna pickups for detecting EM fields are known and, as such, are not discussed further herein.

**[0084]** The EM field processor system **900** includes an A/D converter **904** to sample the EM field signal **532** output by the emission sensor **212** and convert the EM field signal **532** to a digital format for processing by the processor **912**. The processor **912** may be configured to execute machine readable instructions to implement the EM field detector **512**. Such machine readable instructions are discussed in greater detail below in connection with FIG. **23**.

**[0085]** An example current measurement processor system **1000** that may be used to implement the current detector **516** of FIG. **5** is shown in FIG. **10**. The example current measurement processor system **1000** is configured to measure the amount of current drawn by the monitored display device **120** (or, more generally, a corresponding information presenting device) from a power source **1002**. The current draw is detected by an emission sensor **212** implemented, for example, as a current sense transformer **212** coupled between the monitored display device **120** and the power source **1002** as shown. In the example of FIG. **10**, the emission sensor **212** provides the current measurement signal **536** shown in FIG. **5** for processing by the current measurement processor system **1000**. Current sense transformers for measuring current draw are known and, as such, are not discussed further herein.

**[0086]** The current measurement processor system **1000** includes an A/D converter **1004** to sample the current measurement signal **536** output by the emission sensor **212** and convert the current measurement signal **536** to a digital format for processing by the processor **1012**. The processor **1012** may be configured to execute machine readable instructions to implement the current detector **516**. Such machine readable instructions are discussed in greater detail below in connection with FIG. **24**.

**[0087]** An example temperature processor system **1100** that may be used to implement the temperature detector **520** of FIG. **5** is shown in FIG. **11**. The example temperature processor system **1100** is configured to measure heat emanating from the monitored display device **120** (or, more generally, a corresponding information presenting device). The heat emanating from the monitored display device **120** is detected by an emission sensor **212**A implemented, for example, as a temperature sensor **212**A coupled or positioned proximate to the monitored display device **120** as shown. In the example of FIG. **11**, the emission sensor **212**A provides a first temperature signal **540**A, similar to the temperature signal **540** shown in FIG. **5**, for processing by the temperature processor system **1100**.

**[0088]** The temperature processor system **1100** may also include a second emission sensor **212**B implemented, for example, as a temperature sensor **212**B. The second emission sensor **212**B may positioned to measure, for example, the ambient temperature of the room in which the monitored display device **120** is located. In the example of FIG. **11**, the emission sensor **212**B provides a second temperature signal **540**B, similar to the temperature signal **540** shown in FIG. **5**, for processing by the temperature processor system **1100**. The temperature sensors **212**A-B may be implemented by, for example, thermistors, analog silicon temperature sensors

and/or digital silicon temperature sensors, all of which are known and, as such, are not discussed further herein.

**[0089]** The temperature processor system **1100** includes a first A/D converter **1104**A to sample the temperature signal **540**A output by the emission sensor **212**A and convert the temperature signal **540**A to a digital format for processing by the processor **1112**. The temperature processor system **1100** also includes a second A/D converter **1104**B to sample the temperature signal **540**B output by the emission sensor **212**B and convert the audio signal **540**B to a digital format for processing by the processor **1112**. The processor **1112** may be configured to execute machine readable instructions to implement the temperature detector **520**. Such machine readable instructions are discussed in greater detail below in connection with FIG. **25**.

**[0090]** Three example remote device activity processor systems **1200**, **1250** any **1280**, any or all of which may be used to implement the remote control activity detector **524** and/or the people meter activity detector **528** of FIG. **5**, are shown in FIGS. **12**A, **12**B and **12**C, respectively. The example remote device activity processor systems **1200**, **1250** and **1280** are configured to measure control signals transmitted by the remote control device **160** and/or by the people meter control device **164** used in conjunction with the monitored display device **120**. In the first example remote device activity processor system **1200**, the control signals are detected by an emission sensor **212** implemented, for example, as an infrared (IR) detector **212** for scenarios in which either or both of the remote control device **160** and/or the people meter control device **164** employ IR signal transmission. In the second example remote device activity processor system **1250**, the control signals are detected by an emission sensor **212** implemented, for example, as an antenna **212** for scenarios in which either or both of the remote control device **160** and/or the people meter control device **164** employ RF signal transmission. In the third example remote device activity processor system **1280**, the control signals are detected by an emission sensor **212** implemented, for example, as an ultrasonic transducer **212** for scenarios in which either or both of the remote control device **160** and/or the people meter control device **164** employ ultrasonic signal transmission. IR detectors, antennas and ultrasonic transducers are known and, as such, are not discussed further herein.

**[0091]** The first example remote device activity processor system **1200** includes an IR receiver **1204** to receive IR signals detected by the IR detector **212**. The IR receiver **1204** generates corresponding received control signals from the IR signals and outputs the received control signals for processing by the processor **1212**. The second example remote device activity processor system **1250** includes a wireless receiver **1254** to receive RF signals detected by the antenna **212**. The wireless receiver **1254** generates corresponding received control signals from the RF signals and outputs the received control signals for processing by the processor **1212**. The third example remote device activity processor system **1280** includes an ultrasonic receiver **1284** to receive ultrasonic signals detected by the ultrasonic transducer **212**. The ultrasonic receiver **1284** generates corresponding received control signals from the ultrasonic signals and outputs the received control signals for processing by the processor **1292**. The processors **1212**, **1262** and **1292** may be configured to execute machine readable instructions to implement the remote control activity detector **524** and/or the people meter activity detector **528**. Such machine readable instructions are discussed in greater detail below in connection with FIG. **26**.

**[0092]** Flowcharts representative of example machine readable instructions that may be executed to implement the audio processors **228** of FIG. **3**, the video processors **232** of FIG. **4**, the emission processors **236** of FIG. **5** and/or the decision processor **244** of FIG. **2** are shown in FIGS. **13** through **28**. In these examples, the machine readable instructions represented by each flowchart may comprise one or more programs for execution by: (a) a processor, such as the processors **612**, **712**, **812**, **912**, **1012**, **1112**, **1212**, **1262** and/or **1292**, or the processor **2912** shown in the example computer **2900** discussed below in connection with FIG. **29**, (b) a controller, and/or (c) any other suitable device. The one or more programs may be embodied in software stored on a tangible medium such as, for example, a flash memory, a CD-ROM, a floppy disk, a hard drive, a DVD, or a memory associated with the processors **612**, **712**, **812**, **912**, **1012**, **1112**, **1212**, **1262**, **1292** and/or **2912**, but persons of ordinary skill in the art will readily appreciate that the entire program or programs and/or portions thereof could alternatively be executed by a device other than the processors **612**, **712**, **812**, **912**, **1012**, **1112**, **1212**, **1262**, **1292** and/or **2912** and/or embodied in firmware or dedicated hardware in a well-known manner (e.g., implemented by an application specific integrated circuit (ASIC), a programmable logic device (PLD), a field programmable logic device (FPLD), discrete logic, etc.). For example, any or all of the audio processors **228**, the video processors **232**, the emission processors **236** and/or the decision processor **244** could be implemented by any combination of software, hardware, and/or firmware. Also, some or all of the machine readable instructions represented by the flowchart of FIGS. **13** through **28** may be implemented manually. Further, although the example machine readable instructions are described with reference to the flowcharts illustrated in FIGS. **13** through **28**, persons of ordinary skill in the art will readily appreciate that many other techniques for implementing the example methods and apparatus described herein may alternatively be used. For example, with reference to the flowcharts illustrated in FIGS. **13** through **28**, the order of execution of the blocks may be changed, and/or some of the blocks described may be changed, eliminated, combined and/or subdivided into multiple blocks.

**[0093]** Example machine readable instructions **1300** that may be executed to implement the audio code detector **312** of FIG. **3** are shown in FIG. **13**. The machine readable instructions **1300** process audio signals emitted by an information presenting device (e.g., the display device **120** of FIG. **1**), detected by an audio sensor (e.g., the audio sensor **204** of FIGS. **2** and **6**) and input to the audio code detector **312**. The machine readable instructions **1300** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions **1300** begin execution at block **1304** at which the audio code detector **312** performs an automatic gain control (AGC) algorithm which causes a variable gain amplifier (VGA) (e.g., the VGA **616** of FIG. **6**) to amplify or attenuate the audio signal (e.g., the audio signal **230** of FIGS. **2** and **6**) applied to the input of the audio code detector **312**. The audio signal is amplified/attenuated to appropriately fill the dynamic range of an A/D converter (e.g., the A/D converter **604** of FIG. **6**) used to sample and convert the audio signal to a digital format for further processing. An

example AGC algorithm implemented by the audio code detector **312** may control the VGA to yield an output of the A/D converter having an amplitude, variance, standard deviation, energy, etc. within a predetermined range. The predetermined range is based on the characteristics of the particular A/D converter and targeted to achieve an appropriate filling of the A/D converter's dynamic range. AGC algorithms are known in the art and, as such, are not discussed further herein.

**[0094]** After convergence of the AGC algorithm at block **1304**, control proceeds to block **1308** at which the audio code detector **312** checks for audio codes present in the received audio signal. Any appropriate technique for decoding audio codes embedded in a content presentation may be used, such as one or more of those discussed above in connection with the description of FIG. **3**. If at block **1312** the audio code detector **312** detects the presence of a valid audio code, control proceeds to block **1316** at which the audio code detector **312** determines the monitored information presenting device is ON. The audio code detector **312** makes such a determination because the presence of the valid audio code indicates that the monitored information presenting device is emitting an audio signal corresponding to presented program content. If, however, at block **1312** the audio code detector **312** does not detect the presence of a valid audio code, control proceeds to block **1320** at which the audio code detector **312** determines the monitored information presenting device is probably OFF. Here, the audio code detector **312** uses the lack of a valid code to decide that the monitored information presenting device is not emitting an audio signal corresponding to presented program content and, therefore, is probably turned OFF (although the device could be operating in an audio mute state). In any case, after the audio code detector **312** makes a determination at block **1316** or block **1320**, execution of the machine readable instructions **1300** ends.

**[0095]** First example machine readable instructions **1400** that may be executed to implement the audio signature processor **316** of FIG. **3** are shown in FIG. **14**. The machine readable instructions **1400** process audio signals emitted by an information presenting device (e.g., the display device **120** of FIG. **1**), detected by an audio sensor (e.g., the audio sensor **204** of FIGS. **2** and **6**) and input to the audio signature processor **316**. The machine readable instructions **1400** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions **1400** begin execution at block **1404** at which the audio signature processor **316** performs an AGC algorithm which causes a VGA (e.g., the VGA **616** of FIG. **6**) to amplify or attenuate the audio signal (e.g., the audio signal **230** of FIGS. **2** and **6**) applied to the input of the audio signature processor **316**. The audio signal is amplified/attenuated to appropriately fill the dynamic range of an A/D converter (e.g., the A/D converter **604** of FIG. **6**) used to sample and convert the audio signal to a digital format for further processing. AGC algorithms are discussed in greater detail above in connection with FIG. **13** and, as such, are not discussed further herein.

**[0096]** After convergence of the AGC algorithm at block **1404**, control proceeds to block **1408** at which the audio signature processor **316** generates an audio signature from the received audio signal. Any appropriate technique for generating audio signatures based on an audio signal corresponding to a content presentation may be used, such as one or more of those discussed above in connection with the description of FIG. **3**. If at block **1412** the audio signature processor **316** determines that the audio signature generates at block **1408** matches a known reference signature, control proceeds to block **1416** at which the audio signature processor **316** determines that the monitored information presenting device is ON. The audio signature processor **316** makes such a determination because the signature match indicates that the monitored information presenting device is, at least, emitting an audio signal corresponding to presented program content corresponding to the reference audio signature. If, however, at block **1412** the audio signature processor **316** does not detect a match, control proceeds to block **1420** at which the audio signature processor **316** determines that the monitored information presenting device is probably OFF. Here, the audio signature processor **316** uses the lack of a match to decide that the monitored information presenting device is not emitting an audio signal corresponding to presented program content and, therefore, is probably turned OFF (although the lack of a match could also correspond to an audio mute state, unknown program content, etc.). In any case, after audio signature processor **316** makes a determination at block **1416** or block **1420**, execution of the machine readable instructions **1400** ends.

**[0097]** Second example machine readable instructions **1500** that may be executed to implement the audio signature processor **316** of FIG. **3** are shown in FIG. **15**. The machine readable instructions **1500** process audio signals emitted by an information presenting device (e.g., the display device **120** of FIG. **1**), detected by an audio sensor (e.g., the audio sensor **204** of FIGS. **2** and **6**) and input to the audio signature processor **316**. The machine readable instructions **1500** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions **1500** begin execution at block **1504** at which the audio signature processor **316** performs an AGC algorithm which causes a VGA (e.g., the VGA **616** of FIG. **6**) to amplify or attenuate the audio signal (e.g., the audio signal **230** of FIGS. **2** and **6**) applied to the input of the audio signature processor **316**. The audio signal is amplified/attenuated to appropriately fill the dynamic range of an A/D converter (e.g., the A/D converter **604** of FIG. **6**) used to sample and convert the audio signal to a digital format for further processing. AGC algorithms are discussed in greater detail above in connection with FIG. **13** and, as such, are not discussed further herein.

**[0098]** After convergence of the AGC algorithm at block **1504**, control proceeds to block **1508** at which the audio signature processor **316** generates an audio signature from the received audio signal. Any appropriate technique for generating audio signatures based on an audio signal corresponding to a content presentation may be used, such as one or more of those discussed above in connection with the description of FIG. **3**.

**[0099]** Control then proceeds to block **1512** at which the audio signature processor **316** determines whether the audio signature generates at block **1508** may be characterized as "hissy." Typically, an audio signal corresponding to audible program content exhibits significant peak energy fluctuations caused by the varying pressure wave associated with the audio emissions. Conversely, an audio signal corresponding to background noise or silence exhibits relatively small peak energy fluctuations about an average energy value resulting in sound typically characterized as "hissy." Thus, the audio sig-

nature processor **316** may evaluate whether the audio signature generated at block **1508** is hissy to determine whether a monitored information presenting device is emitting an audio signal corresponding to audible program content. In an example hissy audio signature detection algorithm, the audio signature processor **316** may compute a running average of peak energy values of the audio signal. Then, if a particular peak energy value is within some region about this running average, the audio signature processor **316** may determine that a possible hissy state has been entered. If such a possible hissy state exists for a period of time (e.g., three seconds), the audio signature processor **316** may decide that a definite hissy state has been entered and declare the generated audio signature to be hissy. Persons of ordinary skill in the art will appreciate that many techniques may be used to determine whether an audio signature is hissy or, in other words, corresponds to silence or background noise. For example, the average time between audio energy peaks or the variability of the standard deviation of the audio energy peaks may be used to determine whether the audio signal energy fluctuates sufficiently to indicate the presence of an audio content presentation or is relatively static and, therefore, indicative of silence or background noise.

**[0100]** Returning to FIG. **15**, if at block **1512** the audio signature processor **316** determines that the audio signature generated at block **1408** is hissy, control proceeds to block **1516** at which the audio signature processor **316** determines that the monitored information presenting device is OFF. The audio signature processor **316** makes such a determination because a hissy signature indicates that the received audio signal corresponds most likely to background noise and not audio emanating from the monitored information presenting device, thereby indicating that the information presenting device is OFF. If, however, at block **1512** the audio signature processor **316** determines that the generated audio signature is not hissy, control proceeds to block **1520** at which the audio signature processor **316** determines that the monitored information presenting device is probably ON. Here, the audio signature processor **316** uses the lack of a hissyness to decide that the monitored information presenting device is probably emitting an audio signal corresponding to presented program content and, therefore, is probably turned ON. In any case, after audio signature processor **316** makes a determination at block **1516** or block **1520**, execution of the machine readable instructions **1500** ends.

**[0101]** Example machine readable instructions **1600** that may be executed to implement the audio gain level processor **320** of FIG. **3** are shown in FIG. **16**. The machine readable instructions **1600** process audio signals emitted by an information presenting device (e.g., the display device **120** of FIG. **1**), detected by an audio sensor (e.g., the audio sensor **204** of FIGS. **2** and **6**) and input to the audio gain level processor **320**. The machine readable instructions **1600** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions **1600** begin execution at block **1604** at which the audio gain level processor **320** performs an AGC algorithm which causes a VGA (e.g., the VGA **616** of FIG. **6**) to amplify or attenuate the audio signal (e.g., the audio signal **230** of FIGS. **2** and **6**) applied to the input of the audio gain level processor **320**. The audio signal is amplified/attenuated to appropriately fill the dynamic range of an A/D converter (e.g., the A/D converter **604** of FIG. **6**) used to sample and convert the audio signal to a digital format for further processing. AGC algorithms are discussed in greater detail above in connection with FIG. **13** and, as such, are not discussed further herein.

**[0102]** After convergence of the AGC algorithm at block **1604**, control proceeds to block **1608** at which the audio gain level processor **320** examines the steady-state audio gain level to which the AGC algorithm converged at block **1604**. In particular, the audio gain level processor **320** determines whether the steady-state audio gain level exceeds a predetermined threshold indicative of the AGC algorithm converging to a large, possibly maximum, gain. Such a large/maximum convergence would occur of the input audio signal corresponded to silence or background noise. If at block **1612** the audio gain level processor **320** determines that the steady-state audio gain level achieved at block **1604** does not exceed the predetermined threshold, control proceeds to block **1616** at which the audio gain level processor **320** determines that the monitored information presenting device is probably ON. The audio gain level processor **320** makes such a determination because the steady-state gain level indicates that an audio signal emitted from the monitored information presenting device was probably detected and provided as input to the audio gain level processor **320**. If, however, at block **1612** the steady-state audio gain level exceeds the threshold, control proceeds to block **1620** at which audio gain level processor **320** determines that the monitored information presenting device is probably OFF. Here, the audio gain level processor **320** uses the large/maximum steady-state audio gain to decide that the monitored information presenting device is probably not emitting an audio signal corresponding to presented program content and, therefore, is probably turned OFF. In any case, after audio gain level processor **320** makes a determination at block **1616** or block **1620**, execution of the machine readable instructions **1600** ends.

**[0103]** Example machine readable instructions **1700** that may be executed to implement the horizontal sync audio processor **324** of FIG. **3** are shown in FIG. **17**. The machine readable instructions **1700** process audio noise signals emitted by, for example, a horizontal scan fly-back transformer of an information presenting device (e.g., the display device **120** of FIG. **1**), detected by an audio sensor (e.g., the audio sensor **204** of FIGS. **2** and **6**) and input to the horizontal sync audio processor **324**. The machine readable instructions **1700** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions **1700** begin execution at block **1704** at which the horizontal sync audio processor **324** performs an AGC algorithm which causes a VGA (e.g., the VGA **616** of FIG. **6**) to amplify or attenuate the audio signal (e.g., the audio signal **230** of FIGS. **2** and **6**) applied to the input of the horizontal sync audio processor **324**. The audio signal is amplified/attenuated to appropriately fill the dynamic range of an A/D converter (e.g., the A/D converter **604** of FIG. **6**) used to sample and convert the audio signal to a digital format for further processing. AGC algorithms are discussed in greater detail above in connection with FIG. **13** and, as such, are not discussed further herein.

**[0104]** After convergence of the AGC algorithm at block **1704**, control proceeds to block **1708** at which the horizontal sync audio processor **324** examines the frequency spectrum of the input audio signal for characteristics corresponding to

audio emitted by a fly-back transformer. For example, and as discussed above in connection with FIG. 3, a fly-back transformer used in an information presenting device operating in accordance with the NTSC standard may generate tonal audio emissions having a frequency of approximately 15.75 kHz. Therefore, if at block 1712 the horizontal sync audio processor 324 detects the presence of audio frequency tones indicative of a fly-back transformer, control proceeds to block 1716 at which the horizontal sync audio processor 324 determines the monitored information presenting device is ON. The horizontal sync audio processor 324 makes such a determination because the presence of audio emissions corresponding to a fly-back transformer indicates that the monitored information presenting device is operating in an active state. If, however, at block 1712 the horizontal sync audio processor 324 does not detect the presence of audio frequency tones indicative of a fly-back transformer, control proceeds to block 1720 at which the horizontal sync audio processor 324 determines the monitored information presenting device is probably OFF. Here, the horizontal sync audio processor 324 uses the lack of audio emissions corresponding to a fly-back transformer to decide that the monitored information presenting device is probably not operating and, therefore, is probably turned OFF. In any case, after the horizontal sync audio processor 324 makes a determination at block 1716 or block 1720, execution of the machine readable instructions 1700 ends.

**[0105]** Example machine readable instructions 1800 that may be executed to implement the quiet time detector 328 of FIG. 3 are shown in FIG. 18. The machine readable instructions 1800 process audio signals emitted by an information presenting device (e.g., the display device 120 of FIG. 1), detected by an audio sensor (e.g., the audio sensor 204 of FIGS. 2 and 6) and input to the audio gain level processor 320. The machine readable instructions 1800 may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions 1800 begin execution at block 1804 at which the quiet time detector 328 performs an AGC algorithm which causes a VGA (e.g., the VGA 616 of FIG. 6) to amplify or attenuate the audio signal (e.g., the audio signal 230 of FIGS. 2 and 6) applied to the input of the quiet time detector 328. The audio signal is amplified/attenuated to appropriately fill the dynamic range of an A/D converter (e.g., the A/D converter 604 of FIG. 6) used to sample and convert the audio signal to a digital format for further processing. AGC algorithms are discussed in greater detail above in connection with FIG. 13 and, as such, are not discussed further herein.

**[0106]** After convergence of the AGC algorithm at block 1804, control proceeds to block 1808 at which the quiet time detector 328 performs a quiet time detector algorithm to determine whether the audio signal includes any periods of silence indicative of, for example, a channel change operation, a transition between broadcast program content and a commercial, etc. Any appropriate technique for detecting intervals of quiet time based on an audio signal corresponding to a content presentation may be used, such as the technique discussed above in connection with the description of FIG. 3. If at block 1812 the quiet time detector 328 determines that a quiet time interval was detected at block 1808, control proceeds to block 1816 at which the quiet time detector 328 determines that the monitored information presenting device is probably ON. The quiet time detector 328 makes such a determination because the audio signal emitted from the monitored information presenting device includes quiet time intervals probably indicative of short interruptions of program content presented by an actively-operating information presenting device.

**[0107]** If, however, at block 1812 a quiet time interval is not detected, control proceeds to block 1820 at which the quiet time detector 328 determines whether a quiet time interval was detected within a predetermined preceding interval of time. If at block 1820 the quiet time detector 328 determines that a quiet time interval was detected within the preceding interval of time, control proceeds to block 1816 at which the quiet time detector 328 determines that the monitored information presenting device is probably ON. The quiet time detector 328 makes such a determination because the audio signal emitted from the monitored information presenting device recently included quiet time intervals probably indicative of short interruptions of program content presented by an actively-operating information presenting device. If, however, at block 1820 the quiet time detector 328 determines that a quiet time interval was also not detected within the predetermined preceding interval of time, control proceeds to block 1828 at which the quiet time detector 328 determines that the monitored information presenting device is probably OFF. Here, the quiet time detector 328 uses the lack of a quiet time interval within the predetermined period of time to decide that the monitored information presenting device is probably not emitting an audio signal corresponding to presented program content and, therefore, is probably turned OFF. In any case, after quiet time detector 328 makes a determination at block 1816 or block 1828, execution of the machine readable instructions 1800 ends.

**[0108]** Example machine readable instructions 1900 that may be executed to implement the fan noise detector 332 of FIG. 3 are shown in FIG. 19. The machine readable instructions 1900 process audio signals emitted by an information presenting device (e.g., the display device 120 of FIG. 1), detected by an audio sensor (e.g., the audio sensor 204 of FIGS. 2 and 6) and input to the fan noise detector 332. The machine readable instructions 1900 may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions 1900 begin execution at block 1904 at which the fan noise detector 332 performs an AGC algorithm which causes a VGA (e.g., the VGA 616 of FIG. 6) to amplify or attenuate the audio signal (e.g., the audio signal 230 of FIGS. 2 and 6) applied to the input of the fan noise detector 332. The audio signal is amplified/attenuated to appropriately fill the dynamic range of an A/D converter (e.g., the A/D converter 604 of FIG. 6) used to sample and convert the audio signal to a digital format for further processing. AGC algorithms are discussed in greater detail above in connection with FIG. 13 and, as such, are not discussed further herein.

**[0109]** After convergence of the AGC algorithm at block 1904, control proceeds to block 1908 at which the fan noise detector 332 checks for the presence of fan noise in the received audio signal. Fan noise from an operating information presenting device typically exhibits tonal energy in the frequency range between 300 Hz and 5 kHz. As such, any known technique for detecting tonal audio signals in this (or any other appropriate) frequency range may be used at block 1908. If at block 1912 the fan noise detector 332 detects the

presence of fan noise, control proceeds to block **1916** at which the fan noise detector **332** determines the monitored information presenting device is probably ON. The fan noise detector **332** makes such a determination because the presence of fan noise indicates that the monitored information presenting device is probably operating and presenting program content. If, however, at block **1912** the fan noise detector **332** does not detect the presence of fan noise, control proceeds to block **1920** at which the fan noise detector **332** determines the monitored information presenting device is probably OFF. Here, the fan noise detector **332** uses the lack of fan noise to decide that the monitored information presenting device is probably not operating and, therefore, is probably turned OFF. In any case, after the fan noise detector **332** makes a determination at block **1916** or block **1920**, execution of the machine readable instructions **1900** ends.

**[0110]** Example machine readable instructions **2000** that may be executed to implement the audio source detector **336** of FIG. **3** are shown in FIG. **20**. The machine readable instructions **2000** process audio signals emitted by an information presenting device (e.g., the display device **120** of FIG. **1**), detected by audio sensors (e.g., the audio sensors **204**A-B of FIG. **7**) and input to the audio source detector **336**. The machine readable instructions **20000** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions **2000** begin execution at block **2004** at which the audio source detector **336** performs AGC algorithms which cause VGAs (e.g., the VGAs **716**A-B of FIG. **7**) to amplify or attenuate audio signals (e.g., the audio signals **230**A-B of FIG. **7**) applied to the inputs of the audio source detector **336**. The audio signals are amplified/attenuated to appropriately fill the dynamic range of A/D converters (e.g., the A/D converters **704**A-B of FIG. **7**) used to sample and convert the audio signals to a digital format for further processing. AGC algorithms are discussed in greater detail above in connection with FIG. **13** and, as such, are not discussed further herein.

**[0111]** After convergence of the AGC algorithms at block **2004**, control proceeds to block **2008** at which the audio source detector **336** performs a source detection algorithm to determine the source of the input audio signals. Any appropriate technique for audio source detection may be used, such as one or more of those discussed above in connection with the description of FIG. **3**. Next, if at block **2012** the audio source detector **336** determines that the audio source location coincides with the location of the monitored information presenting device, control proceeds to block **2016** at which the audio source detector **336** determines the monitored information presenting device is probably ON. The audio source detector **336** makes such a determination because the audio source detection algorithm performed at block **2008** detected audio probably emanating from the monitored information presenting device and corresponding to presented program content. If, however, at block **2012** the location of the detected audio source does not correspond with the monitored information presenting device, control proceeds to block **2020** at which the audio source detector **336** determines the monitored information presenting device is probably OFF. Here, the audio source detector **336** decides the input audio signal probably does not correspond to the monitored information presenting device and, thus, the information presenting device is probably OFF. In any case, after the audio source detector **336** makes a determination at block **2016** or block **2020**, execution of the machine readable instructions **2000** ends.

**[0112]** Example machine readable instructions **2100** that may be executed to implement the visible light rhythm processor **412** of FIG. **4** are shown in FIG. **21**. The machine readable instructions **2100** process visible light emitted by the display of an information presenting device (e.g., the display device **120** of FIG. **1**). The emitted light is detected by a video sensor (e.g., the video sensor **208** of FIGS. **2** and **8**) positioned to monitor the display of the monitored information presenting device (hereinafter referred to as the monitored display). The video sensor converts the emitted light to an electrical signal which is input to the visible light rhythm processor **412**. The machine readable instructions **2100** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF.

**[0113]** The machine readable instructions **2100** begin execution at block **2104** at which the visible light rhythm processor **412** determines the intensity of the light detected by the video sensor by sampling the signal provided by the video sensor. Next, control proceeds to block **2108** at which the visible light rhythm processor **412** examines the light intensities, for example, over a predetermined interval of time. If at block **2112** the visible light rhythm processor **412** determines that the light intensities indicate that the monitored display is active, control proceeds to block **2116** at which the visible light rhythm processor **412** determines that the monitored information presenting device is probably ON. The visible light rhythm processor **412** makes such a determination, for example, by comparing the light intensities to a predetermined threshold corresponding to a light intensity visible to the human eye and, therefore, probably indicative of the information presenting device displaying active program content. If, however, at block **2112** the visible light rhythm processor **412** determines that the light intensities do not indicate that the monitored display is active, control proceeds to block **2120** at which the visible light rhythm processor **412** determines that the monitored information presenting device is probably OFF. Here, the lack of detected light intensities which would be visible to the human eye probably indicates that the monitored information presenting device is inactive and, therefore, probably turned OFF. In any case, after the visible light rhythm processor **412** makes a determination at block **2116** or block **2120**, execution of the machine readable instructions **2100** ends.

**[0114]** Example machine readable instructions **2200** that may be executed to implement the display activity detector **416** of FIG. **4** are shown in FIG. **22**. The machine readable instructions **2200** process video images corresponding to an area including the display of an information presenting device (e.g., the display device **120** of FIG. **1**). The video images are detected by a video sensor (e.g., the video sensor **208** of FIGS. **2** and **8**) and input to the display activity detector **416**. The video sensor is positioned to monitor an area including the display of the monitored information presenting device (hereinafter referred to as the monitored display). The machine readable instructions **2200** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF.

[0115] The machine readable instructions **2200** begin execution at block **2204** at which the display activity detector **416** captures video frames based on the video signal (e.g., the video signal **234** of FIGS. **2** and **8**) applied to the input of the display activity detector **416**. As discussed above, the display activity detector **416** may use a frame grabber (e.g., the frame grabber **804** of FIG. **8**) to capture the video frames. After the video frames are captured at **2204**, control proceeds to block **2208** at which the display activity detector **416** locates the monitored display in the captured video frames. Control then proceeds to block **2212** at which the display activity detector **416** extracts one or more regions corresponding to the monitored display from each captured video frame. Then, at block **2216**, the display activity detector **416** compares the extracted regions between successive video frames to determine whether the regions differ. For example, the display activity detector **416** may compute a distance metric between the same regions in successive video frames. Then, if the distance metric exceeds a predetermined threshold, the display activity detector **416** may determine that a change has occurred in the region over time.

[0116] Returning to FIG. **22**, if at block **2220** the display activity detector **416** detects that the extracted regions differ between successive video frames, control proceeds to block **2224** at which the display activity detector **416** determines the monitored information presenting device is ON. The display activity detector **416** makes such a determination because the change in the extracted regions indicate that the monitored display is displaying a changing video presentation and, thus, that the monitored information presenting device is ON. If, however, at block **2220** the display activity detector **416** does not detect a difference between the extracted regions, control proceeds to block **2228** at which the display activity detector **416** determines the monitored information presenting device is probably OFF. Here, the display activity detector **416** uses the lack of a change in the extracted regions to decide that the monitored display is not displaying a changing video presentation and, therefore, the monitored information presenting device is probably turned OFF.

[0117] The display activity detector **416** may be configured to increase the confidence of the OFF decision by examining, for example, the color of the extracted region. If the color of the extracted region is a uniform dark color (e.g., black), the display activity detector **416** may determine that the monitored display is more likely turned OFF than, for example, displaying a paused video image. In any case, after the display activity detector **416** makes a determination at block **2224** or block **2228**, execution of the machine readable instructions **2200** ends.

[0118] Example machine readable instructions **2300** that may be executed to implement the electromagnetic (EM) field detector **512** of FIG. **5** are shown in FIG. **23**. The machine readable instructions **2300** process an EM field signal corresponding to an EM field emitted by an information presenting device (e.g., the display device **120** of FIG. **1**), detected by an emission sensor (e.g., the emission sensor **212** of FIGS. **2** and **9A-B**) and input to the EM field detector **512**. The machine readable instructions **2300** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions **2300** begin execution at block **2304** at which the EM field detector **512** samples the input EM field signal. After sampling the input EM field signal, control proceeds to block **2308** at which the EM field detector **512** compares the sampled EM field signal to a predetermined threshold determined, for example, by a calibration procedure which measures the background EM field in an area surrounding the monitored information presenting device.

[0119] If at block **2308** the EM field detector **512** determines that the sampled EM field signal exceeds the threshold, control proceeds to block **2312** at which the EM field detector **512** determines the monitored information presenting device is ON. The EM field detector **512** makes such a determination because the presence of an EM field exceeding the predetermined threshold indicates that the monitored information presenting device is turned ON and operating in an active mode. If, however, at block **2308** the EM field detector **512** determines that the EM field signal does not exceed the threshold, control proceeds to block **2316** at which the EM field detector **512** determines the monitored information presenting device is OFF. Here, the EM field detector **512** uses the lack of a significant EM field to decide that the monitored information presenting device is not operating in an active mode and, therefore, is turned OFF. In any case, after the EM field detector **512** makes a determination at block **2312** or block **2316**, execution of the machine readable instructions **2300** ends.

[0120] Example machine readable instructions **2400** that may be executed to implement the current detector **516** of FIG. **5** are shown in FIG. **24**. The machine readable instructions **2400** process a measured current signal corresponding to current drawn from a power source coupled to an information presenting device (e.g., the display device **120** of FIG. **1**), detected by an emission sensor (e.g., the emission sensor **212** of FIGS. **2** and **10**) and input to the current detector **516**. The machine readable instructions **2400** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions **2400** begin execution at block **2404** at which the current detector **516** samples the input current signal. After sampling the input current signal, control proceeds to block **2408** at which the current detector **516** compares the sampled current signal to a predetermined threshold determined, for example, my measuring the amount of current drawn by the monitored information presenting device in an OFF or standby/sleep mode.

[0121] If at block **2408** the current detector **516** determines that the sampled current signal exceeds the threshold, control proceeds to block **2412** at which the current detector **516** determines the monitored information presenting device is ON. The current detector **516** makes such a determination because a current signal exceeding the predetermined threshold indicates that the monitored information presenting device is turned ON and drawing current from the associated power source. If, however, at block **2408** the current detector **516** determines that the current signal does not exceed the threshold, control proceeds to block **2416** at which the current detector **516** determines the monitored information presenting device is OFF. Here, the current detector **516** uses the lack of a significant current signal to decide that the monitored information presenting device is not operating in an active mode and, therefore, is turned OFF. In any case, after the current detector **516** makes a determination at block **2412** or block **2416**, execution of the machine readable instructions **2400** ends.

[0122] Example machine readable instructions **2500** that may be executed to implement the temperature detector **520** of FIG. **5** are shown in FIG. **25**. The machine readable instructions **2500** process measured temperature measurements corresponding to heat emitted from an information presenting device (e.g., the display device **120** of FIG. **1**), as well as possibly the ambient air temperature in a room in which the monitored information presenting device is located. The temperature measurements are detected by appropriately configured emission sensors (e.g., the emission sensors **212**A-B of FIG. **11**) and input to the temperature detector **516**. The machine readable instructions **2500** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF. The machine readable instructions **2500** begin execution at block **2504** at which the temperature detector **520** samples the temperature signal generated by a first emission sensor positioned to permit measurement of the temperature of the monitored information presenting device. Next, control proceeds to block **2508** at which the temperature detector **520** samples the temperature signal generated by a second emission sensor positioned to permit measurement of the ambient air temperature.

[0123] After sampling of the respective temperature signals, control then proceeds to block **2512** at which the temperature detector **520** compares the monitored information presenting device's temperature to the ambient air temperature, possible offset by a threshold to improve ON/OFF detection reliability. If at block **2512** the temperature detector **520** determines that the monitored information presenting device's temperature sufficiently exceeds the ambient air temperature (based on the additional threshold amount), control proceeds to block **2516** at which the temperature detector **520** determines that the monitored information presenting device is ON. The temperature detector **520** makes such a determination because the monitored information presenting device's temperature indicates that heat is being emitted and, thus, that the device is turned ON. If, however, at block **2512** monitored information presenting device's temperature does not sufficiently exceed the ambient air temperature, control proceeds to block **2520** at which the temperature detector **520** determines the monitored information presenting device is OFF. Here, the temperature detector **520** uses the lack of a significant heat emission to decide that the monitored information presenting device is not operating in an active mode and, therefore, is turned OFF. In any case, after the temperature detector **520** makes a determination at block **2516** or block **2520**, execution of the machine readable instructions **2500** ends. Persons of ordinary skill in the art will appreciate that the processing at step **2508** may be eliminated to reduce the number of required emission sensors if, for example, the threshold at block **2512** is modified to incorporate an expected/average ambient air temperature.

[0124] Example machine readable instructions **2600** that may be executed to implement the remote control activity detector **524** and/or the people meter activity detector **528** of FIG. **5** are shown in FIG. **26**. To simplify the description of FIG. **26**, the remote control activity detector **524** and the people meter activity detector **528** will be referred to generally and collectively as the "remote input device activity detector **524/528**." The machine readable instructions **2600** process control signals emitted by one or more remote input devices (e.g., the remote control device **160** and/or the people meter control device **164** of FIG. **1**) associated with an information presenting device (e.g., the display device **120** of FIG. **1**). The control signals are detected by appropriately configured emission sensors (e.g., the emission sensors **212** of FIG. **12**A-B) and input to the remote input device activity detector **524/528**. The machine readable instructions **2600** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether the monitored information presenting device is ON or OFF.

[0125] The machine readable instructions **2600** begin execution at block **2604** at which the remote input device activity detector **524/528** initializes/configures a receiver (e.g., the IR receiver **1204** of FIG. **12**A, the wireless receiver **1254** of FIG. **12**B and/or the ultrasonic receiver **1284** of FIG. **12**C) which receives and transforms the control signals detected by the emission sensor into a form suitable for subsequent processing by the remote input device activity detector **524/528**. After the receiver is appropriately configured, control proceeds to block **2608** at which the remote input device activity detector **524/528** processes the received control signals. If at block **2612** the remote input device activity detector **524/528** determines that the received control signals correspond to known and/or unknown remote input device activity, control proceeds to block **2616** at which the remote input device activity detector **524/528** determines that the monitored information presenting device is probably ON. For example, known activity could include power ON commands, channel change commands, volume change/mute commands, prompt responses, etc., whereas unknown activity could include a noticeable increase in IR, RF or ultrasonic energy, a cluster of received IR, RF or ultrasonic pulses, etc. The remote input device activity detector **524/528** makes such a determination at block **2616** because the receipt of control signals corresponding to known and/or unknown remote input device activity indicates that a user is probably operating and/or responding to an active information presenting device.

[0126] If, however, at block **2612** control signals corresponding to known and/or unknown remote input device activity are not detected, control proceeds to block **2620** at which the remote input device activity detector **524/528** determines the monitored information presenting device is probably OFF. Here, the remote input device activity detector **524/528** uses the lack of received control signals corresponding to known and/or unknown remote input device activity to decide that the monitored information presenting device is not being controlled and/or responded to by a user and, therefore, is probably turned OFF. In any case, after the remote input device activity detector **524/528** makes a determination at block **2616** or block **2620**, execution of the machine readable instructions **2600** ends.

[0127] Example machine readable instructions **2700** that may be executed to implement the decision processor **244** of FIG. **2** are shown in FIG. **27**. The machine readable instructions **2700** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether a monitored information presenting device (e.g., the display device **120** of FIG. **1**) is ON or OFF. The machine readable instructions **2700** process, for example, the ON/OFF decision outputs **246**, **248** and/or **250** generated by the audio processors **228**, the video processors **232** and the emission processors **236**, respectively, of FIG. **2**. The individual audio processors **228**, the video pro-

cessors **232** and the emission processors **236** make autonomous decisions concerning whether a monitored information presenting device is turned ON or OFF. The machine readable instructions **2700** enable the decision processor **244** to combine the individual, autonomous ON/OFF decisions into a single, comprehensive decision regarding whether the monitored information presenting device is turned ON or OFF.

**[0128]** The machine readable instructions **2700** begin execution at block **2704** at which the decision processor **244** samples the audio decision outputs **246** (also called audio decision metrics **246**) generated by the audio processors **228**. Next, control proceeds to block **2708** at which the decision processor **244** samples the video decision outputs **248** (also called video decision metrics **248**) generated by the video processors **232**. Control then proceeds to block **2712** at which the decision processor **244** samples the emission decision outputs **250** (also called emission decision metrics **250**) generated by the emission processors **236**. Then, after all the decision metrics have been sampled, control proceeds to block **2716** at which the decision processor **244** weights the decision metrics by, for example, scaling or assigning a value to each decision metric corresponding to the confidence associated with the decision metric. For example, and referring to the examples of FIGS. **13-26** above, at block **2716** the decision processor **244** may assign a value of +1 to decision metric of "ON," a value of +0.5 to a decision metric of "probably ON," a value of −0.5 to a decision metric of "probably OFF" and a value of −1 to a decision metric of "OFF."

**[0129]** Next, control proceeds to block **2720** at which the decision processor **244** combines all of the individual decision metrics (e.g., via addition) to determine a weighted majority vote of the individual decisions made by the audio processors **228**, the video processors **232** and the emission processors **236**. Then, if at block **2724** the majority vote favors a decision that the monitored information presenting device is ON (e.g., if the weighted majority vote results in a positive value), control proceeds to block **2728** at which the decision processor **244** declares the monitored information presenting device to be ON. However, if at block **2724** the majority vote favors a decision that the monitored information presenting device is OFF (e.g., if the majority vote results in a negative value), control proceeds to block **2732** at which the decision processor **244** declares the monitored information presenting device to be OFF. In the case of a tie, the decision processor **244** may be configured, for example, to favor either a decision of ON or OFF depending on the particular monitored information presenting device, to produce an output indicating that the state of the monitored information presenting device is indeterminate, etc. In any case, after the decision processor **244** makes a determination at block **2728** or block **2732**, execution of the machine readable instructions **2700** ends.

**[0130]** FIG. **28** illustrates second example machine readable instructions **2800** that may be executed to implement the decision processor **244** of FIG. **2**. As in the case of the example machine readable instructions **2700** of FIG. **27**, the machine readable instructions **2800** of FIG. **28** may be executed periodically (e.g., as part of a program loop) and/or aperiodically (e.g., in response to one or more events) to determine whether a monitored information presenting device (e.g., the display device **120** of FIG. **1**) is ON or OFF. Furthermore, the machine readable instructions **2800** similarly process, for example, the ON/OFF decision outputs **246**, **248** and/or **250** generated by the audio processors **228**, the video processors **232** and the emission processors **236**, respectively, of FIG. **2**. As such, blocks having substantially equivalent functionality in the examples of FIGS. **27** and **28** are labeled with the same reference numeral. The interested reader is referred to the description of FIG. **27** above for a detailed description of these blocks.

**[0131]** Turning to the example of FIG. **28**, the example machine readable instructions **2800** implement a two-stage weighted majority voting procedure, in contrast with the single-stage voting procedure implemented by the example machine readable instructions **2700** of FIG. **27**. Specifically, after sampling the audio decision metrics **246** at block **2704**, control proceeds to block **2806** at which the decision processor **244** computes a weighted majority vote of the audio decision metrics. The audio metric weighted majority vote may be computed at block **2806**, for example, by scaling or assigning a value to each sampled audio decision metric **246** and then adding the resulting metrics to determine the audio metric weighted majority vote. Similarly. a video metric weighted majority vote and an emission metric weighted majority vote may be computed at blocks **2810** and **2814**, respectively, after the corresponding video decision metrics and emission decision metrics are sampled at blocks **2708** and **2712** as shown.

**[0132]** Next, after processing at blocks **2806**, **2810** and **2812** completes, control proceeds to block **2818** at which the decision processor **244** may further weight the individual audio, video and emission metric weighted majority votes based on, for example, the confidence and/or importance associated with the particular type of metric. Control then proceeds to block **2822** at which the decision processor **244** combines the resulting individual audio, video and emission metric weighted majority votes to determine an overall majority vote. Then, control proceeds to block **2724** and blocks subsequent thereto as discussed above in connection with FIG. **27** at which the decision processor **244** uses the overall weighted majority vote to decide whether the monitored information presenting device is turned ON or OFF. Execution of the machine readable instructions **2800** then ends.

**[0133]** Persons of ordinary skill in the art will appreciate that the examples of FIGS. **27** and **28** are but two techniques contemplated by the disclosure herein for combining the ON/OFF decision outputs **246**, **248** and/or **250** generated by, respectively, the audio processors **228**, the video processors **232** and the emission processors **236**. As another example, the decision processor **244** could combine the ON/OFF decision outputs **246**, **248** and/or **250** based on whether a particular decision output corresponds to a presentation by the monitored information presenting device or whether the decision output corresponds to a physical operation of the information presenting device. In such an example, a first weighted majority vote corresponding to the presentation by the monitored information presenting device could be computed from, for example, the decision outputs from any or all of the audio code detector **312**, the audio signature processor **316**, the audio gain level processor **320**, the quiet time detector **332**, the audio source detector **336**, the visible light rhythm processor **412** and/or the display activity detector **416**. A second weighted majority vote corresponding to the physical operation of the monitored information presenting device could be computed from, for example, the decision outputs from any or all of the horizontal sync audio processor **324**, the fan noise detector **332**, the EM field detector **512**, the current detector

516, the temperature detector **520**, the remote control activity detector **524** and/or the people meter activity detector **528**. Then, the first and second weighted majority votes could be combined to generate an overall majority vote to determine whether the monitored information presenting device is turned ON or OFF.

**[0134]** FIG. **29** is a block diagram of an example computer **2900** capable of implementing the apparatus and methods disclosed herein. The computer **2900** can be, for example, a server, a personal computer, a personal digital assistant (PDA), an Internet appliance, a DVD player, a CD player, a digital video recorder, a personal video recorder, a set top box, or any other type of computing device.

**[0135]** The system **2900** of the instant example includes a processor **2912** such as a general purpose programmable processor. The processor **2912** includes a local memory **2914**, and executes coded instructions **2916** present in the local memory **2914** and/or in another memory device. The processor **2912** may execute, among other things, the machine readable instructions represented in FIGS. **13** through **28** and/or implement any or all of the processors **612**, **712**, **812**, **912**, **1012**, **1112**, **1212**, **1262** and/or **1292**. The processor **2912** may be any type of processing unit, such as one or more microprocessor from the Intel® Centrino® family of microprocessors, the Intel® Pentium® family of microprocessors, the Intel® Itanium® family of microprocessors, and/or the Intel XScale° family of processors. Of course, other processors from other families are also appropriate.

**[0136]** The processor **2912** is in communication with a main memory including a volatile memory **2918** and a non-volatile memory **2920** via a bus **2922**. The volatile memory **2918** may be implemented by Static Random Access Memory (SRAM), Synchronous Dynamic Random Access Memory (SDRAM), Dynamic Random Access Memory (DRAM), RAMBUS Dynamic Random Access Memory (RDRAM) and/or any other type of random access memory device. The non-volatile memory **2920** may be implemented by flash memory and/or any other desired type of memory device. Access to the main memory **2918**, **2920** is typically controlled by a memory controller (not shown) in a conventional manner.

**[0137]** The computer **2900** also includes a conventional interface circuit **2924**. The interface circuit **2924** may be implemented by any type of well known interface standard, such as an Ethernet interface, a universal serial bus (USB), and/or a third generation input/output (3GIO) interface.

**[0138]** One or more input devices **2926** are connected to the interface circuit **2924**. The input device(s) **2926** permit a user to enter data and commands into the processor **2912**. The input device(s) can be implemented by, for example, a keyboard, a mouse, a touchscreen, a track-pad, a trackball, an isopoint and/or a voice recognition system.

**[0139]** One or more output devices **2928** are also connected to the interface circuit **2924**. The output devices **2928** can be implemented, for example, by display devices (e.g., a liquid crystal display, a cathode ray tube display (CRT)), by a printer and/or by speakers. The interface circuit **2924**, thus, typically includes a graphics driver card.

**[0140]** The interface circuit **2924** also includes a communication device such as a modem or network interface card to facilitate exchange of data with external computers via a network (e.g., an Ethernet connection, a digital subscriber line (DSL), a telephone line, coaxial cable, a cellular telephone system, etc.).

**[0141]** The computer **2900** also includes one or more mass storage devices **2930** for storing software and data. Examples of such mass storage devices **2930** include floppy disk drives, hard drive disks, compact disk drives and digital versatile disk (DVD) drives. The mass storage device **2930** may be used, for example, store any or all of the machine readable instructions **1300**, **1400**, **1500**, **1600**, **1700**, **1800**, **1900**, **2000**, **2100**, **2200**, **2300**, **2400**, **2500**, **2600**, **2700** and/or **2800**. Additionally, the volatile memory **1518** may be used, for example, to store any or all of the audio decision metrics **246**, the video decision metrics **248** and/or the emission decision metrics **250**.

**[0142]** At least some of the above described example methods and/or apparatus are implemented by one or more software and/or firmware programs running on a computer processor. However, dedicated hardware implementations including, but not limited to, application specific integrated circuits (ASICs), programmable logic arrays (PLAs) and other hardware devices can likewise be constructed to implement some or all of the example methods and/or apparatus described herein, either in whole or in part. Furthermore, alternative software implementations including, but not limited to, distributed processing or component/object distributed processing, parallel processing, or virtual machine processing can also be constructed to implement the example methods and/or apparatus described herein.

**[0143]** It should also be noted that the example software and/or firmware implementations described herein are optionally stored on a tangible storage medium, such as: a magnetic medium (e.g., a magnetic disk or tape); a magneto-optical or optical medium such as an optical disk; or a solid state medium such as a memory card or other package that houses one or more read-only (non-volatile) memories, random access memories, or other re-writable (volatile) memories; or a signal containing computer instructions. A digital file attached to e-mail or other information archive or set of archives is considered a distribution medium equivalent to a tangible storage medium. Accordingly, the example software and/or firmware described herein can be stored on a tangible storage medium or distribution medium such as those described above or successor storage media.

**[0144]** Additionally, although this patent discloses example systems including software or firmware executed on hardware, it should be noted that such systems are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these hardware and software components could be embodied exclusively in hardware, exclusively in software, exclusively in firmware or in some combination of hardware, firmware and/or software. Accordingly, while the above specification described example systems, methods and articles of manufacture, persons of ordinary skill in the art will readily appreciate that the examples are not the only way to implement such systems, methods and articles of manufacture. Therefore, although certain example methods, apparatus and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. On the contrary, this patent covers all methods, apparatus and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

**1**. A method to determine whether a presentation device is ON or OFF, the method comprising:

determining an audio signature based on an audio signal corresponding to an output of the presentation device;

comparing the audio signature to a set of reference signatures corresponding to a set of known media content; and

determining a result indicating whether the presentation device is ON or OFF based on whether the audio signature matches any of the set of reference signatures.

**2**. A method as defined in claim **1** wherein the result indicates that the presentation device is ON when the audio signature matches any reference signature in the set of reference signatures.

**3**. A method as defined in claim **2** wherein the result indicates that the presentation device is OFF when the audio signature does not match any of the set of reference signatures.

**4**. A method as defined in claim **1** wherein the result is a first result, and the method further comprises:

determining a second result indicating whether the presentation device is ON or OFF based on whether the audio signature is characterized as hissy; and

combining the first result and the second result to determine an overall result indicating whether the presentation device is ON or OFF.

**5**. A method as defined in claim **4** wherein the second result indicates that the presentation device is OFF when the audio signature is characterized as hissy, and further comprising:

determining a running average of peak energy values of the audio signal; and

characterizing the audio signature as hissy when a particular peak energy value associated with the audio signature is within a region containing the running average.

**6**. A method as defined in claim **1** wherein the result is a first result, and the method further comprises:

determining a second result indicating whether the presentation device is ON or OFF based on whether an audio gain level used to adjust the audio signal prior to determining the audio signature exceeds a threshold; and

combining the first result and the second result to determine an overall result indicating whether the presentation device is ON or OFF.

**7**. A method as defined in claim **1** wherein the second result indicates that the presentation device is ON when the audio gain level does not exceed the threshold, and the second result indicates that the presentation device is OFF when the audio gain level exceeds the threshold.

**8**. A tangible article of manufacture storing machine readable instructions which, when executed, cause a machine to:

determine an audio signature based on an audio signal corresponding to an output of a presentation device;

compare the audio signature to a set of reference signatures corresponding to a set of known media content; and

determine a result indicating whether the presentation device is ON or OFF based on whether the audio signature matches any of the set of reference signatures.

**9**. A tangible article of manufacture as defined in claim **8** wherein the result indicates that the presentation device is ON when the audio signature matches any reference signature in the set of reference signatures.

**10**. A tangible article of manufacture as defined in claim **10** wherein the result indicates that the presentation device is OFF when the audio signature does not match any of the set of reference signatures.

**11**. A tangible article of manufacture as defined in claim **8** wherein the result is a first result, and the machine readable instructions, when executed, further cause the machine to:

determine a second result indicating whether the presentation device is ON or OFF based on whether the audio signature is characterized as hissy; and

combine the first result and the second result to determine an overall result indicating whether the presentation device is ON or OFF.

**12**. A tangible article of manufacture as defined in claim **11** wherein the second result indicates that the presentation device is OFF when the audio signature is characterized as hissy, and the machine readable instructions, when executed, further cause the machine to:

determine a running average of peak energy values of the audio signal; and

characterize the audio signature as hissy when a particular peak energy value associated with the audio signature is within a region containing the running average.

**13**. A tangible article of manufacture as defined in claim **8** wherein the result is a first result, and the machine readable instructions, when executed, further cause the machine to:

determine a second result indicating whether the presentation device is ON or OFF based on whether an audio gain level used to adjust the audio signal prior to determining the audio signature exceeds a threshold; and

combine the first result and the second result to determine an overall result indicating whether the presentation device is ON or OFF.

**14**. A tangible article of manufacture as defined in claim **13** wherein the second result indicates that the presentation device is ON when the audio gain level does not exceed the threshold, and the second result indicates that the presentation device is OFF when the audio gain level exceeds the threshold.

**15**. An apparatus comprising:

a sensor to detect an audio signal corresponding to an output of a presentation device; and

a processor to:

determine an audio signature based on the audio signal detected by the audio sensor;

compare the audio signature to a set of reference signatures corresponding to a set of known media content; and

determine a result indicating whether the presentation device is ON or OFF based on whether the audio signature matches any of the set of reference signatures.

**16**. An apparatus as defined in claim **15** wherein the result indicates that the presentation device is ON when the audio signature matches any reference signature in the set of reference signatures, and the result indicates that the presentation device is OFF when the audio signature does not match any of the set of reference signatures.

**17**. An apparatus as defined in claim **15** wherein the result is a first result, and the processor is to:

determine a second result indicating whether the presentation device is ON or OFF based on whether the audio signature is characterized as hissy; and

combine the first result and the second result to determine an overall result indicating whether the presentation device is ON or OFF.

**18**. An apparatus as defined in claim **17** wherein the second result indicates that the presentation device is OFF when the audio signature is characterized as hissy, and the processor is to:

determine a running average of peak energy values of the audio signal; and

characterize the audio signature as hissy when a particular peak energy value associated with the audio signature is within a region containing the running average.

**19**. An apparatus as defined in claim **15** wherein the result is a first result, and the processor is to:

determine a second result indicating whether the presentation device is ON or OFF based on whether an audio gain level used to adjust the audio signal prior to determining the audio signature exceeds a threshold; and

combine the first result and the second result to determine an overall result indicating whether the presentation device is ON or OFF.

**20**. An apparatus as defined in claim **19** wherein the second result indicates that the presentation device is ON when the audio gain level does not exceed the threshold, and the second result indicates that the presentation device is OFF when the audio gain level exceeds the threshold.

* * * * *

US 20100066822A1

(19) United States
(12) Patent Application Publication
Steinberg et al.

(10) Pub. No.: US 2010/0066822 A1
(43) Pub. Date: Mar. 18, 2010

(54) CLASSIFICATION AND ORGANIZATION OF CONSUMER DIGITAL IMAGES USING WORKFLOW, AND FACE DETECTION AND RECOGNITION

(75) Inventors: **Eran Steinberg**, San Francisco, CA (US); **Peter Corcoran**, Galway (IE); **Petronel Bigioi**, Galway (IE); **Mihai Ciuc**, Bucuresti (RO); **Stefanita Ciurel**, Bucuresti (RO); **Constantin Vertran**, Bucuresti (RO)

Correspondence Address:
**Tessera/FotoNation**
**Patent Legal Dept.**
**3025 Orchard Parkway**
**San Jose, CA 95134 (US)**

(73) Assignee: **FotoNation Ireland Limited**, Galway (IE)

(21) Appl. No.: **12/554,258**

(22) Filed: **Sep. 4, 2009**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 10/764,335, filed on Jan. 22, 2004, now Pat. No. 7,587,068.

**Publication Classification**

(51) **Int. Cl.**
***H04N 7/18*** (2006.01)
***G06K 9/00*** (2006.01)

(52) **U.S. Cl.** ..... **348/77**; 382/118; 382/224; 348/E07.085

(57) **ABSTRACT**

A processor-based system operating according to digitally-embedded programming instructions performs a method including identifying a group of pixels corresponding to a face region within digital image data acquired by an image acquisition device. A set of face analysis parameter values is extacted from said face region, including a faceprint associated with the face region. First and second reference faceprints are determined for a person using reference images captured respectively in predetermined face-portrait conditions and using ambient conditions. The faceprints are analyzed to determine a baseline faceprint and a range of variability from the baseline associated with the person. Results of the analyzing are stored and used in subsequent recognition of the person in a subsequent image acquired under ambient conditions.




1000
1010
User Interface Modules
Ident & Rel Module
Admin Module
1020
Query Module
1030
Browser Module
1040
Msg. Module
1050
Slide Show Module
1060
Publisher Module
1070
Face Tools Module
1080
Workflow Core Modules
1110
1100
Image Classification Engine
Image Det. Module
1120
Face Det. Module
1130
Face Norm. Module
1190
Face Recog. Module
1140
Database Module
1150
Image Classification Database
1160
Personal Image Collection
1170
External Image Sources
1180

FIG. 1(a)


User Interface Modules
1200
Ident & Rel Module
1210
Admin Module
1220
Query Module
1230
Browser Module
1240
Msg. Module
1250
SlideShow Module
1260
Publisher Module
1270
Face Tools
1280
Workflow Core Modules
1410
Image Class. Engine
1400
Image Det. Module
1420
Face Norm. Module
1430
Face Recog. Module
1440
Database Module
1450
Image Classification Database
1460
Personal Image Collection
1470
In-Camera/User/Interface/Modules
1310
Ident Module
Relsh. Module
1320
Msg. Module
1330
Admin Module
1340
Query Module
1350
Micro Class dB.
1360
Embedded Workflow Module
1370
Face Det. Module
1380
Face Recog. Module
1390
Image Acquisition Process
1325
Captured Images (Incl. Metadata)
1315
Image Capture Device
1300

FIG. 1(b)



1500
In-Camera User Interface Modules
1510
1520
Ident & Relship Module
Admin Module
Query Module
Brwsr Module
Msg. Module
SlideShow Module
Publisher Module
Face Tools Module
1530
1540
1550
1560
1570
1580
1610
In-Camera Workflow Module
Image Capture Device
1600
Image Classf. Engine
1620
Image Det. Module
Face Det. Module
Face Norm. Module
Face Recog. Module
DB Module
1630
1690
1640
1650
1660
Image Classf. dB
1710
1712
1714
1716
In Camera Image Storage
1670
1680
In-Camera Image Acquisition Process
1720
Wireless Network (Internet)
1730
1745
1750
Off-Camera Data Storage
Backup Image Classf. dB
Personal Image Collection
1740


FIG. 1(c)


2200
People Data
2300
Face Recognition Data
2310
Face Class 01 Table
Faceprint 01
Faceprint 02
Faceprint 03
Faceprint nn
2330
2320
ID Table 1
Face Class 01
Face Class 02
Face Class nn
2340
App. Table
Identity 01
Identity 02
Identity nn
2210
ID List
Jane
Paul
Sara
Susan
Uncle Joe
John
Michelle Doe
Aunt Edna
Cousin Fred
2220
Personal Data
Nickname
Full Name
Relationships
Memberships
Other
2230
Relationship List
Brother to Jane
Uncle to Paul, Susan and Sara
Husband to Aunt Edna
Friend of Michelle Doe
Cousin of Fred
2240
Membership List
Member of Jones Family
Member of Exid. Smith Family
Member of Michelle Doe's Friends
Member of Poker Night Group
2100
Image Data
2110
Image List
Image 01
Image 02
Image 03
Image 04
Image 05
Image 06
Image 07
Image 08
Image 09
2130
Image Data
Location
Date/Time Info
E&O Link 01
E&O Link 02
Location Link 01
Location Link 02
Category Link 01
Category Link 02
2120
Events & Occasions List
John's Wedding
Sara's Christening
Mike's Graduation
Thanksgiving 2002
Singalong with Uncle Joe
2140
Locations & Places List
The Beach House
Tahoe in Winter
Tahoe in Summer
The Tahoe Queen Ship
2150
Categories List
Beach Fun
On the Slopes
Fun on Boats
Fun with baby Sara

FIG. 2(a)



Face Recognition Data
Appearance Table (Joe)
Identity "01"
Identity "02"
Identity "nn"
Identity Table 01
Face Class "01.01"
Face Class "01.02"
Face Class "01.03"
Identity Table 02
Face Class "02.01"
Face Class "02.02"
Identity Table nn
Face Class "nn.01"
Face Class Table 01.01
FacePrint "01.01.01"
FacePrint "01.01.02"
FacePrint "01.01.03"
FacePrint "01.01.nn"
Face Class Table 01.02
FacePrint "01.02.01"
FacePrint "01.02.02"
FacePrint "01.02.nn"
Face Class Table 02.01
FacePrint "02.01.01"
FacePrint "02.01.02"
FacePrint "02.01.nn"
2300
2312
2314
2316
2322
2324
2326
2340
2342
2344
2346


FIG. 2(b)

Face Detection Workflow (Detection Module)




FIG. 3

Core System Workflow (Workflow Module I)




FIG. 4(a)


Core System Workflow (Workflow Module II)
Same FP class?
No
Same Identity?
4230
Yes
4350
Yes
Add Faceprint to Face Class
Add Faceprint to closest Face Class for this Identity
4260
4240
4390
4270
Link Image to Known Person Data
From Fig 4(a)
Add Faceprint to most frequent Face Class for this Identity
4280
Crosslink Person to Image Data
4290
Print Msg. to Message Module
Back to Fig 4(a)
4300
Last Faceprint?
No
Get next Faceprint in the Search List
Yes
4310
Load Manual Recognition List
4210
4320
Get next Face on Manual List
4330
Prompt User for Face Identity
4340
User Responds?
4350
Yes
No
4355
If Faceprint is valid create a new face class and add to Identity; Crosslink Image and Identity data; Pring Msg. to message module
Add Face Region to "Un-identified" List
4360
Update Database
4370
Last Entry?
No
4380
Yes
Return to Main Workflow Idle

FIG. 4(b)


Face Normalization Module (Mode A)
5010
Wait for Face Region from Main Workflow (Idle State)
5022
PreFilter?
Yes
Apply Face Feature Location Filter
5020
No
Mark Face Features (Eye, Nose & Mouth)
Determine Face Orientation & Pose
5030
5024
Semi-Frontal Face?
Yes
Apply 2-D Transforms to generate Frontal Face Region
5045
5040
No
Half-Profile Face?
Yes
Estimate Stretch Factor
5052
5050
No
Map Face Region to 3-D Normalized Face Model
5054
Pass Error Message to Main Workflow Module and return to Idle
Rotate Frontal Position
5056
5080
Map to 2D Frontal Face Region
5058
Apply 2D Transforms for Illumination and Scale
5060
Pass Normalized Frontal Face Region to Workflow Module and return to Idle
5070

FIG. 5(a)


Face Normalization Module (Mode B)
5110
Wait for Face Region from Main Workflow (Idle State)
5122
PreFilter?
Yes
Apply Face Feature Location Filter
5120
No
Mark Face Features (Eye, Nose & Mouth)
Determine Face Orientation & Pose
5124
5130
Semi-Frontal Face?
Yes
Map onto 3D Face Model and Generate Multi-View Faceprints
5140
No
5145
Apply Normalization Filters for Scaling & Orientation
5150
Pass Normalized Rotated Face Region to Workflow Module with Pose Rotation Data; return to Idle
5160

FIG. 5(b)



FIG. 6(a)



FIG. 6(b)



FIG. 6(c)



FIG. 6(d)



FIG. 6(e)



FIG. 7(a)



FIG. 7(b)



FIG. 7(c)



FIG. 7(d)



FIG. 7(e)



FIG. 7(f)




FIG. 8(a)


$FP_1 = a_{11}\lambda_1 + a_{12}\lambda_2 + a_{13}\lambda_3 + \ldots + a_{1n}\lambda_n$
$FP_2 = a_{21}\lambda_1 + a_{22}\lambda_2 + a_{23}\lambda_3 + \ldots + a_{2n}\lambda_n$
$\lambda_n$
$\lambda_2$
$FP_1 = a_{11}\lambda_1 + a_{12}\lambda_2 + a_{13}\lambda_3 + \ldots + a_{1n}\lambda_n$
$FP_2 = a_{21}\lambda_1 + a_{22}\lambda_2 + a_{23}\lambda_3 + \ldots + a_{2n}\lambda_n$
$FP_m = a_{m1}\lambda_1 + a_{m2}\lambda_2 + a_{m3}\lambda_3 + \ldots + a_{mn}\lambda_n$
$\lambda_1$
$FP_3 = a_{31}\lambda_1 + a_{32}\lambda_2 + a_{33}\lambda_3 + \ldots + a_{3n}\lambda_n$

FIG. 8(b)


C:\Eran\Work In Progress\
File Edit View Favorites Tools Help
Nikon Browser work drive:work:70th:mom_odowd_70th:
People Placer
Search
New
Search for People
Jennifer
Look in:
Local Harddrives (C:;D:)
Search Subfolders
Search Now
Stop Search
Search Options <<
Date
in the last
months
in the last
days
between
1/ 8/2003
and
2/ 7/2003
Type
Local Harddrives (C:;D:)
1.jpg
10.jpg
2.jpg
3.jpg
4.jpg
5.jpg
6.jpg
7.jpg
8.jpg
9 object(s)
My Computer

FIG. 8(c)


9010
9000
9020
FC1
ID1
9022
FC3
FC2
9024
9026
9030

FIG. 9(a)


λ1
9100
ID1
9110
FC1
9120
9150
FC1
9160
FC3
FC2
FC2
9140
ID2
9130
FC3
9170
λ2
9180
λn

FIG. 9(b)




FIG. 10(a)




FIG. 10(b)




FIG. 11(a)




FIG. 11(b)


11210
ID3A
FC1
FC4
FC2
ID3B
FC3
11220
11230
FC1
FC2
11240
ID2A
ID2B

FIG. 11(c)




FIG. 12(a)




FIG. 12(b)




FIG. 12(c)


13020
13030
$\lambda_1$
$D_{recog}$
13052
13054
13056
13058
13050
13040
$ID_1$
13042
$ID_2$
13010
$\lambda_n$
$\lambda_2$
13060
13070
$\lambda_n$

FIG. 13(a)




FIG. 13(b)


13210
λ1
Drecog
13220
13234
13236
13232
13238
13242
13230
13244
ID1
13246
13240
ID2
λ2
λn

FIG. 13(c)




FIG. 13(d)




FIG. 13(e)

FIG. 14(a)


Nikon Browser work drive:
Shooting Data
DCR-TRV725E
2003/01/04 23:50:00
Image Size: 640 x 480
Focal Length: 8.3mm
Exposure Mode: Programmed Auto
Metering Mode:
1/50 sec - f/1.8
Exposure Comp.: 0 EV
White Balance:
Folders
Folders
Match Found?
Please Select an Option
OR
Select the Icon
for another face in
the picture
Darina (85%)
Cath (30%)
Sarah (25%)
Joan (22%)
Lucy (20%)
Moya (20%)
Tanya (15%)
Ann (12%)
Select this Match
Match to Another Face
Create New Face
O images
O images selected


Nikon Browser work drive:
Shooting Data
DCR-TRV725E
2003/01/04 23:50:00
Image Size: 640 x 480
Focal Length: 8.3mm
Exposure Mode: Programmed Auto
Metering Mode:
1/50 sec - f/1.8
Exposure Comp.: 0 EV
White Balance:
Folders
Folders
Multiple Faces
Detected.
Please use the
icon and select
one face
DSC00001.JPG
DSC00003.JPG
DSC00004.JPG
DSC00005.JPG
DSC00008.JPG
DSC00009.JPG
DSC00010.JPG
DSC00012.JPG
DSC00016.JPG
DSC00017.JPG
DSC00020.JPG
DSC00021.JPG
0 images
0 images selected

FIG. 14(b)



Nikon Browser work drive:
Shooting Data
DCR-TRV725E
2003/01/04 23:50:00
Image Size: 640 x 480
Focal Length: 8.3mm
Exposure Mode: Programmed Auto
Metering Mode:
1/50 sec - f/1.8
Exposure Comp.: 0 EV
White Balance:
Folders
Folders
Single Face Detected...
Performing Search...
DSC00001.JPG
DSC00003.JPG
DSC00004.JPG
DSC00005.JPG
DSC00008.JPG
DSC00009.JPG
DSC00010.JPG
DSC00012.JPG
DSC00016.JPG
DSC00017.JPG
DSC00020.JPG
DSC00021.JPG
0 images
0 images selected


FIG. 14(c)


Nikon Browser work drive:
Shooting Data
DCR-TRV725E
2003/01/04 23:50:00
Image Size: 640 x 480
Focal Length: 8.3mm
Exposure Mode: Programmed Auto
Metering Mode:
1/50 sec - f/1.8
Exposure Comp.: 0 EV
White Balance:
Folders
Folders
Match Found?
Please Select an Option
OR
Select the ▶ Icon
for another face in
the picture
Darina (85%)
Cath (30%)
Sarah (25%)
Joan (22%)
Lucy (20%)
Moya (20%)
Tanya (15%)
Ann (12%)
Select this Match
Match to Another Face
Create New Face
0 images
0 images selected

FIG. 14(d)




FIG. 15(a)




FIG. 15(b)



FIG. 15(c)




FIG. 15(d)




FIG. 15(e)

# CLASSIFICATION AND ORGANIZATION OF CONSUMER DIGITAL IMAGES USING WORKFLOW, AND FACE DETECTION AND RECOGNITION

## CROSS-REFERENCE TO RELATED APPLICATIONS

**[0001]** This application is a continuation in part (CIP) of U.S. patent application Ser. No. 10/764,335, filed Jan. 22, 2004, which is one of a series of contemporaneously-filed patent applications including U.S. Ser. No. 10/764,339, now U.S. Pat. No. 7,551,755, entitled, "Classification and Organization of Consumer Digital Images using Workflow, and Face Detection and Recognition"; U.S. Ser. No. 10/764,336, now U.S. Pat. No. 7,558,408, entitled, "A Classification System for Consumer Digital Images using Workflow and User Interface Modules, and Face Detection and Recognition"; U.S. Ser. No. 10/764,335, entitled, "A Classification Database for Consumer Digital Images"; U.S. Ser. No. 10/764,274, now U.S. Pat. No. 7,555,148, entitled, "A Classification System for Consumer Digital Images using Workflow, Face Detection, Normalization, and Face Recognition"; and U.S. Ser. No. 10/763,801, now U.S. Pat. No. 7,564,994, entitled, "A Classification System for Consumer Digital Images using Automatic Workflow and Face Detection and Recognition".

## BACKGROUND

**[0002]** 1. Field of the Invention

**[0003]** The invention relates to digital image processing, particularly to the field of automatic or semiautomatic grouping and classification of images in a database or image collection and based on the occurrence of faces in the images and the identification and classification of such faces.

**[0004]** 2. Description of the Related Art

**[0005]** The techniques of face detection and face recognition are each being explored by those skilled and a great many advancement have been made in those respective fields in recent years. Face detection has to do with the problem of locating regions within a digital image or video sequence which have a high probability of representing a human face. Face recognition involves the analysis of such a "face region" and its comparison with a database of known faces to determine if the unknown "face region" is sufficiently similar to any of the known faces to represent a high probability match. The related field of tracking involves face or identity recognition between different frames in a temporal sequence of frames. A useful review of face detection is provided by Yang et al., in IEEE Transactions on Pattern Analysis and Machine Intelligence, Vol. 24, No. 1, pages 34-58, January 2002. A review of face recognition techniques is given in Zhang et al., Proceedings of the IEEE, Vol. 85, No. 9, pages 1423-1435, September 1997.

**[0006]** Other related art refers to the grouping, classification, management, presentation and access to collections of digital images in databases, file-systems or other storage mechanisms, being based on image content, global image parameters, or image metadata. Such content based approaches analyze the image content using spatial color distribution, texture, shape, object location and geometry, etc. However they do not explicitly teach to utilize face recognition in conjunction with these techniques, or to initially detect faces in their images, prior to applying a recognition process. It is recognized in the present invention that an advantageous system that provides automation in the detection, recognition and classification processing of digital images would be highly desirable.

**[0007]** None of the prior art references that are cited throughout the description below provides this feature. Many of the classification techniques described are applied to entire images and they do not teach to detect faces in an image, or to perform recognition of such faces. Many of these references concentrate on methods storing or accessing images using databases, but they do not employ in conjunction with these methods the advantageous image processing techniques described by inventors of the present invention.

**[0008]** Some of the medical applications provide classification and archiving of images into particular groups that are associated with a single customer. For example, the customer may be a patient and the classification may be particularly related to medical diagnosis or treatment applications where a large amount of image data (X-rays, Ultrasound scans, etc) which is related to a single patient may be gathered. However, these do not utilize face recognition as a means to compile or manage this image data, i.e., a user is expected to categorize the image according to the associated patient.

**[0009]** Further references available in the literature of the related art describe multi-format transcoding applications for visual data. Others describe means for constructing digital photo albums. These references do not, however, teach to use image processing techniques in the management or access of the data.

**[0010]** At this point we note that the present invention is presented primarily in the context of collections of consumer digital images which would be generated by a typical user of a digital camera. Such an image collection is in a constant state of growth as new sets of images are added every time the user off-loads pictures from the camera onto his computer. Because the image set is in a constant state of flux, it is often not practical to perform database-wide sorting, grouping or management operations every time a few images are added to the collection, because this would put an excessive load on the users computer. Much of the related art literature describes how to function with and operate on a large static image collection. Thus when a sizeable batch of new images is added, as will often happen when a camera is offloaded, these related art teaching do not describe how to perform significant image processing and database-wide testing to determine similarities between new and existing database images and then group and store the new images before the user can access and enjoy his pictures. In reality the application of image processing techniques, or of other image-related tools is understood by the inventors in the present invention as being an ongoing process for collections of consumer images and for the design of these tools, where possible, to operate as automated or semi-automated background processes for applications in consumer imaging.

**[0011]** There is a very compelling need for new and improved tools to manage collections of images. More particularly, there is a need for tools, which can manage and organize image collections which are in a constant state of change and growth. It is also important that these tools can manage and organize such ad-hoc collections using methods, which are easily understandable by the layman and, where possible that such tools can function in semi- or fully-auto-

matic modes so that their work of cataloging and organizing is almost imperceptible to the end-user.

## BRIEF DESCRIPTION OF THE DRAWINGS

**[0012]** FIGS. **1**(*a*)-**1**(*c*) shows an overview of the principle components of the invention;

**[0013]** FIG. **1**(*a*) is an outline of the main system components implemented as a computer program.

**[0014]** FIG. **1**(*b*) shows an alternative embodiment in which certain aspects of the system of the preferred embodiment, including the face detection and recognition modules, are implemented within an image capture appliance such as a digital camera, while the remaining aspects are implemented as a computer program on a desktop computer.

**[0015]** FIG. **1**(*c*) shows an embodiment wherein the system is entirely implemented within a digital camera.

**[0016]** FIG. **2**(*a*) describes an embodiment of a main system database.

**[0017]** FIG. **2**(*b*) gives additional detail of the face recognition data component of the database.

**[0018]** FIG. **3** describes a main face detection workflow in accordance with a preferred embodiment.

**[0019]** FIGS. **4**(*a*)-**4**(*b*) describe a core system workflow in accordance with a preferred embodiment.

**[0020]** FIGS. **5**(*a*)-**5**(*b*) shows a face normalization workflow in accordance with a preferred embodiment.

**[0021]** FIGS. **6**(*a*)-**6**(*e*) illustrate shows some of the different ways that a face candidate region, obtained from the detection module, can be distorted; these distortions should be corrected by the normalization module:

**[0022]** FIG. **6**(*a*) shows a frontal candidate region which is incorrectly oriented and must be rotated into an upright position prior to applying the face recognition module;

**[0023]** FIG. **6**(*b*) is a frontal candidate region which is of a reduced size and must be enlarged prior to applying the recognition module;

**[0024]** FIG. **6**(*c*) is a correct frontal face candidate region which does not require either orientation or size correction;

**[0025]** FIGS. **6**(*d*) and **6**(*e*) illustrate two non-frontal face candidate regions which require pose normalization in addition to size and orientation normalization.

**[0026]** FIGS. **7**(*a*)-**7**(*f*) illustrate how a 3-D model can be applied to model a range of face candidate regions:

**[0027]** FIGS. **7**(*a*)-**7**(*c*) illustrate how a simple 1-D scaling of a normalized face model can be used to model the majority of face candidate regions with good accuracy;

**[0028]** FIGS. **7**(*d*)-**7**(*f*) illustrate how a 2-D face candidate region can be mapped onto such a 3-D normalized face model with 1-D scaling along the horizontal axis.

**[0029]** FIGS. **8**(*a*)-**8**(*b*) illustrate how three face regions (FR**1**, FR**2** and FR**3**) may be mapped to faceprints (FP**1**, FP**2**, and FP**3**) in a 3-component face space.

**[0030]** FIG. **8**(*c*) illustrates multiple face regions extracted from digital images that have subtle pose, orientational, illumination and/or size distortions to be adjusted automatically upon detection in a normalization process in accordance with a preferred embodiment prior to automatic or semi-automatic face recognition processing:

**[0031]** FIG. **9**(*a*) shows a graphical representation of how multiple, distinct, face classes, formed from collections of closely collocated faceprints can be used to define a unique region in face space which is associated with a particular person's identity.

**[0032]** FIG. **9**(*b*) illustrates two such identity spaces with their associated face classes and faceprints.

**[0033]** FIG. **10**(*a*) illustrates how a new faceprint creates a new face class for a person's identity when it is located at a distance further than a certain $R_{min}$ from an existing face class.

**[0034]** FIG. **10**(*b*) illustrates how a new faceprint extends or grows an existing face class when it is within a distance $R_{min}$ from the existing face class.

**[0035]** FIG. **11**(*a*) illustrates how an identity region associated with one person can grow to overlap with the identity region of another person.

**[0036]** FIG. **11**(*b*) describes how these overlapping identity regions can be separated from each other by shrinking the two identity regions into their component face classes.

**[0037]** FIG. **11**(*c*) illustrates a face class shrinking operation in accordance with a preferred embodiment.

**[0038]** FIG. **12**(*a*) shows a face class which has grown over time to incorporate a relatively large number of faceprints which exhibit localized clustering.

**[0039]** FIG. **12**(*b*) illustrates explicitly how these faceprints are clustered.

**[0040]** FIG. **12**(*c*) shows how each local cluster can be replaced by a single clustered face class which is composed of a centre faceprint location in face space and a cluster radius, $R_n$.

**[0041]** FIG. **13**(*a*) describes the recognition process where a newly detected faceprint lies in an region of face space between two "known" identity regions.

**[0042]** FIG. **13**(*b*) shows how, once the recognition process has associated the new faceprint with one of the two known identity regions, $ID_1$, that identity region then grown to include the new faceprint as a new face class within $ID_1$.

**[0043]** FIG. **13**(*c*) shows a similar situation to FIG. **13**(*a*) but in this case it is not clear which of the two identity regions should be associated with the new faceprint and the system must ask the user to make this determination.

**[0044]** FIG. **13**(*d*) illustrates the case where the user chooses $ID_1$.

**[0045]** FIG. **13**(*e*) illustrates the case where the user chooses $ID_2$.

**[0046]** FIGS. **14**(*a*)-**14**(*d*) show a variety of aspects of the user interface to the main workflow module.

**[0047]** FIG. **15**(*a*) illustrates a faceprint associated with an acquired facial image:

**[0048]** FIGS. **15**(*b*) and **15**(*c*) illustrates how a VAR vector can be used to align higher order components of flash and non-flash feature vectors, or faceprints.

**[0049]** FIG. **15**(*d*) illustrates a combined, illumination-normalized feature vector for slab and non-flash faceprints.

**[0050]** FIG. **15**(*e*) illustrates a local baseline faceprint determined from a flash image and a radius of variability determined from the image in ambient illumination.

## INCORPORATION BY REFERENCE

**[0051]** What follows is a cite list of references each of which is, in addition to that which is described as background, the invention summary, the abstract, the brief description of the drawings and the drawings themselves, hereby incorporated by reference into the detailed description of the preferred embodiments below, as disclosing alternative embodiments of elements or features of the preferred embodiments not otherwise set forth in detail below. A single one or a combination of two or more of these references may be con-

sulted to obtain a variation of the preferred embodiments described in the detailed description herein:

[0052] U.S. Pat. Nos. RE33682, RE31370, 4,047,187, 4,317,991, 4,367.027, 4,638,364, 5,291,234, 5,488,429, 5,638,136, 5,710.833, 5,724,456, 5,781,650, 5,812,193, 5,818,975, 5,835,616, 5,852,823, 5,870,138, 5,911,139, 5,978,519, 5,991,456, 6,072,904, 6,097,470, 6,101,271, 6,128,397, 6,148,092, 6,188,777, 6,192,149, 6,249,315, 6,263,113, 6,268,939, 6,282,317, 6,301,370, 6,332,033, 6,349,373, 6,351,556, 6,393,148, 6,404,900, 6,407,777, 6,421,468, 6,438,264, 6,456,732, 6,459,436, 6,473,199, 6,501,857, 6,502,107, 6,504,942, 6,504,951, 6,516,154, 6,526,161, 6,564,225, and 6,567,983;

[0053] United States published patent applications no. 2003/0084065, 2003/0059121, 2003/0059107, 2003/0052991, 2003/0048950, 2003/0025812, 2002/0172419, 2002/0168108, 2002/0114535, 2002/0105662, and 2001/0031142;

[0054] Japanese patent application no. JP5260360A2;

[0055] British patent application no. GB0031423.7; and

[0056] Yang et al., IEEE Transactions on Pattern Analysis and Machine Intelligence, Vol. 24, no. 1, pp 34-58 (January 2002).

Illustrative Definitions

[0057] "Face Detection" involves the art of isolating and detecting faces in an image; Face Detection includes a process of determining whether a human face is present in an input image, and may include or is preferably used in combination with determining a position and/or other features, properties, parameters or values of parameters of the face within the input image;

[0058] "Face Recognition" involves the art of matching an unknown facial region from an image with a set of "known" facial regions.

[0059] "Image-enhancement" or "image correction" involves the art of modifying a digital image to improve its quality. Such modifications may be "global" applied to the entire image, or "selective" when applied differently to different portions of the image. Some main categories non-exhaustively include:

[0060] (i) Contrast Normalization and Image Sharpening.

[0061] (ii) Image Crop, Zoom and Rotate.

[0062] (iii) Image Color Adjustment and Tone Scaling.

[0063] (iv) Exposure Adjustment and Digital Fill Flash applied to a Digital Image.

[0064] (v) Brightness Adjustment with Color Space Matching; and Auto-Gamma determination with Image Enhancement.

[0065] (vi) Input/Output device characterizations to determine Automatic/Batch Image Enhancements.

[0066] (vii) In-Camera Image Enhancement

[0067] (viii) Face Based Image Enhancement.

[0068] "Auto-focusing" involves the ability to automatically detect and bring a photographed object into the focus field.

[0069] A "pixel" is a picture element or a basic unit of the composition of an image or any of the small discrete elements that together constitute an image.

[0070] "Digitally-Acquired Image" includes an image that is digitally located and held in a detector.

[0071] "Digitally-Captured Image" includes an image that is digitally recorded in a permanent file and/or preserved in a more or less permanent digital form.

[0072] "Digitally-Detected Image": an image comprising digitally detected electromagnetic waves.

[0073] A "face region" is a region of a main image which has been determined to contain a human face. In particular, it may contain a substantially oval, skin-colored region which has physical features corresponding to eyes, nose and mouth, or some portion of a face or subset of these facial features.

[0074] A face region is preferably "normalized" in accordance with the invention. Prior to extracting face classifier parameters (see definition below) from a face region, it is preferably first transformed into a normalized form. This may involve any or all of three principle steps: (i) resizing to a standard "size", e.g., based on the separation of eyes, nose and/or mouth; (ii) "orientation" in an upright or other selected direction which may involve rotation of the face region; and (iii) orientation to compensate for up/down or left/right variations in the "pose" of the face. Note that these normalizations may usually performed in reverse order in accordance with a preferred embodiment: first pose normalization is implemented, followed by orientation normalization and finally the face region is normalized for size. A fourth form of normalization that may be preferably performed is luminance normalization (see below definition), but it is treated or characterized separately from the above, which are referred to as spatial normalizations.

[0075] "Face classifier parameters" are a set of values of vector and/or scalar classifiers extracted from a normalized face region. Typical examples of such a set of classifiers could be: (i) principle component vectors, (ii) independent component vectors, (iii) 2D fourier transform components, (iv) wavelet transform components, (v) gabor components, etc. Note that several face classifier techniques may be combined to provide a definitive faceprint.

[0076] The set of face classifier parameters associated with a particular face region is known as the "faceprint" of that face region. The faceprint is preferably a set of face classifier parameters and may be subdivided into two or more subsets of face classifier parameters which may overlap.

[0077] An "archived faceprint" is a set of face classifier parameters associated with a particular fate region ultimately extracted from a parent image and preferably normalized, and stored in the main recognition database, preferably along with links to the parent image and the face region.

[0078] A "known identity" is a set of (database) associations between a known person or other object and one or more face classes comprising one or more archived faceprints.

[0079] The following process is referred to as "luminance normalization". It is common for horizontal and/or vertical variations in luminance levels to occur across a face region due to the ambient lighting at the time an image was captured or other factors such as artificial sources or flashes. In this case. certain types of face classifiers may be distorted and it may be advantageous to normalize luminance levels across the face region prior to extracting face classifier parameters in accordance with a preferred embodiment. As typical variations are linear in form and as the variations manifest themselves principally in skin-colored pixels, it is relatively straightforward to adjust each image pixel of a face region to approximately compensate for such luminance variations caused by ambient lighting.

[0080] When two or more faceprints lie within a certain geometric distance of each other in facespace, they may be preferably grouped into a single face class. If a newly determined faceprint lies within this geometric distance of the face

class, then this face class may be expanded to include the new faceprint, or may be added to the face class without expansion if the all of its face classifier values lie within the existing face class parameter value ranges. This existing face class is referred to as a "prior face class". If the newly determined faceprint is not sufficiently close to any prior face class then a new face class may be created for it.

**[0081]** "Image category data" is referred to as a set of user-defined categories for describing a user's personal or other collection of images. Some pre-defined categories may also be provided in the workflow and/or database modules of the software. Much of the data may, however, be user-defined in order to allow each user to chose image descriptors which are most useful and relevant to their own personal image collection. Examples of image category data include: Beach Fun, Ski Slopes, Mountain Fun (holiday categories); Garden Views, Vegetable Season 2002, My Flowers 2003 (for a gardener); Kids Birthdays 2003, The New Baby, Summer Camps, High School Graduations (for a family), and so on. Note that much of this data may be recorded manually, although face recognition data can preferably also assist in linking certain known identities with certain image categories.

**[0082]** "Image data" is data which helps describe and/or categorize a particular parent image. Examples include time & location when an image was captured (these may be automatically generated and recorded by some cameras); associations between the image and defined "events" or "occasions" such as weddings, graduations, christenings, etc; associations between the image and defined "places" or "locations" such as a holiday resort, a city, a relative's house or a country; associations between an image and a set of user-defined categories relating, for example, to a specialized hobby, a family member, a particular family or holiday activity, or however else a user wishes to define & categorize their personal images.

**[0083]** "Identity data" is data relating to an individual person (or an identifiable object or pet) which can include personal data such as nickname, name, home address, phone number, etc. It may also encompass data relating to interpersonal or family relationships or memberships of social or relationship based groups of persons or objects. Each person (or object) may have a key "identifier" which may be stored in an "ID List" and links to additional identity data associated with the person or object, including, e.g., recognition data.

**[0084]** "Face recognition data is the data by which known persons (or objects, pets or other identities) are linked, e.g., to an appearance table which may contain one or more appearances associated with that person (or object, identity, etc.). Each appearance may be linked to a list of face classes each of which may contain one or more faceprints.

**[0085]** "Added value services tools" are software modules which can provide additional value to an image collection, such as by leveraging the face-related data stored in the system database. As an example, one tool might allow an end-user to search all images containing members of the Jones family and determine what overlap exists with members of the Smith family ("face search tool"). This could then allow the user to determine what members, if any, of the Jones family should be invited to a social event such as a 21st birthday party for one of the daughters of the Smith family ("relationship tool"); additional tools could then prepare invitation cards with collages ("collage tool") of the family members and print these invitations ("print manager tool").

**[0086]** A "unique identifier" may include a filename of an originally-acquired image which contains one or more face regions.

**[0087]** An "identification listing" is referred to as a list of names of people who have been identified by an image classification engine. If a new face is detected, but cannot or is not associated with any known identity, then a new identity is preferably created in the identification listing. This list may link to additional personal data records relating to known identity and also to face recognition data associated with the known identity and a list of images, if any, which contain the person or other identity.

**[0088]** An "image list" is a list of images which have been processed by the image classification engine, and preferably includes links to the locations of the originals of images on an external storage subsystem. In an alternative embodiment, the original binary image data may be maintained within the system database. In a further alternative embodiment, the original image data may be maintained by a remote Web service and the list of original image may include a list of URLs to link to the original binary data of each image. In all of these embodiments, it may be desirable that changes in the storage location of a particular image should be notified to the workflow module of the preferred embodiment which can incorporate such modification into the system database.

**[0089]** "Metadata" may be typically character/ASCII data which is stored in a header region within an image file. For the industry standard Jpeg format, e.g., metadata is stored in EXIF format which includes a series of data tags each of which delimits an ASCII text region. Typical data to be stored as metadata may include data pertaining to the conditions of image acquisition, data pertaining to the manufacturer and model of camera or image acquisition apparatus, data pertaining to the focal length, aperature and/or f-stop settings of an electronic camera lens, data pertaining to the size of original image, the quality of Jpeg compression, the mode of camera flash settings, if used, white and color balance settings (if available), and so on. Note that manufacturers may define custom tags and that binary data may be stored in metadata fields—although it is not common—provided that certain encoding precautions are taken. In the context of the preferred embodiment, metadata refers to any data stored within the original image file other than the raw binary data of the original image itself.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

**[0090]** A system, method and techniques are now described for applying digital image processing using face detection and face recognition techniques to identify the persons contained within a digital image, which may be part of a personal or other image collection. An exemplary database structure is also described, for sorting, grouping, accessing, browsing and/or managing images based on the identities of the persons found within an image.

**[0091]** Additionally, workflow techniques are described which (i) simplify the initial training of the face recognition module when it is initialized for a new collection of images; (ii) allow the user to select between a number of alternative persons when the face recognition module is uncertain of the identity of a particular face located by the face detector module; (iii) allow the user to enter details of a new face which should be added to the list of known persons; and/or (iv) allow

the user to construct database queries based on the persons identified within their personal database.

Overview

**[0092]** In a preferred embodiment, a collection of images is typically stored on a personal computer, although alternatively it may also be stored on a local database server, or on a remote server which is accessed over a network, or as part of an offline storage such as CDs, DVD or an embedded device, or otherwise. The preferred embodiment involves a computer program with a number of linked components which altogether create the workflow module. An image detection module determines when new images are added to the image collection and alerts the main workflow module which then activates a face detection module which scans the image to determine if faces are present. If faces are found, then they are preferably normalized and face prints are generated. Then, the images and face prints, together with the locations of the detected facial-regions and other face classifier parameter data, are made available for the face recognition module to extract, enhance and scan the facial regions and compares their faceprints with a database of "known faceprints". In general, each of the internal modules can be implemented in an automated, user assisted or fully manual mode. In addition, each of the modules may shift over time form a mostly manual to mostly automated operation. This is achieved as part of a "training" capability of the system.

**[0093]** In an alternative embodiment the face detection module may be implemented entirely within an image capture device and the locations of detected faces may be marked as metadata tags within the saved image. When the image is later transferred to a computer on which the main workflow module is active, the presence and locations of faces in an image may be detected and the remainder of the recognition and classification process may proceed as described below.

**[0094]** In a further embodiment both the face detection and face recognition modules are implemented in the image capture device and the faceprints derived from faces detected in an image are recorded in the image metadata for later processing by the main workflow module. In this embodiment, a compressed version of the main faceprint database is also implemented within the image capture device. This micro-classification database is derived from the main database using a grouping algorithm which reduces the number of faceprints (and. where appropriate, face classes) associated with a particular identity. This is achieved using a clustering algorithm which will be described in the detailed description of this embodiment. The micro-classification database can be loaded into the camera flash memory, or alternatively may be created and maintained on removable storage such as a compact-flash card. In a variation of this embodiment a reduced functionality version of the main workflow module is implemented in the image capture device and this allows interaction between the face detection and recognition modules and the user-interface (UI) software modules of said imaging device. In all cases the face recognition process may be augmented by additional processing steps when images are transferred to a computer on which the main workflow module is active. This can be used to do focusing, metering and/or framing on particular people in a group. In addition, a face in an image may be matched to one or more sub-groups or to all known faces in the database. Alternatively, a model of a single face or subset may be matched against the image.

**[0095]** In one embodiments, the image capture device may access the main classification database over a network connection. In another embodiment, the entire system, including the classification database, can be implemented within an image capture device such as a digital camera or scanner.

**[0096]** The face recognition process is a particular aspect which differs from conventional face recognition means. A detailed description is given in the main embodiment section, so an overview is merely provided here. When a faceprint is returned to the main workflow module from the face recognition module the "N" most probable matches are determined by searching the face recognition data tables in the image classification database and if the majority of these matches have the same "identity", and the workflow module is running in "automatic mode", then a successful "automatic match" is considered to have taken place. If, however, there are several equally probable identity matches, or the workflow module is running in "manual" or "learning" mode, then the face recognition module passes these images onto the workflow module which then presents these possible matches to the user and requests that they select a matching "person" for this facial image.

**[0097]** The user may select one of the "known persons" or may create a new "person" with an associated set of "profile" data in the image classification database. This database includes an appearance list for each of the "known persons" containing one or more identities and a table of face classes associated with each such identity. Multiple identities can be associated with each person because people typically change their appearance in daily life. Examples of such instances of varying appearance may be handling people with/without make-up; with/without beard or moustache or with different hair styles; with/without sunburn or tan; with/without glasses, hats, etc; and at different ages. In addition, there may be a chronological description where the faces progress over time which may manifest in changes in hairstyle, hair color or lack thereof, skin smoothness, etc. Within each face class is preferably grouped a set of similar faceprints which are associated with that face class for that person. The database module may also access additional information on individual images, including image metadata, camera metadata, global image parameters, color histogram or correlogram information, etc., which may assist in categorization and search of images. If the user selects a "known identity", then if this new faceprint is sufficiently close to one of the face classes for that identity, it will be preferably added to that face class. Otherwise, in "manual" or "learning" mode the user may be shown a typical image representative of each face class and asked which face class the faceprint should be added to, or if they wish to create a new face class for that person. In "auto" mode, a new face class will be created by the workflow module for that identity.

**[0098]** If the user chooses to create a new identity because the detected face is a new friend, family member or acquaintance, then they may enter a nickname (or "handle") to identify that person. Other additional data may be entered such as the person's full name, phone number, address, birthday, association with other "identities" in the database (e.g. a member of the Sullivan Family; a friend of Pat; Uncle Bill, etc . . . ) and so on.

**[0099]** Thus, each faceprint in the database module is preferably associated with a single identity, while each identity is associated with one or more face classes containing one or more faceprints. Now as a person's image collection grows the number of faceprints associated with each identity in the

database will increase in proportion. The number of face classes associated with each identity will generally increase more slowly as it is unlikely that a person will have more than 5-10 distinct face classes associated with them. This, in turn, will facilitate and improve the accuracy of the recognition process so that after a time most faces will be identified automatically. However, when the number of faceprints associated with an identity increases beyond a certain threshold the recognition process will become significantly slower. To tackle this problem, the faceprints within a particular face class may be "clustered" or "averaged" into a smaller and more definitive set of faceprints when their number increases beyond a certain threshold. This process may be automated and serve to improve the response time of the face recognition module as the size of the faceprint database grows. This feature represents an improvement on existing recognition techniques as it allows for incremental improvement of the recognition process without requiring a complete re-training, and thus a change in the fundamental basis vectors used to describe the faceprints.

**[0100]** A person or other being such as a pet, or an inanimate object such as a home or automobile, may have more than a single identity which accommodates the occasional radical changes in appearance which can occur with people or other identities from time to time in a person's life. In general herein, the example of a person will be used, but the descriptions are meant to apply to other animate and inanimate identities that may be the subject of a collection of pictures such as pets, automobiles, rooms in a house, etc. Consider, for example, the case of a new baby who within a couple of years becomes a toddler, later a child and an adolescent; or to take some more radical examples, consider an adult male who decides to grow a moustache, or beard, or a young woman who frequently wears make-up on social occasions. Many other factors can affect a person's appearance in ways which will confuse a conventional face recognition system such as wearing glasses or hats, having sunburn, etc. By permitting a plurality of identity groupings for a single person, the system of the preferred embodiment provides a means to overcome such disadvantages which are inherent in the prior art.

**[0101]** In an alternative embodiment where the face recognition process occurs within the capture device, the image may already contain one or more face locations and faceprints. This information may be embedded in the image itself with other metadata provided by the capture device. In this case, the face detection operation may be skipped entirely and the face recognition module might not extract faceprints from the image, as is usually preferred. Thus the workflow module can immediately begin to search for matches in the database of "known" faceprints. The faceprints will typically depend on the database that was used to perform the matching, and thus on a latest training set. In some cases, is the main database is retrained after prints are copied to the device, e.g., in the case of Fisher faces, then the prints on the device will not generally be used to match to the main database, i.e., the prints may only be valid until the next re-training.

**[0102]** This describes how the information contained in the faceprint database may be gathered over time. However the user of the system may be more concerned with how he or she may access and use this information to add value to an image collection and to facilitate the organization and management of the collection. Thus, in addition to program modules, the system preferably includes a set of image manipulation tools. These include a query module which assists the end user build up database queries based on "identity" and "relationship" searches on the faceprint database. These queries may be combined with more conventional queries derived from additional image information stored in the database that may include, but is not limited to, image metadata, camera metadata, global image parameters, image color histogram, color correlogram, etc. Thus the user might search for "all Summer Holiday 2002 pictures of members of the Sullivan family at the Beach". The query module will find all such pictures and present these to the user in the browser module. Additional tools which can be incorporated include a slideshow module which assists the user in preparing slideshow animations from the retrieved images; an image enhancement module which implements many of the techniques described in our face tools application(s) to enhance the retrieved pictures and a publisher module which facilitates the generation of Xmas and birthday cards, party invitations, and other fun stuff.

**[0103]** The database may also include some relational description between individual users. The relationship or proximity between people may be defined via a family tree, friends graph, chronological relationship, geographical location, GPS information, and occurrence of multiple faces in a single image.

**[0104]** The following table provides such relations in a textual form. One familiar in the art of creating a database can understand the relation of a database from such information.

| Proximity Parameter | Example |
|---|---|
| Family Tree | Joe is Jane and John's Father |
| Friends | John is friendly with Jim<br>John is a friend of Jim and Jack<br>but John and Jack are not friends |
| Chronological | Jane and Josephine were Jarret's friend in 2005<br>Jackie met Jillian in the summer of 1944 |
| Geographical Location | Joanne and Jake live in Mexico City<br>Jennifer travels a lot |
| GPS Data | Joseph's pictures were taken in Nepal |
| Ultiple faces in an image | Jack and Jill have been together in 5 pictures<br>Jacob was never in the same picture as Jaqueline |

**[0105]** This metadata can be important for classifying a face based on statistical probability. In particular, Bayesian statistics may be implemented for such calculations based on a-priori knowledge. As a simple example, if Image 1000 is of Jim with good probability, and the next image is of Jim and another person, which could be either John or Jack, based on the a-priori knowledge of the relationship (John is friendly with Jim and but John and Jack are not friends) one can statistically conclude that it is of higher probability that the second person is Jim and not Jack. Of course, more sophisticated decisions can be conducted based on the relationships defined above.

**[0106]** On a higher level of database cross correlation, several databases may be shared, combined or used to train a collection of images. For example if Joe creates a database and Jim his father just installs the face detection software, Jim may use Joes database of the family to jump start the training process.

**[0107]** A particular advantage is achieved in that the system may allow consumers to organize and archive their personal image collections based on the people present in each image. This can facilitate access to a personal image collection and greatly enhance the value of the images contained therein.

[0108] A further advantage is that the workflow solution can be a combination of fully manual, user assisted or fully automated. A further related advantage is that the system can tend toward perfecting itself and move towards a more automated solution as the training progresses.

[0109] An additional advantage is that the system provides a workflow solution to allow users to transparently train the program to recognize faces. A further advantage in this regard is that a user does not require a large pre-selected database of facial images to perform the initial training of the recognition engine. Instead this training can occur over a period of time and the proportion of fully-automatic detections may be increased as the number of faceprints in the main database grows.

[0110] An associated advantage is that the system does not require re-training of the fundamental basis vectors set used to describe "faceprints" and thus the face recognition data which is stored in the main system database can be shared with other users. A further advantage is that the system provides a means for the user to search their image collection(s) using queries which include the identity of an individual or a group of people. A further advantage of the invention is that it provides tools to allow face-based enhancement of individual images.

[0111] In addition, the system of the preferred embodiment includes tools which add significant value to a personal image collection by facilitating the creation of "identity-based" slideshows, Xmas and birthday cards, party and dinner invitations, etc. Yet a further advantage is that the face recognition database may be shared among related users to simplify the training detection and archival process.

## Overall Workflow

[0112] FIGS. **1**(*a*)-**1**(*b*) schematically illustrate an overall workflow of the face classification system in accordance with a preferred embodiment. In particular, FIG. **1**(*a*) describes an external computer application, and FIG. **1**(*b*) describes a system, wherein certain functions are implemented on the image acquisition device. In yet a third embodiment, the system is entirely or substantially resident on the image acquisition device.

[0113] The system, as illustrated at FIGS. **1**(*a*)-**1**(*b*), is separated into two major subcomponents: (i) an image classification engine [**1100**] and (ii) a series of user interface modules [**1000**]. The interworking of these two system components is controlled by the core workflow module [**1110**]. The user interface modules allow interaction with a user of the system and are mostly designed to provide the user with improved tools to access and derive added-value from their image collection.

[0114] Examples of such user-interface modules include, but are not limited to, (i) an Identity & Relationship Browser module [**1010**] which allows a user to browse known persons based on their relationships and memberships of social groupings. This module links such persons and groups to image groupings from the users image collection which include the person being browsed, or members of a group of persons with a particular relationship to that person; (ii) a Query module [**1030**] which allows a user to construct more complex search criteria for their image collection (e.g. find all pictures which include "John" and "Jane" and are "Social Events" involving the "Brady Family"); (iii) an Image Browser module [**1040**] which allows a user to browse each image in their collection and view, and alter, the various information relating to that image including the relationship (s) between an image and different persons, social groups, events and other activities which are known to the system; (iv) a Slideshow [**1060**] module which provides a user with tools to link and combine image sequences featuring a selected person or social group for viewing as a slideshow, or transmitting the slideshow by e-mail, or storing the links in the system database for future use; (v) a Publisher [**1070**] module which allows a user to prepare added-value printed items such as cards, parry invitations, collages of pictures, etc, which are based on pictures from the users personal image collection featuring selected persons and/or social groups; and (vi) a Face Tools [**1080**] module which allows a user to enhance and improve images based on the detection and location of faces in the images.

[0115] Additional user-interface modules are provided to allow a user to access and control other system functionality: an Administration module [**1020**] to allow system configuration and settings to be changed according to user preferences; a Message module [**1050**] records a log of system messages and is useful to debug or investigate the historical behaviour of the system.

[0116] The Image Classification Engine [**1100**] is the second major system component. This comprises a set of image analysis modules which perform the functions required to determine the identity of a person in a consumer digital image.

[0117] The first of these modules is an Image Detection module [**1120**] alerts the system that at least one new image has been obtained from some external image source; in the context of a desktop PC this could, for example, occur when a compact flash card or CD-ROM is inserted into a removable drive bay of the computer. Those skilled in the art will realize that there are various means, both hardware and software based, to implement such an image detection module. One well-known example is the means by which the Windows OS detects when a new CD is inserted into the CD-ROM drive of a PC and presents the user with a dialog box to select how images on said CD-ROM disc should be managed by the OS. We cite this as one possible implementation of such an image Detection Module.

[0118] Once at least one new image is detected it is preferably then analyzed by the Face Detection module [**1130**]. This module employs a means to determine if facial candidate regions are present in the new image. Although faces are utilized as specifically emphasized in images of persons and perhaps even pets, other regions may be used such as distinguishing features of automobiles of a collection, or feet of persons who are patients of a podiatrist, and so on. Detailed descriptions of face detection techniques and applications and advantages are set forth further below.

[0119] If no such face regions are determined to be present, then the image is marked as a "non-face" image, the relevant entries are made in the system database, and it is added to the users personal image collection. A user may be optionally provided an opportunity to manually mark face regions within the image. Depending on the system settings, the user may be offered an opportunity to manually include other additional information on the image such as the image category, location, or the event or activity it should be associated with. Once the image is stored and its database entry is completed, then control passes back to the Image Detection module which waits for the next image.

**[0120]** If however the image does contain face-candidate regions then further handling of the image is passed to the Workflow Core module [**1110**]. This module begins by refining the initial face detection process and extracting the facial candidate regions from the image using the Face Detection module [**1130**]. These are then passed to the Face Normalization module [**1190**] which analyzes the lighting, pose, facial features and/or orientation of each face candidate region. Following this analysis, which may involve referencing the entire original image in certain cases, the Face Normalization module [**1190**] performs certain transformations, shape & texture analysis and filtering on each candidate region and then passes the normalized region back to the Workflow Core module [**1110**]. This normalized face candidate region will now become the input to the Face Recognition module [**1140**].

**[0121]** We note that in some cases where extreme variations in lighting conditions, or in the pose or spatial orientation of a candidate face occur, or when a relatively small set of training images are currently available to support the face recognition process that conventional image transformation and filtering techniques may provide an inferior means of image normalization. Thus, in an advantageous alternative embodiment, the face candidate region can be mapped onto a 3D face model which preserves the shape and texture of the original 2D image and allows non-linear lighting and pose compensation to be performed more accurately. Following such compensation, the corrected 3D facial model is projected onto a new, frontal and lighting normalized 2D facial image.

**[0122]** The next component of the Image Classification Engine [**1100**] is the Face Recognition module [**1140**]. Before describing this module in more detail, however, it is useful to provide a generalized introduction to face recognition techniques and thus to describe the concept of a Faceprint as used herein.

**[0123]** After a face candidate region is detected and normalized, we will have a nice "frontal" mugshot of a person, such as the image labeled 10.jpg in FIG. **8**(*c*). This is referred to as a "face region" or a "confirmed face region". Now, the mugshot proceeds to be further processed. There are quite a few ways of doing this, and the preferred method involves doing a 2D transform which is analogous to doing a Fourier Transform from the spatial to frequency domains. In the case of the preferred embodiment, we actually go from the spatial domain (mugshot) to a "face-space" (FS) domain. The most significant components of that "face-space" form the basis vectors which we use to describe and compare the normalized mugshots. The magnitudes of each of these most significant "face-space" (FS) components describe a vector location in FS. Typically, about 20 components (dimensions) are involved to get the most useful results. However, the diagramatic representations are limited to 3 dimensions (or components) for clarity and ease of illustration. FIGS. **8**(*a*)-**8**(*b*) illustrate how three face regions (FR**1**, FR**2** and FR**3**) may be mapped to faceprints (FP**1**, FP**2**, and FP**3**) in a 3-component face space.

**[0124]** In practice, the normalized face regions may or may not be stored as mugshots. Instead, the original image may be stored along with the locations, in that original image, of any detected face regions. Then, data may be stored to allow the normalized face region (mugshot) to be recreated from the original image as desired. The faceprint may be stored for each face region. The faceprints that are what may be advantageously used in accordance with a preferred embodiment to achieve actual recognition of people or objects or other identities.

**[0125]** In some embodiments, the full set of components might not be used of a stored faceprint to compare face regions. It may sometimes be advantageous to have a multi-stage recognition process which uses a combination of several different techniques to extract different face-transform components. For example, there may be three distinct sets of components derived from three different types of face transforms. Examples include principle component analysis (PCA), linear discriminant analysis (LDA), independent component analysis (ICA), and Gabor transforms, among others as may be understood by those skilled in the art upon reviewing the present description. These can be used to perform three distinct sets of recognition tests, or can be partially combined. In a preferred embodiment, we have found that using two distinct types of faceprint data (PCA and LDA, e.g.) in a two stage process confers significant improvement over using either of them separately.

**[0126]** The role of the Face Recognition module [**1140**] is to generate a feature vector, or Faceprint, for a face candidate region identified in an image. This is returned to the Workflow Core module [**1110**] where the generated Faceprint is compared with existing identity regions and face classes. This is achieved by accessing the Image Classification Database [**1160**] via a Database Interface Module [**1150**]. If the Faceprint can be clearly associated with a single identity region then the face is considered to be positively identified and the Image Classification Database [**1160**] is updated accordingly. If there is no clear association with a known identity region the user is prompted to manually provide recognition data on the face candidate region and may be presented with a list of "closest" choices. If necessary the user may also create a new identity region and data profile for this Faceprint. The Workflow Core module [**1110**] then updates the Image Classification Database [**1160**] accordingly. This process will be described in greater detail below. Finally the image completes its analysis by the Image Classification Engine and is added to the Personal Image Collection [**1170**] of the user.

**[0127]** FIG. **1**(*b*) illustrates an alternative embodiment of the invention in which certain components of the system are directly incorporated into an image acquisition appliance, typically a digital camera. In this embodiment certain aspects of the Face Detection, Face Recognition and Core Workflow process are implemented in the camera and the information about the image that is determined from these processes may be incorporated in individual images as Image Metadata (e.g. as custom EXIF tags in a JPEG image). Those skilled in the art will recognize that there are many permutations of the User Interface Modules [**1200**] and the In-Camera User Interface Modules [**1310**] which can be implemented and which may be appropriate for different applications and purposes.

**[0128]** Similarly, the functionality of modules from the Image Classification Engine [**1400**] can be separated in various ways and implemented in part, or indeed in its entirety within the Image Capture Device [**1300**]. In the embodiment described here a compressed Micro Classification Database [**1360**] provides an initial dataset for the Face Recognition module [**1390**]. If the Image Capture Device [**1300**] is set to operate in "recognition mode" then the Image Acquisition Process [**1325**] will alert the Face Detection module [**1380**] when a new image is successfully acquired. If face candidate regions are present in this image the Face Detection module

[1380] will alert the Embedded Workflow module [1370] which may use the information derived from the face candidate regions to interact with the user of the Image Capture Device [1300] or may pass the extracted face candidate regions on to the Face Recognition module [1390] to obtain the relevant Faceprint. In this embodiment the Workflow module [1370] does not implement a detailed recognition process, but does store the locations of any candidate face regions and any derived Faceprint(s) in the Metadata of the image. The main recognition process is initiated when images are uploaded from the Image Capture Device [1300] to a user's Personal Image Collection [1470] and essentially follows the same steps described above except that in this embodiment (i) the Face Detection process has already been implemented in the camera and the location of face candidate regions is already available in the image Metadata and (ii) a preliminary Faceprint or even a Recognition Match for each face candidate region may also be available, depending on the quality of the detected candidate region(s). Note that in another embodiment the entire system functionality could be implemented in the Image Capture Device [1300] if sufficient processing power and data storage is available.

**[0129]** FIG. **1**(*c*) schematically illustrates the in-camera user interface (UI) modules **1500**, the workflow module **1610** and the image acquisition engine **1600** each implemented entirely within a digital camera or other image capture device. The in-camera UI modules **1500** shown include an identity and relationship module **1510**, an administration module **1520**, a query module **1530**, a browser module **1540**, a message module **1550**, a slide show module **1560**, a publisher module **1570**, and a face tools module **1580**.

**[0130]** The image classification engine **1600** includes an image detection module **1620**, a face detection module **1630**, a face normalization module **1690**, a face recognition module **1640** and a database module **1650**. Each of these modules of the image classification engine **1600** work in conjunction with the workflow module **1610** in automatic and/or semi-automatic processing of image data. The image detection module **1620** works in conjunction with the in-camera image acquisition process to alert the workflow module that an original image has been captured and initially processed into in-camera image storage **1670**. Information from the image classification database **1660** is preferably linked and/or stored with corresponding images, face prints, etc., via connection **1716**, into in camera image storage **1670**. These stored images are then preferably processed by the face detection module **1630**, face normalization module **1690**, when one or more faces are detected within the acquired images, and face recognition module **1640** which compares face classifier parameter values of the normalized face regions, or face prints, with archived face prints to discern whether there are matches with known identities. The database module **1650** communicates with an image classification database, e.g., for archiving and recalling face prints, images and related data in accordance with the processing of the workflow module **1610**.

**[0131]** The camera shown is configured for preferably wirelessly networking over a network **1720**, e.g., over the internet, to off-camera data storage **1750**. The wireless network preferably communicates data from the camera to the off-camera storage by a connection **1745** for adding data to a backup image classification database **1730** and/or a personal image collection **1740**. The images within the in-camera image storage **1670** and data contained within the image classification database **1660** may be communicated by links **1712** and **1710**, respectively, to off-camera storage **1750** or other electronic device via wireless network **1720** and/or hardwired or cable output connection. The bi-directional arrow **1745** indicates that the off-camera data storage **1750**, and particularly the personal image collection **1740**, can be added to via download via the network **1720**, ultimately from the in-camera storage **1670** and/or image classification data base **1660**. Arrows **1714** of FIG. **1**(*c*) indicate that the personal image collection **1740** within the off-camera storage **1750** correspond to data contained within the image classification database **1650**.

**[0132]** As indicated in the above description, it is preferred that a main image collection will still remain outside the camera on some form of Web/Network based storage. Alternatively, the camera may have sufficient storage for a user, although even as in-camera storage capabilities grow, users will still likely prefer to be able to get access to their images without needing the use of the camera, e.g., if the camera is in for servicing to remove dust and thus temporarily off-line, or being used by a friend, or put away while the user is on his/her computer for another reason.

**[0133]** Additionally, in the illustrated embodiment of FIG. **1**(*c*), the main image collection (**1740**) remains in this off-camera data storage (**1750**) with a backup of the main image classification database (**1730**) also maintained outside the camera as well as inside it. One advantage for keeping two copies of the database, i.e., one inside the camera and one outside, is that a user may want to use external tools on, say, a home PC to edit the collection without using the camera appliance. As indicated, synchronization between the main image collection (**1745**) and the internal images of the camera (**1712**) and the internal and external classification databases (**1710**) is preferably maintained (in this embodiment) over a wireless network/internet connection (**1720**).

**[0134]** There can be links from the internal camera database (**1660**) to both the pictures in the camera (**1716**) and to other images in the main external image collection (**1714**). It is also implicit in this embodiment that images may be moved both to and from the camera appliance, over the network link, based on the requirements of user tools (**1500**) which are all now implemented in the camera.

**[0135]** One particular advantage of implementing key elements of the workflow within a camera or portable imaging device is that account may be taken of local acquisition conditions. Each person may have multiple identities associated with him or her. Each identity may include one or more face classes. One example of the usefulness of such multiple identities is a customization of each identity to a particular set of local acquisition conditions. For example, images captured in full sun on the beach in Hawaii will differ significantly from those captured under flash at nighttime, or a similar set of beach photographs captured on a cloudy day on the beach in Ireland. It is advantageous to be able to match, in a simple way, local conditions with a subset of a person's associated face classes, or alternatively to be able to customize a generic identity derived from multiple overlapping face classes according to the local acquisition conditions.

**[0136]** In a further embodiment, such normalizations may be advantageously achieved using a handheld imaging device.

**[0137]** Many techniques for transforming face data into a feature vector may concentrate the widest variability of the training dataset into the first principle components (or basis

vectors) of the faceprint feature vector. Thus, in the exemplary case of an eigenfaces technique, practically all of the luminance variations are concentrated, depending on the dataset, into the first or first and second eigenface basis vectors. Accordingly, methods of normalizing, for illumination, a feature vector based on eigenfaces involve removing the first or first and second eigenfaces when forming the relevant faceprint vector.

**[0138]** Also, on a handheld imaging appliance, such as a digital camera, a convenient method to find a consistent and repeatable baseline level for illumination employs built-in image optimization capabilities of the camera. For example, if a face is located at a set distance of 2-3 m and an image is captured of that face, one can be confident with most state-of-art imaging devices that a uniform and consistent illumination of the face will be achieved regardless of the ambient illumination or whether the shot is an indoor or outdoor one. The acquisition of such an image may be referred to as a main image portrait acquisition or simply main image.

**[0139]** In certain embodiments, it is desirable to force the use of the camera flash in order to acquire a reference image. This will depend on the type of imaging device and the size of main imaging sensor. Many modern cameras, however, have sufficient light gathering capacity to be able to acquire an optimal portrait image indoors without use of flash.

**[0140]** By combining these two techniques, a very powerful determination is achieved of the local range of variability for a particular person's face classes. This range of variability is somewhat analogous to the embodiment involving "clustered face classes" associated with FIG. **12**(*c*), where multiple, overlapping face classes are replaced with a single face class with a wider range of variability.

**[0141]** Let us next explain the operation of this new normalization technique. Firstly an image of the person for whom we wish to determine a local face class is captured with the camera in flash mode, enabling it to compensate for any deficiency in the ambient illumination conditions. Then a second image is captured in non-flash mode, or at a lower resolution or with faster exposure settings. This second image provides a measure of the variability introduced by the ambient conditions.

**[0142]** In one embodiment, it is convenient to use a preview image stream of a digital camera. This preview stream is typically captured as a set of raw unprocessed images directly from the image sensor within the camera. It provides a good indication of the raw ambient image acquisition conditions. Further, as it may be captured at a lower resolution than the main image acquisition and at a fixed exposure and acquisition rate (typically 30-60 fps), no compensation for illumination conditions is typically performed on this preview stream. Thus it is an advantageous indicator of extreme ambient conditions when referenced against a main image portrait acquisition.

**[0143]** The camera then process both of these reference images, extracting face regions and processing them to generate a pair of faceprints for each face region. The faceprints associated with each acquired facial image are illustrated in FIG. **15**(*a*). A major variability is captured in the first basis vector, or principle component and can be determined by subtracting these, viz: FV_F(1)−FV_NF(1)=VAR. In FIGS. **15**(*b*) and **15**(*c*), the first component of the flash and non-flash feature vectors are removed, and it is illustrated how this VAR vector can be used to align the higher order components of the remaining flash and non-flash feature vectors (or faceprints). While the main variation between the two faceprints due to local illumination has been removed, there is still a significant variability between the flash and non-flash faceprints. Clearly, the wider the variation between baseline flash and ambient illumination, the greater this variability. Our technique of capturing two reference images enables us to make an accurate determination of this variability using faceprint analysis.

**[0144]** FIG. **15**(*d*) illustrates a combined, illumination-normalized, feature vectors for flash and non-flash faceprints. FIG. **15**(*e*) show how these feature vectors define a local baseline faceprint, determined from the flash image, and a radius of variability, determined from the image in ambient illumination.

**[0145]** Referring to FIG. **12**(*c*), it can seen how this technique provides a very useful means of determining a local "clustered face class" for the faceprint of a person, determined from local conditions using flash and non-flash reference images. This can be used to match local conditions with a subset of a person's identities from the main identity database, or alternatively and analogous to the "clustered face classes" of FIG. **12**(*c*), to customize a generic identity for the person derived from multiple overlapping face classes.

**[0146]** An optimally acquired image does not require the use of flash. The main acquisition system of a camera may be used to get a hi-res "camera-optimized" portrait image. Preview images may be used which are lower resolution, have a fixed frame rate (and so fixed acquisition time) and are not post processed by the camera. Regardless of whether flash is used for the main image or not, it provides an advantageous portrait image which can be used to determine median parameters of a person's faceprint. Preview images can be used to find extreme values for each faceprint in the ambient conditions that the camera is experiencing at that time.

**[0147]** This has several advantages. First, it is not necessary in this embodiment to gather and analyze dozens of different values to get a person's recognition profile. One can simply capture one main image and then one or more preview images, which can be captured just before or after the main image or at the same time. Second, this is a process that can be performed on a camera, is valid for a particular time and place and ambient condition. This information may also be passed back to a more sophisticated system on a desktop or Web system, e.g., for further processing. Ranges of recognition parameters may be advantageously obtained in local, ambient conditions from a pair of differently acquired (reference) face images in a camera.

Image Classification Database

**[0148]** FIG. **2**(*a*) illustrates a representative example of the data structure of the Image Classification Database [**1160**]. A list of links to each image in the Personal Image Collection is maintained in an Image List [**2110**]. The data associated with each image is separated into two principle subcomponents: (i) the actual Image Data [**2100**] which contains information about the nature of a particular image in a user's Personal Image Collection. Examples include base Image Data [**2130**] about the date, time or place (if a camera incorporates a GPS subsystem) at which a picture was taken; Events & Occasions associations [**2120**] which link an image with a list of social or personal occasions such as weddings, family gatherings, seasonal events, etc; Location associations [**2140**] such as the beach, a ski resort or a theme park; Category associations [**2150**] such as various family activities, work or holiday

related picture, hobbies, sports, etc. and (ii) a set of People Data [2200] which contains information about persons who are known to the user. Some of this information may be determined automatically by analysis of images, but much of it will require that the user at least confirm the information which is determined automatically and some information will need to be entered manually. The task of managing this user interaction and associating the recorded information with a particular image is achieved by the Core Workflow module [1110, 1410].

**[0149]** The set of People Data [2200] includes an ID List [2210] which links each person who is added to the list with a set of Personal Data [2220] and a set of Face Recognition Data [2300]. In the embodiment described here the Personal Data [2220] can also include a set of Relationship Data which is stored in a Relationship List [2230] and describes the relationship between this person and other persons who have entries in the database. It can also include a Group Membership List [2240] which contains information about social groups which the person belongs to, including family, extended family, workplace groupings or social activity groupings. Most of this information will need to be entered manually when a new Personal Profile is entered into the system database. The task of managing this user interaction and associating the recorded information with a particular Personal Profile is also achieved by the Core Workflow module [1110, 1410].

Face Recognition Data

**[0150]** FIG. 2(*b*) gives a more detailed description of how the Face Recognition Data [2300] is organized for a single person. An Appearance Table or List [2340] may be generated to contain a list of alternative "appearances" that a person may have. In turn, there is an Identity Space Table (not marked, but including identity table 01 [2322], identity table 02 [2324] and identity tables nn [2326] and however many additional identity tables that may be useful), associated with each "appearance" that a person may'have and including one or more Face Class Tables [2310]. Each Face Class Table [2310] includes, in turn, one or more Faceprints [2330]. The Faceprints are a set of co-ordinates in the known Face Space. The data stored in this set of database tables is directly associated with known Identity Regions, Face Class Regions and Faceprint Vectors in the Face Space and will be explained in more detail when the operation of the face recognition process is described in more detail with reference to FIGS. 9(*a*)-13(*e*).

Face Detection Workflow

**[0151]** FIG. 3 illustrates the Face Detection Workflow as implemented by the relevant modules in FIGS. 1(*a*)-1(*b*). The system sits in a wait state [3110] until the Image Detection Module [1120] informs the Face Detection module that an image is available for processing. If a Prefilter setting is active [3120] the module will initially apply the Prefilter Scan [3122] and recording location information on any potential face candidate regions [3124]. If no Prefilter is required the module moves directly to the Skin Pixel Locator [3120]. Once all relevant skin pixels have been marked they are preferably clustered to form larger, contiguous face candidate regions [3140]. If the module is operating in fully automatic mode [3160] then only complete face candidate regions are accepted and added to the Auto-Recognition List which is then passed to the Core Workflow Module [3162]. If, however, this module is operating in a "semi-automatic" or "learning" mode then additional, incomplete or partial face candidate regions are clustered [3170] and added to a Manual-Recognition List [3180]. In "learning" mode [3190]—this is required when the system has very little training data to allow it to differentiate between different faces—both the Auto-Recognition List and the Manual-Recognition List are merged into a single Training List [3192] which is then passed back to the Core Workflow Module [3194]; or if the system is operating in semi-automatic mode [3190] then a separate Auto-Recognition List and Manual-Recognition List are passed back to the Core Workflow Module [3200]. The module then returns to its normal standby or "wait" state until the next image is detected and loaded. It is noted that in a preferred embodiment, skin detection and clustering are separate from the learning mode feature, and there is preferably no training involved in the detection stage.

Core System Workflow

**[0152]** FIGS. 4(*a*)-4(*b*) illustrate the Core System Workflow and is split into two inter-related diagrams. In this embodiment, we assume that the system is implemented on a single computer as illustrated in FIG. 1(*a*). Some additional modifications would be involved if the system is split between an Image Capture Device and a Desktop PC as illustrated in FIG. 1(*b*).

**[0153]** This module sits in a wait state [4110] until a new image is detected by the Image Detection module [1120] whereupon the image is sent to the Face Detection module [4120]. After completing the detection process the Face Detection module returns its results and if no faces are found [4130] in an image, this module returns to its idle/wait state [4110]. When faces are found the module first tests to see if an Auto-Recognition List exists [4140] and if not it loads the Manual-Recognition List [4310] (or a Training List if the system is in training mode). Then each face candidate region on the Manual-Recognition List is loaded [4320] and the user is prompted to identify said face candidate region [4330]. If the user does not respond [4340] then after a timeout interval the face is added to an Unidentified Face Candidate list [4350]. If the user does respond [4340] then the identity associated with this face candidate region is recorded [4360] and the Face Recognition Database is updated [4370] with this new association between the assigned identity and the Faceprint of this face candidate region. Note that if the system is busy processing a set of images this task can be placed in a background queue. The process of associating an assigned identity with an extracted Faceprint will be described in more detail later. Finally, when the Manual Recognition List is exhausted [4380] the module returns to its idle state [4110] and waits for the next image to be detected.

**[0154]** Normally we expect the system to have an Auto-Recognition List [4140] and in this case the Core Workflow module enters a loop which gets the next face from the Auto-Recognition List [4150] and sends it to the Face Recognition module [4160] which should normally return a valid Faceprint [4170]. If, however, a valid Faceprint is not extracted then the image is probably obscured or incomplete and is added to the Manual Recognition List [4180] for later identification by the user. Normally, however, the Face Recognition module will return a valid Faceprint and this is then added to the Faceprint Search List [4190]. If the Auto Recognition List is not empty [4200] then there are still face candidates in

this list so we load the next of these [4150] and continue with the process of extracting Faceprints for each face candidate region. Otherwise, the Faceprint Search List is loaded [4210] and a search for the closest matching identity to the Faceprint extracted from each valid face candidate is initiated.

[0155] The search methodology employed in this embodiment is described in greater detail when we come to discuss the physical manifestations of our concepts such as Faceprints, Identity Regions and Face Classes in Face Space. For now, the description will be confined, for ease of illustration but not in a limiting sense, to how the database fields of the Face Recognition Data portion of the Image Classification Database are used to determine the most likely match to a particular Faceprint.

[0156] Firstly, a search of all the known Faceprints, or of a selected sub-set when working in semi-automatic mode, which have been recorded by the Image Classification Engine is made and the distance between the current Faceprint and each of these is calculated [4220]. This calculation can be based on one of a number of known multi-dimensional classifier metrics, depending on the means employed to derive the fundamental set of Face Space basis vectors. Typically the basis vectors will be determined using either Principle Component Analysis (PCA) or Independent Component Analysis (ICA) methods and thus we preferably employ either the Euler distance, the Mahalanobis distance and/or the Fisher faces approach for these calculations, although alternative distance metrics may be appropriate for alternative sets of basis vectors such as Fourier- or Wavelet-based basis vectors.

[0157] After this distance calculation, the search algorithm first determines if the N closest matches lie within the same Face Class. If so, then the current Faceprint can be unambiguously associated with that particular Face Class [4230]. The system may be configured such that if the distance between the target faceprint and the nearest face print is much less than to any other face print, then that may be determined also to unambiguously identity a person. In this sense, the sensitivity of the matching may be set to any of a wide range of possible values. The current Faceprint is then added to that Face Class table [4240]. If it cannot be associated with a single Face Class, either because there are not sufficient Faceprints within that class, or because the N closest matches are spread across two or more Face Classes, then the algorithm next determines if the N closest matches belong to the same Identity Grouping [4250], and if this is the case, an unambiguous match can still be achieved. The current Faceprint can next be added to the closest Face Class within that Identity Grouping and that Face Class is expanded to encompass the current Faceprint [4260]. Finally, if the current Faceprint cannot be unambiguously associated with a single Face Class, or a single Identity Grouping, it is still possible that the same "known person" may be associated with the N closest matches [4390]. If this is the same person then the new Faceprint can be unambiguously associated with that person [4395]. If, after each of these steps, an unambiguous match with a "known person" is not achieved, then the face candidate region associated with the current Faceprint is added to the manual recognition list [4398] and the user will be asked to complete the recognition process, or discard the face candidate region completely.

[0158] Note that as the number of Faceprints in the Image Classification Database grows the number, N, of required closest matches will be increased from time to time in order to improve the accuracy & reliability of the recognition process. We further note that the distance metric used to determine the N closest matches is also used to determine if the matches are too distant to constitute a reliable match with a particular Face Class, Identity Grouping or Known Person.

[0159] Once a match has been determined and the current Faceprint has been added to the Face Recognition Data for the "known person" who was matched, the system next creates a link from the Image Data to the database profile of that "known person" [4270]. A cross-link is also added to the profile of the matched "known person" which associates the image with that person [4280]. Finally a message detailing the successful match is sent to the Message Module [4290] which may store, forward, or display it, depending on the administrative settings of the system. If this is not the last face candidate region in the Search List then the system loads the next Faceprint [4210] and repeats the search & match process for it.

[0160] Once all of the face candidate regions on the Auto Recognition List have been processed the system must next consider any face candidate regions which are on the Manual Recognition List. It begins by loading the Manual Recognition List [4310] and loading the first face candidate region from that list [4320]. This face candidate region is next presented to the user of the system via a dialog box [4330]. This dialog box includes the current face candidate region and, if the associated Faceprint was processed by the auto-identification algorithm, a number of potential matching faces of "known persons" may also be explicitly displayed. In addition the user may be provided with a browsable list of all "known persons" to select from and an option to create a new "known person". If the user does not respond within a specified time interval [4340] then the system may automatically add this face candidate region and the associated Faceprint to an Unidentified List [4355]. This list of face candidate regions may be presented to the user the next time that user input is detected. This facilitates the unattended operation of the face recognition process if a large set of new images is added to the system.

[0161] Given that the user does identify the face candidate region, then the associated Faceprint is added to a new Identity Grouping for that person and a new Face Class is also created for the Faceprint [4350], or if the Faceprint is within a predetermined minimum distance of an existing Identity Grouping then that Identity Grouping is enlarged to encompass the Faceprint. This enlargement process for an Identity Grouping is described in greater detail below when physical manifestations are discussed such as having to do with Faceprints, Identity Regions and Face Classes in Face Space. Once a match has been determined and the current Faceprint has been added to the Face Recognition Data for the "known person" who was matched, the system next creates a link from the Image Data to the database profile of that "known person" [4350]. A cross-link is also added to the profile of the matched "known person" which associates the image with that person. A message detailing the successful match may be sent to the Message Module which may store, forward, or display it, depending on the administrative settings of the system. Finally, the System Database is updated [4360]. If there are more face candidate regions remaining on the Manual Recognition list then the next is loaded and the system will repeat this loop until the list is empty [4370]. Once this condition is satisfied it will return to the main workflow idle state [4110].

Image Normalization

[0162] After a list of face candidate regions within an image has been returned by the detection module, the main work-

flow will work to normalize these before they are passed on to the recognition module. The exact normalization procedure to be followed will depend, in part, on (i) the techniques employed in the recognition module to extract a faceprint; (ii) the one or more basis sets, in terms of which the faceprint will be described, and (iii) the physical characteristics of the face candidate region which is to be normalized.

**[0163]** As will be known to those skilled in the art, different face recognition techniques exhibit differing levels of sensitivity to different aspects and physical characteristics of a face candidate region. We cite, as an example, the well-known sensitivity of Eigenface, or PCA techniques to differences in illumination. It has been determined by those skilled in the art that much of this sensitivity is embodied in the three or four largest eigenface basis vectors. Thus, if the faceprint of a face region, described in terms of eigenface basis vectors, omits those particular basis vectors from the basis set, in terms of which the faceprint is described, then the recognition process will be insensitive to variations in illumination.

**[0164]** Implementing a normalization scheme to correct for illumination, in-plane rotation or scaling distortions of a face candidate region are relatively straightforward compared with pose distortions. Thus, the description that follows focuses on approaches to normalization techniques for pose distortion as this is more difficult to compensate for in a normalization scheme. It is worthwhile remarking that the system of the preferred embodiment provides a framework within which existing techniques may be combined to compliment and enhance each other and provide an improved workflow system for face detection, normalization of the resulting face candidate region, the generation of a recognition signature, or faceprint from the normalized face candidate region, and ultimately improved accuracy of recognition of the person associated with the face candidate region. Thus, the pose normalization described herein may be preferably combined with other normalization techniques as understood by those skilled in the art.

**[0165]** Regarding pose normalization, we note that there are two distinct approaches which are implemented in the preferred embodiment of our workflow system. These two approaches to normalization of the image also affect the subsequent face recognition process. Note that these two approaches are complimentary and both may be employed within the same preferred embodiment to enhance the overall accuracy of the workflow recognition process.

**[0166]** Our first implementation of the normalization module is described by FIG. **5**(*a*) and is referred to as normalization mode A. It is assumed that the facial candidate region to be normalized is rotated no more than 45 degrees to the left (or right) and no more than 30 degrees up (or down). The normalization module is activated from its idle state [**5010**] when it is passed such a facial candidate region from the main workflow module. Now in order to further process this facial candidate region it is necessary to determine the facial pose which, in our preferred embodiment, is calculated based on the relative positions of the principle face features (eyes, nose, mouth and, occasionally, ears, hairline and chin). Now information on the locations of said features may already be determined by the face detection module and passed to the normalization module with the image, or may be contained within the image metadata. If this is the case [**5020**] then we may proceed directly to the pose determination step [**5030**]. If, however, information is not available on the locations of the pertinent face features for the face candidate region [**5020**] then it will be necessary to apply a face feature localization filter [**5022**] to the candidate region and to record the locations of the relevant features [**5024**].

**[0167]** In addition to the illumination level of the potential face candidate region, other physical characteristics which can influence the recognition process are illustrated in FIGS. **6**(*a*)-**6**(*e*). The most common of these, but also the more straight-forward of these to handle, as they relate to frontal, or semi-frontal face candidate regions, are in-plane rotation of the face, illustrated by FIG. **6**(*a*) and scaling variations in the size of the face candidate region, illustrated in FIG. **6**(*b*). The ideal face candidate region which is fully frontal and is free of rotational or scaling distortions, is illustrated in FIG. **6**(*c*). The more difficult distortions of a face candidate region occur when the face is rotated to face to the left (or right) so that it appears in a semi-profile as illustrated in FIG. **6**(*d*) [Note: If it is rotated to 45 degrees we shall refer to this as half-profile; to 90 degrees as full-profile]. Equally difficult to correct is the case when the face candidate region is rotated so that the face looks up (or down) as illustrated in FIG. **6**(*e*). In what follows these latter two cases will be referred to as pose distortion whereas simple in-plane rotation, as shown in FIG. **6**(*a*) will be referred to as rotational distortion. We will also refer to faces as semi-frontal where there is a complete view of each eye region and the mouth. In very approximate terms this requires that the left-right rotation is less than 30 degrees and the up/down rotation is less than 15 degrees. The amount of allowable rotation depends partly on the size of the nose and also on how well-defined the eye and mouth regions are.

**[0168]** Once the information on the location of the face features within the face candidate region is available, it is possible to proceed to the pose determination step. A number of approaches to pose determination are understood by those skilled in the art. In our preferred embodiment, we utilize a technique which is based on determining the 2-D projection of the 3-D eye-mouth triangle onto the face candidate region. The anthropometric data indicates that the region delineated by these face features forms an equilateral triangle in the plane of the face for the majority of persons. Thus, from the shape of the 2-D projection of this region, it is possible to determine the plane of the face, and thereby extrapolate the pose distortion [**5030**].

**[0169]** The next step is to determine how this pose distortion can be normalized. A full normalization would require that we transform the face candidate region to a 3-D space map and then rotate it until the appropriate corrections for left/right (yaw) and up/down (pitch) rotations are normalized. However this can be computationally intensive and if a face candidate region is semi-frontal, then we can achieve accurate normalization results using 2-D transformations [**5045**].

**[0170]** If the pose distortion is more extreme, then it is more desirable to transform the face candidate region into a 3-D space. Again there are a variety of approaches that may be understood by those skilled in the art for handling this problem. Most of these employ some technique of deforming a pre-defined 3-D face model to fit the extracted face candidate region. One such technique is described by Tony Jebara in a Ph.D. thesis from McGill University, 1996, entitled 3D Pose Estimation and Normalization for Face Recognition. This employs a normalized 3D face model illustrated in FIG. **7**(*a*) which is drawn from the thesis manuscript. Jebara proposes that a simple 1-D scaling of this model along its horizontal axis is sufficient to match a broad range of faces; thus a person with a thin face can be represented by the compacted model

illustrated in FIG. 7(*b*) and another person with a plump, or "moon" face can be modeled by an elongation of the basic model illustrated in FIG. 7(*c*). The advantage of this technique is that the simple 1-D scaling employed will require much less computing power than more complex 2-D or 3-D matching techniques.

**[0171]** Thus, when a face candidate region is determined to have a greater pose distortion than can be compensated for using a 2-D transformation [**5050**], then it is desired to employ a mapping of the candidate region onto a 3-D model. This begins with a determination of the 1-D horizontal stretch factor [**5045**] which then allows the appropriate scaling of the normalized 3-D face model. The texture, color and feature regions of the 2-D candidate region are next mapped onto the 3-D model [**5054**]. A physical representation of several such example mappings is shown in FIGS. **7**(*d*)-**7**(*f*); FIG. **7**(*d*) shows that this technique is also applicable to semi-frontal images; FIG. **7**(*e*) shows how a candidate region with significant pitch angle is mapped onto the 3-D model and FIG. **7**(*f*) shows how a candidate region with both pitch and yaw pose distortion is mapped to the same model.

**[0172]** Once the candidate region is mapped to the 3-D model the next step is to rotate the model so that the face is in a fully-frontal orientation [**5056**], and this 3-D frontal face is then mapped onto a 2-D normalized face candidate region [**5058**]. This normalized face candidate region must now be further corrected for variations in scale and illumination [**5060**]. It is, for example, particularly important for most face recognition algorithms that the eye and mouth regions be closely aligned to facilitate accurate recognition. This is relatively easy to achieve when standardized "mug-shot" images are used, but when the face candidate regions originate from complex images with a cluttered background it becomes more problematic. Finally, the normalized face candidate region is passed back to the main workflow module and the normalization module returns to its idle state.

**[0173]** Our second implementation of the normalization module is described by FIG. **5**(*b*) and is referred to as normalization Mode B. In this mode of operation the normalization module does not attempt to re-align the face candidate region into a standardized frontal candidate region. Instead the system maintains a plurality of face recognition datasets [**2300**], each of which is associated with a particular discrete range of pose angles. In a simple case there would be face recognition datasets associated with left/right pitch rotations of 0, 15, 30, 45, 60, 70 and 90 degrees and for up/down yaw rotations of 0, 15, 30 and 45 degrees. This implies **91** distinct face recognition datasets, but due to lateral face symmetry it can, in fact, be reduced to 49 distinct datasets. Further, each dataset, associated with a particular pitch & yaw angular combination may be described in terms of a unique basis set. Thus the recognition module is accordingly modified to generate a faceprint based not only on the input face candidate region but also on the pitch & yaw angular combination of pose distortion as determined by the normalization module. In other words, when operating in Mode B the normalization module does not actually modify the pose of the face candidate region but rather determines the pose distortion and matches it to a basis set which is tuned to enhance recognition of faces at that pose angle.

**[0174]** Those skilled in the art will realize that given **49** distinct classes of pose distortion it will take a large amount of input data to populate each of these distinct face spaces with faceprints associated with known persons. To compensate for this we preferably utilize a prior art technique described in detail in Chapter 7, of MIT Artificial Intelligence Technical Report No. 1574 to Beymer.© MIT 1996. This allows a multiplicity of views, at different pitch & yaw pose angles, to be generated from a single input image. Note that the techniques employed by Beymer utilize 2-D techniques, whereas we have extended these to use more sophisticated 3-D techniques, and as this operation can be performed in the background we can employ multi-dimensional approaches utilizing, for example, 3-D Active Appearance Models which offer superior results to the 1-D matching technique described by Jebara and previously cited in this section. Following the generation of this multiplicity of views from a single image, a faceprint is obtained for each view, and each of these faceprints is added to the face recognition dataset for that particular combination of pitch & yaw pose angles. In this way, the 49 face recognition datasets associated with the **49** distinct classes of pose distortion are populated at the same rate as would occur when a single face recognition dataset is used.

**[0175]** FIG. **8**(*c*) illustrates a browser window showing nine face region images of a same person. Each of them, with the exception perhaps of the image labeled 10.jpg, would undergo some normalization processing prior to being subject to the recognition programming. For example, most would undergo some pose and orientation normalization, whereas size and luminance may or may not, depending on the sensitivity that is set, be within tolerance for face recognition.

**[0176]** A description of the practical operation of the face normalization module when operating in Mode B is given in FIG. **5**(*b*). The normalization module is activated from its idle state [**5110**] when it is passed such a facial candidate region from the main workflow module. Now in order to further process this facial candidate region it is necessary to determine the facial pose which, in our preferred embodiment, is calculated based on the relative positions of the principle face features (eyes, nose, mouth and, occasionally, ears, hairline and chin). Now information on the locations of the features may already be determined by the face detection module and passed to the normalization module with the image, or may be contained within the image metadata. If this is the case [**5120**] then we may proceed directly to the pose determination step [**5130**]. If, however, information is not available on the locations of the pertinent face features for the face candidate region [**5120**], then it will be necessary to apply a face feature localization filter [**5122**] to the candidate region and to record the locations of the relevant features [**5124**].

**[0177]** The next step is to determine if the face candidate region is a semi-frontal one [**5140**]. This does not affect the actual normalization procedure, but if the face candidate region is semi-frontal then it is added to a background processing list and will subsequently be used to generate a multiplicity of face views from which the corresponding multi-pose faceprints will be extracted and added to the relevant face recognition datasets [**5145**]. The normalization module then applies filters to scale and correct in-plane orientation of the master face candidate region [**5150**] which is then passed back to the main workflow module together with the relevant pitch & yaw pose angle data [**5160**]. After this, the module returns to an idle state [**5110**].

### Image Recognition Process

**[0178]** A highly advantageous feature of the system of the preferred embodiment is its approach to the problem of

implementing an adaptive, self-learning means of performing face recognition. FIG. 9(*a*) shows a graphical representation of how multiple, distinct, face classes formed from collections of closely collocated faceprints can be used to define a unique region in Face Space which is associated with a particular Identity Region for a "known person". In FIG. 9(*a*), a single Identity Region, $ID_1$ **[9000]** is shown, which is composed of three separate Face Classes, $FC_1$ **[9010]**, $FC_2$ **[9020]**, and $FC_3$ **[9030]**. FIG. 9(*a*) also illustrates three face prints which constitute the members of $FC_2$ **[9020]**, that is $FP_{2A}$ **[9022]**, $FP_{2B}$ **[9024]** and $FP_{2C}$ **[9026]**. Note that in this and the following discussions, the assumption is made that the Face Space is limited to 3 orthonormal basis vectors. This facilitates an analogy with conventional 3D Cartesian Space making some of the concepts easier to visualize and understand. However, any practical Face Space which is used for face recognition purposes may typically utilize a minimum of 20 orthonormal basis vectors, and may generally have an arbitrary number. Thus we emphasize that our analogy with 3D Cartesian Space is a device to simplify the understanding of the concepts outlined in what follows.

**[0179]** FIG. 9(*b*) illustrates two such Identity Spaces with their associated face classes and faceprints. Three orthonormal basis vectors, $\lambda_1$, $\lambda_2$, and $\lambda_n$ are shown, although there are actually 20-50 basis vectors employed in practical implementations, i.e., n=20+. Each of the vectors comprising an entry in a Face Class is shown as a 3D Cartesian Vector, although in reality it has 20+ dimensions.

**[0180]** The overall concept of how this adaptive face recognition algorithm works is somewhat analogous to a series of expanding "bubbles" of "known regions" within Face Space. New points in our multi-dimensional Face Space are obtained from the new Faceprints extracted from face candidate regions identified within the images comprising an image collection. These new points in Face Space are then associated with "known persons" or "known identities" either automatically, or through manual recognition by the user such as in a semiautomatic mode. Once they are associated with a "known person", we use the Face Space coordinate location of this new Faceprint to grow the current Face Classes and Identity Region associated with this "known person". This will enhance future recognition of this particular "known person".

**[0181]** Several such means to grow the region of Face Space associated with a "known person" are described in FIGS. **10**(*a*)-**10**(*b*). In FIG. **10**(*a*), it is illustrated how a new Faceprint **[10010]** which is associated, either automatically or manually, with a "known person" will lead to the creation of a new Face Class **[10030]** when it is located at a distance further than a certain $R_{min}$ **[10020]** from any existing face classes **[10040]** associated with the same "known person". In this way new Face Classes are created by an adaptive recognition algorithm. Such new Face Classes preferably will, in turn, grow the nearest Identity Region for that "known person".

**[0182]** FIG. **10**(*b*) shows how a new Faceprint **[10110]** extends or grows an existing Face Class **[10130]** when it is within a distance $R_{min}$ **[10120]** from the existing face class. This mechanism allows existing Face Classes to grow the region they occupy in Face Space.

**[0183]** Naturally as these bubbles of "known regions" in Face Space continue to expand they will eventually begin to overlap with other such bubbles. When this happens, a means of refining the boundary between the two regions in Face Space may become involved. To stay with the analogy of expanding bubbles: when two bubbles grow to overlap each other, these "outer bubbles" or larger bubbles (Identity Regions) will preferably "burst" when they begin to overlap, while the smaller bubbles within these larger bubbles (Face Classes) remain intact and continue to grow independently. The various steps of this process are illustrated in FIGS. **11**(*a*)-**11**(*c*). In FIG. **11**(*a*), it is illustrated how an Identity Space, $ID_3$ **[11020]**, associated with one person can grow to overlap with the identity region, $ID_2$ **[11030]**, of another person. When this occurs, a more granular separation of the boundary is preferably obtained between the regions of Face Space which identify these two distinct "known persons". The first step in this process is shown in FIG. **11**(*b*) which describes how these overlapping identity regions can be separated from each other by "bursting" the outer bubbles, or Identity Regions and thus shrinking the region of Face Space associated with each "known person" back to their component Face Classes. In this example, the first Identity Region, $ID_3$ **[11110]**, includes four internal Face Classes of which one, $FC_2$ **[11112]** overlaps with the second Identity Region, $ID_2$ **[11120]**, which is composed of only 2 Face Classes, $FC_1$ **[11124]** and $FC_2$ **[11114]**. Each of these component Face Classes are now regrouped into new Identity Regions as shown in FIG. **11**(*c*). Here we see that both Identity Regions have split into two smaller regions. The larger region now includes $ID_{3A}$ **[11210]** which contains three component Face Classes, and $ID_{3B}$ **[11220]** which includes a single component Face Class. The smaller region now includes $ID_{2A}$ **[11230]** and $ID_{2B}$ **[11240]** each including a single component Face Class.

**[0184]** Following on from the analogy of growing "bubbles" of Face Space and now "bursting" these "bubbles" when they start to overlap in order to shrink back the boundary region, there may occasionally arise a desire to reorganize and break down a Face Class into smaller constituent Face Classes. This occurs after the operation described with reference to FIGS. **11**(*a*)-**11**(*b*), because three of the new Identity Regions obtained from the shrinking operation, illustrated in FIG. **11**(*c*), have only a single constituent Face Class. Thus, if any of these classes now grows to overlap another Identity Region, shrinking it again is a problematic issue. A separate situation can also arise where the number of distinct Faceprints which constitute a Face Class has grown to quite a large number. In this situation this multiplicity of Faceprints represents a large amount of redundant information. Furthermore, during the search algorithm to determine a match with a new Faceprint each of these existing Faceprints would preferably be searched against separately. In such a case it also makes sense to break this parent Face Class down into a smaller, more compact, constituent set of Face Classes using some form of "clustering algorithm" to determine the main focal centers and substantially reduce the number of individual Face Prints.

**[0185]** Those skilled in the art will realize that there are a number of different ways to achieve the stated goal of separating a large Face Class into a set of smaller, more compact, Face Classes with a significantly reduced number of constituent Faceprints. In FIGS. **12**(*a*)-**12**(*c*), an approach to solving this problem is illustrated which is that adopted in the preferred embodiment we describe herein. However there are other related algorithms which may prove more beneficial in different situations and we remark that it is not our intention to restrict the means by which a Face Class may be broken up

into smaller, more compact, Face Classes. FIG. **12**(*a*) shows a face class [**12020**] which has grown over time to incorporate a relatively large number of Faceprints [**12010**] which exhibit localized clustering. In this example, there are three obvious clusters of Faceprints. FIG. **12**(*b*) illustrates explicitly how these Faceprints are clustered. For example the cluster, $C_3$ [**12150**] is comprised of three constituent Faceprints, [**12152, 12154**, and **12156**]. By applying a conventional clustering algorithm, FIG. **12**(*c*) shows how each local cluster can be replaced by a single Clustered Face Class which is composed of a centre faceprint location in face space and a cluster radius, $R_n$.

**[0186]** When the system is implemented on a handheld imaging apparatus such as a digital camera, it is possible to determine the equivalent of a clustered face class by capturing two reference images—one under flash illumination and one under ambient illumination. After processing these reference images to extract their normalized faceprints, they can be used to determine a baseline, or center, faceprint from the flash illuminated image and a radius of local variability, or face cluster radius, using the faceprint of the image captured under ambient illumination. An exemplary set of process steps for this technique is provided in FIGS. **15**(*a*)-(*e*).

**[0187]** In our earlier description of the functioning of the recognition algorithm which operates as part of the Core Workflow module, it was mentioned that there is a 3-step comparative analysis applied to the current Faceprint. Thus, if the current Faceprint lies within a region of Face Space which corresponds to an existing Face Class, then the current Faceprint can be unambiguously associated with the "known person" described by the Face Class. Alternatively, if the current Faceprint lies within a region of Face Space which corresponds to an Identity Region then, again, the current Faceprint can unambiguously be associated with the "known person" described by the Identity Region. In the third step of comparison, the current Faceprint lies outside any known Face Classes or Identity Regions and thus is identified in the context of the closest N Faceprints.

**[0188]** This third step is now described in more detail. FIG. **13**(*a*) describes the recognition process where the current Faceprint lies in a region of Face Space between two "known" Identity Regions. Typically the matching Faceprints lie within a maximum recognition distance or the current Faceprint is considered to be too far from any "known" Identity Regions to provide a useful match. Given that this distance criterion is satisfied, the algorithm matches at the N closest Faceprints to the current Faceprint. However, as the distances to the N nearest Faceprints may often be almost equal we generally accept that all Faceprints within a certain recognition radius, $D_{recog}$ [**13020**] are accepted as matches, provided that the number of matching Faceprints is greater than N. In the example shown, the value of N is 5. There are 4 matching Faceprints [**13052, 13054, 13056** and **13058**] which lie in Identity Region $ID_1$ [**13050**] and one matching Faceprint [**13042**] which lies in Identity Region $ID_2$ [**13040**]. As a rule of thumb, the algorithm requires that at least 75% of the closest Faceprint matches should be commonly associated to the same "known person" for an unambiguous match to be allowed. Thus in this example drawn from our preferred embodiment, the current Faceprint [**13010**] is matched with the "known person" associated with Identity Region $ID_1$ [**13050**].

**[0189]** FIG. **13**(*b*) shows how, once the recognition process has associated the new faceprint [**13110**] with one of the two known identity regions, $ID_1$, that identity region, in this case old$ID_1$ [**13120**], then grows to include the new faceprint as a new face class within $ID_1$, forming new$ID_1$ [**13140**].

**[0190]** FIG. **13**(*c*) shows a similar situation to FIG. **13**(*a*), but in this case it is not clear which of the two identity regions should be associated with the new faceprint as there is an almost equal number of matching Faceprints from each ID space and the system then preferably asks the user to make this determination. FIG. **13**(*d*) illustrates the case where the user chooses identity space $ID_1$. In this case old$ID_1$ [**13320**], then grows to include the new faceprint [**13310**] as a new face class within $ID_1$, forming the new identity space, new$ID_1$ [**13340**]. FIG. **13**(*e*) illustrates the alternative case where the user chooses $ID_2$. In this case old$ID_2$ [**13430**], then grows to include the new faceprint [**13410**] as a new face class within $ID_2$, forming the new identity space, new$ID_2$ [**13440**].

**[0191]** In this way, we may consider that new Faceprints cause "bubbles" of known face space to grow around existing identity regions until the surfaces of these "bubbles" begin to intersect with other regions. When a clear, unambiguous, association with an existing known identity cannot be established, then the system will return to the user to make this association.

**[0192]** FIGS. **14**(*a*)-**14**(*d*) illustrates an exemplary user interface (UI) for implementing the system of the preferred embodiment. In the upper left of the browser window, an acquired digital image is shown, e.g., as acquired by a webcam, a digital camera cable-coupled to a PC, a digital camera (dedicated or as part of a mobile phone or pda) wherein the browser is resident on the camera and the UI is visible through a display on the camera, or a scanner. The lower left box within the browser window shows that two face regions have been identified. As described above, the face regions, upon detection as being in fact face regions, would be normalized and a set of face classifier parameter values would be extracted. Then, these would be compared to values corresponding to known identities archived within the database. The right hand side of the browser window indicates that one of the face regions identified corresponds to Darina who is a known person within the database. In this embodiment, the user is provided an option to select Darina as the known identity with which the image is to be associated, or to match to another face or to create a new face, although the system is suggesting that there is a face recognition match with Darina. The user could then cycle to the second face detected and likely be provided a suggestion to associated the second face with another known identity, Sarah.

**[0193]** FIG. **14**(*b*) indicates that the system recognizes that more than one face has been detected, and is providing the user an option to choose one of the faces for further processing. The right hand window in the browser is showing multiple digital images that may be linked and grouped in the archive in accordance with the preferred embodiment, including other images of the faces of Darina and Sarah that will be respectively associated with those known identities. Sarah and Darina themselves may be grouped together as friends, colleagues, workplace associates, etc., and probabilities for finding their faces together in an image containing multiple faces will preferably be increased within the face recognition algorithm.

**[0194]** In FIG. **14**(*c*), one of the faces has been selected, and FIG. **14**(*d*) indicates that a match with Darina of 85% probability has been found among the prior known identities in the database. The system may be configured to automatically

accept Darina as the match and associate and archive the face region and image within the database grouped with the identity Darina.

Face Detection and Enhancement Processing

**[0195]** Face detection was introduced above and a face detection module is included as part of the system of the preferred embodiment. Further details and alternative embodiments involving, utilizing or deriving from the face detection feature are now described. These embodiments include methods and devices for providing or suggesting options for automatic digital image enhancements based on information relating to the location, position, focus, exposure or other parameter or values of parameters of faces in an image. Such parameters or values of parameters may include a spatial parameter. For example, an orientation of a face or faces within an digital image may be used to adjust or suggest an adjustment of an orientation of the entire image or of one or more faces within the image. Color correction or enhancement may be automatically suggested or provided for digital images based on color or tonal values of faces in the image. Pleasing cropping of images may be suggested or provided based on knowledge particularly of the location and/or size of faces in the image. These enhanced images may be classified and archived within the database. In some cases, enhancements may be performed prior to facial recognition processing and/or as part of the normalization process. The enhanced images may be themselves alone archived or they may be preferably stored along with links to the original images.

**[0196]** A still image may be animated and used in a slide show by, e.g., zooming, panning and/or rotating where the center point of an image is within a face or at least the face is included in all or substantially all of the images in the slide show. Selective compression, or alternatively selective resolution, or both, of images may be suggested or automatically provided where one or more faces receive higher grade compression and/or alternatively higher local resolution than other portions of the image. A fill flash may be automatically digitally simulated or suggested, or actually applied to an object, upon analysis of a luminance map of the image. A camera may also be automatically focused prior to acquiring an image based on knowledge regarding the faces in an image.

**[0197]** One embodiment includes an image processing application whether implemented in software or in firmware, as part of the image capture process, image rendering process, or as part of post processing. This system receives images in digital form, where the images can be translated into a grid representation including multiple pixels. This application detects and isolates the faces from the rest of the picture, and determines sizes and locations of the faces relative to other portions of the image or the entire image. Orientations of the faces may also be determined. Based on information regarding detected faces, preferably separate modules of the system collect facial data and perform image enhancement operations based on the collected facial data. Such enhancements or corrections include automatic orientation of the image, color correction and enhancement, digital fill flash simulation and dynamic compression.

**[0198]** In another embodiment, the information regarding the location and size of faces in an image assist in determining correct auto focus distance and exposure in the camera. In a separate embodiment, such information can be processed in the camera as part of the post processing stage such that the saved image is already automatically corrected, enhanced and/or adjusted based on this information.

**[0199]** Advantages of these embodiments include the ability to automatically perform or suggest or assist in performing complex tasks that may otherwise call for manual intervention and/or experimenting. Another advantage is that important regions, e.g., faces, of an image may be assigned, marked and/or mapped and then processing may be automatically performed and/or suggested based on this information relating to important regions of the images. Automatic assistance may be provided to a photographer in the post processing stage. Assistance may be provided to the photographer in determining a focus and an exposure while taking a picture. Meta-data may be generated in the camera that would allow an image to be enhanced based on the face information.

**[0200]** Many advantageous techniques are provided in accordance with further alternative embodiments set forth herein. For example, a method of processing a digital image using face detection within said image to achieve one or more desired image processing parameters is provided. A group of pixels is identified that correspond to an image of a face within the digital image. Default values are determined of one or more parameters of at least some portion of the digital image. Values of the one or more parameters are adjusted within the digitally-detected image based upon an analysis of the digital image including the image of the face and the default values.

**[0201]** The digital image may be digitally-acquired and/or may be digitally-captured. Decisions for processing the digital image based on said face detection, selecting one or more parameters and/or for adjusting values of one or more parameters within the digital image may be automatically, semi-automatically or manually performed. Similarly, on the other end of the image processing workflow, the digital image may be rendered from its binary display onto a print, or a electronic display.

**[0202]** The one or more parameters that may be adjusted may include orientation, color, tone, size, luminance, relative exposure, relative spatial location, tone reproduction, sharpness or focus or combinations thereof. The one or more parameters may include a mask that defines one or more regions where the one or more parameters are valid. The mask may include a continuous presentation of varying strength within different sub-regions of said one or more regions. The one or more parameters may include the same parameter differing in value based on the mask.

**[0203]** Two or more parameters may be concatenated into a single parameter. The digital image may be transformed based on values of the one or more parameters. An operation list may be created for the digital image based on values of the one or more parameters. The operation list may be embedded within the digital image or may be external to the digital image.

**[0204]** Values of orientation may be adjusted such that a rotation value for the digital image is determined. Values of the color, tone, size, luminance, relative exposure may be adjusted including manipulating a color, tonal, size, luminance, fill-flash balance of the digital image, respectively. Values of relative spatial location may be adjusted including adjusting a spatial location of an image of a face relative to at least one other region of the digital image. Values of focus may be adjusted including adjusting values of focus for enhancing a focus of the image of the face within the digital image.

[0205] One or more different degrees of simulated fill flash may be created by manual, semi-automatic or automatic adjustment. The analysis of the image of the face may include a comparison of an overall exposure to an exposure around the identified face. The exposure may be calculated based on a histogram. Digitally simulation of a fill flash may include optionally adjusting tone reproduction and/or locally adjusting sharpness. One or more objects estimated to be closer to the camera or of higher importance may be operated on in the simulated fill-flash. These objects determined to be closer to the camera or of higher importance may include one or more identified faces. A fill flash or an option for providing a suggested fill-flash may be automatically provided. The method may be performed within a digital acquisition device, a digital rendering device, or an external device or a combination thereof.

[0206] The face pixels may be identified, a false indication of another face within the image may be removed, and an indication of a face may be added within the image, each manually by a user, or semi-automatically or automatically using image processing apparatus. The face pixels identifying may be automatically performed by an image processing apparatus, and a manual verification of a correct detection of at least one face within the image may be provided.

[0207] A method of digital image processing using face detection to achieve a desired image parameter is further provided including identifying a group of pixels that correspond to an image of a face within a digitally-detected image. Initial values of one or more parameters of at least some of the pixels are determined. An initial parameter of the digitally-detected image is determined based on the initial values. Values of the one or more parameters of pixels within the digitally-detected image are automatically adjusted based upon a comparison of the initial parameter with the desired parameter or an option for adjusting the values is automatically provided.

[0208] The digitally-detected image may include a digitally-acquired, rendered and/or digitally-captured image. The initial parameter of the digitally-detected image may include an initial parameter of the face image. The one or more parameters may include any of orientation, color, tone, size, luminance, and focus. The method may be performed within a digital camera as part of a pre-acquisition stage, within a camera as part of post processing of the captured image or within external processing equipment. The method may be performed within a digital rendering device such as a printer, or as a preparation for sending an image to an output device, such as in the print driver, which may be located in the printer or on an external device such as the PC, as part of a preparation stage prior to displaying or printing the image. An option to manually remove a false indication of a face or to add an indication of a face within the image may be included. An option to manually override, the automated suggestion of the system, whether or not faces were detected, may be included.

[0209] The method may include identifying one or more sub-groups of pixels that correspond to one or more facial features of the face. Initial values of one or more parameters of pixels of the one or more sub-groups of pixels may be determined. An initial spatial parameter of the face within the digital image may be determined based on the initial values. The initial spatial parameter may include any of orientation, size and location.

[0210] When the spatial parameter is orientation, values of one or more parameters of pixels may be adjusted for re-orienting the image to an adjusted orientation. The one or more facial features may include one or more of an eye, a mouth, two eyes, a nose, an ear, neck, shoulders and/or other facial or personal features, or other features associated with a person such as an article of clothing, furniture, transportation, outdoor environment (e.g., horizon, trees, water, etc.) or indoor environment (doorways, hallways, ceilings, floors, walls, etc.), wherein such features may be indicative of an orientation. The one or more facial or other features may include two or more features, and the initial orientation may be determined base on relative positions of the features that are determined based on the initial values. A shape such as a triangle may be generated for example between the two eyes and the center of the mouth, a golden rectangle as described above, or more generically, a polygon having points corresponding to preferably three or more features as vertices or axis.

[0211] Initial values of one or more chromatic parameters, such as color and tone, of pixels of the digital image may be determined. The values of one or more parameters may be automatically adjusted or an option to adjust the values to suggested values may be provided.

[0212] Within a digital acquisition device, a method of perfecting acquisition parameters of a digital image as part of an image capture process using face detection within said captured image to achieve one or more desired image acquisition parameters is provided. Default values are determined of one or more image attributes of at least some portion of the digital image. Values of one or more camera acquisition parameters are determined. Groups of pixels are identified that correspond to an image of a face within the digitally-captured image. Corresponding image attributes to the groups of pixels are determined. One or more default image attribute values are compared with one or more captured image attribute values based upon analysis of the image of the face. Camera acquisition parameters are then adjusted corresponding to adjusting the image attribute values.

[0213] The method may be performed within any digital image capture device, which as, but not limited to digital still camera or digital video camera. The one or more parameters may include overall exposure, relative exposure, orientation, color balance, white point, tone reproduction, size, or focus, or combinations thereof. The face pixels identifying may be automatically performed by an image processing apparatus, and the method may include manually removing one or more of the groups of pixels that correspond to an image of a face. An automatically detected face may be removed in response to false detection of regions as faces, or in response to a determination to concentrate on less image faces or images faces that were manually determined to be of higher subjective significance, than faces identified in the identifying step. A face may be removed by increasing a sensitivity level of said face identifying step. The face removal may be performed by an interactive visual method, and may use an image acquisition built-in display.

[0214] The face pixels identifying may be performed with an image processing apparatus, and may include manually adding an indication of another face within the image. The image processing apparatus may receive a relative value as to a detection assurance or an estimated importance of the detected regions. The relative value may be manually modified as to the estimated importance of the detected regions.

[0215] Within a digital camera, a method of digital image processing using face detection for achieving a desired image

parameter is further provided. A group of pixels is identified that correspond to a face within a digital image. First initial values of a parameter of pixels of the group of pixels are determined, and second initial values of a parameter of pixels other than pixels of the group of pixels are also determined. The first and second initial values are compared. Adjusted values of the parameter are determined based on the comparing of the first and second initial values and on a comparison of the parameter corresponding to at least one of the first and second initial values and the desired image parameter.

**[0216]** Initial values of luminance of pixels of the group of pixels corresponding to the face may be determined. Other initial values of luminance of pixels other than the pixels corresponding to the face may also be determined. The values may then be compared, and properties of aperture, shutter, sensitivity and a fill flash may be determined for providing adjusted values corresponding to at least some of the initial values for generating an adjusted digital image. The pixels corresponding to the face may be determined according to sub-groups corresponding to one or more facial features.

**[0217]** Within a digital acquisition device with an adjustable optical system having an auto focusing mechanism, a method of perfecting the auto focus mechanism of the adjustable optical system as part of an image capture process using face detection in the image capture process to achieve one or more desired image acquisition parameters is provided. Groups of pixels are identified that correspond to an image of a face within a digitally-captured image. Corresponding image attributes to the groups of pixels are determined. Auto focus is perfected by performing the auto focus on the plural groups of pixels that correspond to the image of the face.

**[0218]** The auto focus may be initially performed on the entire image the method for auto-focusing the lens and the automatic adjusting automatically adjusting one or more properties of the adjustable optical system. A user may manually activate the camera to perform the perfecting of the auto focus. The face pixels identifying may be automatically performed by an image processing apparatus, and one or more of the groups of pixels detected as faces may be manually removed in response to false detection of one or more regions as one or more faces, or in response to a determination to concentrate on less image faces than faces identified in the identifying step. The faces may be removed by increasing a sensitivity level of the face identifying step and/or by an interactive visual method. An image acquisition built-in display may be used. A weighted average on individual objects of the groups may be used in the auto-focus process. The face identifying step may be automatically performed by an image processing apparatus which receives a relative value as to detection assurance. In this case, a weighted average may be calculated based on the relative values as to the detection assurance. The face pixels identifying may be automatically performed by an image processing apparatus which receives a relative value as to an estimated importance of the detected regions. In this case, A weighted average may be calculated based on the relative values as to the estimated detection assurance. The estimated importance of the detected regions of faces may involve an analysis of a parameter such as size of the faces, location of the faces within the captured image, or relative exposure of the faces, or combinations thereof.

**[0219]** Within a digital camera having a lens system, a method of adjusting the capture parameters of a digitally-detected image based on detection of faces within the image to achieve a desired image parameter is also provided. The method may be used for auto-focusing the lens as part of the acquisition process. One or more parameters of pixels of the face image are determined. Values of the one or more parameters of the pixels may be automatically adjusted based upon a comparison of the initial parameter with the desired parameter. For example, one or more properties of the lens system may be automatically adjusted based on the values to adjust the focus, an indication to the region of focus or an adjustment option may be provided. The one or more parameters may include a spatial parameter such as a size and/or a location of the face in the image.

**[0220]** Within a digital acquisition device with a built in flash unit, a method of perfecting the exposure of an acquired digital image using face detection in the acquired image is provided. Groups of pixels that correspond to plural images of faces are identified within a digitally acquired image, and corresponding image attributes to the group of pixels are determined. An analysis is performed of the corresponding attributes of the groups of pixels. It is then determined to activate the built-in flash unit based on the analysis. An intensity of the built-in flash unit is determined based on the analysis.

**[0221]** An initial step of calculating image attributes may be performed on an entire acquired digital image and image attributes may be compared to the image attributes of the group of pixels. The image attributes may include exposure. The exposure may be calculated as a function of one or more parameters including aperture, speed, gain, or relative sensitivity, or combinations thereof. The groups of pixels of faces may be given a certain weight based on weight criteria. The weight criteria may be calculated based on a distance of the groups of pixels to the camera. The weight criteria may be calculated based on relative sizes of the groups of pixels.

**[0222]** A pre-flash may be performed based on the calculated flash intensity to determine whether the analysis is accurate. A second analysis may be performed based on the pre-flash.

**[0223]** One or more different degrees of simulated fill flash may be created by manual, semi-automatic or automatic adjustment. The analysis of the image of the face may include a comparison of an overall exposure to an exposure around the identified face. The exposure may be calculated based on a histogram. Digitally simulation of a fill flash may include optionally adjusting tone reproduction and/or locally adjusting sharpness. One or more objects estimated to be closer to the camera or of higher importance may be operated on in the simulated fill-flash. These objects determined to be closer to the camera or of higher importance may include one or more identified faces. A fill flash or an option for providing a suggested fill-flash may be automatically provided.

**[0224]** Within a digital camera, a further method of digital image processing using face detection for achieving a desired image parameter is provided. A group of pixels is identified that correspond to a face within a digital image. First initial values are determined of a parameter of pixels of the group of pixels. Second initial values of a parameter are determined of pixels other than pixels of the group of pixels. The first and second initial values are compared. Adjusted values of the parameter are determined based on the comparing of the first and second initial values and on a comparison of the parameter corresponding to at least one of the first and second initial values and the desired image parameter.

**[0225]** The parameter may include luminance, and the method may further include automatically generating the

adjusted digital image using the adjusted values. The method may also further include automatically providing an option to generate the adjusted digital image using the adjusted values. The adjusted values of the luminance may be provided by a fill flash, or by a digitally-simulated fill flash.

[0226] Within a digital camera, a further method of digital image processing using face detection to achieve a desired luminance contrast is provided. A group of pixels is identified that correspond to a face within a digital image. First initial values of luminance of pixels of the group of pixels are determined. Second initial values of luminance of pixels other than pixels of the group of pixels are also determined. The first and second initial values are compared to determine an initial luminance contrast. Properties of a fill flash are determined for providing adjusted values of luminance for at least some of the pixels of the digital image based on a comparison of the initial luminance contrast and the desired luminance contrast.

[0227] Within a digital rendering device , a further method of digital image processing using face detection for achieving a desired image rendering parameters is provided. A group of pixels is identified that correspond to a face within a digital image. First initial values are determined of a parameter of pixels of the group of pixels. Second initial values of a parameter are determined of pixels other than pixels of the group of pixels. The first and second initial values are compared. Adjusted values of the parameter are determined based on the comparing of the first and second initial values and on a comparison of the rendering parameter corresponding to at least one of the first and second initial values and the desired image rendering parameter.

[0228] The parameter may include luminance, and the method may further include automatically generating the adjusted digital image using the adjusted values. The method may also further include automatically providing an option to generate the adjusted digital image using the adjusted values. The adjusted values of the luminance may be provided by changing the ink coverage, the display luminance values, etc.

[0229] Within a digital rendering device, a further method of digital image processing using face detection to achieve a desired contrast and color balance is provided. A group of pixels is identified that correspond to a face within a digital image. First initial values of contrast and/or color balance of pixels of the group of pixels are determined. Second initial values of contrast and/or color balance of pixels other than pixels of the group of pixels are also determined. The first and second initial values are compared to determine an initial contrast and/or color balance. Such tool may compensate for the disparity between the input or digitally acquired image and the output device. Such discrepancies may arise due to a mismatching of color gamut, the physical characteristic of the display, reflective or self luminance the limited contrast, the effect of the surrounding environment, etc.

[0230] A method of generating one or more new digital images using an original digitally-acquired image including a face is further provided. A group of pixels that correspond to a face within the original digitally-acquired image is identified. A portion of the original image is selected to include the group of pixels. Values of pixels of one or more new images based on the selected portion are automatically generated, or an option to generate them is provided, in a manner which always includes the face within the one or more new images.

[0231] A transformation may be gradually displayed between the original digitally-acquired image and one or more new images. Parameters of said transformation may be adjusted between the original digitally-acquired image and one or more new images. Parameters of the transformation between the original digitally-acquired image and one or more new images may be selected from a set of at least one or more criteria including timing or blending or a combination thereof. The blending may include dissolving, flying, swirling, appearing, flashing, or screening, or combinations thereof.

[0232] Methods of generating slide shows that use an image including a face are provided in accordance with the generation of one or more new images. A group of pixels is identified that correspond to a face within a digitally-acquired image. A zoom portion of the image including the group of pixels may be determined. The image may be automatically zoomed to generate a zoomed image including the face enlarged by the zooming, or an option to generate the zoomed image may be provided. A center point of zooming in or out and an amount of zooming in or out may be determined after which another image may be automatically generated including a zoomed version of the face, or an option to generate the image including the zoomed version of the face may be provided. One or more new images may be generated each including a new group of pixels corresponding to the face, automatic panning may be provided using the one or more new images.

[0233] A method of generating one or more new digital images using an original digitally-acquired image including a face is further provided. One or more groups of pixels may be identified that correspond to two or more faces within the original digitally-acquired image. A portion of the original image may be selected to include the group of pixels. Values of pixels may be automatically generated of one or more new images based on the selected portion in a manner which always includes at least one of the two or more faces within the one or more new images or a panning intermediate image between two of the faces of said two or more identified faces or a combination thereof.

[0234] Panning may be performed between the two or more identified faces. The panning may be from a first face to a second face of the two or more identified faces, and the second face may then be zoomed. The first face may be de-zoomed prior to panning to the second face. The second face may also be zoomed. The panning may include identifying a panning direction parameter between two of the identified faces. The panning may include sequencing along the identified panning direction between the two identified faces according to the identified panning direction parameter.

[0235] A method of digital image processing using face detection for achieving a desired spatial parameter is further provided including identifying a group of pixels that correspond to a face within a digital image, identifying one or more sub-groups of pixels that correspond to one or more facial features of the face, determining initial values of one or more parameters of pixels of the one or more sub-groups of pixels, determining an initial spatial parameter of the face within the digital image based on the initial values, and determining adjusted values of pixels within the digital image for adjusting the image based on a comparison of the initial and desired spatial parameters.

[0236] The initial spatial parameter may include orientation. The values of the pixels may be automatically adjusted within the digital image to adjust the initial spatial parameter approximately to the desired spatial parameter. An option may be automatically provided for adjusting the values of the

pixels within the digital image to adjust the initial spatial parameter to the desired spatial parameter.

**[0237]** A method of digital image processing using face detection to achieve a desired orientation is also provided including identifying one or more groups of pixels that correspond to a face within a digital image, identifying one or more sub-groups of pixels that correspond to one or more facial features of the face, determining initial values of one or more parameters of pixels of the one or more sub-groups of pixels, determining an initial orientation of the face within the digital image based on the initial values, and determining adjusted values of pixels within the digital image for adjusting the orientation to the desired orientation.

**[0238]** Determining which of the sub-group of pixels belong to which of the group of face pixels may be performed. The determining of the initial values of one or more parameters of pixels may be calculated based on the spatial orientation of the one or more sub-groups that correspond to one or more facial features. The spatial orientation of the one or more sub-groups that correspond to one or more facial features may be calculated based on an axis of an ellipse fit to the sub-group. The adjusted values of pixels within the digital image may be rounded to a closest multiple of 90 degrees. The initial values may be adjusted to adjusted values for re-orienting the image to an adjusted orientation. The one or more facial features may include an eye, two eyes, two eyes and a mouth, an eye, a mouth, hairline, ears, nostrils, nose bridge, eyebrows neck as an extension of the face, or a nose, or combinations thereof, or otherwise as described above.

**[0239]** The method may include identifying one or more sub-groups of pixels that correspond to one or more facial features of the face. Initial values of one or more parameters of pixels of the one or more sub-groups of pixels may be determined. An initial spatial parameter of the face within the digital image may be determined based on the initial values. The initial spatial parameter may include any of orientation, size and location.

**[0240]** When the spatial parameter is orientation, values of one or more parameters of pixels may be adjusted for re-orienting the image to an adjusted orientation. The one or more facial features may include one or more of an eye, a mouth, two eyes, a nose, an ear, and other facial features including the neck as the physical extension of the face. The one or more facial features may include two or more features, and the initial orientation may be determined base on relative positions of the features that are determined based on the initial values. A shape such as a triangle may be generated for example between the two eyes and the center of the mouth, a golden rectangle as described above, or more generically, a polygon having points corresponding to preferably three or more features as vertices or axis.

**[0241]** Initial values of one or more chromatic parameters, such as color and tone, of pixels of the digital image may be determined. The values of one or more parameters may be automatically adjusted or an option to adjust the values to suggested values may be provided.

**[0242]** A method of digital image processing using face detection is also provided wherein a first group of pixels that correspond to a face within a digital image is identified, and a second group of pixels that correspond to another feature within the digital image is identified. A re-compositioned image is determined including a new group of pixels for at least one of the face and the other feature. The other feature may include a second face. The re-compositied image may be automatically generated or an option to generate the re-compositioned image may be provided. Values of one or more parameters of the first and second groups of pixels, and relative-adjusted values, may be determined for generating the re-compositioned image.

**[0243]** A method of compression of an image including a face is also provided also including identifying a group of pixels that correspond to a face within a digitally-acquired image. A first compression portion of the image including the group of pixels is determined. A second compression portion of the image other than the group of pixels is also determined. The first compression portion may be automatically compressed with higher-grade compression than the second compression portion to generate a compressed image including the face, or an option to provided the compressed image including the different grade compressions may be provided.

**[0244]** A method of determining the necessary resolution of an image including a face is also provided also including identifying a group of pixels that correspond to a face within a digitally-acquired image. A first resolution portion of the image including the group of pixels is determined. A second resolution portion of the image other than the group of pixels is also determined. The first resolution portion may be automatically compressed with higher-resolution than the second resolution portion to generate a rendered image including the face, or an option to provided the compressed image including the different grade resolution may be provided. Such method may be used to save on rendering time or consumables. For example, such method may determine using more ink on the more important regions of an image, and less ink on regions of less importance, this saving on the overall ink consumption when printing an image.

**[0245]** Each of the methods provided are preferably implemented within software and/or firmware either in the camera, the rendering device such as printers or display, or with external processing equipment. The software may also be downloaded into the camera or image processing equipment. In this sense, one or more processor readable storage devices having processor readable code embodied thereon are provided. The processor readable code programs one or more processors to perform any of the above or below described methods.

## Alternative Embodiments

**[0246]** Various techniques of optical engineering, software engineering and/or image processing may be utilized or incorporated with features of the preferred embodiments described above in advantageous alternative embodiments that may be within the scope of the present invention as set forth in the claims below and including structural and functional equivalents thereof. For example, techniques for image retrieval may be based on multi-scale edge characteristics (see. e.g., U.S. Pat. No. 6,072,904 to Desai et. al., hereby incorporated by reference). The target image and images in the database may be described by a vector of edge characteristics within the image. Thus image similarity may be determined based in part on a comparison of edge characteristics.

**[0247]** Visual information retrieval software may be employed to allow content-based search and retrieval of images based on visual objects contained within the images (see e.g., U.S. Pat. No. 5,911,139 to Jain et. al., hereby incorporated by reference). A set of universal primitives may be used for operating on images and generating a similarity score. Such techniques may be applied to face recognition. Advantageously, face recognition may be applied according

to various techniques described herein or as understood by those skilled in the art, particularly following face region detection from digital images including single or multiple images of faces having random poses, sizes, colors and luminances, and corresponding normalization as described in accordance with a preferred embodiment.

[0248] Query by example may be used as part of an overall set of options to be used in an image classification and retrieval process, in addition to the many database index and query techniques already known to those skilled in the art (see, e.g., U.S. Pat. No. 5,852,823 to De Bonet, hereby incorporated by reference). A semantically based numeric descriptor may be used of a set of similar input images. The descriptor may be linguistically searchable, and when a new image is encountered, its signature can be matched with similar images in the database. Moreover, the techniques may be applied to entire images, or in accordance with a preferred embodiment, to detected faces within overall images captured with an image acquisition device such as a digital camera or scanner. Further, the detected faces are preferably normalized prior to application of the preferred facial recognition techniques based on comparison of faceprints of sets of facial classifier parameter values prior to classification.

[0249] Images may be compared by determining one or more main subject areas of an image and computing color histogram information on selected blocks within these areas (see, e.g., U.S. Pat. No. 6,351,556 to Loui et. al., hereby incorporated by reference). Correlations between histogram information in the two images, or areas within same overall images, video frames or photographs, may then be used as a measure of image similarity. Foreground "blobs" may be separated from background image data using segmentation techniques, and these foreground blobs may be determined to corresponds to images of persons captured within the image data (see, e.g., US patent application 2002/0168108 to Loui et. al., hereby incorporated by reference). Background/foreground similarity of images may be determined, and these can be subsequently grouped into event clusters (see, e.g., U.S. Pat. No. 6,351,556, hereby incorporated by reference).

[0250] Many of the image processing techniques involved with the preferred embodiments herein for face detection, normalization and recognition, and for association and classification in accordance with the workflow module, may be combined advantageously with archiving and retrieval into databases automatically or semiautomatically. An image management system may incorporate a method of managing images according to image groups (see, U.S. Pat. No. 6,349,373 to Sitka et al., hereby incorporated by reference). Images within particular groups may be associated with single persons in some applications such as for developing a file or biography of a single person, or with multiple persons in accordance with the preferred embodiment described above. Medical applications may benefit greatly by utilizing the single person application where a large amount of image data, e.g., x-rays, ultrasound scans, etc., which is related to a single patient may be gathered, classified and stored for organized retrieval. Much of this image data may not include facial images, but face detection may be applied to those images that do as a tool in the compiling and/or management this image data.

[0251] A database may be included in a preferred or alternative embodiment wherein raw visual data may be stored and can be converted to different output formats as requested by a data output device (see, e.g., U.S. Pat. No. 6,502,107 to Nishida, hereby incorporated by reference). Such database may be combined with the image processing techniques of the preferred embodiment permit advantageous data access and management. That is, a multi-format transcoder for visual data may be used with the face detection, normalization, recognition and workflow and database techniques previously described above and incorporated and not repeated here.

[0252] Further database techniques may be applied for managing digital image data, particularly following image processing in accordance with the modular software approach of the preferred embodiment, including the automatic or semiautomatic detection of faces, provision of detected face region information for normalization, extraction of face classifier values or comparison of extracted faceprints, among other automatic or semiautomatic features of the system. For example, image data may be maintained in its original, high-quality format, while the data may be delivered to a user in a lower quality format but one that may be, e.g., more efficient or functional (see, e.g., U.S. Pat. No. 6,564,225 to Brogliatti et. al., hereby incorporated by reference). Various techniques may be used for ensuring access control to image data stored on the system, and further for facilitating the online ordering and/or purchasing of image data over a Web interface. Image processing in accordance with a preferred embodiment may be combined with these techniques to determine image content or to organize or manage the image data.

[0253] An electronic photo album may be produced from image data stored in an image database. The photo album may be viewed over a network connection on a Web browser (see, e.g., U.S. Pat. No. 6,567,983 to Shiimori, hereby incorporated by reference). Preferably, the photo album may be constructed from images based on information concerning the identity of persons in each image, with these identities in turn being determined, at least primarily and/or where possible, based on face detection and recognition as set forth above herein and utilizing the workflow techniques or the preferred embodiment.

[0254] The facial detection, normalization, recognition and workflow techniques, by themselves or in any combination of these modules, may be combined with any of various recently developed techniques for accessing, grouping and managing of images in databases. For example, images in a database may be grouped and/or accessed based on some time-based similarity of the images (see, e.g., US patent applications 2003/0084065 to Lin et al., hereby incorporated by reference). The image similarity criteria may be based on an image creation timestamp, a last database access timestamp, or any other image information which is stored or can be computed or extrapolated from other image data stored in the database system.

[0255] The grouping of images may be automated based on a color correlogram of images (see, e.g., US patent application 2003/0059107 to Sun et. al., hereby incorporated by reference). The color correlogram of an image represents the spatial distribution of color in an image and provides an accurate color signature of an image compared, e.g., with a color histogram which only records the overall distribution of color in the image.

[0256] Image emphasis and appeal may be determined in part based on a some broad combination of different image characteristics (see, e.g., US patent applications 2003/

0048950 and 2003/0059121 to Savakis et. al., hereby incorporated by reference). These image characteristics may include the presence of persons in an image. Face detection is preferably used for this purpose, while alternatively or in addition, a skin detector may be used. Face detection may also be used to determine if one or more people are part of the main subject of an image. Face region normalization and recognition, as well as workflow, are again preferably further included in the overall system. In one application, image emphasis and appeal data may be used to manage the retrieval and browsing of images in a database. In another application, the same emphasis and appeal data may be used to selectively control the compression of an image.

## Advantages and Features

**[0257]** Several advantages and features have been described in accordance with preferred and alternative embodiments, in addition to the advantageous image classification workflow features. In a first aspect. A processor-based system is provided which operates according to digitally-embedded programming instructions and communicates with one or more digital data storage media for classifying and archiving images including face regions that are acquired with an image acquisition device. The programming instructions include a face detection module for identifying a group of pixels corresponding to a face region within digital image data acquired by the acquisition device. A normalization module generates a normalized version of the face region. A face recognition module extracts a set of face classifier parameter values from the normalized face region. The set of face classifier parameter values are collectively known as a faceprint associated with the normalized face region. A workflow module compares the extracted faceprint to a database of archived faceprints previously determined to correspond to one or more known identities. The workflow module determines based on the comparing whether the new faceprint corresponds to any of the one or more known identities, and associates the new faceprint and normalized face region with a new or known identity within a database including other data corresponding to the archived faceprints and associated parent images for performing further comparisons with further faceprints. A database module archives data corresponding to the new faceprint and its associated parent image according to the associating by the workflow module within one or more digital data storage media. A set of user interface modules serve to obtain user input in the classifying of faceprints and their associated normalized face regions and parent images.

**[0258]** In a related aspect, a processor-based workflow system is further provided which operates according to digitally-embedded programming instructions and communicates with one or more digital data storage media for classifying and archiving images including face regions that are acquired with an image acquisition device. The programming instructions include a workflow module providing for the automatic or semiautomatic processing of identified face regions within digital images from which normalized face classifier parameter values are extracted and collectively referred to as a faceprint. The processing includes comparing the extracted faceprint to a database of archived faceprints previously determined to correspond to one or more known identities. It is determined, based on the comparing, whether the new faceprint corresponds to any of the one or more known identities. The new faceprint is associated with a new or known identity within a database comprising other data corresponding to the archived faceprints and associated parent images for performing further comparisons with further faceprints, such as to permit data corresponding to the new faceprint and its associated parent image to be archived according to the associating by the workflow module within one or more digital data storage media. A set of user interface modules serve to obtain user input in the classifying of faceprints and their associated normalized face regions and parent images.

**[0259]** In a second aspect, a database of faceprint data corresponds to detected face regions within images acquired with an image acquisition device and digitally-embedded within one or more digital storage media. The database includes image, identity and face recognition data components. The image data component includes acquired digital image data including content data and unique identifiers corresponding to individual acquired digital images or face regions therein, or both. The identity data component includes an identification listing of known identities to which identified face regions detected within the image data have been determined to correspond. The face recognition data component includes, for an individual known identity, an appearance table, one or more identity tables and one or more face class tables. The appearance table includes one or more identity entries for the known identity. The one or more identity tables correspond to the one or more identity entries in the appearance table. The one or more face class tables correspond to one or more face class entries of the one or more identity tables. Each face class table includes one or more face print image entries corresponding to faceprints determined from normalized face regions identified within the acquired digital image.

**[0260]** The image data component may further include an image list of the acquired digital image data. A group of image data may include a face region list including one or more entries each corresponding to an identified face candidate region within an acquired digital image. The face region list may further include one or more links, corresponding to the one or more entries, to one or more known identities within the identification listing of the identity data component. The image data component may also include multiple tables of image classification categories to which the image data are determined to belong. The image data component may include a set of database links to the tables of image classification categories.

**[0261]** The known identities may correspond to handles identifying a known person. The identity data component may include database links to face recognition data of the face recognition component, and/or may include one or more database links to personal data associated with one or more known identities. The identity data component may also include a table of personal data associated with a known identity, and/or a set of links to a relationship list or a group membership list or both.

**[0262]** Each identity table may include one or more face class entries each defined by values of one or more face classifier parameters. Two identity entries may be characterized separately due to at least one distinguishing appearance characteristic. The appearance characteristic may be distinguished as determined from a sufficient difference in value of at least one face classifier parameter between faceprints and associated normalized face regions determined to correspond to the same known identity, or based on user input, or both

[0263] The appearance table may include a list of links to one or more identity tables associated with distinct appearances determined for the known identity. The one or more identity tables may include one or more links corresponding to the one or more face class tables.

[0264] In another aspect, a database of faceprint data corresponds to detected face regions within images acquired with an image acquisition device and digitally-embedded within one or more digital storage media, and includes image, identity and face recognition data components. The image data component includes an acquired digital image, or a pointer to the location of the image, and additional data associated with the image including content data and unique identifiers corresponding to the acquired digital images or face regions therein, or both. The image data component further includes an image list of the acquired digital image data. The identity data component includes an identification listing of known identities to which identified face regions detected within the image data have been determined to correspond. The face recognition data component includes, for an individual known identity, one or more identity tables corresponding to one or more identity entries, and one or more face class tables corresponding to one or more face class entries of the one or more identity tables. Each face class table includes one or more faceprint entries corresponding to normalized face regions determined from the acquired digital image.

[0265] The one or more groups of image data may further include image metadata including acquisition device specific information or anthropometrical information associated with conditions of acquisition or normalization, or both, of a face region corresponding to a group of image data and its associated parent image. The image metadata information may include the focal length of a lens coupled with a digital camera at time of image acquisition, a focusing distance of the lens at time of acquisition, or an effective digital camera sensor size, or combinations of two or more of these.

[0266] The one or more image data groups may also include additional image data associated with circumstances of acquisition of a parent image and associated face region corresponding to a group of image data. These circumstances may include a location of image acquisition, date and time of image acquisition, type of image acquisition device, or any post-capture image processing including red eye correction or luminance correction, or combinations of these.

[0267] A group of image data may include a face region list including one or more entries each corresponding to an identified face candidate region within an acquired digital image. The face region list may include one or more links, corresponding to the one or more entries, to one or more known identities within the identification listing of the identity data component.

[0268] The image data component may include multiple tables of image classification categories to which the image data are determined to belong. The image data component may include a set of database links to the tables of image classification categories.

[0269] The known identities may correspond to handles identifying a known person. The identity data component may include database links to face recognition data of the face recognition component. The identity data component may also include one or more database links to personal data associated with one or more known identities, and/or a table of personal data associated with a known identity. The personal data may include full name, one or more addresses, one or more phone numbers, one or more email addresses, or one or more web addresses, or combinations of these. The identity data component may also include a set of links to a relationship list or a group membership list or both. The relationship list may include data on relationships between the known identity and other identities named within the database. The group membership list may include data on grouping of known identities based on family ties, hobbies, interests, group memberships, interpersonal relationships, or combinations thereof. Each identity table may include one or more face class entries each defined by values of one or more face classifier parameters.

[0270] In still another aspect, a database of face print image data corresponds to detected face regions within images acquired with an image acquisition device and digitally-embedded within one or more digital storage media, and includes image, identity and face recognition data components. The image data component includes acquired digital image data including content data and unique identifiers corresponding to individual acquired digital images or face regions therein, or both. The identity data component includes an identification listing of known identities to which identified face regions detected within the image data have been determined to correspond. The face recognition data component includes, for an individual known identity, one or more identity tables and one or more face class tables. The identity tables correspond to one or more identities. Each identity table includes one or more face class entries each defined by values of one or more face classifier parameters. The face class tables correspond to the one or more face class entries of the one or more identity tables. Each face class table includes one or more face print image entries corresponding to faceprints from the acquired digital image data

[0271] The image data component may include an image list of the acquired digital image data. The known identities may correspond to handles identifying a known person. The identity data component may include database links to face recognition data of the face recognition component, and/or to personal data associated with one or more known identities. The identity data component may also include a table of personal data associated with a known identity, wherein the personal data may include full name, one or more addresses, one or more phone numbers, one or more email addresses, or one or more web addresses, or combinations thereof. The identity data component may also include a set of links to a relationship list or a group membership list or both. The relationship list may include data on relationships between the known identity and other identities named within the database. The group membership list may include data on grouping of known identities based on family ties, hobbies, interests, group memberships, interpersonal relationships, or combinations thereof.

[0272] Two identity entries may be characterized separately due to at least one distinguishing appearance characteristic. The appearance characteristic may be distinguished as determined from a sufficient difference in value of at least one face classifier parameter between normalized faceprints determined to correspond to the same known identity, or based on user input, or both

[0273] The appearance table may include a list of links to one or more identity tables associated with distinct appearances determined for the known identity. The identity tables may include one or more links corresponding to the one or more face class tables. The face class tables may include one

or more of the previously determined value ranges of the one or more face classifier parameters. Each value range may be uniquely associated with an identified and user confirmed face region detected within an acquired digital image.

[0274] In a further aspect, a processor-based system programming instructions includes a face detection module for identifying face regions within digital images. A normalization module generates a normalized version of the face region that is at least pose normalized. A face recognition module extracts a set of face classifier parameter values from the normalized face region that are referred to as a faceprint. A workflow module compares the extracted faceprint to a database of archived faceprints previously determined to correspond to known identities. The workflow module determines based on the comparing whether the new faceprint corresponds to any of the known identities, and associates the new faceprint and normalized face region with a new or known identity within a database. A database module serves to archive data corresponding to the new faceprint and its associated parent image according to the associating by the workflow module within one or more digital data storage media.

[0275] In a related aspect, a processor-based workflow system is further provided which operates according to digitally-embedded programming instructions and communicates with one or more digital data storage media for classifying and archiving images including face regions that are acquired with an image acquisition device. The programming instructions include a normalization module for at least pose normalizing the face region. The programming instructions further include a workflow module providing for the automatic or semiautomatic processing of identified face regions within digital images from which normalized face classifier parameter values are extracted and collectively referred to as a faceprint. The processing includes comparing the extracted faceprint to a database of archived faceprints previously determined to correspond to one or more known identities. It is determined, based on the comparing, whether the new faceprint corresponds to any of the one or more known identities. The new faceprint is associated with a new or known identity within a database comprising other data corresponding to the archived faceprints and associated parent images for performing further comparisons with further faceprints, such as to permit data corresponding to the new faceprint and its associated parent image to be archived according to the associating by the workflow module within one or more digital data storage media.

[0276] The pose normalizing may include determining the pose of a confirmed face region, mapping the face region onto a 3d average-face model to create an interim 3d model of the face region, rotating the interim 3d model into full frontal alignment, and translating the facial aspect of the interim 3d model back onto 2d image space to create a pose normalized face region. The determining of the pose of a confirmed face region may include determining locations of principle facial feature within the face region, determining at least two geometric relationships between the facial features, and extrapolating from the geometric relationships the plane of the facial region, relative to the normal plane of the image acquisition apparatus thereby determining the facial pose relative to the normal plane of the image acquisition apparatus. The principle facial features may include two of an eye-pair, nose and mouth regions.

[0277] The mapping of the face region onto a 3d average-face model may include an additional resealing of the 3d average face model along at least one horizontal dimension. The additional resealing may be based on the at least two geometric relationships determined in the pose determining. The normalizing may include performing one or more additional normalizing operations on the pose normalized face region. The one or more additional normalization operations may include luminance, size, or orientation normalization, or combinations of two or more of these.

[0278] In another aspect, a processor-based system operating according to digitally-embedded programming instructions includes a face detection module for identifying face regions within digital images. A normalization module generates a normalized version of the face region. A face recognition module automatically extracts a set of face classifier parameter values from the normalized face region that are referred to as a faceprint. A workflow module automatically compares the extracted faceprint to a database of archived faceprints previously determined to correspond to known identities. The workflow module determines based on the comparing whether the new faceprint corresponds to any of the known identities, and associates the new faceprint and normalized face region with a new or known identity within a database. A database module serves to archive data corresponding to the new faceprint and its associated parent image according to the associating by the workflow module within one or more digital data storage media.

[0279] In a related aspect, a processor-based workflow system is further provided which operates according to digitally-embedded programming instructions and communicates with one or more digital data storage media for classifying and archiving images including face, regions that are acquired with an image acquisition device. The programming instructions include a normalization module for normalizing the face region. The programming instructions further include a workflow module providing for the automatic or semiautomatic processing of identified face regions within digital images from which normalized face classifier parameter values are automatically extracted and collectively referred to as a faceprint. The processing includes automatically comparing the extracted faceprint to a database of archived faceprints previously determined to correspond to one or more known identities. It is then determined, based on the comparing, whether the new faceprint corresponds to any of the one or more known identities. The new faceprint is associated with a new or known identity within a database comprising other data corresponding to the archived faceprints and associated parent images for performing further comparisons with further faceprints, such as to permit data corresponding to the new faceprint and its associated parent image to be archived according to the associating by the workflow module within one or more digital data storage media.

[0280] The face detection module may automatically identify the group of pixels corresponding to the face region when the digital image is received. The detected face regions may be automatically processed for normalization when they are identified.

[0281] While an exemplary drawings and specific embodiments of the present invention have been described and illustrated, it is to be understood that that the scope of the present invention is not to be limited to the particular embodiments discussed. Thus, the embodiments shall he regarded as illustrative rather than restrictive, and it should be understood that variations may be made in those embodiments by workers skilled in the arts without departing from the scope of the

present invention as set forth in the claims that follow and their structural and functional equivalents.

[0282] In addition, in methods that may be performed according to preferred embodiments herein, the operations have been described in selected typographical sequences. However, the sequences have been selected and so ordered for typographical convenience and are not intended to imply any particular order for performing the operations, unless a particular ordering is expressly provided or understood by those skilled in the art as being necessary.

What is claimed is:

**1**. A processor-based image acquisition and processing system including an image acquisition component comprising a lens and image sensor for acquiring a digital image, and a processing component a memory having processor-readable code embedded therein for programming the processor to perform a method of classifying and archiving images including face regions that are acquired with an image acquisition component, wherein the method comprises:

identifying a group of pixels corresponding to a face region within digital image data acquired by the acquisition device;

extracting a set of face analysis parameter values from said face region, said set of face analysis parameter values comprising a faceprint associated with said face region;

determining a first reference faceprint for a person using a reference image captured in predetermined face-portrait conditions;

determining a second reference faceprint for a person using a reference image captured using ambient conditions;

analyzing said first and second reference faceprints to determine a baseline faceprint and a range of variability from said baseline associated with said person;

storing results of said analyzing and using said results in the subsequent recognition of said person in a subsequent image acquired under ambient conditions.

**2**. The system of claim **1**, wherein the method further comprises repeating for one or more different persons.

**3**. The system of claim **1**, wherein the method further comprising normalizing said face regions with respect to size.

**4**. The system of claim **1**, wherein the method further comprises normalizing said face regions with respect to a standard size based on one or more distances between eyes, nose or mouth, or combinations thereof.

**5**. The system of claim **1**, wherein the method further comprises normalizing said face regions first with respect to pose, and then with respect to orientation, and then with respect to size.

**6**. A method of classifying and archiving images including face regions that are acquired with an image acquisition component, wherein the method comprises:

identifying a group of pixels corresponding to a face region within digital image data acquired by the acquisition device;

extracting a set of face analysis parameter values from said face region, said set of face analysis parameter values comprising a faceprint associated with said face region;

determining a first reference faceprint for a person using a reference image captured in predetermined face-portrait conditions;

determining a second reference faceprint for a person using a reference image captured using ambient conditions;

analyzing said first and second reference faceprints to determine a baseline faceprint and a range of variability from said baseline associated with said person;

storing results of said analyzing and using said results in the subsequent recognition of said person in a subsequent image acquired under ambient conditions.

**7**. The method of claim **6**, further comprising repeating for one or more different persons.

**8**. The method of claim **6**, further comprising normalizing said face regions with respect to size.

**9**. The method of claim **6**, further comprising normalizing said face regions with respect to a standard size based on one or more distances between eyes, nose or mouth, or combinations thereof.

**10**. The method of claim **6**, further comprising normalizing said face regions first with respect to pose, and then with respect to orientation, and then with respect to size.

**11**. One or more computer-readable media having code embedded therein for programming a processor to perform a method of classifying and archiving images including face regions that are acquired with an image acquisition component, wherein the method comprises:

identifying a group of pixels corresponding to a face region within digital image data acquired by the acquisition device;

extracting a set of face analysis parameter values from said face region, said set of face analysis parameter values comprising a faceprint associated with said face region;

determining a first reference faceprint for a person using a reference image captured in predetermined face-portrait conditions;

determining a second reference faceprint for a person using a reference image captured using ambient conditions;

analyzing said first and second reference faceprints to determine a baseline faceprint and a range of variability from said baseline associated with said person;

storing results of said analyzing and using said results in the subsequent recognition of said person in a subsequent image acquired under ambient conditions.

**12**. The one or more computer-readable media of claim **11**, wherein the method further comprises repeating for one or more different persons.

**13**. The one or more computer-readable media of claim **11**, wherein the method further comprising normalizing said face regions with respect to size.

**14**. The one or more computer-readable media of claim **11**, wherein the method further comprises normalizing said face regions with respect to a standard size based on one or more distances between eyes, nose or mouth, or combinations thereof.

**15**. The one or more computer-readable media of claim **11**, wherein the method further comprises normalizing said face regions first with respect to pose, and then with respect to orientation, and then with respect to size.

**16**. One or more processor-readable media having stored thereon processor-readable code including a database of face print image data corresponding to detected face regions within images acquired with an image acquisition device and digitally-stored, wherein the face print image data are stored within the media for access by a processor comprises:

an image data component including acquired digital image data including content data and unique identifiers corresponding to acquired digital images or face regions therein, or both;

an identity data component including an identification listing of known identities to which identified face regions detected within the acquired digital image data have been determined to correspond; and

a face recognition data component, comprising for an individual known identity:

one or more identity tables corresponding to one or more identities,

wherein each identity table comprises one or more face class entries each defined by values of parameters of one or more non-geometric face classifiers.

**17**. The one or more processor-readable media of claim **16**, wherein said transformed face classifiers comprise transformed classifiers.

**18**. The one or more processor-readable media of claim **16**, wherein the image data component further comprises an image list of acquired digital image data.

**19**. The one or more processor-readable media of claim **16**, wherein the known identities correspond to handles identifying a known person.

**20**. The one or more processor-readable media of claim **16**, wherein the identity data component further comprises one or more database links to face recognition data of the face recognition data component.

**21**. The one or more processor-readable media of claim **16**, wherein the identity data component further comprises one or more database links to personal data associated with one or more known identities.

**22**. The one or more processor-readable media of claim **16**, wherein the identity data component comprises a table of personal data associated with at least one of the known identities.

**23**. The one or more processor-readable media of claim **16**, wherein the face recognition data component further comprises one or more face class tables corresponding to the one or more face class entries of the one or more identity tables, wherein each face class table comprises one or more face print image entries corresponding to faceprints from the acquired digital image data.

**24**. The one or more processor-readable media of claim **23**, wherein the identified face regions comprise spatially normalized face regions, which are normalized with respect to size.

**25**. The one or more processor-readable media of claim **23**, wherein the normalized face regions comprise spatially normalized face regions, which are normalized with respect to size, orientation or pose, or luminance normalized face regions, or combinations thereof, and

wherein said normalized face regions are normalized with respect to a standard size based on one or more distances between eyes, nose, mouth, or one or more other facial features, or combinations thereof, and

wherein the identity data component further comprises a set of links to a relationship list or a group membership list or both.

**26**. The one or more processor-readable media of claim **23**, wherein the normalized face regions comprise spatially normalized face regions, which are normalized with respect to size, orientation or pose, luminance normalized face regions, or combinations thereof, and

wherein the image data component on the handheld image acquisition device further comprises multiple tables of image classification events, occasions, locations, or places, or other categories, or combinations thereof, each to which groups of multiple images of the image data are determined to belong.

**27**. The one or more processor-readable media of claim **23**, wherein the normalized face regions comprise spatially normalized face regions, which are normalized with respect to size, orientation or pose, luminance normalized face regions, or combinations thereof, and wherein said normalized face regions are normalized with respect to a standard size based on one or more distances between eyes, nose, mouth, or one or more other facial features, or combinations thereof, and

wherein the image data component further includes additional image data associated with circumstances of acquisition of a parent image and associated face region corresponding to a group of image data.

**28**. The one or more processor-readable media of claim **23**, wherein the normalized face regions comprise spatially normalized face regions, which are normalized with respect to size, orientation or pose, luminance normalized face regions, or combinations thereof, and

wherein the one or more groups of image data further include image metadata including focusing distance of the lens at time of acquisition, or effective digital camera sensor size, or both.

**29**. A portable digital image acquisition device, comprising a lens, an image sensor, a processor, and one or more processor-readable media having stored thereon processor-readable code including a database of face print image data corresponding to detected face regions within images acquired with an image acquisition device and digitally-stored, wherein the face print image data are stored within the media for access by a processor comprises:

an image data component including acquired digital image data including content data and unique identifiers corresponding to acquired digital images or face regions therein, or both;

an identity data component including an identification listing of known identities to which identified face regions detected within the acquired digital image data have been determined to correspond; and

a face recognition data component, comprising for an individual known identity:

one or more identity tables corresponding to one or more identities,

each identity table comprises one or more face class entries each defined by values of parameters of one or more non-geometric face classifiers.

**30**. The device of claim **29**, wherein the face recognition data component further comprises one or more face class tables corresponding to the one or more face class entries of the one or more identity tables, wherein each face class table comprises one or more face print image entries corresponding to faceprints from the acquired digital image data.

**31**. The device of claim **30**, wherein the image data component on the handheld image acquisition device further comprises multiple tables of image classification events, occasions, locations, or places, or other categories, or combinations thereof, each to which groups of multiple images of the image data are determined to belong.

**32**. The device of claim **30**, wherein the image data component further includes additional image data associated with circumstances of acquisition of a parent image and associated face region corresponding to a group of image data.

**33**. The device of claim **30**, wherein the one or more groups of image data further include image metadata including focusing distance of the lens at time of acquisition, or effective digital camera sensor size, or both.

* * * * *

# United States Patent [19]

**Lu**

[11] **Patent Number: 4,858,000**

[45] **Date of Patent: Aug. 15, 1989**

[54] **IMAGE RECOGNITION AUDIENCE MEASUREMENT SYSTEM AND METHOD**


[75] Inventor: **Daozheng Lu,** Dunedin, Fla.

[73] Assignee: **A. C. Nielsen Company,** Northbrook, Ill.



[21] Appl. No.: **244,916**

[22] Filed: **Sep. 14, 1988**

[51] **Int. Cl.**[4] ...................... **H04H 9/00;** H04N 17/00; G06K 9/00

[52] **U.S. Cl.** ........................................... **358/84;** 382/2

[58] **Field of Search** ................ 358/84; 379/92; 455/2; 382/2, 19, 23; 340/825.31, 825.34, 825.49



[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,056,135 | 9/1962 | Currey et al. | 358/84 X |
| 3,805,238 | 4/1974 | Rothfjell | 382/2 |
| 4,644,509 | 2/1987 | Kiewit et al. | 358/84 |
| 4,697,209 | 9/1987 | Kiewit et al. | 358/84 |
| 4,712,103 | 12/1987 | Gotanda | 340/825.31 |
| 4,739,398 | 4/1988 | Thomas et al. | 358/84 |
| 4,754,487 | 6/1988 | Newmuis | 382/2 |
| 4,769,697 | 9/1988 | Gilley et al. | 358/84 |



*Primary Examiner*—Keith E. George

*Attorney, Agent, or Firm*—Mason, Kolehmainen, Rathburn & Wyss


[57] **ABSTRACT**


An image recognition method and system are provided for identifying predetermined individual members of a viewing audience in a monitored area. A pattern image signature is stored corresponding to each predetermined individual member of the viewing audience to be identified. An audience scanner includes audience locating circuitry for locating individual audience members in the monitored area. A video image is captured for each of the located individual audience members in the monitored area. A pattern image signature is extracted from the captured image. The extracted pattern image signature is compared with each of the stored pattern image signatures to identify a particular one of the predetermined audience members. These steps are repeated to identify all of the located individual audience members in the monitored area.


**27 Claims, 7 Drawing Sheets**



FIG. 1




FIG. 4




FIG. 5




30
34
36
12
28
34
32

FIG. 2


12
AUDIENCE SCANNER
SCANNER CONTROLLER AND SIGNAL PROCESSING
28A
28
28B
FRAME GRABBER
28A
22
46
44
POWER SUPPLY
34
34A
50
48
52
18
22A
36
SCANNER CONTROLLER
54
36A
56
SCANNER DRIVE
20
A/D AND INTERFACE
24
38
40
30A
LM358
LM358
42
30
38
40
30A
LM358
LM358
42
32A
32

FIG. 3


FIG. 6
FACE IMAGE LOCATION
NORMALIZATION
THRESHOLDING
FEATURE SIGNATURE EXTRACTION
INDIVIDUAL FACE LIBRARY
LEARNING
STOP
RECOGNITION
G-SUB
92
94
96
98
100
102
FIG. 7
IMAGE ACQUISITION
FROM FRAME GRABBER 22
22A
88
LEARNING
RECOGNITION
ZOOMING AND HEAD LOCATION
NORMALIZATION
THRESHOLDING
FEATURE SIGNATURE EXTRACTION
RECOGNITION FOR IFL
REFERENCE
CONCLUDE ?
YES
NO
RESULT OUTPUT
SEARCH NEXT SUBIMAGE
G-SUB
26
104
106
108
110
112
114
116


FIG. 6A
B-SUB
m
n
L
0
FEATURE i=0
1011010
FEATURE i=1
1100110
FEATURE i=(T-1)
98
100
BYTE 0
BYTE (b-1)
BYTE b
BYTE 2b-1
BYTE (T-1)b
BYTE (Tb)-1

FIG. 8A




FIG. 8C




FIG. 8D




FIG. 8G




FIG. 8F



FIG.8E




FIG.8B




FIG.8H



FIG. 8I


START
IS EXPOSURE TIME OK ?
NO
YES
RESET POINTERS RESET MAX.
ALL RAW PICTURE SEARCHED ?
YES
RETURN
NO
UPDATE POINTERS MOVE THE HEAD WINDOW
SEARCH IFL
RESULT ≥ THRESHOLD ?
YES
SAVE POINTER
NO
IS RESULT BETTER THAN MAX. ?
NO
YES
UPDATE MAX.

FIG. 8L


START
GET AND DISPLAY A PICTURE
SEARCH ALL LIBRARIES
DISPLAY THE RESULTS
ALL POSITIONS LEARNED ?
YES
RETURN
NO
SHIFT TO LEFT ONE POSITION
ADD TO LIBRARY
YES
ALL POSITIONS LEARNED ?
NO
MOVE UP ONE POSITION
ADD TO LIBRARY

FIG. 8J




FIG. 8K




FIG. 8M



# IMAGE RECOGNITION AUDIENCE MEASUREMENT SYSTEM AND METHOD

## BACKGROUND OF THE INVENTION

### Related Application

A related application is entitled "IMAGE RECOGNITION SYSTEM AND METHOD, Ser. No. 244,492, filed Sept. 14, 1988, the same date as the present application by the present inventor Daozheng Lu and assigned to the same assignee.

### A. Field of the Invention

The present invention relates generally to image recognition systems for use with television audience measurement and marketing data collection systems, and more particularly to image recognition systems and methods for identifying predetermined individual members of a viewing audience.

### B. Description of the Prior Art

Manual systems for determining the viewing/listening habits of the public are prone to inaccuracies resulting from the entry of erroneous data that may be intentionally or unintentionally entered and are slow in acquiring data.

U.S. Pat. No. 3,056,135 to Currey et al. issued Sept. 25, 1962 and assigned to the same assignee as the present application describes a method and apparatus for automatically determining the listening habits of wave signal receiver users. The method disclosed in Currey et al. provides a record of the number and types of persons sing a wave signal receiver by monitoring the operational conditions of the receiver and utilizing both strategically placed switches for counting the number of persons entering, leaving and within a particular area and a photographic recorder for periodically recording the composition of the audience. A mailable magazine provides a record of both the audience composition and the receiver operation information for manual processing by a survey organization. Thus a disadvantage is that acquiring data is slow and further many viewing audience members object to being identified from the photographic record.

U.S. Pat. No. 4,644,509 to Kiewit et al. issued Feb. 17, 1987 and assigned to the same assignee as the present application discloses an ultrasonic, pulse-echo method and apparatus for determining the number of persons in the audience and the composition of the audience of a radio receiver and/or a television receiver. First and second reflected ultrasonic wave maps of the monitored area are collected, first without people and second with people who may be present in the monitored area. The first collected background defining map is subtracted from the second collected map to obtain a resulting map. The resulting map is processed to identify clusters having a minimum intensity. A cluster size of the thus identified clusters is utilized to identify clusters corresponding to people in an audience. While this arrangement is effective for counting viewing audience members, individual audience members can not be identified.

Various image recognition arrangements and systems are known for recognizing patterns within a captured video image. However, the conventional pattern recognition systems are impractical and uneconomical for identifying individual audience members of a viewing audience due to the vast information storage and computing requirements that would be needed in the conventional systems. It is desirable to provide an image recognition system having the capability to identify individual members of the viewing audience.

## SUMMARY OF THE INVENTION

It is an object of the present invention to provide a method and system for determining the viewing habits of the public that overcome many of the disadvantages of the prior art systems.

It is an object of the present invention to provide an image recognition method and system for identifying predetermined individual members of a viewing audience in a monitored area.

It is an object of the present invention to provide an image recognition method and system for identifying predetermined individual members of a viewing audience in a monitored area utilizing both covert illuminators and video sensors.

Therefore, in accordance with a preferred embodiment of the invention, there are provided an image recognition method and system for identifying predetermined individual members of a viewing audience in a monitored area. A pattern image signature is stored corresponding to each predetermined individual member of the viewing, audience to be identified. An audience scanner includes audience locating circuitry for locating individual audience members in the monitored area. A video image is captured for each of the located individual audience members in the monitored area. A pattern image signature is extracted from the captured image. The extracted pattern image signature is compared with each of the stored pattern image signatures to identify a particular one of the predetermined audience members. These steps are repeated to identify all of the located individual audience members in the monitored area.

In accordance with a feature of the invention, each of the plurality of feature image signatures are stored in a distinct memory space of a predetermined capacity. Each of the feature image signatures is generated by processing a plurality of video images of the face of the individual to be identified. A signature from each of the processed video images is extracted and stored in the corresponding predetermined memory space for the particular feature image signature.

## DESCRIPTION OF THE DRAWING

These and other objects and advantages of the present invention will become readily apparent upon consideration of the following detailed description and attached drawing wherein:

FIG. 1 is a block diagram of the image recognition system according to the present invention;

FIG. 2 is a perspective view partly broken away to show interior details of an audience scanner of the image recognition system of FIG. 1;

FIG. 3 is a partly schematic and block diagram representation of a scanner controller and signal processing circuit of the image recognition system of FIG. 1;

FIG. 4 is a partly schematic and block diagram representation of an analog-to-digital and interface circuit of the image recognition system of FIG. 1;

FIG. 5 is a block diagram of a control, command processor subsystem of the image recognition system of FIG. 1;

FIG. 6 is a block diagram of a learning functional portion of an audience recognition subsystem of the image recognition system of FIG. 1;

FIG. 6A is a graphical representation of a binary subimage and feature, identifying logic for extracting and storing an image signature of the image recognition system of FIG. 1;

FIG. 7 is a block diagram of a recognition functional portion of the audience recognition subsystem of the image recognition system of FIG. 1;

FIGS. 8A–8M are flow charts illustrating the logical steps performed by the image recognition system of FIG. 1.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring now to the drawing, with particular attention to FIG. 1, there is illustrated a block diagram of a new and improved image recognition system according to the invention generally designated by the reference numeral **10**. While the image recognition system **10** is depicted and generally described herein for use with a television receiver to identify individual members of a viewing audience, the principles of the present invention are also applicable to other image recognition systems.

As its major components, the image recognition system **10** includes an audience scanner **12** for scanning and capturing an image of the viewing audience members within a monitored area, and a control command processor subsystem **14** for performing control operations and for storing and processing captured images. A data transfer device **16** is used for periodically transferring stored data to a central computer (not shown) of the television audience measurement and/or marketing data collection systems. The image recognition system **10** includes a scanner controller and signal processing circuit **18** illustrated in FIG. **3** for providing illumination and motor control signals to the audience scanner **12** and for locating and capturing the images of the audience members within the monitored area, an analog-to-digital A/D and interface circuit **20** illustrated in FIG. **4** for identifying the distance between audience members and the audience scanner **12** and a frame grabber **22** for digitizing video images and providing frame buffer memory, timing and control logic. The frame grabber **22** can be implemented with, for example, such as, a model DT2803 low-cost Frame Grabber for use with IBM personal computers, manufactured and sold by Data Translation Inc., of Marlborough, Mass. The scanner controller and signal processing circuit **18** is connected to the A/D and interface circuit **20** and the frame grabber circuit **22** via a plurality of signal lines and a video cable **28**A. A data, address and control bus **24** connects the control command processor subsystem **14** to the A/D and interface circuit **20** and the frame grabber circuit **22**. An audience recognition subsystem **26** for learning and for recognizing feature image signatures of the images of the audience members is illustrated in FIGS. **6** and **7**.

Referring also to FIGS. **2** and **3**, the audience scanner **12** includes a video camera **28** for capturing a video image, a pair of infrared sensors **30** for locating individual audience members, an ultrasound transducer **32** for identifying a distance measurement between the camera **28** and a particular located audience member, a pair of infrared illumination devices **34** for covert illumination of the monitored area, and a scanner drive **36** for scanning the monitored area. The video camera **28** provides a video image signal at a line **28**A that is applied to the frame grabber **22**. The output of the frame grabber **22** is applied to the data, address and control bus **24** via a line **22**A. An infrared video camera, for example, such as a Model CCD1200 IR Microcam, manufactured and sold by Electrophysics Corporation of Nutley, N.J., may be employed for the video camera **28**.

A sensed infrared signal at a line **30**A provided by the infrared sensors **30** is applied to circuit **18**. A parallel opposed dual pyroelectric infrared detector used in conjunction with an optic focusing device including a pair of fixed surface mirrors and a Fresnel lens, may be used for each of the infrared sensors **30**, for example, such as an Eltec Model 429 and an Eltec Model 826C manufactured and sold by Eltec Instruments, Inc. of Daytona Beach, Fla. The sensed voltage signal output of each infrared sensor **30** at lines **30**A corresponds to the temperature distribution of the monitored area. Each of the sensed infrared signals at lines **30**A is applied to one of a pair of preamplifier devices **38**. Each amplified infrared signal is applied to a corresponding one of a pair of low pass filters **40** for providing filtered infrared signals at lines **42** applied to the A/D and interface circuit **20**. A dual operational amplifier integrated circuit device, such as a device type LM358 arranged with appropriate feedback and biasing devices can be used for the preamplifiers **38** and low pass filters **40**.

The ultrasound transducer **32**, such as a 50 KHz electrostatic transducer, for transmitting and for receiving ultrasonic signals provides a distance pulse echo signal at a line **32**A that is applied to the A/D and interface circuit **20**.

Covert illumination of the monitored area is provided by the pair of infrared illumination devices **34** (one shown in FIG. 3) with each illumination device **34** operatively controlled by an activating signal applied at a line **34**A. A Model IRL200 infrared room illuminator manufactured and sold by Electrophysics Corporation of Nutley, N.J., may be employed for the illumination devices **34**, although various illumination devices such as infrared lasers, light emitting diodes or a filtered flash lamp can be used. A switching transistor **44**, such as an NPN bipolar transistor, is turned on by a control signal at a line **46** applied to its base from the A/D and interface circuit **20**. A relay **48** connected between the collector of transistor **44** and a power supply **50** is energized by transistor **44** to close its relay contacts **52**. The output of the power supply **50** is applied at the line **34**A by the closed relay contacts **52**. The output of the power supply **50** is connected to the video camera **28** at a line **28**B.

The scanner drive **36**, such as a stepping motor is operatively controlled by a scanner controller **54** for stepwise angular rotation of the video camera **28** for scanning the monitored area. An integrated circuit stepper motor driver device type SAA1042 manufactured and sold by Motorola Inc. can be employed for the scanner controller **38**. Control signals at a pair of lines **56** are applied to the scanner controller **38** from the A/D and interface circuit **20**.

FIG. **4** provides a partly schematic and block diagram representation of the A/D and interface circuit **20**. The filtered infrared signals at lines **42** are applied to an analog-to-digital A/D converter **58** which generates digital representations of the processed infrared signals. The digitized signals are applied to the control command processor subsystem **14** to identify directions

within the monitored area corresponding to the possible locations of individual audience members. An ultrasound range module 60 drives the ultrasound transducer 32 for transmitting an ultrasonic burst signal and for receiving an echo signal at line 32A responsive to an enable or initiate input signal applied by the control/-command processor 14 via a peripheral interface adapter (PIA) 62 at a line ENABLE. The control command processor subsystem 14 utilizes the identified angle signal to initiate operation of the ultrasound range module 58.

A peripheral interface adapter device type 6522 manufactured by Rockwell International can be used for the PIA 62. Interrupt control signals IRQ2–IRQ7 at the processor subsystem data, address and control bus 24 from the PIA 62 are applied to the processor subsystem 14. The PIA 62 couples data, timing and control signals between the control/command processor 14 and the scanner controller and signal processing circuit 18. The PIA 62 also enables bidirectional communications between the image recognition system 10 and a host system for a particular application. A home unit of the type as described in U.S. Pat. No. 4,697,209 to David A. Kiewit and Daozheng Lu may be connected to the PIA 62.

An integrated circuit 8-bit A/D converter device type AD7828 manufactured and sold by Analog Devices can be employed for the A/D converter 58. A sonar ranging module, for example, such as an integrated circuit device type SN28827 manufactured and sold by Texas Instruments may be used for the ultrasound range module 60. An output echo signal of the ultrasound range module 60 is coupled to the control/-command processor subsystem 14 via an amplifier/limiter stage 64 and the A/D converter 58 which converts the echo signal to a suitable format for use by the control command processor subsystem 14. The processed echo signal representative of distance between the scanner 12 and the located individual audience member is utilized by the control command processor subsystem 14 for adjusting the zooming functions of the video image data during processing.

An octal bus transceiver 66, such as an integrated circuit device type 74HC245 manufactured and sold by Motorola Inc., provides bidirectional data communications between the processor subsystem data, address and control bus 24 and the A/D converter 58. A pair of octal bus transceivers 68 and 70 and a programmable array logic (PLA) device 72 provide bidirectional address and control communications between the processor subsystem data, address and control bus 24 and the PIA 62 and A/D converter 58.

An integrated circuit device type 74HC244 manufactured and sold by Motorola Inc. can be used for each of the octal bus transceivers 68 and 70. An oscillator device 74, such as a 2 MHz oscillator and a timing logic circuit 76 provide timing signals to the PIA 62 and the PLA 72. PLA 72 can be implemented with, for example, an integrated circuit device PLS153 manufactured and sold by Rockwell International.

FIG. 5 provides a block diagram representation of the control command processor subsystem 14 of the image recognition system 10. The control command processor subsystem 14 includes a central processing unit 78, such as, an Intel 80286 high performance 16-bit microprocessor with integrated memory management and adapted for multi-tasking systems and an optional associated memory device 80. The central processing unit 78 is programmable to perform the control and signal processing functions and includes, in known manner, asynchronous input signal timing and clock control bus timing functions.

The control command processor subsystem 14 further may include an image display 82, a computer display 84 and a keyboard 86 for use during the installation of the image recognition system 10. The control command processor subsystem 14 can be implemented with a personal computer system, such as an IBM PC/AT.

Control signals at the processor bus 24 from the central processing unit 78 are applied via the signal line 46 of the PIA 62 (FIG. 4) to the illumination controller switching transistor 44 (FIG. 3) for controlling illumination of the monitored area. Motor control signals at the processor bus 24 from the central processing unit 78 are applied via the lines 56 of the PIA 62 (FIG. 4) to the scanner controller 54 (FIG. 3) which are translated and applied to the stepping motor 36. Feedback position signals may be provided to the central processing unit 78.

FIGS. 6 and 7 provide a block diagram representation of the audience recognition subsystem 26. Bidirectional communications are provided between the central processing unit 78 and the frame grabber 22 and the audience recognition subsystem 26 via the data, address, and control bus 24. Referring initially to FIG. 6, a learning operational mode of the audience recognition subsystem 26 is illustrated. The processed infrared image output signal from the frame grabber 22 is applied to an image acquisition block 88 to generate a digital representation of the infrared image signal. The digital infrared image representation is applied to a face image location block 92 that acquires a variable portion (mxn) pixels of the digitized image signal. The values of m and n are variable between 32 and 256 as determined for a particular identified distance between the scanner 12 and the located audience member. A middle pixel image portion may include, for example, such as m=50 and n=50. A gray-level subimage output of the face image location block 92 at a line G-Sub is applied to a normalization block 94. The normalized output of block 94 is applied to a thresholding block 96 to provide a thresholding, binary level face image output at a line B-Sub. Each pixel of the (mxn) thresholding, binary level face or B-Sub image is represented by a single binary digit or bit, or 2500 bits for the 50×50 pixels. The B-Sub image signal is applied to a feature signature extraction block 98. An extracted pattern image signature output of the feature signature extraction block 98 is stored in an individual face storage library (IFL) 100. A stop function flag is set at stop blocks 102 for updating the image libraries performed by the control command processor subsystem 14 as illustrated in FIG. 8A.

FIG. 6A provides a graphical representation of a B-sub image including mxn pixels. Each of the mxn pixels is either a zero or a one. The B-sub image pixel data is utilized to extract the pattern image signature for storing in the learning operational mode (FIG. 6) and to extract the pattern image signature for comparing with the feature image signatures in the recognition operational mode illustrated in FIG. 7.

In accordance with a feature of the invention, a pseudo random predetermined sequence of the mxn, B-Sub image bits defines a predetermined number T of feature positions used for storing the extracted feature signature output of the feature signature extraction block 98. Each feature position has a predetermined

length L, where the value of L is between 3 and 10. Considering a predetermined feature position of length L=7 and with the above example B-Sub image of 2500 bits, a pseudo random sequence of 2500/7 or 357 feature positions results or T=357. Each feature has a value between 0 and $(2^L-1)$ or, for example, between 0 and 127 when L=7. A memory space of $2^L$ bits arranged as bytes b, where b equals $2^L/8$, is used for storing the possible feature values for each of the feature positions or, for example, 2*7 or 128 bits or 16 bytes. Thus a total memory space for each of the pattern or face image signatures equals T multiplied by b or, for example, 357 positions×16 bytes/position or 5712 bytes.

FIG. **6A** illustrates a plurality of feature positions i=0 through i=(T−1) generally designated by the reference character **98** corresponding to the feature extraction block **98**. The corresponding memory space is represented by the reference character **100** corresponding to the IFL block **100**. The first or i=0 feature position value is stored in a corresponding bit position B in a corresponding byte between 0 and (b−1) within the memory space **98**. The logic steps performed for storing the individual face pattern image signatures are described with respect to FIG. **8B**.

A distinct memory space of a predetermined capacity is defined for each of the individual face pattern image signatures within the image face library IFL block **100**. For example, for a viewing audience including a defined number of audience members P, individual face signatures (T×P) are stored in the corresponding IFL defined memory spaces. Multiple face images are learned for each of the audience members P by sequentially processing a series of video images of the video camera **28** by the image signal processing blocks of FIG. **6** for each of the audience members. All of the resulting extracted pattern image signatures for each of the audience members are stored in the particular corresponding memory space of the IFL memory spaces.

FIG. 7 provides a block diagram representation of the recognition mode of the audience recognition subsystem **26**. The digital representation of the infrared image signal from the image acquisition block **88** corresponding to an identified direction of an audience member by the processor subsystem **14** is applied to a zooming and head location block **104**. A gray-level subimage output G-Sub of the zooming and head location block **104** is applied to a normalization block **106**. The normalized output of block **106** is applied to a thresholding block **108** to provide a thresholding, binary level image output B-Sub. A feature signature is extracted from the B-Sub image at a feature signature extraction block **110**. The extracted B-Sub image feature signature is compared with each of the pattern image signatures stored in the individual face library as illustrated at a block **112** to identify a match. A particular audience member is identified when the compared signatures exceed a predetermined correlation threshold value corresponding to the best matching rate or highest correlation with an individual face pattern image signature in the individual face library is identified at a conclusion block **114**. If such a conclusion can not be reached, a next gray-level subimage output G-Sub of the zooming and head location block **104** is sequentially processed until a satisfactory conclusion can be made. The satisfactory conclusions include both "identified" and "unidentified" audience members. The logic steps performed for recognizing the particular individual audience member are described with respect to FIG. **8B**. An output signal at a



line **116** is then stored corresponding to the particular identified individual member of the viewing audience. The thus identified individual viewing member data can be stored together with other parameter data of a television data collection system, such as channel reception of a monitored receiver.

Referring to FIG. **8A**, there is a main flow chart illustrating the logical steps performed by the control command processor subsystem **14** of the image recognition system **10**. The sequential steps begin with an initialization routine. Then if a stop function is set, the particular pattern image signature memory space can be updated to include the feature image signature stored at IFL block **100** of FIG. **6**. Otherwise, it is determined whether any function or mode has been selected, such as by a remote control or keyboard entry. If yes, then the selected function or mode is set or updated and then performed. Otherwise, the next sequential function or mode of modes **1-7** is performed.

FIG. **8B** is a flow chart illustrating the logic steps performed for learning and recognizing the individual face. The sequential operations begin by setting a memory space address ADDR to the starting address with N-found set to zero. In the learning mode, an identified feature value from the B-Sub image is set to a corresponding bit position, starting with feature position i=0 and repeated for each feature position to i=356. The corresponding bit position B bit of ADDR+A byte, is determined by the particular feature value S, where S is between 0 and 127, A equals an integer value S/8 and B equals S mod **8** or the residue of S after A bytes. For example, a feature value S=114 from the B-Sub image for the feature position i=0 is set to the 2nd bit of ADDR+14 byte.

An individual audience member face image may be learned multiple times (R) with R possible different extracted signatures resulting, depending on any changed facial expressions or various profiles of the audience member. Each of the extracted feature signatures is sequentially stored within the corresponding pattern image signature memory space for the particular audience member by repeating the sequential signal processing of FIG. **6** and the learning or storing steps of FIG. **8B**.

Otherwise if not in the learning mode, then the sequential steps for the recognition mode are performed, such as at the recognition for IFL block **112** when the B-Sub image extracted feature signature is compared with each of the individual pattern image signatures.

In the recognition mode, the identified feature value from the B-Sub image is compared to a corresponding bit position, starting with feature position i=0 and repeated for each feature position to i=356. If the corresponding bit position is set, a match is indicated and the N-found value is incremented by one. Otherwise, if the corresponding bit position is not set, nonmatching is indicated and the N-found value is not changed. The next incremental feature position is then compared to the corresponding bit position for the identified feature value.

After the last feature position i=356 has been identified and compared to identify a match, then the resulting N-found value is compared with a threshold value. If resulting N-found value is less than the threshold value, then a FALSE or no recognition for the particular IFL is indicated. If resulting N-found value is greater than or equal to the threshold value, then a

TRUE or a recognition of the particular IFL is indicated.

FIG. 8C is a flow chart illustrating an operational function or mode **1** logical steps performed to add to the individual pattern image signatures memory space or library. The sequential steps begin with a get and display a picture subroutine illustrated in FIG. 8D. Next a search all libraries subroutine illustrated in FIG. 8E is performed. The results are displayed and added to the library.

The get and display a picture subroutine of FIG. 8D starts with an image acquisition step (block **88** of FIG. 6). The infrared video image is processed (blocks **92, 94** and **96** of FIG. 6) to provide a binary picture (B-sub image). A ratio of the ones in the resulting binary picture is calculated and the resulting binary picture is displayed.

In FIG. 8E, the search all libraries subroutine begins with a check of the exposure time based on the calculated ratio of ones and if adjustment is required, then the sequential operation return without searching the libraries. Otherwise, if adjustment of the exposure time is not required, then an initial MAX value is set for the predetermined N-found value. A first library is searched (block **112** of FIG. 7 and FIG. 8B) and if the result N-found value is greater than the initial MAX value, then the MAX value is updated. Otherwise the MAX value is not changed. Then a next library is searched and the result is compared to the resulting MAX value and adjusted, until all the libraries have been searched.

FIG. 8F is a flow chart illustrating an operational function or mode **2** logical steps performed to verify and add to library. The sequential steps begin with the get and display the picture subroutine illustrated in FIG. 8D. Next the search all libraries subroutine illustrated, in FIG. 8E is performed. The results are displayed, verified by a user operator of the system **10**, then added to an identified correct library.

FIG. 8G is a flow chart illustrating an operational function or mode **3** logical steps performed to locate, display and recognize the faces. The sequential steps begin with a get and display the picture subroutine illustrated in FIG. 8D. Next the search all libraries subroutine illustrated in FIG. 8E is performed. The results are displayed.

FIG. 8H is a flow chart illustrating an operational function or mode **4** logical steps performed to locate the faces. The sequential steps begin with a search raw picture for heads subroutine illustrated in FIG. 8I. Next a locate and search head(s) subroutine illustrated in FIG. 8J is performed.

In FIG. 8I, the search raw picture for head(s) subroutine begins with a check of the exposure time and if adjustment is required, then the sequential operation return without performing any searching for heads. Otherwise, if adjustment of the exposure time is not required, then an initial MAX value is set for the predetermined N-found value and a search area pointer i is reset. The first search area matrix is identified and sequentially compared with each of the individual pattern image signatures (IFM block **112** of FIG. 7 and FIG. 8B). The result is compared with the set predetermined correlation threshold MAX value, and if the result is greater than the initial MAX value, then that search area pointer is saved and the MAX value is updated. Otherwise, the search area pointer is not saved and the MAX value is not changed. Then the search area pointer value is updated and the next search area matrix is identified and the sequential steps are repeated until the total raw picture has been searched.

FIG. 8J illustrates the locate and search head(s) subroutine performed by the control command processor subsystem **14** in the mode **4**. If one search area pointer is stored in the subroutine of FIG. 8I, then the search area window is set to the identified search area matrix by the saved pointer value which corresponds to the head image portion. The exposure time is adjusted and the search all libraries subroutine of FIG. 8E is performed and the results are displayed.

Otherwise, if more than one pointer value is stored in the subroutine of FIG. 8I, then the MAX value is reset for a predetermined initial value. Then the search area window is set to the first identified search area matrix by the first saved pointer value which corresponds to a first head image portion. A local normalization is performed on the search area matrix data and the search all libraries subroutine of FIG. 8E is performed, and if the result is greater than the initial MAX value, then the MAX value is updated. Otherwise the MAX value is not changed. Then a next search area window is set to the next saved pointer value which corresponds to a next head image portion and the sequential steps are repeated until all the head image portions have been searched. Then the search area window is set to the identified search area matrix having the highest MAX value which corresponds to the head image portion. A local normalization is performed on the search area matrix data and the search all libraries subroutine of FIG. 8E is performed and the results are displayed.

FIG. 8K is a flow chart illustrating an operational function or mode **5** logical steps performed to scan and search the monitored area. The sequential steps begin with scanning of the monitored area. Then the video camera **28** is pointed to audience members within the monitored area and the mode **4** operations of FIG. 8H are performed.

FIG. 8L is a flow chart illustrating an operational function or mode **6** logical steps performed to shift and learn. The sequential steps begin with the get and display the picture subroutine illustrated in FIG. 8D. Next the search all libraries subroutine illustrated in FIG. 8E is performed. The results are displayed and if all positions have been learned, then the sequential operation return without adding to the library. Otherwise, the audience member image is shifted to the left one position and added to the pattern image signature IFL. Then the audience member image is moved up one position and sequentially repeated until all positions have been learned and added to the library.

FIG. 8M is a flow chart illustrating an operational function or mode **7** logical steps performed to search and pause. The sequential steps begin with the search raw picture for heads subroutine illustrated in FIG. 8I. Next the locate and search head(s) subroutine illustrated in FIG. 8J is performed. Then if a continue decision is yes, the sequential mode **7** steps are repeated.

Although the present invention has been described in connection with details of the preferred embodiment, many alterations and modifications may be made, without departing from the invention. Accordingly, it is intended that all such alterations and modifications be considered as within the spirit and scope of the invention as defined in the appended claims.

What is claimed and desired to be secured by Letters Patent is:

1. An image recognition system for identifying predetermined individual members of a viewing audience in a monitored area:

means for storing a plurality of pattern image signatures, each of said pattern image signatures corresponding to one of the predetermined individual members;

means for locating individual members in the monitored area;

means for capturing an image of each of said located individual members in the monitored area;

means for comparing each of said captured images with said stored pattern image signatures to identify each of the predetermined individual members.

2. An image recognition system as recited in claim 1 wherein said means for locating the individual members includes an infrared detector for providing a temperature representative signal of the monitored area.

3. An image recognition system as recited in claim 2 further comprising processing means for processing said temperature representative signal to provide a direction signal.

4. An image recognition system as recited in claim 3 wherein said means for locating the individual members further includes ultrasonic means responsive to said direction signal for providing a distance signal.

5. An image recognition system as recited in claim 4 wherein said ultrasonic means include means for transmitting an ultrasonic pulse echo signal, means for detecting a reflected pulse echo signal, and means for processing said detected pulse echo signal for providing said distance signal.

6. An image recognition system as recited in claim 2 wherein said means for locating the individual members further includes scanner means for scanning the monitored area providing angular rotation of said infrared detector in a plane to provide said temperature representative signal of the monitored area.

7. An image recognition system as recited in claim 1 wherein said image capturing means includes an infrared video camera for providing a video image signal.

8. An image recognition system as recited in claim 7 wherein said comparing means includes:

means for processing each said captured video image to provide a digitized image signal; and

means for extracting a pattern signature from said digitized image signal.

9. An image recognition system as recited in claim 8 wherein said digitized image signal comprises a digitized gray level image.

10. An image recognition system as recited in claim 8 wherein said digitized image signal comprises a thresholding binary image.

11. An image recognition system as recited in claim 8 wherein said pattern signature extracting means includes:

means for defining a plurality of predefined feature positions from said digitized image signal;

means for identifying a feature value for each of said plurality of predefined feature positions; and

means for identifying a memory location corresponding to said identified feature value for each of a plurality of predefined feature positions.

12. An image recognition system as recited in claim 11 wherein said comparing means further includes:

means for calculating a number of matching memory locations with each of said pattern image signatures; and

means for identifying a match responsive to said calculated number greater than a predetermined threshold value.

13. An image recognition system as recited in claim 12 wherein said comparing means further includes:

means for identifying a highest matching value to identify each of the predetermined audience members.

14. An image recognition system as recited in claim 1 further comprising covert illumination means for illuminating the monitored area.

15. An image recognition system as recited in claim 14 wherein said covert illumination means include at least one infrared illuminator.

16. A method of identifying predetermined individual members of a viewing audience in a monitored area:

storing a plurality of pattern image signatures, each of said pattern image signatures corresponding to one of the predetermined individual members;

scanning the monitored area and generating a temperature representative signal of the monitored area;

processing said generated temperature representative signal and providing individual members direction signals;

capturing a video image responsive to each of said individual members direction signals in the monitored area;

sequentially comparing each said captured video image with each of said stored pattern image signatures to identify each of the predetermined individual members.

17. A method as recited in claim 16 wherein said step of sequentially comparing includes the steps of:

processing each said captured video image to provide a digitized image signal;

extracting a pattern image signature from each said digitized image; and

comparing each said extracted signature with each of said stored pattern image signatures.

18. A method as recited in claim 17 wherein said steps of extracting and comparing said extracted signature includes the steps of:

identifying a feature value for each of a plurality of predefined feature positions from said digitized image signal;

identifying and comparing a memory location corresponding to said identified feature value for each of said plurality of predefined feature positions with each of said stored pattern image signatures;

calculating the number of matching memory locations for each of said stored pattern image signatures; and

identifying a match responsive to said calculated number greater than a predetermined threshold value.

19. A method as recited in claim 18 further comprising the step of identifying a highest matching value of said identified matching signatures to identify each of the predetermined individual members.

20. A method as recited in claim 16 wherein said steps of storing said plurality of pattern image signatures includes the steps of:

providing a plurality of distinct pattern image signature memory spaces for storing each of said pattern image signatures;

capturing a first video image of each of the predetermined individual members;

sequentially processing each said first captured video image to provide a digitized image signal;

identifying a feature value from each said digitized image signal for each of a plurality of predefined feature positions;

identifying a memory location corresponding to each said identified feature value for each of a plurality of predefined feature positions; and

storing a binary digit one in said identified memory locations in the pattern image signature memory space corresponding to a sequential one of the predetermined individual members.

**21**. A method as recited in claim **20** further comprising capturing at least one subsequent video image of each predetermined individual member and sequentially repeating the processing, identifying and storing steps for each captured video image.

**22**. An image recognition system for identifying predetermined individual members of a viewing audience in a monitored area:

memory means for storing a plurality of pattern image signatures, each of said pattern image signatures corresponding to one of the predetermined individual members;

scanner means for scanning the monitored area;

infrared sensing means carried by said scanner for providing a temperature representative signal of the monitored area;

means responsive to said temperature representative signal for generating a direction signal for each located individual member in the monitored area;

infrared video camera means carried by said scanner means and responsive to said direction signal for capturing an image of each of said located individual members in the monitored area;

means for comparing each said captured image with said stored pattern image signatures to identify each of said located individual members of the predetermined individual members.

**23**. An image recognition system as recited in claim **22** further comprising:

ultrasonic detecting means carried by said scanner means and responsive to said direction signal for each located individual member for transmitting an ultrasonic pulse signal and for detecting a reflected ultrasonic echo signal;

means responsive to said detected ultrasonic echo signal for generating a distance signal; and

wherein said infrared video camera means is responsive to said distance signal for capturing said image of each of said located individual members in the monitored area.

**24**. An image recognition system as recited in claim **22** further comprising:

infrared illumination means carried by said scanner means and responsive to said direction signal for illuminating said located individual member in the monitored area.

**25**. An image recognition system as recited in claim **22** wherein said comparing means includes:

means for processing said captured video image to provide a digitized image signal; and

means for extracting a pattern signature from said digitized image signal.

**26**. An image recognition system as recited in claim **25** wherein said pattern signature extracting means includes:

means for defining a plurality of predefined feature positions from said digitized image signal;

means for identifying a feature value for each of said plurality of predefined feature positions; and

means for identifying a memory location corresponding to said identified feature value for each of a plurality of predefined feature positions.

**27**. An image recognition system as recited in claim **26** further includes:

means for sequentially comparing said identified memory locations with each of said stored pattern image signatures;

means for calculating a number of matching memory locations with each of said pattern image signatures; and

means for identifying a match responsive to said calculated number greater than a predetermined threshold value.

* * * * *

# Robust Face Detection at Video Frame Rate Based on Edge Orientation Features

Bernhard Fröba and Christian Küblbeck
Department of Applied Electronics
Fraunhofer Institute for Integrated Circuits
Am Weichselgarten 3, D-91058 Erlangen, Germany
Email: {bdf,kue}@iis.fhg.de

## Abstract

*In this paper we present a novel approach to real-time face detection in arbitrary grey images and video streams using a multi-stage detection pipeline. It is based on an edge orientation matching and a subsequent candidate verification using a SNoW classifier at the final stage. We have developed a simple and efficient method for object modeling and matching using edge orientation information only which we call EOM (Edge Orientation Matching). To make the system more robust we verify face candidates obtained by the EOM with a view based SNoW classifier which operates directly on the grey values. For further speedup the pipelined matcher is combined with a coarse-to-fine grid scan of the image. On average it thus requires less than* 10% *of all possible image locations to be processed by the detection pipeline. With this method it takes* 50 *msec on an Athlon 1000MHz PC to analyze an image of spatial size* $384 \times 288$. *Experimental results on a large database of 18704 grey still images with 19030 detectable frontal faces, including the M2VTS frontal face database, the CMU test set of Rowley and Baluja and the newly released BioID testset, show that the presented approach outperformes methodes that use Neural Networkes, Bayesian methods and SVMs by far in terms of computational efficiency while showing comparable detetction results. The overall recognition performance is above* 96%.

## 1. Introduction

On-line face detection may serve as basic technique for many potential applications such as complex interaction in multi-modal human machine interfaces, face recognition, video coding and virtual reality applications. The fast and reliant detection of faces is a challenging task which provides general insight to real-time computer vision problems. In the past, several approaches to face detection have been made. A widely-used class of methods for finding faces uses various kinds of grey level correlation approaches. Some authors[12, 1, 5, 7] use artificial neural networks trained with normalized face images and non-face images to model the problem domain. Another view-based algorithm was developed by Sung[14]. He also used normalized grey level images to represent a face and non-face class, but he used an alternative classification method based on the combination of a statistical description of the grey value appearance of each class and a subsequent neural network. Osuna[11] uses a support vector machine as classification algorithm.

Many view-based approaches model the appearance of the face in the eigenspace, like Moghaddam and Pentland [10]. The eigenspace is a feature space and is built by singular value decomposition of a large set of training images. Several distance metrics have been proposed for an eigenspace-based face detection algorithm. Moghaddam[10] for example proposes the DIFS (distance in feature space) metric and a probabilistic model is used to model the face class within the feature space. Yang and colleagues[15] propose two methods, one based on self organizing maps and linear discriminant analysis and another one using a mixture of factor analyzers for face detection.

Especially the view-based methods mentioned above are reported to have a good detection performance but the drawback to be computationally rather expensive and at present are not the appropriate choice for real-time applications. Fast methods on the other hand mostly rely on the use of color or motion information. Both may function well under controlled conditions, but may fail in real world applications.

We have designed a pipelined matching algorithm that uses edge orientation at the early stages and grey appearance for verification at the last stage of the pipeline. This approach together with a coarse-to-fine image scan leeds to a extremly fast detection system that runs at video-framerate on standard computers. The proposed alogrithm is also robust under a wide range of acquisition conditions such as lighting and background variations.

Proceedings of the Fifth IEEE International Conference on Automatic Face and Gesture Recognition (FGR'02)
0-7695-1602-5/02 $17.00 © 2002 **IEEE**

IEEE COMPUTER SOCIETY
Authorized licensed use limited to: University at Buffalo Libraries. Downloaded on May 11,2023 at 17:39:05 UTC from IEEE Xplore. Restrictions apply.

There are several algorithms that use edge orientation information for face processing. Bichsel [2] uses dot products of edge direction maps for the purpose of face recognition. Burl et al. [3] utilize shape statistics of the facial feature (eyes, nose, mouth) configuration learned from a training sample. The feature candidates are detected by what they call Orientation Template Correlation. Maio and Maltoni [8] utilize the hough transform for elliptical face outline detection with a subsequent matching of a manual generated orientation model for verification. The mentioned edge-based methods are not real time for face detection of arbitrary size and the published results are obtained using only small databases.

## 2. System Overview

Our approach is designed to cope with still images as well as video streams. Figure 2 gives an overview over the still image detector. It consists of two consecutive applied methods EOM (Edge Orientation Matching) and an appearance based method called SNoW. It was first used for face detection by Yang[16] et al.. Both methods are applied at an image location in a pipelined manner. The EOM itself consists of a pipeline of successive matching stages, like displayed in Fig. 2. First the model parts with the highest discrimination power are matched at the early stages. Each stage of the EOM has the ability to reject the current position if the score does not match the score criterion of this stage. Thus most of the examined image locations are ruled out at very early stages with little computation. This is further supported by the edge orientation features as the orientation field of an image is usually populated very sparsly.

An analysis window that passed the EOM-pipeline is verified in the last matching stage by a grey level method. Unlike the previous EOM-pipeline which operates in the orientation domain the last one processes the grey value information directly. It requires expensive normalization of the analysis window. But this last stage is reached only a few times per image so that this does not carry much weight on the whole detection process.

For further speedup the pipelined matcher is combined with a coarse-to-fine grid scan of the image, which on average requires less than 10% of the possible image locations to be processed by the detection pipeline. In the next sections we detail the processing blocks and present the performance figures of the system measured an a large database.

## 3. Edge Orientation Matching

In this section we derive a formal description of the EOM. First we describe edge orientation fields which are related to gradient fields. The difference is that the angles




**Figure 2. Matching pipeline.**

are mapped to $[0 \ldots \pi]$ and a threshold on edge strength is used to mask out unreliable edge information. We also introduce an effective distance metric and show how to model an object in the edge orientation domain.

### 3.1. Edge Orientation Fields

The extraction of edge information (strength and orientation) from a 2-D array of pixels $I(x, y)$ (a grey-scale image) is the basic feature calculation in our detection framework. In this work we use the Sobel method (see for example [4]) for edge processing. It is a gradient-based method which needs to convolve the image $I(x, y)$ with two $3 \times 3$ filter masks, $K_x$ for horizontal filtering and $K_x$ for vertical filtering.

$$K_x = \begin{bmatrix} 1 & 0 & -1 \\ 2 & 0 & -2 \\ 1 & 0 & -1 \end{bmatrix} \text{ and } \mathrm{K_y} = \begin{bmatrix} 1 & 2 & 1 \\ 0 & 0 & 0 \\ -1 & -2 & -1 \end{bmatrix} \quad (1)$$

The convolution of the image with the two filter masks gives two edge strength images $G_x(x, y)$ and $G_y(x, y)$,

$$G_x(x, y) = K_x \star I(x, y), \quad (2)$$

$$G_y(x, y) = K_y \star I(x, y). \quad (3)$$

The absolute value $S(x, y)$, referred to as edge strength and the edge direction information $\Phi(x, y)$ are obtained using:

$$S(x, y) = \sqrt{{G_x}^2(x, y) + {G_y}^2(x, y)}, \quad (4)$$



Proceedings of the Fifth IEEE International Conference on Automatic Face and Gesture Recognition (FGR'02)
0-7695-1602-5/02 $17.00 © 2002 **IEEE**
IEEE COMPUTER SOCIETY
Authorized licensed use limited to: University at Buffalo Libraries. Downloaded on May 11,2023 at 17:39:05 UTC from IEEE Xplore. Restrictions apply.
TVision Insights, Inc. – Ex. 1013, Page 000002
APPX1132



a.) b.) c.) d.) e.)

**Figure 1. Example of an image (a), the vertical edge image $G_x(x,y)$ from Equ. (2) (b), the horizontal edge image $G_y(x,y)$ from Equ. (3) (c), the edge strength image $S(x,y)$ from Equ. (4) (d) and the edge orientation image $\Phi(x,y)$ from Equ. (5) (e), where the orientations are coded as grey value information**

$$\Phi(x,y) = \arctan(\frac{G_y(x,y)}{G_x(x,y)}) + \frac{\pi}{2}. \quad (5)$$

The edge information on homogenous parts of the image where no grey value changes occur is often noisy and bears no useful information for the detection. To exclude this information we apply a threshold $T_s$ to the edge strength $S(x,y)$ generating an edge strength field $S_T(x,y)$,

$$S_T(x,y) = \begin{cases} S(x,y) & if \quad S(x,y) > T_s \\ 0 & else \end{cases} . \quad (6)$$

The edge direction as stated in equation (5) takes on values from 0 to $2\pi$. The direction of an edge depends on whether the grey value changes from dark to bright or vice versa. This information is irrelevant for our purposes. Therefore, we map the direction information to a range of value $[0 \ldots \pi]$ obtaining a new field

$$\hat{\Phi}(x,y) = \begin{cases} \Phi(x,y) & if \quad 0 \leq \Phi(x,y) < \pi \\ \Phi(x,y) - \pi & if \quad \pi \leq \Phi(x,y) < 2\pi \end{cases}, \quad (7)$$

which we call the edge orientation field. The edge orientation information can be rewritten using a complex formula

$$\mathbf{V}(x,y) = S_T(x,y)e^{j\hat{\Phi}(x,y)}, \quad (8)$$

where $\mathbf{V}(x,y)$ is the complex edge orientation vector field and $j^2 = -1$. $S_T(x,y)$ and $\hat{\Phi}(x,y)$ are obtained using equation (6) and (7). The edge orientation vector field can be displayed like shown in figure 3. The elements of $\mathbf{V}$ are referred to as $\mathbf{v}$.

### 3.2. Orientation Templates

To build a face model, we use a sample of 2000 hand-labeled face images which are different from the test sets described later. The faces are cropped, aligned and scaled to the size $27 \times 32$ in the grey level domain. From this set of normalized face images an average face is computed. We also use vertically mirrored versions of each face in the set for the average face. Finally the edge orientation vector field $\mathbf{V}_M$ is calculated form the average face.



**Figure 3. Typical orientation template (right image) $\mathbf{V}_M$ for upright frontal face detection. The orientation information is visualized as vectors without arrows. The left image shows the grey value average face from which the model is constructed.**

During training an ordered partitioning of $N_M$ sub-models is searched. The ordering is due to the discrimination power of the sub-models. For finding an optimal partitioning and the associated matching thresholds we also use a nonface-database of 50000 non-face orientation fields of size $27 \times 32$. The optimization process starts with selecting the best feature from the model. The best feature then is the first feature of the most discriminating sub-model. Then the second-best feature is searched and so on. This is done until the best model has $F_M/N_M$ features, where $F_M$ is the number of active feature vectors in the model. The threshold for the sub-model is then chosen to maximize detection on this stage. The whole procedure repeats until the partitioning is



Proceedings of the Fifth IEEE International Conference on Automatic Face and Gesture Recognition (FGR'02)
0-7695-1602-5/02 $17.00 © 2002 **IEEE**
IEEE COMPUTER SOCIETY
Authorized licensed use limited to: University at Buffalo Libraries. Downloaded on May 11,2023 at 17:39:05 UTC from IEEE Xplore. Restrictions apply.
TVision Insights, Inc. – Ex. 1013, Page 000003
APPX1133

found. Note, that each feature is only used once.

For face detection the model $\mathbf{V}_M$ is shifted over the image, and at each image position $(x, y)$ the similarity between the model and the underlying image patch is calculated. This is done by matching the sub-models successively starting with the most discriminating one. The matching score values from each stage are accumulated and compared against a threshold which is also determined during training. If the threshold criterion is missed at a certain stage the current position is discarded.

### 3.3. Distance Metrics

In general the orientation matching process can be described as a convolution-like operation

$$c = \sum_i d_l(\mathbf{V}_M^n, \mathbf{V}_I(x, y)), \tag{9}$$

where $c$ is a similarity score between a sub-image at position $(x, y)$ and a the n-th sub-model. The function $d_l()$ calculates the local distance between two single orientation vectors. In the present system the function $d_l()$ is designed to give a low value for a high similarity and a high value for poor similarity. A simple but very efficient distance measure is based on the Sine of the local angular distance. Edge strength is only used to determine whether the distance should be calculated at a certain point. The local distance is written:

$$d_l = \begin{cases} \sin(|\arg\{\mathbf{v}_i\} - \arg\{\mathbf{v}_m\}|) & \text{if } |\mathbf{v}_i|, |\mathbf{v}_m| > 0 \\ 1 & \text{else} \end{cases}. \tag{10}$$

For computationally efficient execution the distance should be realized as table lookup.

## 4. Candidate Verification

The face candidates detected by the EOM are passed on to a candidate verification module which constitutes the last stage of the matching pipeline, see Fig. 2. We use an appearance based approach first described in [16]. SNoW is an abbreviation for *Sparse Network cf Winnovs* and is a learning network of linear units connecting binary input features with two output nodes. The input features are calculated from the histogram equalized input image patch of size $20 \times 20$. There are $102400$ $(= 20 \times 20 \times 256)$ binary features, and exactly one of them, namely feature number $256 * (20 * x + y) + I(x, y)$ is set to 1 for each pixel in the image. Since we have 400 pixels in the sub-window, exactly 400 features are set to one and the rest is set to zero. The feature vectors are connected with weights to two output targets, called *face target* and non face target. The decision finally is made from the value of the output node $t$ using a threshold $\theta_t$. The network or more precisely the weights are trained using the so called Winnov update rule as described in [16] with a database of 12000 faces, produced by slightly scaling and rotating a set of 1000 aligned face patches, and 25000 non faces. The set of non-faces is obtained using a bootstrapping approach similar to that described in [12].

## 5. Coarse-to-Fine Image Scan

In order to find faces of different sizes we use a multi-resolution image pyramid. The size ratio $R_p$ between two resolution levels is set to $R_p = 1.25$. Each level of the pyramid is searched in a coarse to fine manner.This is done using a sparse grid with a grid step $D_{g^0} = 6$. So we approximately evaluate only 2.8% of all possible locations at this coarse level. Each grid point which passes the matching pipeline and has a similarity value below a threshold $T_{gs}$ is a starting point for a local refinement of the search. In the next step we search at the points of a finer structured local grid around the starting point of the coarse grid. The grid step $D_{g^1} = 3$, which means that every 9th point is evaluated. Finally each point of that second step below $T_{gs}$ is evaluated in a $3 \times 3$ neighborhood. The grid step of this third level is set to $D_{g^2} = 1$. Figure 4 illustrates the whole procedure. Points with a light grey tone are meant to be below the threshold $T_{gs}$. The speedup is controlled by the threshold $T_{gs}$ which determines the number of grid points that are starting points for a finer analysis in their neighborhood. The higher $T_{gs}$ is the less likely it will be that we have to perform fine grid searches. On the other hand it is clear that we are about to miss many true face positions then and the detection rate will decrease.




**Figure 4. Example of the hierarchical grid search. At first the image is searched at a grid $g^0$ with resolution $D_{g^0} = 6$. All locations with values below a threshold $T_{gs}$ (light grey tone) are starting points of a local search on grid $g^1$ with $D_{g^1} = 3$. At the finest grid $g^2$ a $3 \times 3$ neighborhood is evaluated.**



Proceedings of the Fifth IEEE International Conference on Automatic Face and Gesture Recognition (FGR'02)
0-7695-1602-5/02 $17.00 © 2002 **IEEE**

IEEE COMPUTER SOCIETY
Authorized licensed use limited to: University at Buffalo Libraries. Downloaded on May 11,2023 at 17:39:05 UTC from IEEE Xplore. Restrictions apply.
TVision Insights, Inc. – Ex. 1013, Page 000004
APPX1134

## 6. Experiments and Results

### 6.1. Still Images

The image database used for testing the capabilities of the face detector consists of 18704 images, each showing at least one upright face. The whole data set consists of 6 different parts as listed in table 1. The images from the first five sets vary a lot with respect to image quality, lighting conditions, background and the size of the faces displayed. The last set contains the images from the M2VTS [9] database which have an uniform background and the size of the displayed faces is alike. All faces are annotated manually so that the ground truth for the database is known for automatic performance measurement. The CMU [12] and BioID [6] database are publicly available on the Internet and are often used for the benchmarking of face detection algorithms.

| Name | #Images | #Faces | Comment |
|---|---|---|---|
| Test Set I | 10775 | 10775 | complex background |
| Test Set II | 1468 | 1468 | complex, poor quality |
| Internet | 2409 | 2409 | complex background |
| CMU [12] | 179 | 505 | complex, poor quality |
| BioID [6] | 1521 | 1521 | complex background |
| M2VTS [9] | 2352 | 2352 | simple, high quality |
| Total | 18704 | 19030 | |

**Table 1. Dataset used for the evaluation of our algorithm.**

We regard a face as detected if the measured face position and size do not deviate from the true values for more than 30%. The face position and size are defined by the position of the eyes and the reference for the relative displacement measurement is the true eye distance. All the results reported in table 2 are obtained using a resolution pyramid with a size factor between two levels of $R_p = 1.25$. The model used for EOM is that displayed in Fig. 3. It consists of $F_M = 720$ orientation vectors. The model is divided into $N_M = 40$ sub-models.

### 6.2. Comparison with other still image detectors

For benchmarking, we can look at the best detection rates and corresponding number of false detects reported on the CMU database so far. The computation time given in the third place corresponds to an image of size 320 × 240 and in the fourth place the computer platform is given. Rowley [12] obtained a detection performance of (90.1%, 167, 140 sec, SGI O2 175Mhz) using Neuronal Networks for detection. Our system using SNoW only achieves (92.1%, 131, 4 sec, Athlon 1000 Mhz). Schneiderman [13] reports (94.4%, 65, 90sec, Pentium II 450 MHz) for his Bayes approach . The detection rate of the two-stage approach of this paper is a little lower on the CMU dataset (see Tab. 2), but we need only 40 msec to analyze one image of size 320 × 240 on a Athlon, 1000 Mhz and 50 msec for an image of size 384 × 288. Thus even if we take into account that part of the mentioned results are obtained using slower hardware our method is considerably faster.

[1]The images of the CMU database where scaled up by 1.25 before detection.

| Dataset | Detection | #False | False-Rate |
|---|---|---|---|
| Test Set I | 97.76% | 169 | 1/13953306 |
| Test Set II | 90.67% | 88 | 1/3650815 |
| Internet | 96.39% | 48 | 1/15101254 |
| M2VTS | 96.50% | 14 | 1/34324584 |
| BioID | 95.67% | 64 | 1/5201107 |
| CMU[1] | 87.80% | 120 | 1/1233333 |
| Total | 96.63% | 503 | 1/11327348 |

**Table 2. Detection results of the proposed detection system on different databases.**

### 6.3. Video

For our video experiments we use a video stream of spatial resolution 320 × 240 which was searched at frame rate of 15 fps on an Athlon 1000MHz computer. This was done by applying the still image face detector, as described in this paper, to each single video frame in real-time. In the video system we apply smoothness constraints on the motion of the detected faces. Thus we can rule out most of the remaining false detects of the static system because false detects usually show up randomly in time and space. The whole video-system will be described elsewhere in near future. To evaluate the performance of the video system we analyze 1/2 hour of German television program. As it was too expensive to annotate all of the 27000 frames manually we only assessed the system qualitatively by overlaying the detections in the video stream. We encountered very little false detects approximately one in every 20 seconds and an estimated detection rate of above 90% on the appearing frontal faces.

## 7. Summary and Conclusions

In this work we show that edge orientation information is a powerful local feature for object detection. We propose a matching-pipeline which relies solely on edge orientation



Proceedings of the Fifth IEEE International Conference on Automatic Face and Gesture Recognition (FGR'02)
0-7695-1602-5/02 $17.00 © 2002 IEEE
IEEE COMPUTER SOCIETY
Authorized licensed use limited to: University at Buffalo Libraries. Downloaded on May 11,2023 at 17:39:05 UTC from IEEE Xplore. Restrictions apply.
TVision Insights, Inc. – Ex. 1013, Page 000005
APPX1135

features and performs a candidate verification at the last stage of the pipeline. The verification utilizes grey-features and a SNoW Classifier. The combination of a pipelined matching approach and a coarse-to-fine image scan leeds to a very fast face detector. This static detection algorithm achieves detection rates of more than 96% on a data base of 18704 of still images having only 503 false detects. The system is able to analyze a video stream of spatial resolution $320 \times 240$ at frame rate on an Athlon 1000MHz computer. This means that the static face detector needs less than 40 msec (50 msec for size $384 \times 288$) to process a single frame. The introduction of motion constraints further lowers the number of false detects in a video system. We also provide realistic performance figures obtained on a very large database.

## Acknowledgments

The work described here was supported by the German Federal Ministry of Education and Research (BMBF) under the project EMBASSI.

## References


[1] S. Ben-Yacoub, B. Fasel, and J. Lttin. Fast face detection using mlp and fft. In *Audio- And Video-Based Biometric Person Authentication*, pages 31–36, Washington, D.C., 1999.

[2] M. Bichsel. *Strategies of Robust Object Recognition for the Automatic Identification of Human Faces*. PhD thesis, Eidgenssische Technische Hochschule Zrich, Zrich, 1991.

[3] M. Burl and P. Perona. Recognition of planar object classes. In *Proc. CVPR'96*, 1996.

[4] K. R. Castleman. *Digital Image Processing*. Prentice Hall, 1996.

[5] B. Fasel. Fast multi-scale face detection. IDIAP-COM 4, IDIAP, 1998.

[6] O. Jesorsky, K. J. Kirchberg, and R. W. Frischholz. Robust face detection using the hausdorff distance. In *Audio- and Video-based Biometric Person Authentication (AVBPA'2001)*, pages 90–95, Halmstad, Sweden, June 2001.

[7] S.-H. Lin, S.-Y. Kung, and L.-J. Lin. Face recognition/detection by probabilistic decision based neural network. *IEEE Transactions on Neural Networks, Special Issue on Artificial Neural Networks and Pattern Recognition*, 8(1), January 1997.

[8] D. Maio and D. Maltoni. Real-time face location on grayscale static images. *Pattern Recognition*, 33:1525–1539, September 2000.

[9] K. Messer, J. Matas, J. Kittler, J. Luettin, and M. G. Xm2vtsdb: The extended m2vts database. In *Second International Conference on Audio- and Video-based Biometric Person Authentication*, pages 71–77, 1999.

[10] B. Moghaddam and A. Pentland. Maximum likelihood detection of faces and hands. In *International Workshop On Automatic Face- and Gesture-Recognition*, pages 122–128, Zurich, Switzerland, June 26-28 1995.

[11] E. E. Osuna, R. Freund, and F. Girosi. Support vector machines: Training and application. Technical Report 1602, Masachusettes Institute of Technology, March 1997.

[12] H. A. Rowley. *Neural Network-Based Face Detection*. PhD thesis, Carnegie Mellon University, Pitsburgh, 1999.

[13] H. Schneiderman. *A Statistical Approach to 3D Object Detection Applied to Faces and Cars*. PhD thesis, Robotics Institute, Carnegie Mellon University, Pittsburgh, PA, May 2000.

[14] K. K. Sung. *Learning and Example Seletion for Object and Pattern Detection*. PhD thesis, Massachusetts Institute of Technology, January 1996.

[15] M.-H. Yang, N. Ahuja, and D. Kriegman. Face detection using mixtures of linear subspaces. In *International Conference on Face and Gesture Recognition*, pages 70–76, 2000.

[16] M.-H. Yang, D. Roth, and N. Ahuja. A snow-based face detector. In *Advances in Neural Information Processing Systems 12 (NIPS 12)*, pages 855–861. MIT Press, 2000.






IEEE COMPUTER SOCIETY
Authorized licensed use limited to: University at Buffalo Libraries. Downloaded on May 11,2023 at 17:39:05 UTC from IEEE Xplore. Restrictions apply.
TVision Insights, Inc. – Ex. 1013, Page 000006
APPX1136

US007315631B1

(12) **United States Patent**
**Corcoran et al.**

(10) **Patent No.: US 7,315,631 B1**
(45) **Date of Patent: Jan. 1, 2008**

(54) **REAL-TIME FACE TRACKING IN A DIGITAL IMAGE ACQUISITION DEVICE**

(75) Inventors: **Peter Corcoran**, Claregalway (IE); **Eran Steinberg**, San Francisco, CA (US); **Stefan Petrescu**, Bucharest (RO); **Alexandru Drimbarean**, Galway (IE); **Florin Nanu**, Bucharest (RO); **Alexei Pososin**, Galway (IE); **Petronel Biglol**, Galway (IE)

(73) Assignee: **FotoNation Vision Limited**, Galway (IE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/464,083**

(22) Filed: **Aug. 11, 2006**

(51) **Int. Cl.**
***G06K 9/00*** (2006.01)
***G06K 9/32*** (2006.01)
*G06K 9/36* (2006.01)

(52) **U.S. Cl.** ........................................ **382/118**; 382/299

(58) **Field of Classification Search** ................ 382/103, 382/115, 118, 173, 190, 254, 305, 284, 298, 382/299
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,463,163 B1 * 10/2002 Kresch ........................ 382/103
7,082,212 B2 7/2006 Liu et al.
7,194,114 B2 * 3/2007 Schneiderman ............. 382/118
7,227,976 B1 * 6/2007 Jung et al. .................. 382/103
2004/0179719 A1 * 9/2004 Chen et al. ................. 382/118
2005/0105780 A1 * 5/2005 Ioffe .......................... 382/118
2006/0008152 A1 * 1/2006 Kumar et al. ............... 382/190

OTHER PUBLICATIONS

PCT Notification of Transmittal of the International Search Report and the Written Opinion of the International Searching Authority, or the Declaration for PCT Application No. PCT/US2006/032959.

* cited by examiner

*Primary Examiner*—Amir Alavi
(74) *Attorney, Agent, or Firm*—Jackson & Co., LLP; Andrew V. Smith

(57) **ABSTRACT**

An image processing apparatus for tracking faces in an image stream iteratively receives an acquired image from the image stream potentially including one or more face regions. The acquired image is sub-sampled at a specified resolution to provide a sub-sampled image. An integral image is then calculated for a least a portion of the sub-sampled image. Fixed size face detection is applied to at least a portion of the integral image to provide a set of candidate face regions. Responsive to the set of candidate face regions produced and any previously detected candidate face regions, the resolution is adjusted for sub-sampling a subsequent acquired image.

**43 Claims, 3 Drawing Sheets**




Raw Image Acquisition [105]
Primary Image Processing [110]
Full Size Video Image [130]
Camera Memory[140]
Image Store [150]
Face recognition [160]
[161]
Image Subsampler [112]
Luminance correction [195]
Skin Segmentation [190]
Integral Image Generator [115]
Fixed Size Face Detector [120]
Fast Face Detector [280]
Orientation Sensor [170]
Motion Sensor [180]
Face Tracking Module [111]
Candidate Region Tracker [290]
Candidate Region Extractor [125]
Integral Image Generator [115]
Variable Size Face Detector [121]
[141]
[142]
[142,144]
[143]
[145]
[146]
[145]

Figure 1


Acquire Raw Image & Generate Predetermined Subsample Size [205]
Perform Image Processing on Main Image [210]
Generate Integral Image of Subsample Image [211]
Fixed Size Face Detector Applied to Subsample Image [215]
Detected Face Regions Reported to Face Tracking Module [220]
Fixed Size Face Detector [280]
Region merging in Tracking Module [242]
Current Candidate Region(s) Extracted from Full Resolution Image [225]
Integral Image Generated for Current Candidate Regions [230]
Variable Size Face Detector Applied to Generated Integral Images [235]
Status and Face Location (if detected) Reported to Tracking Module [240]
Candidate Region Tracker [290]
Additional Filters and Tracking Logic Applied by Tracking Module [245]
Face Regions and Subsample Size (& Orientation - optional) Updated (by Tracking Module) [250]

Figure 2




Fig 3(a)

Fig 3(b)

Fig 3(c)

Fig 3(d)

# REAL-TIME FACE TRACKING IN A DIGITAL IMAGE ACQUISITION DEVICE

## BACKGROUND

1. Field of the Invention

The present invention provides an improved method and apparatus for image processing in acquisition devices. In particular the invention provides improved real-time face tracking in a digital image acquisition device.

2. Description of the Related Art

Face tracking for digital image acquisition devices include methods of marking human faces in a series of images such as a video stream or a camera preview. Face tracking can be used to indicate to a photographer locations of faces in an image, thereby improving acquisition parameters, or allowing post processing of the images based on knowledge of the locations of the faces.

In general, face tracking systems employ two principle modules: (i) a detection module for locating new candidate face regions in an acquired image or a sequence of images; and (ii) a tracking module for confirming face regions.

A well-known fast-face detection algorithm is disclosed in US 2002/0102024, hereinafter Viola-Jones, which is hereby incorporated by reference. In brief, Viola-Jones first derives an integral image from an acquired image, which is usually an image frame in a video stream. Each element of the integral image is calculated as the sum of intensities of all points above and to the left of the point in the image. The total intensity of any sub-window in an image can then be derived by subtracting the integral image value for the top left point of the sub-window from the integral image value for the bottom right point of the sub-window. Also, intensities for adjacent sub-windows can be efficiently compared using particular combinations of integral image values from points of the sub-windows.

In Viola-Jones, a chain (cascade) of 32 classifiers based on rectangular (and increasingly refined) Haar features are used with the integral image by applying the classifiers to a sub-window within the integral image. For a complete analysis of an acquired image, this sub-window is shifted incrementally across the integral image until the entire image has been covered.

In addition to moving the sub-window across the entire integral image, the sub window is also scaled up/down to cover the possible range of face sizes. In Viola-Jones, a scaling factor of 1.25 is used and, typically, a range of about 10-12 different scales are used to cover the possible face sizes in an XVGA size image.

It will therefore be seen that the resolution of the integral image is determined by the smallest sized classifier sub-window, i.e. the smallest size face to be detected, as larger sized sub-windows can use intermediate points within the integral image for their calculations.

A number of variants of the original Viola-Jones algorithm are known in the literature. These generally employ rectangular, Haar feature classifiers and use the integral image techniques of Viola-Jones.

Even though Viola-Jones is significantly faster than previous face detectors, it still involves significant computation and a Pentium-class computer can only just about achieve real-time performance. In a resource-restricted embedded system, such as a hand held image acquisition device, e.g., a digital camera, a hand-held computer or a cellular phone equipped with a camera, it is generally not practical to run such a face detector at real-time frame rates for video. From tests within a typical digital camera, it is possible to achieve complete coverage of all 10-12 sub-window scales with a 3-4 classifier cascade. This allows some level of initial face detection to be achieved, but with undesirably high false positive rates.

In US 2005/0147278, by Rui et al., which is hereby incorporated by reference, a system is described for automatic detection and tracking of multiple individuals using multiple cues. Rui et al. disclose using Viola-Jones as a fast face detector. However, in order to avoid the processing overhead of Viola-Jones, Rui et al. instead disclose using an auto-initialization module which uses a combination of motion, audio and fast face detection to detect new faces in the frame of a video sequence. The remainder of the system employs well-known face tracking methods to follow existing or newly discovered candidate face regions from frame to frame. It is also noted that Rui et al. involves some video frames being dropped in order to run a complete face detection process.

## SUMMARY OF THE INVENTION

Methods are provided for detecting, tracking or recognizing faces, or combinations thereof, within acquired digital images of an image stream. An image processing apparatus is also provided including one or more processors and one or more digital storage media having digitally-encoded instructions embedded therein for programming the one or more processors to perform any of these methods.

A first method is provided for tracking faces in an image stream with a digital image acquisition device. An acquired image is received from an image stream including one or more face regions. The acquired image is sub-sampled at a specified resolution to provide a sub-sampled image. A corresponding integral image is calculated for a least a portion of the sub-sampled image. A fixed size face detection is applied to at least a portion of the integral image to provide a set of one or more candidate face regions each having a given size and a respective location. Responsive to the given size and respective location of the candidate face regions, and optionally including one or more previously detected face regions, adjusting a resolution at which a next acquired image is sub-sampled.

In a preferred embodiment according to the first aspect, calculations are avoided of a complete highest resolution integral image for every acquired image in an image stream, thereby reducing integral image calculations in an advantageous face tracking system. This either reduces processing overhead for face detection and tracking or allows longer classifier chains to be employed during the frame-to-frame processing interval to provide higher quality results, and either way providing enhanced face tracking. This can significantly improve the performance and/or accuracy of real-time face detection and tracking.

In the preferred embodiment, when implemented in an image acquisition device during face detection, a sub-sampled copy of the acquired image may be extracted from the camera hardware image acquisition subsystem and the integral image may be calculated for this subsampled image. During face tracking, the integral image may be calculated for an image patch surrounding each candidate region, rather than the entire image.

In such an implementation, the process of face detection may be preferably spread across multiple frames. This approach is advantageous for effective implementation. In one example, digital image acquisition hardware is designed to subsample to a single size. This aspect takes advantage of the fact that when composing a picture, a face will typically

be present for multiple frames within video sequences. Significant improvements in efficiency are provided, while the reduction in computation does not impact very significantly on the initial detection of faces.

In the preferred embodiment, the 3-4 smallest sizes (lowest resolution) of subsampled images are used in cycle. In some cases, such as when the focus of the camera is set to infinity, larger image subsamples may be included in the cycle as smaller (distant) faces may occur within the acquired image(s). In yet another embodiment, the number of subsampled images may change based on the estimated potential face sizes based on the estimated distance to the subject. Such distance may be estimated based on the focal length and focus distance, these acquisition parameters may be available from other subsystems within the imaging appliance firmware.

By varying the resolution/scale of the sub-sampled image which is in turn used to produce the integral image, a single fixed size of classifier can be applied to the different sizes of integral image. Such an approach is particularly amenable to hardware embodiments where the subsampled image memory space can be scanned by a fixed size direct memory access (DMA) window and digital logic to implement a Haar-feature classifier chain can be applied to this DMA window. However, it will be seen that several sizes of classifier (in a software embodiment), or multiple fixed-size classifiers (in a hardware embodiment) could also be used.

A key advantage of this aspect is that from frame to frame the calculation involves a low resolution integral image.

Preferably, a full resolution image patch surrounding each candidate face region is acquired prior to the acquisition of the next image frame. An integral image is then calculated for each such image patch and a multi-scaled face detector is applied to each such image patch. Regions which are found by the multi-scaled face detector to be face regions are referred to as confirmed face regions.

This first aspect advantageously avoids involvement of motion and audio queues as described in Rui and allows significantly more robust face detection and tracking to be achieved in a digital camera.

In accordance with a second aspect, a face detection and recognition method is also provided. An acquired image is received from an image stream including one or more face regions. The acquired image is sub-sampled at a specified resolution to provide a first-sub-sampled image. An integral image is calculated for a least a portion of the sub-sampled image. Face detection is applied to at least a portion of the integral image to provide a set of one or more candidate face regions each including a given size and a respective location. Using a database, face recognition is selectively applied to one or more candidate face regions to provide an identifier for a recognized face. The identifier is stored for the recognized face in association with at least one image from the image stream.

In a preferred embodiment according to the second aspect, when face tracking detects a face region from a stream of images, the acquisition device firmware runs a face recognition algorithm at the location of the face using a database preferably stored on the acquisition device comprising personal identifiers and their associated face parameters.

This aspect mitigates problems of algorithms that use a single image for face detection and recognition which have lower probability of performing correctly.

In a third aspect, an orientation of a digital image acquisition device is determined for at least one acquired image of an image stream. Face detection is applied to at least a portion of the acquired image to provide a set of one or more candidate face regions according to the determined orientation, and each candidate face region has a given size and a respective location.

In a preferred embodiment in accordance with the third aspect, the acquisition device includes an orientation sensor which indicates the likely orientation of faces in acquired images. The determined camera orientation is fed to face detection processes which then apply face detection for the likely orientation of faces. This improves processing requirements and/or face detection accuracy.

In a fourth aspect, a method is provided for tracking faces in an image stream using a digital image acquisition device. An acquired image is received from an image stream including one or more face regions. An indication of relative movement of the acquired image relative to a previously acquired image is also received. The previously acquired image includes an associated set of candidate face regions having a given size and a respective location. Adjusted face detection is applied to at least a portion of the acquired image in the vicinity of the candidate face regions as a function of the movement to provide an updated set of candidate face regions.

A face tracking module in accordance with this aspect has improves performance, as it employs a motion sensor subsystem to indicate to the face tracking module large motions of the acquisition device during a face tracking sequence.

Without such an advantageous sensor, where the acquisition device is suddenly moved by a user rather than slowly panned across a scene, candidate face regions in the subsequent frames of a video sequences would be displaced beyond the immediate vicinity of the corresponding candidate region in the previous video frame, such that the face tracking module could fail to track the face and the process would then involve re-detection of the candidate.

In a fifth aspect, a method and apparatus are provided for detecting faces in an image stream using a digital image acquisition device. An acquired image is received from an image stream including one or more face regions. An acquired image is sub-sampled at a specified resolution to provide a sub-sampled image. One or more regions of said acquired image are identified that predominantly include skin tones. A corresponding integral image is calculated for a least one of the skin tone regions of the sub-sampled acquired image. Face detection is applied to at least a portion of the integral image to provide a set of one or more candidate face regions each having a given size and a respective location.

By only running the face detector on regions predominantly including skin tones, more relaxed face detection can be used, as there is a higher chance that these skin-tone regions do in fact contain a face. So, faster face detection can be employed to more effectively provide similar quality results to running face detection over the whole image with stricter face detection involved in positively detecting a face.

## BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the invention will now be described by way of example, with reference to the accompanying drawings, in which:

FIG. **1** is a block diagram illustrating principle components of an image processing apparatus in accordance with a preferred embodiment;

FIG. **2** is a flow diagram illustrating operation of the image processing apparatus of FIG. **1**; and

FIGS. **3**(*a*) to **3**(*d*) illustrate examples of images processed by an apparatus in accordance with a preferred embodiment.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

FIG. **1** shows the primary subsystems of a face tracking system in accordance with a preferred embodiment. The solid lines indicate the flow of image data; the dashed line indicate control inputs or information outputs (e.g. location(s) of detected faces) from a module. In this example an image processing apparatus can be a digital still camera (DSC). a video camera, a cell phone equipped with an image capturing mechanism or a hand help computer equipped with an internal or external camera, or a combination thereof.

A digital image is acquired in raw format from an image sensor (CCD or CMOS) [**105**] and an image subsampler [**112**] generates a smaller copy of the main image. Most digital cameras already contain dedicated hardware subsystems to perform image subsampling, for example to provide preview images to a camera display. Typically, the subsampled image is provided in bitmap format (RGB or YCC). In the meantime, the normal image acquisition chain performs post-processing on the raw image [**110**] which typically includes some luminance and color balancing. In certain digital imaging systems the subsampling may occur after such post-processing, or after certain post-processing filters are applied, but before the entire post-processing filter chain is completed.

The subsampled image is next passed to an integral image generator [**115**] which creates an integral image from the subsampled image. This integral image is next passed to a fixed size face detector [**120**]. The face detector is applied to the full integral image, but as this is an integral image of a subsampled copy of the main image, the processing involved in the face detection is proportionately reduced. If the subsampled image is ¼ of the main image, e.g., has ¼ the number of pixels and/or ¼ the size, then the processing time involved is only about 25% of that for the full image.

This approach is particularly amenable to hardware embodiments where the subsampled image memory space can be scanned by a fixed size DMA window and digital logic to implement a Haar-feature classifier chain can be applied to this DMA window. Several sizes of classifiers may alternatively be used (in a software embodiment), or multiple fixed-size classifiers may be used (in a hardware embodiment). An advantage is that a smaller integral image is calculated.

After application of the fast face detector [**280**] any newly detected candidate face regions [**141**] are passed onto a face tracking module [**111**] where any face regions confirmed from previous analysis [**145**] may be merged with new candidate face regions prior to being provided [**142**] to a face tracker [**290**].

The face tracker [**290**] provides a set of confirmed candidate regions [**143**] back to the tracking module [**111**]. Additional image processing filters are preferably applied by the tracking module [**111**] to confirm either that these confirmed regions [**143**] are face regions or to maintain regions as candidates if they have not been confirmed as such by the face tracker [**290**]. A final set of face regions [**145**] can be output by the module [**111**] for use elsewhere in the camera or to be stored within or in association with an acquired image for later processing either within the camera or offline; as well as to be used in a next iteration of face tracking.



After the main image acquisition chain is completed a full-size copy of the main image [**130**] will normally reside in the system memory [**140**] of the image acquisition system. This may be accessed by a candidate region extractor [**125**] component of the face tracker [**290**] which selects image patches based on candidate face region data [**142**] obtained from the face tracking module [**111**]. These image patches for each candidate region are passed to an integral image generator [**115**] which passes the resulting integral images to a variable sized detector [**121**], as one possible example a VJ detector, which then applies a classifier chain, preferably at least a 32 classifier chain, to the integral image for each candidate region across a range of different scales.

The range of scales [**144**] employed by the face detector [**121**] is determined and supplied by the face tracking module [**111**] and is based partly on statistical information relating to the history of the current candidate face regions [**142**] and partly on external metadata determined from other subsystems within the image acquisition system.

As an example of the former, if a candidate face region has remained consistently at a particular size for a certain number of acquired image frames then the face detector [**121**] is applied at this particular scale and/or perhaps at one scale higher (i.e. 1.25 time larger) and one scale lower (i.e. 1.25 times lower).

As an example of the latter, if the focus of the image acquisition system has moved to approximately infinity, then the smallest scalings will be applied in the face detector [**121**]. Normally these scalings would not be employed as they would be applied a greater number of times to the candidate face region in order to cover it completely. It is worthwhile noting that the candidate face region will have a minimum size beyond which it should not decrease—this is in order to allow for localized movement of the camera by a user between frames. In some image acquisition systems which contain motion sensors, such localized movements may be tracked. This information may be employed to further improve the selection of scales and the size of candidate regions.

The candidate region tracker [**290**] provides a set of confirmed face regions [**143**] based on full variable size face detection of the image patches to the face tracking module [**111**]. Clearly, some candidate regions will have been confirmed while others will have been rejected, and these can be explicitly returned by the tracker [**290**] or can be calculated by the tracking module [**111**] by analyzing the difference between the confirmed regions [**143**] and the candidate regions [**142**]. In either case, the face tracking module [**111**] can then apply alternative tests to candidate regions rejected by the tracker [**290**] (as explained below) to determine whether these should be maintained as candidate regions [**142**] for the next cycle of tracking or whether these should indeed be removed from tracking.

Once the set of confirmed candidate regions [**145**] has been determined by the face tracking module [**111**], the module [**111**] communicates with the sub-sampler [**112**] to determine when the next acquired image is to be sub-sampled, and so provided to the detector [**280**], and also to provide the resolution [**146**] at which the next acquired image is to be sub-sampled.

Where the detector [**280**] does not run when the next image is acquired, the candidate regions [**142**] provided to the extractor [**125**] for the next acquired image will be the regions [**145**] confirmed by the tracking module [**111**] from

the last acquired image. On the other hand, when the face detector [280] provides a new set of candidate regions [141] to the face tracking module [111], these candidate regions are preferably merged with the previous set of confirmed regions [145] to provide the set of candidate regions [142] to the extractor [125] for the next acquired image.

Zoom information may be obtained from camera firmware. Using software techniques which analyze images in camera memory **140** or image store **150**, the degree of pan or tilt of the camera may be determined from one image to another.

In one embodiment, the acquisition device is provided with a motion sensor **180**, as illustrated at FIG. **1**, to determine the degree and direction of pan from one image to another, and avoiding the processing involved in determining camera movement in software.

Such motion sensor for a digital camera may be based on an accelerometer, and may be optionally based on gyroscopic principals within the camera, primarily for the purposes of warning or compensating for hand shake during main image capture. U.S. Pat. No. 4,448,510, to Murakoshi, which is hereby incorporated by reference, discloses such a system for a conventional camera, and U.S. Pat. No. 6,747, 690, to Molgaard, which is also incorporated by reference, discloses accelerometer sensors applied within a modern digital camera.

Where a motion sensor is incorporated in a camera, it may be optimized for small movements around the optical axis. The accelerometer may incorporate a sensing module which generates a signal based on the acceleration experienced and an amplifier module which determines the range of accelerations which can effectively be measured. The accelerometer may allow software control of the amplifier stage which allows the sensitivity to be adjusted.

The motion sensor **180** could equally be implemented with MEMS sensors of the sort which will be incorporated in next generation consumer cameras and camera-phones.

In any case, when the camera is operable in face tracking mode, i.e. constant video acquisition as distinct from acquiring a main image, shake compensation would typically not be used because image quality is lower. This provides the opportunity to configure the motion sensor **180** to sense large movements by setting the motion sensor amplifier module to low gain. The size and direction of movement detected by the sensor **180** is preferably provided to the face tracker **111**. The approximate size of faces being tracked is already known, and this enables an estimate of the distance of each face from the camera. Accordingly, knowing the approximate size of the large movement from the sensor **180** allows the approximate displacement of each candidate face region to be determined, even if they are at differing distances from the camera.

Thus, when a large movement is detected, the face tracker **111** shifts the locations of candidate regions as a function of the direction and size of the movement. Alternatively, the size of the region over which the tracking algorithms are applied may also be enlarged (and the sophistication of the tracker may be decreased to compensate for scanning a larger image area) as a function of the direction and size of the movement.

When the camera is actuated to capture a main image, or when it exits face tracking mode for any other reason, the amplifier gain of the motion sensor **180** is returned to normal, allowing the main image acquisition chain **105**,**110** for full-sized images to employ normal shake compensation algorithms based on information from the motion sensor **180**.

An alternative way of limiting the areas of an image to which the face detector **120** is to be applied involves identifying areas of the image which include skin tones. U.S. Pat. No. 6,661,907, which is hereby incorporated by reference, discloses one such technique for detecting skin tones and subsequently only applying face detection in regions having a predominant skin color.

In one embodiment, skin segmentation **190** is preferably applied to a sub-sampled version of the acquired image. If the resolution of the sub-sampled version is not sufficient, then a previous image stored in image store **150** or a next sub-sampled image can be used as long as the two images are not too different in content from the current acquired image. Alternatively, skin segmentation **190** can be applied to the full size video image **130**.

In any case, regions containing skin tones are identified by bounding rectangles and these bounding rectangles are provided to the integral image generator **115** which produces integral image patches corresponding to the rectangles in a manner similar to the tracker integral image generator **115**.

Not alone does this approach reduce the processing overhead associated with producing the integral image and running face detection, but in the present embodiment, it also allows the face detector **120** to apply more relaxed face detection to the bounding rectangles, as there is a higher chance that these skin-tone regions do in fact contain a face. So for a VJ detector **120**, a shorter classifier chain can be employed to more effectively provide similar quality results to running face detection over the whole image with longer VJ classifiers required to positively detect a face.

Further improvements to face detection are also contemplated in other embodiments. For example, based on the fact that face detection can be very dependent on illumination conditions, such that small variations in illumination can cause face detection to fail and cause somewhat unstable detection behavior, in another embodiment, confirmed face regions **145** are used to identify regions of a subsequently acquired sub-sampled image on which luminance correction may be performed to bring regions of interest of the image to be analyzed to the desired parameters. One example of such correction is to improve the luminance contrast within the regions of the sub-sampled image defined by confirmed face regions **145**.

Contrast enhancement may be used to increase local contrast of an image, especially when the usable data of the image is represented by close contrast values. Through this adjustment, intensities of pixels of a region when represented on a histogram which would otherwise be closely distributed can be better distributed. This allows for areas of lower local contrast to gain a higher contrast without affecting global contrast. Histogram equalization accomplishes this by effectively spreading out the most frequent intensity values.

The method is useful in images with backgrounds and foregrounds that are both bright or both dark. In particular, the method can lead to better detail in photographs that are over-exposed or under-exposed.

Alternatively, this luminance correction can be included in the computation of an "adjusted" integral image in the generators **115**.

In another improvement, when face detection is being used, the camera application is set to dynamically modify the exposure from the computed default to a higher values (from frame to frame, slightly overexposing the scene) until the face detection provides a lock onto a face.

Further embodiments providing improved efficiency for the system described above are also contemplated. For

example, face detection algorithms typically employ methods or use classifiers to detect faces in a picture at different orientations: 0, 90, 180 and 270 degrees. The camera may be equipped with an orientation sensor **170**, as illustrated at FIG. **1**. This can include a hardware sensor for determining whether the camera is being held upright, inverted or tilted clockwise or anti-clockwise. Alternatively, the orientation sensor can comprise an image analysis module connected either to the image acquisition hardware **105, 110** or camera memory **140** or image store **150** for quickly determining whether images are being acquired in portrait or landscape mode and whether the camera is tilted clockwise or anti-clockwise.

Once this determination is made, the camera orientation can be fed to one or both of the face detectors **120, 121**. The detectors may apply face detection according to the likely orientation of faces in an image acquired with the determined camera orientation. This feature can either significantly reduce the face detection processing overhead, for example, by avoiding the employment of classifiers which are unlikely to detect faces or increase its accuracy by running classifiers more likely to detects faces in a given orientation more often.

FIG. **2** illustrates a main workflow in accordance with a preferred embodiment. The illustrated process is split into (i) a detection/initialization phase which finds new candidate face regions [**141**] using a fast face detector [**280**] which operates on a sub-sampled version of the full image; (ii) a secondary face detection process [**290**] which operates on extracted image patches for candidate regions [**142**], which are determined based on locations of faces in one or more previously acquired image frames, and (iii) a main tracking process which computes and stores a statistical history of confirmed face regions [**143**]. Although the application of the fast face detector [**280**] is shown occurring prior to the application of the candidate region tracker [**290**] in FIG. **2**, the order is not critical and the fast detection is not necessarily executed on every frame or in certain circumstances may be spread across multiple frames.

Thus, in step **205** the main image is acquired and in step **210** primary image processing of that main image is performed as described in relation to FIG. **1**. The sub-sampled image is generated by the sub-sampler [**112**] and an integral image is generated therefrom by the generator [**115**] at step **211**. The integral image is passed to the fixed size face detector [**120**] and the fixed size window provides a set of candidate face regions [**141**] within the integral image to the face tracking module step **220**. The size of these regions is determined by the sub-sampling scale [**146**] specified by the face tracking module to the sub-sampler and this scale is preferably based on an analysis of previous sub-sampled/integral images by the detector [**280**] and patches from previous acquired images by the tracker [**290**] as well perhaps as other inputs such as camera focus and movement.

The set of candidate regions [**141**] is merged with the existing set of confirmed regions [**145**] to produce a merged set of candidate regions [**142**] to be provided for confirmation at step **242**.

For the candidate regions [**142**] specified by the face tracking module **111**, the candidate region extractor [**125**] extracts the corresponding full resolution patches from an acquired image at step **225**. An integral image is generated for each extracted patch at step **230** and a variable-size face detection is applied by the face detector **121** to each such integral image patch, for example, a full Viola-Jones analysis. These results [**143**] are in turn fed back to the face-tracking module [**111**] at step **240**.

The tracking module [**111**] processes these regions [**143**] further before a set of confirmed regions [**145**] is output. In this regard, additional filters can be applied by the module **111** either for regions [**143**] confirmed by the tracker [**290**] or for retaining candidate regions [**142**] which may not have been confirmed by the tracker **290** or picked up by the detector [**280**] at step **245**.

For example, if a face region had been tracked over a sequence of acquired images and then lost, a skin prototype could be applied to the region by the module [**111**] to check if a subject facing the camera had just turned away. If so, this candidate region may be maintained for checking in a next acquired image whether the subject turns back to face the camera.

Depending on the sizes of the confirmed regions being maintained at any given time and the history of their sizes, e.g. are they getting bigger or smaller, the module **111** determines the scale [**146**] for sub-sampling the next acquired image to be analyzed by the detector [**280**] and provides this to the sub-sampler [**112**] step **250**.

The fast face detector [**280**] need not run on every acquired image. So, for example, where only a single source of sub-sampled images is available, if a camera acquires 60 frames per second, 15-25 sub-sampled frames per second (fps) may be required to be provided to the camera display for user previewing. Clearly, these images need to be sub-sampled at the same scale and at a high enough resolution for the display. Some or all of the remaining 35-45 fps can be sampled at the scale required by the tracking module [**111**] for face detection and tracking purposes.

The decision on the periodicity in which images are being selected from the stream may be based on a fixed number or alternatively be a run-time variable. In such cases, the decision on the next sampled image may be determined on the processing time it took for the previous image, in order to maintain synchronicity between the captured real-time stream and the face tracking processing. Thus in a complex image environment, the sample rate may decrease.

Alternatively, the decision on the next sample may also be performed based on processing of the content of selected images. If there is no significant change in the image stream, the full face tracking process might not be performed. In such cases, although the sampling rate may be constant, the images will undergo a simple image comparison and only if it is decided that there is justifiable differences, will the face tracking algorithms be launched.

The face detector [**280**] also need not run at regular intervals. So for example, if the camera focus is changed significantly, then the face detector may be run more frequently and particularly with differing scales of sub-sampled images to try to detect faces which should be changing in size. Alternatively, where focus is changing rapidly, the detector [**280**] could be skipped for intervening frames, until focus has stabilized. However, it is generally when focus goes to approximately infinity that the highest resolution integral image is to be produced by the generator [**115**].

In this latter case, the detector may not be able to cover the entire area of the acquired, subsampled, image in a single frame. Accordingly the detector may be applied across only a portion of the acquired, subsampled, image on a first frame, and across the remaining portion(s) of the image on one or more subsequent acquired image frames. In a one embodiment, the detector is applied to the outer regions of the acquired image on a first acquired image frame in order to catch small faces entering the image from its periphery, and on subsequent frames to more central regions of the image.

In a separate embodiment, the face detector **120** will be applied only to the regions that are substantively different between images. Note that prior to comparing two sampled images for change in content, a stage of registration between the images may be needed to remove the variability of changes in camera, caused by camera movement such as zoom, pan and tilt.

In alternative embodiments, sub-sampled preview images for the camera display can be fed through a separate pipe than the images being fed to and supplied from the image sub-sampler [**112**] and so every acquired image and its sub-sampled copies can be available both to the detector [**280**] as well as for camera display.

In addition to periodically acquiring samples from a video stream, the process may also be applied to a single still image acquired by a digital camera. In this case, the stream for the face tracking may include a stream of preview images, and the final image in the series may be the full resolution acquired image. In such a case, the face tracking information can be verified for the final image in a similar fashion to that described in FIG. **2**. In addition, information such as coordinates or mask of the face may be stored with the final image. Such data may fit as an entry in a saved image header, for example, for future post-processing, whether in the acquisition device or at a later stage by an external device.

FIG. **3** illustrates operation in accordance with a preferred embodiment through a worked example. FIG. **3**(*a*) illustrates a result at the end of a detection and tracking cycle on a frame of video, with two confirmed face regions [**301, 302**] of different scales being shown. In this exemplary embodiment, for pragmatic reasons, each face region has a rectangular bounding box. Although it is easier to make computations on rectangular regions, different shapes can be used. This information is recorded and output as [**145**] by the tracking module [**111**] of FIG. **1**.

Based on a history of the face regions [**301,302**], the tracking module [**111**] may decide to run fast face tracking with a classifier window of the size of face region [**301**] with an integral image being provided and analyzed accordingly.

FIG. **3**(*b*) shows the situation after the next frame in a video sequence is captured and the fast face detector has been applied to the new image. Both faces have moved [**311, 312**] and are shown relative to previous face regions [**301, 302**]. A third face region [**303**] has appeared and has been detected by the fast face detector [**303**]. In addition, a fast face detector has found the smaller of the two previously confirmed faces [**304**], because it is at the correct scale for the fast face detector. Regions [**303**] and [**304**] are supplied as candidate regions [**141**] to the tracking module [**111**]. The tracking module merges this new candidate region information [**141**], with the previous confirmed region information [**145**] comprising regions [**301**] [**302**] to provide a set of candidate regions comprising regions [**303**], [**304**] and [**302**] to the candidate region extractor [**290**]. The tracking module [**111**] knows that the region [**302**] has not been picked up by the detector [**280**]. This may be because the face has either disappeared, remains at a size that was too large or small to be detected by the detector [**280**] or has changed size to a size that the detector [**280**] was unable to detect. Thus, for this region, the module [**111**] will preferably specify a large patch [**305**]. Referring to FIG. **3**(*c*), this patch [**305**] is around the region [**302**] to be checked by the tracker [**290**]. Only the region [**303**] bounding the newly detected face candidate will preferably be checked by the tracker [**290**], whereas because the face [**301**] is moving, a relatively large patch [**306**] surrounding this region is specified to the tracker [**290**].

FIG. **3**(*c*) shows the situation after the candidate region extractor operates upon the image. Candidate regions [**306, 305**] around both of the confirmed face regions [**301, 302**] from the previous video frame as well as new regions [**303**] are extracted from the full resolution image [**130**]. The size of these candidate regions has been calculated by the face tracking module [**111**] based partly on statistical information relating to the history of the current face candidate and partly on external metadata determined from other subsystems within the image acquisition system. These extracted candidate regions are now passed on to the variable sized face detector [**121**] which applies a VJ face detector to the candidate region over a range of scales. The locations of any confirmed face regions are then passed back to the face tracking module [**111**].

FIG. **3**(*d*) shows the situation after the face tracking module [**111**] has merged the results from both the fast face detector [**280**] and the face tracker [**290**] and applied various confirmation filters to the confirmed face regions. Three confirmed face regions have been detected [307, 308, 309] within the patches [**305,306,303**] shown in FIG. **3**(*d*). The largest region [**307**] was known, but had moved from the previous video frame, and relevant data is added to the history of that face region. Another previously known region [**308**] which had moved was also detected by the fast face detector which serves as a double-confirmation, and these data are added to its history. Finally a new face region [**303**] was detected and confirmed and a new face region history is then initiated for this newly detected face. These three face regions are used to provide a set of confirmed face regions [**145**] for the next cycle.

It will be seen that there are many possible applications for the regions **145** supplied by the face tracking module. For example, the bounding boxes for each of the regions [**145**] can be superimposed on the camera display to indicate that the camera is automatically tracking detected face(s) in a scene. This can be used for improving various pre-capture parameters. One example is exposure, ensuring that the faces are well exposed. Another example is auto-focusing, by ensuring that focus is set on a detected face or indeed to adjust other capture settings for the optimal representation of the face in an image.

The corrections may be done as part of pre-processing adjustments. The location of the face tracking may also be used for post processing, and in particular selective post processing, where regions with faces may be enhanced. Such examples include sharpening, enhancing, saturating, brightening or increasing local contrast, or combinations thereof. Preprocessing using the locations of faces may also be used on regions without a face to reduce their visual importance, for example, through selective blurring, desaturating, or darkening.

Where several face regions are being tracked, then the longest lived or largest face can be used for focusing and can be highlighted as such. Also, the regions [**145**] can be used to limit areas on which, for example, red-eye processing is performed (see, e.g., U.S. published patent applications numbers 2004/0223063, 2005/0031224, 2005/0140801, and 2004/0041121, and U.S. Pat. Nos. 6,407,777 and 7,042,505, which are hereby incorporated by reference).

Other post-processing which can be used in conjunction with light-weight face detection is face recognition. In particular, such an approach can be useful when combined with more robust face detection and recognition either

running on the same device or an off-line device that has sufficient resources to run more resource-consuming algorithms

In this case, the face tracking module [111] reports the locations of confirmed face regions [145] to the in-camera firmware, preferably together with a confidence factor.

When the confidence factor is sufficiently high for a region, indicating that at least one face is in fact present in an image frame, the camera firmware runs a light-weight face recognition algorithm [160] at the location of the face, for example a DCT-based algorithm. The face recognition algorithm [160] uses a database [161] preferably stored on the camera comprising personal identifiers and their associated face parameters.

In operation, the module [160] collects identifiers over a series of frames. When the identifiers of a detected face tracked over a number of preview frames are predominantly of one particular person, that person is deemed by the recognition module to be present in the image. The identifier of the person, and the last known location of the face, is stored either in the image (in a header) or in a separate file stored on the camera storage [150]. This storing of the person's ID can occur even when a recognition module [160] fails for the immediately previous number of frames, but for which a face region was still detected and tracked by the module [111].

When the image is copied from camera storage to a display or permanent storage device such as a PC (not shown), persons' ID's are copied along with the images. Such devices are generally more capable of running a more robust face detection and recognition algorithm and then combining the results with the recognition results from the camera, giving more weight to recognition results from the robust face recognition (if any). The combined identification results are presented to the user, or if identification was not possible, the user is asked to enter the name of the person that was found. When the user rejects an identification or a new name is entered, the PC retrains its face print database and downloads the appropriate changes to the capture device for storage in the light-weight database [161].

When multiple confirmed face regions [145] are detected, the recognition module [160] can detect and recognize multiple persons in the image.

It is possible to introduce a mode in the camera that does not take a shot until persons are recognized or until it is clear that persons are not present in the face print database, or alternatively displays an appropriate indicator when the persons have been recognized. This allows reliable identification of persons in the image.

This feature of a system in accordance with a preferred embodiment solves a problem with algorithms that use a single image for face detection and recognition and may have lower probability of performing correctly. In one example, for recognition, if a face is not aligned within certain strict limits it becomes very difficult to accurately recognize a person. This method uses a series of preview frames for this purpose as it can be expected that a reliable face recognition can be done when many more variations of slightly different samples are available.

The present invention is not limited to the embodiments described above herein, which may be amended or modified without departing from the scope of the present invention as set forth in the appended claims, and structural and functional equivalents thereof.

In methods that may be performed according to preferred embodiments herein and that may have been described above and/or claimed below, the operations have been described in selected typographical sequences. However, the sequences have been selected and so ordered for typographical convenience and are not intended to imply any particular order for performing the operations.

In addition, all references cited above herein, in addition to the background and summary of the invention sections themselves, are hereby incorporated by reference into the detailed description of the preferred embodiments as disclosing alternative embodiments and components.

The invention claimed is:

**1**. A method of tracking faces in an image stream with a digital image acquisition device, comprising:

a. receiving an acquired image from an image stream including one or more face regions;

b. sub-sampling said acquired image at a specified resolution to provide a sub-sampled image;

c. calculating a corresponding integral image for a least a portion of said sub-sampled image;

d. applying a fixed size face detection to at least a portion of said integral image to provide a set of one or more candidate face regions each having a given size and a respective location;

e. responsive at least in part to the given size and respective location of said candidate face regions, adjusting a resolution for sub-sampling a next acquired image; and

f. repeating steps a. to e. at the adjusted resolution, and

g. further comprising merging said set of candidate face regions with any previously detected face regions to provide a set of candidate face regions of potentially different sizes, and

h. further comprising, for each region of said acquired image corresponding to a region of said merged set of candidate face regions:

calculating an integral image; and

applying variable-sized face detection to each merged region integral image to provide a set of confirmed face regions and a set of rejected face regions.

**2**. A method as claimed in claim **1**, further comprising tracking candidate face regions of different sizes from a plurality of images of said image stream.

**3**. A method as claimed in claim **1**, further comprising:

checking any rejected face regions based on alternative criteria from said fixed and variable sized face detection; and

responsive to said checking indicating any of said rejected face regions is a face region, adding said previously rejected face region to said set of confirmed face regions.

**4**. A method as claimed in claim **3**, wherein said checking comprises applying a skin prototype to any rejected face region.

**5**. A method as claimed in claim **1**, wherein said merging comprises merging a set of candidate face regions for an acquired image with said set of confirmed face regions for a previously acquired image.

**6**. A method as claimed in claim **1**, wherein said regions of said acquired image corresponding to a region of said merged set of candidate face regions comprise regions surrounding respective regions of said merged set of candidate face regions.

**7**. A method as claimed in claim **1**, wherein applying variable sized face detection comprises applying a plurality of cascades of Haar classifiers of varying size to each merged region integral image.

**8**. A method as claimed in claim **7**, comprising applying twelve or fewer sizes of cascades of Haar classifiers.

9. The method of claim 7, comprising applying 3 or 4 sizes of Haar classifiers.

10. A method as claimed in claim 9, wherein each cascade comprises 32 classifiers.

11. A method as claimed in claim 1, wherein said repeating steps a. to e. is performed responsive to changes in content from image to image in said image stream.

12. A method as claimed in claim 1, wherein said applying fixed size face detection comprises applying a cascade of Haar classifiers of a fixed size to said integral image.

13. A method as claimed in claim 1, further comprising the step of:

displaying an acquired image; and

superimposing said tracked candidate face regions on said displayed acquired image.

14. A method of tracking faces in an image stream with a digital image acquisition device, comprising:

a. receiving an acquired image from an image stream including one or more face regions;

b. sub-sampling said acquired image at a specified resolution to provide a sub-sampled image;

c. calculating a corresponding integral image for a least a portion of said sub-sampled image;

d. applying a fixed size face detection to at least a portion of said integral image to provide a set of one or more candidate face regions each having a given size and a respective location;

e. responsive at least in part to the given size and respective location of said candidate face regions, adjusting a resolution for sub-sampling a next acquired image; and

f. repeating steps a. to e. at the adjusted resolution,

wherein said adjusting comprises cycling through a set of at least approximately four sub-sampling resolutions.

15. A method as claimed in claim 14, further comprising merging said set of candidate face regions with any previously detected face regions to provide a set of candidate face regions of potentially different sizes.

16. A method as claimed in claim 14, further comprising storing at least one of the size and location of at least some of said set of candidate face regions in association with said main acquired image.

17. A method as claimed in claim 16, further comprising the step of:

performing spatially selective post processing of said main acquired image based on said stored candidate face regions' size or location.

18. A method as claimed in claim 17, wherein said selective image processing comprises color correction, sharpening, blurring, saturation, subsampling, compression, or a combination thereof.

19. A method of tracking faces in an image stream with a digital image acquisition device, comprising:

a. receiving an acquired image from an image stream including one or more face regions;

b. sub-sampling said acquired image at a specified resolution to provide a sub-sampled image;

c. calculating a corresponding integral image for a least a portion of said sub-sampled image;

d. applying a fixed size face detection to at least a portion of said integral image to provide a set of one or more candidate face regions each having a given size and a respective location;

e. responsive at least in part to the given size and respective location of said candidate face regions, adjusting a resolution for sub-sampling a next acquired image; and

f. repeating steps a. to e. at the adjusted resolution,

wherein said adjusting is responsive to said image being acquired at approximately infinite focus for adjusting said sub-sampling resolution to maximum resolution.

20. A method of tracking faces in an image stream with a digital image acquisition device, comprising:

a. receiving an acquired image from an image stream including one or more face regions;

b. sub-sampling said acquired image at a specified resolution to provide a sub-sampled image;

c. calculating a corresponding integral image for a least a portion of said sub-sampled image;

d. applying a fixed size face detection to at least a portion of said integral image to provide a set of one or more candidate face regions each having a given size and a respective location;

e. responsive at least in part to the given size and respective location of said candidate face regions, adjusting a resolution for sub-sampling a next acquired image; and

f. repeating steps a. to e. at the adjusted resolution,

wherein a. to e. are performed periodically on a selected plurality of images of an image stream, said plurality of images including a main acquired image chronologically following a plurality of images of said selected plurality of images.

21. A method as claimed in claim 20, where the time interval between said selected images is fixed.

22. A method as claimed in claim 21, where the time interval between said selected images is variable and determined during execution.

23. A method as claim in claim 22, wherein said time interval is a function of the time taken to process one or more previous main acquired images.

24. A method as claimed in claim 23, wherein said time interval is dependent on changes in image content for one or more of said selected plurality of images.

25. A method as claimed in claim 23, wherein said cascade comprises at least approximately 32 classifiers.

26. A method of tracking faces in an image stream with a digital image acquisition device, comprising:

a. receiving an acquired image from an image stream including one or more face regions;

b. sub-sampling said acquired image at a specified resolution to provide a sub-sampled image;

c. calculating a corresponding integral image for a least a portion of said sub-sampled image;

d. applying a fixed size face detection to at least a portion of said integral image to provide a set of one or more candidate face regions each having a given size and a respective location;

e. responsive at least in part to the given size and respective location of said candidate face regions adjusting a resolution for sub-sampling a next acquired image; and

f. repeating steps a. to e. at the adjusted resolution, and

g. further comprising responsive to said acquired image being captured with a flash, analyzing regions of said acquired image corresponding to said tracked candidate face regions for red-eye defects.

27. A method as claimed in claim 26, further comprising correcting in said acquired image any red-eye defects.

28. A method as claimed in claim 26, further comprising storing with said acquired image an indication of any red-eye defects.

29. An image processing apparatus for tracking faces in an image stream comprising one or more processors and one or

more digital storage media having digitally-encoded instructions embedded therein for programming the one or more processors to perform an iterative method of tracking faces in an image stream, the method comprising:

a. receiving an acquired image from said image stream including one or more face regions;

b. sub-sampling the acquired image at a specified resolution to provide a sub-sampled image;

c. calculating a corresponding integral image for a least a portion of said sub-sampled image;

d. applying a fixed size face detection to at least a portion of said integral image to provide a set of one or more candidate face regions; and

e. responsive at least in part to said set of candidate face regions, adjusting a resolution for sub-sampling a next acquired image, and

further comprising, for each region of said acquired image corresponding to a region of said merged set of candidate face regions;

f. calculating an integral image; and

g. applying variable-sized face detection to each merged region integral image to provide a set of confirmed face regions and a set of rejected face regions.

**30**. An apparatus according to claim **29**, comprising a digital still camera, a video camera, a cell phone equipped with an image capturing mechanism or a hand help computer equipped with an internal or external camera, or combinations thereof.

**31**. A method of recognizing faces in an image stream with a digital image acquisition device, comprising:

a. providing a database comprising an identifier and associated parameters for each of a number of faces to be recognized;

b. receiving an acquired image from an image stream including one or more face regions;

c. sub-sampling said acquired image at a specified resolution to provide a sub-sampled image;

d. calculating a corresponding integral image for at least a portion of said sub-sampled image;

e. applying face detection to at least a portion of said integral image to provide a set of one or more candidate face regions each having a given size and a respective location;

f. using a database, selectively applying face recognition to at least one of the candidate face regions;

g. providing an identifier for each face recognized in the at least one candidate face region; and

h. storing the identifier for each recognized face in association with at least one image of said image stream, and

i. further comprising providing a level of confidence for each candidate face region based on the face detection, and applying recognition only to candidate face regions having a confidence level higher than a predetermined threshold.

**32**. The method of claim **31**, further comprising repeating steps b. to h.

**33**. A method as claimed in claim **31**, further comprising, responsive to a size and location of a set of one or more candidate face regions and any previously detected face regions, adjusting the resolution for sub-sampling a next acquired image.

**34**. A method as claimed in claim **31**, further comprising storing said identifiers in association with a full-resolution image of said image stream.

**35**. An image processing apparatus including one or more processors, a database including an identifier and associated parameters for each of a number of faces to be recognized, and one or more digital storage media having digitally-encoded instructions embedded therein for programming the one or more processors to perform an iterative method of recognizing faces in an image stream, the method comprising:

a. receiving an acquired image from said image stream including one or more face regions;

b. sub-sampling said acquired image at a specified resolution to provide a first-sub-sampled image;

c. calculating a corresponding integral image for a least a portion of said sub-sampled image;

d. applying face detection to at least a portion of said integral image to provide a set of one or more candidate face regions each including a given size and a respective location;

e. selectively applying face recognition using said database to at least one of the candidate face regions to provide an identifier for a face recognized in a candidate face region; and

f. storing the identifier for the recognized face in association with at least one image of said image stream, and

g. further comprising providing a level of confidence for each candidate face region based on the face detection and applying recognition only to candidate face regions having a confidence level higher than a predetermined threshold.

**36**. A method of detecting faces in an image stream using a digital image acquisition device comprising:

a. receiving an acquired image from said image stream including one or more face regions;

b. sub-sampling said acquired image at a specified resolution to provide a sub-sampled image;

c. identifying one or more regions of said acquired image predominantly including skin tones;

d. calculating a corresponding integral image for a least one of said skin tone regions of said sub-sampled acquired image; and

e. applying face detection to at least a portion of said integral image to provide a set of one or more candidate face regions each having a given size and a respective location, and

wherein in a face detection mode of said digital image acquisition device, each new acquired image is acquired with progressively increased exposure parameters until at least one candidate face region is detected.

**37**. The method of claim **36**, further comprising repeating a. to e.

**38**. A method as claimed in claim **36**, wherein said identifying is performed on said sub-sampled image.

**39**. A method as claimed in claim **36**, wherein said face detection is performed with relaxed face detection parameters.

**40**. A method as claimed in claim **36**, further comprising:

for a candidate face region associated with a previous image, enhancing the contrast of the luminance characteristics of the corresponding region of said acquired image.

**41**. A method as claimed in claim **40**, wherein said enhancing is performed on said sub-sampled image.

**42**. A method as claimed in claim **40**, wherein said enhancing is performed during calculation of said integral image.

**43**. An image processing apparatus including one or more processors and one or more digital storage media having digitally-encoded instructions embedded therein for programming the one or more processors to perform an iterative method of detecting faces in an image stream, the method comprising:

a. receiving an acquired image from an image stream including one or more face regions;

b. sub-sampling said acquired image at a specified resolution to provide a sub-sampled image;

c. identifying one or more regions of said acquired image predominantly including skin tones;

d. calculating a corresponding integral image for a least one of said skin tone regions of said sub-sampled image; and

e. applying face detection to at least a portion of said integral image to provide a set of candidate face regions each having a given size and a respective location, and

wherein in a face detection mode of said digital image acquisition device, each new acquired image is acquired with progressively increased exposure parameters until at least one candidate face region is detected.

* * * * *

(19) Europäisches Patentamt
European Patent Office
Office européen des brevets

(11) EP 0 932 114 A2

# (12) EUROPEAN PATENT APPLICATION

(43) Date of publication:
**28.07.1999 Bulletin 1999/30**

(51) Int Cl.$^{6}$: **G06K 9/00**

(21) Application number: **99300179.1**

(22) Date of filing: **12.01.1999**

(84) Designated Contracting States:
**AT BE CH CY DE DK ES FI FR GB GR IE IT LI LU MC NL PT SE**
Designated Extension States:
**AL LT LV MK RO SI**

(30) Priority: **23.01.1998 GB 9801550**

(71) Applicant: **Sharp Kabushiki Kaisha**
**Osaka-shi, Osaka 545-8522 (JP)**

(72) Inventors:
- **Hong, Qi He**
  **Abingdon, Oxfordshire OX14 5PT (GB)**
- **Holliman, Nicholas Steven**
  **Wallingford, Oxfordshire OX10 OAY (GB)**
- **Ezra, David**
  **Wallingford, Oxfordshire OX10 ORL (GB)**

(74) Representative: **Robinson, John Stuart**
**Marks & Clerk,**
**4220 Nash Court,**
**Oxford Business Park South**
**Oxford OX4 2RU (GB)**

Remarks:
The application is published incomplete as filed (Article 93 (2) EPC).

## (54) A method of and apparatus for detecting a face-like region and observer tracking display

(57) A method is provided for detecting face-like regions in a colour image, for instance from a video camera. The saturation component is derived (21) from a colour image (20), for instance by conversion from the RGB format which is typical of the output of video cameras. The spatial resolution of the saturation-component image is reduced (22) by spatial averaging so that the image of a face has a limited extent, such as less than five reduced resolution pixels in each dimension. The reduced resolution saturation image is then tested (23) to find regions which are of substantially uniform saturation and of a predetermined size and shape and which are surrounded by a region of substantially different saturation.




FIG. 6

EP 0 932 114 A2



Printed by Jouve, 75001 PARIS (FR)

## Description

[0001] The present invention relates to a method of and an apparatus for detecting a face-like region of a colour image. Such a method may be used in association with other methods for detecting a face in an image and for capturing a target image, for instance during the initialisation stage of an image tracking system which may be associated with an observer tracking autostereoscopic display. Such methods and apparatuses have a wide range of applications, for instance in skin colour detection, face detection and recognition, security surveillance, video and image compression, video conferencing, multimedia database searching and computer games.

[0002] The present invention also relates to an observer tracking display, for instance of the autostereoscopic type.

[0003] Autostereoscopic displays enable a viewer to see two separate images forming a stereoscopic pair by viewing such displays with the eyes in two viewing windows. Examples of such displays are disclosed in EP 0 602 934, EP 0 656 555, EP 0 708 351, EP 0 726 482 and EP 0 829 743. An example of a known type of observer tracking autostereoscopic display is illustrated in Figure 1 of the accompanying drawings.

[0004] The display comprises a display system 1 co-operating with a tracking system 2. The tracking system 2 comprises a tracking sensor 3 which supplies a sensor signal to a tracking processor 4. The tracking processor 4 derives from the sensor signal an observer position data signal which is supplied to a display control processor 5 of the display system 1. The processor 5 converts the position data signal into a window steering signal and supplies this to a steering mechanism 6 of a tracked 3D display 7. The viewing windows for the eyes of the observer are thus steered so as to follow movement of the head of the observer and, within the working range, to maintain the eyes of the observer in the appropriate viewing windows.

[0005] capture would be difficult for a computer, given all possible types of people with different age, sex, eye shape and skin colour under various lighting conditions.

[0006] Suwa et al, "A Video Quality Improvement Technique for Video Phone and Video Conference Terminal", IEEE Workshop on Visual Signal Processing and Commun ications, 21-22 September 1993, Melbourne, Australia disclose a technique for detecting a facial region based on a statistical model of skin colour. This technique assumes that the colour and brightness in the facial region lie within a defined domain and the face will occupy a predetermined amount of space in a video frame. By searching for a colour region which consists of image pixels whose colours are within the domain and whose size is within a known size, a face region may be located. However, the colour space domain for the skin colour changes with changes in lighting source, direction and intensity. The colour space also varies for different skin colours. Accordingly, this technique requires calibration of the skin colour space for each particular application and system and is thus of limited applicability.

[0007] Swain et al, "Color Indexing", International Journal of Computer Vision, 7:1, pages 11 to 32, 1991 disclose the use of colour histograms of multicoloured objects to provide colour indexing in a large database of models. A technique known as "histogram back projection" is then use to locate the position of a known object such as a facial region, for instance as disclosed by Sako et al, "Real-Time Facial-Feature Tracking based on Matching Techniques and its Applications", proceedings of 12 IAPR International Conference on Patent Recognition, Jerusalem, October 6-13 1994, vol II, pages 320 to 324. However, this technique requires knowledge of the desired target, such as a colour histogram of a face, and only works if sufficient pixels of the target image are different from pixels of other parts of the image. It is therefore necessary to provide a controlled background and additional techniques are required to cope with changes of lighting.

[0008] Chen et al, "Face Detection by Fuzzy Pattem Matching", IEEE (0-8186-7042-8), pages 591 to 596, 1995 disclose a technique for detecting a face-like region in an input image using a fuzzy pattern matching method which is largely based on the extraction of skin colours using a model known as "skin colour distribution function" (SKDF). This technique first converts the RGB into a Famsworth colour space as disclosed in Wyszechi et al, "Color Science", John Wiley & Sons Inc, 1982. The SCDF is built by gathering a large set of sample images containing human faces and selecting the skin regions in the images by human viewers. A learning program is then applied to investigate the frequency of each colour in the colour space appearing in the skin regions. The SCDF is then unified and is used to estimate the degree of how well a colour looks like skin colour. Once a region is extracted as a likely skin region, it is subjected to further analysis based on pre-established face shape models, each containing 10 x 12 square cells. However, a problem with this technique is that the SCDF can vary as the lighting conditions change.

[0009] According to a first aspect of the invention, there is provided a method of detecting a face-like region of a colour image, comprising reducing the resolution of the colour image by averaging the saturation to form a reduced resolution image and searching for a region of the reduced resolution image having, in a predetermined shape, a substantially uniform saturation which is substantially different from the saturation of the portion of the reduced resolution image surrounding the predetermined shape.

[0010] The colour image may comprise a plurality of picture elements and the resolution may be reduced such that the predetermined shape is from two to three reduced resolution picture elements across.

[0011] The colour image may comprise a rectangular

array of M x N picture elements, the reduced resolution image may comprise (M/m) by (N/n) picture elements, each of which corresponds to m x n picture elements of the colour image, and the saturation of each picture element of the reduced resolution image may be given by:

$$P = (1/mn) \sum_{i=0}^{m-1} \sum_{j=o}^{n-1} f(i,j)$$

where f(i,j) is the saturation of the picture element of the ith column and the jth row of the m x n picture elements. The method may comprise storing the saturations in a store.

**[0012]** A uniformity value may be ascribed to each of the reduced resolution picture elements by comparing the saturation of each of the reduced resolution picture elements with the saturation of at least one adjacent reduced resolution picture element.

**[0013]** Each uniformity value may be ascribed a first value if

$$(\max(P)-\min(P))/\max(P) \leq T$$

where max(P) and min(P) are the maximum and minimum values, respectively, of the saturations of the reduced resolution picture element and the or each adjacent picture element and T is a threshold, and a second value different from the first value otherwise. T may be substantially equal to 0.15.

**[0014]** The or each adjacent reduced resolution picture element may not have been ascribed a uniformity value and each uniformity value may be stored in the store in place of the corresponding saturation.

**[0015]** The resolution may be reduced such that the predetermined shape is two or three reduced resolution picture elements across and the method may further comprise indicating detection of a face-like region when a uniformity value of the first value is ascribed to any of one reduced resolution picture element, two vertically or horizontally adjacent reduced resolution picture elements and a rectangular two-by-two array of picture elements and when a uniformity value of the second value is ascribed to each surrounding reduced resolution picture element.

**[0016]** Detection may be indicated by storing a third value different from the first and second values in the store in place of the corresponding uniformity value.

**[0017]** The method may comprise repeating the resolution reduction and searching at least once with the reduced resolution picture elements shifted with respect to the colour image picture elements.

**[0018]** The saturation may be derived from red, green and blue components as

$$(\max(R,G,B)-\min(R,G,B))/\max(R,G,B)$$

where max(R,G,B) and min(R,G,B) are the maximum and minimum values, respectively, of the red, green and blue components.

**[0019]** The method may comprise capturing the colour image. The colour image may be captured by a video camera and the resolution reduction and searching may be repeated for different video fields or frames from the video camera. A first colour image may be captured while illuminating an expected range of positions of a face, a second colour image may be captured using ambient light, and the second colour image may be subtracted from the first colour image to form the colour image.

**[0020]** According to a second aspect of the invention, there is provided an apparatus for detecting a face-like region of a colour image, comprising a data processor arranged to reduce the resolution of the colour image by averaging the saturation to form a reduced resolution image and to search for a region of the reduced resolution image having, in a predetermined shape, a substantially uniform saturation which is substantially different from the saturation of the portion of the reduced resolution image surrounding the predetermined shape.

**[0021]** According to a third aspect of the invention, there is provided an observer tracking display including an apparatus according to the second aspect of the invention.

**[0022]** It is known that human skin tends to be of uniform saturation. The present method and apparatus make use of this property and provide an efficient method of finding candidates for faces in colour images. A wider range of lighting conditions can be accommodated without the need for colour calibration so that this technique is more reliable and convenient than the known techniques. By reducing the resolution of the saturation of the image, computational requirements are substantially reduced and a relatively simple method may be used. Averaging increases the uniformity of saturation in a face region so that this technique is capable of recognising candidates for faces in images of people of different ages, sexes and skin colours and can even cope with the wearing of glasses of light colour. Because this technique is very efficient, it can be implemented in real time and may be used in low cost commercial applications.

**[0023]** This technique may be used in the initial stage 9 shown in Figure 3 of the accompanying drawings for the image tracking system disclosed in EP 0 877 274 and GB 2 324 428. Further, this technique may be used as the first part of a two stage face detection and recognition techniques as disclosed, for instance, in US 5 164 992, US 5 012 522, Turk et al "Eigen faces for Recognition", Journal 1 of Cognitive Neuroscience, vol 3, No

1, pages 70 to 86, 1991, Yuille et al, "Feature Extraction from Faces using Deformable Templates", International Journal of Computer Vision, 8(2), pages 99 to 111, 1992 and Yang et al, "Human Face Detection in Complex Background", Pattern Recognition, vol 27, No 1, pages 53 to 63, 1994. In such two stage techniques, the first stage locates the approximate position of the face and the second stage provides further analysis of each candidate's face region to confirm the existence of the face and to extract accurate facial features such as eyes, nose and lips. The first stage does not require high accuracy and so may be implemented with fast algorithms. The number of image regions which have to be analysed in the second stage is limited by the first stage. This is advantageous because the second stage generally requires more sophisticated algorithms and is thus more computing-intensive.

**[0024]** The invention will be further described by way of example, with reference to the accompanying drawings, in which:

Figure 1 is a block schematic diagram of a known type of observer tracking autostereoscopic display;

Figure 2 is a block schematic diagram of an observer tracking display to which the present invention may be applied;

Figure 3 is a flow diagram illustrating observer tracking in the display of Figure 2;

Figure 4 illustrates a typical target image or template which is captured by the method illustrated in Figure 3;

Figure 5 illustrates the appearance of a display during template capture by the display of Figure 2;

Figure 6 is a flow diagram illustrating a method of detecting face-like regions constituting an embodiment of the present invention;

Figure 7 is a diagram illustrating a hue saturation value (HSV) colour scheme;

Figure 8 is a diagram illustrating image resolution reduction by averaging in the method illustrated in Figure 6;

Figure 9 is a diagram illustrating calculation of uniformity values in the method illustrated in Figure 6;

Figure 10 is a diagram illustrating patterns used in face-candidate selection in the method illustrated in Figure 6;

Figure 11 is a diagram illustrating the effect of different positions of a face on the method illustrated in Figure 6;

Figure 12 is a diagram illustrating a modification to the method illustrated in Figure 6 for accommodating different face positions;

Figure 13 is a block schematic diagram of an observer tracking display to which the present invention is applied; and

Figure 14 is a system block diagram of a video tracking system of the display of Figure 13 for performing the method of the invention;

**[0025]** Like reference numerals refer to like parts throughout the drawings.

**[0026]** Figure 6 illustrates in flow diagram form a method of automatically detecting and locating face-like regions of a pixellated colour image from a video image sequence. The video image sequence may be supplied in real time, for instance by a video camera of the type described hereinbefore with reference to Figure 2. The method is capable of operating in real time as part of the initialisation stage 9 shown in Figure 3.

**[0027]** In a step 20, the latest digital image in the red, green, blue (RGB) format is obtained. For instance, this step may comprise storing the latest field of video data from the video camera in a field store. In a step 21, the video image is converted from the RGB format to the HSV format so as to obtain the saturation of each pixel. In practice, it is sufficient to obtain the S component only in the step 21 and this may be used to overwrite the RGB pixel data or one component thereof in the field store so as to minimise memory requirements.

**[0028]** The RGB format is a hardware-oriented colour scheme resulting from the way in which camera sensors and display phosphors work. The HSV format is one of several formats including hue saturation intensity (HSI) and hue lightness saturation (HLS) and is more closely related to the concepts of tint, shade and tone. In the HSV format, hue represents colour as described by the wavelength of light (for instance, the distinction between red and yellow), saturation represents the amount of colour that is present (for instance, the distinction between red and pink), and lightness, intensity or value represents the amount of light (for instance, the distinction between dark red and light red or between dark grey and light grey). The "space" in which these values may be plotted can be shown as a circular or hexagonal cone or double cone, for instance as illustrated in Figure 7, in which the axis of the cone is the grey scale progression from black to white, distance from the axis represents saturation and the direction or angle about the axis represents the hue.

**[0029]** The colour of human skin is created by a combination of blood (red) and melanin (yellow, brown). Skin colours lie between these two extreme hues and are somewhat saturated but are not extremely saturated.

TVision Insights, Inc. – Ex. 1015, Page 000004

The saturation component of the human face is relatively uniform.

**[0030]** Several techniques exist for converting video image data from the RGB format to the HSV, HSI or HLS format. Any technique which extracts the saturation component may be used. For instance, the conversion may be performed in accordance with the following expression for the saturation component S:

$$S = 0 \text{ for } \max(R,G,B)=0$$

$$S=(\max(R,G,B)-\min(R,G,B))/\max(R,G,B) \text{ otherwise}$$

**[0031]** Following the conversion step 21, the spatial image resolution of the saturation component is reduced by averaging in a step 22. As described hereinbefore with reference to Figure 2, the approximate distance of the face of an observer from the display is known so that the approximate size of a face in each video image is known. The resolution is reduced such that the face of an adult observer occupies about 2 to 3 pixels in each dimension as indicated in Figure 6. A technique for achieving this will be described in more detail hereinafter.

**[0032]** A step 23 detects, in the reduced resolution image from the step 22, regions or "blobs" of uniform saturation of predetermined size and shape surrounded by a region of reduced resolution pixels having a different saturation. A technique for achieving this is also described in more detail hereinafter. A step 24 detects whether a face candidate or face-like region has been found. If not, the steps 20 to 24 are repeated. When the step 24 confirms that at least one candidate has been found, the position of the or each uniform blob detected in the step 23 is output at a step 25.

**[0033]** Figure 8 illustrates the image resolution reduction step 22 in more detail. 30 illustrates the pixel structure of an image supplied to the step 20. The spatial resolution is illustrated as a regular rectangular array of MxN square or rectangular pixels. The spatial resolution is reduced by averaging to give an array of (M/m)x(N/n) pixels as illustrated at 31. The array of pixels 30 is effectively divided up into "windows" or rectangular blocks of pixels 32, each comprising mxn pixels of the structure 30. The S values of the pixels are indicated in Figure 8 as f(i,j), for $0 \le i < m$ and $0 \le j < n$. The average saturation value P of the window is calculated as:

$$P = (1/mn) \sum_{i=o}^{m-1} \sum_{j=o}^{n-1} f(i,j)$$

**[0034]** In the embodiment illustrated in the drawings, the reduction in spatial resolution is such that an adult observer face occupies about 2 to 3 of the reduced resolution pixels in each dimension.

**[0035]** The step 23 comprises assigning a uniformity status or value U to each reduced resolution pixel and then detecting patterns of uniformity values representing face-like regions. The uniformity value is 1 or 0 depending on the saturations of the pixel and its neighbours. Figure 9 illustrates at 35 a pixel having an averaged saturation value $P_0$ whose uniformity U shown at 36 in Figure 9 is to be calculated from $P_0$ and the averaged saturation values $P_1$, $P_2$ and $P_3$ of the three neighbouring pixels. Assigning uniformity values begins at the top left pixel 37 and proceeds from left to right until the penultimate pixel 38 of the top row has been assigned its uniformity value. This process is then repeated for each row in turn from top to bottom ending at the penultimate row. By "scanning" the pixels in this way and using neighbouring pixels to the right and below the pixel whose uniformity value has been calculated, it is possible to replace the average saturation values P with the uniformity values U by overwriting into the store so that memory capacity can be used efficiently and it is not necessary to provide further memory capacity for the uniformity values.

**[0036]** The uniformity status U is calculated as:

$$U = 1 \text{ if } (fmax-fmin)/fmax \le T$$

$$U = 0 \text{ otherwise}$$

where T is a predetermined threshold, for instance having a typical value of 0.15, fmax is the maximum of $P_0$, $P_1$, $P_2$ and $P_3$, and fmin is the minimum of $P_0$, $P_1$, $P_2$ and $P_3$.

**[0037]** When the ascribing of the uniformity values has been completed, the array 36 contains a pattern of 0s and 1s representing the uniformity of saturation of the reduced resolution pixels. The step 23 then looks for specific patterns of 0s and 1s in order to detect face-like regions. Figure 10 illustrates an example of four patterns of uniformity values and the corresponding pixel saturation patterns which are like the face candidates in the video image. Figure 10 shows at 40 a uniform blob in which dark regions represent averaged saturation values of sufficient uniformity to indicate a face-like region. The surrounding light regions or squares represent a region surrounding the uniform saturation pixels and having substantially different saturations. The corresponding pattern of uniformity values is illustrated at 41 and comprises a pixel location with the uniformity value 1 completely surrounded by pixel locations with the uniformity value 0.

**[0038]** Similarly, Figure 10 shows at 42 another face-like region and at 43 the corresponding pattern of uni-

formity values. In this case, two horizontally adjacent pixel locations have the uniformity value 1 and are completely surrounded by pixel locations having the uniformity value 0. Figure 10 illustrates at 44 a third pattern whose uniformity values are as shown at 45 and are such that two vertically adjacent pixel locations have the uniformity value 1 and are surrounded by pixel locations with the uniformity value 0.

**[0039]** The fourth pattern shown at 46 in Figure 10 has a square block of four (two-by-two) pixel locations having the uniformity value 1 completely surrounded by pixel locations having the uniformity value 0. Thus, whenever any of the uniformity value patterns illustrated at 41, 43, 45 and 47 in Figure 10 occurs, the step 23 indicates that a face-like region or candidate has been found. Searching for these patterns can be performed efficiently. For instance, the uniformity values of the pixel locations are checked in turn, for instance scanning left to right in each row and top to bottom of the field. Whenever a uniformity of value of 1 is detected, the neighbouring pixel locations to the right and below the current pixel location are inspected. If at least one of these uniformity values is also 1 and the region is surrounded by uniformity values of 0, then a pattern corresponding to a potential face candidate is found. The corresponding pixel locations may then be marked, for instance by replacing their uniformity values with a value other than 1 or 0, for example a value of 2. Unless no potential face candidate has been found, the positions of the candidates are output.

**[0040]** The appearance of the patterns 40, 42, 44 and 46 may be affected by the actual position of the face-like region in relation to the structure of the reduced resolution pixels 36. Figure 11 illustrates an example of this for a face-like region having a size of two-by-two reduced resolution pixels as shown at 49. If the face-like region indicated by a circle 50 is approximately centred at a two-by-two block, the pattern 47 of uniformity values will be obtained and detection will be correct. However, if the face were shifted by the extent of half a pixel in both the horizontal and vertical directions as illustrated at 51, the centre part of the face-like region may have a uniformity value which is different from the surrounding region as illustrated at 51. This may result in failure to detect a genuine candidate.

**[0041]** In order to avoid this possible problem, the steps 21 to 24 may be repeated for the same video field or for one or more succeeding video fields of image data. However. each time the steps 21 to 24 are repeated, the position of the array 31 of reduced resolution pixels is changed with respect to the array 30 of the colour image pixels. This is illustrated in Figure 12 where the whole image is illustrated at 52 and the region used for spatial resolution reduction by image averaging is indicated at 53. The averaging is performed in the same way as illustrated in Figure 8 but the starting position is changed. In particular, whereas the starting position for the first pixel in Figure 8 is at the top left corner 54 of the whole image 52, Figure 12 illustrates a subsequent averaging where the starting position is shifted from the top left corner by an amount Sx to the right in the horizontal direction and Sy downwardly in the vertical direction, where:

$$0<Sx<m \text{ and } 0<Sy<n$$

**[0042]** Each image may be repeatedly processed such that all combinations of the values of Sx and Sy are used so that mxn processes must be performed. However, in practice, it is not necessary to use all of the starting positions, particularly in applications where the detection of face-like regions does not have to be very accurate. For instance, where the face-like region detection forms the first step of a two step process as mentioned hereinbefore, the values of Sx and Sy may be selected from a more sparse set of combinations such as:

$$Sx=ix(m/k) \text{ and } Sy=jx(n/l)$$

where i, j, k and l are integers satisfying the following relationships:

$$0\leq i<k$$

$$0\leq j<l$$

$$1\leq k<m$$

$$1\leq l<n$$

**[0043]** This results in a total of kxl combinations.

**[0044]** As mentioned hereinbefore, the steps 21 to 24 may be repeated with the different starting positions on the same image or on a sequence of images. For real time image processing, it may be necessary or preferable to repeat the steps for the images of a sequence. The method may be performed very quickly and can operate in real time at between 10 and 60 Hz field rate depending on the number of face candidates present in the image. Thus, within a short period of the order of a very few seconds or less, all possible positions can be tested.

**[0045]** The method illustrated in Figure 6 may be performed on any suitable hardware, such as that illustrated in Figure 2. The tracking processor 4 as described hereinbefore is capable of being programmed to implement the method of Figure 6 as part of the initialisation stage 9 shown in Figure 3. The data processing is performed by the R4400 processor and associated memory

and the processor 4 includes a video digitiser and frame store as illustrated in Figure 2 for storing the saturation values, the averaged saturation values of the reduced resolution pixels and the uniformity values.

**[0046]** The method illustrated in Figure 6 works well with uniform lighting including ambient lighting and is applicable to applications under poor lighting conditions by using an active light source. Although the method does not require any special lighting and is very resilient to changes in the lighting of an observer, an active light source may be used during the initialisation stage 9 of Figure 2 and then switched off during subsequent observer tracking, which is highly robust and does not require special lighting.

**[0047]** Figure 13 shows a display of the type shown in Figure 2 modified to provide active lighting. The active light source comprises a flash light 55 with a synchroniser controlled by the processor 4. The flash light 55 is disposed in a suitable position, such as above the display 7 and adjacent the sensor 3, for illuminating the face of an observer.

**[0048]** Figure 14 illustrates the video tracking system 2 and specifically the data processor 4 in more detail. The data processor comprises a central processing unit (CPU) 56 connected to a CPU bus 57. A system memory 58 is connected to the bus 57 and contains all of the system software for operating the data processor.

**[0049]** The video camera 3 is connected to a video digitiser 59 which is connected to a data bus 60, to the flash light with synchroniser 55, to the CPU 56 and to an optional video display 61 when provided. A frame store 62 is connected to the data bus 60 and the CPU bus 57.

**[0050]** For embodiments not using active lighting, the frame store need only have a capacity of one field. In the case of the video camera 3 described hereinbefore and having a field resolution of 640 x 240 pixels and for a 24 bit RGB colour signal, a capacity of 640 x 240 x 3 = 460800 bytes is required. For embodiments using active lighting, the frame store 62 has a capacity of two fields of video data, ie: 921600 bytes.

**[0051]** In use, the flash light 55 is synchronised with the video camera 3 and with the video digitiser 59 so that the flash light is switched on or off at the appropriate time when an image is being captured.

**[0052]** The flash light 55 is used to flash light at the face of the observer so as to improve the uniformity of distribution. If the flash light 55 is much stronger than the ambient light, the intensity of the face is largely determined by the flash light 55. However, the use of a strong light source tends to produce an over-saturated image, in which many objects may be falsely detected as face-like regions. Further, the use of a powerful flashing light may become unpleasant to the observer and might cause damage to the eyes.

**[0053]** The flash light 55 should therefore be of mild intensity. In this case, the effects of ambient light may need to be reduced so as to improve the reliability of detecting genuine face-like regions.

**[0054]** The method illustrated in Figure 6 may be modified so as to compare two consecutive frames of video image data in which one is obtained with the flash light 55 illuminated and the other is obtained with ambient light only. The first of these therefore contains the effect of both the ambient light and the flash light 55. This first image I(a+f) may therefore be considered to comprise two components:

$$I(a+f) = I(a)+I(f)$$

where I(a) is the ambient light-only image and I(f) is the image which would have been produced if the only light source where the flash light 55. This may be rewritten as:

$$I(f)=I(a+f)-I(a)$$

**[0055]** Thus, by subtracting the image pixel data or the reduced resolution data in the step 21 or the step 22, the effect of over-saturation of the background by the flash light 55 may be reduced. A further reduction may be obtained by ensuring that the flash light 55 largely directs its light to the region which is likely to be occupied by the face of the observer.

**Claims**

1. A method of detecting a face-like region of a colour image, comprising reducing the resolution (22) of the colour image by averaging the saturation to form a reduced resolution image and searching (23) for a region of the reduced resolution image having, in a predetermined shape, a substantially uniform saturation which is substantially different from the saturation of the portion of the reduced resolution image surrounding the predetermined shape.

2. A method as claimed in Claim 1, characterised in that the colour image comprises a plurality of picture elements and the resolution is reduced such that the predetermined shape is from two to three reduced resolution picture elements across.

3. A method as claimed in Claim 2, characterised in that the colour image comprises a rectangular array (30) of M by N picture elements, the reduced resolution image (31) comprises (M/m) by (N/n) picture elements, each of which corresponds to m by n picture elements (32) of the colour image, and the saturation P of each picture element of the reduced resolution image is given by:

$$P = (1/mn)\sum_{i=0}^{m-1} \sum_{j=o}^{n-1} f(i, j)$$

where f (i, j) is the saturation of the picture element of the ith column and the jth row of the m by n picture elements (32).

**4.** A method of claimed in Claim 3, characterised by storing the saturations in a store (62).

**5.** A method as claimed in Claim 3 or 4, characterised in that a uniformity value is ascribed to each of the reduced resolution picture elements by comparing the saturation of each of the reduced resolution picture elements with the saturation of at least one adjacent reduced resolution picture element.

**6.** A method as claimed in Claim 5, characterised in that each uniformity value is ascribed a first value if

$$(\max(P) - \min(P))/\max(P) \leq T$$

where max (P) and min (P) are the maximum and minimum values, respectively, of the saturations of the reduced resolution picture element and the or each adjacent picture element and T is a threshold, and a second value different from the first value otherwise.

**7.** A method as claimed in Claim 6, characterised in that T is substantially equal to 0.15.

**8.** A method as claimed in any one of Claims 5 to 7 when dependent on Claim 4, characterised in that the or each adjacent reduced resolution picture element has not been ascribed a uniformity value and each uniformity value is stored in the store (62) in place of the corresponding saturation.

**9.** A method as claimed in Claim 6 or 7 or in Claim 8 when dependent on Claim 6, characterised in that the resolution is reduced such that the predetermined shape is two or three reduced resolution picture elements across and in which the method further comprises indicating detection of a face-like region when a uniformity value of the first value is ascribed to any of one reduced resolution picture element (41), two vertically or horizontally adjacent reduced resolution picture elements (43, 45) and a rectangular two-by-two array of picture elements (47) and when a uniformity value of the second value is ascribed to each surrounding reduced resolution picture element.

**10.** A method as claimed in Claim 9 when dependent on Claim 4, characterised in that detection is indicated by storing a third value different from the first and second values in the store (62) in place of the corresponding uniformity value.

**11.** A method as claimed in any one of Claims 2 to 10, characterised by repeating the resolution reduction and searching at least once with the reduced resolution picture elements shifted (53) with respect to the colour image picture elements (52).

**12.** A method as claimed in any one of the preceding claims, characterised in that the saturation is derived (21) from red, green and blue components as

$$(\max(R, G, B) - \min(R, G, B)) / \max(R, G, B)$$

where max (R, G, B) and min (R, G, B) are the maximum and minimum values, respectively, of the red, green and blue components.

**13.** A method as claimed in any one of the preceding claims, characterised by capturing (20) the colour image.

**14.** A method as claimed in Claim 13, characterised in that the colour image is captured (20) by a video camera (3) and the resolution reduction (22) and searching (23) are repeated for different video fields or frames from the video camera (3).

**15.** A method as claimed in Claim 14, characterised in that a first colour image is captured while illuminating an expected range of positions of a face, a second colour image is captured using ambient light, and the second colour image is subtracted from the first colour image to form the colour image.

**16.** An apparatus for detecting a face-like region of a colour image, characterised by a data processor (4, 56-62) arranged to reduce the resolution (22) of the colour image by averaging the saturation to form a reduced resolution image and to search (23) for a region of the reduced resolution image having, in a predetermined shape, a substantially uniform saturation which is substantially different from the saturation of the portion of the reduced resolution image surrounding the predetermined shape.

**17.** An observer tracking display (1, 2) characterised by an apparatus as claimed in Claim 16.


2
TRACKING SYSTEM
TRACKING
PROCESSOR
4
SENSOR
SIGNAL
TRACKING
SENSOR 3
POSITION
DATA
SIGNAL
5
6
STEERING
MECHANISM
TRACKED
3D DISPLAY
7
DISPLAY CONTROL
PROCESSOR
WINDOW
STEERING
SIGNAL
DISPLAY SYSTEM
1

FIG.1




FIG. 2

TVision Insights, Inc. – Ex. 1015, Page 000010


Initialisation
Stage 9
Target Image Capture
OK?
No
Yes
Global Target Search
12
13
Motion Detection
14
Local Target Match
15
Yes
Tracking lost?
No
Tracking
Stage
10

FIG. 3






FIG.4




FIG. 5


20
Obtain the latest digital image (RGB)
Obtain saturation picture by converting image format from RGB to HSV
21
Reduce image resolution of S-component by averaging, so that an adult's face has about 2-3 pixels in each dimension
22
Find uniform blobs that have 2-3 pixels in each dimension
23
Face candidate found?
24
No
Yes
Output position of uniform blobs detected
25

FIG. 6




FIG. 7




FIG . 8




FIG. 9


41
40
0 0 0
0 1 0
0 0 0
42
0 0 0 0
43
0 1 1 0
0 0 0 0
0 0 0
44
0 1 0
45
0 1 0
0 0 0
0 0 0 0
47
0 1 1 0
46
0 1 1 0
0 0 0 0

FIG. 10


49
50
51
50

FIG.11


54
Sx
50
whole image
52
Sy
Region for image averaging 53

FIG.12




FIG.13

TVision Insights, Inc. – Ex. 1015, Page 000020




FIG. 14

TVision Insights, Inc. – Ex. 1015, Page 000021

*A remarkable new technology may soon tell us precisely who watches television, what they watch, and for how long—and thus require a major restructuring of the way television conducts its business*

# WATCHING AMERICANS WATCH TV

BY ERIK LARSON



A GREAT MYSTERY HAS GNAWED AT THE HEARTS OF advertisers ever since the Bulova Watch Company paid for the first TV ad, which aired on July 1, 1941: How many people stick around for the commercials? Advertisers have always had to come at the question from an oblique angle, measuring the audiences for the programs surrounding their commercials rather than for the commercials themselves. The A. C. Nielsen Company brought technology to the business of estimating audience size in 1942, with the first mechanical meter, the Audimeter, which used a stylus to scratch out a record of where a radio dial was tuned. The system was crude but once refined proved far faster than the competition's surveys, and Nielsen quickly gained monopoly control over the business of national ratings, at first for radio and later for television. Most viewers know Nielsen as the maker of the bullets that killed *Star Trek* and *Twin Peaks*, but to think of its ratings exclusively in terms of their show-stopping power is to underestimate the depth of Nielsen's influence over the culture, content, and business of television, and thus over the evolution of our consumer culture itself. Nielsen *is* television. Imagine a company like IBM granting to an outside party a decisive say in whether it has a profit or a loss in a given quarter, and you'll begin to understand Nielsen's peculiar hold over broadcasting.

Nielsen kept competitors at bay through the deft and timely use of technology, but each fundamental advance changed the landscape of television. All along, the company's engineers pursued TV's Golden Fleece, the elusive "passive" audience meter, a device capable of recognizing each TV viewer and recording even his briefest exit, without his having to lift a finger. Audience engineers have dreamed of such a device ever since that epiphanic instant in 1952 when a Toledo, Ohio, water commissioner realized that a sudden city-wide drop in pressure coincided exactly with a commercial break in *I Love Lucy*, and joked that someone should invent a "flushometer." The men from Nielsen tried weight-sensing scales and electric eyes and even sophisticated military technology of the kind we so vividly saw put to work during the Gulf War. Still, some insurmountable obstacle always seemed to get in the way—big dogs, for example, the bane of any audience engineer.

Until lately Nielsen could afford to pursue this quest at



TVision Insights, Inc. – Ex. 1016, Page 000001
IPR2023-01014 (TVision Insights, Inc. v. The Nielsen Company (US), LLC)
APPX1172



a leisurely pace. Now, however, Nielsen's three largest customers, ABC, CBS, and NBC, openly charge that the company's existing "people meter" technology is unreliable, perhaps obsolete. After an exhaustive investigation they concluded in 1989 that their $10 billion industry had become a helpless captive of some rather flimsy statistics. Soon Nielsen reported steep, inexplicable declines in key segments of TV viewing which seemed to confirm the networks' worst fears and deeply shook their faith in the company's ratings.

"The thing we've always had has been this set of numbers," says Alan Wurtzel, ABC's senior research executive. "It's the foundation upon which program decisions are made, deals are made, advertising dollars are spent. When those numbers became unreliable, inconsistent, inaccurate, unexplainable, they just threw into chaos almost everything we did, because they were the basis on which the business was built."

To make matters worse, last April the networks invited all comers to present ideas for alternative ways of measuring the U.S. audience, the television equivalent of having your spouse suddenly begin advertising for a new lover. The competition has begun to stir. The Arbitron Company, which competes fiercely with Nielsen to rate local TV markets, continues to threaten to go national; it has funded an effort at the Massachusetts Institute of Technology's Media Lab to develop a passive meter and last November began tracking public response to the full network schedule. A French company has already deployed a kind of passive meter; Arbitron has begun testing the system for use here. Britain's AGB International, which was deeply gored in a past encounter

TVision Insights, Inc. – Ex. 1016, Page 000002



APPX1173

with Nielsen, hints that the U.S. market is simply too lucrative to resist.

Nielsen, therefore, finds itself virtually forced to deploy its newest secret weapon—a device that may be the ultimate passive meter. I met the machine in New York. It can identify viewers and even gives a rough indication of whether their heads are turned toward the TV. The system could fix a lot of the problems cited by the networks, but its deployment would have a significance far beyond its capacity to produce accurate numbers. By tracking the TV audience on a second-by-second basis, Nielsen's passive meter may yield the first accurate ratings of commercials—not shows, *commercials*—and thus at last solve that great nagging mystery about the "reach" of advertising. If it does, however, it will sharply alter the way consumer products are marketed in America, even the way television shows are written and produced. "The implications," says John Dimling, Nielsen Media's executive vice-president, "could be quite staggering."

But does anyone really want to know the truths that Nielsen's black box (and for now it really is a black box) may bring? What's wrong with Nielsen's numbers? Why did everyone accept them until now? And how did television, arguably the most powerful influence on American culture, become so dependent on such a fragile collection of digits in the first place?

## Sonar in the Living Room

THIS MAY BE HARD TO IMAGINE, BUT AT THE dawn of broadcasting, advertisers doubted that radio and TV would ever be useful for wooing consumers. They needed proof. They hired market researchers, themselves newly arrived on the commercial landscape, to conduct surveys, first simply to find out how many homes in America had a radio and later to determine what programs drew the most listeners. Somewhere along the way, however, ratings took on a power they were never meant to have, much to the chagrin even of Robert Elder, a co-inventor of Nielsen's first meter. In a 1978 letter he wrote that television "suffers greatly from the misuse of the [Nielsen Television Index] and for that reason I am not too happy about my part in getting it started."

Nielsen, founded in 1923 by Arthur C. Nielsen, Sr., acquired the rights to the Audimeter from Elder and his partner, Louis Woodruff, in 1936. The company spent six years refining the idea, and in 1942 launched a radio ratings service that within a few years went national and directly challenged the dominant supplier of the day, C. E. Hooper, Inc., whose "Hooperatings" still relied on surveys. Nielsen promised better, faster numbers, and quickly left Hooper in the dust. In 1950 Nielsen launched its meter-based television index, all the while continuing a policy of aggressively patenting every conceivable audience-measurement idea—a policy that paid off in 1961, when its toughest competitor yet, the American Research Bureau, which had crowded one of Nielsen's meter patents, wound up having to pay Nielsen royalties on all sales associated with the technology. The ARB temporarily abandoned TV meters in 1972; it took the name Arbitron in 1973.

Throughout the 1950s the amount of data that Nielsen delivered and the speed at which it did so increased sharply. At first Nielsen needed six weeks for delivery. By 1961 delivery took sixteen days, although in 1959 Nielsen had begun reporting day-after ratings from a small sample of homes (ARB did it first, in 1957). Newspapers reported Nielsen's rankings, a practice that strengthened the importance of ratings. C. E. Hooper had established the practice, by providing lists of top-rated programs to the press. The growing influence of ratings twice drew the attention of Congress, more forcefully in 1963–1964, with a full-blown investigation that yielded 1,700 pages of testimony and, ultimately, a set of Federal Trade Commission guidelines that sternly warned broadcasters always to remember that ratings data, based as they were on statistical estimates, were "inherently imperfect."

Researchers, meanwhile, took up the hunt for a passive meter.

In 1964 a San Diego inventor named James Tanner caused a major stir at the National Association of Broadcasters' meeting in Chicago, where he planned to demonstrate a ratings truck capable of capturing the tuning of televisions that it passed on the street. The truck, he claimed, could monitor up to 3,500 TVs every thirty minutes while moving at speeds of up to fifty miles per hour, giving new meaning to the notion of a ratings sweep.

Tanner had to cancel his demonstration, however, because he couldn't get the truck to work. The idea died.

The next year an Oklahoma State University professor, Charles L. Allen, produced a sensation when he published the results of his work with what may have been the first passive audience meter, his DynaScope, a stop-action movie camera that, with the help of a strategically placed mirror, took pictures every fifteen seconds of both the audience and the shows they were watching. Graduate students analyzed almost 1.5 million photographs from ninety-five test homes to see whether people were attentive, inattentive, or simply absent while the TV was on, and discovered that 19 percent of the time the TV played to an empty room. For another 21 percent of the time someone was present but so involved in something else that he or she didn't see the screen. The DynaScope didn't restrain anyone's behavior, apparently: Allen's graduate students wound up poring over stop-action accounts of couples fighting and making love.

The study spurred a flurry of invention among Nielsen's engineers. They experimented with bladderlike scales hidden in couches which would identify people by weight, a concept later embodied in what employees still

TVision Insights, Inc. – Ex. 1016, Page 000003

refer to as the "whoopee cushion" patent. The scales, however, couldn't tell the difference between kids and big dogs. The engineers also tried using height as an identifier. They lined doorways with electric eyes that measured each viewer who came through. High heels were its undoing.

Things took a turn toward the spooky in 1981, when David A. Kiewit became Nielsen Media's director of engineering. He had spent the previous decade building surveillance and targeting systems for submarines and bombers, a terrific background for anyone interested in either counting or destroying vast numbers of TV viewers. Kiewit and colleagues devised an infrared sensor that scanned rooms for "hot bodies." The system could indeed locate and count people, but it also counted light bulbs and toasters. One Nielsen engineer took the system home for some real-world testing and quickly got fed up. It kept reporting an extra person in his living room. "Whenever anybody upstairs took a shower," Kiewit told me recently, "there appeared to be a very long, thin person standing behind the couch who stood there for ten minutes or so and then *slo-o-o-owly* went away." The phantom was a hot-water pipe embedded in the wall.

With a little tinkering the system could be calibrated to skip most nonhuman sources of heat, but it, too, proved vulnerable to the big-dog effect. "You could set your threshold so that if a house had a small dog, you could skip him," Kiewit said, "but a big dog? You were in trouble."

Next Kiewit's group built a wall-mounted sonar set that scanned living rooms in exactly the way a ship scans New York harbor, transmitting inaudible signals and capturing the returning echoes. The system compared successive sonar images to isolate points of movement, and presumed these to be members of the audience. It was sensitive enough to pick up the soft heave of a viewer's chest as he breathed—or the soft heave of a seat cushion easing back into shape after its occupant had gotten up and left.

As elaborate as these systems were, neither even came close to identifying viewers. A true passive meter was still a long way off, and Nielsen wasn't in any great rush to get there. Its monopoly was intact; no serious competition was in sight.

The landscape of television, however, had suddenly begun to change. In the 1950s a typical family got approximately three channels—well, actually 3.8 by Nielsen's count. The networks sliced the audience pie into three substantial portions and didn't much worry about whether Nielsen correctly allocated the crumbs. But cable TV arrived, VCRs followed (they first hit the U.S. market in 1975), and remote controls allowed viewers to switch channels effortlessly. The networks' share of audience began to shrink.

A word of explanation here: Nielsen reports two numbers, the rating and the share. The rating is a measure of average audience and is expressed as a percentage of America's total potential audience of 93.1 million TV-equipped households. During prime time only about 60 percent of these households actually watch their TVs. Nielsen's share figures show how this active nightly audience divides itself among the various programs and stations. Suppose, for example, that this Thursday night 50 million households watch TV. Suppose that 25 million of these active households watch *Cheers*. The episode's rating would be 26.9 gross rating points, or 26.9 percent of all 93.1 million TV-equipped households. The share would be 50 percent, or half of the 50 million viewers who actually watched TV during that portion of the evening.



***Nielsen began documenting the networks' declining audience in the 1978–1979 season, when the three still drew a robust 91 percent of prime-time viewers.***

Nielsen began documenting the cruel fact of the networks' declining audience in the 1978–1979 season, when the three still drew a robust 91 percent of prime-time television viewers. Their share has shrunk every year since. By 1985 the average household could get 18.8 channels, and the networks' share of audience had shrunk to 77 percent. By last year the average home got thirty channels and the networks' share had fallen to 63 percent.

For a bit of culture shock, consider this: Seven of the fifty highest-rated programs of all time are 1964 episodes of *The Beverly Hillbillies*. Each had a rating of 41.8 to 44. In the most heavily watched of these, Jed, Jethro, and Granny somehow managed to command a 65 percent share of viewers—more than the combined share of all three networks today.

By the mid-1980s the explosion in TV choices had begun to outpace Nielsen's ability to keep up. By now advertisers cared less about reaching masses of households

TVision Insights, Inc. – Ex. 1016, Page 000004

and more about reaching the demographic segments of the population best suited to their products: for example, women twenty-five to fifty-four, men eighteen to forty-nine, or kids. Nielsen's set meters, sophisticated versions of the original Audimeter, recorded only that a TV was on and that it was receiving a particular station. Nielsen got its demographic data from viewer diaries kept by a second panel of families. Researchers feared that one member of each family, usually the already harried woman of the house, typically kept the diary for everyone. With so many channels, they worried, how could anyone remember exactly what a family watched, let alone the channel on which it appeared? They fretted, too, about the so-called halo effect that occurred when distracted diary-keepers wrote down what they *would* have watched or *should* have watched, rather than what they really did watch.

By 1985 the networks were ready for a change, and AGB, the British ratings giant, offered a tempting one. AGB had previously announced that it wanted to wire America with a new kind of meter, one it had already deployed in Ireland, Thailand, and the Philippines, which captured tuning and demographics simultaneously, continuously. AGB offered all this, moreover, at a lower cost.

The networks, delighted by the challenge to Nielsen's monopoly as well as by the promised improvements, helped fund an initial test of AGB's technology in Boston. This was a tricky time for Nielsen. Even though the networks had already lost market share, they were still Nielsen's biggest customers; on a symbolic level, moreover, their continued endorsement was vital. But their contracts with Nielsen were about to expire. Nielsen had offered each of them a new three-year contract that would cost $14 million.

CBS made a show of canceling its contract, ostensibly to prevent automatic renewal; in a further display of disaffection it signed a one-year contract with AGB. In July of 1987 David Poltrack, then and now CBS's top research official, told *The New York Times*, "It is certainly possible that we will not be a client of Nielsen come the fall." ABC also canceled, but did not sign with AGB.

AGB's year-and-a-half-long Boston test gave Nielsen time to dust off a meter it had begun testing a decade before, which worked very much like AGB's fearsome new weapon. Both were called people meters, because they sought to provide an electronic measure not just of tuning but of who was watching. Both began producing ratings in September of 1987, and thus gave broadcasters an opportunity to see how competing ratings systems would describe the same objective reality.

The two new systems produced radically conflicting results. The variations, moreover, occurred in a pattern that defied reduction to a mathematical constant. On the first Monday night, for example, Nielsen's people meter rated ABC's football game 15.3. AGB gave it 11.9, a discrepancy of roughly three million households. Nielsen's meter-and-diary system, which the company continued in order to provide stability during the transition, gave the game 14.5.

Nielsen flatly declared that AGB's numbers were "wrong." AGB said Nielsen's were too high. Confusion reigned; advertising negotiations faltered. Ultimately the industry voted to stay with Nielsen, which was at least a known entity. AGB fled the country, reportedly trailing $80 million in losses.

The new meter brought more data more quickly, including overnight demographics, but it was no friend to the networks. That first season the networks' share of audience dropped from 75 percent to 70 percent. The networks, acting together as the Committee on Nationwide Television Audience Measurement (CONTAM), a body that had been founded in 1963 in response to the congressional hearings, hired a respected media-research firm, Statistical Research, Inc., of Westfield, New Jersey, to investigate the new system.

The resulting report was completed in late 1989 and weighed six pounds. It was 550 pages long, in seven volumes, and arrived in a slick, heavy-gauge gray box meant to last a century. I read the report—every killing, if soporific, detail. This may be my imagination, but I thought I detected a kind of deep and weary sorrow in its text, a disappointed sigh: so this is what went on behind the curtains of Oz all these years! The report "documented an erosion in the quality of the Nielsen service," in its authors' words. "The vision, the actions, and the commitment of the past have been diminished."

Jonn Dimling, of Nielsen Media, read the final, most critical volume in his room in a Northbrook, Illinois, Holiday Inn. "I was about as depressed as I've ever been," he told me. "Even though I was prepared for everything they were going to say, seeing it all, just one thing after another—you think, 'My God, what have we done?'"

To make matters worse, a few months later Nielsen reported the sharp declines in some audience segments which so troubled the networks. Viewers disappeared. In particular, kids failed to show up for Saturday-morning cartoons. Droves of viewers in key segments deserted the prime-time hours. The declines were so steep, so unexpected, that they caused an immediate combined loss to the networks of about $200 million, the value of commercial time the networks had to cough up to make good on previously arranged audience guarantees.

In the months following, the networks launched an attack on Nielsen unprecedented for its ferocity. The assault, however, drew attention to what may have been the most significant revelation of the CONTAM report: how devilishly complex this business of measuring America's TV audience has become. Ronald Kessler, the program director of the prestigious Survey Research Center at the University of Michigan, and both a critic and a closet admirer of Nielsen, thinks that Nielsen's ability to produce any ratings at all is something of a minor miracle. "If you look inside what Nielsen does, it is absolutely

TVision Insights, Inc. – Ex. 1016, Page 000005



APPX1176

mind-boggling," he says. "Push any door and you find unbelievable detail."

At the same time, he added, "little errors mount up like crazy in a thing like this."

## Choosing Nielsen Families

I DON'T KNOW ANY NIELSEN FAMILIES. I HAVE NEVER met a member of a Nielsen family, and to my knowledge no Nielsen families live on my block. The only person I know who even comes close to having known a Nielsen family is my wife, who recalls vague feelings of childhood envy toward a family in her neighborhood which had been recruited to the cause. At any one time about 4,000 American families are wired by Nielsen, or one for every 23,000 of the country's television-equipped households. They are a secretive bunch, under orders to keep quiet about their Nielsen status lest someone try to coerce them into a scheme to manipulate the ratings. (They are told to report any suspicious encounters.) Together they compose one of the most influential groups in America, for their viewing habits directly and immediately determine the allocation of roughly $10 billion worth of network air time each year. A single Nielsen household, therefore, accounts for about $2.5 million of that $10 billion in advertising fees. Ronald Kessler puts it another way: "It's worth a television network's time to find a $150,000 house in America that has a Nielsen meter, pay the owner $200,000 for the house, and then tune that television set to their station a hundred percent of the time."

Broadcasters treat Nielsen's ratings as if they were exact numbers, not estimates. The networks sell about 70 percent of their prime-time advertising in what is called the up-front market, a time bazaar that opens in June, shortly after the networks announce their schedules for the following fall. Here advertisers buy big blocks of time in advance; in return the networks sell the time at a discount and guarantee that the advertisers' commercials will draw an agreed-on number of viewers. Deals are cut to the tenth of a ratings point; viewers become a commodity, sold on a cost-per-thousand (CPM) basis. An unexpected ratings dip of a single percentage point can cost a network millions of dollars in "make-goods" to satisfy the guarantees.

"As negotiations take place, deals are decided on the basis of CPM differences of pennies," CBS's David Poltrack said in a recent talk to members of the Advertising Research Foundation. Yet these negotiations, he said, ignore the range of error inherent in any statistical sample, and the far greater error in a sample as fundamentally flawed as Nielsen's. A true calculation of the room for error, he said, would "tell us that even a CPM variation of a dollar or more may not be real."

Statistical theory holds that every sample, no matter how perfect—even if everyone surveyed agreed to participate—starts life with a built-in, or standard, error. If a single episode of, say, *Murphy Brown* earns a rating of 15, the standard error is six tenths of a ratings point in either direction, according to Edward Schillmoeller, Nielsen Media's chief statistician. The episode has roughly a 68 percent chance of having an audience size between 15.6 and 14.4, and a 32 percent chance of having an audience that falls outside those limits.

This level of accuracy, however, applies only in ideal, textbook conditions, not in the rough-and-tumble world of surveying people, where the degree of error may be far greater.

Nonetheless, small changes in ratings affect even programming decisions. Poltrack told his audience, "Programs are canceled or shifted around the schedule after a four-week ratings trend is provided, even though differences between the points in the trend line may not be significant. In short, we have ignored the weak foundation of our television measurement system. . . ."

Daily ratings intensify this false sense of precision. "We could probably do without daily ratings," Poltrack told me during an interview in his office last April. They tend, he said, to shorten the already short-range perspective of his industry. The networks, faced with shrinking audiences and rising costs, have little patience. "*Murphy Brown* took three years to be a hit," he said. "This is a mentality where if you're not a hit in four weeks, we take you off and put something else on."

Having said this, however, he tipped back his chair and began flipping through a set of Nielsen overnights that had just arrived on his desk. "There's always *something* interesting," he said. He turned to the ratings for the previous Friday and cited that night's episode of the CBS series *Dallas*. "*Dallas* has been going up in the ratings for us, and *Dallas* is going to have its last telecast ever in a couple of weeks. We want to see if there's any momentum building. And sure enough"—he pointed to the page—"*Dallas* is up again in the ratings, a good sign there's some momentum."

The news about another show was less sanguine. He turned to Thursday's revised ratings. CBS had recently introduced a lackluster stopgap series called *The Antagonists* opposite NBC's top-rated comic juggernaut, *Cheers*.

"The first couple of weeks it got okay ratings," Poltrack said. "We were waiting very anxiously to see what the show did when *Cheers* went into repeats."

That previous Thursday a fresh *Antagonists* had aired against the first *Cheers* repeat of the season. Nonetheless, *Cheers* got an 18.8 rating, or a 31 share; *The Antagonists* got only an 8.1 rating, for a 13 share.

"It didn't go up at all," he said. "That's bad news, because the rating was not high enough to represent success for the show, and the fact it didn't go up at all . . ." He stopped, and let the thought—and the show, as it happens—hang. *The Antagonists* didn't make it to this season's schedule.

TVision Insights, Inc. – Ex. 1016, Page 000006



APPX1177



**B*y tracking the audience on a second-by-second basis, Nielsen's passive meter may yield the first accurate ratings of commercials—not shows, commercials.***

Ratings have attained a certain psychic precision as well. A fraction of a point can mean the difference between a producer's being considered a winner or a loser, and in television the distinction matters. "It's not the reality, it's the perception," says Bonny Dore, a successful producer of TV movies and miniseries, such as *Sins* and *Glory! Glory!* "If the perception is you lost—you lost," she says. And that perception can affect negotiations for a producer's next deal—"or whether you *get* another deal."

"Does it bother you," I asked, "that Nielsen's ratings are so flawed?"

"You're simply feeding into every nightmare a producer's ever had. We work and slave and go into debt and we do something wonderful, and the numbers are, quote, 'a little disappointing.' Then to find out that maybe they're off by five share points? You just want to go kill yourself. Other than that," she said, laughing, "it's fine."

## Where Statistical Sampling Goes Wrong

AT ITS VERY BEST, STATISTICAL SAMPLING IS fraught with problems. The initial response rate for the 1990 census was the lowest in history, even though all we had to do was fill out a single questionnaire, and are required by law to do it. Nielsen runs a huge, continuous, partly automated survey of America twenty-four hours a day, 365 days a year, and intrudes on the daily life of each recruit for two years at a stretch.

In the real world, as Nielsen has found, sampling is hell.

The process begins with the creation every ten years of a "sample frame," the population of households in America from which all Nielsen families are selected. First, using Census Bureau data, Edward Schillmoeller's department divides the country into successively smaller hunks of territory until at last it has a collection of some 5,000 "block groups," or units of census geography comprising on average about 425 housing units each. Next, Nielsen sends squads of field agents into each of these block groups to count every housing unit, both to account for any changes in the number of homes since the Census Bureau made its report and to note the addresses of potential Nielsen candidates. The crews merely count, until they reach a number selected at random by Schillmoeller's department. Assume there are indeed 425 homes in a block group. Nielsen picks a random number from 1 to 425. If the number is 125, the enumerator counts the first 124 homes without jotting down a single address. The next housing unit, be it a cave, tree, or converted beer truck, is the primary target household, a "Basic" in Nielsen-speak. This is the home Nielsen most dearly wants to recruit, and the one that sampling theory dictates Nielsen indeed *must* recruit. If the house is vacant, or even a vacant slab in a trailer park, Nielsen will keep coming back for five years in hopes that someone will have moved in.

In theory, every household has an equal shot at becoming a Nielsen family; in practice, however, the odds for some of us are zero. Nielsen would never allow me to be a member of its sample, because I am "occupationally disqualified," as are all my fellow journalists, every editor, producer, and advertising executive, and of course every single employee of CBS, NBC, ABC, CNN, MTV, local television stations, and Arbitron. The presumption is that we could not be trusted to behave ourselves and at the first opportunity would rush out and write about the experience or tune our TVs to the stations we work for. (Nielsen has good reason to worry: station employees included by chance in diary panels have been known to "load up" the diaries with their own stations' programs.) Nielsen also builds in demographic safety valves to avoid the unlikely but statistically possible selection of an aberrant sample—say, 4,000 black households. Such an occurrence might delight the networks, given that black families watch half again as much television as their nonblack peers, but would not do much for Nielsen's statistical credibility.

Today's people meter demands a lot from its hosts. Arthur Nielsen, Sr., wrote in 1955 that one of the beauties of the Audimeter system was that it operated "entirely automatically and outside the collaborating family's day-to-day awareness." Today's meter is a nagging shrew, consisting of three components: a computer the size of a compact-disc player, known as the home unit; a smaller box with a numerical keypad and a faceplate of

TVision Insights, Inc. – Ex. 1016, Page 000007

red and green lights, which sits atop the TV set; and a remote control, typically with eight numbered buttons and an "OK" button. Nielsen assigns a button to everyone in a household, even children as young as two. And everyone, even the two-year-old, is expected to behave in appropriate Nielsen fashion—that is, to press his button whenever he starts to watch TV and whenever he stops. Visitors pick an unoccupied button, enter their sex and age on the numerical keypad, and then also report their arrivals and departures. When a viewer punches in, the lights associated with his number change from red to green. Periodically the meter demands a little reassurance that someone is indeed watching, and will blink a single red bulb at the far right of the set-top box. One press of the "OK" button calms the machine. The longer the prompt goes unanswered, however, the more adamant the meter becomes, blinking its bulbs in an increasingly frenzied manner until it is ablaze with flashing lights, like the scene of a midnight car wreck. Some meters finally cry out in frustration, emitting a pained and disappointed beep.

Volunteers also subject their homes to a lot of drilling and wiring. Nielsen requires that every single TV set, VCR, and cable converter be metered and connected to the home unit. Any satellite dish has to be metered separately with an "inclinometer" that records which way, and thus at which satellite, the dish is pointing. Nielsen even takes an inventory of unused TVs kept in the attic or basement. Nielsen's agents don't simply accept a homeowner's assurance that a set won't be used. They have him swear to it in an affidavit, and then attach a small plastic seal to the prongs of the plug. If on a return visit the agent finds the seal broken, he will ask permission to meter the set; if he isn't allowed to, he may eject the family from the sample.

Today's typical Nielsen home, says Larry Patterson, the company's director of field operations, has two TVs, one VCR, and one cable converter, requiring an array of equipment that takes five or six hours to install. The most complex house he has come across had six TVs, five VCRs, and cable access; installing the meters took two full days.

In return for all this equipping and pestering, each family can pick gifts from a Nielsen catalogue and gets cash payments of two dollars a month for each TV or VCR in the house. A household with one TV would get just $24 a year; the family with the complex system mentioned above would get $264.

The networks worry that the burden is too great, that Nielsen families experience "button fatigue" and begin engaging in such inappropriate behaviors as failing to log in, or letting a visitor *just sit there* without first registering his age and presence. CONTAM conducted exit interviews with families leaving the Nielsen stable and found that one out of three reported getting tired of the meter; half of these said that as a result accuracy had suffered. More than one in ten said they "hardly ever" logged out when they finished watching a show.

The networks fear that button fatigue is especially pronounced among children. Almost half the kids (or their parental spokespeople) interviewed by CONTAM said that they did indeed get tired of pushing buttons. Nielsen takes great pains to win their cooperation. It gives them a Nielsen coloring book and shows them a video called "The Nielsen People Meter Show." Nielsen wants kids to bond to their buttons, and practices some subtle human engineering. It gives them a choice of animal stickers to place next to their buttons—but not commercial figures like Donald Duck or the Ninja Turtles, of course, because these might bias their viewing behavior.

Nielsen assigns the youngest child button No. 1 and works up from there by age. It does this to avoid button "churn," the shuffling of meter slots as people join or leave the household. Nielsen wants the oldest person on the highest button because of the cold actuarial fact that this person is the likeliest to die and leave a disorienting gap in the panel.

Who would agree to invite such an imperious guest into their homes? Far too few people, as it happens. In a typical week only about 48 percent of the households installed and on line are Basics, according to CONTAM. Such a low rate of cooperation makes statisticians queasy; it could be an indicator of a fundamental difference between those who do cooperate and those who don't. The question is, how does this affect viewing patterns? An early CONTAM study, conducted in 1964 in response to the congressional investigations, found that those who cooperated watched somewhat more TV than non-cooperators. The networks claim that the people meter has reversed the pattern—that now people who don't cooperate are the heaviest network watchers.

Nielsen's cooperation rate is actually far worse than 48 percent. In its routine disclosures the company reports only the percentage of Basics who refuse to participate, and doesn't mention the number of "Alternates" it had to approach before achieving its 4,000-household sample. In fact, Nielsen must approach three Alternates, on average, before it finds a willing participant. In some cases, according to Schillmoeller, recruiters have had to approach up to thirty additional homes.

Moreover, on any given day about 10 percent of Nielsen's people-meter households produce faulty data that cannot be included in the daily ratings calculations. The families most likely to be excluded, CONTAM discovered, were the heaviest viewers, reflecting a Catch-22 phenomenon literally engineered into the people-meter system: the more TVs and VCRs and Nielsen equipment you have, the greater the chance something will happen to bump your data from the day's tabulations.

Fatigue causes some families to drop out of the sample altogether. Other households leave for quirkier reasons:

TVision Insights, Inc. – Ex. 1016, Page 000008

one family bought a slick new TV and didn't want Nielsen's installers tinkering with it. Larry Patterson lost another Nielsen household to one of the cold realities of ghetto life in New York City. He and a partner had recruited an elderly woman living in a tough housing project in the borough of Queens. Early the following week he got a call from a city homicide detective who told him that the woman had been found strangled in her bed the previous Sunday morning. He requested all the woman's viewing records for Saturday night, in case they held some clue to the timing of her murder.

She had turned off the set at 11:23 P.M. on Saturday, Patterson found. But he also discovered a curious thing: someone had watched a lot of television in the woman's apartment the Sunday afternoon after she'd been killed.

The detective was silent a moment. "Oh, yeah," he said. "That was us. We were watching the football game."

"For him, at least," Patterson told me, "it certainly confirmed our credibility."

Readings from America's 4,000 people-metered households are automatically transmitted every night from 3:00 A.M. to about 7:00 A.M. Florida time, the machines dutifully calling home to Nielsen's Dunedin Center. Most people assume that the people meter alone produces all the information Nielsen needs for its ratings. In fact this nightly torrent of data is by itself utterly useless.

The meter tells only who is watching the TV set and how the set is tuned. Nielsen must merge this data with a second torrent of information, the detailed records of exactly what programs appeared on thousands upon thousands of TV stations and cable "headends" around the country—not what the stations planned to broadcast but what they actually did broadcast, and the exact times at which they did so.

On any day the task is monumental: The networks supply Nielsen with their daily lineups, but typically these succumb to special reports, late-running baseball games, natural disasters, and so forth—regional events that might cause an affiliate to interrupt the network "feed." Nielsen keeps track of all this by stationing robotic TV watchers in the TV markets where Nielsen families reside to watch television twenty-four hours a day, *forever*. They watch for a basic network signal, hidden from human viewers, that indicates when the network feed is being broadcast by an affiliate. If the signal arrives at its scheduled time, Nielsen assumes that all is well. Any discrepancy is called a conflict. In a typical week Nielsen's program-records department in Dunedin will resolve 12,000 to 15,000 such conflicts, often by calling stations to find out just exactly what did air. During the first week of the Gulf War, Nielsen confronted 50,000 conflicts and in the process exposed a bit of affiliate treachery. A few stations had dumped their network feeds to broadcast CNN instead.

CONTAM factored together all the forces tending to reduce cooperation and the supply of usable data, and determined that Nielsen's people-meter sample had a final net response rate of only 37 percent, meaning that only 37 percent of Nielsen's originally targeted Basics produced usable household data on any given day—a rate "below all industry or government standards for high quality operations," CONTAM reported. "The rate has declined steadily over recent years and indications are that, unless a different effort is introduced, it will continue to do so. At some point . . . a totally different measurement approach will have to be considered."

## The New Passive People Meter

"AS YOU CAN SEE, THIS IS YOUR TYPICAL LIVING room," said Christopher Lubniewski, a Nielsen client-service representative, in a recent interview. The room was a barren, windowless office in Nielsen Media's executive headquarters in New York. Nielsen's new passive people meter, a squat black box the size of a videocassette recorder, was perched before me on the shelf of an incongruous breakfront, the only thing even remotely living-room-like.

The machine and I had already been introduced—that is, it had scanned me and then stored four images of my face: three head-on portraits and one quarter-profile. It was now ready to try matching the real me to these digital mug shots.

If it succeeded, it would display on a nearby video screen my name and a number indicating how confident it was about the identification. A number and no name would mean that it had failed. I did not want a zero. A zero would be a pretty good indicator that I had died or at least stopped breathing. A number from 60 to 83 would mean that I was a person, although not someone the meter knew. Anything higher would mean that it knew me well enough to display my name.

The meter scans the room every two seconds, looking for signs of life. It compares each fresh image in a given location with its predecessor to produce a digital representation of movement, the hallmark of humanness. A life-size photograph brought into the room might fool the system for a moment, Lubniewski told me, but over the next few scans its lack of movement would cause the meter to ignore it.

The system next locates the melange of digits most resembling those for a human head, a search program that may at last help Nielsen separate the men from the dogs. "If a cat or a big dog jumped up here," Lubniewski said, "the system would scan it and try to find the head, and during the match-off would give it a score of zero to sixty." A nonhuman moving object.

The machine notices every departure and return. Its reliance on head-on or nearly head-on views, moreover, means that it will not count people who are present but

TVision Insights, Inc. – Ex. 1016, Page 000009



APPX1180

involved in other activities, such as reading the newspaper or making love on the floor.

The machine gets good but deeply qualified reviews. "It's very accurate," Robert A. Warrens, a senior vice-president and the director of media resources and research for J. Walter Thompson USA, told me not long ago. "I sat in a room in different positions and overall it was able to pick me up a hundred percent." But many who have seen the meter worry that it could worsen Nielsen's already poor cooperation rate, especially given today's heightened concern for privacy. "We know that one out of every two households has a TV in one or more bedrooms," says Nicholas P. Schiavone, NBC's vice-president of media and marketing research, and the current chairman of CONTAM. "Now, I come to your home and tell you I'm going to set up a recognition meter in every room of your household where there's a TV. Will people allow a device that can recognize—that can *see*—into those rooms?"



***"It scans the room every one or two seconds. You could fool it, but chances are if it misses you—if you sneeze or make a face— we'll still know you're there."***

Nielsen installed a nonfunctioning version in a group of Nielsen homes to see if their occupants, led to believe the system really worked, would indeed accept a camera-like device in their living rooms, bedrooms, even bathrooms (where one percent of American families currently have a TV). The answer, apparently, is a qualified yes.

The thing could appear in viewers' homes fairly soon. William G. Jacobi, Nielsen Media's president and chief operating officer, told me he'd "be disappointed if the passive meter were not playing a role in the rating system within the next three years."

If the meter works, it will solve Nielsen's problem of button fatigue. One school of thought holds that the passive meter could even improve initial cooperation rates by eliminating the workload associated with the current people meter. It would do nothing, however, to help Nielsen keep up with the proliferation of miniature portable TVs and track the ranks of so-called "out-of-home" viewers, the great uncounted masses who watch television while on vacation, in hotels, away at college, or on the job. To help meet these challenges, Nielsen's Dunedin researchers are experimenting with a pocket-sized electronic "diary" that people would, in theory, whip out to record the shows they watch in bars and elsewhere. They are also testing ways by which various pieces of Nielsen equipment could communicate with one another through the ordinary plugs and circuits of a house, thereby eliminating the need to run so many wires through homes. Moreover, Nielsen recently hired its first chief research officer, a kind of research cop, to study Nielsen's existing rating methods and look for simple ways to improve them.

The passive meter, however, is the thing Nielsen most likes to show off. "Try moving your chair backward and forward," Chris Lubniewski suggested. The meter registered my identity with scores of about 90.

Lubniewski took a seat in an adjacent wheeled chair and together we kicked our way throughout the meter's field of vision. It named us both. I tried covering the top half of my head with a legal pad, something I often do when I watch TV. The machine hesitated. I was a person, all right, but it couldn't say who.

Changes in hairstyle won't throw the meter, Lubniewski said—although he did mention a recent exception. "One woman came in here wearing her hair very tight," he said. "She let it go and it fell in front of her face, and the system *did* get confused."

This could be forgiven, I decided. In a similar situation I'd have felt likewise—but what about shaving a moustache? No effect, Lubniewski said; someone had tried it.

I asked Nielsen's public-relations man, sitting nearby, if I could borrow his glasses. The machine named me with its highest score yet.

It was time to get serious. Man to machine. I stuck out my tongue, yanked back the corners of my mouth, and closed one eye, a maneuver I picked up from my three-year-old daughter.

Lubniewski smiled, but the smile looked thin to me; it masked, I was certain, the kind of ennui that can come only from watching armies of otherwise sober people suddenly let down their hair or flourish surprise pairs of glasses.

"A lot of people try to fool the system," Lubniewski said. "You have to remember, it scans the room every one or two seconds. You could fool it, but chances are if it misses you—if you sneeze or make a face—we'll still know you're there."

TVision Insights, Inc. – Ex. 1016, Page 000010

I smiled past my fingers but held the pose a bit longer, just to make sure the system got it. It identified me as human, but otherwise didn't recognize me.

Satisfied, I tucked in my tongue.

An instant later, the monitor displayed my name with a cautious score of 85.

## What Lies Ahead

A TRUE PASSIVE METER IS ALMOST CERTAIN TO APpear over the next few years. Barring the unexpected arrival of a new challenger, that meter will function like the one I saw demonstrated in Nielsen's offices. In the past, fundamental advances in ratings technology have brought far-reaching change to the business and culture of television. What changes will this meter bring? What revelations about the audience-holding power of commercials? Of TV itself?

History is full of broad hints about the awful truth: plunging water pressure in Toledo, the DynaScopic chronicles of TV sex in Oklahoma. The best indications of what lies ahead, however, come from the deployment of near-passive meters here and in France. In 1987 R. D. Percy & Company, a now-defunct ratings concern, installed an infrared body sensor in 609 homes, and demonstrated that television sets played to empty rooms about 13 percent of the time. The proportion climbed sharply for certain categories of shows. Golf commentators, for example, spent 20 percent of their time whispering stroke-by-strokes to unoccupied couches and chairs. Viewers abandoned *Good Morning America* and *Today* for roughly twelve minutes out of every hour. During commercials the absentee rate as much as doubled.

French advertisers recently got a look at commercial avoidance. In France, Mediametrie holds a virtual monopoly over TV ratings. In 1989, however, a challenger, Telemetric, deployed a form of passive meter called Motivac, which detects the presence of people by sensing motion, just as Nielsen's does. Its ability to identify viewers, however, depends on the fact that the French watch TV the way Americans did back in the 1960s—that is, with the whole family gathered in favorite seats around a single TV. Viewers must provide Motivac with detailed information about their TV-watching habits, including where they most like to sit. If Motivac finds a person in that *chaise favorite*, it checks its memory for the likely occupant.

Motivac provides Telemetric's clients with a moment-by-moment "spike graph" of the nation's viewing; it proved with dismaying immediacy that vast numbers of viewers flee prime-time shows during commercials and the final credits. It found, for example, that a collection of commercials broadcast during a World Cup soccer match triggered a virtual stampede from the living rooms of France, with the TV audience suddenly shrinking from 9 million to 3.5 million. Telemetric also discovered that high ratings garnered by French news shows during the Gulf War were deceptive. Viewers gathered only at the beginning of each broadcast, to catch the headlines, and then left the TV on and went about their business elsewhere in the home.

Such news here could cause an immediate restructuring of the pricing of advertising time. No advertiser believes that everyone stays for the commercials, of course, but a second-by-second measure of audience size would at long last document the rate of desertion. Advertisers would discover that some shows hold their audiences more tenaciously during commercial breaks than others. For most of my friends, the Super Bowl is a big beer-and-popcorn event, but the half-life of beer in the human body is known to be brief. Suppose advertisers discover that most of America flees to the bathroom during those ultra-expensive bowl spots?

Commercial ratings might bring an element of justice to television. At last advertising agencies would find themselves subject to the same ratings tyranny that producers and TV writers have had to endure all these years. Suddenly agencies, too, would find their Nielsen rank published in *Variety* and *The Los Angeles Times*. Think of the implications—now *commercials* could be canceled!

Second-by-second ratings, however, could lash the creative content of shows even more tightly to the numbers. The new ratings would provide programming executives with an unprecedented ability to tinker with the content and structure of television shows. "It is conceivable," John Dimling told me recently, "that if you literally had second-by-second or minute-by-minute ratings, you'd know what people in a given demographic group tend to leave the program at what point in time. The use of that information in making programs could be kind of mind-boggling. You could do a content analysis of the program, and relate the content to when people tend to leave, or when they come back. Or if they come back. It may turn out that a certain point in the story or a certain production technique tends to interest people or not interest people."

Suppressing a chill, I asked, "You mean one could rate individual characters? Even subplots?"

"Sure, sure," he said, without an instant's hesitation.

If Nielsen now stands on a threshold, so does television itself. Ratings began simply as a way for advertisers to prove to themselves that radio and television could help them reach masses of consumers. The numbers soon took on a life all their own and an authority they were never meant to have. They became the soul of television. But when is enough enough? How much information is too much information? Does TV now risk snuffing the last ember of creativity under a yet huger cascade of deceptively precise numbers? Before Nielsen takes that next great technological leap, I'd like to invoke the old FTC warning: Even at their best, Nielsen's ratings will always be estimates. They will always be "inherently imperfect." □

TVision Insights, Inc. – Ex. 1016, Page 000011



APPX1182

Copyright of Atlantic Magazine Archive is the property of Atlantic Monthly Group LLC and its content may not be copied or emailed to multiple sites or posted to a listserv without the copyright holder's express written permission. However, users may print, download, or email articles for individual use.




Figure 63: *FRVT 2000 Temporal experiments—Visionics Corp. Verification Scores*

## 7.2 Product Usability Test

### 7.2.1 Overview

The scenario chosen for the Product Usability Test was access control with live subjects. Some systems tested, however, were not intended for access control applications. The intended application for each system, as shown in Appendix J, should be kept in mind when evaluating the results of the Product Usability Test.

The Product Usability Test was administered in two parts: the Old Image Database Timed Test and the Enrollment Timed Test. For the Old Image Database Timed Test, vendors were given a set of 165 images captured with a standard access control badge system, including one image of each of the three test subjects. The set contained two images for five people, and one image for each of the other 155 people. Vendors enrolled these images into their system for comparison with the live subjects. The operational scenario was that of a low-security access control point into the lobby of a building. The building's security officers did not want to mandate that the employees take the time to enroll into the new facial recognition system so they used their existing digital image database taken from the employee's picture ID badges.

For the Enrollment Timed Test, the images of the three test subjects were removed from the system while the other images were retained. Vendors were then allowed to enroll the three subjects using their standard procedures, including the use of multiple images. The purpose of the test was to measure system performance using vendor enrollment procedures. The enrollment procedures were not evaluated. The operational scenario was that of an access control door for a medium-to-high security area within the building previously described. In this case, employees were enrolled in the facial recognition system using the standard procedures recommended by the vendor.

During the Product Usability Test, several parameters were varied including start distance, behavior mode, and backlighting. Tests were performed for each subject at distances of 12, 8, and 4 feet for all trials except for the variability test. Test subjects performed each test—always at 12 feet—using cooperative and simulated, repeatable, indifferent behavior modes. For the cooperative mode, subjects looked directly at the camera for the duration of the trial. For the indifferent mode (we will refer to this as indifferent from this point forward), subjects instead moved their focus along a triangular path made up of three visual targets surrounding the camera. Each trial was performed with and without backlighting provided by a custom light box.

For the Old Image Database Timed Test, subjects began each trial standing at the specified start distance then walked toward the camera when the timer was started. Each subject started at 12, 8 and 4 feet in cooperative mode then repeated in indifferent mode. Subject 1 then performed 8 cooperative trials from a start distance of 12 feet for the variability test, a test to determine the consistency of the subject-system interaction. Subject 1 then performed three more cooperative trials from 12, 8, and 4 feet holding a photograph of his own face to determine if the system could detect liveness. The photograph was an 8" x 10" color glossy print taken in a professional photo studio. This entire sequence was followed four times: once in verification mode without backlighting, once in identification mode without backlighting, once in verification mode with backlighting, and once in identification mode with backlighting.

The Enrollment Timed Test was performed exactly as the Old Image Database Timed Test described above except the subjects stood in place at the specified start distance rather than walking toward the camera.

### 7.2.2 Interpreting the Results – What Do the Tables Mean?

The tables in Section 7.2.4 and Section 7.2.5 show the data recorded during the live tests. For the Old Image Database Timed Test, three parameters were recorded:

- *Final distance* is the distance in feet between the camera and the test subject at the end of the trial. This was recorded in increments of one foot.
- *Acquire time* is the time in seconds it took the system to report a match, regardless of whether or not the answer was correct. This was recorded in increments of 1/100 second. An X indicates that a match was not acquired within the 10-second time limit.
- *Correct match* tells whether or not the system matched the live subject with the correct person in the database. Again, an X indicates that a match was not acquired within the 10 second time limit.

For the Enrollment Timed Test, the parameters were recorded as described; however, the subjects stood in place for each of these trials so it was unnecessary to record the final distance.

For the variability test, subject 1 performed eight cooperative-mode trials for both the verification and identification modes, with and without backlighting. A start distance of 12 feet was used for each trial.

Note that it is desirable to have a correct match on all trials except the photo tests, where a photo of subject 1 was used to attempt access. Although none of the vendors claimed to have a liveness detection feature, most systems were not fooled by the photo.

Also note that most systems performed much better in the Enrollment Timed Test than in the Old Image Database Timed Test. This is most likely because the Old Image Database Timed Test used a database with one image per subject taken with a different camera and under different lighting conditions than those used in the testing room. For the Enrollment Timed Test, subjects were enrolled and tested for a match in the same testing room and multiple images were taken in most cases.

### 7.2.3 Sample Images and Test Subject Description

For the Old Image Database Timed Test, vendors were given a set of 165 images of 160 people (including one image of each of the three test subjects) to use for enrollment. These images were

acquired using a standard access-control badge system developed and maintained by NAVSEA Crane. The system is made up of the following components:

- EBACS Mk3 Mod 4 badge software (developed by NAVSEA Crane);
- Integral Technologies' FlashPoint 3075 PCI video frame grabber;
- Imaging Technology Corp.'s CCD 1000 video camera;
- Lowel iLIGHT portrait lighting system, including a single 100W, 3200K lamp.

In each case, images were collected at two different sites using the same system, with overhead fluorescent lighting in addition to the system lamp. There were 33 images of 33 subjects acquired at NAVSEA Crane, and 132 images of 127 subjects acquired at NIST. One image per subject was acquired at NAVSEA Crane. One image was acquired for each of 122 subjects at NIST, while two images were acquired for five subjects. Subjects stood 8 feet in front of a camera adjusted to a height of 5 ft. 6 in. A white wall was located one foot behind the subject. Images were captured with a resolution of 380 x 425 and saved as 24-bit JPEG files with a quality setting of 90 percent.

Figure 64 shows the color images of the three test subjects used for the Old Image Database Timed Test. Subject 1 is a 6-ft. Caucasian male with glasses. Subject 2 is a 6 ft.-1 in. Caucasian male without glasses. Subject 3 is a 5 ft.-2 in. Caucasian female without glasses.



Figure 64: *Sample Images from EBACS Mk3 Mod 4 badging system. From left to right, subject 1, subject 2 and subject 3.*

### 7.2.4 Old Image Database Timed Test Results

| Subject ID | Behavior Mode | Start Distance | Backlighting Off | | | Backlighting On | | |
|---|---|---|---|---|---|---|---|---|
| | | | Final Distance | Acquire Time | Correct Match? | Final Distance | Acquire Time | Correct Match? |
| 1 | Cooperative | 12 | 1 | 7.53 | No | 1 | X | X |
| | | 8 | 1 | X | X | 1 | X | X |
| | | 4 | 1 | X | X | 1 | 10.00 | No |
| | Indifferent | 12 | 1 | X | X | 1 | X | X |
| | | 8 | 1 | X | X | 1 | X | X |
| | | 4 | 1 | X | X | 1 | 10.00 | No |
| 2 | Cooperative | 12 | 1 | 6.41 | No | 1 | X | X |
| | | 8 | 1 | X | X | 1 | X | X |
| | | 4 | 1 | X | X | 1 | 9.95 | No |
| | Indifferent | 12 | 1 | X | X | 1 | X | X |
| | | 8 | 1 | 5.19 | No | 1 | X | X |
| | | 4 | 1 | X | X | 1 | X | X |
| 3 | Cooperative | 12 | 1 | X | X | 1 | X | X |
| | | 8 | 1 | X | X | 1 | X | X |
| | | 4 | 1 | X | X | 1 | X | X |
| | Indifferent | 12 | 1 | X | X | 1 | X | X |
| | | 8 | 1 | 3.83 | No | 1 | X | X |
| | | 4 | 1 | X | X | 1 | X | X |
| 1 Variability Test | Cooperative | 12 | 1 | X | X | 1 | X | X |
| | | 12 | 1 | X | X | 1 | X | X |
| | | 12 | 1 | X | X | 1 | X | X |
| | | 12 | 4 | 4.87 | No | 1 | X | X |
| | | 12 | 1 | X | X | 1 | X | X |
| | | 12 | 1 | X | X | 1 | X | X |
| | | 12 | 1 | X | X | 1 | X | X |
| | | 12 | 1 | X | X | 1 | X | X |
| 1 Photo Test | Cooperative | 12 | 1 | 8.37 | Yes | 1 | 9.55 | Yes |
| | | 8 | 3 | 3.77 | Yes | 1 | X | X |
| | | 4 | 1 | X | X | 1 | 3.35 | Yes |

Table 10: *Banque-Tec—Old Image Database Timed Test Ver.fication Mode*

| Subject ID | Behavior Mode | Start Distance | Backlighting Off | | | Backlighting On | | |
|---|---|---|---|---|---|---|---|---|
| | | | Final Distance | Acquire Time | Correct Match? | Final Distance | Acquire Time | Correct Match? |
| 1 | Cooperative | 12 | 1 | 10.00 | No | 3 | 6.62 | No |
| | | 8 | 1 | 6.63 | No | 1 | 5.90 | No |
| | | 4 | 1 | 7.69 | No | 1 | 5.44 | No |
| | Indifferent | 12 | 1 | X | X | 3 | 7.45 | No |
| | | 8 | 1 | X | X | 1 | 8.26 | No |
| | | 4 | 1 | 6.73 | No | 1 | 6.12 | No |
| 2 | Cooperative | 12 | 1 | X | X | 7 | 4.09 | No |
| | | 8 | 1 | 8.76 | No | 1 | 8.33 | No |
| | | 4 | 1 | 5.09 | No | 1 | 5.18 | No |
| | Indifferent | 12 | 1 | 8.26 | No | 3 | 7.04 | No |
| | | 8 | 1 | 9.46 | No | 1 | 9.13 | No |
| | | 4 | 1 | 8.14 | No | 1 | 6.48 | No |
| 3 | Cooperative | 12 | 1 | 9.33 | No | 1 | 10.00 | No |
| | | 8 | 1 | 8.13 | No | 1 | 5.44 | No |
| | | 4 | 1 | 5.58 | No | 1 | 5.09 | No |
| | Indifferent | 12 | 1 | X | X | 2 | 8.00 | No |
| | | 8 | 1 | 10.00 | No | 1 | 7.15 | No |
| | | 4 | 1 | 7.37 | No | 1 | 7.58 | No |
| 1 Variability Test | Cooperative | 12 | 3 | 5.66 | No | 4 | 5.51 | No |
| | | 12 | 2 | 8.00 | No | 3 | 5.54 | No |
| | | 12 | 4 | 5.95 | No | 3 | 5.42 | No |
| | | 12 | 4 | 4.92 | No | 5 | 3.95 | No |
| | | 12 | 3 | 6.56 | No | 1 | 8.28 | No |
| | | 12 | 3 | 6.58 | No | 3 | 5.78 | No |
| | | 12 | 2 | 6.53 | No | 4 | 5.47 | No |
| | | 12 | 3 | 6.19 | No | 1 | 9.75 | No |
| 1 Photo Test | Cooperative | 12 | 6 | 4.09 | No | 7 | 3.74 | No |
| | | 8 | 2 | 5.50 | No | 4 | 3.80 | No |
| | | 4 | 1 | 4.02 | No | 1 | 5.58 | No |

Table 11: *C-VIS—Old Image Database Timed Test Verification Mode*

# FACE IMAGE RESOLUTION VERSUS FACE RECOGNITION PERFORMANCE BASED ON TWO GLOBAL METHODS

*Jingdong Wang** *Changshui Zhang** *Heung-Yeung Shum*+

*State Key Laboratory of Intelligent Technology and Systems
Department of Automation, Tsinghua University, Beijing
+Microsoft Research Asia

### ABSTRACT

Face recognition is an interesting topic in computer vision and object recognition. Researchers have proposed numeric recognition methods under the various conditions such as different pose, illumination and expression. However no research has been done to depict the relation between face image resolution and face recognition performance so far.

In this paper, we divide the face image information into the discriminative and structure information, and conjecture that the face recognition rate will level off when face image resolution arrives at one certain resolution threshold. Then, we propose several PCA and LDA based face recognition experiments and present statistical results to depict how face recognition rate changes with face image resolution. The experimental results validate the conjecture. Moreover, we propose several experiments to demonstrate that only enhancing the structure information could not help to improve the recognition performance.

## 1. INTRODUCTION

Face recognition is a popular topic in computer vision and object recognition in recent twenty years. It has a number of real-world applications such as surveillance, secure access and human/computer interface. Also, many methods successfully applied in face recognition can be eventually transferred to other object recognition problems. A detail survey can be found in [1].

In the following, we will first give a brief review on recognition methods and then present some research works about the recognition robustness against the various conditions. Finally, we introduce the related work.

**Face Recognition Methods**

For review clarity, we divide face recognition techniques roughly into two categories: a) the global approach, and b) the component-based approach.

a) In the former category, the input to a classifier is a single feature vector that represents the whole face image. Several classifiers have been proposed in the literature e.g. minimum distance classification in the eigenspace [2] [3] based on PCA, the independent face space based on ICA [4] and the discriminative subspace based on LDA [2] [3], neural networks [5], and probabilistic matching based on intrapersonal/extrapersonal image difference [6] [7]. The global techniques work well for classifying frontal views of face. For all the global techniques an alignment stage needs to be added before classifying the face. In [7] the correspondences between two face images are first built by labeling some key points and then an affine transform is computed to warp an input image into a reference face image. Active morphable model is adopted in [8] to match the input face with the reference face. Active shape models are used in [9] to align the input face with the model face. A semiautomatic alignment step in combination with SVM classification was proposed in [10].

b) For the component-based algorithms, the main idea is to compensate for pose changes by allowing a flexible geometrical relation between the components in the classification stage. In [11] face recognition was performed by independently matching templates of three facial regions(eyes, nose and mouth). The configuration of the components during classification was unstrained since the system did not include a geometrical model of the face. A similar approach with an additional alignment stage was proposed in [12]. In [13] a geometrical model of a face was implemented by a 2-D elastic graph. The recognition was based on wavelet coefficients that were computed on the nodes of the elastic graph. In [14] a window was shifted over the face image and the DCT coefficients computed within the window were fed into a 2-D Hidden Markov Model.

**Face Recognition Robustness**

Although some of the previous techniques have achieved successes in constrained scenarios, the general task of face recognition still poses a number of challenges with respect to the changes in illumination, facial expression and pose. Therefore currently researchers pay more attention to the study of the robustness against the changes in pose, illumination and expression.

In [15] Bernd Heisele et al. presented a component-based and two global recognition methods with multi-class support vector classifier and evaluated them with respect to the robustness against the pose changes. Takeshi Shakunaga and Kaz-uma Shigenari proposed a decomposed eigenface based face recognition method for realizing robust face recognition under various lighting conditions when too few images are available for registration in [18]. In [16] Geof Givens and his collaborators considered 11 factors that influence PCA-based face recognition performance including race, gender, age, glasses, facial hair, bangs, mouth, eyes, complexion, makeup and expression. They built an ANOVA system to analyze the relation between these subject covariates and the distance of the image pairs of the same subject. Some researchers are also concerned about how to optimize some specific face recognition methods, e.g. in [17] Wendy et al. analyzed PCA-based face recognition algorithms and studied the relation between recognition performance and the selection of eigenvector and distance measures.

When studying face recognition, researchers all run across one problem: what resolution face image is proper for face recognition. However, it is a pity that no researchers have worked on this problem. Fortunately, some researchers have done some related work. Simon Baker et al. thought that the enhanced information of the high resolution over the low resolution face could been decided by the low resolution face and built the corresponding face hallucination algorithm [19]. Ce Liu et al. first constructed a "recognized" global model to hallucinate the individual global face, then built a local model to enhance the local face feature [20].

Motivated by their work, we divide face image information into two kinds of information: the discriminative information and the structure information. The former represents the individual information compared with other face images. The latter is the common information of all face images under the same resolution. Then one conjecture is given that face recognition rate will level off when the face image resolution arrives at one certain value.

Finally, we perform PCA and LDA-based recognition algorithms on the AR-face database. The relation curves between face recognition rate and face resolution validate that the recognition rate will not increase until the face resolution arrives at some certain value. Moreover we propose experiments to indicate that it does not help to improve face recognition performance only to enhance the structure information with the bilinear interpolation.

The rest of this paper is organized as follows. Section 2 presents some analysis of the relation between face image resolution and face recognition performance, then Section 3 describes two global recognition methods: PCA and LDA. The experimental results are presented in Section 4. Conclusions and discussion are given in the final section.

## 2. FACE IMAGE RESOLUTION ANALYSIS

In this section, we first introduce the generalized Gaussian Pyramid, which is used to generate the multi-resolution face images. Then, we analyze the face image information constitution and conjecture the relation between face recognition performance and face image resolution. Finally, we give an example on OCR to illuminate the face information constitution.

**Generalized Gaussian Pyramid**

The Gaussian Pyramid [21] starting at level $l = k$ of an image $I$ is the set of images $G_k(I), G_{k+1}(I), \cdots, G_N(I)$

$$G_l(I) = \begin{cases} I & if \quad l = k \\ REDUCE(G_{l-1}(I)) & if \quad k < l \leq N \end{cases}$$

and N is chosen so that $G_N(I)$ is some fixed size. Traditionally the size of $G_l(I)$ is one-forth of $G_{l-1}(I)$ . In this paper, we want to reduce the high resolution face image (e.g. $256 \times 192$) to any lower resolution one. Firstly, we choose

$$REDUCE(I)(m,n) = \frac{1}{4}\sum_{i=0}^{1}\sum_{j=0}^{1} I(2m+i, 2n+j)$$

as the pixel averaging function to generate Gaussian interpolation to get the face images with the resolution $128 \times 96$, $64 \times 48$, $32 \times 24$, $16 \times 12$ . Secondly, we apply the bilinear down-sampling upon the higher resolution face image $G_l(I)$ near to $h \times w$ and generate the generalized Gaussian face image with the resolution $h \times w$ (The higher resolution face image near to $72 \times 54$ is $G_1(I)$ with the resolution $128 \times 96$). The generalized Gaussian images are shown in Figure 1 and Figure 2.



**Fig. 1**. The Gaussian Pyramid

**Face Image Information Analysis**

When observing an object, people will usually see it more clearly when moving nearer and see it most clearly when the distance is (smaller than) one fixed value $d_0$. If the object is known to be a face, we will recognize it when the distance is another fixed value $d_1$, which is usually larger than $d_0$. The former phenomenon can be interpreted by Shannon Sampling Theory. According to Shannon Sampling Theory,



**Fig. 2**. The lower resolution face images from $120 \times 96$ to $72 \times 54$ using bilinear downsampling on the image of $128 \times 96$

the image with one certain resolution can retain all the original image information, i.e., the corresponding reconstruction image will not lose any information. In the following, we will analyze the latter phenomenon.

The face image information can be partitioned into two kinds of information: the discriminative information and the structure information. The discriminative information represents the information distinguishing from other face images. The structure information represents the common information of all face images under the same resolution, which can be roughly estimated from the lower resolution face image. Accordingly, the difference of the discriminative information between the higher resolution face image and the lower one is called the enhanced discriminative information, and the difference of the structure information is called the enhanced structure information.

**Conjecture** The discriminative information will increase with the face image resolution increasing and remain stable when reaching one specific resolution.

According to this conjecture, the face recognition rate will increase with the face image resolution and will level off when arriving at one certain resolution. In Section 4 we will propose experiments to validate this conjecture.

**One Illuminative Example**

We give a simple example to illuminate the structure and discriminative information. When performing optical character recognition (OCR) with known font definition, we also observe the similar phenomenon. Before reaching the resolution threshold, the enhanced information is mainly character individual information which helps to recognize it more correctly. When reaching the threshold, most of the enhanced information corresponds to the font information. In this problem, the individual character information corresponds to the discriminative information and the font information corresponds to the structure information.

## 3. PCA AND LDA BASED FACE RECOGNITION METHODS

In this section, we introduce two global face recognition methods: PCA and LDA. Then we present some distance measures adopted in the two methods.

**Principal Component Analysis**

Given a $t$-dimensional vector representation of each face, the Principal Component Analysis (PCA) can be used to find a subspace whose basis vectors correspond to the maximum-variance directions in the original space. Let $W$ represent the linear transformation that maps the original $t$-dimensional space onto a $f$-dimensional feature subspace where normally $f \ll t$. The new feature vectors $y_i \in \Re^f$ are defined by $y_i = W^T x_i, i = 1, \cdots, N$. The columns of W are the eigenvectors $e_i$ obtained by solving the eigenvalue decomposition $\lambda_i e_i = Q e_i$, where $Q = XX^T/N$ is the covariance matrix, and $\lambda_i$ the eigenvalue associated with the eigenvector $e_i$. Usually, before obtaining the eigenvectors of $Q$, the average of all image vectors is subtracted from all image vectors to ensure that eigenvector with the highest eigenvalue represents the dimension in the eigenspace in which variance of vectors is maximum in a correlation sense.

Pentland et al. [22] have empirically pointed out that superior face recognition results are achieved when the first two eigenvectors are discarded. This is because the first two eigenvectors seem to represent changes in illumination. Figure3 shows the average face together with the first four eigenfaces (from left to right) on the AR-face database, which demonstrate the first two eigenfaces represent changes in illumination. In this paper, we will perform face recognition with eliminating the first two eigenvectors.



**Fig. 3**. Average face + first 4 eigenfaces

**Linear Discriminant Analysis**

Linear Discriminant Analysis (LDA) searches for those vectors in the underlying space that best discriminate among classes (rather than those that best represent the data). More formally, given a number of independent features relative to which the data is described, LDA creates a linear combination of these which yields the largest mean differences between the desired classes. Mathematically speaking, for all the samples of all classes we define two measures: (i)

one called within-class scatter matrix, as given by

$$S_w = \sum_{j=1}^{c} \sum_{i=1}^{N_j} (x_i^j - \mu_j)(x_i^j - \mu_j)^T$$

where $x_i^j$ is the $ith$ sample of class $j$, $\mu_j$ is the mean of class $j$, $c$ is the number of classes, and $N_j$ the number of samples in class $j$; (ii) the other is called between-class scatter matrix

$$S_b = \sum_{j=1}^{c} (\mu_j - \mu)(\mu_j - \mu)^T$$

where $\mu$ represents the mean of all classes. The goal is to maximize the between-class measure while minimizing the within-class measure. One way to do this is to maximize the ratio $\frac{\det|S_b|}{\det|S_w|}$. Like in [3], we also compute the projection matrix W with performing SVD on $S_w^{-1}S_b$. In this paper, we first choose the PCA subspace as the intermediate space and then obtain the final discriminating subspace by using LDA. The first five fisherfaces are shown in Figure4 (from left to right).



**Fig. 4**. The first 5 fisherfaces

**Distance Measures**

There are mainly four traditional distance measures used in the subspace obtained by PCA or LDA: City-block(L1), Euclidean(L2), Angle and Mahalanobis, which are defined as follows:

**L1** City Block Distance

$$d(x,y) = |x - y| = \sum_{i=1}^{k} |x_i - y_i|$$

**L2** Euclidean Distance(Squared)

$$d(x,y) = \|x - y\|^2 = \sum_{i=1}^{k} (x_i - y_i)^2$$

**Angle** Negative Angle Between Image Vectors

$$d(x,y) = -\frac{x \cdot y}{\|x\| \, \|y\|} = -\frac{\sum_{i=1}^{k} x_i y_i}{\sqrt{\sum_{i=1}^{k} (x_i)^2 \sum_{i=1}^{k} (y_i)^2}}$$

**Mahalanobis** Mahalanobis Distance

$$d(x,y) = -\sum_{i=1}^{k} \frac{1}{\sqrt{\lambda_i}} x_i y_i$$

where $\lambda_i$ is the $ith$ Eigenvalue corresponding to the $ith$ Eigenvector.

For simplicity, in this paper we choose the block distance measure and use Nearest Neighbor classifier.

## 4. EXPERIMENTS

The experimental results to be presented in this section are obtained using the AR-face database [23]. This database consists of over 3200 color images of the frontal faces of 126 subjects. There are 26 different images for each subject. For each subject, these images were recorded in two different sessions separated by two weeks, each session consisting of 13 images. Each image in the database consists of a $768 \times 576$ array of pixels.

In this experiment, we choose the first 7 face images of the first session by eliminating occluded face images for each subject, as shown in Figure5. Then we have $126 \times 7$ face images. We observe that the size of the face part is almost above $256 \times 192$. We manually locate the centers of eye and then perform geometric normalization with the eye locations fixed to get geometric normalized face image with the size $256 \times 192$. One example of normalized faces is in Figure6. Then we use the generalized Gaussian Pyramid to generate the multi-resolution face images as shown Figure1 and Figure2.



**Fig. 5**. The first 7 faces of the first session in the AR face database for one subject

**The Relation Curve Between Face Recognition Performance and Face Image Resolution**

In this experiment, we use a leave-one-out methodology to obtain statistical results. We randomly choose one of seven images for each subject as the testing part and the remainders as the training part. Because this process is quite time-consuming, we performed the randomly choosing method seven times with assuring that iff each of seven face images is chosen once as the testing face image. We test PCA and LDA face recognition methods with Nearest Neighbor



**Fig. 6**. The normalized faces

classifier. The result is depicted in Figure7. From the curve changing trend, we can observe that the threshold resolution is about $64 \times 48$, i.e., before $64 \times 48$ the recognition rate increases roughly with the increasing resolution and when reaching $64 \times 48$, the rate keeps stable when the resolution increasing.




**Fig. 7**. Performance curve with the resolution changing from $16\times 12$ to $136 \times 102$ based on PCA (the left figure) and LDA (the right figure)

**Structure Information versus Face Recognition Performance**

We are also concerned about how the enhanced structure information influences recognition performance. So we expand the face images with the resolution $16 \times 12$, $32 \times 24$ and $64 \times 48$ to the corresponding higher resolution face images with the resolution $32 \times 24$, $64 \times 48$ and $128 \times 96$ by the bilinear interpolation[1]. Then we perform PCA and LDA based classifiers while keeping the energy ratio $90\%$ and keeping the eigenvector number fixed.

From Figure8, we have the following two observations: (1) the recognition rate of expanded faces will decrease in comparison with unexpanded faces when keeping the energy ratio fixed and keeping the eigenvector number fixed using PCA, and (2) for LDA when keeping the energy ratio fixed the recognition rate will decrease, however when keeping the eigenvector number fixed the recognition will increase a little and still be less than the near higher resolution face recognition rate ( $64 \times 48$ is an exception because recognition rate in unexpanded $64 \times 48$ is higher than unexpanded $128 \times 96$, which is seen in Figure7). From the two observations, we conclude that only enhancing the structure information does not help to improve recognition performance.

[1]Strictly speaking, the bilinear interpolation only adds a little structure information. A reasonable method to enhance the structure information should incorporate the prior information of the higher resolution faces.




**Fig. 8**. Performance comparison. The first column of each resolution represents real $h \times w$, the second represents expanded $2h \times 2w$ while keeping the energy ratio fixed, the third represents expanded $2h \times 2w$ while keeping the eigenvector number fixed and the fourth represents real $2h \times 2w$. The top figure is for PCA, and the bottom for LDA.

## 5. CONCLUSION

In this paper, we first analyze the relation between face recognition rate and face image resolution by dividing face image information into the discriminative and structure information. Then, we test two global face recognition algorithms on the AR-face database to obtain the relation curve, which validates our conjecture and also gives the threshold resolution of $64 \times 48$.

The statistical results help the researchers on face recognition to choose the appropriate resolution face image. On the other hand, they also help to understand face hallucination algorithm proposed in [20] and provide a good advice that the global model embedding a middle-resolution face image and local model built from the middle-resolution to the high-resolution should be more reasonable.

## 6. REFERENCES


[1] W. Zhao, R. Chellappa, A. Rosenfeld and P. Phillips, "Face Recognition: a literature survey," http://citeseer.nj.nec.com/374297.html, 2000, 67 pages.

[2] P. N. Belhumeur, J.P. Hespanha and D. J. Kriegman, "Eigenfaces vs. Fisherfaces: Recognition Using Class Specific Linear Projection," IEEE Trans. on PAMI,1997.

[3] A. M.Martinez and A. C.Kak, "PCA versus LDA," IEEE Trans. on PAMI,2001.

[4] B. A. Draper, K. Baek, M. S. Barlett and J.R. Beveridge, "Recognizing faces with PCA and ICA," Computer Vision and Image Understanding. To appear.

[5] M. Fleming and G. Cottrell, "Categorization of faces using unsupervised feature extraction," In Proc. IEEE IJCNN International Joint Conference on Neural Networks, 1990.

[6] M. L. Teixeira and J. R. Beveridge, "An Implementation and Study of the Moghaddam and Pentland Intrapersonal/Extrapersonal Image Difference Face Recognition Algorithm," CSU Computer Science Department Technical Report, May 2003.

[7] B. Moghaddam, W. Wahid and A. Pentland, "Beyond Eigenfaces: Probabilistic Matching for Face Recognition," The 3rd IEEE Int'l Conference on Automatic Face and Gesture Recognition 1998.

[8] X. Xu, "Active Morphable Model for the Analysis and Synthesis of Human Faces," Master Thesis, 2003

[9] A. Lanitis, C. Taylor and T.Cootes, "Automatic interpretation and coding of face images using flexing models," IEEE Trans. on PAMI, 1997.

[10] K. Jonsson, J.Matas, J. Kittler and Y. Li, "Learning support vector vectors for face verification and recognition," In Proc. IEEE International Conference on Automatic Face and Gesture Recognition 2000.

[11] R.Brunelli and T Poggio, "Face Recognition: Features versus templates," IEEE Trans. on PAMI, 1993.

[12] D.J. Beymer, "Face recognition under varying pose," A.I. Memo 1461, Center for Biological and Computational Learning, MIT, Cambridge, MA, 1993.

[13] L. Wiskott, J. Fellous, N. Kruger and C. von der malsburg, "Face recognition by elastic bunch graph matching," IEEE Trans. on PAMI, 1997.

[14] A. Nefian and M.Hayes, "An embedded HMM-based approach for face detection and recognition ," In Proc. IEEE international Conference on Acoustics, Speech, and Signal Processing, 1999.

[15] B. Heisele, P. Ho and T. Paggio, "Face recognition with support vector machines: Global versus component-based approach," In Proc. IEEE International Conference on Computer Vision, 2001.

[16] G. Givens, J R. Beveridge, B. A. Draper and D. Bolme, "A Statistical Assessment of Subject Factors in the PCA Recognition of Human Faces," CVPR 2003 Workshop on Statistical Analysis in Computer Vision Workshop, June 2003.

[17] W. S. Yambor, B. A. Draper and J.R. Beberidge, "Analyzing PCA-based face recognition algorithms: eigenvector selection and distance measures ," in Empirical Evaluation Methods in Computer Vision, H. Christensen and J. Phillips (eds.), World Scientific Press, Singapore, 2002.

[18] T. Shakunaga and K. Shigenari, "Decomposed eigenface for face recognition under various lighting conditions," IEEE Trans. on PAMI, 1993.

[19] S. Baker and T. Kanade, "Hallucinating Faces," The fourth International Conference on Automatic face and Gesture Recognition ,2000.

[20] C. Liu, H.Y. Shum and C.S. Zhang, "A Two-Step Approach to Hallucinating Faces: Global Parametric Model and Local nonparametric Model," In Proc. IEEE International Conference on Computer Vision and Pattern Recogntion, 2001.

[21] P. J. Burt, E. H. Adelson, "The Laplacian Pyramid as a Compact image Code ," IEEE Trans. on Communications, 1983.

[22] A. Pentland, T Starner, N. Etcoff, N. Masoiu, O. Oliyide and M. Turk , "Experiments with eigenfaces ," Looking at people, workshop of IJCAI, 1993.

[23] A.M. Martinez and R. Benavente, "The AR-face database ," CVC Technical Report 24, June, 1998.

Grounds 2 and 3 are perhaps even worse combinations, as the modification requires changing the principle of operation of the primary reference, *Nielsen-372* (Ex. 1006) and frustrates its purpose. In short, *Nielsen-372* employs a camera to view a display device (*e.g.*, TV) to determine if the TV is on. Patent Owner's hindsight-predicated combination requires turning the camera around to face the audience, thus wholly forgoing a significant feature of the *Nielsen-372* disclosure.

For these reasons and others discussed in detail below, Petitioner fails to meet its burden and institution of this Petition should be denied.

## II. STATUTORY DISCLAIMER OF CLAIMS 1, 9, AND 16

Patent Owner has filed a statutory disclaimer disclaiming independent claims 1, 9, and 16 of the '243 Patent. Ex. 2002, *Request for Statutory Disclaimer*. Patent Owner makes this disclaimer solely in the interests of streamlining the process of confirming the validity of claims 4-6, 8, 11-14, and 18-20, which are the only claims at issue in the parallel litigation. Ex. 2003, *Complaint for Patent Infringement,* C.A. No. 1:22-cv-01345, Paper 1, p. 19.

Patent Owner's arguments of patentability provided herein are for claim 4 (and similarly, claims 11 and 18). All other Challenged Claims depend, directly or indirectly from claims 4, 11, or 18.

*exposure environment to obtain a reduced-resolution image*.[4] *'243 Patent*, 15:56-58, 16:49-51, 17:41-43. Each of the remaining dependent claims depends, directly or indirectly, from one of these claims. Petitioner maps *Tian's* teaching of investigating the minimum viable resolution for facial expression analysis to the *reduc[ing] a resolution…* limitation. *Petition*, 26-27. As established below, *Tian* does not teach *reduc[ing] a resolution* of an image of a media exposure environment.

### *1.* Tian *Does Not Teach "Reduc[ing] a Resolution"*

*Tian* is generally directed to "explor[ing] the effects of different image resolutions for each step of facial expression analysis." *Tian*, Abstract. To perform this exploration, *Tian* uses images from a "widely used public database" at five different resolutions. *Id.* To clarify that these images are identical but for resolution, *Tian* states that "lower resolution images are down-sampled from the originals." *Id.*, 000002.

Petitioner relies on this latter sentence from *Tian* to claim that *Tian* teaches the claimed step to *reduce a resolution of a first image ... to obtain a reduced-resolution image*. *Petition*, 26. Petitioner mischaracterizes *Tian's* teachings in support of the claim that "Tian **creates** lower-resolution images by down-sampling from original images." *Id.* A POSITA reviewing the context of Petitioner's carefully

[4] Claim language is underlined and *italicized* for ease of reference.

selected quotes would not conclude that *Tian* teaches actively creating the reduced-resolution images. *Dec.* ¶¶ 44-48.

For example, the caption for Table 1 begins by characterizing the images as "[a]n example in **five different resolutions from Cohn-Kanade database**." *Tian,* 000002; *Petition*, 26; Ex. 1003, ¶ 119. Neither Petitioner nor their expert makes any attempt to reconcile *Tian's* statement that the "five different resolutions" are "from [the] Cohn-Kanade database" with the claim requirement to *reduce a resolution of a first image....* That is, selecting a previously created, down-sampled image stored in a database is not equivalent to instructions to *reduce a resolution of a first image....*

Similarly, *Tian* states, "five different resolutions of the head region are studied … **based on** Cohn-Kanade AU-Coded Face Expression Image Database[.]" *Tian,* 000002 (left column, last paragraph); *Dec.*, ¶ 49. A POSITA reading this sentence would not understand *Tian* is performing the down-sampling. *Dec.,* ¶¶ 47-49. If *Tian* were actively reducing the resolution in the *Tian* process (as required by claims 4, 11, and 18), then there would be no reason for *Tian* to describe its process as using the five different resolutions "based on" the Cohn-Kanade database. *Dec.* ¶ 49.

Analyzing the facial expressions at whatever resolution was available from the Cohn-Kanade database would also be consistent with *Tian*'s actual purpose, which is to investigate expression analysis in "real environments." *Tian*, Abstract;

*Dec.*, ¶ 50. Nothing in *Tian* suggests that it would actually be **desirable** to reduce the resolution of an image prior to performing expression analysis; rather *Tian* acknowledges that, given real-world images, they may be provided at a low resolution. *Tian*, 000002 ("Most systems attempt to recognize facial expressions from data collected in a highly controlled laboratory situation with very high resolution faces. **However, in real applications, the face region is often in lower resolutions**.") (internal parentheticals omitted). In other words, a POSITA would read *Tian* as teaching that expressions are analyzed in images at whatever resolutions are available from the database. *Dec,* ¶ 50. There would be no reason to actively reduce the resolution of an image further for the purpose of performing expression analysis. *Dec.*, ¶¶ 50-51.

Because Petitioner has the burden to establish that the reference teaches the claim limitation, and because *Tian* does not teach a step to **reduce** the resolution, Petitioner has failed to meet its burden. As such, Petitioner's Ground 1 fails for at least this reason.

### C. The Petition Fails to Establish a Sufficient Motivation to Combine the References

Although Patent Owner has disclaimed independent claims 1, 9, and 16 to streamline the Board's analysis, Patent Owner submits that there is no motivation to combine *Tian* with *Lu-577* for claims 1, 9, and 16. Because the remaining Challenged Claims depend, directly or indirectly, from claims 1, 9, and 16,

### *3. Claims 4, 11, and 18: Petitioner Provides No Credible Motivation for Analyzing Reduced-Resolution Images and Tian Teaches That Doing So Is Undesirable*

Regarding claims 4, 11, and 18, Petitioner asserts a POSITA would have found it obvious to apply *Tian's* teachings to *Lu-577's* system to "reduce[] the resolution of a first image" and "perform[] face detection or head pose estimation on the reduced-resolution image." *Petition,* 27.[6] As discussed in Section IV.B, *Tian* does not teach a step of "reducing a resolution." Separately, Petitioner's proposed motivation for modifying *Lu-577's* system to analyze a reduced-resolution image fails to withstand the most cursory scrutiny. Petitioner's arguments are directed to why there is a motivation to perform **face detection** on a reduced-resolution image rather than the claimed **head orientation determination** on a reduced-resolution

[6] The Petition's mapping for claim 4 cites Ex. 1003, ¶¶ 117-122. *Petition,* 26-27. Exhibit 1003, ¶¶ 120 and 122 provide the alleged motivation to combine for claim 4. In those paragraphs, Dr. Doermann refers back to §V1.A.1, which allegedly is "explaining why it would have been obvious to analyze reduced-resolution images; that analysis is incorporated here." Referring to that section of Ex. 1003, it appears only ¶¶ 68-70 address the reduced-resolution limitation. Therefore, Patent Owner addresses relevant sections from ¶¶ 68-70 in the present analysis of a lack of motivation to combine for claims 4, 11, and 18.

image. Therefore, Petitioner's arguments do not respond to the actual claim language. Additionally, *Tian* teaches away from the combination because *Tian* teaches reduced-resolution images are **undesirable** in the context of expression analysis.

Thus, Petitioner fails to provide a credible motivation for combining *Tian's* alleged **teaching of determining head pose estimation on reduced-resolution images** into *Lu-000's* recognition system, and a POSITA would not be motivated to make the proposed modification.

#### a) Tian's Mapped Teachings

Petitioner maps *Tian's* teaching of analyzing images of various resolutions for claim 4. *Petition,* 26. *Tian* explores the "effects of different image resolutions for each step of facial expression analysis." *Tian,* Abstract. *Tian* attempts facial expression analysis of (pre-processed) "down-sampled" original face images as "lower resolution images." *Tian,* Abstract, 00002; *Dec.* ¶¶ 103-104. As discussed above, Petitioner also maps *Tian's* head pose estimation for teaching determining the head orientation. *Petition,* 27. *Tian* performs head pose estimation on all the face images at each resolution. *Tian,* 000005.

#### b) No Motivation for Modifying Lu-577 (Modified by Lu-000) with Tian's Reduced-Resolution Head Pose Estimation

A complete analysis of obviousness requires a reason, "based upon rational underpinnings," why a POSITA would have been motivated to "modify the prior art[.]" *Ice Castles, LLC v. James Youngstrom,* IPR2021-01179, Paper 13, 9 (January 7, 2022) (citing *In re Magnum Oil Tools Int'l, Ltd.,* 829 F.3d 1364, 1380 (Fed. Cir. 2016)). To satisfy this requirement, a petitioner "must…articulate specific reasoning, based on evidence of record, to support the legal conclusion of obviousness." *Id.* (citing *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 418 (2007)).

Here, Petitioner asserts a POSITA would have been motivated to modify *Lu-577* with *Tian's* teachings because, per Petitioner, reducing the resolution of the image "**can** reduce the time and resource consumption of tasks such as **face detection and pose estimation**." *Petition,* 10, 72; *see also* Ex. 1003, ¶ 69 ("The processing resources and time can be reduced if the resolution of the image is reduced."). This conclusory motivation is not supported by substantial evidence.

Petitioner's declarant cites three references (Exs. 1013-1015) to support Petitioner's motivation of reducing "time and resource consumption." *Petition,* 10; Ex. 1003, ¶ 69. However, none of these references provides any support for the proposition that **head pose estimation**, as allegedly taught by *Tian*, is resource-intensive or would benefit from reduced processing time.

Notably, Petitioner's arguments are directed to problems with **face detection**, rather than **head pose estimation**. Face detection is a distinct step from head pose estimation, according to *Tian*. *Tian,* 000002; *Dec.*, ¶¶106-107. Specifically, *Tian* differentiates between head detection (*i.e.*, detecting there is a head in the image) versus head pose estimation. *Dec.*, ¶¶ 107-108 (discussing Tian's teaching at 000002 of head detection followed with "After the head is located, the head image is converted.... Then a [neural network] is employed to estimate head pose.").

First, Dr. Doermann opines that "tasks such as **face detection** can be resource-consuming." Ex. 1003, ¶ 69 (citing Ex. 1013, 000001). However, neither the opinion nor the cited Ex. 1013 actually addresses the claim language of the '243 Patent, directed to **determining the orientation of the head** on the reduced-resolution image. Dr. Doermann's opinion relates to **face detection** rather than head orientation. A POSITA would have understood detecting a face is a distinct operation from determining head orientation, as even *Tian* differentiates between the two steps. *Dec.* ¶¶ 107-108.

Exhibit 1013, cited by Dr. Doermann in support of his opinion, states "**view-based** [face detection] methods ... are reported to have a good detection performance but the drawback to be computationally rather expensive[.]" Ex 1013, 000001, col. 2, para. 3. Thus, Ex. 1013 does not state that all face detection techniques are computationally expensive, as Dr. Doermann argues. Rather, only a

particular approach (*i.e.,* view-based methods) is computationally expensive. A POSITA having the knowledge of Ex. 1013 would not have understood the claimed step to *determine the orientation of the head* to be a "resource-consuming" problem that would motivate a modification to Petitioner's proposed system. *Dec.*, ¶ 109. Even Dr. Doermann admits the "resource-consuming task" is **face detection**, not determining head orientation. *Dec.* ¶¶ 108-109; Ex. 1003, ¶ 69.

Dr. Doermann further opines "processing resources and time can be reduced" for **face detection** if the image resolution is reduced. Ex. 1003, ¶ 69 (*citing* Ex. 1014, 2:43-53). Once again, however, Exhibit 1014 cited by Dr. Doermann describes the possibility of reduced-resolution processing for "**face detection and tracking**," rather than determining head orientation. Ex. 1014, 2:43-53. Exhibit 1014 makes no reference to head orientations whatsoever. *Dec.* ¶ 110; *see* Ex. 1014 *generally*.

Finally, Dr. Doermann cites Ex. 1015 in support of the same proposition (*i.e.*, that processing resources and time can be reduced for face detection if the image resolution is reduced). In addition to being related to the wrong problem (that of face detection rather than the claimed head orientation determination), the cited material here is even further afield from the modification being proposed by Petitioner. Ex. 1015 describes how the saturation of an image can be averaged (thus reducing the resolution of the **saturation** sampling rather than that of the **image**). Ex. 1015,

[0011]; [0020]. This saturation averaging does not reduce the computational resources required for face recognition but instead allows more efficient methods to be employed. Ex. 1015, [0020]; *Dec.* ¶¶ 111-113. In other words, any motivation provided by Ex. 1015 would be to switch to an entirely different algorithm for face detection more suitable for reduced-saturation images. *Dec.* ¶¶ 112-113. In addition to failing to support Dr. Doermann's opinion, employing the motivation from this reference would actually require **more extensive** modification beyond that proposed by Petitioner. *Dec.,* ¶ 114. Lastly, *Lu-000* performs face recognition on binarized images that are two-tone (*i.e.*, black-and-white). *Lu-000,* 7:47-55; *Dec.* ¶ 115. Ex. 1015's reduced "saturation" is thus completely irrelevant to any modification of *Lu-000*, and thus would not have motivated a POSITA to modify *Lu-577* as modified by *Lu-000. Id.*

In sum, Dr. Doermann identifies no factual basis for his conclusory statement that performing "head pose estimation on a reduced-resolution image provides savings in processing resources or time[.]" Ex. 1003, ¶ 69. Each of Dr. Doermann's cited background references is directed to face detection, which is irrelevant to the proposed modification of performing head orientation determination on a reduced-resolution image. *Dec.*, ¶ 116. As such, Dr. Doermann's conclusory testimony does not "qualify as substantial evidence" for the proposed motivation. *TQ Delta, LLC,* 942 F.3d at 1358.

Thus, viewing Dr. Doermann's opinions and the cited background references, a POSITA would not understand that head pose estimation as proposed by *Tian* is particularly resource intensive and would not be motivated by the prospect of saving computational requirements to modify *Lu-577* with *Tian's* teaching of reducing the resolution of an image for performing *Tian's* **head pose classification**. *Dec.* ¶ 116.

#### c) *Tian* Teaches That Performing "Facial Analysis" on Lower Resolution Images is Undesirable

*Tian* is generally directed to exploring the effects of image resolution on expression analysis. *Tian*, Abstract. Underpinning the entire exploration *Tian* undertakes, however, is the well-known understanding that low resolution is undesirable for facial image analysis. *Dec.*, ¶¶ 117-119; *Tian*, Abstract. As a background for the "exploration," *Tian* merely recognizes that, in some real-world scenarios, the only images **available** may be lower resolution. However, a POSITA reading *Tian* would be led away from unnecessarily increasing the difficulty of the facial analysis process by intentionally reducing the resolution of an image prior to processing. *Dec.* ¶ 120.

A prior art reference must be considered in its entirety, *i.e.*, as a whole, including portions that would lead away from the claimed invention. *W.L. Gore & Assoc., Inc. v. Garlock, Inc.*, 721 F.2d 1540, (Fed. Cir. 1983), *cert. denied*, 469 U.S. 851 (1984). "A reference may be said to teach away when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in

the reference, or would be led in a direction divergent from the path that was taken by the applicant." *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 (Fed. Cir. 2018) (quoting *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009)). Here, Petitioner cherry-picks *Tian*'s results to conclude that determining a head orientation based on a reduced-resolution image is **possible** "without substantially reducing the accuracy of [the] determination" (hardly a glowing endorsement). *Petition*, 27. The Petition fails to consider the portions of *Tian* that would discourage a POSITA from intentionally and unnecessarily reducing the image resolution.

Throughout the reference, *Tian* consistently connects low resolution with difficulty. *See, e.g., Tian*, 000002, 000006 (including "low resolution input images" as being "among the factors that complicate facial expression analysis."). Similarly, when discussing ways to improve performance, *Tian* discusses techniques for increasing the resolution to increase the accuracy. *Id.* (giving "multiple cameras[,]" "[a]ctive cameras[,]" and "super-resolution" as techniques for increasing resolution and therefore accuracy). Thus, even though *Tian* explores techniques for ameliorating the difficulties of working with low-resolution images when necessary, a POSITA would be nonetheless discouraged from unnecessarily lowering the resolution and thereby intentionally increasing the difficulty of the facial analysis process. *Dec.*, ¶¶ 120-122. As such, *Tian* teaches away from modifying the system

of *Lu-577* (modified by the teachings of *Lu-000*) to reduce the resolution of the captured image of the media exposure environment prior to determining head orientation, and a POSITA would not be motivated to make such a modification. *Dec.,* ¶ 123.

#### *4. The Petition's Generalized Allegations of Obviousness Do Not Provide the Required Articulated, Specific Reasoning*

For Ground 1, the Petition provides a series of generalized assertions of obviousness while failing to provide articulated, specific reasoning for the proposed combination. *In re Magnum Oil Tools Int'l, Ltd.,* 829 F.3d 1364, 1380 (Fed. Cir. 2016) (petitioner must "articulate specific reasoning, based on evidence of record," to support obviousness); *Microsoft Corporation v. Uniloc 2017 LLC,* IPR2020-00101, Paper 10, 6-7 (PTAB May 6, 2020). For example, the Petition asserts the references are "similarly directed" to "image processing and facial analysis," *Lu-577* employs "known head location and face recognition software," and the references are "compatible." *Petition*, 8-9.

Contrary to Petitioner's assertion, *Tian* is not "similar" to *Lu-000* or *Lu-577. Dec.* ¶¶ 124-125. *Lu-577* (as modified with Lu-000) employs head location and **face recognition** software to identify audience members. *Lu-577,* [0039]. *Lu-000* discloses an "**image recognition method and** system … for identifying predetermined individual members of a viewing audience" by recognizing their faces. *Lu-000*, Abstract, 2:39-47, 7:39-55. By contrast, *Tian* recognizes **facial**

*Packaging, Inc.*, IPR2020-00429, Paper 23, 8-9 (PTAB July 2020) (*citing Advanced Bionics, LLC v. Med-EL Elekromedizinische Geräte GmbH*, IPR2019-01469, Paper 6 at 7 (PTAB Feb. 2020)).

## VI. GROUND 3: THE COMBINATION OF NIELSEN-372, STEINBERG, AND TIAN DOES NOT RENDER THE CHALLENGED CLAIMS OBVIOUS

The only difference between the combinations of Grounds 2 and 3 is Petitioner incorporating arguments regarding *Tian* from Ground 1. *Petition,* 71-88. Petitioner relies on the same Ground 2 argument for combining *Nielsen-372* and *Steinberg*. *Petition,* 71. Petitioner recycles the arguments for modifying *Lu-577* with *Tian* into the combination of *Tian* with *Nielsen-372* and *Steinberg. Compare Petition,* 8-11 *with* 71-73. Thus, the obviousness combinations for Ground 3 fail for the same reasons noted for Grounds 1 and 2. *See Section IV-V.*

## VII. NEITHER TIAN NOR STEINBERG IS ANALOGOUS ART TO THE '243 PATENT

All of Petitioner's modifications of the primary references across all grounds share a common, fatal flaw: none of Petitioner's secondary references are analogous art. Petitioner alleges that the field of endeavor of the '243 Patent is "media analysis." *Petition,* 4-6 (identifying the field of endeavor for each of the references). Notably, neither Petitioner nor its declarant makes any showing of the cited references being reasonably pertinent to a problem with which the inventor is involved. The field of endeavor of the '243 Patent does not broadly encompass

"media analysis," and the cited secondary references fail to be within a reasonably scoped field of endeavor for the '243 Patent.

The '243 Patent is unambiguous in its general "Field of the Disclosure" statement: "[t]his disclosure relates generally to audience measurement more particularly, to methods and apparatus to capture images." *'243 Patent*, 1:36-39. This is supported by the claims: independent claims 1 and 9 recite "an audience measurement system," and independent claim 16 recites "a method for obtaining exposure data for a media exposure environment." *'243 Patent*, cols. 1, 9, 16; *see also Netflix v. DivX,* No. 22-1138, *10 (Fed. Cir. Sept. 11, 2023) ("We determine the field of endeavor by reference to explanations of the invention's subject matter in the patent application, including the embodiments, function, and structure of the claimed invention.") (internal quotes omitted).

As the Federal Circuit recently affirmed, the test for whether a prior art reference is analogous art is a two-prong one: "'(1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.'" *Id.* at *8. Here, Petitioner argues *Tian* and *Steinberg* are in the same field of endeavor. Again, Petitioner does **not** argue that either *Tian* or *Steinberg* is "reasonably pertinent" to the particular problem being addressed by the inventors of the '243 Patent.

Like the ’243 Patent, *Steinberg* is unambiguous in its “Field of the Invention” statement: “[t]he invention relates to digital image processing, particularly to the field of **automatic or semiautomatic grouping and classification of images in a database** or image collection and based on the occurrence of faces in the images and the identification and classification of such faces.” *Steinberg*, [0003]. *Tian*, while not a patent reference, includes a similarly straightforward statement of the problem it sets out to solve: “This paper explores the effects of different image resolutions for each step of facial expression analysis.” *Tian,* Abstract. As such, neither *Steinberg* nor *Tian* shares the field of endeavor of the ’243 Patent and, as such a POSITA would not have been motivated to combine them with the respective primary references. *Dec.*, ¶ 158.

Petitioner characterizes the field of endeavor of the ’243 Patent as “media analysis.” *Petition,* 3, 5-6. But this conflates two entirely distinct fields of endeavor: (1) media **exposure** analysis (*i.e.*, audience measurement); and (2) image processing. *Dec.,* ¶¶ 159-162. As described above, *Tian* is directed to determining the effects of image resolution on facial expression analysis and therefore falls into the category of image processing. *Steinberg* is directed to classifying faces in an image database and is thus likewise directed to image processing. Accordingly, neither of Petitioner’s secondary references is directed to the field of endeavor of the ’243 Patent, that of audience measurement. *Dec.* ¶¶ 159-161.

Although Petitioner does not provide any argument that either *Tian* or *Steinberg* is reasonably pertinent to the problem being solved, Patent Owner addresses the second prong as well. A prior art reference is reasonably pertinent to the problem solved "only if its subject matter logically would have commended itself to an inventor's attention in considering his problem." *Netflix* at *15 (quoting *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1382 (Fed. Cir. 2019)) As described above, the problem being solved by the claimed invention is that of audience measurement. *Dec.,* ¶ 163. *Tian's* investigation is broadly related to "facial expression analysis." *Dec.*, ¶ 164. As Dr. Saber opines, a reference investigating the minimum resolution for an image that still allows an expression to be analyzed would not have logically come to the attention of an inventor solving the problem of audience measurement. *Id.*

Similarly, *Steinberg* is broadly related to the classification of images in a database "in the context of collections of consumer digital images which would be generated by a typical user of a digital camera." *Steinberg,* [0010]. As Dr. Saber opines, a reference related to classifying collections of images from consumer digital cameras would also not have logically come to the attention of an inventor solving the problem of audience measurement. *Dec.,* ¶ 165. As such, neither *Tian* nor *Steinberg* is analogous art under the second prong of the relevant test.

## VIII. DISCRETIONARY DENIAL UNDER § 314(A) IS WARRANTED

Petitioner asserts the Petition should not be discretionarily denied institution under § 314(a). *Petition,* 6-7. Petitioner only addresses a few of the six *Fintiv* factors and ignores the rest, broadly stating "the *Fintiv* factors favor institution." *Petition,* 6-7; *Apple Inc. v. Fintiv, Inc.,* IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020). Petitioner purports the "merits" of the Petition are compelling. *Petition,* 6. For all the reasons discussed above, **the merits of the Petition are not compelling**. Thus, the Petition would not "plainly lead to a conclusion that one or more claims are unpatentable." *Memorandum: Interim Procedures for Discretionary Denials in AIA,* June 21, 2022, 3-4.

Factor 1: Petitioner misrepresents the Judge presiding over the parallel litigation, as Nielsen and TVision consented to Magistrate Judge **Burke** conducting "all proceedings" in the Delaware district court case. Ex. 2005, *Notice, Consent, and Reference of a Civil Action to a Magistrate Judge*, Nov. 7, 2022. Unlike Judge Noreika, Judge Burke recently **denied** staying cases for IPR proceedings. *See, e.g.,* Ex. 2007, *Topia Technology, Inc. v. Egnyte, Inc.,* No. 21-cv-01821 (D. Del. Mar. 6, 2023), *Hearing Transcript,* 5:4-12, 48:16-22. Thus, *Fintiv* factor 1 favors discretionary denial under § 314(a).

Factor 3: The Parties have invested significant work in the parallel litigation. Ex. 2006, *Docket Report for Case No. 1:22-cv-01345, District Court of Delaware.*

24. Counsel informed me that there need not be a specific teaching, motivation, or suggestion in the prior art to combine or modify prior art references in a particular way. For instance, the background knowledge or common sense of a person of skill could make a claim of an obvious variation on what was already known. However, there must be an articulable reason as to why a particular combination would be made or a specific reference modified.

25. I have also been informed that it is improper, in an obviousness analysis, to apply hindsight, and in particular to use the patent claims as a roadmap to assemble a collection of references or modifications to references. I understand that the proper question is what would have been obvious to a person of ordinary skill in the art without the benefit of hindsight and specifically without access to the patent at issue.

## III. LEVEL OF A PERSON HAVING ORDINARY SKILL IN THE ART

26. Petitioner proposes that a person having ordinary skill in the art at the time of the '243 Patent would have been:

> a person with a bachelor's degree in computer science, electrical engineering, or a similar field with at least two years of experience in media analysis or a person with a master's degree in computer science, electrical engineering, or a similar field with a specialization in media analysis.

*Petition*, 7.

27. I do not dispute Petitioner's proposed POSITA definition.

28. As of the earliest priority date of the '243 Patent, which counsel has informed me is December 15, 2011, I was, at the least, a POSITA applying Petitioner's definition. As set forth above in the discussion of my qualifications, I had a Ph.D., master's degree, and bachelor's degree in electrical engineering. My Ph.D. focused on Signal/Image/Video Processing, Pattern Recognition, and Computer Vision. Thus, I specialized in media analysis.

29. Additionally, I have over 25 years of work experience related to media analysis, including performing image and video processing research for multimedia applications and performing research in pattern recognition and machine learning. I have authored several journal publications related to implementing pattern recognition for detecting faces and/or relevant content in images prior to December 15, 2011. I also had at least two years of work experience in developing face detection and facial feature extraction approaches.

## IV. THE CLAIMED INVENTION OF THE '243 PATENT

30. I have been asked to provide my opinions on the invention disclosed and claimed in the '243 Patent. The '243 Patent discloses an audience measurement system. *'243 Patent,* Ex. 1001, Abstract, 1:37-39, 2:26-29. The audience measurement system recognizes the identities of people watching TV by performing facial recognition on images of audience members. *'243 Patent,* 2:42-45, 5:14-19.

High-resolution images are captured in the TV environment by a high-resolution image sensor to perform facial recognition. *'243 Patent,* 2:50-56, 5:39-43, 8:55-60.

31. Cameras were known to implement an illumination source within audience measurement systems when capturing high-resolution images. *'243 Patent,* 2:57-61. Frequently activating the illumination source to capture high-resolution images caused several disadvantages (i.e., resource consumption, audience annoyance). *'243 Patent,* 3:4-30. To address these issues, the audience measurement system of the '243 Patent selectively activates the illumination source only for frames that "require high-resolution image data," such as for facial recognition processes. *'243 Patent,* 3:31-37. Frames not requiring high resolution include frames used for only counting audience members. *'243 Patent,* 3:41-44.

32. I note that Dr. Doermann, Petitioner's declarant, opines the "selective activation of illumination" is the "purported new approach" of the '243 Patent. *Declaration of Dr. Doermann,* Ex. 1003, ¶ 20. In my opinion, the claimed system in the '243 Patent improves audience measurement systems by providing a way to determine head orientation to designate captured images for facial recognition. For example, in claim 4, head orientation determination is performed based on the reduced resolution image, with the result being that if the head orientation is suitable for face recognition (e.g., because the person in the image is facing the camera), then activation of the illumination and capture of a high resolution image for facial

recognition can be performed. *'243 Patent,* 9:4-22, 9:26-31, 9:54-59, 10:29-38, 10:67-11:24, 11:34-36. Based on the results of the head orientation, the system determines if frames are to undergo facial recognition. If so, the illumination source is activated. *'243 Patent,* 10:1-7. If not, illumination is not activated to avoid unnecessary light that may "annoy[]" the audience. *'243 Patent,* 3:4-30, 9:40-47. The audience measurement system reduces the resolution of images captured without illumination activated so the head orientation within the image may be accurately determined and used to determine if succeeding frames are to undergo facial recognition. *'243 Patent,* 10:67-11:8, 11:19-23, 11:34-36;10:31-38.

33. The '243 Patent thus discloses and claims (in claims 4, 11, and 18) determining the orientation of the heads in the captured images based on a reduced-resolution image. The step of determining the head orientation based on the reduced-resolution image then allows for analyzing images captured in low light to determine when to activate the illumination source for images that will undergo facial recognition. All of the challenged dependent claims include a limitation reciting "determin[ing] the orientation of the head with respect to the camera." *'243 Patent,*

claims 4, 11, 18[1]. Contrary to Dr. Doermann's opinion, because the "new approach" (per Petitioner) for selectively activating illumination relies on determining the head orientations, the Challenged Claims do indeed recite a combination of features not shown in the prior art. Ex. 1003, ¶¶ 16-20. Namely, the determination of the head orientations provides an improvement to the audience measurement system, i.e., improving the analysis of images captured in low light by performing head orientation determination on reduced-resolution images and determining the head orientation in order to perform the selective illumination of images designated to undergo facial recognition.

34. For the reasons above and provided herein, it is my opinion that the Challenged Claims recite a combination of novel and non-obvious features. Ex.

[1] I note the remaining challenged dependent claims incorporate the limitations from either claim 4 (claims 5-6), claim 11 (claims 12-14), or claim 18 (claims 19-20). *'243 Patent,* col. 15-col. 17. Thus, all dependent claims include head orientation determination therein. Furthermore, the dependent claims depend from independent claims that recite determining "an orientation of the head," and therefore incorporate head orientation determination via the independent claim limitation. *'243 Patent,* 15:36-37, 16:35-36, 17:30-31.

1003, ¶ 20. Namely, the Challenged Claims recite determining a head orientation and matching the head to a known person to "determine audience identification information," with the head orientation determination being based on a reduced-resolution image (see, e.g., claim 4).

## V. OPINIONS ON CHALLENGED GROUND 1

### A. OPINIONS REGARDING *TIAN'S* RESOLUTION REDUCING FOR HEAD POSE ESTIMATION

35. Petitioner maps *Tian* as allegedly teaching the claimed "reduc[ing] a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image" and "determin[ing] the orientation of the head with respect to the camera based on the reduced-resolution image." *Petition,* 26-27 (*citing* § VI.A.2[1e] at p. 22-23). I have been asked to provide my opinions on whether a POSITA would have been motivated and found it obvious to combine *Tian* with *Lu-577* (as modified to include *Lu-000's* recognition system) for teaching the above limitations. Before providing such opinions, I initially provide a discussion of a POSITA's understanding of *Tian*.

36. *Tian* is concerned with "automatic **facial expression analysis** (AFEA) systems," and, more specifically, the "effects" of different image resolutions on various steps of "**facial expression analysis**" performed by AFEAs. *Tian,* Ex. 1005, Abstract. *Tian* is interested in the effects of various image resolutions to determine

*Tian* could just arbitrarily choose any "different resolutions" for exploring each step of facial expression analysis thereon. In other words, if *Tian* actually taught actively reducing the resolution of an image (as required in claims 4, 11, and 18), there would be no reason for *Tian* to describe using five different resolutions "based on" (i.e., coming from) the Cohn-Kanade Database. Because, if *Tian* were creating the reduced-resolution images, *Tian* could choose any random resolution to down-sample the images to. This creation of reduced-resolution images would not require basing the selected resolutions on any "database."

50. Indeed, the purpose of *Tian's* resolution effects exploration supports *Tian* using resolutions of readily available images. As discussed above, *Tian* explores the effects of different image resolutions for each step of facial expression analysis" for the purpose of studying the performance of facial expression analysis "in real environments" where the face image is "often in lower resolution." *See* ¶ 36 (*citing Tian*, Abstract). Thus, *Tian* wants to explore how facial expression analysis performs on images taken "in real environments," i.e., images that **start** with a low resolution. In fact, *Tian* has no interest in analyzing images that are not from a "real environment," as "most" AFEA systems already analyze images from a "controlled laboratory situation." *Tian,* Abstract, 000002. Based on *Tian's* express purpose, a POSITA would understand *Tian* to teach analyzing facial expressions in images at whatever resolution they were captured with, e.g., whatever resolutions are available

from the database. Because *Tian* attempts to explore resolutions at which the images were captured with, a POSITA would understand *Tian* would be discouraged from actively **further** reducing the resolution of an image for the purpose of performing expression analysis.

51. For the above reasons, it is my opinion *Tian* fails to teach or suggest the claimed step of actively "reduc[ing] a resolution of a first image."

### D. OPINIONS REGARDING THE MOTIVATION TO COMBINE *TIAN'S* HEAD POSE ESTIMATION WITH *LU-577*

52. I have been asked to provide my opinions as to whether a POSITA would have been motivated to modify *Lu-577's* audience measurement system (as modified to include *Lu-000's* recognition system) with *Tian's* head pose estimation. Petitioner relies on the modification for dependent claims 4, 11, and 18. *Petition,* 27 (*citing* 22-23 for claim 4(b)), 37 (*citing* claim 4(b) mapping), 42 (*citing* mapping of 16(e) (i.e., "determining,… an orientation of the head with respect to the camera). However, all of the motivations provided by Petitioner fail because either: (1) the motivations are based on irrelevant problems (e.g., a problem associated with face detection that is not commensurate with the claim scope of the '243 Patent), or (2) the alleged improvements are flawed and would not, in fact, improve *Lu-577's* facial recognition (as modified to include *Lu-000's* comparison of extracted signatures with every stored signature). Thus, a POSITA would not have been motivated to

reviewing *Tian* would have been discouraged from purposely reducing the resolution of a captured image.

### ***II. References Cited by Dr. Doermann Do Not Provide Support for Reduced Resource Consumption in Head Pose Estimation***

106. Dr. Doermann cites three background references (Ex. 1013-1015) to support his motivation of reducing "time and resource consumption" by performing head orientation determination on reduced-resolution images, as allegedly taught by *Tian*. Ex. 1003, ¶ 69. In my opinion, these references **do not provide support for the opinion that <u>head pose estimation</u>** is resource intensive and should be performed on reduced-resolution images.

107. Dr. Doermann alludes to this discrepancy himself, as he opines "tasks such as **face detection**" (not head pose estimation) "**<u>can</u>** be resource-consuming." Ex. 1003, ¶ 69. However, face detection being resource-consuming **does not address whether <u>head pose estimation</u> is resource-intensive**. Indeed, *Tian* recognizes these two processes are distinct from one another, as *Tian* separately evaluates "face detection" from "head pose estimation." *Tian,* 000002, 000005 (stating head pose estimation resulted in different accuracy than face detection—"**compared to face detection, head pose estimation can detect 98% faces…**"). In fact, both processes result in different facial expression accuracies. *Id.* Thus, per *Tian,* face detection is a distinct and separate step from head pose estimation.

108. *Tian* even distinguishes head detection (i.e., "detect[ing] the head") from head pose estimation. *Tian*, 000002 (describing "[a]fter" the head is detected, the image is converted and then a neural network is "employed to estimate the head pose"). Specifically, *Tian* discloses the head is first detected, and then the separate step of head pose estimation is performed on the image. *Id*. Thus, *Tian's* head pose estimation **is distinct from face detection** and head detection.

109. The first cited reference (Ex. 1013) states "view-based [face detection] methods…are reported to have a good detection performance but the drawback to be computationally rather expensive." Ex. 1013, 000001; Ex. 1003, ¶ 69 (quoting Ex. 1013). Dr. Doermann relies on this quote for supporting his opinion that "**face detection** can be resource-consuming." Ex. 1003, ¶ 69. However, Ex. 1013 does not disclose **all** face detection techniques are computationally expensive. Rather, only certain approaches (i.e., view-based methods) are computationally "expensive." Ex. 1013, 000001. In viewing Ex. 1013, a POSITA would not have understood the claimed "determine the orientation of the head" to be "resource-consuming," as Ex. 1013 is discussing the distinct process of **face detection**. Thus, this problem of resource consumption **would not have motivated** a POSITA to make Petitioner's proposed modification, given the knowledge of Ex. 1013. In fact, even Dr. Doermann admits the "resource-consuming" operation is **face detection, <u>not</u> head pose estimation.** Ex. 1003, ¶ 69.

110. Turning to Ex. 1014, Dr. Doermann further opines "[s]ome approaches of **face detection** may require analyzing all pixels of an image," and that "processing resources and time can be reduced" by reducing the resolution of the image. Ex. 1003, ¶ 69 (*citing* Ex. 1014, *Corcoran*, 2:43-53). Once again, Ex. 1014 may support there being a problem of resource consumption in **face detection** (*Corcoran*, 2:43-53), but does not provide support for head orientation determination having any problem of resource consumption. Instead, *Corcoran* discloses avoiding certain calculations of a "highest resolution integral image" to thereby reduce, in some instances, "**processing overhead for face detection and tracking**." *Corcoran,* 2:43-53. Thus, *Corcoran*, at best, supports that reducing an image resolution may reduce "processing overhead" for **face detection**. *Corcoran* has no mention of determining a head orientation or estimating a head pose. *See generally,* Ex. 1014. Thus, Ex. 1014 does not remedy the deficiency of Dr. Doermann's cited reference, Ex. 1013, in supporting his opinion that **head pose estimation** (mapped for teaching the head orientation determination) is resource intensive.

111. The last background reference Dr. Doermann cites for allegedly supporting the proposed motivation is Ex. 1015 ("*Hong*"). Ex. 1003, ¶ 69 (*citing* Ex. 1015, *Hong*). Dr. Doermann does not provide any explanation for his cite, but merely quotes *Hong's* disclosure that "by reducing the **resolution of the saturation of the image**, computational requirements are substantially reduced, and a relatively

simple method may be used." Ex. 1003, ¶ 69 (*citing* Ex. 1015, *Hong*, [0022]). Dr. Doermann cites this quote to allegedly support his opinion that "processing resources and time can be reduced if the resolution of the image is reduced." *Id.* *Hong* discloses "a method for **<u>detecting face-like</u> regions in a <u>colour image</u>**." *Hong*, Abstract. *Hong* implements this method by performing **face detection**. *Hong*, [0001] (describing the "invention" relates to "detecting a face-like region," and that the method be used with "other methods for detecting a face in an image"). For the same reasons discussed above, a POSITA would not have been motivated by a benefit associated with **face detection** to modify *Lu-577* (as modified by *Lu-000*) to determine a head orientation based on a reduced-resolution image. *See* ¶¶ 107-110.

112. The method includes "reducing the resolution of the colour image by **averaging the saturation to form a reduced resolution image**." *Hong*, [0009], [0011], [0020]. The saturation averaging does not reduce the computational requirements, but rather allows more efficient methods of **face detection** to be implemented. *Hong*, [0020]. The efficient face detection methods provided by implementing the saturation averaging reduces "computational" requirements. *Hong*, [0022]. Additionally, a POSITA would have understood the averaging operation to add computational processing to the face detection procedure. Namely, the steps involved in the averaging process are extra steps implemented in order to perform the more efficient face detection methods of *Hong*. Additionally, the

averaging operation would increase the blurring of the image, as taking an average of the saturation would reduce the sharpness and detail in the image. *Hong,* [0031-0032] (describing after the step of "averaging" the saturation, the reduced-resolution image comprises regions or "blobs of uniform saturation").

113. Furthermore, specific equations and algorithms are used to implement the saturation averaging and face detection performed on the reduced-saturation images. Hong, [0010-0011], [0018], [0020]. Thus, if Ex. 1015 motivates any modification relating to reducing a resolution to reduce "computational requirements," the modification would include switching to a completely different algorithm for performing face detection that works well for reduced-saturation images. However, neither Petitioner nor Dr. Doermann asserts any process in *Lu-000* being switched with a face detection method catered to reduced-saturation images when modifying to include *Tian's* head pose estimation. Thus, for this reason alone, Ex. 1015 does not support any motivation for modifying *Lu-000* to include *Tian's* reduced-resolution head pose estimation, such as the motivation of decreasing processing requirements and time.

114. Additionally, employing the reduced "computational requirements" motivation from *Hong* would actually **increase the amount of modification required** beyond that proposed by Petitioner and Dr. Doermann. Namely, to reap the benefit of reduced "computational requirements," a POSITA would have

understood reconfiguration of *Tian's* head pose estimation is required to perform the face detection method on saturation-averaged images, rather than detecting a head in an image. *Tian*, 000002. Furthermore, additional steps would be required for averaging the saturation of *Lu-000's* images. These increased modifications may actually provide the opposite effect of increasing the processing required, rather than reducing computations.

115. Even if Dr. Doermann envisioned this extensive modification, the saturation-averaging modification does not make sense when modifying *Lu-000's* recognition system. *Lu-000's* extracted signatures that are compared to the various stored pose signatures are extracted from normalized and **binarized** face images. *Lu-000*, 6:40-51 (disclosing an "extracted pattern image signature" is extracted from a "binary" B-sub "face image"), 6:57-62 (describing the extraction of a signature from a binarized B-sub image is utilized "in the recognition operational mode"), 7:47-55 (disclosing extracting the signature from the binary level B-sub image and comparing it to the stored signatures to identify a match). A POSITA would have understood because the images are binarized, the signatures are **extracted from two-tone images in black and white**. Thus, a POSITA would not have looked at *Hong's* reduction in the saturation of a **colored image** as motivating a modification to *Lu-000's* recognition system that employs black and white images. Accordingly, Ex.

1015's reduced saturation would not have motivated a POSITA to modify *Lu-577* (as modified by *Lu-000*).

116. To summarize, none of the background references support Dr. Doermann's conclusory opinion that performing "head pose estimation on a reduced-resolution image provides savings in processing resources or time." Ex. 1003, ¶ 69. All of the references (Ex. 1013-1015) cited by Dr. Doermann are directed to **face detection**, which is not relevant to Petitioner's proposed modification of performing **head orientation determination** on a reduced-resolution image (as allegedly taught by *Tian's* head pose estimation). Thus, a POSITA would not have understood *Tian's* head pose estimation is resource intensive. Accordingly, a POSITA would not have been motivated by the supposed benefit of reduced computational requirements to modify *Lu-577's* system (employing *Lu-000's* recognition system) with *Tian's* teaching of reducing an image resolution and performing head pose estimation on the image (as Petitioner maps for teaching the claimed "determine the orientation of the head…based on the reduced-resolution image.").

### ***III. Tian Teaches Performing Facial Analysis on Lower Resolution Images Is Undesirable***

117. As discussed previously, *Tian* desires to explore the effects of various image resolutions on expression analysis. *See* ¶ 36. However, *Tian's* exploration is

the success) of facial expression analysis by purposely reducing the resolution of an image prior to performing the expression analysis steps.

120. Petitioner ignores the above issues with applying facial image analysis on low resolution images. Rather, Petitioner and Dr. Doermann point to results from *Tian* that show, at certain resolutions, performing head pose estimation "**can** detect 98% faces," and from these results, asserts determining a head orientation based on a reduced-resolution image can be performed "without substantially reducing the accuracy of the determination." *Petition,* 27; Ex. 1003, ¶¶ 68-69. Worse still, neither Petitioner nor Dr. Doermann addresses the aspects of *Tian* that would actually **discourage** a POSITA from purposely and unnecessarily reducing the resolution of an image.

121. *Tian* discloses "**low resolution input images**" is one factor "**that complicate[s] facial expression analysis**." *Tian*, 000002, 000006. Additionally, "real environments" in which "lower resolution" images are captured make real-life facial expression analysis "**more difficult**." *Tian,* Abstract (stating "in real environments, the face image is often in lower resolution"), 000002 (stating "Real-life facial expression analysis," such as analysis that would be performed on images taken in real environments, "is **much more difficult than the posed actions studied predominantly to date**."), *see also*, 000006. Thus, *Tian* repeatedly states low resolution images make facial expression analysis more difficult. To combat this

difficulty, *Tian* even suggests techniques that can be used to increase image resolution to improve expression analysis accuracy. *Tian, 000006* (stating "multiple cameras" can be "expected to provide improved accuracy;" "[a]ctive cameras can be used to **acquire high resolution face images**;" and "techniques of **super-resolution can be used to get high resolution images** from multiple low resolution images"). Thus, though *Tian* does find certain steps of facial expression analysis to be able to be performed on low resolution images (000005), *Tian* **still** recognizes the **problems caused by low resolution images** and even discloses methods to address these problems that increase the image resolution.

122. *Tian's* repeated discussion of low resolution images making facial expression analysis more difficult and his inclusion of various techniques to improve accuracy by increasing resolution would have dissuaded a POSITA from intentionally lowering the resolution of an image to be analyzed and, accordingly, increasing the difficulty of facial expression analysis. In other words, though *Tian* explores methods for mitigating the difficulties associated with analyzing low resolution images when **only low resolution images are available**, a POSITA would be discouraged from taking a high resolution image and reducing the resolution of the image. Furthermore, because performing various facial image analysis processes on low resolution images was known to negatively affect

## VII. OPINIONS ON CHALLENGED GROUND 3

### A. OPINIONS REGARDING WHETHER THE COMBINATION OF *NIELSEN-372, STEINBERG,* AND *TIAN* RENDER OBVIOUS CLAIMS 4-6, 11-14, AND 18-20

157. I note Petitioner essentially puts forth the same obviousness arguments used within Grounds 1 and 2 for Ground 3 combining *Nielsen-372, Steinberg,* and *Tian. Compare Petition,* 8-11 *with* 71-73 (providing the same obviousness arguments for Tian); *see also Petition,* 71 (using the same arguments from Ground 2 ("§§ VI.B.1-2") for showing obviousness of "Nielsen-372 and Steinberg"). Thus, it is my opinion Ground 3 fails to render obvious claims 4-6, 11-14, and 18-20 for the same reasons noted above for Grounds 1 and 2. *See Section V-VI.*

## VIII. OPINIONS REGARDING WHETHER TIAN AND STEINBERG ARE IN THE SAME FIELD OF ENDEAVOR OR SOLVE THE SAME PROBLEM AS THE '243 PATENT

158. I have been asked to provide my opinions on whether *Tian* and *Steinberg* are in the same field of endeavor or solve the same problem as that disclosed in the '243 Patent. I note Petitioner applies either *Tian* or *Steinberg* as secondary references in all Challenged Grounds. *Petition,* 3. For the reasons discussed below, it is my opinion neither *Tian* nor *Steinberg* are: (1) in the same field of endeavor or (2) solve the same problem as the '243 Patent. The '243 Patent is solving problems in the field of "audience measurement," and neither *Tian* nor *Steinberg* have anything to do with audience measurement.

159. The '243 Patent discloses the "field" of the invention to "relate[] generally to audience measurement and, more particularly, to methods and apparatus to capture images." *'243 Patent,* 1:36-39. The description of the invention further indicates the field is "audience measurement," disclosing embodiments of an "audience measurement device." *'243 Patent,* 4:52-56; *see also, generally, the '243 Patent.* Furthermore, the claims themselves recite an "audience measurement system" (claim 1 and 9) and a "method for obtaining exposure data for a media exposure environment" (claim 16). *'243 Patent*, claims 1, 9, 16.

160. Contrastingly, *Steinberg's* "Field of the Invention" is "digital image processing, **particularly to the field of automatic or semiautomatic <u>grouping and classification of images in a database or image collection</u> based on the occurrence of faces in the images and the identification and classification of such faces."** *Steinberg,* [0002-0003]. *Steinberg's* primary context of applying the image processing system is for classifying images within stored image collections, with these images being ones taken by a user of a digital camera. *See* ¶ 137. Nowhere does *Steinberg* mention applying the image processing system for audience measurement. *See, generally, Steinberg.* Thus, *Steinberg* is not within the same field of endeavor as the '243 Patent. Accordingly, a POSITA would not have looked to *Steinberg's* image processing system that classifies stored image collections for combining with the primary reference *Nielsen-372*.

161. *Tian* is clear in its field of endeavor and its problem to solve, disclosing "[t]his paper explores **the effects of different image resolutions for <u>each step of facial expression analysis</u>**" and exploring such effects on "automatic facial expression analysis (AFEA) systems." *Tian,* Abstract. Thus, as discussed previously, *Tian* explores the effects of different image resolutions on the performance of AFEA systems to determine how resolutions affect facial expression analysis. *See* ¶ 36. *Tian* has no mention of an audience or performing audience measurement. *See, generally, Tian.* Thus, *Tian* is not within the same field of endeavor as the '243 Patent. Accordingly, a POSITA would not have looked to *Tian's* facial expression analysis techniques and combined them with the primary reference *Lu-577.*

162. Petitioner claims both *Tian* and *Steinberg* share the same field of endeavor of the '243 Patent, asserting the field of endeavor is "media analysis." *Petition,* 3, 5-6; Ex. 1003, ¶¶ 33-36, 42-45. However, this interpretation blends two completely distinct fields; that of (1) media **exposure** analysis; and (2) image processing. The media being "analyzed" in "media exposure analysis" is explicitly being exposed to an audience, thus specifically analyzing media an audience is watching. *'243 Patent,* 1:43-64 (generally describing "audience measurement" as implementing analysis of "media content" being exposed to an audience). This media exposure analysis is implemented for "audience measurement." *Id.*

Contrastingly, image processing generally relates to processing any images, and **does not require the processing to be performed on media being watched by an audience**. Notably, *Tian's* field of facial expression analysis and *Steinberg's* field of classifying collected images via facial recognition fall under the distinct field of image processing. Thus, because image processing is a field distinct from audience measurement, neither of the secondary references relied upon by Petitioner are directed to the field of endeavor of the '243 Patent.

163. Additionally, it is my opinion that neither *Tian* nor *Steinberg* are reasonably pertinent to the problem being solved in the '243 Patent. This is because the problem being solved in the '243 Patent is one found in audience measurement. Namely, the '243 Patent is solving a problem caused by capturing images of audience members in an "**audience measurement system**," where the dark environment makes frequent illumination "annoy[ing]" to audience members, among causing other disadvantages. *'243 Patent,* 2:57-3:35. For example, the '243 Patent discloses frequent illumination annoys "members of a panel that are exposed to the illumination source **while in the presence of the audience measurement system**." *'243 Patent,* 3:12-16. Furthermore, red glow emitted from an IR LED illumination source in an audience measurement system may annoy audience members because the red glow "faces the panel members **while the panel members are, for example, watching a television**." *'243 Patent,* 3:16-24. This annoyance

may prove "detrimental to an ability of the **audience measurement system** to maintain persons in the panel **and/or to collect as much data as possible.**" '243 Patent, 3:21-24.

164. Contrastingly, *Tian* is solving a problem known to occur in **facial expression analysis**. Namely, *Tian* investigates how different resolutions affect facial expression analysis to determine the lowest resolution where you can still accurately recognize an expression. *Tian,* Abstract, 000005-6. An inventor solving the '243 Patent's problems of audience measurement would not have logically looked to a reference investigating the minimum resolution applicable for successful facial expression analysis. In other words, *Tian* would not have logically come to the attention of an inventor concerned with problems in audience measurement.

165. Similarly, *Steinberg* would not have logically come to the attention of an inventor concerned with audience measurement problems. Namely, because *Steinberg* is solving problems related to classifying images within an image database. *Steinberg,* [0006] (describing utilizing "face recognition" for "grouping, classification, management, presentation and access to collections of digital images in databases" would be "desirable"), [0010]. Thus, a reference, such as *Steinberg*, that is broadly related to classifying collections of images from consumer cameras would also not have logically come to the attention of an inventor solving audience measurement problems.

Trials@uspto.gov
571-272-7822

Paper 10
Date: January 8, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

TVISION INSIGHTS, INC.,
Petitioner,

v.

THE NIELSEN COMPANY (US), LLC,
Patent Owner.

---

IPR2023-01014
Patent 11,470,243 B2

---

Before TERRENCE W. McMILLIN, JOHN A. HUDALLA, and GARTH D. BAER, *Administrative Patent Judges*.

McMILLIN, *Administrative Patent Judge*.

# DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

# I. INTRODUCTION

## *A. Background and Summary*

TVision Insights, Inc. ("Petitioner")[1] filed a Petition for *inter partes* review of claims 1, 4–6, 8, 9, 11–14, 16, and 18–20 of U.S. Patent No. 11,470,243 B2 (Ex. 1001, "the '243 patent"). Paper 2 ("Pet.") at 3. The Nielsen Company (US), LLC ("Patent Owner")[2] filed a Preliminary Response. Paper 6 ("Preliminary Response" or "Prelim. Resp."). In the Preliminary Response, Patent Owner indicates that it has filed a statutory disclaimer for independent claims 1, 9, and 16 of the '243 patent and thus claims 4–6, 8, 11–14, and 18–20 (the "challenged claims") are the only claims at issue. Prelim. Resp. 1–2 (citing Ex. 2002 (Request for Statutory Disclaimer)).

With our authorization, Petitioner filed a Reply to Patent Owner's Preliminary Response (Paper 7 ("Reply")) and Patent Owner filed a Sur-reply (Paper 9 ("Sur-reply")). The Reply and Sur-reply were limited to arguments relating to discretionary denial. *See generally* Reply; Sur-reply.

We have authority to determine whether to institute an *inter partes* review. 35 U.S.C. § 314 (2018); 37 C.F.R. § 42.4(a) (2020) ("The Board institutes the trial on behalf of the Director."). The standard for institution is set forth in 35 U.S.C. § 314(a), which provides that *inter partes* review may

---

[1] Petitioner identifies "TVision Insights, Inc." as the real party-in-interest to this proceeding. Pet. 89.
[2] Patent Owner identifies "The Nielsen Company (US), LLC" as the real party-in-interest to this proceeding. Paper 3, 2. Patent Owner states that "it is a subsidiary, either directly or indirectly, of numerous parent entities, and that Brookfield Corporation (NYSE: BN; TSX: BN.TO), through its subsidiaries and investment funds and vehicles, indirectly owns 10% or more of Patent Owner The Nielsen Company (US), LLC." *Id.*

and head pose estimation can detect faces in lower resolution than face detectors. (2) Appearance feature extraction needs face alignment. (3) There is no difference in the recognition of expression analysis when the head region resolution is 72x96 or higher." *Id.* at 6 ("Conclusion and Discussion").

Petitioner presents a declaration from an IEEE Director that states that Tian was published and made available no later than July 2, 2004. Ex. 1028; *see also* Pet. 5 ("Tian was published by IEEE and publicly available no later than July 2004."). On its face, Tian states, "Proceedings of the 2004 IEEE Computer Society Conference on Computer Vision and Pattern Recognition (CVPRW'04)." Ex. 1005 (footer on every page). Patent Owner does not dispute this evidence. *See generally* Prelim. Resp. The earliest priority date claimed for the '243 patent is December 15, 2011. Ex. 1001, code (63), 1:6–32. Tian is prior art to the '243 patent.

*3. Analysis of Claims 4, 11, and 18*

The Petition provides an element-by-element analysis to show that the limitations recited in dependent claims 4, 11, and 18, including the limitations recited in disclaimed independent claims 1, 9, and 16 that are incorporated by nature of the dependency, are taught by the cited art. *See* Pet. 12–27 (claims 1 and 4), 32–37 (claims 9 and 11), 38–42 (claims 16 and 18). Except for the first limitation recited in claims 4, 11, and 18 directed to reducing the resolution of an image that is discussed below, Patent Owner does not challenge Petitioner's showing as to any of the limitations recited in claims 1, 4, 9, 11, 16, and 18. *See generally* Prelim. Resp. We have reviewed the showing in the Petition as to these claims and determine that the showing is plainly supported by the cited art and the arguments and other

evidence relied on in the Petition and, based on the present record, that it is highly likely that Petitioner will prevail as to these claims.

Claims 4, 11, and 18 are similar in that each of these claims includes limitations directed to reducing the resolution of an image and determining the orientation of a head with respect to a camera based on the reduced-resolution image. *See* Ex. 1001, 15:54–60, 16:47–53, 17:40–47. But there are differences in these dependent claims (*see id.*)[14] and in the independent claims (1, 9, and 16) that recite limitations that claims 4, 11, and 18 incorporate based on the dependency (*see id.* at 15:13–42, 16:21–43, 17:15–36). 35 U.S.C. § 112 ¶ 4 ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."). The parties largely ignore these differences and we shall only discuss them as necessary to our analysis of the contentions, arguments, and evidence presented by the parties.

The patentability arguments made by Patent Owner are limited to dependent claims 4, 11, and 18. *See* Prelim. Resp. 2 ("Patent Owner's

---

[14] Challenged claim 4 depends from disclaimed claim 1 and challenged claim 11 depends from disclaimed claim 9. Ex. 1001, 15:53–60 (claim 4), 16:47–53 (claim 11). Method claims 4 and 11 differ in their preambles and in that claim 4 recites "reduce a resolution of a first image of the one or more of the images . . ." whereas claim 11 recites "reduce a resolution of the first image . . ." *Id.* Challenged claim 18 depends from disclaimed claim 16. *Id.* at 17:40–47. Method claim 18 is similar to claims 4 and 11. In place of "reduce a resolution" as recited in claims 4 and 11, claim 18 recites "reducing a resolution of the first image." In place of "determine the orientation of the head with respect to the camera based on the reduced-resolution image" as recited in claims 4 and 11, claim 18 recites, "wherein the determining the orientation of the head includes determining the orientation of the head with respect to the camera using the reduced-resolution image."

*Id.* at 8–9. However, as Petitioner points out, "[Patent Owner] does not dispute that Tian teaches that 'lower resolution images are down-sampled from the originals' and that down-sampling is a method of reducing image resolution." Reply 1. There appears to be no dispute that Tian does disclose a method of reducing the resolution of an image, i.e., down-sampling.[18]

In Petitioner's proposed combination of the teachings of Lu-577 and Tian, Petitioner relies on Tian's teaching of "obtaining and analyzing reduced-resolution images and that the accuracy of face detection and head pose estimation can be maintained for reduced-resolution images." Pet. 10 (citing Ex. 1005 (Tian), Abstract, 2, 5). Patent Owner does not dispute that Tian provides these teachings. *See generally* Prelim. Resp. Petitioner contends that "[a] POSITA would have found it obvious to apply Tian's teachings to Lu-577's system to perform facial analysis on reduced-resolution images" because "[d]oing so can reduce the time and resources

---

*See* Ex. 1001, 15:16 (emphasis added). Neither independent claim 9, from which claim 11 depends, nor independent claim 16, from which claim 18 depends, include a limitation directed to "instructions." *See id.* at 16:21–43, 17:15–36.

[18] The Petition also states that "[b]y [the priority date claimed for the '243 patent], techniques (e.g., subsampling, interpolation) for obtaining reduced-resolution images were widely known." Pet. 2 (citing Ex. 1003 (Doermann Decl.) ¶ 15). Patent Owner does not challenge this statement. *See generally* Prelim. Resp. The only technique for reducing resolution of an image discussed in the '243 patent is binning pixels. *See* Ex. 1001, 11:5–36 ("Binning is a process in which a neighborhood of pixels (e.g., a first pixel and a number of adjacent pixels) is summed together . . . to assign more light per orthogonal block of pixels at the cost of lower resolution."). In paragraph 15 of the Doermann Declaration cited in the Petition, it states that "binning pixels" is among the techniques for obtaining reduced-resolution images that were widely known.

consumption of tasks such as face detection and pose estimation, without substantially reducing the accuracy of these tasks." Pet. 10 (citing Ex. 1003 (Doermann Decl.) ¶¶ 68–69.

At least at this preliminary stage of these proceedings, we determine that Petitioner's showing that the cited art teaches the "reducing the resolution" limitation as recited in claim 4 and similarly recited in claims 11 and 18 to be compelling.[19] Tian plainly teaches obtaining reduced-resolution images and teaches down-sampling as shown in the Petition. *See* Pet. 26.

Petitioner contends that a skilled artisan would have been motivated to combine the relevant teachings of Lu-577 and Tian with a reasonable expectation of success, and the Petition includes the following passages to support this contention:

> Lu-577 is in the same field of endeavor as the '243 patent, which is media analysis. (Pet. 4.)
>
> Tian is in the same field of endeavor as the '243 patent, which is media analysis. (*Id.* at 5.)

---

[19] Herein, we use "compelling" in accordance with the compelling evidence test ("the evidence of record so far in the case would plainly lead to [this] conclusion") as set forth in the USPTO Memorandum, Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation ("Guidance Memo"), 5 n.6 (June 21, 2022) (available at https://www.uspto.gov/sites/default/files/documents/interim_proc_discretionary_denials_aia_parallel_district_court_litigation_memo_20220621.pdf); *see also OpenSky Indus., LLC v. VSLI Tech. LLC*, IPR2021-010164, Paper 102, 49 (PTAB Oct. 4, 2022) (precedential) ("[a] challenge can only 'plainly lead to a conclusion' . . . if it is highly likely that the petitioner would prevail").

> The combination simply uses Tian's teachings about image processing and facial analysis, in the manner taught by Tian, to implement functionalities in Lu-577, which a POSITA would have been more than capable of doing. A POSITA would have had a reasonable expectation of success in combining the references given the overlap between Lu-000 and Tian and because the combination uses well-known techniques that would not have changed the principle of operation for any of the references. (*Id.* (citing Ex. 1003 ¶72).)
>
> A POSITA would have found it obvious that head orientation is determined based on an [sic] reduced-resolution image at least because doing so would have saved processing resources without substantially reducing the accuracy of determination. (*Id.* at 27 (citing Ex. 1003 ¶ 122).)

We determine that Petitioner's showing as to motivation to combine the relevant teachings of Lu-577 and Tian is well-supported, reasonable, and persuasive.

As noted above, Patent Owner disputes Petitioner's showing as to the motivation to combine the relevant teachings of Lu-577 and Tian. *See* Prelim. Resp. 10–45. Patent Owner provides this summary of its arguments relating to motivation to combine:

> Each of Petitioner's motivations to combine the references is based either on a flawed alleged improvement or nonexistent problems with the base reference based on Petitioner's declarant misreading the background references. Petitioner's own reference teaches away from Petitioner's proposed modifications. Petitioner's proposed combination would not actually result in any of Petitioner's proposed benefits, and the problems purported to be solved do not actually exist. Rather, Petitioner takes a functional system and uses impermissible hindsight to add in redundant processing steps to the detriment, rather than the benefit, of the system.

We have considered all the arguments and evidence presented by the parties on the issue of whether a skilled artisan would have been motivated to combine the relevant teachings of Lu-577 and Tian. We determine that Petitioner has articulated compelling reasoning which supports its position on motivation to combine Lu-577 and Tian as proposed by Petitioner with regard to challenged claims 4, 11, and 18. We find Patent Owner's arguments to be less convincing and unavailing.

*4. Summary as to Claims 4, 11, and 18*

We have considered all the arguments and evidence presented by the parties with regard to claims 4, 11, and 18. Petitioner has shown that the cited combination of Lu-577 and Tian teaches all the limitations of claims 4, 11, and 18, and has articulated well-supported reasoning as to why a skilled artisan would have been motivated to combine these teachings as set forth in claims 4, 11, and 18. In contrast, Patent Owner's arguments to the contrary are not supported or convincing. We determine that, based on the present record, Petitioner's showing is compelling as Petitioner is highly likely to prevail in establishing the obviousness of claims 4, 11, and 18 in view of Lu-577 and Tian.[26]

*5. Analysis of Claims 5, 6, 8, 12–14, 19, and 20*

Petitioner challenges claims 5, 6, 8, 12–14, 19, and 20 based upon a combination of the teaching of Lu-577 and Tian. Pet. 3, 27–31, 37–38, 42–

[26] Accordingly, we institute *inter partes* review as to all the challenged claims (except for the disclaimed claims (*see* 37 C.F.R. § 42.107(e))) and all the challenges raised in the Petition (to the extent not mooted by the disclaimer). 37 C.F.R. § 42.108(a) ("When instituting *inter partes* review, the Board will authorize the review to proceed on all of the challenged claims and on all grounds of unpatentability asserted for each claim.").

43. Petitioner provides an element-by-element analysis showing that the additional limitations recited in these dependent claims are taught by the cited art. *See id.* At this juncture, Patent Owner does not provide any arguments relating specifically to the challenges to these claims. *See generally* Prelim. Resp. For the reasons discussed above in relation to claims 4, 11, and 18, we determine that, based on the present record, Petitioner's showing is compelling as Petitioner is highly likely to prevail in establishing the obviousness of claims 5, 6, 8, 12–14, 19 and 20 in view of Lu-577 and Tian.

### *E. Asserted Obviousness of Claims 4–6, 8, 11–14, and 18–20 Based on Nielsen-372, Steinberg, and Tian*

Petitioner also challenges claims 4–6, 8, 11–14, and 18–20 as being obvious over Nielsen-372, Steinberg, and Tian. *See* Pet. 3, 71–88. We start with a description of the disclosures of Nielsen-372 and Steinberg and then consider the arguments and evidence presented by the parties relating to the challenge to claims 4–6, 8, 11–14, and 18–20 based on this combination of references.

#### *1. Nielsen-372 (Ex. 1006)*

Nielsen-372 "relates generally to audience measurement." Ex. 1006 ¶ 2. Figure 1 of Nielsen-372 is reproduced below.

*4. Summary as to Claims 4–6, 8, 11–14, and 18–20*

We have considered all the arguments and evidence presented by the parties with regard to claims 4–6, 8, 11–14, and 18–20. Petitioner has shown that the combination of Nielsen-372, Steinberg, and Tian teaches all the limitations of claims 4–6, 8, 11–14, and 18–20, and has articulated well-supported reasoning as to why a skilled artisan would have been motivated to combine these teachings as set forth in claims 4–6, 8, 11–14, and 18–20. In contrast, Patent Owner's arguments to the contrary are relatively weak. We determine that, based on the present record, Petitioner's showing is compelling as Petitioner is highly likely to prevail in establishing the obviousness of claims 4–6, 8, 11–14, and 18–20 in view of Nielsen-372, Steinberg, and Tian.

III. DISCRETIONARY INSTITUTION, 35 U.S.C. § 314(a)

Institution of an *inter partes* review is discretionary. *See* 35 U.S.C. § 314(a) (authorizing institution of an inter partes review under particular circumstances, but not requiring institution under any circumstances); *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 273 (2016) ("[T]he agency's decision to deny a petition is a matter committed to the Patent Office's discretion."); *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018) ("[Section] 314(a) invests the Director with discretion on the question whether to institute review . . . ." (emphasis omitted)); *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1367 (Fed. Cir. 2016) ("[T]he PTO is permitted, but never compelled, to institute an IPR proceeding.").

Patent Owner urges the Board to exercise discretion to deny institution of *inter partes* review under § 314(a) based on the factors established in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, 2020 WL 2126495,

The one-frame process in *Tian* does not use the face location from the first frame for facial recognition in the second frame.

Third, the motivations to combine are utterly lacking and contrary to the strict requirements of Federal Circuit law. *See, e.g., Virtek Vision International ULC v. Assembly Guidance Systems, Inc. d/b/a Aligned Vision*, Nos. 2022-1998, -2022 (Fed. Cir. Mar. 27, 2024) ("It does not suffice to meet the motivation to combine requirement to recognize that two alternative arrangements … were both known in the art.")

Petitioner fails to show the unpatentability of any of the challenged claims, and the Board should find all challenged claims not unpatentable.

## II. GROUND 1: THE COMBINATION OF LU-577 AND TIAN DOES NOT RENDER CLAIMS 4-6, 8, 11-14, AND 18-20 OBVIOUS

### A. Petitioner's Proposed Combination Fails to Teach the Claim Limitations

Tian's system does not teach affirmatively reducing a resolution, as required by the challenged claims, but instead relies on images from a database that have been pre-processed (at some previous time by some unspecified party) to reduce their resolution. *Tian* also fails to teach performing face recognition on a *different* image from that in which the face was detected and its orientation determined, as required by Challenged Claims 5-6, 8, 12-14.

### *1. Tian Does Not Teach the Claimed "Reduc[ing] a Resolution"*

Challenged Claims 4, 11, and 18 recite similar limitations for processing circuitry, a device, or a method step to "*reduce a resolution of a first image*,"[1]:

> **4**. The audience measurement system of claim **1**, wherein the processor circuitry is to:
> reduce a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image, and
> determine the orientation of the head with respect to the camera based on the reduced-resolution image.
>
> **11**. The audience measurement system of claim **9**, wherein the audience measurement device is to:
> reduce a resolution of the first image of the media exposure environment to obtain a reduced-resolution image, and
> determine the orientation of the head with respect to the camera based on the reduced-resolution image.
>
> **18**. The method of claim **16**, further comprising:
> reducing a resolution of the first image of the media exposure environment to obtain a reduced-resolution image, and
> wherein the determining of the orientation of the head includes determining the orientation of the head with respect to the camera using the reduced-resolution image.

*'243 Patent*, 15:56-58, 16:49-51, 17:41-43. *Tian* does not teach actually reducing the resolution of the images, much less circuitry, instructions, or a device to do so. Instead, *Tian* discloses a pre-existing "public database" of images that "are down-

[1] Claim language is underlined and *italicized* for ease of reference.

sampled" versions of the original images. *Dec.* 46, 48. *Tian* fails to disclose the audience measurement system of claims 4 or 11 or the method of claim 18, which teach a specific process of reducing the resolution of images as part of the overall system or method. The specification describes how the image sensor of the device reducing the resolution enhances the contrast and allows a low-light frame to trigger illumination for a succeeding frame—thus enabling the advantage of the invention. '243 Patent, 11:5-36. In other words, the specification never describes the use of pre-processed images. Instead, the specification *only* describes using circuitry *in the audience measurement system* to reduce the resolution of images as part of a specific system or method. *See id. at* FIG. 3.

#### a) The Institution Decision ("ID") misapprehends the requirements of the claims

Claim 4 includes an affirmative limitation of *processor circuitry to execute* … *machine-readable instructions to* … *reduce a resolution of a first image*. *See* limitations [1a] and [4a]. Claim 11 affirmatively recites that the *audience measurement device is to* … *reduce a resolution of the first image*[.] *See* limitations [11p] and [11a]. Claim 18 recites a method that includes an affirmative step of *reducing a resolution of the first image* in the method. *See* limitation [18a].[2] Despite

[2] For ease of references, these limitations are collectively referred to as "the resolution reduction limitations."

this, the Institution Decision determines that "Tian plainly teaches obtaining reduced-resolution images[.]" *Institution Decision*, 22. This conclusion ignores the specific requirements of the claims as a whole.

Patent Owner submits that the claims do not recite a method step of "obtain[ing] a reduced-resolution image[.]" Rather, the claims recite instructions, a device, and an affirmative step to "reduce a resolution" of a first image—i.e., to actually perform the processing needed to reduce the resolution of an image. "[O]btain[ing] a reduced-resolution image" is not "reduc[ing] a resolution," because it does not perform the claimed processing. *Tian's* experimental setup describes no such instructions, device, or step. Indeed, as shown below, *Tian* shows in FIG. 1 the "basic structure" (*i.e.*, the steps) of the algorithms tested, and no "reduce the resolution" step is included:




Figure 1: Basic Structure of Facial Expression Analysis Systems.

*Tian,* FIG. 1.

The Institution Decision also states that *Tian* "teaches down-sampling as shown in the Petition." *ID*, 22. But *Tian* teaches *obtaining* images that "are down-sampled" by some undetermined process; down-sampling is not a part of the "Basic Structure" of *Tian's* "Facial Expression Analysis Systems." *Tian, FIG.1 (supra). Tian* does not perform such down-sampling or disclose any computer-readable instructions, device, or method step for performing the down-sampling. *Tian, generally.*

Petitioner's mapping mischaracterizes the teachings of *Tian. Petition, 26* ("Tian *creates* lower-resolution images by down-sampling from original images.") (*emphasis* added). Petitioner's characterization of Tian's language is wrong, as *Tian* does not *create* the down-sampled images; it just accesses existing down-sampled images. *Dec* 48 (Dr. Saber opining that a POSITA would not understand that *Tian* teaches a facial expression analysis system that creates lower-resolution images or performs any resolution reduction step.).

The distinction between "obtaining reduced-resolution images" and the resolution-reduction limitations of the claims is important. These limitations are part of the claims and must be afforded patentable weight. *See, e.g., Chewy,* 94 F.4th at 1351-62 (Fed. Cir. Mar. 5, 2024) (affirming summary judgement of non-

The caption for Table 1 begins by characterizing the images as "[a]n example in **five different resolutions from Cohn-Kanade database**." *Tian,* 000002. *Tian* goes on to state, "five different resolutions of the head region are studied … **based on** Cohn-Kanade AU-Coded Face Expression Image Database[.]" *Id.* Neither Petitioner nor their declarant makes any attempt to reconcile *Tian's* statement that the "five different resolutions" are "from [the] Cohn-Kanade database" with the actual requirements of the resolution-reduction limitations. *Petition*, 26; Ex. 1003, ¶ 119. *Tian* is not performing the down-sampling. *Dec.,* ¶¶ 47-49. If *Tian* were actively reducing the resolution in the *Tian* process (as required by claims 4, 11, and 18), then there would be no reason for *Tian* to describe its process as using the five different resolutions "based on" the Cohn-Kanade database. *Dec.* ¶ 49. As described above, the claims require "reducing a resolution[,]" not simply obtaining reduced-resolution images.

Analyzing the facial expressions at whatever resolution was available from the Cohn-Kanade database would also be consistent with *Tian*'s actual purpose, which is to investigate expression analysis in "real environments[.]" *Tian*, Abstract; *Dec.*, ¶ 50. *Tian* does not teach reducing the resolution of images as a part of performing facial analysis; rather, *Tian* investigates pre-processed low-resolution images. *Tian*, 000002 ("Most systems attempt to recognize facial expressions from data collected in a highly controlled laboratory situation with very high resolution

faces. **However, in real applications, the face region is often in lower resolutions**.") (internal parentheticals omitted). In other words, a POSITA would read *Tian* as teaching that expressions are analyzed in images at whatever resolutions are available from the database. *Dec,* ¶ 50. There would be no reason to actively reduce the resolution of an image further for the purpose of performing expression analysis. *Dec.*, ¶¶ 50-51.

As noted above, *Tian* provides a high-level outline of the structure (*i.e.,* the steps) of the Facial Expression Analysis Systems being evaluated. *Tian,* FIG. 1. Notably, this structure fails to include any step of "reduce a resolution[.]" *See also Supp Dec,* 8-10 (Dr. Saber opining that a step of reducing the resolution would not fall into any of the depicted steps or sub-steps, and a POSITA would not be motivated to include a resolution-reduction process within any of these steps). *Tian* views low-resolution images as a natural occurrence, undesirable but unavoidable. *Supp. Dec.,* 11. In light of the plain view of the claims, *Tian* does not disclose the resolution-reduction limitations.

Finally, as noted above, claims 4 and 11 require "circuitry [] to [] reduce a resolution" and an "audience measurement device [] to [] reduce a resolution[.]" Petitioner's declarant admits that *Tian* includes no circuitry. *Ex. 2018, Doermann Declaration,* 27:14-21 ("'Circuitry' does not appear in Tian."). Similarly, Petitioner's declarant admits that *Tian* includes no disclosure of computer-readable

instructions, and any such instructions must be inferred. *Id.,* 30:19-21 ("[T]he algorithms here [in Tian] are an abstraction of the implementation that **surely would have been done** in order to get the results."). As such, regardless of how *Tian's* images are reduced, it is undisputed that *Tian* includes no disclosure of the claimed hardware that performs the resolution reduction process.

### c) Applying *Tian's* teachings would not result in a useable "audience measurement system" as claimed

The resolution-reduction limitations represent a pertinent step in the claimed system and method and are important because the claimed step of reducing a resolution occurs in the context of an audience measurement system, which imposes unique operating constraints for image processing. For example, the specification explains that reducing the resolution achieves the advantage of improved contrast in low-light images, common in a media exposure environment. *'243 Patent*, 10:58-63 (unilluminated images are too dark and low-contrast for analysis); 11:24-29 (reducing the resolution can increase the amount of light per pixel, thereby enabling analysis of low-light images). The resolution-reduction process can be performed quickly enough to be processed for use in the next frame (the "two-frame process") so as to minimize the use of the illumination source, which is distracting to the audience. *Id.* at FIG. 3; 11:5-36; 9:18-31; 10:1-13; 4:40-51.

*Tian* does not teach this process, and Tian's teachings of pre-processed reduced-resolution images would not result in a usable audience measurement

system and method. *Supp. Dec,* 12-14. First, *Tian* relies on pre-processing for resolution reduction. *Tian*, 000002 (characterizing Table 1 as "[a]n example in five different resolutions from Cohn-Kanade database.") Using a pre-processed image to determine head orientation does not make sense because the head orientation is used to determine whether to activate the illumination source. *'243 Patent*, 13:41-51; *see also unchallenged claims* 24-25. By relying on images captured and pre-processed before the analysis begins, a system relying on *Tian's* teachings would not be able to activate the illumination source in order to perform analysis of succeeding frames,[3] because the succeeding frames would have been captured before the analysis of the first frame could trigger illumination. Because no frames would be illuminated, the system would never be able to perform facial analysis of the unilluminated images. *'243 Patent*, 10:44-54 (images suitable for facial recognition are those that are high-resolution and well-lit). Such a system or method would thus also be unable to identify audience members and would be of no use as an audience measurement system or method. *Supp. Dec.,* 15.

Second, relying on *Tian's* teachings would fail to result in a useable audience measurement system or method for another reason as well: images captured in a media-exposure environment are typically low-contrast, and down-sampling does

[3] As recited, for example, in claims 5, 6, 12, 14, and 19.

not increase the contrast of images. *'243 Patent,* 3:44-50; *Supp. Dec.*, 16-17; *see also Ex. 2018, Doermann Deposition Transcript* 63:21-64:6 (Dr. Doermann agreeing that *Tian* would assume that it would be beneficial to compare images that are identical but for resolution). Because the reduced-resolution images in the Cohn-Kanade database are produced by down-sampling, applying *Tian's* teachings (rather than a suitable technique) would result in low-resolution, low-contrast images not suitable for analysis. *'243 Patent*, 10:58-67 (when the illuminator is not lit, even high-resolution image data is likely to be dark and low-contrast and thus not suitable for analysis); *see also Supp. Dec.* 18. The other techniques identified by Petitioner, subsampling and interpolation, also fail to increase the contrast of images and thus share the same fatal flaw. *Petition, 2*; *Supp Dec.*, 19. Because the resulting low-contrast images would not be suitable for analysis, such a system would be unable to identify frames suitable for facial recognition. Again, such a system or method would be unable to identify audience members and would not be functional as an audience measurement system or method.

Third, Tian's teachings of down-sampling would not result in a useable audience measurement system or method because down-sampling alone does not produce an image ready for analysis. Dr. Saber discusses how down-sampling without an appropriate antialiasing step can lead to aliasing, which in turn could interfere with head detection and render the system inoperable. *Supp. Dec.,* 20.

Adding the necessary antialiasing step, however, also adds processing requirements that may extend processing time unacceptably. *See also* § (B.1.a)(1) *infra* (discussing the processing requirements of antialiasing). For example, if a complex antialiasing algorithm is used, the scene in the media exposure environment may have changed before the time the head detection step can trigger facial recognition, frustrating the claimed two-frame process because the head has moved in the interim. *Supp. Dec.*, 21-24. Unlike the '243 Patent, Neither *Tian* nor Petitioner begins to address the complexities a POSITA would face when actually implementing down-sampling in an audience measurement system.

Because (1) *Tian* does not teach the resolution-reduction limitations, and (2) the only technique mentioned by *Tian* for producing reduced-resolution images would not result in a usable audience measurement system, the Board should find these claims not unpatentable.

#### 2. *Petitioner's References, Alone or in Combination, Do Not Teach the Claimed Two-Frame Process*

Claims 5, 6, 12, and 19 require a two-frame process for facial recognition. Broadly:

1. The location of a head is identified in a first frame; and
2. The identified head location from the first frame is used to perform facial recognition in a second frame.

This is different from the prior art, including Tian, which identifies the face location and performs facial analysis in the same frame. For every subsequent frame, Tian updates the face location and does not use the face location from the first frame. Simply put, Tian uses a single-frame process for facial analysis. *Supp. Dec.*, 26.

The key claim limitations reciting this two-frame process are reproduced below:

> **4**. The audience measurement system of claim **1**, wherein the processor circuitry is to:
> reduce a resolution of a first image of the one or more of the images of the media exposure environment to obtain a reduced-resolution image, and
> determine the orientation of the head with respect to the camera based on the reduced-resolution image.
> **5**. The audience measurement system of claim **4**, wherein the processor circuitry is to determine the audience identification information by: (i) generating a facial signature from a region of a second image of the one or more of the images corresponding to a location of the head in the reduced-resolution image, and (ii) comparing the generated facial signature to a database of facial signatures.
>
> **6**. The audience measurement system of claim **4**, wherein the processor circuitry is to:
> identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained;
> analyze a portion corresponding to the identified region of a second image; and
> based on the analysis of the region of the second image, determine that the head matches the known person.

> **12**. The audience measurement system of claim **11**, wherein the audience measurement device is to:
> identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained; and
> analyze a portion of a second image corresponding to the identified region to determine whether the head matches the known person.
>
> **19**. The method of claim **18**, further comprising:
> identifying a region corresponding to the head within the first image from which the reduced-resolution image was obtained;
> analyzing a portion of the second image corresponding to the identified region; and
> based on the analyzing of the region of the second image, determining whether the head matches the known person.

Petitioner maps *Tian's* teachings of "determining a face/head location in a first image and using this location for subsequent images unless a change is detected" to the claimed two-frame process. *Petition,* 28, 30, 37, 42, 77, 83, 87. Yet, these portions of Tian highlight that Tian is a single-frame, not two-frame, process.

*Tian* updates ("tracks") the location of the head/face for each frame to perform face analysis for that frame. *Tian*, 000001 ("a face detector to detect a face in each frame or just detect face in the first frame and then track the face in the remainder of the video sequence."); *Supp. Dec.*, 27. Regardless of whether *Tian* detects the head/face location in each frame or tracks the movement of the head/face in the current frame based on prior frames, *Tian* is locating and conducting facial analysis of a single frame (the "single-frame process"). *Supp. Dec.*, 27. This is in contrast to the claimed invention that determines a head/face location in the first frame and then

Doermann admitted that *Tian* updates the facial feature locations for each frame in the remainder of the video sequence after the initial head location is determined. *Ex. 2018*, Doermann Deposition Transcript, 36:20-37:1, 39:18-21 (Dr. Doermann agreeing that Tian updates the facial feature locations for each successive frame based on the previous frame). l. Thus, Petitioner's declarant admits that the face locations are updated for every frame. As such, a combination relying on *Tian's* teachings would not teach the claimed method of using the location of the head/face in a first frame to perform facial analysis of later frames.

Because *Tian* does not teach the claimed two-frame process, Petitioner has failed to meet its burden. As such, the Board should find claims 5, 6, 12, and 19 not unpatentable for at least this reason as well.

### B. The Petition Fails to Establish a Sufficient Motivation to Combine the References

The Petition relies on *Tian*, an academic reference exploring the effects of low resolution, to provide teachings of reducing a resolution and thereby modify Lu-577/Lu-000/Lert, an existing audience measurement system. This is needed because no contemporary image processing system would have taught or suggested intentionally reducing the resolution. Petitioner argues that disclosures of the '243 Patent relate to "selectively activating an illumination source and processing images taken without illumination to enhance the lighting while reducing the resolution and analyzing them for certain purposes." *Petition*, 3. The "certain purposes" Petitioner

glosses over include increasing the contrast to enable image analysis in unilluminated media exposure environments. '243 Patent, 10:58-11:4. Intentionally reducing the resolution of images prior to facial analysis is novel. This is why the *Tian* mapping fails. Tian suggests that conventional approaches rely on performing "facial analysis" on "very high resolution faces[.]" *Tian's* investigation shows the highest accuracy for both face detection and head-pose estimation with full-resolution images. *Tian, 000002*; Table 3; *Supp Dec.* 32-33.

Indeed, Petitioner's declarant agreed that a system that could perform image analysis on images upscaled to higher resolution with perfect accuracy and without incurring any time or computational resources would "improve [his] results" and "in general, [he] would try it. Of course." Ex. 2018, *Doermann Deposition Transcript*, 71:1-9. Though Dr. Doermann couched such a system as "fiction" and "magic" (*id.* at 69:15-21, 70:8-10), such an approach is simple in the context of Petitioner's proposed combination: simply do not intentionally reduce the resolution of images prior to performing image analysis. As such, a POSITA would understand that the best results would be obtained with the highest resolution images and would not seek to intentionally seek to reduce resolution.

Because intentionally reducing the resolution of images prior to facial analysis runs counter to conventional wisdom and *Tian's* results, Petitioner can find no non-hindsight motivation to modify the system of *Lu-577/Lu-000/Lert* to do so. This

highlights the impermissible hindsight of Petitioner's combination. Petitioner takes a functional system and adds in processing steps that are detrimental and unnecessary, which is improper under the law. *Cook Group Incorporated v. Boston Scientific Scimed, Inc.,* IPR2017-00440, Paper 7, 25-26 (using hindsight to employ a "redundant and unnecessary" modification does not provide a "sufficient rationale" for obviousness).

#### *1. The Combination Does Not Achieve Petitioner's Proposed Benefit, and Any Benefit Would Be Outweighed by Drawbacks Petitioner Fails to Address*

For the combination of *Lu-577/Lu-000/Lert* with *Tian*, Petitioner alleges numerous benefits:

- Performing head detection and head orientation determination on reduced-resolution images requires fewer processing resources (claims 4, 11, and 18). *Petition*, 10.
- Determining whether an image is suitable for face recognition would improve the "performance" of face recognition (claims 4, 11, and 18). *Id.*
- Head tracking within a video sequence would save further processing resources by reducing the number of times face detection needs to be applied (claims 5, 6, 12, 14, and 19). *Id.* at 9.

As set forth below, each of these modifications involves complications and drawbacks that Petitioner fails to weigh properly against the purported benefits, and none of the alleged benefits themselves stand up to scrutiny.

**a) Petitioner's Proposed Modification to Process Reduced-Resolution Images Would Not Reduce the Net Processing Resources Required**

Petitioner proposes performing head orientation determination on a reduced-resolution image in order to allegedly "reduce the time and resource consumption of tasks such as face detection and pose estimation, without substantially reducing the accuracy of these tasks." *Petition*, 10 (citing Ex. 1003, ¶¶69-70). However, Petitioner's modification *would not* save time and processing resources and *would* reduce the accuracy of face detection and pose estimation. Petitioner's failure to consider the drawbacks of the proposed modification is fatal to their proposed combination.

(1) <u>Petitioners Fail to Consider the Additional Processing Resources Required to Reduce the Resolution</u>

When combining prior art references, "[e]vidence suggesting reasons to combine cannot be viewed in a vacuum apart from evidence suggesting reasons not to combine." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1363 (Fed. Cir. 2017). It is Petitioner's burden to provide "adequate evidentiary support for how a person of ordinary skill would weigh any advantages or disadvantages" for the proposed combination. *Oticon Medical AB et al. v. Cochlear*

*Limited*, IPR2019-00975, Paper 52, 36-41 (PTAB Oct. 14, 2020) (holding Petitioner's failure to weigh the disadvantages of a proposed modification against the benefits showed that the modification was based on impermissible hindsight); *see also id.* at 38) ("[T]he burden of proof, which rests with Petitioner, [is] to prove that the disadvantages of [a modification] would not be significant.").

Here, Petitioner claims a reduction in processing resources required to analyze reduced-resolution images but fails to weigh (or even consider) the *additional* processing resources that would be required to produce the reduced-resolution images in the first place. Neither Petitioner nor Petitioner's declarant addresses whether the increase in resources needed to reduce the resolution of the images would outweigh any decrease in resources needed to process the lower-resolution images. *See Petition* at 10-11 (claiming the benefit of "reduce[d] the time and resource consumption" for reducing image resolution but failing to address any time and resource consumption associated with the resolution reduction process). Because Petitioner has not met their burden (or, indeed, made any effort) to show that the benefits of their proposed modification outweigh the associated disadvantages, Petitioner has not provided persuasive evidence to show predictable results. *Oticon Medical* at 39 (Petitioner's failure to provide evidence that disadvantages would not be significant was a failure to show predictable results). As such, Petitioner's obviousness theories are fatally flawed.

Here, though Petitioner has not addressed these disadvantages—much less met their burden of showing that they are not significant—the proposed modification includes disadvantages more than sufficient to outweigh any potential reduction in processing power. For example, down-sampling, as proposed by Petitioner, is known to introduce image artifacts unless filtering techniques such as antialiasing are also performed. *Supp. Dec.* 20-21 (citing Ex. 2028). These imaging artifacts can interfere with image analysis such as head orientation determination. *Id.* As Dr. Saber opines, reducing the resolution of an image without introducing artifacts that can interfere with subsequent processing is a multi-step process that involves processing each pixel of the image multiple times. *Supp. Dec.,* 37-39, 41-43. The additional processing resources required can outweigh any reduction in processing resources from performing head detection and head orientation determination on the reduced-resolution image. *Id. at* 39.

Petitioner also overstates the processing required for face detection and head orientation determination. In describing the processing resources required to perform face detection, Petitioner's declarant states that "[s]ome approaches of face detection may require analyzing all pixels of an image to search for a face." Ex. 1003, ¶ 69. However, this analysis ignores the fact that resolution reduction itself, even excluding the extra processing needed to avoid artifacts, may also "require analyzing all pixels of an image." *Supp Dec.*, 40, 44. Indeed, a prior patent for which Dr.

Doermann is named as an inventor characterizes the same resolution reduction method proposed by Dr. Doermann as "slow" because it requires multiple floating-point calculations for each pixel. *Ex. 2016,* U.S. Patent Application Publication No. 2007/0257934A1 to Doermann, et al., [0061]; [0065]; *see also Ex. 2018, Doermann Deposition Transcript,* 40:23-41:10 (Dr. Doermann admitting that forms of interpolation used in image scaling typically require calculations for each pixel).

Furthermore, the resolution reduction process commonly includes an anti-aliasing filter, such as a low-pass filter, to avoid aliasing artifacts. *Supp. Dec.*, 41. In fact, Dr. Doermann's own publication history supports the proposition that "[i]n digital video, a low pass filter is often applied to filter a high-resolution image before subsampling in order to eliminate aliasing." Ex. 2015, *Text Extraction, Enhancement and OCR in Digital Video*, 7; *see also Ex. 2018,* Doermann Deposition Transcript, 59:14-60:4 (Dr. Doermann that Ex. 2015 represents his contemporaneous opinion "in general"). Typical anti-aliasing algorithms rely on convolution, which requires processing each pixel of the original multiple times. *Supp. Dec.,* 41-43 (citing the computational complexity of convolution algorithms). This results in the Petitioner's proposed combination requiring *more* processing resources for typical audience measurement scenarios than simply performing all steps on the full-resolution images. *Id.* Accordingly, a POSITA would not be motivated to modify the system

of Lu-577/Lu-000/Lert to perform facial analysis on reduced-resolution images in order to save processing resources.

(2) Petitioner's Modifications Are Redundant

Elsewhere, Petitioner proposes further modifying *Lu-577* to incorporate *Tian's* teachings of "determining a face/head location in a first image and using this location for subsequent images[.]" *Petition,* 9. However, Tian's face/head tracking process updates the location of facial features in each frame based on the previous frame, so the head location and the head orientation are known. *Ex. 1005, Tian*, 000001; *see also Ex. 2018*, *Doermann Deposition Transcript*, 39:15-21 (Dr. Doermann agreeing that Tian updated the facial feature locations for each successive frame). Given that the head location and the head orientation are known from face tracking, reducing the resolution has computational costs (from reducing the resolution) without any benefit (because head detection and head orientation determination would be unnecessary), thus negating any benefit from reducing the resolution. *Cf.* Ex. 1003, ¶ 69 ("face detection may require analyzing all pixels of an image to search for a face") *with id.* at ¶ 64 (face tracking avoids the need to run a face detector across the entire image). Thus, by rendering the purported advantages of Petitioner's resolution-reduction modification redundant, this head-tracking modification further shifts the net effects of Petitioner's proposed combination towards the "disadvantages" side of the scale. While a POSITA is not required to

choose the best option from all of those available in order to render a claim obvious, no motivation to modify a reference exists when the motivation *not* to combine outweighs any motivation to combine. *Cf. Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. Dec. 7, 2017) ("It's not necessary to show that a combination is the best option, only that it be a suitable option.") (internal quotes omitted) *with Arctic Cat* 876 F.3d at 1363 ("Evidence suggesting reasons to combine cannot be viewed in a vacuum apart from evidence suggesting reasons not to combine."). Here, the advantages, slight to begin with, are made redundant by the other modifications in Petitioner's proposed combination, while the disadvantages are significant. *Supp Dec.*, 45-48.

(3) Petitioner's Analysis of Accuracy is Factually Flawed

The only potential drawback of Petitioner's proposed modification addressed by the Petition is the effect on face detection and pose estimation accuracy of performing these tasks on reduced-resolution images. *Petition*, 10. Petitioner contends that reducing the resolution prior to performing the step of head detection and head orientation determination can be done "without substantially reducing the accuracy of these tasks." *Id.* In support of this claim, Petitioner cites to *Tian's* experimental findings and, in passing, Exs. 1013-1015. *Id.* However, none of this material would lead a POSITA to the conclusions that Petitioner wishes to draw. *Supp. Dec.,* 49-59.

First, none of Exs. 1013-1015 relate to reducing the resolution of an image, and none support the proposition that face detection and head orientation determination can be performed on a reduced-resolution image without loss of accuracy:

- Ex. 1013 describes the processing requirements of a particular view-based face detection algorithm that the reference characterizes as "not the appropriate choice for real-time applications[,]" such as that described by the '243 Patent. *Ex. 1003*, 000001; *see also Supp Dec.*, 50.
- Ex. 1014, as cited by Petitioner, characterizes the processing requirements of an "integral image[,]" a heavily processed image where "[e]ach element of the integral image is calculated as the sum of intensities of all points above and to the left of the point in the image." As such, Ex. 1014 is also irrelevant to the processing requirements of the unprocessed images of the '243 Patent. *Ex 1014*, 2:43-53; 1:27-29; *see also Supp Dec.* 51.
- Ex. 1015 describes reducing the resolution of the *saturation* of an image (*i.e.,* making the colors more uniform so as to be more easily able to pick out the uniform colors of a face) without changing the image resolution itself. Ex. 1015, ¶ [0022] ("By **reducing the resolution of the saturation** of the image, computational requirements are

substantially reduced and a relatively simple method may be used.") (**emphasis** added); *see also Supp. Dec.* 52 (Dr. Saber opining that Ex. 1015 describes reducing the saturation resolution of individual pixels).

In short, Petitioner's only evidence allegedly supporting the claim that performing facial analysis on reduced-resolution images can be done "without substantially reducing the accuracy of these tasks" is *Tian*.

However, Petitioner also fails to consider the applicability of *Tian's* findings in the context of the claimed audience measurement system. As discussed below, *Tian's* field of endeavor is not audience measurement. § IV, *infra.* This is important because *Tian* begins with full-face images, where the face region takes up a significant portion of the original image. *Supp. Dec.*, 53-54 (Dr. Saber computing that, based on the full resolution for the original image and the full resolution of the face region, the face makes up approximately 36% of the pixels of original image).

By contrast, the camera in an audience measurement system captures an image of the entire media exposure environment. *See, e.g.,* '243 Patent, claim 9 (reciting a system operable to "collect a first image of the media exposure environment with a camera"); *see also id.* at FIG. 1 (depicting the field of view for a typical media exposure environment). As Dr. Saber points out, an image captured of such a media exposure environment will begin with the face of an audience member taking up significantly less of the image. *Dec.* 55-59 (Dr. Saber calculating the size of the head

audience member not actively looking at the television is not exposed to their advertisement. *Id.* However, in practice, a POSITA would appreciate that it would be desirable to include in audience measurements all people in the room who can be recognized, even if they look away from the television. *Id.*

#### c) Petitioner's Proposed Modification to Rely on Head Tracking Would Not Reduce the Net Reduction of Processing Resources Required and Would Decrease the Performance of Face Recognition

Petitioner motivates modifying *Lu-577/Lu-000/Lert* to include head tracking within a video sequence by stating that doing so would save further processing resources by reducing the number of times face detection needs to be applied. *Petition*, 9.; *see also* Ex. 1003*,* ¶ 63-64. However, much like their other proposed motivations, Petitioner fails to consider the drawbacks of the additional processing resources required for their proposed modification is fatal to their proposed combination.

Petitioner's proposed combination fails because Petitioner completely fails to consider the drawbacks of the modification and weigh them against the claimed benefit. And these drawbacks are significant:

- First, Petitioner claims the benefit of reduced processing resources resulting from performing head detection fewer times because the head is tracked between video frames, without accounting for the **increase** in processing costs associated with performing the head tracking.

- Second, Petitioner fails to account for the need to perform head detection regardless, in order to identify new audience members entering the frame.
- Third, Petitioner entirely fails to weigh the reduction in facial recognition performance associated with using the head location from the first image to perform face recognition in the second image.

Because Petitioner has not met their burden to show that the benefits of their proposed modification outweigh the associated disadvantages, Petitioner has not provided persuasive evidence to show predictable results. *Oticon Medical* at 39.

First, Petitioner does not even attempt a cursory accounting for the **increase** in processing resources needed to perform the head tracking against a potential decrease resulting from performing head detection fewer times. In fact, as described below, the sole reference cited by Petitioner's declarant in support of this modification immediately goes on to emphasize the need to continue to perform face detection even after a face is detected. Ex. 1010*,* ¶ [0003]; *see also Ex. 2018, Doermann Deposition Transcript*, 75:19-24 (Dr. Doermann agreeing that, based on Ex. 1010, it would still be necessary and desirable to perform face detection over the other portions of the image). Nonetheless, assuming *arguendo* that head detection could be replaced by head or face tracking, thereby saving the resources associated with head detection, a POSITA would appreciate that performing face tracking itself

requires processing resources. *Supp. Dec.*, 70-71; *see also Ex. 2018, Doermann Deposition Transcript,* 35:5-11 (Dr. Doermann agreeing that head tracking in a frame would require processing the frame based on a previous frame in order to update the location of the head in the current frame); 39:15-21 (Dr. Doermann agreeing that Tian's face tracking process updates the facial locations for each successive frame based on the previous frame). Petitioner has provided no evidence of how large or small the processing resources required by face tracking would be or whether they would be greater or larger than the processing resources required by performing head detection. As such, Petitioner has failed to meet "the burden of proof, which rests with Petitioner, *i.e.*, to prove that the disadvantages [of the proposed modification] would not be significant." *Oticon Medical*, 38.

Second, Petitioner ignores the teaching from their own background reference that teaches that it is both desirable and necessary to perform head detection across each image even when head tracking is used:

> Once a face is detected, its location is recorded and a localized region around that face is scanned by a face detector in the next frame. Thus, once a face is initially detected, it can be accurately tracked from frame to frame without a need to run a face detector across the entire image. The "located" face is said to be "locked" by the face tracker. **Note that it is still desirable to scan the entire image or at least selected portions of the image with a face detector as a background task in order to locate new faces entering the field of view of the camera.**

Ex. 1010, ¶ [0003] (**emphasis** added). In other words, a POSITA would understand that in Petitioner's proposed combination, **no savings in processing resources could be realized** because performing head detection in each new frame would still be necessary. *Supp. Dec.*, 72. Once again, Petitioner's claimed benefits fail to stand up to scrutiny. Though Petitioner has failed to meet its burden of showing evidence of how a POSITA would have weighed the benefits of this modification against the drawbacks, the lack of benefit (owing to the need to perform head detection regardless) would suggest that a POSITA would find that drawbacks (in terms of increasing the processing costs of performing head tracking) outweighed any benefit, and the POSITA would not be motivated to modify *Lu-577-Lu-000/Lert* as Petitioners propose. Id.

Third, a POSITA would understand that performing facial recognition in a region of an image where the head **was** is necessarily going to be less accurate than performing facial recognition in a region of an image where the head **is now.** *Supp. Dec.*, 73-74. As Dr. Saber opines, facial analysis accuracy is improved by starting with an up-to-date identification of the head region and is decreased by an out-of-date identification of the head region. *Supp. Dec.,* 73 (citing *Tian's* need for "well-aligned" heads for facial analysis). Once again, Petitioner fails to weigh this drawback (decreased accuracy) against the claimed benefit (decreased processing resources from fewer head detections). Indeed, in proposing other modifications,

Petitioner makes precisely the opposite tradeoff. *Petition*, 9-10 (performing head detection and head orientation determination on reduced-resolution images but performing face recognition on full-quality images because "it was known that the performance of face recognition may be adversely affected by the reduction of image resolution.").

In justifying Petitioner's modification to rely on out-of-date head location information, Dr. Doermann discusses how this approach is "applicable when a sequence of images is taken for a person by a video camera" because "a person's head or face is unlikely to move significantly" and "the region corresponding to the person's head or face likely remains the same across the sequence of images." Ex. 1003, ¶ 64. However, this analysis ignores the fact that the background references he relies on all rely on head tracking so that the head "can be accurately tracked from frame to frame." *Id.*

For example, *Tian,* which Petitioner relies on for their mapping, expressly states that face tracking should be used to update the face location for a video sequence and provides the possibility that "head finding and head tracking" may **also** be needed "to handle large head motion." *Tian*, 000001; *see also Supp Dec.,* 75 (Dr. Saber opining that Tian's data set represents the best case for reusing a head position and that a real-world scenario would require updating the head position before performing face detection.). *Tian* further states that even when the "face image is

continually in the frontal or near frontal view in an image sequence," the location of facial features must be updated prior to further processing by "searching for the dark pixels around their positions in the last frame." *Tian,* 000003; *Supp. Dec.,* 76. Ex. 1010, also relied upon by Dr. Doermann, suggests that a previously located face must be relocated in each frame by a process in which "a localized region around that face is scanned by a face detector in the next frame." *Ex. 1010,* ¶ [0003]. *1010,* ¶ [0003]; *Supp. Dec.,* 74. In other words, Petitioner cites **no art** suggesting that acceptable (much less un-degraded) facial recognition performance can be achieved by using un-updated face locations from the previous frame.

Once more, Petitioner's failure to weigh these disadvantages of the proposed modification against the claims benefit is fatal to their proposed combination. *Oticon Medical*, 36-41. Indeed, it is doubtful Petitioner could ever meet this burden, given their contradictory rationales for the different modifications to *Lu-577-Lu-000/Lert. Cf. Petition 10-11* (arguing that a POSITA would spend computing resources to perform facial recognition on full-resolution images in order to avoid adversely affecting facial recognition performance) *with Petition* 9 (arguing that a POSITA would choose not to update the face location before performing facial recognition in order to save processing resources). As such, claims 5-6, 8, 12-14, and 19-20 should be found not unpatentable for at least this reason.

14-15. Having presented this flawed combination, Petitioner further fails to explain "why" a POSITA would have been motivated to modify *Nielsen-372* "in a way that it would not work for its intended purpose." *Id.* at 16. Thus, Petitioner fails to establish a *prima facie* showing of obviousness for Ground 3, and Board should reject Petitioner's proposed modification of *Nielsen-372* for at least this reason. *Endo Pharm., Inc.,* 922 F.3d at 1373.

#### *2. Modifying Nielsen-372/Steinberg with Tian's Teachings Does Not Achieve Petitioner's Proposed Benefit, and Any Benefit Would Be Outweighed by Drawbacks Petitioner Fails to Address*

Petitioner proposes further modifying the system of *Nielsen-372/Steinberg* (introduced in the now-moot Ground 2) to incorporate *Tian's* teachings in order to render the Challenged Claims obvious for Ground 3. As set forth below, Petitioner has failed to establish that a POSITA would be motivated to modify the *Nielsen-372/Steinberg* system with the teachings of *Tian*, or that such a combination would achieve Petitioner's proposed benefit.

##### a) Petitioner's Proposed Modification to Process Reduced-Resolution Images Would Not Reduce the Net Reduction of Processing Resources Required

As in Ground 1, Petitioner's Ground 3 modification of *Nielsen-372/Steinberg* to incorporate *Tian's* teachings of processing reduced resolution images is motivated by reduced processing resources and time. The analysis provided is essentially identical between the two Grounds. *Cf. Petition*, 72-73 *with Petition,* 10-11; *cf. Ex.*

*1003* ¶ 68-70 *with Ex. 1003,* ¶¶ 286-288. Petitioner provides no more weighing of the associated disadvantages against the claimed benefits for Ground 3 than for Ground 1. *Id.* In the mapping for element [4a], Petitioner further suggests that Steinberg's teachings of processing images with different resolutions would motivate a POSITA to incorporate *Tian's* teachings of actually reducing the resolution. *Petition,* 75-76 (*citing*, Ex. 1003, ¶ 312). However, none of this material remedies Petitioner's failure to weigh the claimed benefits of processing reduced-resolution images against the additional drawbacks (in the form of the additional processing resources and time required to reduce the resolution of the images).

For the reasons set forth with respect to Ground 1 above in § II.B.1.a), this failure is fatal to the combination of Ground 3, and the Board should find claims 4, 11, and 18 (and by virtue of dependency, the other challenged claims) not unpatentable for at least this reason.

**b) Petitioner's Proposed Modification to Rely on Head Tracking Would Not Reduce the Net Reduction of Processing Resources Required and Would Decrease the Performance of Face Recognition**

As in Ground 1, Petitioner's Ground 3 modification of *Nielsen-372/Steinberg* to incorporate *Tian's* teachings of head tracking is motivated by reduced processing resources and time. The analysis provided is essentially identical between the two Grounds. *Cf. Petition*, 72 *with Petition,* 9; *cf. Ex. 1003* ¶ 63-64 *with Ex. 1003,* ¶¶ 284-285. Petitioner provides no more weighing of the associated disadvantages

against the claimed benefits for Ground 3 than for Ground 1. *Id.* For the reasons set forth with respect to Ground 1 above in § II.B.1.c), this failure is fatal to the combination of Ground 3, and the Board should find claims 5, 6, 12, 14, and 19 (and by virtue of dependency, claims 8, 13, and 20) not unpatentable for at least this reason.

## IV. NEITHER TIAN NOR STEINBERG IS ANALOGOUS ART TO THE '243 PATENT

All of Petitioner's modifications of the primary references across all grounds share a common, fatal flaw: none of Petitioner's secondary references are analogous art. As the Federal Circuit recently affirmed, the test for whether a prior art reference is analogous art is a two-prong one: "'(1) whether the art is from the same field of endeavor, regardless of the problem addressed and, (2) if the reference is not within the field of the inventor's endeavor, whether the reference still is reasonably pertinent to the particular problem with which the inventor is involved.'" *Id.* at *8.

Petitioner alleges that the field of endeavor of the '243 Patent is "media analysis" and that this field of endeavor is shared by the prior art references. *Petition,* 4-6 (identifying the field of endeavor for each of the references). Notably, neither Petitioner nor its declarant makes any showing of the cited references being reasonably pertinent to a problem with which the inventor is involved. However, the field of endeavor of the '243 Patent does not broadly encompass "media analysis," and the cited secondary references do not share any reasonably scoped field of

endeavor for the ’243 Patent. Notably, Petitioner does **not** argue that either *Tian* or *Steinberg* is “reasonably pertinent” to the particular problem being addressed by the inventors of the ’243 Patent.

### A. Neither the ’243 Patent nor Petitioner’s Art in the Field of “Media Analysis”

The term “media analysis” is introduced by Petitioner in an apparent effort to find an umbrella broad enough to cover the ’243 Patent and the disparate prior art references. Petitioner’s expert admits that “[t]he phrase [media analysis] does not appear in the [‘243] Patent, as I said before, or any of the four specific references that we – that I used.” Ex. 2018, *Doermann Deposition Transcript*, 25:6-8. However, this term does not reflect the content of the’243 Patent, *Tian*, or *Steinberg* and is merely an attempt to obfuscate their disparate fields.

First, the ’243 Patent is unambiguous in its general “Field of the Disclosure” statement: “[t]his disclosure relates generally to **audience measurement** and, more particularly, to methods and apparatus to capture images.” *’243 Patent*, 1:36-39. This is supported by the claims: independent claims 1 and 9 recite “an audience measurement system,” and independent claim 16 recites “a method for obtaining exposure data for a media exposure environment.” *’243 Patent*, cols. 1, 9, 16; *see also Netflix v. DivX,* No. 22-1138, *10 (Fed. Cir. Sept. 11, 2023) (“We determine the field of endeavor by reference to explanations of the invention’s subject matter

in the patent application, including the embodiments, function, and structure of the claimed invention.") (internal quotes omitted).

Next, *Tian*, while not a patent reference, also directly sets out its goal: "[t]he goal was to help understand [the] question: how do we recognize facial expressions in real life." Tian, 000006; *see also Ex. 2018*, *Doermann Deposition Transcript* 21:13-16, 25:11-20 (Dr. Doermann agreeing that the goal of Tian is to understand how we identify facial expressions in real life). To achieve this goal, Tian examines images at different resolutions to determine the effects of resolution on the ability to identify facial expressions: "[t]his paper explores the effects of different image resolutions for each step of facial expression analysis." *Tian,* Abstract. *Nielsen*, by contrast, counts and identifies individual audience members (regardless of their facial expressions) and never addresses facial expressions. *See id.* at 23:4-6 (Dr. Doermann agreeing that the '243 Patent never discusses facial expressions).

Finally, *Steinberg,* like the '243 Patent, is unambiguous in its "Field of the Invention" statement: "[t]he invention relates to digital image processing, particularly to the field of **automatic or semiautomatic grouping and classification of images in a database** or image collection and based on the occurrence of faces in the images and the identification and classification of such faces." *Steinberg*, [0003]. Steinberg goes on to note that "the present invention is presented primarily in the context of collections of consumer digital images which

would be generated by a typical user of a digital camera." *Steinberg,* [0010]. Thus, Steinberg's field of endeavor is labeling a consumer's collection of photos with the identities of their friends and family when they appear in those photos. *See, e.g., Steinberg,* [0090], [0098].

As such, neither *Steinberg* nor *Tian* shares the field of endeavor of the '243 Patent and, as such, a POSITA would not have been motivated to combine them with the respective primary references. *Dec.*, ¶¶ 158-161.

In summary, Petitioner's characterization of the field of endeavor conflates two entirely distinct fields of endeavor: (1) media **exposure** analysis (*i.e.*, audience measurement); and (2) image processing. *Dec.,* ¶¶ 159-162. As described above, *Tian* is directed to determining the effects of image resolution on facial expression analysis and therefore falls into the category of image processing. *Steinberg* is directed to classifying faces in an image database and is thus likewise directed to image processing. Accordingly, neither of Petitioner's secondary references is directed to the field of endeavor of the '243 Patent, that of audience measurement. *Dec.* ¶¶ 159-161.

### B. Petitioner's Art Is Not Reasonably Pertinent to the Problem Being Solved by the '243 Patent

Although Petitioner does not provide any argument that either *Tian* or *Steinberg* is reasonably pertinent to the problem being solved, Patent Owner addresses the second prong as well. A prior art reference is reasonably pertinent to

the problem solved "only if its subject matter logically would have commended itself to an inventor's attention in considering his problem." *Netflix* at *15 (quoting *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1382 (Fed. Cir. 2019)) As described above, the problem being solved by the claimed invention is measuring audiences for media ratings, *i.e.*, counting and identifying viewers of a particular piece of media content. '243 Patent 1:64-2:3; *Dec.,* ¶ 163.

*Tian's* investigation is broadly related to "facial expression analysis." *Dec.*, ¶ 164. As Dr. Saber opines, a reference investigating the minimum resolution for an image that still allows an expression to be analyzed would not have logically come to the attention of an inventor solving the problem of audience measurement. *Id.*

Similarly, *Steinberg* is broadly related to the classification of images in a database "in the context of collections of consumer digital images which would be generated by a typical user of a digital camera." *Steinberg,* [0010]. As Dr. Saber opines, a reference related to classifying collections of images from consumer digital cameras would also not have logically come to the attention of an inventor solving the problem of audience measurement. *Dec.,* ¶ 165. As such, neither *Tian* nor *Steinberg* is analogous art under the second prong of the relevant test.

different resolutions from Cohn-Kanade database" indicates the reduced images come from the database. *Tian,* 000002 (Table 1 caption). A POSITA would further understand that image resolution would not be reduced as a part of the image analysis process. A POSITA would have understood that repeated resolution reduction would waste resources, and thus would have read *Tian* to use images at the desired resolutions "from" the database. *Tian,* Table 1.

8. To further indicate *Tian* does not employ any instructions, device, or process for *reduc[ing] the resolution of a first image*, *Tian* investigates the effects of various image resolutions on common "automatic facial expression analysis (AFEA) systems." *Tian,* Abstract. These systems are developed for recognizing facial expressions in "very high resolution frontal face[]" images. *Id. Tian* explores the effects of various real-world image resolutions within known AFEA systems. *Id.* Figure 1 below outlines an exemplary AFEA system being tested to investigate the effects of image resolutions:




Figure 1: Basic Structure of Facial Expression Analysis Systems.

*Tian,* 000001. This is consistent with, and confirmed by, Table 3 (Tian, 000005, reproduced above), which shows each of these steps being performed for each of the five resolutions coming "from" the database in showing that resolution reduction would not be a part of *Tian's* AFEA system, and would not be performed by *Tian*. *Tian,* 000002 (Table 1 caption).

9. The exemplary AFEA system structure outlined in Figure 1 does not include a step of *reduc[ing] the resolution of a first image*. Rather, all of the above elements of the system are applied to an image regardless of what resolution the image is at. In other words, the common processes of face detection, head pose estimation, feature extraction, and expression recognition do not involve any resolution reduction step. *Machine Analysis of Facial Behavior: Naturalistic and Dynamic Behavior,* Maja Pantic, The Royal Society, 2009 (Ex. 2021) at p. 3505 (outlining the "three steps" of facial expression recognition, none of which include reducing a resolution of the image). Rather, as *Tian* discloses, these systems are commonly developed to handle high-resolution images, so they would not contain a reduction resolution step. *Tian,* Abstract.

10. Additionally, a POSITA would not be motivated to add a step of resolution reduction into the AFEA systems being tested by *Tian*, as *Tian* himself disparages using images of lower resolution in recognizing facial expressions. *Tian* discloses "low resolution input images" are "among the factors that complicate facial

expression analysis." *Tian,* 000006. Indeed, researchers developed techniques to combat this known disadvantage, such as employing super-resolution in AFEA systems to "get higher resolution images." *Tian,* 000006; *see also, Super-Resolution Reconstruction and Its Future Research Direction*, Patanavijit, 2009, (Ex. 2022) pp. 156 (describing research efforts applying super-resolution processes to recognize faces in images and applying such processes to "multi-model cases such as smiling or angry images"). Thus, because lower-resolution images were known to further complicate expression analysis for AFEA systems, a POSITA would not have been motivated to include instructions, a device, or a process step that adds this complication into the AFEA systems tested by *Tian*.

11. *Tian* is not looking to purposely reduce resolutions of images applied to AFEA systems, but understands that low-resolution images will naturally occur in "real environments." *Tian,* Abstract. Rather, *Tian* indicates the images processed in AFEA systems are ideally of high resolution, as lower resolution "input images" complicate AFEA and make AFEA "**more difficult**." *Tian,* Abstract, 000002; *see also, Dec.,* ¶ 121. Further, *Tian's* discussion of techniques to increase image resolution (e.g., super-resolution) further indicates reducing a resolution of an image should be avoided. Additionally, if a low-resolution image is unavoidable, *Tian* understands the importance of mitigating the corresponding AFEA complications by increasing the resolution, when possible. *Dec.* ¶¶ 121-122. Thus, a POSITA would

not look at *Tian* and understand *Tian* to teach an AFEA system performing instructions, including a device, or performing a process of *reduc[ing] a resolution* of a captured image.

### 2. *Applying Tian's teachings would not result in a useable "audience measurement system," as claimed*

12. The details of the resolution reduction process applied in the '243 Patent are relevant to how the audience measurement system operates. Namely, the '243 Patent describes applying "pixel binning" to images captured "without use of the illumination source." *'243 Patent,* 3:50-56. The binning process sums certain neighboring pixels to increase the contrast (i.e., increase the light per pixel), while decreasing the resolution of the image. *'243 Patent,* 3:54-56, 11:10-19. For this reason, images taken without the illumination source that are "likely to be of low contrast" are processed via pixel binning to increase the contrast. *'243 Patent,* 11:5-10. Most images in the audience measurement system will be taken in the "majority mode," without the illumination source being on, in order to decrease audience annoyance caused by the illumination source. *'243 Patent,* 8:52-54, 8:60-64, 10:15-17 (describing the illuminator is not illuminated in the "majority mode" of image capture), 3:12-24 (describing the illumination source as annoying audience members when the light is turned on). Thus, the pixel binning procedure provides the advantage of increasing the contrast in an image captured in a low-light environment. This advantage is specific to audience measurement systems where

resolution by a non-integer factor is more computationally expensive than reducing by an integer factor. Indeed, Interpolation itself also requires processing **each pixel in the image**. *Id.* at pp. 184-185. Thus, Petitioner's proposed combination of *Tian's* suggested down-sampling to reduce the resolution requires *additional* processing resources be implemented for audience measurement scenarios, when compared to performing all analysis steps on the full-resolution images. Considering these additional processing resources, a POSITA would not have been motivated to apply *Tian's* purported teaching of resolution reduction to the audience measurement system of Lu to save processing resources.

44. Furthermore, Dr. Doermann cites to Ex. 1013 to support the notion that "some approaches of face detection may require analyzing all pixels of an image," and therefore may be resource intensive. Ex. 1003, ¶ 69. Ex. 1013 discusses specific face detection procedures, namely "view-based approaches," as being "computationally rather expensive." Ex. 1003, ¶ 69; Ex. 1013, 000001. However, other common face detection methods, such as template matching, knowledge-based methods, edge detection, and feature-based methods, among others, typically require lower processing resources when compared to view-based methods that require the use of multiple views. Ex. 1023, 000003-000006; *Face Recognition Algorithms,* Universidad del Pais Vasco (Ex. 2034) at pp. 12-13; Ex. 2012, 3-4. This is because these methods typically employ geometrical/structural aspects within the image to

detect features of a face when performing face detection, and thus need not analyze multiple views of the face. *Id.* Given the above, a POSITA would understand locating a face in a full-resolution image would not require noticeably higher processing resources or time than performing a resolution-reduction process followed by performing face detection on the resulting reduced image (with the added risk of reduced accuracy). Thus, the proposed benefit of decreasing processing resources is negligible, and a POSITA would understand the additional processing requirements to reduce the resolution would outweigh such a benefit. I note common head pose estimation methods are similarly simplistic and require relatively less processing resources (i.e., under Dr. Doermann's definition of "resource intensive," they do not need to analyze every pixel in the image). *See, e.g.,* Ex. 1020 (surveying various pose estimation techniques); *Facial Feature Based Head Tracking and Pose Estimation,* Jari Hannuksela, Department of Electrical and Information Engineering, University of Oulu, 2003 (Ex. 2035) at p. 25 (describing a "simple pose estimation procedure" algorithm that computes the 3D pose of an object "from three points if the geometry of the object is known" (i.e., ellipse shape of a head)). For example, geometric methods of performing head pose estimation merely locate facial features in the image and use these locations to determine pose "from their relative configuration." Ex. 1020, 000003. Some template matching methods merely

compare an image to a set of exemplary images "labeled with a discrete pose" to find a matching head pose. *Id.*

### *ii. Petitioner's Proposed Modifications are Redundant*

45. As discussed above, Dr. Doermann opines reducing the resolution of images may reduce "processing resources," by reducing the number of pixels that need to be processed for face detection, citing Ex. 1013 that discloses "**some** approaches of face detection" require analyzing all pixels. *See* ¶ 40. However, Dr. Doermann ignores the fact that other proposed modifications (i.e., head/face tracking as described below) to the system *already* reduce the number of pixels to be analyzed, making the proposed benefit of applying resolution reduction redundant within the modified system.

46. Specifically, Petitioner further modifies Lu to include *Tian's* purported teaching of determining "a face/head location in a first image," and using that location for processing of subsequent images via head tracking. *Petition,* 9; *See also,* ¶¶ 26. As proposed by Petitioner, this modification already avoids the need for analyzing all pixels of the image, as Dr. Doermann's cited Ex. 1010 states that utilizing head tracking allows a face detector to only scan a "localized region" of pixels without needing to analyze all pixels in the image. Ex. 1003, ¶ 64 (citing Ex. 1010, [0003]). Thus, Petitioner's own head-tracking modification and supporting

the benefits related to processing resources of reducing the resolution of a captured image prior to performing head detection and head orientation determination would be outweighed by the costs (i.e., processing resources, time, and accuracy) of the resolution reduction process in the scenarios of the '243 Patent.

*iii. Petitioner's Accuracy Analysis is Factually Flawed*

49. The only potential disadvantage Petitioner and Dr. Doermann address regarding the proposed modification is the effect on accuracy of face detection and head pose estimation performed on images of reduced resolution. *Petition,* 10; Ex. 1003, ¶ 69. Namely, Petitioner claims performing such operations on reduced-resolution images would not "substantially" reduce "the accuracy of these tasks." *Petition,* 10. Petitioner and Dr. Doermann cite various references (Exs. 1013-1015) to support such a statement, including relying on *Tian's* experimental results. *Petition,* 10; Ex. 1003, ¶ 69. As discussed below, none of these cited references support this claim, and accordingly, a POSITA would not have concluded that reducing the resolution does not affect head detection and head pose estimation accuracy.

50. Dr. Doermann cites Ex. 1013 to indicate face detection can be a "resource-consuming" process. Ex. 1003, ¶ 69 (citing Ex. 1013, 000001). The notion of reducing the resolution of images is not addressed in Ex. 1013, let alone that such reduction would not affect the performance of head detection and head pose

estimation. Thus, Ex. 1013 does not support Petitioner's and Dr. Doermann's conclusion. Additionally, the "[v]iew-based [face detection] methods" quoted by Dr. Doermann as being computationally expensive and disclosed in Ex. 1013 are "**not appropriate**" for "**real-time applications**." Ex. 1013, 000001. As discussed above, the claimed audience measurement system of the '243 Patent analyzes the images in real-time in order to accurately measure the audience that is watching TV. *See* ¶ 13. Thus, a POSITA would not consider the resource-consuming view-based processes when modifying an audience measurement system, such as that of Lu-577.

51. Dr. Doermann also cites Ex. 1014 to support the opinion that "the processing resources and time can be reduced if the resolution of the image is reduced." Ex. 1003, ¶ 69 (citing Ex. 1014, 2:43-53). Specifically, Ex. 1014 states that "calculations are avoided of a complete highest resolution **integral image** for every acquired image in an image stream," thereby "reducing integral image calculations." *Id.* The "integral image" on which processing is applied is **derived from an acquired image**, as "each element of the integral image is **calculated** as the sum of intensities of all points above and to the left of the point in the image." Ex. 1014, 1:25-29, 2:33-35 (describing the method of the invention calculating a "corresponding integral image" for a portion of the image). Furthermore, the resource reduction is based on **reducing the resources required of integral image calculation**. Ex. 1014, 2:45-57. Creating this integral image would itself be a

resource-intensive process (under Dr. Doermann's definition), as, during the process, each pixel is created by summing intensities for every pixel above and left of the pixel being processed, as described above. Ex. 1014, 1:25-29. Furthermore, as the images captured in the modified system are not being processed in this way to create an integral image, any processing reductions disclosed in Ex. 1014 are irrelevant. This disclosed reduction is also irrelevant to any processing requirements of the images disclosed in the '243 Patent, as these images are unprocessed (excluding the resolution reduction by the pixel binner) prior to any head detection or head orientation determination. *'243 Patent,* 9:7-22 (describing the images analyzed to detect a head or orientation of the head are received "directly from the image capturer").

52. Ex. 1015, which is also cited by Dr. Doermann, is even less relevant to the proposed modification reducing resource consumption while not affecting head detection and head pose estimation accuracy. Ex. 1003, ¶ 69. Ex. 1015 describes reducing the resolution of the **saturation** of a "colour image" by "averaging the saturation." Ex. 1015, [0009]. The resolution of the saturation for each pixel is reduced. Ex. 1015, [0035] (describing each "pixel" has its own "averaged saturation value"), [0041] (describing an array of "reduced resolution pixels"). The method averages the saturation across pixels to make the colors in the image more uniform, such that a face may be more easily detected from background elements. Ex. 1015,

[0011-0015]. Dr. Doermann cites Ex. 1015, ¶ [0022], which states "by reducing the resolution **of the saturation of the image,** computational requirements are substantially reduced." Ex. 1003, ¶ 69 (citing Ex. 1015, [0022]). However, the reduction in computational requirements is based on changing the resolution of the saturation component of each pixel (via saturation averaging), without changing the pixel resolution of an image. Additionally, Dr. Doermann ignores the increase in processing required to perform a conversion from RGB to an appropriate color space that calculates saturation, perform the reduction on the saturation channel, and then convert back to RGB for further processing. As Petitioner's modification applies *Tian's* reducing the pixel resolution of an image (rather than the saturation resolution), Ex. 1015 is irrelevant. Accordingly, none of Exs. 1013-1015 are relevant to the proposed modification, let alone provide evidence that reducing an image resolution does not affect the performance of head detection and head pose estimation.

53. Finally, Petitioner relies on *Tian's* experimental results to support the claim that performing "face detection and pose estimation" on reduced-resolution images will not "substantially reduc[e] the accuracy of these tasks." *Petition,* 10; *see also,* Ex. 1003, ¶ 69 (Dr. Doermann opining such tasks "do[] not substantially reduce the accuracy of these analysis tasks according to *Tian's* teachings"). However,

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

TVISION INSIGHTS, INC.,

Petitioner,

v.

THE NIELSEN COMPANY (US), LLC,

Patent Owner.

---

Case No. IPR2023-01014

U.S. Patent No. 11,470,243

---

# PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE

## TABLE OF CONTENTS

**Page**


I. GROUND 1 .......... 4

A. "reduc[ing] a resolution." .......... 4

1. Undisputed teachings of Tian satisfy the limitation at issue. .......... 4

2. Tian teaches performing the act of reducing a resolution of an image. .......... 5

3. PO's argument distinguishing Tian based on unsupported limitations should be rejected. .......... 8

B. Disputed limitations of claims 5, 6, 12, 14, and 19 .......... 10

1. Undisputed disclosures show that Ground 1 teaches the limitations at issue. .......... 10

2. PO's mischaracterization of claim scope should be rejected. .......... 12

C. A POSITA would have found it obvious to combine Lu-577 and Tian. .......... 14

1. Analyzing reduced-resolution images saves processing resources. .......... 15

a. The resource savings outweigh any purported cost .......... 16

b. PO's purported redundancy does not exist. .......... 19

c. Tian's accuracy findings are applicable to audience measurement. .......... 19

2. Applying Tian's pose estimation teachings would have achieved the explained benefits. .......... 20

a. Pose estimation improves the performance of face recognition. .......... 21

b. Pose estimation is not redundant. .......... 22

c. Pose estimation facilitates determining if a person is watching television. .......... 22

3. Modifying Lu-577 based on Tian's face tracking teachings would have achieved the explained benefits. .......... 23

D. The Petition's use of incorporated teachings of Lert and Lu-000 does not combine different embodiments. ........................................24

II. GROUND 3 ..........................................................................................26

A. The combination of Ground 3 teaches the disputed limitations. ........26

B. PO's mischaracterization of Petitioner's combination of Nielsen-372 and Steinberg should be rejected. ..................................26

C. PO's mischaracterization does not undermine the obviousness showing of Ground 3 regardless.......................................................27

D. PO's attacks on the motivation to combine with Tian fail for the same reasons as explained for Ground 1. ...........................................29

III. ANALOGOUS ART ..........................................................................29

PO's arguments that the combinations of Ground 1 and Ground 3 do not teach the disputed limitations mischaracterize the prior art and the claim requirements. And PO's attacks on the motivation to combine Lu-577 or Nielsen-372 and Steinberg with Tian are contradicted by both experts and based on importing unrecited limitations into the claims. PO's bodily incorporation argument against the combination of Nielsen-372 and Steinberg fails because it is based on a misunderstanding of the combination.

# I. GROUND 1

## A. "reduc[ing] a resolution."

### 1. Undisputed teachings of Tian satisfy the limitation at issue.

The Institution Decision found "no dispute that Tian does disclose a method of reducing the resolution of an image[.]" D.I., 21. The POR largely rehashes its POPR arguments and still does not dispute that (1) Tian teaches down-sampling, (2) down-sampling is a method of reducing image resolution, and (3) resolution-reduction techniques were widely known by 2011 (*see also* Ex-1003, ¶15; Ex-1033, 31:6-23). Notably, PO acknowledges that Tian teaches "resolution reduction," despite contending that it is performed in "pre-processing." POR, 10-11. None of the claims at issue limit resolution reduction to a certain time or stage

of processing.[1] Therefore, even under its own characterization, PO cannot deny Tian's explicit teaching of reducing image resolutions. PO's assertion that Tian's "experimental setup" or "structure" does not include a step of reducing a resolution (POR, 3, 5-6, 9), even if accepted,[2] does not negate the obviousness of doing so in light of Tian's teachings.

PO argues that the Board misapprehends the requirements of the claims. POR, 4-7. This argument is misplaced because the Board found that Tian teaches obtaining a reduced-resolution image by down-sampling, rather than directly from a database. D.I., 22 ("Tian plainly teaches obtaining reduced-resolution images and teaches down-sampling as shown in the Petition."), 21.

#### 2. Tian teaches performing the act of reducing a resolution of an image.

PO contends that "Tian does not *create* the down-sampled images" (POR, 6; *see also* POR, 3-4, 7-10) based on Dr. Saber's opinion that Tian directly obtains pre-processed images from the Cohn-Kanade database, which includes images of different resolutions (Ex-2001, ¶¶46-49; Ex-2020, ¶¶4-7).

---

[1] In *Chewy, Inc. v. Int'l Bus. Machines Corp.*, the Federal Circuit determined that a "storing" limitation requires pre-fetching an object but not retrieving an object on demand. 94 F.4th 1354, 1358-62 (Fed. Cir. 2024). *Chewy* is not applicable because PO's exclusion of pre-processing has no basis in the claims.

[2] This assertion is wrong. *Infra* §I.A.2.

This argument is contradicted by Tian's "Database" sub-section, which discusses the "DFAT subset of Cohn-Kanade expression database" used by Tian's experiment. Ex-1005, 000005. Tian explains that "[t]he database contains 704 image sequences from 97 subjects" and "[t]he image sequences … were digitized into 640x480 pixel arrays[,]" for which "[t]he size of head region is about 280x380 pixels." *Id.* Tian obtains images of the original resolution (i.e., 640x480) from the Cohn-Kanade database and creates reduced-resolution images by down-sampling the original images. *E.g.*, Ex-1005, 000002 ("The lower resolution images are down-sampled from the originals."), Abstract.

Tian teaches face regions of five different resolutions: 288x384 (Original), l44xl92, 72x96, 36x48, and 18x24. Ex-1005, 000002 (Table 1). The 288x384 face region (i.e., "about 280x380 pixels") is directly cropped from the original images. Ex-1005, 000005. Head regions of the other resolutions are created using down-sampling. Ex-1005, 000002, Abstract.

Tian's teaching of down-sampling images is consistent with statements quoted in the POR. In the statement "[a]n example in five different resolutions from Cohn-Kanade database" (Ex-1005, 000002 (quoted at POR, 8)), "in five different resolutions" and "from Cohn-Kanade database" both modify "example." This demonstrates down-sampling an example from the Cohn-Kanade database into five different resolutions. In the statement "five different resolutions of the

head region are studied … based on Cohn-Kanade AU-Coded Face Expression Image Database" (*id.*), the term "based on" confirms that the images of different resolutions are created based on original images in the database.

Dr. Saber's opinion is flawed because he misunderstood the Cohn-Kanade database. First, Dr. Saber admitted that Tian's "Database" subsection described the resolution of the image sequences that Tian uses. Ex-1033, 110:11-113:18. He conceded that only one resolution is mentioned in this subsection, and could not explain why it does not mention other resolutions had the database included them. *Id.*; Ex-2020, ¶54.

Second, Tian states that "[m]ore details about the [Cohn-Kanade] database can be found at paper [16]." Ex-1005, 000005. This paper confirms that the images sequences in the database "were digitized into either 640x490 or 640x480 pixel arrays" without mentioning any reduced resolutions and explains that "image data [in the database] may be … down-sampled to examine the effects of reduced resolution …" Ex-1031, 000006.

Third, PO's argument should be rejected because Dr. Doermann obtained a copy of the Cohn-Kanade database and confirmed that it does not include reduced-resolution images. Ex-1034, ¶¶2-4. A POSITA reading Tian would have known that the Cohn-Kanade database, admittedly well-known in the field (Ex-1033, 113:19-114:13), does not include reduced-resolution images and that Tian teaches

creating its own. In contrast, Dr. Saber had no support or knowledge for his theory regarding the Cohn-Kanade database. Ex-1033, 116:5-20, 119:19-120:19.

PO's argument that Tian does not teach "circuitry, instructions or a device" (POR, 3, 9-10) attacks a strawman because the Petition relies on other references for these conventional hardware or software features. Pet., 13-16, 32, 47-49, 64-65; Ex-1033, 31:24-32:12.

#### 3. PO's argument distinguishing Tian based on unsupported limitations should be rejected.

PO's arguments that Tian's teachings would not result in a usable audience measurement system (POR, 4, 10-13) are incorrect and directed to unrecited limitations. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (warning against confining claims to specific embodiments).

First, PO argues that Tian relies on pre-processing images and would not be able to activate the illumination source for succeeding frames. POR, 11. As explained above, Tian does not rely on pre-processed images. *Supra* §I.A.2. More importantly, the feature of activating an illumination source is only recited in claims 24-25, which are not at issue in this IPR.[3] Nor is activating an illumination source part of either ground of the Petition.

---

[3] PO's continuing reliance on the illumination feature confirms Petitioner's explanation that none of the challenged claims recite the '243 patent's purported inventive idea. Pet. 2-3.

Any purported necessity of activating illumination based on image analysis is contradicted by PO's expert, who admitted that cameras had the ability to activate flashlight with each photo or activate flashlight based on detection of ambient light by 2011. Ex-1033, 136:14-24. Dr. Saber also admitted that well-lit images can be taken with natural light or artificial light in an audience measurement environment, with or without a camera's illumination source. Ex-1033, 135:10-136:13.

Second, PO argues that Tian's teachings would not result in a usable system because "down-sampling does not increase the contrast of images." POR, 11-12. Again, none of the challenged claims require some level of contrast for image analysis or recite contrast improvement as a purpose of resolution reduction.

PO argues that "applying *Tian*'s teachings … would result in low-resolution, low-contrast images not suitable for analysis." POR, 12; Ex-2020, ¶16, ¶18. Tian proves PO wrong by reporting face detection and pose estimation being performed on down-sampled images with high accuracy. Ex-1005, 000005; Ex. 1003, ¶68. Dr. Saber admitted that he had no reason to challenge Tian's credibility. Ex-1033, 123:1-10.

Third, PO argues that down-sampling without antialiasing does not produce an image ready for analysis and, if antialiasing is performed, it may hinder facial recognition. POR. 12-13. The '243 patent does not claim or otherwise mention

antialiasing (Ex-1033, 95:18-96:15) and discloses a resolution-reduction method (e.g., pixel binning) without a separate antialiasing step (Ex-1033, 68:10-14). *Cf.* Ex-2018, 44:16-45:1. To the extent PO is contending antialiasing is an implied necessary step, Tian's experimental results (Ex-1033, 123:1-10) show otherwise by achieving high accuracy (Ex-1005, 000005; Ex. 1003, ¶68) while not performing antialiasing (Ex-2020, ¶20). Ex-1034, ¶9. Additionally, Dr. Saber admits that the claims encompass capturing a sequence of images (e.g., as frames of a video) before analyzing any of them. Ex-1033, 138:10-139:22. Therefore, antialiasing is not required and, even if performed, would not delay capturing the next image.

### B. Disputed limitations of claims 5, 6, 12, 14, and 19.[4]

#### 1. Undisputed disclosures show that Ground 1 teaches the limitations at issue.

The disputed limitations all require performing face recognition on a region/portion of a second image *corresponding to* a location/region of the head in a first image, whose resolution may be reduced. POR, 14-15; Ex-1001, 15:61-16:9, 16:54-61, 17:48-57.

Taking claim 5 as an example, the Petition establishes the following facts:

[4] While PO's arguments for Ground 1 focus on claims 5, 6, 12, and 19, PO's similar arguments for Ground 3 additionally cover claim 14. POR, 49-50. Since PO raises no argument specifically for claim 14, it is addressed here.

- Lu-577 (incorporating Lu-000) teaches performing face recognition on a region of an image corresponding to a face/head location. *E.g.*, Pet. 28; Ex-1003, ¶¶125-127; Ex-1008, Abstract, 2:20-38, 6:49-51, 7:25-27, 7:39-8:6.[5]
- Tian teaches determining a face/head location in a first image and using this location for subsequent images unless a change is detected. *E.g.*, Pet., 28; Ex-1003, ¶129; Ex-1005, 000001, 000003.
- Face/head location often does not change across a sequence of images taken in a short period of time. *E.g.*, Pet., 9; Ex-1003, ¶64.
- Tian teaches performing face detection on a reduced-resolution image. *E.g.*, Pet. 10-11; Ex-1003, ¶¶68-69; Ex-1005, Abstract, 000002, 000005.

Based on the above, the Petition explains that it would have been obvious to determine a person's face/head location in a first image, whose resolution may be reduced, and perform face recognition on regions of this location in a second image. Pet. 28, 76; Ex-1003, ¶130, ¶¶318-319.

PO does not dispute the aforementioned facts and fails to explain why, when (1) face recognition is performed on a region of a second image corresponding to

[5] For Ground 3, Steinberg teaches performing face recognition on a region of an image corresponding to a face/head location. *E.g.*, Pet. 76; Ex-1003, ¶¶316-317; Ex-1007, ¶0077, ¶0092, ¶0096, ¶0124, ¶¶0126-0127, ¶0130, FIGs. 1(a)-(c).

the head location and (2) the head location in the second image is the same as that in the first image, the analyzed region in the second image would somehow not correspond to the head location/region in the first image. POR, 15-17. PO cannot reasonably dispute that the limitations at issue are obvious under Ground 1. *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1002 (Fed. Cir. 2016) ("[C]ombinations of prior art that sometimes meet the claim elements are sufficient to show obviousness.").

**2. PO's mischaracterization of claim scope should be rejected.**

Rather than address the claim language directly or propose a claim construction, PO invents the concept of a "two-frame process." POR, 13. The "two-frame process" concept serves as a disguise for an implicit negative limitation: that the determination of the head location cannot be performed on the second image. PO relies on this negative limitation because, rather than contend there is anything that Tian does not perform, PO faults Tian for confirming the head location in subsequent images. For example, PO argues that Tian does not teach the "two-frame process" because "*Tian* updates ("tracks") the location of the head/face for each frame to perform face analysis for that frame." POR, 14-16.

This negative limitation has no basis in the claims. Independent claims 1, 9, and 16 all recite "comprising," indicating the inclusive nature of the claims. Ex-1001, 15:15, 16:21, 17:16. The disputed limitations all recite the term

"corresponding to," which is consistent with confirming that it is proper to analyze a region in the second image corresponding to the head location in the first image. Ex-1001, 15:61-16:9, 16:54-61, 17:1-7, 17:48-57; Ex-1003, ¶62. In fact, Dr. Saber disparages PO's negative limitation, which requires blindly using a head location of a first image for a second image without confirmation, by stating that "a person could move their head between image captures in a sequence, and thereby render the previous location useless in recognizing the face in the current image." Ex-2020, ¶73.

When PO's negative limitation is not imported into the challenged claims, PO's arguments fail. For example, PO's characterization that "Tian must accurately determine the location of the head/face in the current frame…" (POR, 16) is not precluded by the claims. Nor can PO reasonably dispute that face tracking involves analysis of an earlier frame in addition to a current frame—e.g., scanning a localized region in a second image around a location where a face is detected in a first image. Ex-1003, ¶64 (citing Ex-1010, ¶0003). PO's characterization that "Tian updates the facial feature locations for each frame … after the initial head location is determined" based on Dr. Doermann's testimony is, again, not precluded. POR, 17. There is no dispute that when the head location does not change in two images (which often occurs), any updating will determine a

region in the second image corresponding to the head location in the first image. *E.g.*, Ex-1003, ¶135.

### C. A POSITA would have found it obvious to combine Lu-577 and Tian.

In the DI, the Board determined that "Petitioner's showing as to motivation to combine the relevant teachings of Lu-577 and Tian is well-supported, reasonable and persuasive" (D.I., 25), enumerating a list of Petitioner's showings in support (D.I., 22-25). The POR addresses some showings but neglects others (*see* POR, 17-40), including:

- Lu-577 explicitly invites employing "known head location and face recognition software." D.I., 23 (citing Pet., 8; Ex. 1003, ¶59; Ex. 1004, ¶39).
- Motivation to apply Tian's teaching of taking a sequence of images. D.I., 23 (citing Pet., 9; Ex-1003, ¶61; Ex-1010, ¶3; Ex-1022, 7).
- The combination involves an application of known techniques (e.g., Tian's facial analysis techniques) to a known system (e.g., Lu-577's audience measurement system) and method ready for improvement. D.I., 24 (citing Pet., 11, Ex. 1003, ¶71).
- The combination simply uses Tian's teachings in the manner taught by Tian to implement functionalities in Lu-577. D.I., 25 (citing Pet., 11; Ex-1003, ¶72).

These showings provide independent and unrebutted reasons for combining Lu-577 and Tian.

PO claims that "[i]ntentionally reducing the resolution of images prior to facial analysis is novel," but cannot sustain this claim without relying on an ambiguous concept of "intentionally" and a feature of "increasing the contrast," neither of which is claimed. POR, 17-18; Pet. 3. The challenged claims merely require reducing image resolution before performing facial analysis, and there is nothing novel about this because it is exactly what Tian does.[6] PO's attack on Tian for being an academic reference and bald assertion that "no contemporary image processing system would have taught or suggested internationally reducing the resolution" (POR, 17) are absurd and incorrect because, for example, Exhibit 1014 teaches intentionally reducing the resolution.[7] Ex-1014, 2:43-53; Ex-1015, ¶0022; Ex-1003, ¶69; Pet. 10. As explained below, PO fails to rebut concrete motivations for modifying Lu-577 based on Tian's teachings.

### 1. Analyzing reduced-resolution images saves processing resources.

---

[6] No novelty is added by Dr. Doermann's willingness to try what PO's counsel himself called "a magical system," where higher resolution images can be analyzed "with perfect accuracy and without incurring any time or computational resources," because such a system does not exist. Ex-2018, 71:1:9; POR, 18.

[7] PO's arguments distinguishing Exhibit 1014 (POR, 26) lack merit. Exhibit 1014 teaches saving processing resources for face detection, which includes the step of deriving integral images, by processing reduced-resolution images. Ex-1034, ¶8; Ex-1003, ¶69; Ex-1014, 1:23-58, 2:29-53, Fig. 2.

The Petition establishes the obviousness of performing face detection or pose estimation on reduced-resolution images because doing so saves processing resources without reducing accuracy. Pet., 10-11 (citing Ex-1003, ¶69). PO fails to rebut this showing.

a. <u>The resource savings outweigh any purported cost.</u>

PO does not dispute that analyzing reduced-resolution images saves processing resources but contends that the saving is outweighed by cost for creating the reduced-resolution images. POR, 21-24. This argument is contradicted by PO's own expert. When questioned, Dr. Saber admitted that face detection is computationally complex, including steps such as data dimension reduction, pre-processing, feature extraction, weighing, evaluation, and comparison. Ex-1033, 75:13-91:4; Ex-2034, 14-15. The feature extraction step, by itself, includes computing convolution multiple times (e.g., horizontal, vertical) for each pixel. Ex-1033, 85:14-88:21. Head orientation determination also requires feature extraction. Ex-1033, 91:10-92:8.

In contrast, down-sampling may simply involve "pick[ing] a pixel out of every four[.]" Ex-1033, 33:15-34:1, 35:18-38:13; *see also* Ex-1003, ¶15. Dr. Saber conceded that face detection and head orientation determination are each computationally more complex than resolution-reduction methods. Ex-1033, 98:24-102:2.

Dr. Saber admitted that performing facial analysis on fewer pixels significantly saves processing resources. Ex-1033, 83:7-18, 88:22-89:1. Under Dr. Saber's examples, the savings of performing facial analysis on a reduced-resolution image with 1/4 of the pixels (i.e., eliminating 25 multiplications and 24 additions on each of 3/4 of the pixels) undoubtedly outweigh any processing needed to reduce the resolution (e.g., picking 1/4 of the pixels with no calculation). Ex-1033, 87:14-22, 33:15-34:1.

PO focuses on two special scenarios, antialiasing and interpolation, in an attempt to show cost for reducing image resolution. Both scenarios are untethered from the claims and grounds.

First, PO argues that "additional processing resources [for antialiasing] can outweigh any reduction in processing resources[.]" POR, 22-23. However, antialiasing is neither required by the '243 patent nor necessary for resolution reduction. *Supra* §I.A.3. None of the Petition's grounds require antialiasing.

Second, PO argues that resolution reduction by interpolation may "require analyzing all pixels of an image." POR, 22-23 (citing Ex-2016; Ex-2020, ¶40, ¶44). Again, the '243 patent does not even mention interpolation, and Tian's down-sampling admittedly includes computationally more efficient methods such as

subsampling. Ex-2020, ¶43; Ex-1033, 33:15-34:1, 35:18-38:13.[8] Regardless, Dr. Saber admits that interpolation is computationally simpler than face analysis. Ex-1033, 96:23-98:3, 100:3-14, 101:18-102:2.

PO's allegation that Petitioner has not met its burden to weigh advantages against disadvantages (POR, 20-21) overlooks the record. Dr. Doermann explains that resolution-reduction techniques included "simply subsampling the image and dropping pixels." Ex-1003, ¶15; Pet., 2. He next explains that facial analysis is "resource-consuming" and that "[t]he processing resources and time can be reduced if the resolution of the image is reduced." Ex-1003, ¶69 (citing Ex-1014, 2:29-53; Ex-1015, ¶0022); Pet. 10-11. Here, unlike *Oticon*, the advantage of performing facial analysis on reduced-resolution images easily outweigh PO's purported disadvantage. Ex-1034, ¶¶5-8. Ultimately, even if there is tradeoff between resource savings and additional costs, such a tradeoff does not obviate the motivation to combine Lu-577 and Tian because "[i]t's not necessary to show that a combination is the best option, only that it be a suitable option." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 800 (Fed. Cir. 2021) (internal quotation mark omitted); *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) ("A given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine.") (citation omitted).

---

[8] Tian's down-sampling does not require interpolation. Ex-1034, ¶9.

b. PO's purported redundancy does not exist.

PO's argument that the advantage of resolution reduction is redundant because head location and orientation are known from head tracking (POR, 24-25) misunderstands the combination and the claims. The Petition explains that the combination of Lu-577 and Tian teaches "reduc[ing] the resolution of a first image of the one or more of the images and perform[ing] face detection or head pose estimation on the reduced-resolution image." *E.g.*, Pet. 26-27; Ex-1003, ¶120. The combination further teaches, after determining the face/head location in a reduced-resolution image, performing face tracking in subsequent images (e.g., a second image). *E.g.*, Pet. 28; Ex-1003, ¶¶129-130. Because face detection and head pose estimation are performed on a reduced-resolution image and face tracking is performed on different, subsequent, images, PO's purported redundancy does not exist.

c. Tian's accuracy findings are applicable to audience measurement.

PO contends that Tian's findings are not applicable to audience measurement, for which a face region has a lower resolution. POR, 27-28. To begin with, PO's assumption that "the camera … captures an image of the entire media exposure environment" (POR, 27) is contradicted by PO's expert, who testified that the camera just needs to capture part of the environment (Ex-1033, 153:22-154:9).

PO's contention relies on Dr. Saber's analysis of two examples. POR, 27-28; Ex-2020, ¶¶55-59. The first example, Figure 1 of the '243 patent, does not illustrate an image taken by a camera in a media exposure environment, but instead includes people's back and the camera (110) itself. Ex-2020, ¶56; Ex-1001, Fig. 1, 5:9-28. The second example is an image from an online shopping webpage for a sofa, where individuals are not even watching television. Ex-2020, ¶57; Ex-2037. Dr. Saber's testimony based on inapplicable examples carries no weight.

Dr. Saber's analysis is also flawed for assuming low original resolutions for images (e.g., 1280x960 and 1200x960). Ex-2020, ¶¶56-57. The assumed resolutions are about 1.2 megapixels and significantly smaller than what cameras in 2011 were capable of capturing. Ex-1032, ¶186; Ex-1033, 158:20-22; Ex-1034, ¶11. Images taken by state-of-the-art cameras would have significantly greater resolution for face regions, allowing successful facial analysis after down-sampling. Ex-1033, 155:4-9; Ex-1034, ¶¶11-13.

Dr. Saber's analysis, even assumed to be correct, cuts against PO's argument. He estimates the head region for an adult to be 75x100 pixels in the second example. Ex-2020, ¶57. This resolution, reduced by a factor of four, becomes 37.5x50 pixels. This is still larger than 36x48, for which Tian reports high-accuracy face detection and pose estimation. Ex-1005, 000005.

### 2. Applying Tian's pose estimation teachings would have achieved the explained benefits.

PO fails to rebut the obviousness of applying Tian's pose estimation to Lu-577. Pet. 10.

a. Pose estimation improves the performance of face recognition.

PO's argument that selectively performing face recognition would have undermined its performance (POR, 29-30) ignores that certain head orientations are not suitable for face recognition, as both experts agree. Ex-1003, ¶66; Ex-1033, 159:22-161:3. While Lu-000 teaches learning multiple face images for each person (Ex-1008, 7:25-38, 8:36-40), PO does not (and cannot) contend that images of unsuitable head orientations are learned. POR, 30; Ex-1033, 165:22-166:10. It is unquestionably beneficial not to perform face recognition on image with unsuitable head orientations.

PO also ignores that false face recognitions undermine performance. PO's example of face recognition on 10 consecutive frames with a 25% chance of success (POR, 29) ignores that unsuccessful face recognition results in identification of a wrong person (Ex-1033, 163:15-164:7). PO's example would have resulted in more misidentifications (e.g., 75% chance) than correct identifications (e.g., 25% chance), undoubtedly undermining the overall performance of face recognition. Ex-1034, ¶10.

PO argues that Dr. Doermann's testimony somehow supports its argument. POR, 29. However, what Dr. Doermann explained was that analyzing more images

would typically improve face recognition performance because the images can be analyzed to "pick the best one," which confirms the benefit of selecting images using pose estimation. Ex-2018, 77:18-78:16. In addition, PO's invented concept of "continuous measurement" (POR, 30) is not claimed by the '243 patent and irrelevant to the current proceeding.

b. Pose estimation is not redundant.

PO argues that a pose estimation step would have been redundant in light of Lu-000's "brute force method." POR, 30-33. As explained above, this argument ignores that (1) there are head orientations not suitable for face recognition and (2) Lu-000 does not store signatures for all possible head orientations. *Supra* §I.C.2.a.

Rather than adding unnecessary processing, the head pose estimation step would prevent wasteful processing for comparing feature signatures extracted from unsuitable images with all stored signatures. Ex-1003, ¶66. This step would also prevent misidentifications resulting from analyzing unsuitable images. *Id.* Thus, pose estimation would have obviated unnecessary processing for the costly "brute force method" and improved the accuracy of face recognition.

c. Pose estimation facilitates determining if a person is watching television.

Contrary to PO's argument (POR, 33-34), Tian's pose estimation at least determines (1) "the angle of a face" and (2) "if the face of the person is 'looking at' the camera," two criteria that PO admits to indicate whether a person is watching

television (POR, 33-34 (citing Ex-1012, ¶0039)). In agreement with Dr. Doermann (Ex-1003, ¶67), Dr. Saber admits that Tian's frontal view "is angled ~0 degrees from the camera" and indicates that that the person "is looking directly toward the camera[.]" Ex-2001, ¶92. Tian groups frontal view and near frontal view together because both are suitable for expression analysis. Ex-1005, 000002-03. This grouping choice does not negate Tian's ability to determine individuals of the frontal view and the fact that they are looking at the camera, nor does PO dispute the obviousness of doing so. *See generally* Ex-1020.

PO's argument that advertisers would rather NOT know whether members of the audience look at the television (POR, 34-35) is specious. It is also misplaced because using pose estimation to determine if individuals are watching television does not inhibit the ability to identify those who are not.

#### 3. Modifying Lu-577 based on Tian's face tracking teachings would have achieved the explained benefits.

None of PO's purported drawbacks (POR, 35-36) regarding this modification has merit. First, PO's argument about "increase in processing resources" (POR, 36-37) misses the point because replacing face detection with face tracking reduces the number of pixels analyzed and the processing resources needed to do so. Dr. Doermann explains that face tracking allows a face to be "accurately tracked from frame to frame without a need to run a face detector across the entire image." Ex-1003, ¶64 (citing Ex-1010, ¶0003); Pet., 9. Dr. Saber

agrees that face tracking saves processing resources, as he contends that this benefit makes the benefit of analyzing reduced-resolution images "redundant." Ex-2020, ¶¶45-46.

Second, PO asserts that, even with face tracking, face detection is still required for locating new faces entering the field of view. POR, 37-38. This assertion is irrelevant to the current proceeding because all challenged claims concern "a head." Neither the claims nor the prior-art combinations require locating new faces in any image, let alone an image in which face tracking is performed.

Third, PO argues that face tracking harms the accuracy of face recognition when using out-of-date face locations. POR, 38-40. This argument is untethered from the Petition's obviousness theory, which states that "Tian teaches determining a face/head location in a first image and using this location for subsequent images *unless a change is detected*." Pet. 9 (emphasis added). Using a face/head location from a previous image when no change is detected ensures no out-of-date face location is used.

### D. The Petition's use of incorporated teachings of Lert and Lu-000 does not combine different embodiments.

In the DI, the Board correctly determined that "Lu-577's incorporation by reference of Lu-000 and Lert is not at all akin to combining two embodiments." I.D. 32. This is because the relied-on teachings of Lert and Lu-000 are both

incorporated to Lu-577's disclosure of its first embodiment, which corresponds to paragraphs 35-43 and Figure 2. Ex-1004, ¶¶0035-43, Fig. 2.

In paragraph 39, Lu-577 teaches "employ[ing] known head location and face recognition software (e.g., as taught by [Lu-000])[.]" Ex-1004, ¶0039. In paragraph 40, Lu-577 explains that "characteristic signatures can be extracted from these representations [of audio portions of television programs] … in order to identify the television programs[.]" Ex-1004, ¶0040. For this signature-based approach, Lu-577 incorporates Lert by reference. Ex-1004, ¶0003. While PO argues that Lu-577 teaches other approaches (POR, 43; *see* Ex-1004, ¶0002, ¶0004), the Petition does not rely on any other approach or seek to combine it with Lert's signature-based approach. PO's attorney argument that paragraph 7 of Lu-577 disparages Lert (POR, 43) lacks basis because this paragraph is unrelated to Lert's signature-based approach (Ex-1034, ¶14) and does not amount to a teach-away.

Since Lu-577 discloses using Lu-000's and Lert's teachings for its first embodiment, they are "part of what the inventors viewed as their invention" (POR, 43) and are not used to "modify" Lu-577 (*id.*). Because Lu-000 and Lert are properly incorporated by reference into Lu-577 (D.I., 32-33) and are directed to the same embodiment, no motivation to combine is required. *Gen. Elec. Co. v. Raytheon Techs. Corp.*, 983 F.3d 1334, 1352 (Fed. Cir. 2020) (holding that a motivation to combine elements present together in a reference is not required).

## II. GROUND 3

### A. The combination of Ground 3 teaches the disputed limitations.

PO reiterates its arguments that Tian does not teach the disputed limitations. POR, 49-50. These arguments fail for the same reasons explained above. *Supra* §I.A-B.

### B. PO's mischaracterization of Petitioner's combination of Nielsen-372 and Steinberg should be rejected.

PO's attacks the combination of Nielsen-372 and Steinberg (POR, 50-57) by asserting that the combination relies upon the camera of Nielsen-372 (POR, 44-49). The Board correctly pointed out PO's mischaracterization, finding that "[f]or each of [the] limitations in the independent claims that contains the first recitation of 'a camera' …, Petitioner cites teachings in Steinberg, not Nielsen-372." D.I., 41-43 (citing Pet., 53, 65, 69).

PO insists on its mischaracterization based on the following two sentences in the Petition:

- "Nielsen-372's system includes needed hardware (e.g., a computer and a camera) for implementing Steinberg's approach." POR, 44-45 (citing Pet. 44; Ex-1003, ¶200), 48.
- "Nielsen-372 provide the hardware architecture for performing Steinberg's method…" POR, 45 (citing Pet. 45, Ex-1003, ¶¶199-200, 203.), 48.

In both sentences, Steinberg's approach/method refers to identifying individuals in the audience using face detection, normalization, and recognition, as opposed to Nielsen-372's manual-input-based approach. *See, e.g.*, Ex-1003, ¶202 ("Steinberg teaches a different *approach* of identifying individuals by performing face detection, normalization, and recognition …"); Pet., 44.

Dr. Doermann explains that "modules for performing face detection, normalization, and recognition may be implemented on a computer …, an image acquisition device …, or both" (Ex-1003, ¶199) and that it would have been obvious to implement these functions "on either the computer or the camera of Nielsen-372…" (Ex-1003, ¶200) because "Nielsen-372 provide the hardware architecture for performing Steinberg's face recognition method …" (Ex-1003, ¶203). Nowhere do the Petition or Dr. Doermann propose physically implementing Steinberg's camera using Nielsen-372's camera. PO's mischaracterization should be rejected.

### C. PO's mischaracterization does not undermine the obviousness showing of Ground 3 regardless.

PO's attack on the combination of Nielsen-372 and Steinberg essentially asks the Board to find the challenged claims non-obvious for claiming a camera pointing at individuals rather than a television. POR, 50-57. The '243 patent, as well as Dr. Saber, admits this to be a prior-art feature. Ex-1001, 1:56-66; Ex-1033, 23:10-12; *see* D.I., 43, n.28.

First, PO's argument is improperly directed to bodily incorporation, as it focuses on where a specific camera in Nielsen-372's system is pointing at. POR, 47-48, 51-55. This argument also lacks merit because applying Steinberg's teachings to Nielsen-372 does not necessitate turning the Nielsen-372's camera away from the television. Dr. Saber confirmed a POSITA's ability to connect two cameras to a computer to simultaneously capture a television and an audience (Ex-1033, 23:17-24, 24:17-25:9) as well as the availability of cameras with multiple image sensors for different directions or a wide field of view by 2011 (Ex-1033, 24:5-16, 27:8-21). Available technologies would have obviated the need to stop capturing images of the television.

Second, PO contends that not using the video sensor would have frustrated Nielsen-372's purpose and changed its principle of operation. POR, 53-55. However, Nielsen-372 explicitly teaches that the video sensor (e.g., camera) is optional. For example, claim 1 recites "[a] method to determine whether a presentation device is ON or OFF" based on "an audio signal," without requiring video signal. Ex-1006, 17-18 (cl. 1). Thus, not using Nielsen-372's camera to capture images of the television, even if required by the combination, is not inconsistent with the purpose and intended operation of Nielsen-372's system.

Third, PO's claim that "voluntary audience measurement" is a principle of operation of Nielsen-372 (POR, 54-56) lacks support because Nielsen-372 does not

mention the concept of "voluntary audience measurement" or discuss any benefit of such an approach. Nielsen-372 teaches that its people meter is "to capture information about the audience" and "*may* prompt the audience members to indicate that they are present …" Ex-1006, ¶48 (emphasis added). Dr. Doermann explains that applying Steinberg's method furthers Nielsen-372's goal of capturing audience information by reducing interruptions and improving accuracy. Ex-1003, ¶201; Pet., 44. Dr. Saber's testimony confirms this position by admitting that the purported "voluntary" system interrupts individuals to "identify themselves" and undercounts viewing activities for "certain guilty pleasure shows." Ex-2001, ¶¶150-151.

### D. PO's attacks on the motivation to combine with Tian fail for the same reasons as explained for Ground 1.

PO's arguments against the motivation to combine for Ground 3 essentially mimics those for Ground 1. They fail for the same reasons as explained above. *Supra* §I.C.

## III. ANALOGOUS ART

Dr. Doermann explains that the field of the '243 patent is media analysis, including analysis of audio signals and image signals. Ex-1003, ¶46. PO's proposed field of endeavor, "audience measurement" (POR, 62), is contradicted by Dr. Saber, who accepts Petitioner's POSITA definition requiring experience in "media analysis." Ex-2001, ¶¶26-29. When questioned, Dr. Saber further admitted

that he has no experience in audience measurement (Ex-1033, 23:2-9), the "field" of the '243 patent is "digital image/video processing, computer vision, pattern recognition, machine learning," (Ex-1033, 19:5-21) and his experience in this field qualifies him as a POSITA and expert (Ex-1033, 13:16-23, 22:15-23). PO's narrow definition ignores that audience measurement is an application in the field of media analysis. *E.g.*, Ex-1033, 14:25-15:7, 16:8-16, 23:2-9. That the '243 patent, Tian, and Steinberg does not literally recite "media analysis" (POR, 60) does not negate the fact that all of them are directed to media analysis, which Dr. Saber admits to include analyzing audio data and images. Ex-1033, 21:10-19.

Date: July 24, 2024

Respectfully,

SHEPPARD, MULLIN,
RICHTER & HAMPTON LLP

*/Harper Batts/*
Harper Batts (Reg. No. 56,160)
Attorney for Petitioner

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), the undersigned certifies that the foregoing Petitioner's Reply to Patent Owner's Response contains 5,583 words and therefore complies with the 5,600 word type-volume limit specified by 37 C.F.R. §42.24(c)(1). The word count does not include those portions excepted by 37 C.F.R. §42.24(c) and was calculated by Microsoft Word 365.

Date: July 24, 2024

*/Harper Batts/*
Harper Batts (Reg. No. 56,160)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 24, 2024, a complete copy of the foregoing Petitioner's Reply to Patent Owner's Response was served via email to all parties to this proceeding at the addresses indicated:


Jennifer C. Bailey
jennifer.bailey@eriseip.com

Robin A. Snader
robin.snader@eriseip.com

Megan J. Redmond
megan.redmond@eriseip.com

PTAB@eriseip.com


Date: July 24, 2024

*/Harper Batts/*
Harper Batts (Reg. No. 56,160)
Attorney for Petitioner

# Comprehensive Database for Facial Expression Analysis


Takeo Kanade
The Robotics Institute
Carnegie Mellon University
Pittsburgh, PA, USA 15213
tk@cs.cmu.edu
http://www.cs.cmu.edu/~face

Jeffrey F. Cohn
Department of Psychology
University of Pittsburgh
The Robotics Institute
Carnegie Mellon University
4015 O'Hara Street
Pittsburgh, PA, USA 15260
jeffcohn+@pitt.edu

Yingli Tian
The Robotics Institute
Carnegie Mellon University
Pittsburgh, PA, USA 15213
yltian@cs.cmu.edu



## Abstract

*Within the past decade, significant effort has occurred in developing methods of facial expression analysis. Because most investigators have used relatively limited data sets, the generalizability of these various methods remains unknown. We describe the problem space for facial expression analysis, which includes level of description, transitions among expression, eliciting conditions, reliability and validity of training and test data, individual differences in subjects, head orientation and scene complexity, image characteristics, and relation to non-verbal behavior. We then present the CMU-Pittsburgh AU-Coded Face Expression Image Database, which currently includes 2105 digitized image sequences from 182 adult subjects of varying ethnicity, performing multiple tokens of most primary FACS action units. This database is the most comprehensive test-bed to date for comparative studies of facial expression analysis.*


## 1. Introduction

Within the past decade, significant effort has occurred in developing methods of facial feature tracking and analysis. Analysis includes both measurement of facial motion and recognition of expression. Because most investigators have used relatively limited data sets, the generalizability of different approaches to facial expression analysis remains unknown. With few exceptions [10, 11], only relatively global facial expressions (e.g., joy or anger) have been considered, subjects have been few in number and homogeneous with respect to age and ethnic background, and recording conditions have been optimized. Approaches to facial expression analysis that have been developed in this way may transfer poorly to applications in which expressions, subjects, contexts, or image properties are more variable. In addition, no common data exist with which multiple laboratories may conduct comparative tests of their methods. In the absence of comparative tests on common data, the relative strengths and weaknesses of different approaches is difficult to determine. In the areas of face and speech recognition, comparative tests have proven valuable [e.g., 17], and similar benefits would likely accrue in the study of facial expression analysis. A large, representative test-bed is needed with which to evaluate different approaches.

We first describe the problem space for facial expression analysis. This space includes multiple dimensions: level of description, temporal organization, eliciting conditions, reliability of manually coded expression, individual differences in subjects, head orientation and scene complexity, image acquisition, and relation to non-facial behavior. We note that most work to date has been confined to a relatively restricted region of this space. We then describe the characteristics of databases that map onto this problem space, and evaluate Phase 1 of the CMU-Pittsburgh AU-Coded Facial Expression Database against these criteria. This database provides a large, representative test-bed for comparative studies of different approaches to facial expression analysis.

## 2 Problem space for face expression analysis

### 2.1 Level of description

Most of the current work in facial expression analysis attempts to recognize a small set of prototypic expressions. These prototypes occur relatively

infrequently, however, and provide an incomplete description of facial expression [11]. To capture the subtlety of human facial expression, fine-grained description of facial expression is needed. The Facial Action Coding System [FACS: 4] is a human-observer-based system designed to detect subtle changes in facial features. Viewing videotaped facial behavior in slow motion, trained observers can manually FACS code all possible facial displays, which are referred to as action units (AU) and may occur individually or in combinations.

FACS consists of 44 action units. Thirty are anatomically related to contraction of a specific set of facial muscles (Table 1) [22]. The anatomic basis of the remaining 14 is unspecified (Table 2). These 14 are referred to in FACS as miscellaneous actions. Many action units may be coded as symmetrical or asymmetrical. For action units that vary in intensity, a 5-point ordinal scale is used to measure the degree of muscle contraction.

Although Ekman and Friesen proposed that specific combinations of FACS action units represent prototypic expressions of emotion, emotion-specified expressions are not part of FACS; they are coded in separate systems, such as EMFACS [8]. FACS itself is purely descriptive and includes no inferential labels. By converting FACS codes to EMFACS or similar systems, face images may be coded for emotion-specified expressions (e.g., joy or anger) as well as for more molar categories of positive or negative emotion [13].

**Table 1. FACS Action Units.**

| AU | Facial muscle | Description of muscle movement |
|---|---|---|
| 1 | Frontalis, pars medialis | Inner corner of eyebrow raised |
| 2 | Frontalis, pars lateralis | Outer corner of eyebrow raised |
| 4 | Corrugator supercilii, Depressor supercilii | Eyebrows drawn medially and down |
| 5 | Levator palpebrae superioris | Eyes widened |
| 6 | Orbicularis oculi, pars orbitalis | Cheeks raised; eyes narrowed |
| 7 | Orbicularis oculi, pars palpebralis | Lower eyelid raised and drawn medially |
| 9 | Levator labii superioris alaeque nasi | Upper lip raised and inverted; superior part of the nasolabial furrow deepened; nostril dilated by the medial slip of the muscle |
| 10 | Levator labii superioris | Upper lip raised; nasolabial furrow deepened producing square-like furrows around nostrils |
| 11 | Levator anguli oris (a.k.a. Caninus) | Lower to medial part of the nasolabial furrow deepened |
| 12 | Zygomaticus major | Lip corners pulled up and laterally |
| 13 | Zygomaticus minor | Angle of the mouth elevated; only muscle in the deep layer of muscles that opens the lips |
| 14 | Buccinator | Lip corners tightened. Cheeks compressed against teeth |
| 15 | Depressor anguli oris (a.k.a. Triangularis) | Corner of the mouth pulled downward and inward |
| 16 | Depressor labii inferioris | Lower lip pulled down and laterally |
| 17 | Mentalis | Skin of chin elevated |
| 18 | Incisivii labii superioris andIncisivii labii inferioris | Lips pursed |
| 20 | Risorius w/ platysma | Lip corners pulled laterally |
| 22 | Orbicularis oris | Lips everted (funneled) |
| 23 | Orbicularis oris | Lips tightened |
| 24 | Orbicularis oris | Lips pressed together |
| 25 | Depressor labii inferioris, or relaxation of mentalis, or orbicularis oris | Lips parted |
| 26 | Masseter; relaxed temporal and internal pterygoid | Jaw dropped |
| 27 | Pterygoids and digastric | Mouth stretched open |

| | | |
|---|---|---|
| 28 | Orbicularis oris | Lips sucked |
| 41 | Relaxation of levator palpebrae superioris | Upper eyelid droop |
| 42 | Orbicularis oculi | Eyelid slit |
| 43 | Relaxation of levator palpebrae superioris; orbicularis oculi, pars palpebralis | Eyes closed |
| 44 | Orbicularis oculi, pars palpebralis | Eyes squinted |
| 45 | Relaxation of levator palpebrae superioris; orbicularis oculi, pars palpebralis | Blink |
| 46 | Relaxation of levator palpebrae superioris; orbicularis oculi, pars palpebralis | Wink |

**Table 2. Miscellaneous Actions.**

| AU | Description of Movement |
|---|---|
| 8 | Lips toward |
| 19 | Tongue show |
| 21 | Neck tighten |
| 29 | Jaw thrust |
| 30 | Jaw sideways |
| 31 | Jaw clench |
| 32 | Bite lip |
| 33 | Blow |
| 34 | Puff |
| 35 | Cheek suck |
| 36 | Tongue bulge |
| 37 | Lip wipe |
| 38 | Nostril dilate |
| 39 | Nostril compress |

## 2.2 Transitions among expressions

A simplifying assumption in previous research is that expressions are singular and begin and end from a neutral position. In reality, facial expression is more complex, especially at the level of action units. Action units may occur in combinations or show serial dependence. Transitions from action units or combination of actions to another may involve no intervening neutral state. Parsing the stream of behavior is an essential requirement of a robust facial analysis system, and training data are needed that include dynamic combinations of action units, which may be either additive or non-additive.

An example of an additive combination is smiling (AU 12) with mouth opening, which would be coded as AU 12+25, AU 12+26, or AU 12+27 depending on the degree of lip parting and whether and how far the mandible was lowered. In the case of AU 12+27, for instance, the facial analysis system would need to detect transitions among all three levels of mouth opening while continuing to recognize AU 12, which may be simultaneously changing in intensity.

Non-additive combinations represent further complexity. Following usage in speech science, we refer to these interactions as co-articulation effects. An example is the combination AU 12+15, which often occurs in embarrassment. While AU 12 raises the cheeks, its action on the lip corners is modified by the downward action of AU 15. The resulting appearance change is highly dependent on timing. The downward action of the lip corners may occur either simultaneously or sequentially. To be comprehensive, a database should include individual action units and both additive and non-additive combinations, especially those that involve co-articulation effects. A classifier trained only on single action units may perform poorly for combinations in which co-articulation effects occur.

## 2.3 Deliberate versus spontaneous expression

Most face expression data have been collected by asking subjects to perform a series of expressions. These directed facial action tasks may differ in appearance and timing from spontaneously occurring behavior [5]. Deliberate and spontaneous facial behavior are mediated by separate motor pathways, the pyramidal and extra-pyramidal motor tracks, respectively [16]. As a consequence, fine-motor control of deliberate facial actions is often inferior and less symmetric to that which occurs spontaneously. Many people, for instance, are able to raise their outer brows spontaneously while leaving their inner brows at rest; few can perform this action voluntarily. Spontaneous depression of the lip corners (AU 15) and raising and narrowing the inner corners of the brow (AU 1+4) are common signs of sadness. Without training, few people can perform these actions deliberately, which incidentally is an aid to lie detection [5]. Differences in the temporal organization of spontaneous and deliberate facial actions are particularly important in that many pattern recognition approaches, such as Hidden Markov Modeling, are highly dependent on the timing of appearance change. Unless a database includes both

deliberate and spontaneous facial actions, it will likely prove inadequate for developing face expression methods that are robust to these differences.

## 2.4 Reliability of expression data

When training a system to recognize facial expression, the investigator assumes that training and test data are accurately labeled. This assumption may or may not be accurate. Asking subjects to perform a given action is no guarantee that they will. To ensure internal validity, expression data must be manually coded, and the reliability of the coding verified. Inter-observer reliability can be improved by providing rigorous training to observers and monitoring their performance. FACS coders must pass a standardized test, which ensures (initially) uniform coding among international laboratories. Monitoring is best achieved by having observers independently code a portion of the same data. As a general rule, 15% to 20% of data should be comparison coded. To guard against drift in coding criteria [12], re-standardization is important. In assessing reliability, coefficient kappa [7] is preferable to raw percentage of agreement, which may be inflated by the marginal frequencies of codes. Kappa quantifies inter-observer agreement after correcting for level of agreement expected by chance.

## 2.5 Individual differences among subjects

Face shape, texture, color, and facial and scalp hair vary with sex, ethnic background, and age [6, 23]. Infants, for instance, have smoother, less textured skin and often lack facial hair in the brows or scalp. The eye opening and contrast between iris and sclera differ markedly between Asians and Northern Europeans, which may affect the robustness of eye tracking and facial feature analysis more generally. Beards, eyeglasses, or jewelry may obscure facial features. Such individual differences in appearance may have important consequence for face analysis. Few attempts to study their influence exist. An exception was a study by Zlochower [23]. They found that algorithms for optical flow and high-gradient component detection that had been optimized for young adults performed less well when used in infants. The reduced texture of infants' skin, their increased fatty tissue, juvenile facial conformation, and lack of transient furrows may all have contributed to the differences observed in face analysis between infants and adults.

In addition to individual differences in appearance, there are individual differences in expressiveness, which refers to the degree of facial plasticity, morphology, frequency of intense expression, and overall rate of expression. Individual differences in these characteristics are well established and are an important aspect of individual identity [14]. (Incidentally, these individual differences could be used to augment the accuracy of face recognition algorithms). An extreme example of variability in expressiveness occurs in individuals who have incurred damage either to the facial nerve or central nervous system [16, 19, 21]. To develop algorithms that are robust to individual differences in facial features and behavior, it is essential to include a large sample of varying ethnic background, age, and sex, that includes people who have facial hair and wear jewelry or eyeglasses, and includes both normal and clinically impaired individuals.

## 2.6 Head orientation and scene complexity

Face orientation relative to the camera, presence and actions of other people, and background conditions may influence face analysis. In the face recognition literature, face orientation has received deliberate attention. The FERET data base [17], for instance, includes both frontal and oblique views, and several specialized data bases have been collected to try to develop methods of face recognition that are invariant to moderate change in face orientation [20]. In the face expression literature, use of multiple perspectives is rare and relatively less attention has been focused on the problem of pose invariance. Most researchers assume that face orientation is limited to in-plane variation [1] or that out-of-plane variation is small [10, 11]. In reality, large out-of-plane variation in head position is common and often accompanies change in expression. Kraut [9] found that smiling typically occurs while turning toward another person. Camras [2] showed that infant surprise expressions often occur as the infant pitches her head back. To develop pose invariant methods of face expression analysis, image data are needed in which facial expression changes in combination with significant non-planar change in pose.

Scene complexity, such as background and presence of other people, potentially influences accuracy of face detection, feature tracking, and expression recognition. Most databases use image data in which the background is neutral or has a consistent pattern and only a single person is present in the scene. In natural environments, multiple people interacting with each other are likely to be present, and their effects need to be understood. Unless this variation is represented in training data, it will be difficult to develop and test algorithms that are robust to such variation.

## 2.7 Image acquisition and resolution

Image acquisition includes properties and number of video cameras and digitizer, size of the face image relative to total image dimensions, and ambient lighting. All of these factors may influence facial expression analysis. Images acquired in low light or at coarse resolution can provide less information about facial features. Similarly, when face image size is small relative to total image size, less information is available. NTSC cameras record images at 30 frames per second, The implications of down-sampling from this rate are unknown. Many algorithms for optical flow assume that pixel displacement between adjacent frames is small. Unless they are tested at a range of sampling rates, robustness to sampling rate and resolution cannot be assessed.

Within an image sequence, change in head position relative to the light source and variation in ambient lighting have potentially significant effects on face expression analysis. A light source above the subject's head will cause shadows to fall below the brows, which can obscure the eyes, especially for subject's with more pronounced bone structure or hair. Methods that work well in studio lighting may perform poorly in more naturalistic lighting (e.g., through an exterior window) when angle of lighting changes across an image sequence.

Most investigators use single-camera set-ups, which is problematic when a frontal orientation is not required. With image data from a single camera, out-of-plane variation may be difficult to standardize. For more than small out-of-plane rotation, multiple cameras may be required. Multiple camera setups can support 3-D modeling and in some cases ground truth with which to assess the accuracy of image alignment.

Image resolution is another concern. Professional grade PAL cameras, for instance, provide very high resolution images. By contrast, security cameras provide ones that are seriously degraded. Although post processing may improve image resolution, the degree of potential improvement is likely limited. Also the effects of post processing for expression recognition are not known. Algorithms that work well at optimal resolutions of full-face frontal images and studio lighting can be expected to perform poorly when recording conditions are degraded or images are compressed. Without knowing the boundary conditions of face expression algorithms, comparative performance is difficult to assess. Algorithms that appear superior within one set of boundary conditions may perform more poorly across the range of potential applications. Appropriate data with which these factors can be tested are needed.

## 2.8 Relation to non-facial behavior

Facial expression is one of several channels of nonverbal communication that may occur together. Contraction of the zygomaticus major (AU 12), for instance, often is associated with positive or happy vocalizations, and smiling tends to increase vocal fundamental frequency [3]. Few research groups, however, have attempted to integrate gesture recognition broadly defined across multiple channels of communication. An important question is whether there are advantages to early rather than late integration. Databases containing multi-modal expressive behavior afford opportunity for integrated approaches to analysis of facial expression, prosody, gesture, and kinetic expression.

## 2.9 Summary and problem statement

The problem space for facial expression includes multiple dimensions. To develop robust methods of facial expression analysis, these dimensions must be adequately sampled. In addition, to allow for comparative tests of alternative approaches to facial expression analysis, appropriate data must be made available to the face analysis community. To meet these needs, we have developed the CMU-Pittsburgh AU-Coded Facial Expression Database to serve as a test-bed for algorithm development and testing.

# 3 The CMU-PITTSBURGH AU-Coded Face Expression Image Database

Our interdisciplinary research group of psychologists and computer scientists is developing a large, representative facial expression database for use in both training and testing of algorithms for facial expression analysis. In this section we first describe the CMU-Pittsburgh AU-Coded Face Expression Database. We then evaluate the database against the criteria presented above, and discuss current and future work.

## 3.1 Description of database

Facial behavior was recorded in 210 adults between the ages of 18 and 50 years. They were 69% female, 31% male, 81%% Euro-American, 13% Afro-American, and 6% other groups (Table 3). They were observed in an observation room equipped with a chair on which to sit and two Panasonic WV3230 cameras, each connected to a Panasonic

AG-7500 video recorder with a Horita synchronized time-code generator. One of the cameras was located directly in front of the subject, and the other was positioned 30 degrees to the subject's right. An example of image data from the CMU-Pittsburgh AU-Coded Facial Expression Database can be seen in Figure 1. For approximately one third of subjects, ambient room lighting augmented by a high-intensity lamp was used. For the other two thirds, two high-intensity lamps with reflective umbrellas were used to provide uniform lighting.

**Table 3. CMU-Pittsburgh AU-Coded Facial Expression Database.**

| | |
|---|---|
| Subjects | |
| Number of subjects | 210 |
| Age | 18-50 years |
| Women | 69% |
| Men | 31% |
| Euro-American | 81% |
| Afro-American | 13% |
| Other | 6% |
| Digitized sequences | |
| Number of subjects | 182 |
| Resolution | 640x490 for grayscale<br>640x480 for 24-bit color |
| Frontal view | 2105 |
| 30-degree view | Videotape only |
| Sequence duration | 9-60 frames/sequence |
| Action Units | |
| From Table 1 | All but AU 13 |
| From Table 2 | AU 8, 38, and 39 |

Subjects were instructed by an experimenter to perform a series of 23 facial displays; these included single action units and combinations of action units. Although each display began and ended in a neutral face, for combinations the timing of action units could be examined. Sixty subjects performed head rotation to 30 degrees with facial expression, which was recorded with both cameras.

Image sequences for frontal views were digitized into either 640x490 or 640x480 pixel arrays with 8-bit gray-scale or 24-bit color values. To date, 1917 image sequences from 182 subjects have been FACS coded for either target action units or the entire sequence. Thirty-degree views are available on videotape. Approximately fifteen percent of the 1917 sequences were comparison coded by a second certified FACS coder. Inter-observer agreement was quantified with coefficient kappa, which is the proportion of agreement above what would be expected to occur by chance [7]. The mean kappas for inter-observer agreement were 0.82 for action units coded at apex and 0.75 for frame-by-frame coding. For those action units that were coded only at apex and not from beginning to end, we are performing additional coding. We also are increasing the number of action units that have been coded for intensity.



**Figure 1. Frontal and 30-degree to the side views available in CMU-Pittsburgh AU-Coded Facial Expression Database.**

The CMU-Pittsburgh AU-Coded Face Expression Image Database includes all of the action units listed in Table 1 either alone or in combination with other AUs, with the exception of AU 13, which most people find difficult to perform voluntarily and occurs infrequently in spontaneous behavior. Miscellaneous actions listed in Table 2 are less well represented. The database has been used in several studies [e.g., 10, 11, 18]. For information about use of the database, please contact the second author.

### 3.2 Database evaluation

With 1917 sequences from 182 male and female subjects of varying ethnic background, the database provides a sufficiently large, representative test-bed for assessing facial behavior and individual-difference factors. The level of facial expression description supports analyses of single action units and both additive and non-additive combinations. By applying EMFACS, emotion-specified expressions (e.g., joy, anger) may be analyzed as well. Action unit combinations representing joy, surprise, sadness, disgust, anger, and fear are included in adequate numbers. These prototypic expressions may be further combined to form aggregates of positive and negative expression. The database includes subjects of varying skin color and facial conformation, so that the influence of these factors may be examined.

Lighting conditions and context were relatively uniform. Out-of-plane head motion was small to mild. Images were acquired using S-Video cameras (approximately 425 lines per frame) and digitized at frame rate omitting odd fields. The image data may be transformed or down-sampled to examine the effects of reduced resolution, sampling rate, image compression, and luminance.

The database has several limitations in its present form. Intensity scoring of action units is incomplete, and for many sequences only target frames rather than the entire sequence have been coded. As noted above, continued coding is underway in order to further improve the data. Another limitation is the lack of spontaneous expressions. Because deliberate and spontaneous expressions may have different appearance and timing, it is important to have adequate numbers of each.

One solution, which we are pursuing, is to examine our videotapes for instances of spontaneously occurring action units that occurred during the experimental session. We now have a large sample of spontaneous smiles (AU 12) and related action units (e.g., AU 6), and these will be added to the database.



**Figure 2. Automated face detection and facial-feature and eye tracking in image sequence obtained from synchronized cameras and split-screen generator.**

### 3.3 Database extension.

**Emotion analysis**. We are making arrangements to include data from our studies of emotion processes. In these studies, we have elicited emotion responses in infants, children, and adults and recorded their facial and vocal behavior [e.g., 3, 23]. Figure 2 from [18] shows an example of automated face detection and feature tracking in an image sequence of face-to-face interaction between a mother and her infant. The image was acquired from two synchronized cameras and a split-screen special-effects generator, which is commonly used by psychologists who study social interaction. The image suggests challenges in several dimensions of the face analysis problem space. The face images and facial features, especially in the infant, are small relative to the image size, the infant's face has low texture, some shadows occur, and the likelihood of sudden and large motion, occasional occlusion, and moderate out-of-plane motion is high. These are challenging problems for which appropriate training and testing data are critical.

**Surgical application.** Another data source is facial behavior from patients who have experienced damage to the facial nerve or the higher brain centers that control facial behavior [16]. An example can be seen in Figure 3 from [21]. Notice the mild asymmetry in repose due to muscle weakness and the more marked asymmetry that occurs in the second frame. The inclusion of clinical data such as these challenges assumptions of symmetry, which are common when working with directed facial action task images from subjects who have normal facial function.



**Figure 3. Automated facial feature tracking in image sequence from subject with facial nerve impairment.**

**Omni-view facial analysis.** We plan to expand our ability to analyze facial expression from multiple perspectives. Our research team has a method referred to as virtualized reality that can integrate input from dense arrays of over 50 cameras [15]. An example of a face image from multiple camera views can be seen in Figure 4. The subject is shown from the perspective of six cameras. Using virtualized reality, intermediate views may be generated for all possible perspectives. This approach affords accurate 3-D modeling of facial expression and the necessary ground-truth with which to test image alignment algorithms that are based on single-camera data.

## 4. Conclusion.

The problem space for facial expression analysis includes multiple dimensions. These include level of description, transitions among expressions, distinctions between deliberate and spontaneous expressions, reliability and validity of training and test data, individual differences among subjects in facial features and related characteristics, head orientation and scene complexity, image

characteristics, and relation to other non-verbal behavior. Development of robust methods of facial expression analysis requires access to databases that adequately sample from this problem space. The CMU-Pittsburgh AU-Coded Facial Expression Image Database provides a valuable test-bed with which multiple approaches to facial expression analysis may be tested. In current and new work, we will further increase the generalizability of this database.



**Figure 4. Face images obtained from omni-view camera. (6 images are shown here out of 50 that were available).**

## 5. Acknowledgements

This research was supported by grant number R01 MH51435 from the National Institute of Mental Health.

## 6. References


[1] M.S. Bartlett, J.C. Hager, P. Ekman, T.J. Sejnowski, Measuring facial expressions by computer image analysis. *Psychophysiology*, 36:253-264, 1999.

[2] L.A. Camras, L. Lambrecht, L., G.F. Michel. Infant "surprise" expressions as coordinative motor structures. *Journal of Nonverbal Behavior*, 20:183-195, 1966.

[3] J.F. Cohn, G.S. Katz, Bimodal expression of emotion by face and voice. *ACM and ATR Workshop on Face/Gesture Recognition and Their Applications*, 41-44, 1998.

[4] P. Ekman, W.V. Friesen, *Facial Action Coding System,* Consulting Psychologist Press, Palo Alto, CA, 1978.

[5] P. Ekman, E. Rosenberg (Eds.), *What the face reveals.* NY: Oxford University, 1997.

[6] L.G. Farkas, I.R. Munro, Anthropometric Facial Proportions in Medicine, Springfield, Illinois: Charles C. Thomas, 1987.

[7] J.L. Fleiss, *Statistical Methods for Rates and Proportions*, NY: Wiley, 1981.

[8] W.V. Friesen, P. Ekman, EMFACS-7: *Emotional Facial Action Coding System*, Unpublished manuscript, University of California at San Francisco, 1983.

[9] R.E. Kraut, R. Johnson, Social and emotional messages of smiling: An ethological approach. *Journal of Personality and Social Psychology*, 37:1539-1523, 1979.

[10] J.J.J. Lien,T. Kanade, J.F. Cohn, C.C. Li, Detection, tracking, and classification of subtle changes in facial expression. *Journal of Robotics and Autonomous Systems*, in press.

[11] J.J.J. Lien, T. Kanade, J.F. Cohn, C.C. Li,. Automated facial expression recognition. *Proceedings of the Third IEEE International Conference on Automatic Face and Gesture Recognition (FG'98),* 390-395, 1998.

[12] P. Martin, P. Bateson, *Measuring behavior: An introductory guide.* Cambridge: Cambridge University, 1986.

[13] R. Matias, J.F. Cohn, S. Ross, A comparison of two systems to code infants' affective expression. *Developmental Psychology*, 25: 483-489, 1989.

[14] A.S.R. Manstead, Expressiveness as an individual difference. In R.S. Feldman & R. Rime (Eds.), *Fundamentals of nonverbal behavior,* 285-328. *NY: Cambridge University*, 1991.

[15] P.J. Narayanan, P. Rander, T. Kanade, Constructing virtual worlds using dense flow. *Proceedings of the International Conference on Computer Vision '98*, 3-10, 1998.

[16] W.E. Rinn, The neuropsychology of facial expression: A review of the neurological and psychological mechanisms for producing facial expressions. *Psychological Bulletin,* 95:52-77, 1984.

[17] S.R. Rizvi, P.J. Phillips, H. Moon, The Feret verification testing protocol for face recognition algorithms. *Proceedings of the Third International Conference on Automatic Face and Gesture Recognition*, 48-55, 1998.

[18] Y.L. Tian, T. Kanade, J.F. Cohn, Robust lip tracking by combining, shape color and motion. *Asian Conference for Computer Vision, 2000.*

[19] J.M., VanSwearingen, J.F. Cohn, A. Bajaj-Luthra, Specific impairment of smiling increases severity of depressive symptoms in patients with facial neuromuscular disorders. *Journal of Aesthetic Plastic Surgery*, in press.

[20] T. Vetter, Learning novels views to a single face image. *Proceedings of the IEEE International Conference on Automatic Face and Gesture Recognition '95:* 22-29, 1995.

[21] G.S. Wachtman, J.F. Cohn, J. VanSwearingen, E.K. Manders, Pixel-wise tracking of facial movement by computer image processing. *Robert H. Ivy Society of Plastic & Reconstructive Surgeons*, Pittsburgh, 1999.

[22] A.J. Zlochower, *Deciphering emotion from the face: An evaluation of FACS, EMG, and computer-vision based approaches to facial expression analysis.* Unpublished manuscript, University of Pittsburgh, 1997.

[23] A.J. Zlochower, J.F. Cohn, J.J. Lien, T. Kanade, A computer vision based method of facial expression analysis in parent-infant interaction, *International Conference on Infant Studies*, Atlanta, Georgia, April 1998.

Planet Depos
We Make It Happen™

# Transcript of Dr. Eli Saber

**Date:** July 2, 2024
**Case:** TVision Insights, Inc. -v- The Nielsen Company (US), LLC (PTAB)

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

_________________________

BEFORE THE PATENT TRIAL AND APPEAL BOARD

__________________________

TVISION INSIGHTS, INC.,

Petitioner,

v.

THE NIELSEN COMPANY (US), LLC,

Patent Owner.

____________________________

IPR2023-01014

U.S. Patent No. 11,470,243

____________________________

DEPOSITION OF DR. ELI SABER

Conducted Virtually

Tuesday, July 2, 2024

7:32 A.M. PST

Job No.: 539447

Pages: 1-174

Reported by: Crystal Hereford, RPR

Deposition of DR. ELI SABER, conducted virtually.

Pursuant to notice, before CRYSTAL HEREFORD, Registered Professional Reporter, Certificate No. 30819, and California Certified Reporter, Certificate No. 14416.

A P P E A R A N C E S

ON BEHALF OF PETITIONER:

FANGZHOU (FRED) QIU, ESQ.
HARPER S. BATTS, ESQ.
SHEPPARD MULLIN
1540 El Camino Real, Suite 120
Menlo Park, California 94025
650.815.2600

ON BEHALF OF PATENT OWNER:

ROBIN A. SNADER, ESQ.
ERISE IP
7015 College Boulevard, Suite 700
Overland Park, Kansas 66211
913.777.5604

ALSO PRESENT:

MICHAEL ENYRE
VIRGINIA BROWN
LUCIEN NEWELL, A/V Technician, Planet Depos

C O N T E N T S


| EXAMINATION OF DR. ELI SABER | PAGE |
|---|---|
| By Mr. Qiu | 5 |


E X H I B I T S

(Retained by counsel)


| SABER | DEPOSITION EXHIBIT | PAGE |
|---|---|---|
| Exhibit 1001 | US Patent No. 11,470,243 | 93 |
| Exhibit 1005 | Ying-Li Tian, Evaluation of Face Resolution for Expression Analysis | 104 |
| Exhibit 1008 | US Patent No. 4,858,000 | 164 |
| Exhibit 2001 | SIGNED_Declaration of Saber for 243 Patent | 19 |
| Exhibit 2020 | Supplemental Declaration of Dr. Eli Saber | 42 |
| Exhibit 2034 | Face Recognition Algorithms | 73 |

P R O C E E D I N G S

THE REPORTER: We will go on the record.

Will counsel please announce your appearance and state whom you represent?

MR. SNADER: Robin Snader with Erise for the patent owner.

MR. QIU: Fred Qiu with Sheppard Mullin for Petitioner TVision Insights, Inc. With me is my colleague, Harper Batts.

DR. ELI SABER

a witness herein, having been first duly sworn by the certified reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION

BY MR. QIU:

Q. Good morning, Dr. Saber.

A. Good morning to you.

Q. I want to go over a few -- to get started, I want to go over a few ground rules.

So you understand you are under oath to tell the truth here?

A. I do.

Q. For this deposition, we will need verbal responses because this is being transcribed today. We need to make sure the court reporter can get your

responses. Is that fair?
A. That is fair.
Q. And we can take breaks today when you need to. I would just ask that there's no questions pending when you take breaks. Is that fair?
A. That is fair.
Q. Do you understand you are not allowed to discuss your testimony with your counsel during breaks today?
A. I do.
Q. If you don't understand a question, let me know, and I will rephrase. Unless you say otherwise, I will assume you understand the question. Is that fair?
A. That is fair.
Q. You have to answer my questions today unless your attorney instructs you otherwise. Is that fair?
A. Yes.
Q. Are you on any medication today?
A. No, I am not.
Q. Any reason that you wouldn't be able to provide accurate and truthful testimony today?
A. No.
Q. Are you here to give testimony in the inter partes review proceeding involving US Patent Number 11,470,243?

A. I am.
Q. Today, we'll refer to that patent as the '243 patent. Is that right?
A. That is fine.
Q. What documents do you have here with you?
A. I'm sorry?
Q. What documents do you have here with you?
A. Counsel has sent three binders that have all the exhibits in them. They arrived a couple days ago.
Q. So you're referring to all the papers and exhibits that have been filed with this proceeding?
A. That is correct.
Q. Are the documents clean copies?
A. Yes, they are.
Q. Are these documents hard copies or electronic copies?
A. The three binders are all hard copies right here.
Q. Do you have electronic copies on your computer that you will be accessing?
A. No, I do not. I would ask that you would upload all the exhibits that we are going to talk about in electronic form to the chat box, please.
Q. Okay. That sounds good.
Do you have any other documents with you?

A. No, I do not.
Q. Does the -- do you have any notes with you?
A. No, I do not.
Q. Since we are conducting this deposition over Zoom and we are not in the same room, I'd ask that you don't use your computer for anything other than this Zoom meeting. Is that okay?
A. That's perfectly fine.
Q. If you access any document on your computer, including any document that I may upload, I'd ask you to let me know that you are accessing the document. Is that okay?
A. That's fine. I will only access the documents that you upload.
Q. Okay. Now, one of the things that we are probably going to talk about today is the concept of a person of ordinary skill in the art. Are you familiar with that phrase?
A. You cut out a little bit, so I didn't hear you very well. Would you repeat, please, the question.
Q. Sure.
One of the things that we're going to talk about today is the concept of a person of ordinary skill in the art. Are you familiar with that concept?
A. I am.

Q. If we use the term "POSITA," P-O-S-I-T-A, will you understand that refers to a person of ordinary skill in the art?
A. I will.
Q. So you have had two declarations submitted for this case. Is that right?
A. That is correct.
Q. Are there any errors in your declaration or anything you want to change?
A. While I was reviewing the original declaration, not the supplemental, on page 24, paragraph 48, the quote has been misquoted and should be --
Q. Let me -- give me a minute to go there.
Okay. Sorry. Please keep going.
A. Yes. Let me go to the declaration.
On page 24 of the original declaration, not the supplemental, paragraph 48, the first sentence has a quotation from Tian. And that quote should say "An example in five different resolutions from the Cohn-Kanade database," not "of." It should say "An example in."
Q. Okay. Any other errors or changes you have in the declarations?
A. Not that I noticed. There might be some minor typos here and there, but this one I thought would

be important to point out.

Q. How much time did you spend preparing your declaration?

A. I don't recall off the top of my head.

Q. Any ballpark estimate?

A. It's hard to estimate. I mean, I don't know. Many hours. I don't remember off the top of my head. It's been a while, and so I don't remember exactly off the top of my head.

Q. Do you remember how much time you spent for your supplemental declaration?

A. Again, I don't remember off the top of my head. It's been a while.

Q. Did you prepare your original declaration yourself?

A. So I have a process that works very well for me. Obviously I looked at the materials. I read them very carefully. I discuss details with counsel. I provide a first draft, and then it's a collaborative and iterative effort to come to the final revision, which I review very carefully and sign.

Q. Did you use the same process for both declarations?

A. Yes, I did.

Q. Is there any part of either declaration that

you didn't prepare yourself?

MR. SNADER: I'd caution the witness to not reveal any information that might be protected by privilege.

A. I don't remember off the top of my head. As I mentioned, it's a collaborative and iterative effort to come to the final document.

Q. So you're not sure whether there are any portions of your declaration that you didn't prepare yourself.

MR. SNADER: Objection; asked and answered.

A. Again, as I mentioned, it's a collaborative and iterative effort, and I don't remember the details off the top of my head. It's been quite a while.

Q. What documents did you review when preparing your declaration?

A. The list of exhibits that I have reviewed when preparing my declarations are listed in the exhibits -- list of exhibits section of both declarations.

Q. Did you review anything that's not listed in the list of exhibits?

A. I don't recall off the top of my head, but most likely not. Obviously I relied on my expertise and knowledge and experience in the field as well.

Q. What did you do to prepare for this deposition?
A. I read through my declarations. I read through the patent and the prior art. And I had meetings with counsel.
Q. How much time did you spend preparing for this deposition with counsel?
A. How much time did I spend meeting with counsel?
Q. Yes.
A. I don't know. Somewhere between eight to ten hours between meetings and phone calls.
Q. How much time did you spend other than meeting with counsel for prepping for this deposition?
A. Probably around 10 hours or so, 10 to 12 hours.
Q. Did you review any documents that's not listed on the exhibit list for preparing for this deposition?
MR. SNADER: Objection; asked and answered.
A. No, I did not.
Q. In total, how much time have you spent reading and reviewing the '243 patent?
A. I don't remember off the top of my head.
Q. Have you ever reviewed the entire

specification of the '243 patent?
A. I'm sorry?
Q. Have you ever reviewed the entire specification of the '243 patent?
A. I must be missing a word or so. Have you reviewed the what?
Q. Have you reviewed the entire specification of the '243 patent?
A. Okay. The entire specification, yes, I have.
Q. Do you believe you have an adequate understanding of the '243 patent?
A. Yes, I do.
Q. Is there anything you think is unclear about the '243 patent?
A. No, there's not.
Q. Do you believe you're qualified to testify as an expert in the field of the '243 patent?
A. Yes, I am.
Q. What knowledge or expertise qualifies you as an expert?
A. I have been working in the field of digital image/video processing, computer vision, machine learning for many years, since the early '90s.
Q. Do you believe your experiences are relevant to the field of the '243 patent?

A. Yes, I do.

Q. Why are they relevant?

A. As I mentioned, I have been working in the field of image processing, digital video processing, object tracking, object detection, face recognition, segmentation, classification, machine learning for -- since the early '90s, since the '93 time frame.

Q. So you mentioned multiple different subjects. Are they all in the same field? Or are they different fields?

MR. SNADER: Objection; form.

A. Well, there is a lot of overlap between a lot of the fields. Like, computer vision, pattern recognition, and machine learning have a lot of overlap. So there's a lot of overlap in a variety of methodologies, algorithms, et cetera.

Q. What does image processing entail?

A. Well, on a high-overview level, you know, the processing of images, taking on, let's say, digital images and performing segmentation or classification or restoration, compression. So you're processing the image to transform it from Domain A to Domain B, let's say, as a general -- very high overview, general explanation.

Q. How is image processing related to the field

of the '243 patent?
A. Well, obviously the '243 patent discusses an audience measurement system. So there is the -- you know, identifying people, performing facial recognition on audience members, counting people. So acquiring imagery and processing that imagery to -- for certain outcomes.
Q. What does digital video processing include?
A. Well, digital video processing essentially starts to get into the temporal domain, so the processing of sequences of images taken with, let's say, a video camera -- I think. Let's say 30 frames a second for discussion's sake. So you're acquiring images -- frames at 30 frames per second that constitute a video of some object or scenery that you have acquired, so...
Q. What does computer vision entail?
A. Well, computer vision gets -- I mean, again, I'm talking in general, very general here -- gets into the algorithms of how would you view imagery or apply stereo imaging or a variety of techniques to essentially acquire imagery, whether it's still or video, and perform certain actions.
Q. What are the actions?
A. Let's say I'm doing autonomous driving. So I'm acquiring imagery, and then I am instructing a robot

or a vehicle to navigate an environment. So I have to be able to process that.

Q. Does computer vision include analyzing the images? Yeah. That's my question.

MR. SNADER: Objection; form.

A. I didn't quite follow your question. Would you repeat that, please?

Q. Does computer vision include analyzing the images to identify objects?

A. Yes, it does.

Q. Does computer vision include analyzing the images to -- for other purposes?

A. Yes.

Q. What are some of the other purposes?

A. Segmentation, classification, recognition. These are some applications.

Q. Why is computer vision relevant to the field of the '243 patent?

MR. SNADER: Objection; assumes facts not in evidence.

A. Well, I mean, the '243 patent is obviously doing, you know, face recognition. It's doing, you know, classification. So it would -- you know, computer vision as a whole is a very big umbrella of a field, so some of the techniques there would be relevant

to what's taking place in the '243.
Would you upload a copy of the '243, please?
Q. Sure.
MR. QIU: Counsel, would you like to upload? Or should I?
MR. SNADER: If you have a copy at hand, that would be convenient. Otherwise, I can upload.
Q. Dr. Saber, I have uploaded a copy of the patent. Can you see that?
A. I do. I am in the process of downloading it.
Q. Okay.
A. I have an empty folder on my desktop that I will download all the exhibits into.
All right. I do have it in front of me, and it is -- I do have it open, and I also have a paper copy.
Q. Are you a POSITA?
A. Well, I am an expert in the field, but I'm very well aware of the knowledge and expertise of a POSITA.
Q. So you would opine that you are a POSITA.
MR. SNADER: Objection; vague and ambiguous.
A. As I mentioned, obviously I'm an expert in the field, but I'm also very well aware of the knowledge and expertise of a POSITA.

Q. Do you believe you're -- do you believe you are qualified as a POSITA?

A. Yes.

Q. And you explained that in your original declaration, correct?

A. I'm sorry?

Q. You explained that in your original declaration, correct?

A. I explained what?

Q. You explained that you qualify as a POSITA in your original declaration, correct?

A. Could you upload a copy of the original declaration, please.

Q. Actually, let me -- as it is uploading, let me rephrase my question.

Why do you believe you qualify as a POSITA?

MR. SNADER: Counsel, can you clarify the field of the -- of your question?

MR. QIU: Sorry? Could you repeat that?

MR. SNADER: You keep saying "POSITA." Just for the record, can you clarify that you're talking about a POSITA in the area of the -- say, the '243 patent or...

MR. QIU: Sure.

Q. Dr. Saber, why do you believe you qualify as

a POSITA in this case?
A. Give me one moment. Let me download the document and have it open.
Excuse me. So please repeat your question.
Q. Why do you believe you qualify as a POSITA regarding the '243 patent?
A. Well, as I mentioned, I've been working in this field for over 30 years. I've worked with colleagues. I've worked with students. I've worked with engineers during my time at the Xerox Corporation. So I've interacted with colleagues, students, engineers, other practitioners in the field. So I'm well aware of the knowledge and expertise of a POSITA.
Q. You mentioned you have worked in this field for over 30 years. Which field are you referring to?
A. The digital image -- digital -- well, typically we refer to it as signal processing as an umbrella, but basically the digital image/video processing, computer vision, pattern recognition, machine learning. I've been working in this field for -- or these fields for over 30 years now.
Q. Can you please go to your declaration -- original declaration, which is Exhibit 2001, at paragraph 28.
(Exhibit Number 2001 introduced.)

A. Yes, sir. Let me go there.
Q. Please let me know when you get there.
A. Yes, sir. I'm there.
Q. At the end of that paragraph, you explain that you specialize in media analysis. Is that correct?
A. Yes, sir. You read that correctly.
Q. So you -- would you say the fields you mentioned, like video processing, computer vision, pattern recognition, machine learning, those are part of media analysis?
MR. SNADER: Objection; form.
A. Well, you can apply the techniques in those fields to a variety of different applications. Media analysis is obviously one of those applications, but you can apply digital video processing, for instance, to do compression or, you know, to do a variety of applications.
Q. Let me try to reframe my question, because, Dr. Saber, I think you didn't quite understand it -- quite answer it.
Which of the fields that you mentioned where you have over 30 years experience in are part of media analysis?
MR. SNADER: Objection; form.
A. Well, again, they all apply depending on

what you -- what's the application that's involved. So if I'm doing digital video processing, if I'm processing a sequence of images or imagery, you know, you may apply techniques from image and video processing or computer vision, for instance. If I'm doing media analysis for classification, if I'm trying to classify a variety of patterns or classes, then those techniques from pattern recognition might come into play. So it depends on the application.

Q. What do you mean by "media analysis" when you mention it in your declaration?

A. Well, analyzing digital media, digital sequences of images -- images, analyzing, you know, imagery that would be acquired through, you know, cameras or...

Q. Are audio data also a part of media -- digital media?

A. Yeah. That could be -- that could be -- yes. It would be part of it.

Q. But is the patent about media analysis?

A. Well -- so you see in -- I'm looking at the patent, Column 1, lines between 35 and 40.

So you see the "Field of the Disclosure." You see it says "This disclosure relates generally to audience measurement and, more particularly, to methods

and apparatus to capture images."
Q. Dr. Saber, are you done with this?
A. Yes.
Q. So is the '243 patent about audience measurement or about media analysis?
MR. SNADER: Objection; form.
A. Well, again, as you see in the field of the disclosure, it discloses "The disclosure relates generally to audience measurement and, more particularly, to methods and apparatus to capture images."
So you're capturing imagery, which you are going to analyze for -- as they do in the '243 for the purposes of the '243.
Q. So how does your expertise in media analysis qualify you as a POSITA for the '243 patent?
A. I think I've answered that already. I mean, I have been working in the field of image/video processing, computer vision, pattern recognition, machine learning for over 30 years now on a variety of applications from segmentation to object detection, tracking, classification, recognition, many applications, printing applications.
Q. So what is your experience in audience measurement?

A. I don't understand your question.

Q. Do you have any previous experience in audience measurement?

A. I haven't done direct work in audience measurement, because this is not one of the applications I have targeted. But all the image processing applications that go with what's being discussed in the '243 is work that I've been involved with for over 30 years.

Q. By 2011, was it common to use cameras to take photos of the audience?

A. Yes.

Q. Was it common for cameras to be connected to a computer so that the computer can process and analyze photos taken by the camera?

A. Yes.

Q. By 2011, would a POSITA have been able to connect two cameras to a computer where the two cameras pointed different directions?

MR. SNADER: Objection; calls for speculation.

A. You mean hard-wiring -- you know, USB or hard-wiring two cameras to computers to capture imagery? Yes.

Q. By 2011, were there multi-directional cameras

proportional to my weighting. And when I weight them, I can basically have multiplications -- four multiplications and three additions.

Q. By 2011, would a POSITA have been able to use pixel binning to reduce the resolution of an image?

A. Say that again.

Q. By 2011, would a POSITA have been able to use pixel binning to reduce the resolution of an image?

A. Well, if you're stating pixel binning as meaning adding four pixels together and essentially summing them or summing them and dividing by four, yes, a POSITA would know how to do that.

Q. And according to your description of the pixel binning method of adding four pixels together, does that include three summation operations?

A. Yes. If you're just strictly adding them together, yes.

Q. Generally, is face detection computationally more complex than downsampling?

MR. SNADER: Objection; vague and ambiguous.

A. I didn't follow your question. Can you rephrase?

Q. Sure.

I'm asking about the relative computational complexity of two operations. One operation is face

detection. Another operation is downsampling.
And that question is: Is face detection generally computationally more complex than downsampling?
A. So your question is too general. So if you're saying downsampling is just picking one out of every four pixels -- that's downsampling -- that would be relatively easier than doing face detection. But I would have to see exactly what the algorithms are specifically to be able to comment with specifics.
Q. Taking your example where downsampling means sampling or taking one out of every four pixels, is that significantly more simple than most face detection methods?
A. Generally speaking, it's fairly simple for you to skip every other pixel in the horizontal and vertical direction and just select one.
Q. How about the computational complexity of face detection versus pixel binning?
MR. SNADER: Objection; vague and ambiguous.
A. So if pixel binning is defined as the addition of four pixels and computing the sum, then that would be relatively easier than a face detection algorithm, generally speaking. But, again, we would have to see the details of exactly what you're doing to

provide specifics and, you know, accurate technical discussions.

Q. How about the relative computational complexity of face detection versus bilinear interpolation?

MR. SNADER: Objection; vague and ambiguous.

A. Again, for you to do this technically accurately, you would have to know exactly the steps of how it's being done and who is doing it and how the algorithm is doing it. But generally speaking, bilinear interpolation would be relatively easier to do than face detection, generally speaking. But, again, I would have to see the details of the algorithms to be able to give you specific computational complexities.

Q. Next, I want to ask about the computational complexity of post estimation or face orientation determination. How does the computational complexity of post estimation compare to that of subsampling?

MR. SNADER: Objection; vague and ambiguous.

A. I don't know what you mean by "post estimation." What are you estimating? What is -- post what? Your question is too vague, sir.

Q. Let me use another word.

How does the computational complexity of face orientation determination compare with subsampling an

image to reduce its resolution?

MR. SNADER: Objection; vague and ambiguous.

A. Again, to be specific and accurate, you would have to look at the algorithm details specifically. But face orientation determination would be, relatively speaking, more complex than subsampling. But, again, I'd have to see the details of what exactly the algorithms are doing, how it's being done to comment with specifically on that -- with specificity on it.

Q. How does the computational complexity of face orientation determination compare with pixel binning?

MR. SNADER: Objection; vague and ambiguous.

A. Again, I mean, generally speaking, to be accurate, I would have to see the exact algorithms. But pixel binning, if you're just summing four pixels, it would be relatively easier computationally-wise than face orientation detection.

Q. How does the computational complexity of face orientation determination compare with bilinear interpolation?

MR. SNADER: Objection; vague and ambiguous.

A. Again, the same answer as before. I would need to see the details of the algorithms to give you things more specific. But bilinear interpolation would probably relatively be easier -- if it's properly

implemented, it would probably be easily -- easier than face orientation determination.

Q. How does the computational complexity of face detection compare with anti-aliasing?

MR. SNADER: Objection; vague and ambiguous.

A. Again, the same answer. I mean, it depends on what your are detecting, how you -- if I'm just detecting front-based faces with one convolutional kernel -- so it depends on how the algorithms are structured and implemented. So it's hard to answer that question with specifics. I would need to see the details of the algorithms to give you exact answers with specificity.

Q. How does the computational complexity of face orientation determination compare with anti-aliasing techniques?

MR. SNADER: Objection; vague and ambiguous. Objection; asked and answered, I believe.

A. So, I mean, again, you would need -- I would need to have specifics to answer. You're asking very general questions of a very general nature. You know, am I looking at the face orientation for one orientation? Am I looking for two? Am I looking for 1 degree orientation steps from all the way 360?

So I need to see specifics to discuss details

compared to other techniques and discuss the details of those algorithms. So it's hard to say directly "this is what it would be." It depends a lot on what you're doing, what exactly are the steps of the algorithms.
Q. Taking face detection in an audience measurement scenario, for example, how does the computational complexity of the face detection in that scenario compare with that of prefiltering for anti-aliasing?
A. I didn't get the first part of your question. You broke up.
Q. Taking face detection for audience measurement in a living room, for example, how does --
A. What kind of measurement? For what?
Q. Face detection.
A. Yes. For audience measurement, okay.
Q. Audience measurement.
A. Okay.
Q. Taking that example, how does the computational complexity of face detection compare with that of low-pass filtering for anti-aliasing?
A. Well, I would need to see what the algorithms -- the details of the algorithms that you are applying, what conditions you're applying them in, what -- are you detecting the faces for any orientation,

a single orientation? So there's a lot of specifics in these questions. You need to know the specifics to really give a proper answer to these questions.
Q. Are you familiar with the Tian reference, which is Exhibit 1005?
(Exhibit Number 1005 introduced.)
A. Yes, I am.
Q. What is this reference about?
A. Do you want -- I don't believe you've uploaded that reference. Would you like to upload it, please.
Q. Yeah. I'm doing it now.
A. I have the reference.
Q. What is the Tian reference about?
A. Well, if you look at the title, it says "Evaluation of Face Resolution for Expression Analysis."
Q. Tian teaches using the Cohn-Kanade face expression database. Is that correct?
A. Tian is referring to the Cohn-Kanade database. That is correct.
Q. Is it your understanding that this database includes images in five different resolutions?
A. Well, if you look at Table 1 of Tian, Tian states that "An example in five different resolutions from the Cohn-Kanade database." So a POSITA reading

that would understand that Tian is providing an example in five different resolutions from the Cohn-Kanade database.

Q. And based on this understanding, you believe Tian does not teach the process of reducing the resolution of an image. Is that correct?

MR. SNADER: Objection; mischaracterizes testimony.

A. Well, as I mentioned to you, Tian says "An example in five different resolutions from the Cohn-Kanade database." Tian does not teach -- does not provide a system or circuitry or any hardware or algorithms to perform different -- to convert the different resolutions. Tian makes a statement "An example in five different resolutions from the Cohn-Kanade database."

Q. Are you familiar with the Cohn-Kanade database?

A. Yes, I am. I mean, I understand the database has obviously facial expression -- facial expressions.

Q. Did you know this database before your engagement on this case?

A. Well --

MR. SNADER: Objection; scope.

A. I don't remember off the top of my head if I

ran across it at some point in time. I don't remember.

Q. Where did you get your knowledge about this database?

MR. SNADER: Objection; scope.

A. Well, obviously Petitioner has filed a petition in this case with a declaration from Dr. Doermann. I am responding to that petition with the proper analysis.

Q. So you got your knowledge about the database based on your analysis of Dr. Doermann's declaration?

MR. SNADER: Objection; mischaracterizes testimony.

A. Again, I don't remember off the top of my head whether I've ran across the database before. It's been, you know -- I've been working in this field for 30 years.

But I reviewed the prior art that was provided in the petition. Obviously I've reviewed the petition. I've reviewed the patent. I've reviewed the prior art. And based on Tian, a POSITA would not understand Tian to teach reducing a resolution.

Q. So you got your knowledge about this database from the Tian reference. Is that correct?

MR. SNADER: Objection; mischaracterizes testimony.

A. Again, as I mentioned, I don't remember off the top of my head if I've ran across the database before. But in the time of this, essentially, investigation, if you want to call it, I reviewed the prior art that was provided in the petition. And based on Tian, a POSITA would not understand Tian to teach reducing a resolution.

You look, for instance, at Figure 1 of Tian. You can see Tian provides a module or -- for face acquisition. And within -- underneath that module, you can see Tian provides face detection and head pose estimation. So let's call those a submodule.

And then the next kind of elliptical looking thing in Tian shows facial data extraction and representation and underneath that provides geometric and appearance feature submodules.

And then it goes to the next step for facial expression recognition, and under that, you have two submodules, basic expression and action units.

There's no discussion at all in any of these modules about reducing the resolution or any type of algorithms, methodologies, anything that says anything about resolution.

Q. Did you get any knowledge about the Cohn-Kanade database from anything other than Tian?

A. As I mentioned earlier, I have reviewed in this case -- I have reviewed the prior art that you provided -- that was provided in this petition. And based on Tian, a POSITA would not understand Tian to teach reducing a resolution. Tian clearly states "An example in five different resolutions from the Cohn-Kanade database."

Q. Let's go to the abstract of Tian.

A. Okay.

Q. The last sentence of the abstract states "The lower resolution images are downsampled from the originals," correct?

A. That is correct. You read it correctly.

Q. Is downsampling a method to reduce the resolution of the image?

A. Well, downsampling, as we discussed earlier, is a methodology to reduce the resolution of the images. But as I've mentioned already, Tian does not provide any methodology, any circuitry, any hardware, any algorithms to say anything about downsampling. And obviously Tian provides description of all his other modules that I -- from Figure 1. There's no discussion of downsampling anywhere in Tian.

Q. Can you please go to page 5 of Tian. By "page," I mean the Bates number in the lower right

corner.
A. Yes, sir.
Q. Let me first follow up with the answer you just had.
So is it your opinion that because Tian does not provide hardware or software for downsampling, a POSITA reading Tian would not have known how to do that?
A. A POSITA reading Tian would not understand Tian to teach reducing a resolution. A POSITA reading Tian would not understand Tian to be reducing -- to teach reducing a resolution since there is no disclosure in Tian of any resolution reduction, circuitry, hardware, methodology, details.
Q. Why not? Why does Tian not disclose reducing a resolution --
MR. SNADER: Objection -- objection; calls for speculation.
A. You would have to ask Tian that. I'm just reading Tian's paper. I can't speculate on why Tian doesn't disclose that. But Tian does not disclose any methodology or algorithms to reduce resolution. It's just a passive statement that's being discussed there. There's no active methodology or algorithms of any kind.
Q. Why is Tian's disclosure of downsampling not a disclose of reducing the resolution of an image?

A. All that Tian states is "The lower resolution images are downsampled from the original." There's no disclosure -- Tian does not provide any -- and the same sentence is repeated again in Table 1. So if you look at Table 1 and you look at the abstract, you see the same sentence repeated there, "The lower resolution images are downsampled from the originals." It's kind of like a cut and paste. There's no disclosure of any methodology or algorithms of how that is done, just a passive statement.

Q. Can you please go to the first -- very first paragraph on page 5 of Tian.

A. Page 5? Are we talking about the left column or the right column?

Q. The left column.

A. Okay.

Q. Do you see a section that starts with "3.1. Database"?

A. I do.

Q. That section includes a paragraph that describes the Cohn-Kanade database, correct?

A. Are you talking about the first paragraph above Table 3?

Q. That's correct, the paragraph starting with "The DFAT subset of Cohn-Kanade expression database."

A. Yes.
Q. So you agree that is a paragraph describing the Cohn-Kanade database, correct?
A. Well, that paragraph provides a summarized discussion of the database. You notice it says -- it talks about the subset. It talks about the database contains 704 image sequences from 97 subjects. So it gives a summarized overview of the database. It doesn't give any specifications or any details of the imagery besides just the summarized overview.
Q. The paragraph mentions 640-times-480 pixel arrays. Is that correct?
A. If you're referring to the sentence halfway down the paragraph, the sentence reads "The image sequences began with a neutral face and were digitized into 640-by-480 pixel arrays with either 8-bit grayscale values."
Q. Does that sentence refer to the resolution of images in the database?
A. It refers to a resolution of image sequences in the database.
Q. The sentence starts with the term "The image sequences," correct?
A. Yes.
Q. What does that refer to?

MR. SNADER: Objection; vague and ambiguous.
A. Image sequences? Sequences of images. Like, you would take a video sequence, in a sense. Image sequences.
Q. Does that refer -- does the image sequences in the sentence you just read out refer to the 704 image sequences from 97 subjects?
A. I would say -- you know, if you look at it -- I would have to -- I would say yes. "The database contains 704 image sequences from 97 subjects."
And then later on, he states "The image sequences," so he's referring to the 704 image sequences from the 97 subjects.
And then two sentences later, he says "The length of the image sequences are varying from 9 to 47 frames."
Q. The second-to-last sentence of this paragraph says "The size of the head region is about 280-times-380 pixels." Is that correct?
A. You read that correctly.
Q. Does that refer to the resolution of the head regions of the images that have a resolution of 640-times-480?
A. Well, it's generally referring to the size of the head region is about 280-by-380 pixels in those

image sequences that he's describing, that Tian is describing.

Q. Does this paragraph discuss any other resolutions for images in the Cohn-Kanade database?

A. Well, those numbers that we've talked about are the only numbers stated in that paragraph.

Q. If this database -- if the Cohn-Kanade database includes images of other resolutions, why does this paragraph not describe those other resolutions?

MR. SNADER: Objection; calls for speculation.

A. I didn't write the paper, sir. I'm just responding to the paper as a POSITA. You would have to ask Tian that question of, you know, how -- what he described and why he described it the way -- it could be space limitations in the paper. It could be a lot of different reasons. That question, you'd have to ask Tian. I'm just responding to what is in the paper.

Q. Is the Cohn-Kanade database well known in your field?

A. Well --

MR. SNADER: Objection; vague and ambiguous.

A. I don't know what you mean by "well known." It depends on whether you're doing an expression analysis or not. "Well known" is a very general term.

Q. So you don't know what "well known" means in your field?

A. Well, "well known" to one person means something else to a different person. So "well known" is a very relative term. So...

Q. What does "well known" mean to you?

A. It depends on, you know, the field that you're working in. You know, well known could be a database that's being practiced by most professionals. It could be, you know -- for the person that's doing facial expression analysis, that database is well known. If you're not doing facial expression analysis, perhaps it's not so well known.

Q. Oh, so it is well known for facial analysis. Is that right?

MR. SNADER: Objection; mischaracterizes testimony.

A. Well, the field -- if you look at this paper, this paper is about facial expression analysis. Right? This paper is about evaluation of face resolution for expression analysis. So it's specific. Tian is essentially evaluating facial resolutions for face -- for expression analysis. So for people working in this field directly, this database would be more well known.

Q. The Cohn-Kanade -- okay. So with -- sorry.

Strike my question.

In your opinion, the Cohn-Kanade database would have been known to a POSITA in 2011, correct?

MR. SNADER: Objection; mischaracterizes testimony.

A. A POSITA that would be working in this area would be familiar with, obviously, the literature in this area so would know about this facial -- a POSITA working in facial expression analysis would know about the database.

Q. But you are not sure about whether you were -- you know the Cohn-Kanade database before this case, correct?

A. I said I don't remember off the top of my head if I ran into it. I mean, I've been working for 30 years in this field. I don't remember every single database and every single algorithm and every single image that I've looked at. So I don't remember off the top of my head. I don't recall whether I've come across this database at some point or not.

But a POSITA working -- you know, this paper is about facial expression analysis, and that database is in that field.

Q. Do you know what's in the database?

A. I'm sorry?

Q. Do you know what is in the Cohn-Kanade database?

A. I don't know what you mean by do I know what's in the database.

Q. Do you know what data is in the Cohn-Kanade database?

A. I can't remember off the top of my head what's in the database. Again, I'm reacting -- I'm responding to a petition that was filed by Petitioner that -- where, you know -- I've reviewed the petition. I've reviewed the prior art. And based on Tian and as a POSITA reading Tian, a POSITA would not understand Tian to teach reducing a resolution. So I'm responding based on the four corners of Tian, in a sense, of what Tian has disclosed and what's been provided in the petition and declaration.

Q. In preparing for your response -- sorry.

In preparing your expert declarations, did you look at what was in the database?

A. No, I did not.

Q. Did you ask the attorneys that you are working with to give you --

MR. SNADER: Objection --

Q. -- information about the database?

MR. SNADER: Objection; calls for privileged

information.

Dr. Saber, I'll instruct you not to answer.

MR. QIU: What's the basis of the objection?

MR. SNADER: You're asking for contents of discussion between attorneys and experts. That's privileged information, expert work product.

MR. QIU: I think I'm just trying to ask for whether Dr. Saber was given access to the database. I'm not asking for the discussions of Dr. Saber and any members of counsel.

MR. SNADER: You did. If you'd care to rephrase your question as whether he accessed the database -- which I believe you asked and he answered -- I won't object to that. If you're asking about what information was exchanged between attorneys and Dr. Saber, I will object to that, and I will instruct him not to answer.

Q. Did you request information about the Cohn-Kanade database from the attorneys --

MR. SNADER: Objection; calls for privileged information.

Dr. Saber, please don't answer.

Q. Did you ask anyone for access to the Cohn-Kanade database?

MR. SNADER: To the extent that that

implicates privileged information, I'll instruct you not to answer with respect to any discussions between yourself and counsel. Other than that, you may answer.

A. As I mentioned already to you earlier in my previous answer -- which is not going to change if you ask me the same question a hundred times. I've already answered that question for you multiple times -- I've reviewed the prior art that was provided in the petition. I've reviewed Tian. And based on the four corners of Tian and on the prior art and the petition and the declaration, a POSITA would not understand Tian to teach reducing a resolution based on -- I'm looking at the four corners of the petition, the declaration, Tian, and the prior art. That is what I was instructed to perform.

Q. Did you in any way confirm your understanding that the Cohn-Kanade database include images in five different resolutions?

MR. SNADER: Objection; asked and answered. I believe we've covered this topic, Counsel.

A. I agree, Counsel. I think I've already answered your question multiple times.

I have reviewed Tian and the four corners of Tian, along with the prior art and the declarations and the petitions. And a POSITA would not understand Tian

to teach any reduction of a resolution.
MR. QIU: Move to strike as non-responsive.
Q. I'm not asking about the four corners of Tian. My question, which I will repeat, is: Did you in any way confirm your understanding that the Cohn-Kanade database include images in five different resolutions?
MR. SNADER: Objection; asked and answered.
A. I think I've already answered your question.
Q. So is it a yes or no?
A. As I've told you, a POSITA would not understand Tian to teach reducing a resolution. So the disclosures of Tian, a POSITA reading Tian would not understand that Tian as doing any resolution reduction. So Tian's disclosure clearly state "The lower resolution images are downsampled from the originals," as you mentioned in your opening line of this questioning. And Table 1 of Tian provides "An example in five different resolutions from Cohn-Kanade database."
MR. QIU: Move to strike as non-responsive.
Q. Dr. Saber, I asked a simple question. Did you in any way confirm your understanding that the Cohn-Kanade database include the images in five different resolutions?
MR. SNADER: Objection; asked and answered. Counsel, move on.

MR. QIU: Counsel, like, Dr. Saber still has not answered the question I asked. It's a very simple yes or no question. He either did verify or he didn't.
A. I didn't need to. Tian clearly states in Table 1 -- again, I'm reading Tian as a POSITA and responding to your petition, the prior art, and the four corners of Tian.
Tian states "An example in five different resolutions from Cohn-Kanade database." So a POSITA reading Tian would not understand Tian to teach reducing a resolution.
Q. Will you please go to page 5 of Tian.
A. Page 5. Yes, sir.
Q. The first paragraph on the left column, the last sentence states "More details about the database can be found at paper 16." Is that correct?
A. That is correct. You read that correctly.
Q. Did you access paper 16?
A. No, I did not.
Q. Are you aware that the database -- the Cohn-Kanade database does not contain images in five different resolutions?
MR. SNADER: Objection; scope. Objection; relevance. Objection; argumentative.
A. Again, I'm analyzing here based on

instructions from counsel to analyze the petition, the prior art, the four corners of Tian. And as I've informed you earlier, if you look at Tian's Figure 1, the table that we just discussed, in Tian there's no discussion of reducing a resolution in any of the steps in Figure 1. There's no discussion of reducing a resolution anywhere in Tian. There's no process, no procedure, no methodology, no circuitry, no hardware. There's no disclosure of any reduction of resolution in Tian.

MR. QIU: Move to strike as non-responsive.

Q. Dr. Saber, I'm not asking you about the four corners of Tian. I'm asking about your knowledge about the Cohn-Kanade database. Let me repeat my question.

Are you aware that the Cohn-Kanade database does not contain images in five different resolutions?

MR. SNADER: Objection -- same objections. Further objection; assumes facts not in evidence.

A. As I mentioned to you, I did not need to look at the database for my analysis given the context of the petition, declaration, and the four corners of Tian. I'm responding to the petitioner's analysis based on the prior art that's in front of me.

Q. So before you were engaged for this case, did you know whether the Cohn-Kanade database include images

in five different resolutions?

MR. SNADER: Objection; asked and answered.

A. As I said to you earlier, I have been working in this field for over 30 years. I don't know off the top of my head what every database out there that we have access to or looked at exactly includes. So I would have to look specifically at each database for me to respond to a given database.

MR. SNADER: Counsel, I realize you're in the middle of a line. But we have been going for about an hour, so if you have a good stopping point coming up, we could take maybe a five-minute...

MR. QIU: Okay. Let's take a five-minute break.

THE WITNESS: Okay. It's 3:15. I will be on my desk at 3:20.

MR. QIU: See you then.

(Off the record: 12:15 p.m. to 12:21 p.m.)

Q. Exhibit 1005, which is Tian, it is a research paper, correct?

A. Yeah. It's a paper published by Tian.

Q. Can you please go to page 5 of Tian.

A. Page 5. Yes, sir.

Q. There's a table shown there, right?

A. Are you referring to Table 3? Yes.

Q. Table 3 shows experimental results of Tian, correct?
A. Well, Table 3 -- let's just be very specific and accurate. Table 3 shows a summary of the effects of faces at different resolution for expression analysis.
Q. Do you have any reason to doubt or challenge the credibility of these results?
A. No. Not necessarily, no. I mean, these are results that Tian -- based on Tian's analysis, these are the results that Tian has published.
Q. Do you have any reason to question the credibility of Tian's results in general?
A. Well --
MR. SNADER: Objection; vague and ambiguous.
A. I think your question is kind of vague. I mean, people conduct experiments and publish results. If you construct the experiment in a different way, the results might change.
So I don't have any doubt that Tian has constructed this experiment and published these results with the images that Tian has, you know, experimented on.
Q. Can you please open your supplemental declaration.
A. Supplemental declaration. Yes, sir.

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

TVISION INSIGHTS, INC.,

Petitioner,

v.

THE NIELSEN COMPANY (US), LLC,

Patent Owner.

---

Case No. IPR2023-01014

U.S. Patent 11,470,243

---

# Reply Declaration of Dr. David Scott Doermann

I, David Scott Doermann, declare as follows:

1. I previously submitted a declaration in this proceeding (Ex-1003). I have been asked to respond to certain opinions of Dr. Eli Saber and arguments in the Patent Owner's Response. I have considered the additional materials listed in the attached Appendix 1. I make this declaration based upon my own personal knowledge and, if called upon to testify, would testify competently to the matters contained herein.

2. Dr. Saber states that "a POSITA would read the caption of Table 1 [of Tian] as indicating all images, including the lower resolution images, come 'from the Cohn-Kanade database'." Ex-2020, ¶5. This is different from my understanding of Tian. Tian's "Database" subsection discusses the "DFAT subset of Cohn-Kanade expression database" used by Tian's experiment. Ex-1005, 000005. This subsection states that "[t]he image sequences … were digitized into 640x480 pixel arrays[,]" for which "[t]he size of head region is about 280x380 pixels[,]" without mentioning other resolutions. *Id*. Based on this paragraph, I understand Tian to obtain images of an original resolution of 640x480 from the Cohn-Kanade database.

3. Tian's Table 1 shows five images, respectively marked with "288x384 (Original)," "144x192," "72x96," "36x48," and "18x24." The caption of Table 1 is reproduced below:

An example in five different resolutions from Cohn-Kanade database. The head region is cropped for display purpose only. The lower resolution images are down-sampled from the originals.

Ex-1005, 000002. Based on the images shown in Table 1 and the caption, I understand that the first image marked with “288x384 (Original)” is the head region of an example original image obtained from the Cohn-Kanade database. The other four images are head regions of reduced-resolution versions of this example’s original image that Tian creates by down-sampling.

4. To validate my understanding, I obtained a copy of the Cohn-Kanade database. I was previously familiar with the dataset while at the University of Maryland but no longer had access. Dr. Jeffrey Cohn lists the database on his personal website (https://www.jeffcohn.net/Resources/) under Databases, and provides an agreement form for its use. As instructed, I provided the form as a faculty member at the University at Buffalo, and received instructions to download it. The source and website from which I obtained the Cohn-Kanade database indicate that any reference to the database should include the citation “Kanade, T., Cohn, J. F., & Tian, Y. (2000). Comprehensive database for facial expression analysis. Proceedings of the Fourth IEEE International Conference on Automatic Face and Gesture Recognition (FG'00), Grenoble, France, 46-53.” Tian cites this paper as a reference [16] and states that “[m]ore details about the [Cohn-Kanade] database can be found at paper [16].” Ex-1005, 000005, 07. I reviewed the Cohn-

Kanade database and determined that images in the database have resolutions of 640x480 or 640x490. I did not find reduced-resolution images in the database. This is consistent with my reading of Tian and my recollection about the Cohn-Kanade database, which I encountered in earlier research. My review of the Cohn-Kanade database confirms my understanding that Tian obtains original images from this database and creates reduced-resolution images by down-sampling.

5. Regarding performing face detection and head pose estimation on reduced-resolution images, Dr. Saber argues that the additional processing requirements to reduce the resolution would outweigh the reduction in processing resources by analyzing reduced-resolution images. Ex-2020, ¶¶38-44. I disagree with Dr. Saber.

6. As explained in my original declaration, facial analysis is resource-consuming. Ex-1003, ¶69. For example, regardless of the specific method used (including those mentioned by Dr. Saber (Ex-2020, ¶44)), face detection and head pose estimation both require feature extraction over the image analyzed. This normally includes shifting a window (e.g., 5x5 pixels) across the entire image multiple times (e.g., in different directions or for identifying different types of features) and performing complex computations (e.g., multiple multiplications and summations) when the window is placed at each pixel position. Because complex

computations are performed for each pixel, significant processing resources are saved when facial analysis is performed on a reduced-resolution image.

7. I further explained in my original declaration that resolution-reduction techniques included "simply subsampling the image and dropping pixels." Ex-1003, ¶15. This process merely involves reading values of selected pixels in an original image for use as pixel values of a subsampled image. Only the selected pixels are read and no mathematical calculation is performed to modify the pixel values. As a POSITA would have understood, this process requires minimal computation.

8. The amount of processing needed for reducing the resolution of an image is trivial when compared with the resource savings for performing facial analysis on reduced-resolution images. As explained in my original declaration, "[t]he processing resources and time can be reduced if the resolution of the image is reduced." Ex-1003, ¶69. I further cited to background references to support this explanation. For example, Exhibit 1014 teaches a face detection approach including deriving an integral image from an acquired image and using the integral image for extracting features to be used in face detection. Ex-1014, 1:23-58, Fig. 2. Exhibit 1014 teaches subsampling an image before performing face detection on the subsampled image so that "calculations are avoided of a complete highest resolution integral image." Ex-1014, 2:29-53. This "reduces processing overhead

for face detection[.]" *Id*. Exhibit 1014 would not have proposed this method if the processing resources for subsampling outweigh the savings of processing resources for performing face detection on the subsampled image.

9. Dr. Saber argues that antialiasing and interpolation are computationally expensive. Ex-2020, ¶¶40-43. However, antialiasing is not required for resolution reduction or facial analysis. For example, Tian teaches down-sampling and analyzing images without mentioning either antialiasing or the method of interpolation. In some situations these may help, but Tian showed that face detection can be accomplished, without noticeable reduction in performance. Tian teaches reducing the resolution by integer factors. For example, in Table 1, the 144x192 image is obtained by reducing the resolution of the original 288x384 image by a factor of four; the 72x96 image is obtained by reducing the resolution by another factor of four. Ex-1005, 000002. This can be accomplished by subsampling the images to pick one pixel out of every four. Even if considered, antialiasing and interpolation are significantly simpler than facial analysis tasks such as face detection and head pose estimation in terms of the computation involved.

10. Dr. Saber argues that selecting images suitable for face recognition based on head orientation determination "would decrease the chance of successful

# I. GROUNDS 1, 3, CLAIMS 4, 11, AND 18: TIAN DOES NOT TEACH "REDUC[ING] A RESOLUTION"

## A. Tian's Teachings Are Ambiguous

All challenged claims include processing circuitry, a device, or a method step to "reduce a resolution" of an image. (Ex. 1001, Claims 4, 11, 18). Petitioner relies on Tian for this limitation. (Paper 2, 26-27, 36-37, 42, 75-76). Tian does not expressly or implicitly teach resolution reduction, the Parties dispute a POSITA's understanding of Tian's teachings, and Petitioner provides no additional evidence clarifying Tian's ambiguous teachings.[1] Petitioner has not met its burden by a preponderance of the evidence.

### *1. Summary of Parties' Arguments Regarding Resolution Reduction*

The Petition identifies only a single sentence from Tian for allegedly "creat[ing] lower-resolution images by down-sampling from original images[,]" rather than obtaining the reduced-resolution images from some other source: "The lower resolution images are down-sampled from the originals." (Paper 2, 26; Paper 22, 6 (same); *Tian* (Ex. 1005), Abstract, Table 1, 000002 (repeating teaching three times verbatim)). The sentence is ambiguous when taken alone and, in context,

[1] To correct Petitioner's mischaracterization, Patent Owner **does not** acknowledge that Tian teaches "resolution reduction." (Paper 22, 4).

shows that the reduced-resolution images were obtained from a database. (Paper 17, 7-9; Ex. 2020, ¶¶ 4-9; Ex. 2001, ¶¶ 48-49).

The Petition's only support is Doermann's conclusory opinions. Doermann opines: "Tian creates lower-resolution images by down-sampling from original images and analyzes multiple different resolutions." (Ex. 1003, ¶ 119, *cited by* Pet. 26). Doermann's opinion merely repeats the Petition's attorney argument without a basis or explanation for the opinion. *Xerox Corp. v. Bytemark, Inc.,* IPR2022-00624, Paper 9, 15 (PTAB Aug. 24, 2022) ("conclusory and unsupported" expert testimony is entitled to "little weight"). Doermann observes: "Tian illustrates example images in reduced resolutions," citing to Table 1:

Table 1: An example in five different resolutions from Cohn-Kanade database. The head region is cropped for display purpose only. The lower resolution images are down-sampled from the originals.




Doermann summarily concludes: "Therefore, Tian teaches reducing the resolution of an image to obtain a reduced-resolution image." (Ex. 1003, ¶ 119). Doermann provides no argument or evidence explaining why Tian's statement teaches creating the reduced-resolution images as opposed to obtaining them from some other source.

Petitioner's Reply adds a second sentence of Tian for allegedly teaching resolution reduction, namely Table 1's caption: "An example in five different resolutions from Cohn-Kanade database." *Tian*, 000002. Petitioner argues, with only attorney argument, that "'in five different resolutions' and 'from Cohn-Kanade database' both modify 'example.'" (Paper 22, 6). Patent Owner's expert, Saber, disagrees, explaining why he believes a POSITA would read the caption for Table 1 as "indicating all images, including the lower resolution images, come 'from the Cohn-Kanade database.'" (Ex. 2020, ¶ 5, ¶¶ 4-11 (explaining why Tian does not teach resolution reduction); Paper 17, 3-9 (same); Ex. 2001, ¶¶ 48-49)). The caption is properly read as illustrating five example images of a subject's head region, in five different resolutions, from the Cohn-Kanade database. The referenced sentence does not state the Tian system performs the actual resolution reduction.

Petitioner argues that Ex. 1031 (a belatedly introduced reference cited by Tian as describing the Cohn-Kanade database) gives the as-digitized image size of 640x480 "without mentioning any reduced resolutions…." (Paper 22, 7). Doermann similarly argues that Ex. 1031 and Tian describe the original pixel array as 640x480 "without mentioning other resolutions." (Ex. 1034, ¶ 2, ¶ 4 (discussing Ex. 1031)). Regarding a current (i.e., 2024) version of the database, Doermann opines, "I did not find reduced-resolution images in the database." (Ex. 1034, ¶ 4). Doermann concludes this "confirms my understanding that Tian obtains original images from

this database and creates reduced-resolution images by down-sampling." *Id.*; Paper 22, 7-8.

As discussed below, Petitioner's arguments as to how Tian should be interpreted are predicated on a failure of Tian to mention resolutions other than the original image size. Petitioner thus does not satisfy its burden to show Tian teaches the affirmative step of reducing the resolution of the images.

### *2. This Board's Precedent Compels Finding No Unpatentability When the Prior Art's Teachings Are Ambiguous*

Petitioner's two sentences from Tian do not teach actually reducing the resolution and are, at the least, ambiguous. The Parties' declarants present conflicting opinions regarding how a POSITA would understand the sentences. *Cf.* Ex. 1003, ¶ 119, Ex. 1034, ¶¶ 2-4, *with* Ex. 2020, ¶¶ 4-11, Ex. 2001, ¶¶ 46-50. Petitioner resorts to arguing that the **failure** of Tian or Ex. 1031 to mention resolutions, other than the original resolution size, is evidence that Tian performs resolution reduction. (Ex. 1034, ¶ 2; Paper 22, 7).

Because of Tian's ambiguities, a POSITA would not have recognized the significance of and relationships between the teachings of the cited prior art to achieve the claimed subject matter without hindsight knowledge of the claimed invention. Under similar facts, the Board found the claims not unpatentable because the prior art was ambiguous, there was conflicting testimony of expert declarants, and there was no other persuasive evidence supporting Petitioner's reading of the

prior art. *GMG Products LLC v. Traeger Pellet Grills LLC,* PGR2019-00035, Paper 34, 27 (PTAB Aug. 31, 2020). In *GMG*, the dispute centered around whether metadata for an appliance was current metadata "indicating that an appliance is communicably connected with the cloud." *Id.*, 20-21. The Board noted Petitioner "infer[red]" from the prior art's disclosure that "there is an intrinsic indication that the information conveyed includes that the appliance is connected to a network…." *Id.*, 22. The Board considered Petitioner's argument that how metadata is obtained "necessarily reflects current information" but concluded the argument was "speculative" because the art did not preclude other methodologies and that the record was "nebulous." *Id.*, 25, 23.

The same result is warranted here. Other than Petitioner's two sentences from Tian and the conclusory statements from Doermann (Ex. 1003, ¶ 119), Petitioner offers no other evidence to support its contention that Tian teaches reducing a resolution. Petitioner does not point to a system architecture in Tian that would perform resolution reduction. *Cf.* Ex. 2020, ¶ 8. Petitioner does not point to anything in Tian that would **preclude** Tian from obtaining reduced-resolution images from an alternative, third-party source. *GMG*, 25 (finding the art was ambiguous in part because there was "no preclusion" of an alternative).

Tian analyzes a data set derived from the Cohn-Kanade database, called the DFAT subset. (Paper 22, 6; *Tian*, 00005). Tian does not state what images, and at

what resolutions, are in the DFAT subset. We do know **some** transformation of the data set occurs from the Cohn-Kanade database to the DFAT subset because the DFAT subset includes fewer images than the Cohn-Kanade database. *Cf. Tian,* 000005 (*Tian* describing 704 sequences from 97 subjects), *with* Ex. 1031, 000006 (describing 1917 sequences from 182 subjects). Petitioner points to no disclosure in Tian that precludes the DFAT subset from including the reduced-resolution images. Petitioner identifies no evidence that necessarily requires the POSITA to infer that Tian is performing the resolution reduction as opposed to obtaining reduced-resolution images from another source.

In contrast, Patent Owner presented extensive expert opinion explaining why a POSITA would not understand Tian to teach resolution reduction. (Paper 17, 3-10; Ex. 2020, ¶¶ 4-11; Ex. 2001, ¶¶ 44-50).

Like in *GMG*, Petitioner asks the Board to **infer** a teaching in Tian because neither Tian (when discussing the DFAT subset) nor Ex. 1031 mentions resolution sizes other than the original resolution size. (Ex. 1034, ¶ 2; Paper 22, 7). Per Petitioner's logic, the lack of "mentioning other resolutions" means that it must be the case that Tian reduces the resolution. (Ex. 1034, ¶ 2; Paper 22, 7-8). In *GMG*, the Board found a similar logic by Petitioner "speculative[.]" *GMG*, 25 (noting the prior art reference does not preclude the appliance is "no longer connected for communication with the cloud").

Because (1) Tian's teachings are, at the least, ambiguous, (2) the evidence presents conflicting expert testimony regarding the meaning of these few ambiguous sentences from Tian, and (3) Petitioner offers no other persuasive evidence supporting Petitioner's contentions, Petitioner has not met its burden in proving unpatentability. It is Petitioner's burden to prove unpatentability by a preponderance of the evidence. *GMG*, 27. Satisfaction of that burden must be based on evidence of record and cannot be based on ambiguous prior art. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380–81 (Fed. Cir. 2016). Petitioner's mapping of ambiguous prior art relies on improper hindsight and therefore fails. *Id.*; *Ex Parte Newton et al.,* Appeal 2018-004205, 6 (PTAB Dec. 26, 2019) (upholding patentability where the prior art was ambiguous); *Ex Parte Newton et al.,* Appeal 2018-004161, 6 (PTAB June 18, 2019) (noting "the references are not explicitly clear," and did not establish that a skilled artisan would have recognized the significance of and relationships between the teachings in prior art to achieve the claimed subject matter).

### B. Petitioner's Late, Changing Theories of Unpatentability Must Be Rejected

Petitioner seemingly realizes the ambiguity of Tian's teachings and introduces—for the first time in its Reply—a new theory as to how Tian teaches resolution reduction. (Paper 22, 4-5). Petitioner argues Tian's lack of structure for resolution reduction "does not negate the **obviousness** of doing so **in light of Tian's teachings**." *Id.*, 5 (emphases added).

First, Petitioner asserts for the first time that Tian would render resolution reduction **obvious**, as opposed to the Petition's original claim that Tian **teaches** resolution reduction. (Paper 2, 26). Petitioner's new obviousness theory must be rejected. *Juniper Networks, Inc. v. Swarm Tech. LLC*, IPR2021-01445, Paper 62, 29 (PTAB Feb. 7, 2023) (declining a new theory of obviousness advanced in Petitioner's Reply); *Tesla, Inc. v. Charge Fusion Techs., LLC*, IPR2022-01217, Paper 29, 15 (PTAB Jan. 17, 2024) (finding preponderance of the evidence not supporting Petitioner's assertions of the prior art's teachings, noting Petitioner relies on the art's express teachings and does not assert obviousness of the claim limitation, and that "[o]ur decision is limited to the particular basis for the challenge advanced by Petitioner"); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016).

Second, if Petitioner is arguing that Tian **inherently** teaches resolution reduction, this is a new argument that was not presented in the Petition and should be rejected. "Inherency…may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient." *PAR Pharma., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014) (citation omitted). Petitioner provides no evidence or argument establishing that Tian necessarily performs the resolution reduction.

### C. Obtaining the Reduced-Resolution Images from Another Source Does Not Satisfy the Claim Limitation

Petitioner argues "[n]one of the claims at issue limit resolution reduction to a certain time or stage of processing." (Paper 22, 4-5). Petitioner relies on an incorrect interpretation of the claims, as the claims require an audience measurement system/method that analyzes a sequence of images "obtained by a camera while the media content corresponding to the content identifying data is presented by the television" (Ex. 1001, Claim 1) and "reduce a resolution" of a first image from the sequence of images (Claim 4). The resolution reduction must occur as part of the overall system/method of analyzing images taken while media content is presented to the audience member. (Paper 17, 10-13). Claim 5, for example, further confirms that the resolution reduction must occur during the media content exposure, as the facial signature of a second image is generated based on a location of the head in the first image (i.e., the reduced-resolution image). The steps of claim 5 could not be performed if the pre-reduced-resolution image was obtained from another source. Petitioner's argument regarding the time or stage when the resolution reduction is performed is incorrect as inconsistent with the claim language.

## II. GROUNDS 1, 3: MOTIVATION TO MODIFY LU-577 OR NIELSEN-372 / STEINBERG

For claims 4, 8, and 11, Petitioner proposes to modify Lu-577 or Nielsen-372/Steinberg with Tian, motivated by saving processing resources without reducing

Petitioner's Reply also introduces new arguments and evidence for the motivation. Petitioner newly addresses the disadvantages and attempts to reframe previously cited references as evidence of the disadvantages. These arguments and evidence are untimely and should be stricken. *Juniper Networks*, 29.

### B. Petitioner Fails to Weigh the Advantages/Disadvantages

Petitioner incorrectly analyzes the computational advantages and disadvantages of the combination. There is a computational cost (disadvantage) in resolution reduction. (Ex. 2020, ¶¶ 38-39 and Ex. 1034, ¶ 7 (Saber and Doermann agreeing there is a computational cost for resolution reduction)). There is a computational cost in performing facial analysis. (Ex. 2020, ¶ 44 and Ex. 1034, ¶ 6 (Saber and Doermann agreeing there is a computational cost for performing facial analysis)). Petitioner argues that the computational cost of performing facial analysis for a reduced-resolution image is less than for a non-reduced-resolution image. (Paper 22, 18). Petitioner also argues that the cost to reduce the resolution is less than the cost to perform the facial analysis on the nonreduced-resolution image. *Id*. However, Petitioner's new arguments for the combination have several errors.

#### *1. Petitioner Error 1*

To correctly perform a comparison of the advantages versus disadvantages of resolution reduction prior to facial analysis, the calculus must determine the cost of resolution reduction **plus** the cost of performing facial analysis on the reduced-

resolution image. This total cost must then be compared to the cost of performing facial analysis on the nonreduced-resolution image alone. Fatally to its motivation arguments, Petitioner has not made this comparison.

Instead, Petitioner simply offers the conclusory argument that facial analysis is expensive while resolution reduction is "trivial[.]" (Ex. 1034, ¶ 8; Ex. 1003, ¶ 69). Petitioner makes no showing—even in generalized terms—of whether the cost of reducing resolution is greater than the processing resources for performing facial analysis on reduced versus nonreduced-resolution images. For example, Petitioner should have presented evidence or argument of what the cost difference is between performing facial analysis on reduced versus nonreduced images. Instead of doing this analysis, Petitioner simply generically argues "[t]he processing resources and time can be reduced if the resolution of the image is reduced." (Ex. 1003, ¶ 69; Paper 17, 26-27 (providing rebuttal to the background references (Exs. 1014-1015) discussed by Doermann at Ex. 1003, ¶ 69, Paper 22, 18)).

The issue is not whether facial analysis is more computationally complex than resolution reduction, as urged by Petitioner. (Paper 22, 16). Rather, the issue is whether the difference in computational cost between facial analysis for reduced- versus nonreduced-resolution images warrants the cost of resolution reduction in the first place. Petitioner flatly states the cost savings "undoubtedly outweigh any processing needed to reduce the resolution." (Paper 22, 17). This is attorney

argument with no expert declarant support and should be disregarded. *Exacq Techs., Inc. v. Jds Techs., Inc.,* IPR2016-00568, Paper 7, 22 (PTAB June 14, 2016) (noting "Petitioner's expert does not add materially to Petitioner's attorney argument…without citation to the evidence that serves as the basis for his opinion").

Petitioner responds that the combination does not have to be the best option, only a suitable option. (Paper 22, 18). Petitioner's generic citation to obviousness case law fails to recognize that there is already a suitable option **without** the modification Petitioner proposes (i.e., without resolution reduction). Specifically, resolution reduction prior to facial analysis does not have to be performed to obtain a suitable facial analysis result, as Lu-577 and Nielsen-372 already perform suitable facial recognition.

Doermann also responds by arguing the processing cost for resolution reduction is "trivial" and citing Ex. 1014. (Ex. 1034, ¶ 8; Paper 22, 15). Doermann fails to inform the Board that Ex. 1014 incurs **no** processing cost for down-sampling because Ex. 1014 relies on "dedicated" special-purpose hardware already present in the viewfinder of a digital camera for the subsampled images. (Ex. 1014*,* 5:21-24 ("Most digital cameras already contain dedicated hardware subsystems to perform image subsampling.")). None of Tian, Lu-577, or Nielsen-372/Steinberg discloses similar special-purpose hardware. Therefore, reliance on Ex. 1014's dedicated hardware to support the motivation is inapposite.

### 2. ***Petitioner Error 2***

Petitioner does not analyze the computational cost of pre-processing a down-sampled image, which is required for there to be a reasonable expectation of success in performing facial analysis. An obviousness motivation requires performing sufficient steps to have a reasonable expectation of success.

Patent Owner argued and provided undisputed evidence that the skilled person would understand that down-sampling to obtain a reduced-resolution image introduces artifacts into the image. (Paper 17, 22-24; Ex. 2020, ¶ 38). These artifacts need to be removed, using antialiasing, prior to performing facial analysis. (Ex. 2020, ¶¶ 20-23, 37-39). However, there is a computational cost to performing antialiasing. *Id.*, ¶¶ 38-39. Therefore, the overall cost of resolution reduction is not simply the cost of down-sampling itself. Instead, the overall cost is the cost of down-sampling plus the cost of preprocessing the image (e.g., antialiasing) to render the image suitable for facial analysis. *Id.*, ¶ 39. Petitioner thus fails to correctly calculate the cost of the proposed modification.

Petitioner argues that antialiasing is irrelevant because the claims do not recite antialiasing. (Paper 22, 9-10). Petitioner is not engaging in the correct analysis. The obviousness analysis requires determining whether there would be a motivation for the combination, i.e., a reason *why* the skilled person would want to perform resolution reduction prior to facial analysis. *Key Safety Sys., Inc. v. Am. Vehicular*

*Scis., LLC*, IPR2016-01872, Paper 7, 14-15 (PTAB Apr. 4, 2017). If the skilled person recognizes that preprocessing of the image (e.g., antialiasing) is suitably and desirably done prior to facial analysis to have a reasonable chance of successfully recognizing a face, then the skilled person would only be motivated to perform the proposed combination in conjunction with performing antialiasing. *Natera, Inc. v. NeoGenomics Lab. Inc.*, 106 F.4th 1369, 1378 (Fed. Cir. 2024) (finding "[u]nclaimed factors relevant to the feasibility of creating a useful claimed invention can impact the motivation to combine analysis if a skilled artisan would reasonably consider them."). Because a POSITA would determine there is no reasonable expectation of success from forgoing preprocessing (e.g., antialiasing) of the down-sampled image, a POSITA would not be motivated to make the combination.

The analysis also asks whether the skilled person would be motivated to put the combination together as proposed by Petitioner. *Key Safety*, 14-15 (Petitioner failed to show a skilled person would have been motivated to assemble the combination as proposed). This analysis must account for steps, even if unclaimed, that would be known and expected for a useful combination. Here, the skilled person would find Petitioner's combination unsuitable and undesirable for performing the claimed facial analysis without antialiasing. (Ex. 2020, ¶¶ 20-23, 37-39; Paper 17, 17-40).

Petitioner's argument that antialiasing is not needed because Tian does not describe performing antialiasing (Paper 22, 10) is meritless because Tian does not include *any* discussion of performing the resolution reduction process, let alone the applicable preprocessing techniques. (*See* Ex. 1005 *generally*.)

### *3. Petitioner Error 3*

In arguing that the "resource savings outweigh any purported cost[,]" Petitioner points to the steps for performing face detection, including feature extraction. (Paper 22, 16). Petitioner then argues that "[h]ead orientation determination also requires feature extraction[,]" and that feature extraction "includes computing convolution multiple times…for each pixel." *Id.* Petitioner's highlighting of convolution-based methodologies for head orientation determination is not consistent with Tian, which discloses utilizing neural networks to estimate head pose (i.e., head orientation determination). *Tian*, 000002 ("Then a three-layer neural network (NN) is employed to estimate the head pose."). Hence, Petitioner improperly analyzes the cost for facial analysis using a convolution-based algorithm not discussed in Tian, while Tian teaches a suitable neural-network algorithm that Petitioner ignores. (Paper 22, 16; Ex. 1034, ¶ 6). Petitioner does not provide any cost analysis whatsoever of Tian's approach. As a result, Petitioner fails to weigh whether using Tian's neural network methodology would have less computational cost on a reduced-resolution image than Petitioner's proposed convolution method.

#### *4. Petitioner Error 4*

Petitioner's combination performs resolution reduction regardless of whether a head is detected in the image because head detection is performed on reduced-resolution images. Resolution reduction is thus performed **for every frame**, while face recognition can only be skipped **for some frames**, but Petitioner completely ignores the computational cost of resolution reduction. Any weighing of the benefits and the drawbacks must account for the fact that the resolution-reduction process would be performed more often than the head-orientation determination process could be skipped, even if the latter were more computationally expensive each time it was run. Thus, the weighing of the advantages and the drawbacks is significantly more complex than Petitioner's simple assertion that the advantages "easily outweigh" the disadvantages. (Paper 22, 18). Because Petitioner offers no evidence of the net computational cost of its modification, Petitioner fails to account for the drawbacks and thus fails to meet its burden.

### C. Reducing the Resolution Runs Counter to Conventional Wisdom

The evidence shows that in the prior art, performing facial analysis on high-resolution images is more accurate and desirable, thus discouraging resolution reduction prior to facial analysis. (Paper 17, 18; Ex. 2018, 71:1-9 (Doermann agreeing image analysis on higher-resolution images would "[o]f course" improve results); *Tian,* 000002 (Tian suggesting that conventional approaches rely on

performing facial analysis on "very high resolution faces"). "[P]roceeding contrary to the accepted wisdom…is 'strong evidence of unobviousness.'" *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 668 (Fed. Cir. 2000) (citation omitted).

Petitioner counters that Ex. 1014 teaches "intentionally reducing the resolution." (Paper 22, 15). Petitioner is mistaken, as Ex. 1014 uses full-resolution images when performing face detection. Ex. 1014 uses a "fast face detector" that determines "candidate regions" based on subsampled images generated as preview images for a camera display. (Ex. 1014, 5:21-24). However, these "candidate regions" must subsequently be confirmed/rejected as including/not including a face by **full-resolution** "variable size face detection[.]" *Id.*, 6:44-51, FIG. 2.



(Ex. 1014, FIG. 2 (excerpt) (showing that the candidate regions are analyzed at full- to perform face detection and tracking)). Thus, Ex. 1014's subsampled images are available **at no additional processing cost** (because they are present for preview purposes), and Ex. 1014 **still** performs facial analysis on full-resolution images to maintain acceptable performance.

Thus, Ex. 1014 provides no evidence rebutting the conventional wisdom that facial recognition would be performed on high-resolution images. Consequently, Petitioner's modification of intentionally reducing the resolution prior to facial recognition would not be obvious.

## III. GROUND 1: MOTIVATION TO MODIFY LU-577 TO PERFORM HEAD POSE DETERMINATION

Petitioner's motivation for modifying Lu-577 to perform head orientation determination is that performing face recognition only when the head is oriented toward the camera would provide higher accuracy. (Paper 22, 21-22). Petitioner argues that every failure to recognize an audience member would result in an identification of the wrong person. (Paper 22, 21).

A **misidentification** of a face is not the same as **failure to identify** the face. *Cf.* Ex. 2020, ¶ 44 (Saber explaining that obscured facial features for certain frames in a video sequence may cause identification to *fail*, not misidentify the audience member). To match, the correlation between the candidate and reference images must exceed a predetermined threshold. (Ex. 1008, 7:55-58). If no audience member

exceeds that threshold, a "no recognition" result is returned, not a misidentification. *Id.*, 8:65-67. By failing to consider the possibility of a "no recognition" result, Petitioner again fails to weigh the advantages and disadvantages of the proposed modification correctly. Petitioner thus does not establish that a POSITA would have a reasonable expectation of success in combining the prior art as Petitioner proposes.

## IV. GROUNDS 1, 3: THE COMBINATION DOES NOT TEACH CLAIMS 5, 6, 12, 19

Patent Owner separately argues the patentability of claims 5, 6, 12, and 19, which require a two-frame process for facial recognition. Broadly, the claims require (1) identifying the location of a head in a first frame; and (2) using the identified head location from the first frame to perform facial recognition in a second frame. (Paper 17, 13). Using claims 5-6 as representative:

> **5**. The audience measurement system of claim **4**, wherein the processor circuitry is to determine the audience identification information by: (i) generating a facial signature from a region of a second image of the one or more of the images corresponding to a location of the head in the reduced-resolution image, and (ii) comparing the generated facial signature to a database of facial signatures.

(Ex. 1001, Claim 5).

> **6**. The audience measurement system of claim **4**, wherein the processor circuitry is to:
> identify a region corresponding to the head within the first image from which the reduced-resolution image was obtained;
> analyze a portion corresponding to the identified region of a second image; and
> based on the analysis of the region of the second image, determine that the head matches the known person.

*Id.*, Claim 6.

Petitioner's combinations fail to teach the claimed two-frame process. Tian instead tracks the head location in every frame and uses the identified head location from the *second* frame to perform face recognition in the second frame rather than using the head location from the *first* frame (i.e., a single-frame recognition process).

Petitioner argues that because the location of the audience member's head may not change between frames, then whenever the head does not change location, Tian's single-frame process satisfies the two-frame requirement of the claims. (Paper 22, 11-14). Petitioner also argues that Patent Owner's two-frame interpretation of the claims improperly imports a negative limitation into the claims.

Petitioner's claim interpretation contradicts one of the fundamental canons of claim construction by rendering claim language meaningless and failing to give effect to every word of the claim. *In re Power Integrations, Inc.*, 884 F.3d 1370,

1376 (Fed. Cir. 2018). Petitioner's interpretation entirely reads out claim 5's region "corresponding to the location of the head in the reduced-resolution image" and claim 6's "corresponding to the identified region." Applying Petitioner's interpretation, *any* region of the second image can be analyzed to perform facial recognition because that location *could sometimes* correspond to the location of the head in the first image. The two-frame interpretation properly gives effect to the words of the claim by requiring that the identified head location from the first frame is used to perform facial recognition in a second frame.

## V. GROUND 3: PROPOSED COMBINATION OF NIELSEN-372 AND STEINBERG

Patent Owner iterates its POPR argument discussing the claimed "camera" mapped to Nielsen-372's ON/OFF detector that includes a camera. (Paper 6, 46-57). The Board's ID rejected this argument and found the Petition mapped the claimed "camera" to Steinberg's camera. (Paper 10, 42-43). The POR explained why the Petition mapped Nielsen-372's camera. (Paper 17, 44-48, citing Ex. 1003, ¶¶ 199-200).

Doermann repeatedly opined that the combination implements Steinberg's approach on Nielsen-372's local metering system, including the Nielsen-372 camera:

- "A POSITA would have found it obvious to implement Steinberg's approach on Nielsen-372's people meter or other components of the local

Nielsen-372's camera is as an ON/OFF detector facing the television. (Paper 6, 50-52).

Finally, Petitioner argues that Nielsen-372 is not a "voluntary audience measurement system" because it fails to use those words verbatim and uses permissive language to describe prompting audience members to identify themselves. (Paper 22, 28-29). Petitioner does not point to any embodiments that automatically identify audience members. *Id.* Changing from voluntary audience measurement to automatic audience measurement would change the principle of operation, and the evidence of Saber's opinion that such a change might cause audience members to reconsider their participation is undisputed. Petitioner's proposed modification to the system of Nielsen-372 would change its principle of operation and would not be obvious.

## VI. GROUNDS 1, 3: NON-ANALOGOUS ART

Petitioner's sole argument that Tian and Steinberg are analogous art is that they share a common field of endeavor. (Paper 2, 4-6 (not arguing that the prior art is reasonably pertinent to the problem solved by the inventor)). Petitioner's field-of-endeavor argument conflates the definition of a POSITA with the field of endeavor of the challenged patent. (Paper 22, 29-30). The field of endeavor of a patent is determined "by reference to explanations of the invention's subject matter in the patent application, including the embodiments, function, and structure of the claimed

invention." *Netflix, Inc. v. DivX, LLC,* 80 F.4th 1352, 1359 (Fed. Cir. 2023). The explanation of the field in the '243 Patent relates to audience measurement. (Paper 17, 60-61; Ex. 1001, 1:37-39, 1:43–2:3, claims 1, 9, and 16 (preambles)). By contrast, Petitioner's asserted field of endeavor is untethered to the '243 Patent.

Saber qualifies as a POSITA because he has the knowledge of "a hypothetical person who is presumed to know the relevant prior art." *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). That Saber's knowledge goes beyond "audience measurement" (Paper 22, 29-30) to include prior art generally related to image processing does not make the field of endeavor of the '243 Patent broader. The field of endeavor of a patent does not change based on the qualifications of an expert opining on the patent. Petitioner's arguments are meritless and should be disregarded.

## VII. GROUND 1: INCORPORATION OF LU-000 AND LERT'S EMBODIMENTS INTO LU-577

Petitioner argues Lu-577 does not disparage the approach of Lert. (Paper 22, 25). Lu-577 discusses Lert as an audience measurement approach prior to the switchover in 2006 from analog broadcasting to digital. (Paper 17, 43-44; Ex. 1004, [0007]). After this switchover, "[c]hanges in the methods of measuring the reception of television or radio programming are required…." *Id.* Per Lu-577, Lert's method of "extraction of a characteristic feature signature" (*id.*, [0004]) to identify

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

TVISION INSIGHTS, INC.,
Petitioner,
v.

THE NIELSEN COMPANY (US), LLC,
Patent Owner.

---

IPR2023-01014
Patent 11,470,243 B2

---

Record of Oral Hearing
Held: October 16, 2024

---

Before TERRENCE W. McMILLIN, JOHN A. HUDALLA, and GARTH D. BAER, Administrative Patent Judges.

APPEARANCES:

ON BEHALF OF THE PETITIONER:

HARPER BATTS, ESQUIRE
FRED QIU, ESQUIRE
Sheppard, Mullin, Richter & Hampton LLP
1540 El Camino Real
Suite 120
Menlo Park, California 94025
(650) 815-2600

ON BEHALF OF THE PATENT OWNER:

JENNIFER BAILEY, ESQUIRE
ROBIN SNADER, ESQUIRE
MEGAN REDMOND, ESQUIRE
Erise IP, P.A.
7015 College Blvd #700,
Overland Park, Kansas 66211
(913) 777-5600

ALSO PRESENT, OBSERVING:
SAL KAROTTKI
JUSTIN COOK
GREG HUFFMAN

The above-entitled matter came on for hearing on Wednesday, October 16, 2024, commencing at 1:00 p.m., via video teleconference.

must be recognized while viewing the program, otherwise the system just doesn't capture the fact that the audience is viewing the program.

And I emphasize this point, kind of, answering your particular question, Your Honor, is that because performing head orientation determination on a pre-reduced image does not satisfy Claim 4. And I really want to stress that point.

So, even if we have -- sorry. Go ahead, Your Honor. Did you have a question?

JUDGE McMILLIN: Yes. I'm sorry. Thank you.

MS. BAILEY: Please.

JUDGE McMILLIN: I appreciate your watching me. If Tian teaches reducing the resolution and that you can still determine head orientation from those reduced resolution images, is it enough that it contains those two teachings and that the other references, Nielsen-372 and Lu-577, contain teachings regarding obtaining the first and second images?

MS. BAILEY: It is not enough that there is simply use of reduced resolution images in Tian. I'm going to go back to where I was before that it is not enough to meet Claim 4 that Tian uses pre-reduced images. The claim recites a processor perform -- or processor circuitry to do two steps, reduce the resolution prior to head orientation determination, but it has to be done while the image is taken in the media exposure environment and while viewing the media content. If the image is pre-reduced, there is no way for the image to be taken while the user is watching the television.

I also want to hit on something that you said, Your Honor, with respect to where Tian obtains its images, its reduced images from, and there's two buckets of evidence here. The first bucket is the ambiguity of

Explicitly invites employing known head location and face recognition software. That doesn't address the reduction of resolution so that one doesn't get us anywhere.

I mean, I can continue on if you'd like, Your Honor, if this is helpful to you?

JUDGE McMILLIN: Well, let's talk about number two, the explicitly invites employing known head location and face recognition software. If the reference says employing known head location and face recognition software and Tian is a known head location and face recognition software, and I know it isn't it, but if it does talk about how to do a known head location and face recognition system, you know, why doesn't that one count?

MS. BAILEY: Well, two responses to that, Your Honor. First of all, Tian it's only doing facial analysis and the reduction in the resolution is not active. It is looking at already reduced resolution images. So Tian, and I really want the Board to appreciate this if possible. Tian does not say let's reduce the resolution of the images prior to facial analysis. It simply does not teach that. It looks at --

JUDGE McMILLIN: What it says is -- I'm sorry for interrupting you.

MS. BAILEY: No, I'm --

JUDGE McMILLIN: What it says is, A, we analyze reduced resolution images and we were still able to do head location, face location on those reduced images. And again, why aren't those teachings enough?

MS. BAILEY: Because, look, I realize this is not normal oral argument etiquette, but may I ask Your Honor a question back?

JUDGE McMILLIN: Sure, go ahead.

MS. BAILEY: So, would you agree that Tian is not choosing to reduce the resolution of the image as part of performing its facial analysis software? In other words, to get a good result from its facial analysis software?

JUDGE McMILLIN: I don't know. It says you've got an original image and we cut the resolution in half, we cut the resolution in half, we cut the resolution in half, and we cut the resolution in half, and then we look to see whether in that third or fourth cut could we still locate the head? And the answer was yes --

MS. BAILEY: So --

JUDGE McMILLIN: -- 100 percent of the time.

MS. BAILEY: So, what Tian is doing is it's saying it recognizes some images are going to be captured at a lower resolution so they're already captured at a lower resolution these images that Tian --

JUDGE McMILLIN: I'm not sure. I'm not sure I agree with that. It seems to say on page 5 and it seems to be the argument of Petitioner that all the images were 640 by 480 pixel rates.

MS. BAILEY: But Tian -- let's get back to where we started this line of questioning that Lu invites employing known head location and face recognition software. This would be software to perform facial analysis. Tian is not teaching that you would want to intentionally reduce the resolution prior to performing facial analysis. It is an -- go ahead, Judge.

JUDGE McMILLIN: I'm not sure that's true. I think there's a distinction clearly in the challenged patent between doing head location on a reduced resolution image and doing facial recognition on a non-reduced resolution image.

MS. BAILEY: So, let's talk about head orientation determination alone, which is what is recited in Claim 4.

JUDGE McMILLIN: Thank you, yes.

MS. BAILEY: Sure. Tian still is not intentionally reducing the resolution for the purpose of then doing head orientation to determination. Tian is studying what happens when you start out with an image at lower resolution, and I refer to the abstract that talks about images being captured in real environments, images are often at low resolution. It's what I just quoted from the abstract.

Your Honors, if I'm, and I mean this please respectfully, I think you're reading into Tian that it is actively reducing the resolution so that it can then perform facial analysis and that's incorrect. Tian recognizes that in real life instances you're going to start with lower resolution images and so therefore it is an academic paper that studies what that effect would be.

JUDGE McMILLIN: I think, and maybe it's me who has to apologize this time that you're misreading what we took from Tian, and what we took from Tian is it has a teaching of you can reduce the resolution of an image by downsampling. And if you reduce the resolution you can still do head location analysis and it'll work.

MS. BAILEY: Your Honor, you actually just said something in your question that I think is very important. You started out your question saying that Tian obtains images, and that's also in the institution decision and that's the problem. Obtaining reduced resolution images does not satisfy Claim 4 because we do not have anything where we have an active resolution reduction as part of audience measurement while the user is watching television.

Tian does not have the system architecture. I'm sorry, go ahead, Your Honor, please.

JUDGE McMILLIN: We get that from Claims 1, 9, and 16 that, you know, we obtain the image according to the challenged claims; in what's recited in those claims.

MS. BAILEY: Are you reading -- just out of curiosity, Your Honor, Claim 1, the limitation that begins, "Obtain content identifying data." Is that where you read in the obtain images? Then if you're looking at the patent, it's Column 15, Line 22, I think.

JUDGE McMILLIN: And so, if you look at starting at about Line 30, "the sequence of images obtained by a camera while the media content corresponding to the content identifying data is presented by the television."

MS. BAILEY: Okay. So --

JUDGE McMILLIN: That's at least one place it says where that sequence of images is obtained.

MS. BAILEY: That's different than obtaining a reduced resolution image, which is what Your Honors put into the institution decision, which is, respectfully, incorrect. The way that Claims 1 and 4 work together is that this user is -- or someone is sitting on their couch watching television. There's going to be a sequence of images captured, obtained. Then one of those images is going to have the resolution reduced per Claim 4 and then the head orientation determination is done.

But obtaining reduced resolution images from another source is not what is claimed and does not meet the claims.

JUDGE McMILLIN: According to the examples in the patent, at least the way I read it, is you're always obtaining high resolution images. Your

camera obtains high resolution images so the original images that you have are at high resolution and then they reduce the resolution by this pixel binning process.

And so now you've got a reduced resolution image and then you do the head orientation on that reduced resolution image. And so, the images you obtain, like the original image that's disclosed in Tian, is a higher resolution image.

MS. BAILEY: That is not what Tian is doing. Though. Tian at best is obtaining the reduced resolution images from a different source. Even if we were to concede that Tian, which we don't, but let's just assume arguendo that Tian the academic pulls in the original resolution images and then preprocesses all the images to obtain reduced resolution images. That still doesn't satisfy the claim because the images are -- the reduced resolution images are still pre-reduced.

And it doesn't satisfy the claim because the image for which the reduced resolution has to be one of the sequence of images that is taken while the user is watching the television.

And then Claim 5 comes in and says the second image has to have face recognition performed. If you were to preprocess full resolution images into a reduced resolution and then at some time later perform facial analysis on them, you would not be able to satisfy. That system does not satisfy Claims 1 and 4 and 5 collectively.

JUDGE McMILLIN: But if the element we're looking for is reduce a resolution of an image, doesn't Tian teach reduce a resolution of an image?

MS. BAILEY: No. It does not teach active -- I'm so sorry, Your Honor. I --

JUDGE McMILLIN: No, go ahead. I'm sorry.

MS. BAILEY: I thought you were done.

JUDGE McMILLIN: No.

MS. BAILEY: Please continue.

JUDGE McMILLIN: Oh, no, I was done.

MS. BAILEY: I'm sorry. The video makes it difficult. I did not mean to speak over you. No. It is our position that Tian does not teach active reduction as part of the head orientation determination and it certainly wouldn't do it in the combination in the media environment that is claimed.

JUDGE McMILLIN: Okay. I understand your argument. Thanks.

MS. BAILEY: Okay. I see that I'm getting close to my opening time. I do want to move to Claim 5.

JUDGE McMILLIN: Go ahead. You've got a couple minutes left.

MS. BAILEY: Okay. And I may go ahead and move into my rebuttal period, Your Honor, just so that we can discuss Claim 5 real quickly. This is at our DX-18. You can tell that I'm not really following our slides.

So, but I do want to talk about how Tian does not teach Claim 5, and I've got a very strong opinion on this and bear with me while I explain. Tian's tracking method is not the same process as recited in Claim 5. Petitioner argues that because Tian's tracking method has the same result as the claimed invention under certain circumstances then Tian's tracking method teaches Claim 5, but that is incorrect because the claims recite processing steps that are different from Tian.

Claim 5 recites locating a head in a first image. The face recognition is then performed on the second image using the region corresponding to where the head was located in the first image,. So, that means that in the

claimed invention if the head moves between images one and two, the claimed system is not going to accurately determine the face recognition for image two because it's using the same location in image two where the head was recognized in image one.

I just want to pause there, make sure Your Honors are following that because, frankly, it took me a little bit to understand it when I first picked up this patent.

JUDGE McMILLIN: Isn't it true of every system if you locate the head in a first image and then the head moves and then you try to perform facial recognition on where the head was but now it's moved, the head's not there anymore. You can't do facial recognition on it.

MS. BAILEY: But that's not what Tian's doing. Tian doesn't do that. Let me explain what Tian does then. And you said every system, I don't know honestly how to answer that, Your Honors. I only know how to answer it with respect to what the record has, which is Tian and what is being used.

JUDGE McMILLIN: Well, my question was, yeah, that analysis applies to Tian but also doesn't it apply to the claimed system? And so, if in the claimed system you locate a head in the first image and the head's not there for the second image, you can't do facial recognition on it.

MS. BAILEY: Correct. And to be clear, the issue with Claim 5 is not whether the process could or could not be performed but you are exactly right, Your Honor, that in the recited claims if the head moves between frame one and frame two, facial recognition isn't going to be performed.

And that's because the system is for an audience measurement system, is the claims are to an audience measurement system. It's assuming the

person is sitting on their couch and they're not moving a whole lot between frames, kind of, like how I sit on my couch and I'm not moving. So, the system, kind of, assumes that and that's why it's willing to look at where the head was located in frame one because it assumes there's not going to be much movement.

That is not how Tian's tracking method works and this is the big difference and why Claim 5 is not taught by Tian. In Tian, the head location is tracked image to image so the head is going to be located in the image one and then for image two the system is going to start locating the head using the region from image one. But then because it's tracking it's going to see where the head moved between image one and image two.

So if the head went from image one to image two 10 centimeters over in the frame of view, it's going to find where the head is located in image two and do the face recognition for the new location of the head in image two. That is different than Claim 5.

So, what that means in Tian is that if the head does not move between frame one and frame two, then Tian will have the same results as Claim 5. But Tian performs a different process than Claim 5. The Board must give the claimed algorithm of Claim 5 patentable weight. It is legally improper to determine patentability or unpatentability based on Tian's tracking algorithm having the same claim result but via a different algorithm.

We do not grant patents simply because the claimed invention has a different result than the prior art, otherwise all my prosecution clients would love me as soon as I could show that we have a different result because then we could get a patent. But that's not the law.

We also do not invalidate patents simply because the claimed invention has the same result as the prior art under certain circumstances. These are two different algorithms and the different algorithm that's claimed in Claim 5 has to be given patentable weight, Your Honor.

JUDGE McMILLIN: And what specific language in Claim 5 are you referring to?

MS. BAILEY: Yes, Your Honor. It is, give me one second, it is the corresponding to a location of the head in the reduced resolution image which is the first image that we've been talking about. So in Tian, it does not generate the facial signature in the second image corresponding to a location of the head in the first image. It generates the facial signature corresponding to a location of the head in the second image because it tracks the head location frame-to-frame.

Are there any questions, Your Honors?

JUDGE McMILLIN: Well, if the head doesn't move does Tian meet that claim limitation? If the head doesn't move is where it generates the facial signature that region doesn't correspond to location of the head in the reduced resolution image?

MS. BAILEY: Two responses, Your Honor. Claim 5 recites a processor circuitry to do this, so it has to be programmed to perform that. What you just asked, Your Honor, is if Tian has the same result does it meet the claim limitation? And that is legally incorrect, Your Honor.

The question is not whether Tian has the same result if the head moves or not. The question is whether Tian has the same claimed algorithm of a processor circuitry to do that functionality and it does not.

I'm getting low on time. I'd like to bring up a couple of other issues if possible? Okay, great.

JUDGE McMILLIN: Well, it's your time.

MS. BAILEY: Okay. I'm just going to run through analogous art. First of all, they did not -- Petitioner did not present a reasonably pertinent analysis so we're just left with field of endeavor, and this is on our DX-13 by the way, Your Honor.

Petitioner contends that field of endeavor is media analysis. They rely on Dr. Doermann's opinion in Exhibit 1003, paragraph 46. Petitioner never explains why the field of endeavor is media analysis. They just say it.

The field of the '243 patent, however, is audience measurement. Petitioner's rebuttal is to comment on Dr. Saber's credentials, but the expert's credentials don't have anything to do with the analogous art analysis. So, our situation here is we have no showing of why the patent is in the identified field of media analysis. We have no showing of how the reference is in the identified field of media analysis, and we have no showing of analogous art.

Additionally, Dr. Doermann opines that media analysis includes analysis of audio signals and image signals. There's a conjunctive there. Under this definition, Tian also doesn't meet the field because it doesn't address audio signals.

I'm going to move on if there aren't any questions.

JUDGE McMILLIN: Well, what if they're wrong? What if it's not media analysis? Can we make our own determination as to what the field of the patent is and what the analogous art is?

MS. BAILEY: I don't believe at this point at oral argument without allowing the parties to brief on it that the Board has the authority to do that.

JUDGE McMILLIN: Go ahead. Sorry I interrupted you.

MS. BAILEY: No. No, of course, I don't mind whatsoever. Finally, I want to talk about the no motivation to combine of what we, kind of, call the internal embodiments with respect to Lu-577. I find this an interesting academic and legal issue. So, Lu-577 incorporates two -- it actually incorporates a lot of references. The petition's mapping relies on two references. I want to focus on the Lert incorporation.

The Board in their institution decision at page 32 says that they consider Lert in combination with Lu-577 to be a single embodiment. And the reason that we got here, I kind of jumped into this argument, is that the law is very clear that if there is a combination of embodiments within a single reference there needs to be a motivation to combine. There's lots of case law or law on that.

The Board's position in its institution decision was, well, this incorporation by reference is to a single embodiment. So, there actually does not need to be a motivation to combine and said that our position was legally and factually incorrect. And I appreciate where the Board is coming from, but I would like to point out that Lert and the use of Lert actually is a different embodiment.

The petition's mapping for Claim 1 using Lu-577 as a base reference relies on what's called the first embodiment in Lu. Lu names this embodiment first embodiment, second embodiment. And Lu zeroes -- excuse me. Lert is incorporated for the audio content that is in the claims.

## CERTIFICATE OF SERVICE AND FILING

I certify that on August 6, 2025, I electronically filed the foregoing using the Court's CM/ECF filing system. All counsel of record who are deemed to have consented to electronic service, including counsel for appellant, were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e).

I further certify that, upon acceptance and request from the Court, the required paper copies of the foregoing will be deposited with United Parcel Service for delivery to the Clerk, UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT, 717 Madison Place, N.W., Washington, D.C. 20439.

/s/ Clifford T. Brazen
Clifford T. Brazen
ERISE IP, P.A.
7015 College Blvd, Ste. 700
Overland Park, KS 66211
(913) 777-5600
cliff.brazen@eriseip.com
Counsel for Appellant

*Counsel for Appellant*